ROBBINS GELLER RUDMAN
 & DOWD LLP
SPENCER A. BURKHOLZ (147029)
STEVEN W. PEPICH (116086)
ERIC I. NIEHAUS (239023)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
stevep@rgrdlaw.com
eniehaus@rgrdlaw.com
ksciarani@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> STAMPS.COM, INC., et al., <br><br> Defendants. | Case No. 2:19-cv-01828-MWF-SK <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED COMPLAINT <br><br> Date: January 13, 2020 <br> Time: 10:00 a.m. <br> Ctrm: 5A <br> Judge: Hon. Michael W. Fitzgerald |

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  FACTUAL ALLEGATIONS ............................................................... 4

A.   Stamps' Abuse of the Reseller Program Damaged Its Relationship with the USPS ................................................. 4

B.   Defendants Concealed the Truth from Investors ................................. 8

C.   Defendants Finally Revealed the Truth ............................................ 10

III. ARGUMENT ..................................................................................... 12

A.   Standards Governing a Motion to Dismiss Under Rule 12(b)(6) ....... 12

B.   Plaintiff Has Pled with Specificity How and Why Defendants' Statements Were False or Misleading ................................................. 13

1.   Defendants Concealed Stamps' Manipulation and Abuse of the USPS Reseller Program ................................................. 14

2.   Defendants' Statements Were False or Misleading and Material – Not Puffery ................................................................. 15

3.   Former Stamps Employees and Internal Documents Are Reliable and Corroborate Plaintiff's Claims ........................... 17

4.   Stamps' Historical Results and Growth Estimates Were Misleading .................................................................................. 21

5.   Stamps' Reseller Scheme Jeopardized the USPS Relationship ................................................................................. 22

6.   The PSLRA Safe Harbor Does Not Apply to Defendants' Misrepresentations ..................................................................... 23

C.   The Complaint Pleads a Strong Inference of Scienter ....................... 26

1.   Defendants' Public Statements About the Company's Strong Relationship with the USPS and the Reseller Program Supports a Strong Inference of Scienter ................... 27

2.   Stamps Insiders' $230 Million Worth of Insider Trading Further Supports Scienter ........................................................... 29

3.   The Core Operations Doctrine Bolsters Scienter ..................... 32

4.   Former Employee Allegations Support Scienter ....................... 33

5.   Defendants' False Exculpatory Statements Are Additional Indicia of Scienter ................................................... 34

- i -

**Page**

6.      The Abrupt Departure of Stamps' President and Former CFO Further Establishes Scienter ........................................... 36

D.      Loss Causation Is Adequately Alleged ................................................ 36

1.      The February 21, 2019 Corrective Disclosure ......................... 38

2.      The May 9, 2019 Corrective Disclosure ................................... 38

E.      Plaintiff's Section 20A Claim Is Adequately Alleged ........................ 39

IV.   CONCLUSION ................................................................................................. 40

- ii -

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ansell v. Laikin*,
2011 WL 3274019 (C.D. Cal. Aug. 1, 2011) ...................................................... 13

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .................................................... 30

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ...................................................... 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 13

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...................................................................... 20, 25

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) ........................................................................... 20

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ............................................................. 35

*Dobina v. Weatherford Int'l*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012) ............................................................. 35

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ................................................................................... 36, 37

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ........................................................................ 26

*Evanston Police Pension Fund v. McKesson Corp.*,
2019 WL 5587311 (N.D. Cal. Oct. 29, 2019) .............................................. 22, 32

*First Solar, Inc. v. Mineworkers' Pension Scheme*,
No. 18-164, 2019 WL 2153153 (U.S. May 15, 2019) ...................................... 38

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) .................................................... 13

- iii -

**Page**

*Gebhart v. S.E.C.*,
   595 F.3d 1034 (9th Cir. 2010) ................................................................. 26

*Greenstone v. Cambex Corp.*,
   777 F. Supp. 88 (D. Mass. 1991)
   *aff'd*, 975 F.2d 22 (1st Cir. 1992) ........................................................... 22

*Henning v. Orient Paper, Inc.*,
   2011 WL 2909322 (C.D. Cal. July 20, 2011) ......................................... 13

*HsingChing Hsu v. Puma Biotechnology, Inc.*,
   2017 WL 3205774 (C.D. Cal. July 25, 2017) ......................................... 25

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009, 1033 (C.D. Cal. 2008) ................................... 18, 23

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ........................................ 26

*In re Amylin Pharm., Inc., Sec. Litig.*,
   2002 WL 31520051 (S.D. Cal. Oct. 10, 2002) ........................................ 33

*In re Banc of California Sec. Litig.*,
   2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) .......................................... 36

*In re Blue Rhino Corp. Sec. Litig.*,
   2004 WL 5681763 (C.D. Cal. Oct. 7, 2004) ........................................... 19

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ..................................................................... 19

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ................................................................... 22

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) .............................................. 19, 32

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................ 18, 27

- iv -

**Page**

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ................................................................. 12

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ..................................................... 27

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................... 16

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ..................................................... 24

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..................................... 13, 15, 19

*In re QLT Inc. Sec. Litig.*,
312 F. Supp. 2d 526 (S.D.N.Y. 2004) ..................................................... 21

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ................................................... 16, 17, 24

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ........................................... 15

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................... 30

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ....................................... 17

*In re Sofamor Danek Grp., Inc.*,
123 F.3d 394 (6th Cir. 1997) ................................................................... 22

*In re Syncor Int'l Corp. Sec. Litig.*,
239 F. App'x 318 (9th Cir. 2007) ............................................................ 22

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................................... 32

Cases\4834-8967-4668.v1-11/18/19

**Page**

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .................................................................. 13, 40

*In re Verifone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992),
*aff'd*, 11 F.3d 865 (9th Cir. 1993) ................................................................. 22

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) .......................................................... 16

*Johnson v. Aljian*,
394 F. Supp. 2d 1184 (C.D. Cal. 2004),
*aff'd*, 490 F.3d 778 (9th Cir. 2007) ............................................................... 40

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ................................................................. 20, 37

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................... 37, 39

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ................................................................................ 12, 15

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................. 20, 37

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
2008 WL 7084629 (C.D. Cal. July 10, 2008) ................................................... 40

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ......................................................................... 21

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .............................................................. 16

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .......................................................................... 18

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ................................................................... 27, 29

Cases\4834-8967-4668.v1-11/18/19

**Page**

*Okla. Police Pension & Ret. Sys. v. Lifelock, Inc.*,
   780 F. App'x 480 (9th Cir.) ................................................................ 24

*Patel v. Axesstel, Inc.*,
   2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ...................................... 33

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ..................................................... 26, 30

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014),
   *overruled on other grounds by City of Dearborn Heights Act 345*
   *Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ............................................... 19, 26, 29

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018) ............................................ 23

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ........................ 26, 29, 32

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ........................................................... 29

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018) ........................................ 23

*Rudolph v. UTStarcom*,
   2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) .................................. 37

*S. Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ........................................................... 26

*Shaw v. Dig. Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ........................................................... 31

*Shenk v. Karmazin*,
   867 F. Supp. 2d 379 (S.D.N.Y. 2011) .............................................. 29

Cases\4834-8967-4668.v1-11/18/19

**Page**

*Smilovits v. First Solar Inc.*,
119 F. Supp. 3d 978 (D. Ariz. 2015),
*aff'd sub nom.*, *Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ..................................................................*passim*

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009) ..........................................................30, 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ......................................................................... 12, 26, 36

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016)...................................................26

*United States v. Reyes*,
660 F.3d 454 (9th Cir. 2011) .......................................................................35

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
2017 WL 2378369 (C.D. Cal. May 31, 2017)....................................................29

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009).....................................................................19, 29

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b) ...................................................................................... 4, 15, 26, 40
§78t-1(a) .............................................................................................. 4, 39, 40
§78u-4(b)(1)............................................................................................. 13
§78t(a)............................................................................................................. 4

17 C.F.R.
§240.10b5-1(c)(1).......................................................................................... 32
§2401.10b-5(b) ............................................................................................. 15

Federal Rules of Civil Procedure
Rule 12(b)(6) .............................................................................................. 12

Cases\4834-8967-4668.v1-11/18/19

## I.   INTRODUCTION

Throughout the Class Period,[1] defendants made it appear that Stamps' Internet-based mailing and shipping reseller strategy was a huge success, with Stamps posting double-digit compounded annual growth in net revenue and earnings.  Stamps' revenue increased from $128 million in 2013 to $587 million in 2018, a 359% increase.  Stamps' share price responded accordingly, rising from $110 per share at the start of the Class Period to more than $280 per share.

Stamps publicly represented throughout the Class Period that its strong operating performance resulted from the Company's strong partnership with the United States Postal Service ("USPS") – a partnership that accounted for approximately 87% of Stamps' revenue.  The truth, however, was that a significant portion of Stamps' reported revenue and earnings growth during the Class Period was the product of undisclosed, improper and unsustainable business practices – Stamps' manipulation of a USPS reseller program in a manner that was designed to and did effectively cannibalize USPS revenues, costing the USPS an estimated $235 million per year.  Specifically, as set forth in more detail herein, Stamps was secretly transitioning existing USPS customers (without the USPS's consent) to its affiliated resellers and also bundling these small-volume postage customers to get large-volume discounted rates to which the small-volume customers were not entitled and sharing the extra revenue with the reseller.

At the beginning and throughout the Class Period, the USPS had warned Stamps and its affiliated resellers that it would not allow these manipulative reseller practices to continue and they were at risk of losing these contracts.  Defendants

---

[1] This is a securities fraud class action brought on behalf of all persons who purchased the common stock of Stamps.com, Inc. ("Stamps") between May 3, 2017 and May 8, 2019, inclusive (the "Class Period"), against Stamps, its Chief Executive Officer ("CEO") Kenneth McBride ("McBride"), its President and former Chief Financial Officer ("CFO") Kyle Huebner ("Huebner"), and its CFO Jeff Carberry ("Carberry").

- 1 -

ignored these warnings and continued to engage in the improper practices to inflate Stamps' revenue, earnings and stock price. Yet defendants knew it was only a matter of time before Stamps' unauthorized "reselling" of special reduced postage rates would be restricted by the USPS. Armed with this information, McBride, Huebner and Carberry (the "Individual Defendants") and other Stamps insiders rushed to sell hundreds of millions of dollars in Stamps stock at artificially inflated prices of as high as $272 per share. The dramatic stock sales by these Company insiders were both unusual in their amount and suspicious in their timing and were completed without first disclosing the adverse facts regarding Stamps' scheme and wrongful course of business. The Individual Defendants collectively sold over 300,000 of their Stamps shares at artificially inflated prices for proceeds of nearly *$59 million*. In total, Stamps insiders dumped over a million shares of stock during the Class Period for proceeds of more than *$230 million*.

On February 21, 2019, Stamps stunned investors by announcing the end of its exclusive USPS partnership. On Stamps' year-end 2018 conference call held that day, McBride misleadingly represented that it was Stamps that had decided to end the partnership, when in fact it was the USPS that ended the exclusive partnership due to its realization that Stamps had manipulated the reseller program and diverted revenues from the USPS. This dramatic revelation shocked the market, which attempted to process the inexplicable announcement that Stamps was simply walking away from "one of [its] most important business partners," which accounted for a significant portion of its revenue. Stamps disclosed it was reducing its expected FY19 earnings per share ("EPS") from $10.76 per share to $5.63 per share – or by approximately 50%. As a result of this news, the Company's stock price plummeted $114 per share on record trading volume of 13.7 million shares, dropping from $198 per share to close at less than $84 per share on February 22, 2019, a decline of over *57%*.

On May 8, 2019, Stamps again shocked investors, slashing the Company's FY19 profit outlook by up to 46%. Stamps announced that it was lowering earnings

- 2 -

guidance because the USPS had told Stamps that there would be anticipated unfavorable amendments and the termination of certain Negotiated Service Agreements ("NSAs") between the USPS and the Company's affiliated reseller partners – which defendants had known would happen since the start of the Class Period.  The Company stated that it now expected FY19 profits of $3.35-$4.85 per share, down as much as 46% from its prior estimate.  As a result of this news, Stamps' stock price dropped another $46 per share, on record trading volume of 16.8 million shares, to close at under $37 per share on May 9, 2019, a decline of over *56%*.

Loss causation is clearly pled in this case.  In fact, two consecutive 50% slides in Stamps' share price following two consecutive quarterly announcements is extraordinary.  Stamps investors lost *76%* of their investment in only two and a half months as the truth regarding Stamps' deteriorating relationship with the USPS reached the market.  Accordingly, while Company insiders were able to unload over *$230 million* of their own Stamps stock at prices well over $200 per share, Lead Plaintiff Indiana Public Retirement System ("Lead Plaintiff") and other members of the Class who purchased Stamps shares at inflated prices have suffered hundreds of millions of dollars in harm as the truth about, and impact associated with, defendants' misconduct entered the market.

Plaintiff's complaint details how and why defendants' statements about its relationship with the USPS were false and misleading.  Through internal documents and witness accounts, the complaint details how defendants were manipulating the reseller program, and the various ways in which the USPS was communicating its displeasure directly to Stamps executives.  None of these practices was fully disclosed to investors.  Defendants only disclosed the fact that Stamps had a reseller program and that some of the low-volume customers received discounted rates – not that Stamps was working with its affiliated resellers to move existing USPS customers from Stamps to the resellers with NSAs and bundling the low-volume customers to get even better, lower rates at the expense of the USPS.  Falsity and scienter are

- 3 -

Cases\4834-8967-4668.v1-11/18/19

properly pled.  For these reasons, plaintiff's §10(b) and §20(a) claims are sufficiently pled.  And because plaintiff adequately alleges this predicate violation and that McBride traded contemporaneously in the same securities as plaintiff, the §20A claim is also sufficiently alleged. *Infra*, §III.E.  Defendants' Notice of Motion and Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 79) ("Motion" or "Mtn.") should accordingly be denied.

## II.    FACTUAL ALLEGATIONS

### A.    Stamps' Abuse of the Reseller Program Damaged Its Relationship with the USPS

Stamps' operating performance was highly dependent on maintaining and preserving its critical business arrangements with the USPS, which accounted for approximately 87% of Stamps' revenue during the Class Period.  ¶¶3, 114.[2]  Instead of protecting that relationship, Stamps was abusing the USPS's reseller program to directly profit at the USPS's expense.  ¶¶32-33, 43-44.  Stamps' reseller scheme involved concealing its abuse by using subsidiaries and affiliates who had NSAs with the USPS, which provided discounts for large-volume shippers who qualified for lower postage rates.  ¶¶31, 41-43.  The reseller NSAs did not permit bundling small-volume shippers to access discounted rates.  ¶¶6, 30-33.  Nevertheless, Stamps improperly bundled small-volume shippers who were existing USPS customers through Stamps and routed them through the reseller program.  Stamps gave non-qualifying, existing USPS customers slightly discounted shipping rates, while pocketing the difference (*i.e.*, the spread) with the resellers between what these customers paid Stamps for postage and the deeply discounted rates Stamps paid the USPS under reseller NSAs.  ¶¶33, 42-45.

---

[2]    All "¶" and "¶¶" references are to the Consolidated Class Action Complaint for Violations of the Federal Securities Laws, filed August 5, 2019 (ECF No. 71) (the "Complaint").

- 4 -

The following chart shows this manipulative practice, with Stamps routing its own existing customers to a reseller (Express) and sharing the increased revenues with the reseller, and depicting how the USPS ended up with less revenue ($4.90 with Stamps per package vs. $4.00 per package with Stamps using the reseller Express):



Stamps' dramatic earnings growth started in 2014 when it began acquiring companies such as Endicia, ShipWorks, ShippingEasy and ShipStation in order to obtain their customer lists, which included substantial numbers of existing USPS shippers. ¶43. Stamps diverted these existing USPS shippers (without any request or consent) into its reseller scheme. ¶42. While Stamps profited by shifting existing USPS customers to the reseller program, the USPS lost revenue from these shippers who had previously paid higher rates for the very same USPS postage. Stamps' abusive practices are estimated to have contributed to the loss of USPS's revenues of $235 million a year. ¶¶5, 11, 63. While the USPS's revenue increased only 3% between 2013 and 2017, Stamps' revenue grew 266% during that same period. ¶45.

- 5 -

Stamps subverted the reseller program in a manner that simply increased the profitability of Stamps and lowered the USPS's revenue.  ¶¶31-33.[3]

Defendants knew the USPS was fundamentally opposed to this conduct.  In July 2016, the USPS Deputy Director of Office of Accountability and Compliance, publicly expressed the official USPS position that a reseller's NSA would be terminated for cannibalizing existing USPS business.  ¶40.  Yet Stamps continued to engage in these wrongful practices notwithstanding knowledge that they were improper.  A Stamps account manager, employed from February 2017 to September 2018, confirmed that Stamps gave discounted postage rates to customers without the required USPS approval and without their meeting the required volume thresholds – a practice known internally as the Company's "special sauce." ¶¶46-47.  This former employee explained that he was instructed to persuade some 2,000 existing customers to switch to the reseller program.  *Id.*

A Stamps Field Sales Representative who was employed with the Company until May 2019 relayed that the USPS had been upset "for a few years" with Stamps for providing unauthorized discounts to customers.  ¶48.  Another Field Sales Representative who worked at Stamps from March 2014 through October 2018 recounted USPS personnel frequently expressed their displeasure to Stamps sales representatives about providing unauthorized discounts, but Stamps' management instructed employees to continue with business as usual, despite the fact that these practices "didn't go over well" with the USPS.  ¶49. Correspondence from the USPS confirmed that in 2016 the USPS began investigating Stamps' reseller partner IntuiShip and its affiliate Move Method for suspected abuses of the reseller program. ¶¶52-53.  During this period, Stamps received written communication from the USPS

---

[3]  Stamps' conduct also contravened strict guidelines under the Postal Accountability Act of 2006 ("PAEA") relating to who can receive an NSA and under what circumstances it can be used.  ¶¶36-38.  Stamps' practice of surreptitiously and unilaterally converting small volume and existing USPS shippers to unauthorized NSA pricing violated PAEA safeguards and evaded the USPS's control over who should receive NSA pricing.  ¶39.

- 6 -

notifying it that Stamps' reseller partner (IntuiShip and its affiliate Move Method) was at risk of losing its NSA as a result of unauthorized discounts given to existing USPS customers. ¶54.

Further, in August 2017 Stamps received an email from its reseller partner, Parcel Partner, which attached a USPS letter and referred to a similar prior April 2017 communication about the changes the USPS wanted to make to the reseller program to deal with the actual and suspected reseller abuses. ¶58. The communication explained that the USPS was "concerned about short pays and Resellers not having direct relationships with shippers." *Id.*

However, Stamps continued to direct its employees to continue providing customers with unauthorized discounts. ¶¶49, 83(h). To hide this misconduct, Stamps managers instructed account personnel to "keep [the USPS] in the dark" regarding customer discounts that were "not fully authorized by the USPS." ¶50. To help further conceal these conditions from the USPS, Stamps publicly represented that its practices were beneficial to the USPS and that it was not abusing the reseller program. ¶68. One analyst noted, in February 2018, that Stamps had limited its financial reporting by taking a number of steps to "reduce[] the detail of information provided to investors," which had the effect of concealing the fact that it was reaping substantial profits by abusing the reseller program. ¶61.

Defendants also understood that the newly elected presidential administration in 2017 was determined to investigate why the USPS was losing money and to halt abuses of certain USPS contractual arrangements. ¶55. In April 2018, a governmental Task Force was convened in order to study USPS contractual agreements. ¶¶9, 63. This Task Force issued a report in December 2018 that listed "product pricing" among the primary reasons for the deterioration in the USPS's financial condition. *Id.* While this Task Force investigation was ongoing, the USPS reopened contract negotiations with Stamps over their revenue sharing agreement. ¶¶106-107. On February 21, 2019, two months after release of the Task Force report,

- 7 -

Stamps stunned investors by announcing it had lost its exclusive USPS commission-based partnership.  ¶¶10, 108-110.[4]  Shortly thereafter, defendants revealed that the USPS was renegotiating and restricting use of the reseller program in a way that would negatively impact Stamps' revenue.  ¶¶12, 64, 111-113, 127.

### B.      Defendants Concealed the Truth from Investors

Throughout the Class Period, defendants concealed that Stamps was abusing the reseller program in order to secretly skim USPS profits and that the USPS opposed to this misconduct and was actively taking steps to investigate and halt it.  Defendants told investors there were no disagreements or friction with the USPS over Stamps' reseller practices, which purportedly did not conflict with USPS interests.  ¶68 ("We both have the common goal of growing USPS package volume and serving and retaining USPS customers" and "[we] feel that we have created a sustainable win-win model for both of us."); ¶74 ("[w]e continue to enjoy a great partnership with the Postal Service and feel that we have created a sustainable win-win model for both of us"); ¶80 ("[W]e're pleased to see the continued trend on the USPS.  As you know, we succeed when they succeed."); ¶85 ("[W]e continue to focus on how to create value for the USPS, how to help them be successful in the e-commerce package market."); ¶92 ("the general view is the idea of USPS increasingly embracing partnerships like ours makes a ton of sense for them").  Defendant Huebner reiterated this false message, telling investors Stamps had a "win-win partnership" with the USPS where "both sides are succeeding."  ¶75.  These statements were materially false and misleading – Stamps' reseller practices conflicted with the USPS's interests, Stamps was profiting at the USPS's expense and Stamps' conduct was not beneficial to the USPS.  ¶71(b), (f)-(g); ¶77(d)-(e), (g)-(i); ¶83(b), (e), (g), (i); ¶93(d), (f), (i)-(k).

---

[4]   Tellingly, while defendants contend that Stamps wanted to end its exclusivity contract with the USPS (Mtn. at 10-11), Stamps had publicly stated it was happy with that contract a short time earlier.  ¶¶70, 72, 80.

- 8 -

Although the USPS was already taking steps to remedy abuses of the reseller program (¶¶51-59), defendants told investors the USPS was very happy with the arrangements and there was no reason to expect changes. ¶68 ("We continue to enjoy a great partnership with USPS . . . . In particular, the USPS is very happy with the very successful partnership Stamps.com has together with the Postal Service . . . ."); ¶69 ("we don't really expect any material changes to any kind of the underlying economics or the revenue share agreements that we have"); ¶70 ("USPS is very happy with the approach they've taken and business model. They're happy with the relationship with Stamps.com.").[5] Defendant McBride told investors the USPS reseller partnership was growing "stronger and stronger." ¶74.

Based on the purported stable and successful USPS relationship, defendant Carberry told investors: "I think there's lots of opportunity for us to grow in all those different areas, and we feel comfortable with our 20% projection over the next 5 years." ¶76. But the USPS was already taking steps to end Stamps' improper practices, which put the entire relationship with the USPS in jeopardy. Defendants misrepresented the nature of Stamps' results of operations by concealing that they were tainted by Stamps' improper reseller practices. ¶¶66-67, 72-73, 78-79, 81-82, 84-85, 87-88, 90-91.

In April 2017 rumors were circulating that the USPS had sent a letter to resellers notifying them of impending new restrictions to the reseller program that, if the rumors were true, would mean the USPS was taking steps to reign in suspected abuses. In response to an analyst's question about the existence of this rumored April 2017 letter from the USPS to resellers, defendant McBride (during the May 3, 2017 analyst conference call) denied there was any USPS push back on the existing reseller program:

---

[5] Defendants knew the USPS would be very unhappy with their relationship once it discovered and confirmed Stamps' abuses of the reseller program. ¶¶51-57. This is apparently why Stamps instructed its employees to conceal its wrongful conduct from the USPS. ¶50.

There was no letter.  The rumor is false. . . .  We talk to them constantly, to the most senior folks there.  So we're happy and they're happy.  And what the letter information that's been propagated, we believe is part of the strategy with our stock.  So it's not true. ¶70.

This statement was false.  According to an email, Parcel Partners had notified its partners in April 2017, which included ShipWorks (owned by Stamps), that the USPS was actively seeking to restructure the reseller program in order to stop abusive short pays and the improper aggregation of small-volume shippers – all of which were key sources of Stamps' revenue and profits.  ¶¶58-59, 71(d).

By the time the government opened its Task Force investigation into the USPS contractual arrangements in April 2018, defendants had already been aware for at least a year that the USPS was working to tighten and restrict the reseller program. Notwithstanding that knowledge, during an August 8, 2018 analyst conference call, the defendants downplayed the significance of the USPS Task Force investigation by telling investors the Task Force "report will come out strongly in favor of the partnership between the USPS and private industry like the partnerships we've had with the USPS." ¶89.  During an October 31, 2018 analyst conference call, McBride again told investors that Stamps' relationship with the USPS was strong and that the Task Force report would "reflect the very positive effect . . . partnerships like ours have had on growth in the USPS' package volumes."  ¶92.  The USPS reopened contract negotiations with Stamps during this period, but defendants told investors this was purportedly not a cause for concern, but was just part of normal contractual negotiations with the USPS.  ¶¶106-107.

C.    **Defendants Finally Revealed the Truth**

On February 21, 2019, defendants made their first public announcement that caused investors to realize Stamps' relationship with the USPS was broken, rather than strong and mutually beneficial as defendants had claimed, when defendant

- 10 -

McBride unexpectedly announced the shocking news that Stamps had purportedly decided to discontinue its commission-based revenue-sharing partnership with the USPS. ¶¶10, 11, 94-96, 108-113. The market was stunned and investors unnerved as to why Stamps would suddenly and inexplicably walk away from the critical USPS contract, which meant Stamps would lose a quarter of its annual revenue (or approximately $140 million) from the high commission revenue it received from its exclusive USPS contract. ¶124. Defendants had publicly represented just four months before that they were pleased with the 2017 renegotiation of this USPS contract. ¶74. And defendants had also been telling investors throughout the Class Period that their contractual relationship with the USPS was mutually beneficial to both Stamps and the USPS. Moreover, defendants' expressed desire to obtain non-exclusivity as the purported reason for terminating the USPS contract – a contract through which Stamps itself had exclusive access to the USPS – was not believable. Stamps already had non-exclusivity under its various subsidiaries' (ShipStation, ShipWorks, and ShippingEasy) multicarrier shipping platforms. ¶¶10, 108. Further confirming the negative reality that the USPS had terminated the contract (and not vice versa) – defendant Huebner (Stamps' President and former CFO) abruptly resigned on the same day Stamps announced the contract was terminated. ¶¶120, 125. As a result of this news, Stamps' stock price plummeted $114 per share in a single day, closing at just under $84 per share on February 22, 2019 – a decline of over 57%. ¶126. Investor reaction to this unfavorable news is further supported by a February 26, 2019 article in *The American Conservative*, which reported that contrary to defendant McBride's representations that Stamps initiated the dissolution of its USPS partnership, it was actually the USPS that terminated the commission-based contract due to Stamps' abuses of the reseller program. ¶¶11, 123.

On May 8, 2019, Stamps announced that it was further lowering earnings expectations by up to 46% because the USPS was taking steps to tighten and restrict its reseller partners' NSAs – the very same contracts under which Stamps and its

- 11 -

reseller partners had been profitably operating their undisclosed and abusive reseller practices. ¶127. Defendants had known about and anticipated these adverse changes since the start of the Class Period. ¶¶51-59. But when they finally disclosed this information to investors, Stamps' stock price dropped another $46 per share on record trading volume of 16.8 million shares to close at just under $37 per share on May 9, 2019 – a decline of over 56%. ¶128.

Defendants' false and misleading statements had caused Stamps' stock price to trade at artificially inflated prices of over $200 per share during the Class Period. ¶¶13, 121, 130. Both of defendants' stunning public disclosures in February and May 2019 caused Stamps' stock price to twice collapse by more than 50% in the span of less than three months – an unprecedented and huge two-step stock price decline that caused investors to lose 76% of the value of their investments in the space of two-and-a-half months. ¶¶10, 12, 129.

## III.    ARGUMENT

### A.    Standards Governing a Motion to Dismiss Under Rule 12(b)(6)

The Complaint's factual allegations must be taken as true and, together with all plausible inferences, viewed collectively and holistically in determining whether the PSLRA's pleading standards are met. Fed. R. Civ. P. 12(b)(6); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-23 (2007).[6] "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, at the pleading stage, a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*,

---

[6] All citations and footnotes are omitted and emphasis is added unless otherwise noted.

- 12 -

563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### B.  Plaintiff Has Pled with Specificity How and Why Defendants' Statements Were False or Misleading

To adequately plead falsity, "'the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (quoting 15 U.S.C. §78u-4(b)(1)).  Here, the Complaint unambiguously alleges the "who, what, where, how and why" of every material misstatement and omission and identifies the reasons why defendants' statements were false and misleading. *See Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at \*2 (C.D. Cal. July 20, 2011).[7] Specifically, throughout the Class Period, defendants continuously touted the Company's strong partnership with the USPS and strong financial performance, including revenue and earnings growth, while concealing that these financial metrics were the product of an unsustainable and improper reseller scheme to inflate Stamps' financial results at the expense and to the detriment of the USPS. *See* ¶¶66-70, 72-76, 78-82, 84-92.  Indeed, plaintiff listed in detail the many reasons why defendants' statements were false and misleading when made, including the following:

- Stamps engaged in a manipulative reseller scheme to transition existing and unqualified Stamps customers to the reseller program to obtain lower rates reserved for high volume shippers, thereby skimming revenue from

---

[7]  Courts in this district have  repeatedly found this style of pleading permissible and not "puzzle-pleading" as defendants suggest.  *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at \*9 (C.D. Cal. June 9, 2016) (holding that allegations, irrespective of volume, that "contain direct quotations," "highlight in bold and italics the ***particular statements***" alleged to be false and misleading, and in "the succeeding paragraphs [set forth] ***why*** the bolded and italicized statements were false and misleading" are not puzzle pleadings) (emphasis in original); *Ansell v. Laikin*, 2011 WL 3274019, at \*4 (C.D. Cal. Aug. 1, 2011); *In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008) (holding a "long and detailed complaint is not a work of 'puzzle pleading'" as a matter of law").  For the Court's convenience, plaintiff has identified each false statement and why the statement was misleading by reference to paragraphs in the Complaint. *See* Exhibit A, attached hereto.

- 13 -

the USPS, instead of using the reseller program to meet the stated goal of bringing new customers to the USPS (¶71(a), (g)-(h); ¶77(a), (e)-(g), (i); ¶83(b), (f), (h); ¶93(e)-(f), (h), (j));

- Stamps' purported "great partnership with USPS" was unsustainable because the USPS was not "very happy" with Stamps' actions, and prior to and throughout the Class Period, the USPS expressed its displeasure that its existing customers were improperly being provided NSA discounts they did not qualify for, souring the relationship and leading the USPS to threaten to terminate NSAs and implement actual changes to the reseller program if Stamps continued the abusive practices (¶71(b)-(c), (f); ¶77(c)-(e), (g), (i); ¶83(i); ¶93(c)-(d), (g), (k)-(l)); and

- Stamps' strong financial results and growth prospects were entirely dependent on Stamps' abuse of the reseller program (¶71(e), (i); ¶77(b)-(c), (h), (k); ¶83(a), (d); ¶93(a)-(b), (i)).

### 1. Defendants Concealed Stamps' Manipulation and Abuse of the USPS Reseller Program

As described above, defendants failed to disclose that Stamps was engaged in a deceptive and unsustainable reseller scheme to artificially inflate the Company's revenues and profits. Yet defendants contend they "fully" disclosed the true nature of Stamps' reseller practices in public filings. Mtn. at 16-17. However, the disclosures were clearly not complete. Defendants only disclosed the fact that Stamps had a reseller program and that some low-volume customers got discounted rates. What defendants failed to disclose was that Stamps was secretly transitioning existing Stamps low-volume customers (who did not qualify for *even lower rates*) to their affiliated resellers who had NSAs, and also worked with the resellers to bundle those customers to get even lower rates from the USPS that were reserved for high-volume shippers. The USPS never gave its approval to this process. ¶¶5-6, 29, 43-44, 46, 48-60. The resellers were supposed to bring new customers to the USPS, not use existing

- 14 -

Stamps customers with the USPS and circumvent the terms of the NSAs and share the illicit profits with Stamps. This practice was never disclosed by Stamps in any public filing or statement. Defendants also did not disclose in any of these public filings that the USPS had become aware of some of these practices and was investigating their impropriety and threatening to change or terminate the reseller NSAs that Stamps was using to manipulate the program. Unsurprisingly, the USPS took offense to Stamps' abuse of the reseller program because it did not receive what it was promised when entering into these agreements – the acquisition of new customers. ¶¶40, 48-50, 52-54, 58.[8]

### 2. Defendants' Statements Were False or Misleading and Material – Not Puffery

By choosing to speak and characterizing Stamps' partnership with the USPS as "sustainable" and "strong" and claiming that the "most senior folks" at the "USPS [are] very happy with relationship with Stamps" and thus investors should not "expect any material changes to any kind of the underlying economics or the revenue share agreements" (¶¶68-70), defendants triggered a legal duty to disclose all material information necessary to make the "'statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (citing 17 C.F.R. §2401.10b-5(b)) (adding "companies can control what they have to disclose [under §10(b) and Rule 10b-5] by controlling what they say to the market"); *see also In re Questcor Sec. Litig.*, 2013 WL 5486762, at *11 (C.D. Cal. Oct. 1, 2013) (Section 10(b) "forbids omissions of 'material fact[s] necessary in order to make the statements made . . . not misleading.'"). Defendants' continuous Class

---

[8] While defendants criticize plaintiff's reliance on shortseller reports (Mtn. at 12, 34), they also claim shortseller reports in 2016 fully disclosed Stamps' misconduct without pointing to what the reports disclosed or even citing to them. Mtn. at 17 n.2. Defendants cannot have it both ways. In fact, defendants' own false statements denied the facts stated in these reports, including defendant McBride's denial on the May 2017 conference call that the shortseller information was correct. *See, e.g.*, ¶70. At a minimum, it is a factual dispute that is inappropriate to resolve on a motion to dismiss. *Id.*

- 15 -

Cases\4834-8967-4668.v1-11/18/19

Period statements concerning the "strength" of Stamps' USPS partnership required them to disclose material adverse information about that relationship, yet they failed to do so. *See* ¶¶71, 77, 83, 93.

Unable to deny that plaintiff alleged facts demonstrating the USPS's ongoing dissatisfaction with its fraying relationship with Stamps (¶¶40, 48-50, 52-54, 58), defendants assert that certain positive statements about Stamps' relationship with the USPS, "one of [its] most important business partners," which accounted for 87% of Stamps' revenue (¶¶40, 48-50, 52-54, 58, 68), are somehow immaterial "puffery." Mtn. at 17-18. As a general matter, "the line between puffery and a misleading statement is often indistinct, and requires an analysis of the context in which the statements were made." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017). Accordingly, "determining whether a given statement is material [*i.e.*, not puffery] 'entail[s] fact-intensive assessments that are more properly left to the jury.'" *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). A statement can only be characterized as puffery if it is "'so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information.'" *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008). "'[G]eneral statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

Defendants' statements regarding Stamps' relationship with the USPS were not "puffery." They were not "so exaggerated or vague" that no reasonable investor would rely on them when considering the total mix of available information. Rather, defendants made affirmative misrepresentations that succinctly summarized the factual background of their interactions with the USPS, and therefore can be objectively deemed false. For example, defendant McBride intended his statement

- 16 -

that the "USPS is very happy with the successful partnership Stamps.com has together with the Postal Service" to convey an objective view of the relationship because it was "***based on very recent ongoing conversations we have [had] with the most senior executive there.***" ¶68; *see also* ¶70 ("They're very happy . . . . We talk to them constantly."). The contents of those discussions with USPS executives are objectively verifiable descriptions that cannot properly be categorized as puffery. *Quality Sys.*, 865 F.3d at 1143 (finding statements such as "categories one and two are strong" to be material).

In sum, defendants' statements concerning the status of Stamps' most important partnership are material facts that cannot be considered puffery. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) ("when the statements are 'made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material'").

### 3. Former Stamps Employees and Internal Documents Are Reliable and Corroborate Plaintiff's Claims

Defendants' contention that plaintiff's allegations are unreliable because they are based in part on information from ex-employees is without merit. *See* Mtn. at 20-22. The witness statements, internal documents, and contextual allegations all corroborate each other to support the well-founded conclusion that Stamps abused the reseller program and directly harmed the USPS's financial interests, causing the USPS to oppose and restrict these wrongful practices.[9] Defendants do not dispute the

---

[9] *See* ¶40 (USPS spokespersons expressly stated this conduct was prohibited); ¶¶51-54 (internal documents reflect that the USPS threatened Stamps' reseller partners with contract termination for engaging in such cannibalization of USPS business); ¶58 (the notice from Stamps' reseller partner demonstrates that Stamps was a party to their joint conduct, which the USPS was going to halt and change); ¶¶122-130 (at the end of the Class Period, defendants disclosed the USPS intended to restrict the reseller program), ¶¶46-50 (former Stamps employees only serve to corroborate these allegations concerning Stamps' prohibited practices).

- 17 -

reseller program was intended to expand USPS business. But Stamps' misuse of that program cannibalized existing USPS customers, which clearly thwarted this goal.

Defendants fault plaintiff (without citation to any authority) for not naming "who made these statements" or quoting "what exactly [was] said." Mtn. at 21. But plaintiffs "need not name their sources as long as [other facts] provide an adequate basis for believing that the defendants' statements were false." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *accord In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005*)* (explaining that allegations should include "'adequate corroborating details'").

Courts regularly find former employee accounts reliable based on details similar to those plaintiff provides here. For example, in *In re Amgen Inc. Sec. Litig.*, the court credited confidential witness accounts because the "[c]omplaint designates the confidential witnesses' job titles and the region in which they worked, and sets forth in 'convincing detail' the information these informants have obtained." 544 F. Supp. 2d 1009, 1033 (C.D. Cal. 2008). The court further held that "the absence of their names does not invalidate the strong inference derived from the informants' assertions." *Id.* This is exactly what plaintiff has done here. First, plaintiff identifies each former employee by title, time of employment and region of responsibility. *E.g.*, ¶46 (Account Manager from February 2017 to September 2018 in Mountain View, CA); *see also* ¶¶48-50. Second, each detailed account of the information they possessed is directly attributed to a witness. ¶¶46-50. For example, a former Stamps Accounts Manager confirmed that Stamps gave discounts to customers even though they were not fully authorized by the USPS to receive those discounts. ¶50. The former employee had sufficient basis to determine that such activity was wrongful because his/her managers wanted the USPS to be kept in the dark about the improper conduct, as such a disclosure could lead to reprisals from the USPS. *Id.* These allegations sufficiently establish the witness' reliability. Moreover, these allegations

- 18 -

should be fully credited because the former employee's statements are corroborated by other sources. *New Century*, 588 F. Supp. 2d at 1225.

Defendants similarly request that the Court disregard the August 2017 USPS letter Stamps received from its reseller partner, Parcel Partners, via email, that further corroborates the former employees' statements that the USPS was unhappy with Stamps' involvement in the abuse of the reseller program. Mtn. at 21-22. Defendants demand to know the author of the document, the list of all person(s) at Stamps that reviewed it, and the contents of an attachment referenced in the letter. *Id.* But in *In re Blue Rhino Corp. Sec. Litig.*, cited by defendants, the Court only required such precise detail for documents containing an "alleged false or misleading statement." 2004 WL 5681763, at *10 n.12 (C.D. Cal. Oct. 7, 2004). Here, plaintiff does not assert that the letter contained any of defendants' false and misleading statements. Instead, the Court may use these internal documents (along with public sources cited in the Complaint) to corroborate the confidential witnesses' statements and plaintiff's allegations. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008); *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (finding falsity established through contradictory internal documents), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). In any event, plaintiff describes the email by date (August 2017), sender (Parcel Partners) and addressee/recipient (Stamps), and quotes it verbatim extensively in the Complaint, including its reference to the attached USPS letter and that Parcel Partners had communicated the very same issues in April 2017 to its partners – including Stamps and its subsidiaries, including ShipWorks. ¶58.

Defendants also assert that portions of the former employee accounts, as a matter of law, should be disregarded as hearsay. Mtn. at 21. But "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002); *accord Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n. 4 (9th Cir. 2009). Instead, courts "examine a

- 19 -

confidential witness's hearsay account to determine if it is "'sufficiently reliable, plausible, or coherent.'"" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016). As discussed above, the former employees' accounts are consistent with each other and corroborated by other sources in plaintiff's allegations, which as a whole establishes that the former employees' accounts are reliable.

Defendants further argue that even if the Court credits allegations attributed to former Stamps employees – which it should – those statements illustrate inactionable differences in opinion between those employees and Stamps' senior executives. Mtn. at 22. Contrary to defendants' arguments, plaintiff's allegations relating to former employees' factual observations do not concern matters of opinion.[10] These former employees recount their participation in Stamps' business conduct and the USPS's expressed reaction to those objectionable practices.[11]

Indeed, weighing perceived differences of opinion is a fact determination that is inappropriate to resolve on a motion to dismiss. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (noting defendants' proffered evidence

---

[10] Here, the former employees' first-hand accounts are unlike the complicated assessments in the cases cited by defendants, where the inactionable differences in opinion between employees and the senior executives were interpretations of complex accounting rules with respect to revenue recognition or the interpretation of clinical trial data. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068-69 (9th Cir. 2008); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014).

[11] Raising factual disputes concerning the USPS's position on Stamps' abusive practices, defendants reference an August 1, 2017 Stamps-published transcript entitled "A Stamps.com interview series with leaders in the online retail industry," which purports to memorialize an interview with Jim Cochrane, Chief Customer and Marketing Officer and Executive Vice President at USPS. During the interview, Mr. Cochrane stated that the authorized use of NSAs "allows [the USPS] to compete better for the larger shippers," and noted that NSAs and the reseller program were intended to go after new business. Contrary to defendants' assertions (Mtn. at 22-23), Mr. Cochrane did not specifically address whether Stamps was misusing the reseller program or whether the USPS was satisfied with the exclusive partnership it had with Stamps. Indeed, Mr. Cochrane's interview was subsequently brought to the attention of the USPS, and on August 8, 2017, Michael Elston, Ethics Liaison at the USPS, sent an email to Jessica Brewster-Johnson, Senior Ethics Counsel of the USPS, discussing Mr. Cochrane's August 1 interview and specifically his discussion of the reseller program. Less than five months later, Mr. Cochrane departed from his post at the USPS and became an independent industry consultant.

- 20 -

Cases\4834-8967-4668.v1-11/18/19

contradicted plaintiffs' but concluding that "plaintiffs' confidential witnesses suggest otherwise, so these disputes must at least await discovery"); *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 535 (S.D.N.Y. 2004). Nonetheless, the former employees' views are corroborated throughout the Complaint by a variety of sources. *See*, ¶¶40, 52-54, 58.

### 4. Stamps' Historical Results and Growth Estimates Were Misleading

As discussed above, defendants repeatedly attributed the source of Stamps' "strong performance in [its] financial and customer metrics" and future expected earnings growth to the "great partnership with USPS" based on a "sustainable win-win model" that "is continuing to be stronger and stronger." ¶¶66, 68, 74, 78. These statements were misleading because defendants failed to disclose that Stamps' soon-to-be-curtailed abuse of the USPS reseller program would eliminate its ability to siphon revenues from the USPS. ¶5. With the USPS's investigation already underway by the start of the Class Period, Stamps' revenue and profits resulting from its undisclosed improper practices were not sustainable. ¶¶59-60. Accordingly, these financial results, consisting of a significant albeit unsustainable revenue contribution, presented a false and misleading portrait of the source of Stamps' revenue growth and future prospects.

Yet defendants argue that Stamps' statements about its past and future performance cannot be misleading. Mtn. at 23-25. But they ignore that even statements which are accurate on their face "'"can become, through their context and manner of presentation, devices which mislead investors."'" *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). "'"For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."'" *Id.* at 887. When a company makes public statements touting the explanation for, and sources of its financial success, as plaintiff has alleged here (¶¶72, 76, 78, 81, 87, 90), it has a duty

- 21 -

to ensure that those statements are accurate and complete. *Evanston Police Pension Fund v. McKesson Corp.*, 2019 WL 5587311, at \*10 (N.D. Cal. Oct. 29, 2019) ("[E]xplanations for financial statements may be misleading if they put the source of illegal revenue at issue without disclosing the illegality.") (citing *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007).[12]

### 5. Stamps' Reseller Scheme Jeopardized the USPS Relationship

Defendants improperly contest plaintiff's allegations by arguing that Stamps itself was not directly accused of breaching any contract or violating USPS governance. Mtn. at 19. But such action is not required. Plaintiff alleges that defendants failed to disclose *any* information about Stamps' reseller scheme, whether it was accused of a breach of contract or not, as it was this undisclosed conduct that rendered their statements false or misleading. The issue of who had the NSA and whether it was technically breached is also a red herring, because either way defendants knew the USPS was opposed to such manipulation of the reseller discounts and was already taking steps to further restrict NSAs to prevent these abuses. ¶¶5, 29-30, 43, 55-60. Yet defendants told investors the USPS was very happy with the

[12] Defendants assert that *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997) and *Greenstone v. Cambex Corp.*, 777 F. Supp. 88 (D. Mass. 1991) *aff'd*, 975 F.2d 22 (1st Cir. 1992), relieve them of the obligation to identify that Stamps' results were the result of wrongdoing. But these cases merely stand for the unremarkable proposition that quantitatively accurate financial statements themselves cannot be alleged to be false. *Sofamor*, 123 F.3d at 401. Unlike what Stamps knew about the USPS's plans to shut down those practices and the significant loss of revenue those changes entailed, in *Sofamor*, "no regulatory action was initiated" nor predicted by the company to suggest its wrongdoing would have a material effect on the company's results. 123 F.3d at 402. Similarly, defendants' citations to *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991) and *In re Verifone Sec. Litig.*, 784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993), stand for the proposition that there is no independent duty to disclose predictions of future results. Mtn. at 24. Unlike here, where Stamps' "first quarter performance[] led [Stamps] to increase [its] guidance for 2017" (¶66; *see also* ¶¶72, 76) and thus put the source of its wrongfully obtained revenue at issue, "no projections were made" by Verifone to give it a duty to disclose adverse information. *Verifone*, 784 F. Supp. at 1484. In *Convergent*, there was no need to disclose softening demand because the "market clearly knew demand for [the company's product] would decrease," unlike investors here, who were kept completely in the dark about Stamps' abusive practices. *Convergent*, 948 F.2d at 513.

- 22 -

existing arrangements and was not taking steps to restrict what they said were mutually beneficial practices. ¶¶69, 73.

Finally, defendants misstate the law when arguing Stamps had no duty "'to accuse itself of wrongdoing.'" Mtn. at 20. "Once [d]efendants[] chose to speak about" an issue, they are required to do so with a reasonable basis for their statements, and "they could not 'omit material facts related to that issue so as to make the disclosure misleading.'" *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018); *Amgen*, 544 F. Supp. 2d at 1030-31 (rejecting defendants' argument that "they . . . believed it was premature" to disclose an "interim" report because the misrepresentation and omission of material facts "'create[d] an impression of a state of affairs which differ[ed] in a material way from the one that actually exist[ed]'"). Given defendants' constant boasting about the strength and persistence of Stamps' relationship with the USPS, they were required to disclose that Stamps' abusive conduct was damaging this relationship in order to make those statements not misleading. *See City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1042 (N.D. Cal. 2018) (statements that the defendant company was "performing well in the market despite inventory shortages, customer complaints, and canceled orders" . . . created an 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]'").

### 6. The PSLRA Safe Harbor Does Not Apply to Defendants' Misrepresentations

The vast majority of defendants' alleged misstatements concern matters of historical fact. These statements are not subject to the PSLRA safe harbor protection, which only applies to forward-looking statements. For instance, defendants concealed Stamps' ongoing abuses of the reseller program, misrepresented the ***current*** status of Stamps' relationship with the USPS, falsely denied the USPS had begun to take steps to restrict the reseller program, and hid the fact that Stamps' historically reported earnings were tainted by these abuses. None of these misstatements is forward

- 23 -

looking, as each concerns existing and/or historical events. Accordingly, they are not subject to dismissal under the safe harbor.

Defendants argue their false and misleading statements with respect to Stamps' future growth prospects are covered by the safe harbor provisions of the PSLRA. Mtn. at 25. However, a statement about future conditions is not protected where defendants "make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1142. Here, defendants combined Stamps' historical growth trends with future projections when representing that prior growth trends would continue into the future. Because the historical growth trends were illusory and tainted due to the undisclosed and abusive business practices, defendants' related statements about future growth were equally misleading for these same reasons. Defendants' growth projections also concealed that continued growth was unsustainable, since, as defendants were aware by no later than April 2017, the USPS had already begun to implement steps that would prevent Stamps from skimming USPS revenue through abusive and concealed reseller practices.[13]

Defendants provided no warnings about Stamps' improper conduct, nor that USPS representatives had made clear that USPS *would* terminate agreements if Stamps or one of its reseller partners were found to be cannibalizing USPS business and, prior to the Class Period, informed its reseller partners it would make changes to

---

[13] Even if defendants' statements about continued growth could be viewed as purely forward looking, they would not qualify for safe harbor protection because the purported warnings were not meaningful. *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 817 (C.D. Cal. 2011) (holding that "boilerplate language concerning the risks inherent in [an agency approval] process" is not meaningful because it did not "address misstatements concerning . . . past communications with the [agency]"). This is particularly true, where, as here, defendants made specific and highly detailed misstatements that could not be counterbalanced by any broad, vague and generally applicable warnings. *See Okla. Police Pension & Ret. Sys. v. Lifelock, Inc.*, 780 F. App'x 480, 484 (9th Cir.) (requiring that disclosures "'counterbalance [the] misleading impression created by [the initial misrepresentations]'"). These purported warnings were the opposite of a meaningful warning, because they concealed that Stamps was abusing the reseller program, that the USPS opposed Stamps' practices, and that the USPS was already taking steps designed to halt these abuses.

- 24 -

restrict the practice. *See* ¶¶40, 58. Defendants contend they warned that operating results could be negatively impacted "[i]f the USPS decides to withdraw certain discounts" and that there was "no assurance that our integration partners will continue to have access to such discounts." Mtn. at 26. These purported warnings told investors there was only a future risk of these adverse events occurring, when these conditions **had already occurred** by the start of the Class Period. *Berson*, 527 F.3d at 987 (noting that orders "***might*** be issued is quite different from knowing they were in fact issued") (emphasis in original). The purported warnings reinforced the alleged misrepresentations, because they perpetuated defendants' affirmatively false statements that the USPS was currently happy with, and not taking action that would restrict, the reseller program. *HsingChing Hsu v. Puma Biotechnology, Inc.*, 2017 WL 3205774, at *4 (C.D. Cal. July 25, 2017) (finding cautionary language cannot be meaningful when "such language would itself be 'misleading in light of historical fact[s]'").

Defendants also try to point to public statements that Stamps could compete with the USPS's service offerings, but this did not disclose Stamps' misuse of the terms and intent of the reseller program. Mtn. at 26. Instead, defendants expressly told investors that Stamps' relationship with the USPS was a cooperative "win-win model for both of us." ¶68. Finally, defendants argue that their August 2018 disclosure of a renegotiation notice from the USPS revealed "a risk that renegotiation is unsuccessful." Mtn. at 26-27. But defendant McBride told investors there was no reason for concern over this purportedly routine contract renegotiation, thereby continuing to conceal Stamps' wrongful conduct, which the USPS was about to end. ¶107. This purported disclosure did not begin to alert investors to Stamps' abusive practices nor to the fact that the USPS was investigating and pushing back in a way that threatened their relationship.

- 25 -

Cases\4834-8967-4668.v1-11/18/19

## C. The Complaint Pleads a Strong Inference of Scienter

As this Court has previously noted that, in order to sufficiently plead scienter, "'a complaint must allege that the defendant [] made false or misleading statements either intentionally or with deliberate recklessness.'" *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at \*11 (C.D. Cal. Feb. 27, 2015) (alterations in original). This §10(b) element can be pled either through direct or circumstantial evidence. *See Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010) (citing *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996)). A defendant is reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese*, 747 F.3d at 569. This is especially true "'where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.'" *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*13 (C.D. Cal. Apr. 12, 2016) (quoting *Reese*, 747 F.3d at 576).

"There is no bright-line rule" regarding when "an inference of deliberate recklessness is ***sufficiently*** strong." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original). And "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). An inference of scienter is "strong" when it is "cogent and ***at least as compelling as any opposing inference*** one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Under this standard, a "'***tie goes to the Plaintiff***.'" *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at \*8 (C.D. Cal. Aug. 4, 2014). The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Further, in making its scienter determination, a court must review "all the allegations holistically." *Id*. at 326.

- 26 -

Courts routinely find a strong inference of scienter where, as here, defendants omit material negative information that they knew, or should have known, rendered favorable statements misleading. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *see also Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 1000 (D. Ariz. 2015) (analyzing falsity and scienter together, because "[t]hese elements are closely intertwined and dependent upon similar facts"), *aff'd sub nom.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018). Knowledge of facts suggesting that statements were "'inaccurate or misleadingly incomplete'" is "'classic evidence of scienter.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005).

**1.      Defendants' Public Statements About the Company's Strong Relationship with the USPS and the Reseller Program Supports a Strong Inference of Scienter**

The Ninth Circuit has held that "specific admissions from top executives that they are involved in every detail of the company" and had access to information contradicting their public statements "are factors in favor of inferring scienter." *Daou*, 411 F.3d at 1022. Here, defendants regularly promoted their personal awareness of, responsibility for, and involvement in, the Company's contractual relationships with the USPS, including the use of the USPS's reseller program. *See, e.g.*, ¶¶61, 74, 89, 92, 104, 106-108.

In addition to concealing its illicit business practices from investors, throughout the Class Period Stamps repeatedly dispelled investor concerns regarding the reseller program by claiming that the program was beneficial to and, in fact, a major asset of the USPS. For example, in August 2017, shortly after questions surfaced regarding Stamps' role in the USPS reseller program, defendant McBride repudiated any suggestion of tension between Stamps and the USPS, assuring investors that, based on first-hand knowledge of "very recent ongoing conversations we have with the most senior executive" at the USPS, "[w]e continue to enjoy a great partnership with the

- 27 -

Cases\4834-8967-4668.v1-11/18/19

USPS and feel that we have created a sustainable win-win model for both of us." ¶68. Stamps repeatedly concealed the existing strain in its relationship with the USPS while touting the purported strength of its ties to the agency. Likewise, on August 8, 2018, Stamps revealed in a quarterly Form 10-Q filing with the SEC that the USPS had approached the Company to discuss renegotiating their arrangement. This decision by the USPS occurred during the same quarter (the second quarter of 2018) in which the federal Task Force had launched its investigation of the USPS's long-term financial viability. It also followed growing concerns among investors and analysts regarding the propriety of Stamps' reseller relationships.

Nevertheless, during an investor conference call, defendant McBride downplayed the significance of the negotiations: "These types of negotiations are very common for us. . . . In general, we expect that updates to our agreements with the USPS will continue to reflect the critical role that we play in their e-commerce package business, including that we have the largest private sales force focused on driving USPS growth." ¶92. When pressed by an analyst to provide more clarity, McBride again claimed the negotiations reflected no change to prior practice, stating: "[L]ike I mentioned in the prepared remarks, these types of agreements, these types of negotiations are very common for us. We've had – over the span of 20 years, we've had dozens of these types of negotiations." ¶107. McBride, however, knew that conditions had changed and that the USPS was no longer willing to accept the status quo.

Indeed, based on their communications with the USPS and with Stamps' reseller partners, defendants were well aware by the start of the Class Period that the USPS was in the process of tightening and restricting abuses in the reseller program, thereby allowing the USPS to monitor, police and stop the abuses that were resulting from Stamps' improper scheme of converting low-volume existing USPS customers to its reseller program. Thus, rather than some routine business discussion, defendants knew that the USPS was on the brink of severing its relationship with the Company and restructuring its reseller program.

Cases\4834-8967-4668.v1-11/18/19

Given that the Company was engaged in a reseller scheme throughout the Class Period, the only plausible inference is that defendants knowingly lied about the source of Stamps' success, or attributed that success to specific (legitimate) sources without bothering to check where the Company's profits actually came from. The Complaint establishes the former, but either way, defendants acted with scienter. *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *16 (C.D. Cal. May 31, 2017) ("Falsity itself can be indicative of scienter when allegations as to falsity are 'combined with "allegations regarding a management's role in the company" that are "particular and suggest that the defendant had actual access to the disputed information."'") (quoting *Zucco*, 552 F.3d at 1000). Pragmatically, either defendants knew the true facts and lied or they recklessly failed to obtain "reasonably available data" that concerned "the heart of their companies' businesses." *Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387 (S.D.N.Y. 2011). In short, defendants' proposed competing inference that defendants were ***not*** aware of Stamps' illicit reseller scheme (and the inevitable consequences of the scheme to Stamps' business relationship with the USPS) "is directly contradicted by the fact that [they] specifically addressed [the ongoing contractual negotiations with the USPS] in [their] statement[s]." *Reese*, 747 F.3d at 572; *see also OSI*, 2015 WL 1985562, at *12 ("[A]n inference of scienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements.").

### 2. Stamps Insiders' $230 Million Worth of Insider Trading Further Supports Scienter

Defendants' and other Stamps insiders' unusual and suspicious stock sales for proceeds of over ***$230 million*** during the Class Period bolster the strong inference of scienter. *See Oracle*, 380 F.3d at 1232. Insider stock sales give rise to an inference of scienter when they are "'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). To determine whether sales are

- 29 -

suspicious, courts examine: "(1) the amount and percentage of shares sold [by insiders]; (2) the timing of the sales; and (3) the consistency of the sales with prior trading history." *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1192 (D. Nev. 2009).

***First***, during the Class Period, defendants McBride, Huebner and Carberry collectively sold over 302,000 of their Stamps shares (or 58%, 83% and 47%, respectively) at artificially inflated prices for proceeds of nearly $59 million.  ¶¶7, 98.[14]  Courts have found a strong inference of scienter where total sales percentages were much smaller.  *See, e.g.*, *Provenz*, 102 F.3d at 1491 (20%); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14-*15 (C.D. Cal. July 1, 2008) (7%); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (7.6%); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *19 (N.D. Cal. Nov. 27, 2018) (20%).

***Second***, the insider sales were also suspicious in timing.  As demonstrated above, the sales were predominantly made between August 2017 and June 2018, just after President Trump took office and subsequently announced his intent to eliminate business practices detrimental to the USPS.  The majority of the sales were also made at times when the stock was trading at around $200 per share, as defendants were materially inflating the Company's revenues through their reseller scheme. Indeed, defendant Carberry sold his shares (for over $13 million in proceeds) at prices at on near a 52-week trading high for Stamps stock.  The suspiciousness of the insider stock sales and their proximity to the Company's concurrent stock repurchases (*see* ¶¶102-103) raise a strong inference that these insiders were aware of the unsustainability of Stamps' reseller scheme when they sold their shares and used that information in connection with the sales to avoid the significant losses in share value that would

[14]  *See also* Insider Sales for Buerba (99.85%), Biswas (99.8%), Khechfe (99%), Lipson (98%), Miller (93%), Bortnak (86%), Weisberg (61%), Clem (52%), Jones (35%), and Ananda (14%).  ¶98.

- 30 -

follow from the impending collapse of Stamps' key source of revenue and profits.

***Third***, the sales were not consistent with the insiders' prior trading histories. During the two years prior to the Class Period, these same Company insiders sold only 447,568 shares of their Stamps stock, for proceeds of only $50 million compared to $230 million during the Class Period. Notably, as defendants concede, CEO McBride sold only 85,000 shares for $10.7 million in proceeds in the prior two years – compared to his Class Period sales of 190,000 shares (which equated to 58% of his total holdings) for proceeds of more than $35 million. Moreover, there were ***no reported sales*** for seven of the thirteen Company insiders (Ananda, Biswas, Buerba, defendant Carberry, Khechfe, Lipson and Miller) during this time period. The significantly smaller number of pre-Class Period sales by such a broad swath of Company insiders highlights the suspicious nature of their Class Period insider sales.

Defendants argue that plaintiff has manipulated the start of the Class Period to manufacture this stock sales analysis and that it should start in April 2018, when President Trump signed the executive order forming the Task Force. Mtn. at 29. Defendants' argument is completely without merit. The Complaint properly alleges a Class Period starting on May 3, 2017, with factual allegations showing defendants were on notice at that time that the USPS was investigating manipulations of the reseller process involving Stamps and other resellers and informing the participants, including Stamps and its subsidiaries. ¶58 (Stamps informed that the "USPS Reseller Model would be changing" in April 2017); ¶¶52-54 (Stamps notified in 2016 that partner IntuiShip and Move Method were warned by USPS). Defendants' argument that plaintiff may not allege the stock sales of non-defendants who are either senior executives or board members is also without merit. *See, e.g., Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) (insider sales by non-defendants, "inasmuch as they are at least consistent with [plaintiffs'] theory of fraud, provide some support against the defendants' motion to dismiss"). Additionally, Stamps' use of a stock repurchase plan to inflate its stock price while defendants sold stock is a proper indicia

- 31 -

of scienter. *Countrywide*, 588 F. Supp. 2d at 1187-88 (finding that the approval of a stock repurchase plan while insiders liquidated their holdings was "economically suspect" and "contribute[s] to a strong inference of scienter").

Finally, Defendants' argument that a certain portion of their sales occurred pursuant to a 10b5-1 trading plan (Mtn. at 30-31) is unavailing and improper at this stage. The existence of a trading plan is an affirmative defense that is inappropriate to adjudicate at the pleading stage. *See* 17 C.F.R. §240.10b5-1(c)(1). Such a defense "'requires an additional factual finding of good faith,'" and the Court cannot "'make such factual findings when considering a motion to dismiss'" because it must "'draw all inferences in favor of the non-moving party.'" *Shuffle Master*, 615 F. Supp. 2d at 1193; *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[A]lthough evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *McKesson*, 2019 WL 5587311, at *14 n.3 ("[A]t this stage of the litigation the Court will not accept [a Rule 10b5-1 plan] as proof of the disputable conclusion that they rule out the possibility of trading based on nonpublic material information.").

### 3.  The Core Operations Doctrine Bolsters Scienter

In addition to alleging direct knowledge, the Complaint also alleges that the Individual Defendants had ready access to adverse facts due to their positions as CEO and CFO and their involvement in Stamps' core business. ¶¶114-116. "[W]hen allegations pertain to a company's core operations, the Ninth Circuit permits an inference of scienter." *OSI*, 2015 WL 1985562, at *12. Here, Stamps has only one core operation: "Internet-based mailing and shipping solutions to customers in the United States and Europe." ¶2. It would be absurd that the CEO and CFO of the Company would be unaware of the business relationship with its *largest* mailing and shipping client. Postage and shipping transactions with the USPS accounted for

- 32 -

approximately **87%** of Stamps' Class Period revenue.  *See In re Amylin Pharm., Inc., Sec. Litig.*, 2002 WL 31520051, at *8 (S.D. Cal. Oct. 10, 2002) (imputing knowledge of misstatements to officers of small three-product company where misstatements related to company's primary product); *see also Patel v. Axesstel, Inc.*, 2015 WL 631525, at *10-*11 (S.D. Cal. Feb. 13, 2015) (citing cases).  Finally, considered with the other allegations, the Individual Defendants' top-level positions add to the strong inference of scienter.

### 4.    Former Employee Allegations Support Scienter

Former Stamps employees have further corroborated the essential facts of defendants' reseller scheme and provide ample factual support for the claim that defendants were well aware (or reckless to the fact) that Stamps' abusive practices were unsustainable.  Specifically, one former Stamps Account Manager confirmed that shortly after he began working with the Company he was instructed by his managers to persuade some 2,000 existing Stamps clients to switch to the ShipStation service – confirming that significant cannibalization of existing USPS customers (rather than customer growth) served as the key driver of the Company's revenue growth.  ¶47.

Another former Stamps Field Sales Representative also confirmed that certain USPS teams and District Managers would frequently express their displeasure to Stamps/Endicia sales representatives concerning the Company's manipulative practices of offering reseller NSA discounts to existing customers of the USPS who did not otherwise qualify for such prices.  According to this former employee, the response they were given by their superiors up the chain of command was to continue with business as usual, despite the fact that these practices "didn't go over well" with the USPS.  ¶49.

Finally, another former Stamps Account Manager further confirmed that Stamps account personnel were instructed by their managers to "keep [the USPS] in

- 33 -

the dark" regarding certain discounted postal rates because "we could get in trouble if we tell [the USPS] too much."  This former employee was further told by the Company's National Sales Manager (Candi Booth) that at Stamps "[w]e don't rat on one another."  Although this former employee followed Booth's directives, the former Stamps Account Manager felt this conduct "was wrong" and expressed these concerns to "upper management" during this former employee's tenure with the Company. ¶50.

Defendants incorrectly assert that the allegations derived from Stamps' former employees should not be credited because they were "low level" employees.  But these employees communicated regularly up the "chain of command" with individuals such as Stamps National Sales Manager, Candi Booth, who clearly can be characterized as a senior executive at Stamps.  ¶¶49-50.  Defendants also argue that "Stamps made most of the challenged statements about its relationship with the USPS on or before August 2, 2017, *before* Plaintiff alleges any of the critical comments were made."  Mtn. at 35-36.  Despite defendants' assertions, their statements about Stamps' "strong" business relationship with the USPS continued to be made *after* this date and throughout the rest of the Class Period, and was a topic of immense importance for analysts and investors every quarter.  ¶¶74-75, 80, 86, 89, 92.  Moreover, plaintiff provides allegations from former employees who were at the Company as early as March 2014.  *See* ¶49; *see also* ¶46 (starting employment at Stamps in February 2017).

**5.     Defendants' False Exculpatory Statements Are Additional Indicia of Scienter**

As demonstrated above, defendants repeatedly were asked about Stamps' ongoing contractual relationships with the USPS and the propriety of Stamps' reseller relationships, and each time emphatically denied any friction with the USPS and/or any impending material adverse changes to the Company's business model.  In making these denials, defendants dispelled investor concerns regarding the reseller program by claiming that the program was beneficial to and, in fact, a major asset of

- 34 -

the USPS. ¶¶92, 104, 106-107. When Stamps finally revealed in February 2019 the termination of its commission-based "profit sharing" relationship with the USPS, the Company continued its deception by misrepresenting the true reasons for the termination. ¶108. The Company falsely claimed that the decision to terminate its relationship with the USPS was driven by its own desire to avoid exclusivity and use other carriers. However, the Company was already generating business from carriers other than the USPS through the companies it owned – ShipStation, ShipWorks and ShippingEasy. ¶¶41, 76. Moreover, Stamps derived the majority of its revenue from the USPS and knew it could not make up that lost revenue for several years, if ever, as evidenced by the Company's concurrent announcement of significantly reduced expected future earnings. ¶¶124, 127.

Defendants' false exculpatory statements also do not comport with the Company's prior disclosures about the contract negotiations, which made clear that they were initiated by the USPS, and not Stamps. After years of cannibalizing existing USPS business, the agency finally demanded that Stamps renegotiate the terms of their contract in the second quarter of 2018. This happened contemporaneously with the launch of the Task Force, and the relationship was terminated in early 2019, soon after the Task Force report was published, further confirming that the termination of the partnership was driven by the USPS's dissatisfaction with Stamps and not the other way around. ¶¶63, 109. As such, defendants' efforts to conceal the truth regarding the termination of Stamps' commission-based "profit sharing" relationship with the USPS – which was an inevitable consequence of Stamps' deceptive reseller scheme – "more readily give[s] rise to the requisite strong inference of scienter." *Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012); *see also City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("specificity" of false statements is "strong circumstantial evidence" that defendants received "specific" truthful information on the topic). *United States v. Reyes*, 660 F.3d 454,

- 35 -

466-67 (9th Cir. 2011) (false exculpatory statements can be considered as evidence of consciousness of guilt).

### 6. The Abrupt Departure of Stamps' President and Former CFO Further Establishes Scienter

The timing and circumstances surrounding the resignation of defendant Huebner strengthens the inference of defendants' scienter, as he was closely related to the fraud. ¶¶120, 125. Defendants concede that executive resignations support an inference of scienter when accompanied by suspicious circumstances. Mtn. at 33. Here, there is no question there were suspicious circumstances – the Company was engaged in a massive reseller scheme throughout Huebner's tenure as President and CFO. Further, Huebner suspiciously departed at a critical time during the Class Period – on February 21, 2019, two months after the federal Task Force report was released and the same day Stamps stunned investors by announcing the end of its USPS exclusive partnership. ¶120; *see In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *8 (C.D. Cal. Sept. 6, 2017) (resignation of a defendant on the same day as a corrective disclosure "'add[s] one more piece to the scienter puzzle'"). This departure was seen as abrupt and unexpected by analysts and industry insiders – especially since Huebner had just been promoted to President of Stamps in August 2017. ¶¶120, 125.

Accordingly, when reviewing all the facts collectively, the inference that defendants knowingly or recklessly made material misstatements is at least as, if not far more, compelling than any inference defendants ask the Court to accept. *See Tellabs*, 551 U.S. at 322-24.

### D. Loss Causation Is Adequately Alleged

Loss causation is a "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Because "loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the

- 36 -

Cases\4834-8967-4668.v1-11/18/19

plaintiff's loss." *Lloyd*, 811 F.3d at 1210. Loss causation requires linkage between defendants' alleged fraud and plaintiff's loss – the "'infinite variety'" of ways to plead and prove that linkage are "'context-dependent'" and the corrective disclosures "'need not precisely mirror'" defendants' misrepresentations. *First Solar*, 881 F.3d at 753; *Lloyd*, 811 F.3d at 1210. The revelation must "'relate back to the misrepresentation.'" *Lloyd*, 811 F.3d at 1210. But no "admission or finding of fraud" is required. *Metzler*, 540 F.3d at 1064. Pleading loss causation is "not meant to impose a great burden upon a plaintiff," but to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. In general, "loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage." *Rudolph v. UTStarcom*, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008). Here, plaintiff alleges, with far more specificity than required, the direct relationship between the misrepresented facts and the corrective disclosure that caused the stock price decline.

Defendants mistakenly argue that the only way loss causation can be pled is if the market "'learned of and reacted to the fraud.'" Mtn. at 37-38 (citing *Metzler* and *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014)). Yet the Ninth Circuit's recent decision in *First Solar* (the seminal case not even cited by defendants) rejected this approach, noting there are an infinite variety of sways to plead loss causation, "even if the market was unaware at the time [of the] fraud." *First Solar*, 881 F.3d at 753-54. Ruling broadly on the requirements for loss causation, the Ninth Circuit recently held in *First Solar* that "'"a causal connection between the material misrepresentation and the loss"'" suffices to establish loss causation. *Id.* at 753. The Court rejected the defendants' attempts to argue that earlier Ninth Circuit decisions, such as *Loos*, articulated more limited standards, explaining that such cases "should be understood as fact-specific variants of the basic proximate cause test, as clarified by *Lloyd.*" *First Solar*, 881 F.3d at 752-54 (expressly citing *Loos* and rejecting the "fraud must be revealed" standard as the only way to plead loss causation as promoted

- 37 -

by defendants here).

The Ninth Circuit held that "[a] plaintiff may . . . prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, *even if the market was unaware at the time that fraud had concealed the miss*." *Id.* at 754. In *First Solar*, the press release "simply revised the company's earnings and revenue guidance and 'did not mention the hot-climate defect' that allegedly drove the revisions."[15] The Ninth Circuit affirmed the district court's decision upholding loss causation for that price decline because the revisions were "the financial impacts of those defects." *Id.* This is similar to the corrective disclosures by Stamps that reduced its FY19 EPS.

### 1.    The February 21, 2019 Corrective Disclosure

On February 21, 2019, Stamps announced that its FY19 earnings would be reduced by 50% due to the termination of its exclusive agreement with the USPS, which caused its stock price to decline 57%. ¶¶122-126. This disclosure of the financial impact clearly related to the fraud, even though the precise details of the fraud were not disclosed to investors – comporting with *First Solar*. 881 F.3d at 753, 754. The disclosed earnings reduction is clearly related to the termination of the exclusive relationship that Stamps had with the USPS, which itself was the subject of the alleged false statements. Nothing more is required. And the fact that Stamps' stock price remained artificially inflated because the disclosure was only a partial corrective disclosure does not negatively impact the loss causation analysis for the May 9, 2019 corrective disclosure.

### 2.    The May 9, 2019 Corrective Disclosure

On May 9, 2019, Stamps announced a 46% reduction in FY19 EPS due to the USPS clamping down on abuses in its reseller program. ¶127. This announcement caused a 56% stock price decline. ¶128. The announcement clearly related back to

---

[15] *First Solar, Inc. v. Mineworkers' Pension Scheme*, No. 18-164, 2019 WL 2153153, at *21 (U.S. May 15, 2019), https://www.supremecourt.gov/DocketPDF/18/18-164/99854/20190515150818947_18-164%20First%20Solar.pdf.

Cases\4834-8967-4668.v1-11/18/19

the false and misleading statements made by defendants about Stamps' relationship with the USPS and the reseller program, which the USPS was now amending and restricting. Defendants claim that the disclosure was akin to a potential investigation by the USPS and not a corrective disclosure under *Loos*. Their argument is without merit. First, defendants reduced Stamps' FY19 EPS by up to 46% due to the USPS's actions to clean up the abuses in the reseller program. If these actions only resulted in a "potential" minor impact, there would have been no need for such a drastic cut to Stamps' EPS. Second, *First Solar* clarifies *Loos* in holding that the disclosure of an EPS reduction related to the fraud is sufficient, even if the market is not aware of the details of the related fraud. *Id.* at 753, 754.

Moreover, as demonstrated in the Complaint, the timing and magnitude of the two declines in Stamps' stock price compared to the market and its peers negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to defendants' fraudulent conduct. *See* ¶126 (Company's stock price plummeted $114 per share on record trading volume of 13.7 million shares to close at just under $84 per share on February 22, 2019, a decline of over *57%*); ¶128 (Company's stock price dropped $46 per share on record trading volume of 16.8 million shares to close at just under $37 per share on May 9, 2019, a decline of over *56%*); *see also* ¶129 ("there are 'zero instances' of a U.S. stock dropping 50% on earnings twice in a row, since 2001"). As such, the economic loss suffered by Lead Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Stamps stock and the subsequent significant decline in the value of Stamps stock from the corrective disclosures.

### E.   Plaintiff's Section 20A Claim Is Adequately Alleged

Defendants challenge the sufficiency of plaintiff's §20A insider trading claim (Mtn. at 39), but contrary to their assertions, the claim is adequately alleged. First, as

- 39 -

explained above, plaintiff's §10(b) claim is sufficiently pled, and that claim can serve as the predicate violation for the §20A claim. *See VeriFone*, 704 F.3d at 710. Second, the trading period here is contemporaneous. ¶133 ("On or about December 18, 2017, defendant McBride sold 8,115 shares of Stamps common stock for almost $1.5 million in proceeds. On the same day, Lead Plaintiff INPRS bought shares of Stamps common stock."); *e.g.*, *Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 WL 7084629, at *14-*15 (C.D. Cal. July 10, 2008) (one-, two- and five-day trading periods held sufficient). Finally, the inside information McBride possessed is his knowledge that Stamps' financial results were driven by the Company's unsustainable deceptive reseller scheme. *Supra*, §III.B-C. Further, "when an insider trades while in possession of material, nonpublic information, a strong inference arises that such information was used by the insider in trading." *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004), *aff'd*, 490 F.3d 778 (9th Cir. 2007). The insider trading claim is adequately alleged.

## IV.   CONCLUSION

For the foregoing reasons, defendants' Motion should be denied. Plaintiff maintains the sufficiency of the Complaint, but if the Court finds otherwise, plaintiff requests leave to amend.

DATED: November 18, 2019

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
STEVEN W. PEPICH
ERIC I. NIEHAUS
KEVIN S. SCIARANI

s/ Spencer A. Burkholz
SPENCER A. BURKHOLZ

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

- 40 -

Cases\4834-8967-4668.v1-11/18/19

Lead Counsel for Lead Plaintiff Indiana
Public Retirement System

- 41 -

Cases\4834-8967-4668.v1-11/18/19

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 18, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

 s/ Spencer A. Burkholz
SPENCER A. BURKHOLZ

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  spenceb@rgrdlaw.com

- 42 -

# Mailing Information for a Case 2:19-cv-01828-MWF-SK Matt Karinski v. Stamps.com, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christina Lucen Costley**
  christina.costley@kattenlaw.com,tamara.vazquez@kattenlaw.com,ecf.lax.docket@kattenlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com,info@glancylaw.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com,rswartz@scott-scott.com,edewan@scott-scott.com,tlaughlin@scott-scott.com,aweas@scott-scott.com,efile@scott-scott.com

- **Adam C McCall**
  amccall@zlk.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Eric Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Steven W Pepich**
  stevep@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

- **Kevin S Sciarani**
  ksciarani@rgrdlaw.com,KSciarani@ecf.courtdrive.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Paul Satoshi Yong**
  paul.yong@kattenlaw.com,paula.phillips@kattenlaw.com,ecf.lax.docket@kattenlaw.com

- **Richard H Zelichov**
  richard.zelichov@kattenlaw.com,tamara.vazquez@kattenlaw.com,ecf.lax.docket@kattenlaw.com

- 43 -

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)