UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No. CV 19-1828-MWF (SKx)** **Date: January 17, 2020**

Title: Matt Karinski v. Stamps.com, Inc., et al.

Present: The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

| Deputy Clerk: | Court Reporter: |
| --- | --- |
| Rita Sanchez | Not Reported |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| --- | --- |
| None Present | None Present |

**Proceedings (In Chambers):** ORDER RE: DEFENDANTS' MOTION TO DISMISS [79]

Before the Court is Defendants Stamps.com, Inc. ("Stamps" or the "Company"), Kenneth McBride, Kyle Huebner, and Jeff Carberry's Motion to Dismiss the Consolidated Class Action Complaint (the "Motion"), filed on October 4, 2019. (Docket No. 79). On November 18, 2019, Lead Plaintiff Indiana Public Retirement System ("Lead Plaintiff" or "Plaintiff") filed an Opposition. (Docket No. 83). On December 9, 2019, Defendants filed a Reply. (Docket No. 84).

The Court has read and considered the papers filed in connection with the motions, and held a hearing on January 13, 2020.

For the reasons discussed below, the Motion is **DENIED**. Plaintiff has sufficiently alleged that Defendants made a material misrepresentation by stating that Stamps had a strong partnership with USPS and that USPS fully approved Stamps' use of the reseller program. However, Plaintiff has failed to allege that Defendants made any other actionable misrepresentation or omission. Because Plaintiff has sufficiently alleged the remaining elements of its Section 10(b) claim, the claim does not fail as a matter of law. Because Plaintiff's Section 10(b) claim survives, its Section 20A claim also survives.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No. CV 19-1828-MWF (SKx) Date: January 17, 2020**
Title: Matt Karinski v. Stamps.com, Inc., et al.

## I. BACKGROUND

On March 13, 2019, Plaintiff Matt Karinski commenced this action. (*See generally* Docket No. 1). On June 5, 2019, the Court appointed Indiana Public Retirement System as Lead Plaintiff. (Docket No. 62).

On August 5, 2019, Lead Plaintiff filed a Consolidated Complaint ("Complaint"). (Docket No. 71). The Complaint contains the following allegations, which the Court must accept as true for purposes of this Motion:

This is a securities fraud class action brought on behalf of all persons who purchased the common stock of Stamps.com between May 3, 2017 and May 8, 2019, inclusive (the "Class Period") and were harmed thereby (the "Class"). (Complaint ¶¶ 1, 135). Excluded from the Class are Defendants; their immediate families; the officers and directors of the Company, at all relevant times; members of their immediate families, and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have, or had, a controlling interest. (*Id.* ¶ 135).

Defendant Stamps is a provider of Internet-based mailing and shipping solutions to customers in the United States and Europe. (*Id.* ¶ 2). Defendant Kenneth McBride served as the Company's Chairman and CEO at all relevant times. (*Id.* ¶ 20). Defendant Kyle Huebner has served as the Company's President since August 2017. (*Id.* ¶ 21). At all relevant times prior to August 2017, Huebner was the Company's Co-President and CFO. (*Id.*). Defendant Jeff Carberry has served as the Company's CFO since August 2017. (*Id.* ¶ 22). Defendants McBride, Huebner, and Carberry are collectively referred to as the "Individual Defendants." (*Id.* ¶ 23).

Stamps offers customers USPS products at discounted rates that allow them to print "electronic postage" directly onto envelopes, plain paper, or labels using a standard personal computer, printer, and Internet connection. (*Id.*). Throughout the Class Period, Defendants represented that Stamps' revenue and earnings growth was being driven by its strong and mutually beneficial partnership with USPS. (*Id.* ¶ 25). The key pillar of this partnership was a revenue sharing agreement pursuant to which Stamps served as the official online provider of USPS postage and shipping solutions.

(*Id.*). This agreement provided the Company with exclusive access to USPS's $20 billion postage and delivery market. (*Id.*). In turn, the USPS relied on Stamps to grow its sales and provide customers with an accessible online interface. (*Id.*).

During the Class Period, Stamps exploited its contractual relationships with the USPS by providing customers authorized-discounted USPS shipping under what was known as the "reseller program." (*Id.* ¶ 2). Stamps' relationship with the USPS was largely premised on the notion that Stamps' promotional and business activities would induce large-volume shippers to utilize USPS products. (*Id.*). To this end, Stamps was allowed to buy postage from the USPS at prices that were far less than advertised rates and resell that postage at a substantial markup (though still below market price). (*Id.*). Stamps had an agreement with the USPS that Stamps would only offer these discounted rates to companies that would ship in large volumes, and therefore, warranted discounts for buying postage in bulk. (*Id.*).

In violation of the terms and the spirit of the USPS's reseller program, Stamps, however, was clandestinely offering discounted pricing to small volume shippers that were already using the USPS for their shipping needs. (*Id.*). Once the USPS confirmed Stamps' improper reseller practices, the highly profitable exclusive partnership Stamps had with the USPS was terminated. (*Id.*).

Stamps publicly represented throughout the Class Period that its strong operating performance was the result of the Company's strong partnership with the USPS. (*Id.* ¶ 4). To investors, Defendants made it appear that the Company's strategy was a glowing success, and as a result of this perceived success, Stamps' share price rose from approximately $110 to more than $280 per share during the Class Period. (*Id.*).

The truth, however, was that a majority of Stamps' reported revenue and earnings growth during the Class Period was the product of the undisclosed, improper, and unsustainable business practices. (*Id.* ¶ 5).

### A. Stamps' Manipulation of the USPS Reseller Program

The USPS provided two programs that are relevant in this action: The Negotiated Service Agreement ("NSA") program and the reseller program. (*Id.* ¶ 32). Pursuant to these NSAs, the USPS offers discounted postage rates to qualified high-volume end users, typically individual companies shipping more than 50,000 items a year. (*Id.* ¶ 30). The USPS did not offer discounted postal rates to low-volume shippers. (*Id.*). The USPS also created a postage reseller program, in which it granted three intermediary companies (Parcel Partners, Express 1, and IntuiShip) the right to receive discontinued postage in exchange for business from their former DHL customers. (*Id.*). The intent and purpose of this reseller program was to acquire new shipping business for the USPS by offering discounted rates to large volume shippers. (*Id.*).

Contrary to the terms of their contractual agreements, Stamps and its affiliated intermediaries secretly switched existing USPS customers that had previously paid USPS retail pricing to discounted pricing under the reseller program, effectively cannibalizing the USPS's business. (*Id.* ¶ 32). The reseller – owned by or partnered with Stamps – would then kick back a large fraction of the discount to Stamps as the PC postage provider. (*Id.* ¶ 33). In this way, the reseller program was subverted from one designed to provide new package business for the USPS to one that had simply increased the profitability of Stamps and lowered USPS revenues. (*Id.*).

Below is an illustrative chart depicting the two alleged processes:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No. CV 19-1828-MWF (SKx)** **Date: January 17, 2020**

Title: Matt Karinski v. Stamps.com, Inc., et al.




Defendants' reseller scheme was inconsistent with and in contravention of the Postal Accountability and Enhancement Act of 2006 (the "PAEA"), which governs the USPS's setting of special pricing under NSAs. (*Id.* ¶ 36). The USPS's use of an NSA did not give private parties such as Stamps a license to resell USPS discounted postage to any and all potential shippers without the express consent and authorization of the USPS. (*Id.*). Rather, the PAEA has strict guidelines authorizing which customers can receive an NSA and under what circumstances it can be used. (*Id.*). Defendants' scheme contravened the USPS's safeguards and was designed to evade the USPS's control over which customers received NSA pricing. (*Id.*).

Key to Stamps' reseller scheme was its use of a web of intermediaries to conceal its business model. (*Id.* ¶ 41). Stamps acquired or otherwise asserted control over a number of multi-carrier platforms, including Endicia, ShipStation, IntuiShip, and Express 1. (*Id.*). Stamps purchased the companies in order to obtain their respective customer lists, which included a substantial number of existing USPS shippers. (*Id.* ¶ 43). Stamps then took the existing USPS customers and gave them slight discounts

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No. CV 19-1828-MWF (SKx)** **Date: January 17, 2020**
Title: Matt Karinski v. Stamps.com, Inc., et al.

by running them through the reseller program, pocketing the difference between what it and its reseller partners paid the USPS. (*Id.*).




(*Id.* ¶ 43).

**B. Former Stamps Employees' Corroboration**

Former Stamps employees have allegedly corroborated the essential facts of Defendants' reseller scheme. (*Id.* ¶ 46). For example, a former Stamps Account Manager, who was employed by the Company from February 2017 to September 2018 in the Mountain View, California office, confirmed that the Company gave discounted package rates to customers through its Stamps account (only if they meet certain volume thresholds) and through its multi-carrier platform (without any volume thresholds). (*Id.*). This former employee stated that shortly after he began working with the Company, he was instructed to persuade some 2,000 existing Stamps clients to switch to the ShipStation service. (*Id.* ¶ 47).

Another former Stamps Field Sales Representative, who was originally employed by Endicia and remained with the Company post-acquisition until May 2019 predominantly in the Ohio and Pennsylvania markets, also confirmed that the USPS had been upset "for a few years" with Stamps/Endicia for making available discounted postal rates for customers that did not individually meet the USPS's annual shipping requirements for the discounted rates. (*Id.* ¶ 48). Another former Stamps Field Sales Representative, who was originally employed by the USPS for 36 years and joined the Company in March 2014 through October 2018 in predominantly the Midwest markets, also confirmed that certain USPS teams and District Managers would frequently express their displeasure to Stamps/Endicia sales representatives concerning the Company's practices of offering reseller NSA discounts to existing customers of the USPS who did not otherwise qualify for such prices. (*Id.* ¶ 49).

Another former Stamps Account Manager, employed by the Company from October 2017 to February 2019 in the East Region office, further confirmed that the Company gave discounted postal rates to customers who were "not fully authorized by the USPS." (*Id.* ¶ 50). According to this former employee, Stamps account personnel were instructed by their managers to "keep [the USPS] in the dark" regarding certain discounted postal rates because "we could get in trouble if we tell [the USPS] too much." (*Id.*). The former employee was also told by the Company's National Sales Manager Candi Booth that at Stamps "[w]e don't rat on one another." (*Id.*).

### C. Governmental and Public Scrutiny

Prior to the Class Period, the USPS began investigating certain resellers' activities to determine whether they were cannibalizing existing USPS business. (*Id.* ¶ 51). In 2016, as part of its investigation, the USPS targeted Stamps and its affiliates, threatening to pull Stamps' PC potage printing license if it was established that Stamps was engaging in a continuing practice of converting existing USPS customers to its reseller program thereby cannibalizing existing USPS business. (*Id.*).

The USPS was particularly focused on Stamps affiliate/partner and postage reseller IntuiShip, along with its third-party sales affiliate, Move Method. (*Id.* ¶ 52). Move Method was already under USPS scrutiny for funneling existing USPS

customers through IntuiShip's reseller NSA, and this scrutiny was reflected in a series of communications, which began when Doreen Rathburn at USPS sent an email concerning potential cannibalization of existing USPS customers. (*Id.*).

Stamps became aware that the USPS was scrutinizing IntuiShip and Move Method for abuse of the reseller program because Stamps personnel, Candi Booth and Amine Khechfe, received copies of the USPS investigative letters that objected to IntuiShip's using the reseller program to service existing USPS customers. (*Id.* ¶ 54).

In January 2017, the Executive Branch's oversight of the USPS became even more focused on the financial solvency of the government postal provider. (*Id.* ¶ 55). Stamps was in regular contact with the USPS during the Class Period regarding its contractual requirements. (*Id.* ¶ 57). Defendants understood certain adverse changes were coming and would soon be applied to Stamps' existing USPS reseller contracts/agreements. (*Id.*). Starting in the first half of 2017, the USPS began revising its existing NSAs (which are subject to periodic/annual renewal) in a manner that was designed to limit and restrict the ability of Stamps to misuse the reseller program. (*Id.*). As part of its newly implemented process, the USPS required written permission before a reseller could transition any client to a shipping program that utilized an NSA that provided postage rates below Commercial Plus Pricing. (*Id.*).

Moreover, just after the start of the Class Period, Stamps received an August 2017 letter from its reseller partner, Parcel Partner, which disclosed the USPS's position and new restrictions designed to reign in abuse of the reseller program. (*Id.* ¶ 58). Thus, based on their communications with the USPS and with Stamps' reseller partners, Defendants were aware by the start of the Class Period that the USPS was in the process of tightening and restricting the reseller program so as to require resellers to maintain the proper documentation for all shippers, thereby allowing the USPS to monitor, police, and stop the abuses that were resulting from Stamps' scheme of converting low-volume existing USPS customers to its reseller program. (*Id.* ¶ 59).

In an effort to avoid public scrutiny, Stamps actively concealed key information regarding its business operations and specifically how Stamps was profiting at the expense of the USPS. (*Id.* ¶ 61). For example, the Company declined to break out the

proportion of revenues earned through the reseller program, but instead lumped such revenue together with other revenue earned throughout the Company's revenue-sharing agreement with the USPS. (*Id.*).

In April 2018, a governmental Task Force established to evaluate the USPS's operations and finances. (*Id.* ¶ 63). The Task Force's December 2018 Report (the "Task Force Report") confirmed that the USPS was forecasted to lose tens of billions of dollars over the next decade, listing "product pricing" among the primary reasons for the deterioration in the USPS's financial condition. (*Id.* ¶¶ 9, 63). Two months after this report was released, Stamps announced the end of its USPS partnership. (*Id.* ¶ 63). Finally, on May 8, 2019, Stamps revealed that, in addition to the loss of the exclusive commission business, the USPS was also restricting and terminating certain NSA contracts with the Company's reseller partners and, thus, that Stamps' expected future earnings would be substantially reduced. (*Id.* ¶ 64).

**D. <u>Defendants' Allegedly False and Misleading Statements</u>**

The Complaint alleges that, throughout the Class Period, Defendants touted the Company's strong financial performances, including revenue and earnings growth, while concealing that these financial metrics were the product of an unsustainable and improper reseller scheme to inflate Stamps' financial results at the expense and to the detriment of the USPS. (*Id.* ¶ 65). On May 3, 2017, the start of the Class Period, Defendants issued a release of Stamps' 1Q17 financial results, which stated that Stamps saw strong revenue and earnings in the quarter, saw continued strong growth in its shipping business areas, experienced strong contributions from all of its subsidiaries, and remained excited about future prospects. (*Id.* ¶¶ 66-67).

On the 1Q17 conference call, CEO McBride stated that "[t]he USPS has always been one of our most important partners" and that Stamps "continue[s] to enjoy a great partnership with the USPS and feel that we have created a sustainable win-win model for both of us, which will result in the continued growth of USPS packages, in e-commerce and more generally." (*Id.* ¶ 68). He also stated that "the USPS is very happy with the very successful partnership." (*Id.*). On the same call, in response to the analyst questions concerning the Company's relationship with the USPS and whether

the USPS had sent a letter to participants in the reseller program with potential changes, McBride stated that "[t]here was no letter" and that "USPS is very happy with the approach [it] has taken and business model" and "[it is] very happy with the relationship with Stamps.com." (*Id.* ¶ 70).

The Complaint alleges that these statements, among others, were false and misleading. (*Id.* ¶ 71). For example, Stamps was not generating strong growth in its shipping business, but rather was engaged in a secret, unsustainable reseller scheme to bundle small-volume shippers and skim profits from the USPS. (*Id.* ¶ 71(a)). The USPS also was not "very happy with" Stamps or its approach. (*Id.* ¶ 71(c)). In fact, by the start of the Class Period, Defendants' course of business was cannibalizing existing USPS customers and skimming profits from the USPS in contravention of USPS governance. (*Id.*). Stamps' relationship with the USPS also had sourced prior to the Class Period; between 2014 and 2017, USPS teams and District Managers had repeatedly expressed their displeasure to Stamps/Endicia sales representatives concerning the Company's manipulative practice of offering reseller NSA discounts to existing USPS customers that did not otherwise qualify for such pricing. (*Id.* ¶ 71(f)). Because Stamps could not continue the illicit reseller scheme, Defendants had no reasonable basis to expect and did not expect Stamps' revenue and earnings growth to continue. (*Id.* ¶ 71(k)).

Defendants made similar statements in the release announcing its 2Q17, 3Q17, 4Q17, FY17, 1Q18, 2Q18, and 3Q18 financial results, and the corresponding conference calls. (*Id.* ¶¶ 72-76, 78-82, 84-92). Specifically, in response to analyst questions concerning the USPS Task Force investigation and impending report, CEO McBride stated: "We don't know the specifics in the report," but "we do think that based on our conversations that the report will come out strongly in favor of the partnerships between the USPS and private industry like the partnership we've had with the USPS." (*Id.* ¶¶ 89, 92). These statements were similarly false and misleading in part because Stamps' financial results were dependent on Stamps' manipulation of the USPS reseller program, which improperly benefited Stamps at the expense of USPS, which was losing an estimated $235 million per year. (*Id.* ¶¶ 77, 83 93).

On February 21, 2019, after the market closed, Stamps held a conference call to discuss its 2018 financial results as well as its business outlook. (*Id.* ¶ 94). On the call, Stamps' CEO McBride falsely represented that the Company had been the one that "decided to discontinue [its] shipping partnership with the USPS so that [it could] fully embrace partnerships with other carriers." (*Id.*). On February 26, 2019, *The American Conservative* reported that, contrary to McBride's representation, it was the USPS that had decided to terminate its relationship with Stamps in the face of the Company's abuse of the reseller program. (*Id.* ¶ 95).

On May 8, 2019, Stamps further shocked investors by slashing its profit outlook for the full year. (*Id.* ¶ 97). Stamps attributed the lowered guidance to potential unfavorable short- and long-term amendments, renegotiations, and termination of certain NSA contracts between the USPS and the Company's reseller partners – which Defendants had known about and anticipated since the start of the class Period. (*Id.*). Nonetheless, Defendants falsely told investors that they "very recently bec[a]me aware" of these adverse conditions that would have a negative impact of the Company's financials. (*Id.*).

### E. <u>Additional Scienter Allegations</u>

Knowing it was only a matter of time before Stamps' unauthorized "reselling" of special reduced postage rates would be discovered and shut down by the USPS, the Individual Defendants and other Stamps insiders rushed to sell hundreds of millions of dollars in Stamps stock at artificially inflated prices as high as $272 per share. (*Id.* ¶ 7). The dramatic stock sales by these Company insiders were unusual in their amount and suspicious in their timing and were completed without first disclosing the adverse facts regarding Stamps' scheme and wrongful course of business. (*Id.*). Defendants McBride (the Company's CEO and Chairman), Huebner (the Company's CFO prior to August 2017), and Carberry (the Company's current CFO), collectively sold over 302,000 of their Stamps shares at artificially inflated prices for proceeds of nearly $59 million. (*Id.*). In total, Stamps insiders sold over a million shares of stock during the Class Period for proceeds of over $230 million. (*Id.* ¶¶ 7, 98).

During the two years prior to the Class Period, these same Company insiders sold only 377,568 shares of their Stamps, for proceeds of only $41.7 million. (*Id.* ¶ 100). The insider sales were also suspicious in timing. (*Id.* ¶ 101). The sales were predominantly made between August 2017 and June 2018, just after President Trump took office and subsequently announced his intent to eliminate business practices detrimental to the USPS. (*Id.*). The sales were also made at times when the stock was trading at over $200 per share as Defendants were materially inflating the Company's revenues through their reseller scheme. (*Id.*). Individual Defendants were in possession of material non-public information when they sold the shares. (*Id.* ¶¶ 20-22).

In order to allow Stamps' insiders to sell the vast majority of their Stamps shares at artificially inflated prices before the truth about their manipulative practices were revealed, Defendants and other Stamps board members caused the Company to repurchase approximately $300 million in Stamps shares at the same time Stamps insiders were selling hundreds of millions of dollars' worth of Company stock. (*Id.* ¶ 102). The stock repurchase averted a precipitous decline in Stamps' share price that the massive insider trading would have otherwise caused. (*Id.*).

In addition, during the Class Period, Stamps repeatedly dispelled investor concerns regarding the reseller program by claiming that the program was beneficial to the USPS and concealing the existing strain in the relationship. (*Id.* ¶¶ 104, 106). When Stamps finally revealed in February 2019 the termination of its commission-based "profit sharing" relationship with the USPS, the Company continued its deception by misrepresenting the true reasons for the termination. (*Id.* ¶ 108). The Company falsely claimed that the decision to terminate its relationship with the USPS was driven by its desire to avoid exclusivity. (*Id.*). But the evidence, including the Task Force Report, confirms that the termination of the partnership was driven by the USPS's dissatisfaction with Stamps and not the other way around. (*Id.* ¶ 109).

On February 21, 2019, two months after the USPS Task Force Report was released, and the same day Stamps announced the end of its USPS exclusive partnership, Stamps' President and former CFO Huebner notified Stamps that he intended to resign after 20 years of service. (*Id.* ¶ 120). This departure was seen as

abrupt and unexpected by analysts and industry insiders – especially since Huebner had just been promoted to Stamps' President in August 2017. (*Id.*).

### F. Loss Causation/Economic Loss

Defendants' false and misleading statements artificially inflated Stamps' stock price, deceived Lead Plaintiff and the Class, and caused them losses when the truth was revealed. (*Id.* ¶ 121). As a result of their purchases of Stamps' stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss. (*Id.*).

On February 22, 2019, when Stamps announced the removal of the USPS exclusive partnership and the resignation of Huebner, the Company's stock price dropped 57 percent. (*Id.* ¶ 126). On May 8, 2019, when Stamps reduced its profit outlook for the full year due to potential unfavorable amendments, renegotiations, and terminations of certain NSA contracts between the USPS and the Company's reseller partners, the Company's stock price declined by over 56 percent. (*Id.* ¶¶ 127-28). After the dust had cleared, Stamps investors had lost 76 percent of their investments in only two and a half months. (*Id.* ¶ 129).

Based on the above allegations, Lead Plaintiff alleges three claims for relief: (1) violations of § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (against all Defendants); (2) violations of § 20(a) of the 1934 Act (against Individual Defendants); and (3) violations of the § 20(a) of the 1934 Act (against Defendant McBride only). (*Id.* ¶¶ 141-169).

## II. REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

Along with their Motion, Defendants filed a Request for Judicial Notice and Consideration of Documents Incorporated by Reference ("Request") on October 4, 2019. (Docket No. 80). Plaintiff did not oppose Defendants' Request, and on December 9, 2019, Defendants filed a Notice of Non-Opposition. (Docket No. 85).

In the Request, Defendants requests that the Court consider specific portions of documents attached as Exhibits 1 through 34 to the Declaration of Paul S. Yong ("Yong Decl." (Docket No. 81)). (Request at 2). The documents fall into the following five categories: (1) transcripts of public earnings calls and interviews (Exs. 11-19); (2) public SEC filings (Exs. 1-10); (3) public government records (Exs. 20-24); (4) news articles, analyst reports, press releases, and blog posts (Exs. 25-33); and (5) Stamps' historical stock trading prices (Ex. 34). (Request at 12).

Defendants request that the Court consider Exhibits 6, 8-10, 14-16, 23, 33-34 under the incorporation by reference doctrine, and request that the Court take judicial notice of Exhibits 1 through 34 under the Federal Rule of Evidence 201. (Request at 21). Pursuant to *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), Defendants identified the specific portions of the documents they are requesting the Court to consider. (*Id.*).

Under Rule 12(d) of the Federal Rules of Civil Procedure, if the Court considers matters outside the pleadings in ruling on a motion to dismiss that motion must be converted into one for summary judgment. Fed. R. Civ. P. 12(d). As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). An exception to this general rule exists for (1) materials that are attached to or necessarily relied upon in the complaint, and (2) matters of public record. *Id.* at 688-89; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in assessing securities fraud claims, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

The Court determines that Exhibits 6, 14-16, 23, 33 are incorporated by reference. The Court also takes judicial notice of the remaining documents for the limited purpose that Defendants specify in their Request because they are of matters not subject to reasonable dispute.

Accordingly, the Request is **GRANTED**.

## III. LEGAL STANDARD

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013)

In ruling on the Motion under Rule 12(b)(6), the Court follows *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The Court must disregard allegations that are legal conclusions, even when disguised as facts. *See id*. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Eclectic Properties E., LLC v. Marcus & Millichap Co*., 751 F.3d 990, 996 (9th Cir. 2014). "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' plaintiffs must include sufficient 'factual enhancement' to cross 'the line between possibility and plausibility.'" *Eclectic Properties*, 751 F.3d at 995 (quoting *Twombly*, 550 U.S. at 556–57) (internal citations omitted).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the Complaint alleges a plausible claim for relief. *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011). "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, No. 13-56644, 2016 WL 5389307, at *2 (9th Cir. Sept. 27, 2016) (as amended) (quoting *Iqbal*, 556 U.S. at 679). Where the facts as pleaded in the Complaint indicate that there are two alternative explanations, only one of which would result in liability, "plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." *Eclectic Properties*, 751 F.3d at 996–97; *see also Somers*, 729 F.3d at 960.

Allegations of fraud must meet a higher pleading standard. Fed. R. Civ. P. 9(b) (requiring the pleading party to "state with particularity the circumstances constituting fraud or mistake"). It is well-established that, "[a]t the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). The parties do not dispute the standard for pleading Plaintiffs' Exchange Act claims.

## IV. DISCUSSION

"To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, 134 S. Ct. 2398, 2407, 189 L. Ed. 2d 339 (2014) (internal quotation marks omitted).

Defendants raise four arguments as to why the Complaint should be dismissed: (1) Plaintiff fails to plead an actionable misrepresentation or omission; (2) Plaintiff fails to adequately plead scienter; (3) Plaintiff fails to plead loss causation; and (4) Plaintiff's Section 20(a) claim should be dismissed because it is based on Plaintiff's Rule 10b-5 claim.

### A. Material Misrepresentation or Omission

Defendants argue that Plaintiff fails to plead an actionable misstatement or omission under the heightened pleading standards of the PSLRA.

#### 1. Pleading with Specificity

As an initial matter, Defendants argue that the Complaint should be dismissed because Plaintiff fails to identify particular misstatements and specify why they are false. (Motion at 15). Instead, Defendants contend that Plaintiff resorts to "puzzle-

pleading," *i.e.*, copying Stamps' public statements, highlighting certain portions, and then listing various alleged deficiencies without connecting any of the allegedly misleading statements with contradictory facts known to Defendants at the time. (*Id.*). Defendants argue that they are unable to discern why Plaintiff alleges that many of the quoted statements are false. (*Id.*).

In response, Plaintiff argues that the Complaint alleges the "who, what, where, how and why" of every material misstatement and omission and identifies the reasons why Defendants' statements were false and misleading. (Opp. at 13-14). It also argues that courts in this district have found its style of pleading permissible and not "puzzle-pleading." (*Id.* at 13, n.7) (citing cases). Plaintiff also attaches a table to its Opposition, in which it asserts that it identified each false statement and why the statement was misleading. (*Id.*; Opp. Ex. A (Docket No. 83-1)).

The Court agrees with Defendants that the Complaint could have more clearly identified each of the alleged misstatements and the reasons why they were misleading or false. Nonetheless, the Court determines that Plaintiff has pled with sufficient specificity to meet the PSLRA standard. The Complaint quotes specific statements and then explains in the subsequent paragraphs why they are allegedly false and misleading. (*See* Complaint ¶¶ 66-70, 72-76, 78-82, 84-92; *id.* ¶¶ 71, 77, 83, 93). As Plaintiff notes, at least one other district court has concluded that similar allegations meet the PSLRA specificity requirement. *See Flynn v. Sientra, Inc.*, No. CV 15-7548 SJO (RAOx), 2016 WL 3360676, at *9 (C.D. Cal. June 9, 2016) ("[T]he Court does not find the allegations . . . to present such a difficult 'puzzle' that dismissal is warranted on this ground alone" in part because "Plaintiffs highlight in bold and italics the **particular statements** in these filings that they shortly thereafter contend to be false or misleading.") (emphasis in original).

Moreover, based on the Motion, Defendants appear to have been able to identify the alleged misstatements and the reasons why the statements were misleading. Therefore, the Court examines whether the alleged omissions or misstatements are actionable.

The parties appear to agree that the alleged misrepresentation or omission center around the following: (1) Stamps' alleged abuse of the USPS reseller program; (2) Defendants' representations that its partnership with the USPS was "strong"; and (3) Defendants' historical results and growth estimates. (Motion at 14-27; Opp. at 13-25). The Court examines each allegation separately.

**2. Stamps' Reseller Scheme**

In the Complaint, Plaintiff alleges that Stamps "secretly" abused the reseller program in two ways: (a) by offering discounted postal rates to low-volume shippers, who would otherwise not qualify for the discount; and (b) by switching existing USPS customers that had previously paid USPS retail pricing to discounted pricing under the reseller program. (Complaint ¶ 32). Specifically, Plaintiff alleges that Defendants failed to disclose that the true nature of Stamps' reseller practices in public filings and instead asserted that Stamps was generating "continued strong growth in [its] shipping business" and that it has "created a sustainable win-win model for both [USPS and Stamps], which will result in the continued growth of USPS packages, in e-commerce and more generally." (*See e.g.*, Complaint ¶¶ 67, 68).

As to the first alleged omission, Defendants argue that Stamps repeatedly disclosed since at least 2015 that it was utilizing the reseller program to sell discounted postage to small and existing USPS customers. For example, Defendants cite to SEC Form 10-Q, dated August 7, 2015, which disclosed that "[t]hrough our partnership with Express 1, Stamps.com and our subsidiaries are able to provide Express 1's shipping discounts to our lower volume customers." (Yong Decl., Ex. 1 at 3). In the Q2 2016 earnings call, Stamps further stated that "resellers are explicitly authorized by the USPS to offer discounted rates to smaller shippers at rates below commercial base pricing." (Yong Decl., Ex. 11 at 4). Defendants also cite to Q1 2017 earnings call transcript, in which Defendants disclosed that "[r]esellers were an excellent opportunity to bring the USPS brand and shipping solutions downmarket to smaller volume shippers." (Yong Decl., Ex. 14 at 3).

As to the second alleged omission, Defendants argue that it disclosed in Q2 2016 earnings call that "the retention of existing customers" was one of the reseller

program's key purposes and that Stamps had used "reseller rates in order to retain" customers with the USPS. (Yong Decl., Ex. 11 at 4-5). In the same call, Stamps stated that "[t]he reseller program is meant both for the acquisition of new volume and for the retention of existing volume." (*Id.* at 7). Stamps repeated in an earnings call in August 2017 that "[r]esellers are important, both for keeping existing business and for growing new business." (Yong Decl., Ex. 14 at 3).

Plaintiff does not refute that Defendants made these statements, but instead argues that Defendants failed to "fully" disclose the true nature of Stamps' reseller practices. (Opp. at 14). Although Plaintiff alleges in the Complaint that Defendants "secretly" gave discounted rates to some low-volume customers, Plaintiff appears to acknowledge that Defendants disclosed this conduct prior to the Class Period. (*Id.*). Nonetheless, Plaintiff argues that Defendants failed to disclose that Stamps was secretly transitioning existing Stamps low-volume customers to their affiliated resellers who had NSAs, and also worked with the resellers to bundle those customers to get even lower rates from the USPS. (*Id.*). At the hearing, Plaintiff reiterated this argument, asserting that USPS intended to provide discounted reseller rates to new customers, not existing low-volume customers.

Based on Defendants' disclosures, which the Court may consider even on a motion to dismiss, Defendants adequately disclosed that Stamps offered discounted postal rates to ***low-volume*** shippers through its partnership with resellers. Defendants also disclosed that Stamps offered "reseller rates" to ***existing*** customers to help USPS retain these customers. While Plaintiff may be correct that USPS did not intend for Stamps to provide "reseller rates" to existing customers, Plaintiff has not demonstrated that Defendants made any false or misleading statements regarding the program.

Therefore, Plaintiff may not base its claims on Defendants' alleged omission of their reseller scheme. *See Siegel v. Lyons*, No. C-95-3588 DLJ, 1996 WL 438793, at *4 (N.D. Cal. Apr. 26, 1996) ("Where SEC filings actually disclose allegedly omitted information, dismissal of a claim premised upon nondisclosure is proper.").

**3. Strong Partnership with the USPS**

Plaintiff also alleges that Stamps' positive statements about its relationship with the USPS and its position in the market were misleading because: (a) Stamps was violating a USPS contract and/or "governance"; (b) USPS was opposed to Stamps' reseller scheme and was taking steps to prevent Stamps' scheme from continuing; and (c) USPS employees purportedly criticized the prices Stamps was charging.

As a preliminary matter, Defendants argue that the allegations related to Stamps' strong relationship with the USPS fail because the challenged statements are corporate puffery. (Motion at 18). Defendants reiterated this argument at the hearing. Defendants further relied at the hearing on *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9 (2d Cir. 2019), but that is an unpublished case to which no Ninth Circuit case is similar.

In response, Plaintiff argues that Defendants' statements are not "puffery" because they are not so exaggerated or vague that no reasonable investor would rely on them when considering the total mix of available information. (Opp. at 16). Moreover, Plaintiff notes that Defendants made affirmative misrepresentations about the factual background of their interactions with the USPS, which are objectively verifiable descriptions. (*Id*. at 16-17).

"When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (internal quotation marks and citation omitted). "[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Id.* "But even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Id.* "For example, reassuring investors that 'everything [was] going fine' with FDA approval when the company knew FDA approval would never come was materially misleading." *Id.* (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). "Similarly, a statement that the company 'anticipates a continuation of its accelerated expansion schedule' when the expansion

had already failed was materially misleading." *Id.* at 1143-44 (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

Here, Defendants stated: "USPS is very happy with the approach they've taken and business model. They're very happy with the relationship with Stamps.com. We talk to them constantly, to the most senior folks there. So we're happy and they're happy." (Complaint ¶ 70). In reality, Plaintiff alleges that USPS teams repeatedly expressed their displeasure concerning the Company's practice and that USPS was investigating Plaintiff's reseller affiliates because their business practices were adversely impacting USPS. (*Id.* ¶ 71).

The Court agrees with Plaintiff. Normally, Defendants' statements that USPS was "very happy" with Stamps and their business model and that Stamps had a "great partnership with USPS" would be considered general statements of optimism that constitutes corporate puffery. However, here, Plaintiff has alleged additional context that makes these statements misleading, including the fact that USPS was investigating Stamps' resellers and were implementing changes to the resellers' NSAs to reduce or end Stamps' reseller business practice. In light of this additional context, Plaintiff has sufficiently alleged that Defendants' statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Therefore, the Court examines whether Plaintiff has sufficiently alleged that Defendants' statements about its strong relationship with USPS was false or misleading.

***First,*** Defendants argue that their positive statements about their relationship with the USPS were not false because Plaintiff has not pled a breach of the contract with USPS or a statutory violation. (Motion at 19). Plaintiff alleges that the USPS was not "very happy with" Stamps' business model because Stamps was violating USPS governance and its contractual agreement with USPS. (Complaint ¶¶ 77(c), 83(d), 93(b)). However, Defendants argue that Plaintiff does not provide any basis for its assertion that Stamps breached its contract with USPS. (Motion at 19). They further argue that there is no "USPS governance" that requires Stamps to obtain USPS

approval prior to extending reseller rates to small and/or existing customers. (*Id.*). Even if Plaintiff had pled particularized facts establishing that Stamps had violated a contract, statute, or regulation, Defendants also argue that Stamps had no duty to accuse itself of wrongdoing. (*Id.* at 20).

Plaintiff does not appear to dispute Defendants' assertion that Stamps did not actually breach its contract or USPS governance. (*See* Opp. at 22-23). Instead, it argues that the Complaint "alleges that defendants failed to disclose any information about Stamps' reseller scheme, whether it was accused of a breach of contract or not, as it was this undisclosed conduct that rendered their statements false or misleading." (*Id.* at 22).

Because Plaintiff has failed to plausibly allege that Stamps' business model violated any contract, statute, or regulation, the Court determines that Plaintiff's allegations regarding Stamps' strong partnership with the USPS fail to the extent that they are based on an alleged contract breach or statutory violation.

***Second***, Plaintiff alleges that Defendants' statements about the strong relationship were misleading because they knew that USPS was opposed to Stamps' reseller scheme and was taking steps to prevent Stamps' scheme from continuing. (Opp. at 22-23). Specifically, Plaintiff alleges that Individual Defendants understood from their communications with the USPS that the USPS was no longer willing to accept economically unfavorable business relationships with private parties. (Complaint ¶ 56). Plaintiff further alleges that USPS had rejected Stamps' reseller scheme and was in the process of terminating critical aspects of its existing business relationship with Stamps. (*Id.*).

In response, Defendants emphasize that there is no allegation that USPS was investigating Stamps, and even if it had, Stamps would not have had to disclose a preliminary investigation that did not result in formal proceedings or a finding of wrongdoing. (Reply at 7).

The Court agrees with Plaintiff. Plaintiff does not argue that the investigation of Stamps or its resellers created Defendants' duty to disclose. Instead, Plaintiff argues

that Defendants' assertion that USPS was "very happy" with Stamps' business model was misleading in light of the fact that USPS was taking steps to prevent Stamps from continuing to provide the discounted reseller postage rates to existing low-seller USPS customers. "[C]ompanies can control what they have to disclose under these provisions by controlling what they say to the market." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45, 131 S. Ct. 1309, 1322 (2011). "But once defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Id.* (internal quotation marks and citation omitted). Because Defendants touted its strong relationship with USPS and USPS's approval of Stamps' business model, Stamps had a duty to disclose adverse information that cut against this positive information, including USPS's opposition to Stamps' reseller business practice and its efforts to prevent such practice from continuing.

***Third***, Plaintiff alleges that Defendants' statements about the strong relationship was misleading because USPS employees allegedly criticized the prices Stamps was charging. Plaintiff bases these allegations on statements from unnamed former stamps employees and an email Stamps received from its reseller partner, Parcel Partners.

Defendants argue that these allegations fail because Plaintiff has failed to describe the confidential witnesses with sufficient particularity to establish their reliability. (Motion at 20-21). Defendants also argue that the Court cannot rely on the August 2017 email, which allegedly disclosed the USPS's new restrictions designed to reign in the abuse of the reseller programs, because it is not a publicly available document and Plaintiff failed to disclose the author, the person(s) at Stamps who reviewed the letter, and other details. (*Id.* at 21-22). Further, even if the Court were to credit allegations from anonymous witnesses and the letter, Defendants argue that Plaintiff has at most pled a "difference of opinion." (*Id.* at 22-23).

In response, Plaintiff argues that the witness statements, internal documents, and contextual allegations all corroborate each other to support its allegation that Stamps abused the reseller program and directly harmed the USPS's financial interests,

causing the USPS to oppose and restrict these wrongful practices. (Opp. at 17). It argues that plaintiffs need not name their sources as long as other facts provide an adequate basis for believing that the defendants' statements were false. (*Id.* at 18). Plaintiff also asserts that the August 2017 USPS letter that Stamps received from Parcel Partners can be considered to corroborate the confidential witnesses' statements and plaintiff's allegations. (*Id.* at 19).

The Court does not determine whether the confidential witness' statements and the letter are sufficient on their own to establish material misrepresentations. Before the Court is a ***complaint***, not a summary judgment record or trial transcript. At a minimum, the statements and letter further support Plaintiff's allegation that the USPS was not happy with Stamps' reseller business model.

While the former employees are unnamed in the Complaint, Plaintiff has alleged their job titles, the region where they worked, and set forth details regarding the information they obtained. Therefore, the anonymity of the former employees is not dispositive. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1033 (C.D. Cal. 2008) ("The Complaint designates the confidential witnesses' job titles and the region in which they worked, and sets forth in 'convincing detail' the information these informants have obtained. Although allegations against anonymous informants are often difficult to assess, here, the absence of their names does not invalidate the strong inference derived from the informants' assertions."). The August 2017 email, in which Parcel Partners allegedly told Stamps that USPS was imposing restrictions to reign in the reseller program, further supports this claim.

Moreover, the Court does not agree with Defendants that Plaintiff has only alleged a difference of opinion within the USPS. Defendants argue that, at most, Plaintiff has alleged that some low-level USPS employees were unhappy with Stamps' business practice, but that this opinion was not shared with the senior executives at USPS. (Motion at 22-23). While Defendants may ultimately prove that this is the case, Plaintiff has not alleged such a set of facts. Instead, Plaintiff alleges that the USPS as a whole was unhappy with Stamps' business practices and that the USPS was working on stopping Stamps from continuing with its reseller program.

***Fourth***, Defendants argued at the hearing that their statements about the strong partnership are not false or misleading because there is evidence demonstrating that USPS actually believed Stamps to be a "very important partner." However, whether USPS and Stamps truly had a "strong" partnership and whether USPS was actually "very happy" with Stamps' reseller practices are factual disputes that are not properly determined right now.

Therefore, the Court concludes that Plaintiff has sufficiently alleged that Defendants' representation that it had a strong relationship with USPS or that USPS was "very happy" with Plaintiff's business practice was misleading.

**4. Historical Results and Growth Estimates**

Plaintiff alleges that Stamps' discussion of, and positive statements about, its past and future financial results were misleading. (*See e.g.*, Complaint ¶¶ 71(a), (e)).

Plaintiff does not appear to allege that the financial results were actually untrue or that Stamps missed any of its financial projections it provided to the market. (*See generally* Complaint; Motion at 24, n.6). Instead, Plaintiff alleges that Defendants presented a false and misleading portrait of the source of Stamps' revenue growth and future prospects because they failed to disclose that "Stamps' soon-to-be-curtailed abuse of the USPS reseller program would eliminate its ability to siphon revenues from the USPS." (Opp. at 21). Plaintiff argues that when a company makes public statements touting the explanation for, and sources of, its financial success, it has a duty to ensure that those statements are accurate and complete. (*Id.* at 22-23).

In response, Defendants argue that a company cannot be liable for securities fraud if it has accurately reported past performance, even if such performance might not continue in the future. (Reply at 13). Moreover, Defendants argue that a company's accurate discussion of its historical results is not rendered misleading even if the company fails to disclose that those results purportedly resulted from wrongdoing. (Motion at 24; Reply at 13-14). Defendants further argue that Plaintiff has not demonstrated that Stamps put the source of its revenue at issue. (Reply at 14).

"Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) (citing *In re Sofamor Danek*, 123 F.3d 394, 401 n. 3 (6th Cir.1997)). However, "explanations for financial statements may be misleading if they put the source of illegal revenue at issue without disclosing the illegality." *Evanston Police Pension Fund v. McKesson Corp.*, No. 18-CV-06525-CRB, 2019 WL 5587311, at *10 (N.D. Cal. Oct. 30, 2019); *see also In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) (statements that acknowledged legitimate income sources for defendant's overseas earnings while omitting unlawful ones were misleading).

Here, Plaintiff has not demonstrated that any of Defendants' sources of income were illegal, as explained above. Moreover, Plaintiff has not demonstrated that Stamps put the sources of its revenue at issue. In its Opposition, Plaintiff does not identify the specific statement where Defendants explained the sources of its revenue; instead, Plaintiff cites to six different paragraphs in the Complaint. (Opp. at 21) (citing Complaint ¶¶ 72, 76, 78, 81, 87, 90). In each of the paragraphs, however, the Complaint contains general statements made by Stamps and CFO Cranberry about how Stamps achieved strong performance, how its shipping business continued to be strong, and how Stamps was well positioned for the next quarter. The statements do not, for example, assert that Defendants' revenue comes from business practices unrelated to the reseller program.

Therefore, Plaintiff has failed to demonstrate that Stamps' discussion of, and positive statements about, its past and future financial results were misleading.

**B. <u>Scienter</u>**

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To satisfy the requisite state of mind element, "a complaint must allege that the defendant [] made false or misleading statements either intentionally or

with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

Accepting all factual allegations in the complaint as true, a court must "consider the complaint in its entirety," and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (emphasis in the original). Under this analysis, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Plaintiff argues that it has established scienter based on the following allegations: (1) Defendants' involvement in the contractual relationship with the USPS; (2) Defendants' and other Stamps' insiders' stock sales; (3) former employee allegations; (4) Defendants' false exculpatory statements; and (5) the abrupt departure of Stamps' president and former CEO Huebner. (Opp. at 27-36).

Perhaps none of the individual allegations alone would be sufficient to establish scienter. However, taken together, they give rise to a strong inference of scienter:

***First***, Plaintiff alleges that Defendants were aware of, and involved in, the Company's contractual relationship with the USPS. (Opp. at 27) (citing Complaint ¶¶ 61, 74, 89, 92, 104, 106-08). Specifically, Defendants regularly referenced conversations they had with USPS regarding their partnership. (*Id.*). Such allegations support an inference that Defendants were aware that the USPS was not happy with Stamps, and in particular, its reseller business practice. *See Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. CV 16-02942 SJO (KSx), 2017 WL 2378369, at *16 (C.D. Cal. May 31, 2017) ("Falsity itself can be indicative of scienter when allegations as to falsity are combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information.") (quoting *Zucco*, 52 F.3d at 1000) (internal quotation marks omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No. CV 19-1828-MWF (SKx)** **Date: January 17, 2020**

Title: Matt Karinski v. Stamps.com, Inc., et al.

***Second***, Plaintiff alleges that the insider stock sales support a finding of scienter. "Insider stock sales are not inherently suspicious; they become so only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (internal quotation marks and citation omitted). "Among the relevant factors to consider in making this determination are: "1) the amount and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history." *Id.* "Context is important, especially for assessing the weight to attach to the timing of the sales." *Id*.

Plaintiff alleges that the volume and history of the insider stock sales are suspicious. First, Individual Defendants collectively sold over 302,000 of their shares, which accounted for 58% of McBride's shares, 83% of Huebner's shares, and 47% of Carberry's shares. (*Id.* at 30). Second, the majority of the sales took place between August 2017 and June 2018, just after President Trump took office and announced his intent to eliminate business practices detrimental to the USPS. (*Id.*). Third, the insider stock sales occurred concurrently with the Company's stock repurchases, which helped inflate Stamps' share prices. (*Id.*).

In response, Defendants argue that the long putative class period of over two years precludes an inference of scienter based on stock sales. (Motion at 29). They also contend that Plaintiff attempts to exaggerate the volume of stock sales by listing sales from individuals not named as defendants and not alleged to have made any challenged statements. (*Id.* at 30). They also argue that the class period stock sales by the three Individual Defendants (as well as almost all the sales by non-defendants) were made pursuant to SEC Rule 10b5-1 trading plans, which allow corporate insiders to set a schedule by which to sell shares. (*Id.*).

Furthermore, Defendants argue that their volume and timing of stock sales are not suspicious. (Reply at 17-19). For example, they note that in the two years before the class period, Defendants Huebner and McBride alone sold 240,454 shares (or about 80 percent of the class period sales). (*Id.* at 17). They also point out that Plaintiff has not pled any trading history for Carberry. They further contend that Plaintiff has failed

to demonstrate that the timing of the sales was suspicious. (*Id.* at 17-18). Specifically, Plaintiff alleges that the corrective disclosures and supposedly related stock drops did not occur until February and May 2019, but none of the Defendants sold any stock after March 9, 2018 – almost an entire year earlier. (*Id.* at 18). Defendants also refute Plaintiff's assertion that Stamps' stock repurchases is suspicious because Stamps repurchased fewer shares of stocks in the months in which the insiders sold than in the months when insiders did not sell. (*Id.* at 19).

While Defendants' arguments might appeal to a trier of fact, the Court cannot determine as a matter of law that the sales do not support scienter, even if the sales would alone be insufficient.

***Third***, Plaintiff argues that former employees' allegations further support its allegation that Defendants were aware (or reckless to the fact) that Stamps' reseller business practices were unsustainable. (Opp. at 33). For example, one former Stamps Field Sales Representative stated that certain USPS teams and District Managers would frequently express their displeasure to Stamps/Endicia sales representatives concerning the Company's practices of offering reseller NSA discounts to existing customers of the USPS who did not otherwise qualify for such prices. (*Id.*). Another stated that Stamps account personnel were instructed by their managers to "keep [the USPS] in the dark" regarding certain discounted rates because "we could get in trouble if we tell [the USPS] too much." (*Id.* at 33-34). This former employee also expressed these concerns to "upper management" during the employee's tenure with the Company. (*Id.* at 34).

Defendants argue that these statements do not support an inference of scienter because they are merely anecdotal and relate only to low-level employees. (Reply at 20). Moreover, they point out that Plaintiff does not allege that the former employees had direct contact with any of the Defendants. (*Id.* at 21). The Court agrees with Defendants that the statements by the former employees alone likely would not establish a strong inference of scienter. Nonetheless, given the specificity and details regarding the witnesses and the alleged information they perceived, the Court determines that the statements contribute to the holistic assessment of scienter. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d at 1033 (finding that allegations from

anonymous informants supported inference of scienter where "[t]he Complaint designate[d] the confidential witnesses' job titles and the region in which they worked, and set[] forth in 'convincing detail' the information these informants have obtained.").

***Fourth***, Plaintiff alleges that Defendants' false exculpatory statements are additional indicia of scienter. (Opp. at 34). When Stamps finally revealed in February 2019 the termination of its commission-based "profit sharing" relationship with the USPS, the Company also claimed that it was its decision to terminate its relationship with the USPS. (*Id.* at 35). However, Plaintiff alleges that this claim was false, which is demonstrated by the Company's prior disclosures about the contract negotiations, which made clear that they were initiated by the USPS, and not Stamps. (*Id.*). This renegotiation also happened contemporaneously with the launch of the Task Force, and the relationship was terminated in early 2019, soon after the Task Force report was published. (*Id.*). Therefore, Plaintiff argues that Defendants' efforts to conceal the truth regarding the termination of Stamps' commission-based "profit sharing" relationship with the USPS more readily gives rise to the inference of scienter. (*Id.*).

The Court agrees with Plaintiff. While Plaintiff has not yet proven that it was USPS's decision to terminate the relationship, Plaintiff has put forth several pieces of evidence in support of this allegation. For example, it is undisputed that Defendants were involved in the negotiations with the USPS, and therefore, Defendants likely would have been aware if the USPS was the one who initiated the termination of the commission-based "profit sharing" relationship. If the USPS had indicated its unhappiness during the negotiations process, and ultimately decided to terminate the relationship, Plaintiff's statements otherwise would be false and would further support an inference of scienter.

When considered holistically, the facts alleged in the Complaint create an inference of scienter sufficient even under the PSLRA and Rule 9(b) at this stage. Moreover, since the Complaint adequately pleads scienter as to the individual executives and directors, this scienter can be imputed to Stamps as a corporation. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) ("Since the Complaint adequately pleads scienter, it is imputed to the Company."); *In re Apple Computer Inc. Sec. Litig.*, 127 Fed. Appx. 296, 303 (9th Cir. 2005) ("A corporation is

deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement.”).

### C. Loss Causation

“To prove loss causation, [the Plaintiffs] must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the [Plaintiffs].” *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014). “[L]oss causation is a ‘context-dependent’ inquiry as there are an ‘infinite variety’ of ways for a tort to cause a loss.” *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citation omitted). “Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant’s misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.” *Id.*

“Revelation of fraud in the marketplace is simply one of the ‘infinite variety’ of causation theories a plaintiff might allege to satisfy proximate cause.” *Id.* at 754. “When plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory.” *Id.* (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008)). However, “[a] plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss.” *Id.* “That a stock price drop comes immediately after the revelation of fraud can help to rule out alternative causes[,] [but] that sequence is not a condition of loss causation.”

Here, Plaintiff alleges that Stamps made two corrective disclosures: an announcement on February 21, 2019, and another announcement on May 9, 2019. (Opp. at 38) (citing Complaint ¶¶ 122-126, 127-128). In the February 21st announcement, Stamps announced that the FY19 earnings would be reduced 50 percent due to the termination of its exclusive agreement with the USPS. (Complaint ¶¶ 122-126). In the May 9th announcement, Stamps further reduced its FY1 guidance

based on potential changes to the USPS's agreements with the third-party resellers. (*Id.* ¶ 127).

Defendants emphasize that neither announcement disclosed the conduct that Plaintiff contends is fraudulent. (Reply at 24-25). However, Plaintiff argues that both earnings reduction were clearly related to the allegedly fraudulent conduct. (Opp. at 38). For example, Plaintiff argues that the first announcement related to the termination of the exclusive relationship that Stamps had with the USPS, which itself was the subject of the alleged false statements. (*Id.*). Plaintiff also argues that the second announcement related back to the false and misleading statements made by Defendants about Stamps' relationship with the USPS and the reseller program, which the USPS was now amending and restricting. (*Id.* at 39).

The Court determines that Plaintiff has sufficiently alleged that Defendant's misstatements (regarding the strength of its relationship with USPS and USPS's approval of Stamps reseller products), as opposed to some other fact, foreseeably caused the plaintiff's loss. While Defendants may argue that there are other reasons the stock price fell, such factual dispute is better suited for at a later stage in the proceedings. *See Rudolph v. UTStarcom*, No. C 07-04578 SI, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008) ("[L]oss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage.")

**D. <u>Section 20A Claim</u>**

The parties agree that Plaintiff's Section 20A claim turns on whether Plaintiff's 10(b) claim survives. (Motion at 39; Opp. at 39-40).

Defendants additionally argue that the claim fails because Plaintiff does not plead particularized facts establishing that McBride sold shares on December 18, 2017 based on material non-public information. (Motion at 39). The Court disagrees. Plaintiff has alleged that the Individual Defendants actively participated in the contractual negotiations with USPS, and therefore, had a basis for knowing USPS's discontent with the program and its efforts to discontinue Stamps' reseller program during the Class Period.

Accordingly, the Motion is **DENIED** as to Plaintiff's Section 20(a) claim.

## V. CONCLUSION

The Motion is **DENIED**.

Defendants shall respond to the Complaint by **January 31, 2020**.

IT IS SO ORDERED.