UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

MATT KARINSKI, et al.,              )
                                    )
          Plaintiffs,               )
                                    )
               vs.                  )
                                    )   2:19-CV-1828-MWF (SKx)
STAMPS.COM, INC., et al.,            )
                                    )
          Defendants.               )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Monday, January 13, 2020

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

APPEARANCES OF COUNSEL:


For the Plaintiffs:


        ROBBINS GELLER RUDMAN & DOWD LLP
        By:  Spencer Burkholz, Attorney at Law
             Eric Niehaus, Attorney at Law
             Kevin Sciarani, Attorney at Law
        655 West Broadway, Suite 1900
        San Diego, California 92101



For the Defendants:

        KATTEN MUCHIN ROSENMAN LLP
        By:  Richard Zelichov, Attorney at Law
             Christina Costley, Attorney at Law
             Paul Yong, Attorney at Law
        2029 Century Park East, Suite 2600
        Los Angeles, California 90067]

THE CLERK:  Calling item number two, case number CV-19-1828-MWF, Matt Karinski vs. Stamps.com, Inc., et al.

Counsel, state your appearance for the record.

MR. BURKHOLZ: Spence Burkholz for the plaintiffs.  I have Eric Niehaus and Kevin Sciarani from my firm.

THE COURT:  Good morning, counsel.

MR. ZELICHOV: Good morning, Your Honor.  Richard Zelichov from Katten Muchin Rosenman on behalf of the defendants, and I have with me my colleagues Christina Costley and Paul Yong.

THE COURT:  Good morning, counsel.

Obviously, very good briefs, and I want to compliment both sides on those.

You know, I started out having a lot of sympathy for the plaintiffs, and I say that of course I still have sympathy for the plaintiffs if most of what is being alleged is true, clearly there is some investors, some of whom I'm sure were very savvy, who have lost money.

But what I'm saying is when I say I was sympathetic, I meant it distinctly in terms of this motion which is in front of me.  As I first understood the issue, it was that the business plan was just understood per se, you know, not something that was -- it was illegal, it was in breach of the contract, it was something that had to be hidden because it was -- it was just improper.  You know, I mean, the same way

if somebody said that the -- if the business plan was a Ponzi scheme, then of course it's going to be hidden.

But then really, you know, once the defendants, you know, in the motion were kind of pushing and saying, no, what was really going on here, and if you really look at what is being alleged, what can be understood to be said here is that there was this changing landscape, and it was against this changing landscape. And, you know, with that understanding, it's not to say that the plaintiffs still haven't alleged something. They, you know, my conclusion is that they have, but they haven't necessarily alleged as much as they think they have.

If one accepts that what was -- what -- I know -- I don't want to say what was going on here, I have no idea what was going on here, but what is really being alleged here is this changing landscape in regard to the Postal Service and whether the defendants were being fair to investors in light of those changing circumstances.

You know, another thing, though, where, you know, the plaintiffs did a good job in the consolidated Complaint, did a good job in the opposition, was pointing out that there is a lot of specificity here. You know, yes, under the Act, and even more than Rule 9, you do begin to get into the weeds in a way that ordinarily would not be allowed, even necessarily be required under Rule 9, and to a certain

degree, you know, evidentiary things.  But once you get to the point of saying, well, who is this particular witness and how can we believe him or her in all of this?  You know, even under the Act it's just -- it just gets to be too much.

You know, we aren't having a trial here.  I'm not reading these papers the way I would for a -- whether I should issue a preliminary injunction or not.  You know, it's just, we'll find out, you know, we'll find out the exact name of who these informants are.  And we'll -- either they are -- perhaps on summary judgment or perhaps to the trier of fact we'll figure out whether they are believable or not.  But there is just even under the Act there is only so far that the defense can go in making those sorts of arguments.

So I hope those -- you know, it's a very long tentative -- I hope those kind of general thoughts will help you in approaching your arguments here.  But since this is just so complicated, I usually let the party who is sort of the most aggrieved by the tentative go first, but here why don't we just let the defendants go first as the moving parties.

MR. ZELICHOV: Thank you, Your Honor.  And may it please the Court?  And we really do appreciate the work that the Court did in going through the Complaint and the various motions.

I would like to sort of I guess specifically address

the areas in the tentative that the Court is presently leaning towards against my client, and I think I want to do a couple of things here that hopefully clarify why I believe the Court's tentative, at least on those particular issues, is incorrect.

And I think I want to start -- well, I think there are two cases I want to sort of talk about briefly, and then I also want to talk about some of the allegations that the Court looked to to think or to hold that Stamps was not fully -- relationship with the USPS was not positive.

So the first case I sort of want to discuss is, it's not a case from this Court, it's a case from the Southern District of New York, but I think it has a lot -- it has a lot to say here that I think goes to where we are.  And this is the case against Express Scripts, which occurred in the Southern District of New York.

And in that case Express Scripts is a pharmacy benefits manager whose largest customer was health insurance company Anthem.  And on February 16th, 2015, Anthem sent Express Scripts a notice of breach of contract.  And right after that, on February 25th, 2015, even though they had received this notice of breach of contract from Anthem, Express Scripts stated that it had a great relationship with Anthem and that the relationship was very, very solid.

Then, on April 1st, 2015, Anthem sent Express

Scripts another notice of breach of contract, this one with respect to pricing. And the parties tried to meet to resolve their differences, but they just weren't able to, and they actually accused each other of acting in bad faith.

And then shortly thereafter, in a number of statements on April 29th, 2015, July 29th, 2015, October 19th, 2015, Express Scripts said that it really enjoys its relationship with Anthem, the relationship was a two-way street, its business outlook remains strong, it enjoyed strong client retention across the board, and that it had strong client relationships.

There was still further efforts at negotiation that failed. And then in December 2015 Express Scripts stated that its previous negotiations with Anthem had resulted in a mutually-beneficial agreement. And then after even more failed negotiations in which Express Scripts actually refused to even meet with Anthem, Express Scripts stated that its negotiations with Anthem were pretty routine. And then right thereafter, Express -- Anthem sued Express Scripts, the stock price fell significantly, and the stockholders brought claims for securities fraud.

And the Court held that the statements about the -- basically, the Court held that most of the statements, the vast majority of the statements about the negotiation -- about the relationship between Express Scripts and Anthem,

which -- the ones I've just read to you, were nonactionable puffery.  And then they also said with respect to the statements about the negotiations which -- that didn't have a definite outcome, that they weren't actionable because Express Scripts could not guess about the outcome of ongoing negotiations.

And the Second Circuit affirmed the Southern District of New York decision last year.  And I think Stamps is actually in a better position than Express Scripts, because in August of 2018, right after we got our first sort of notice that the company -- that the USPS was continuing -- considering terminating the package business incentive agreement, we issued a very specific risk disclosure about that.  We also here, the USPS has never even asserted that we breached any contract with them.  So again, we are in a better position than Express Scripts.

And then unlike Express Scripts and Anthem where there are no continued relationships or contracts between Express Scripts and Anthem, Stamps and the USPS continue to have a host of other contracts reflecting that they still continue to have this really positive relationship, it's just a single contract that they were unable to reach agreement on.

The second case that I kind of -- I think I want to bring the Court's attention to, and maybe this goes without

saying because I'm -- I expect that the Court may know more about this case than I do, is the issue that -- the opinion that the Court issued just last month in the *Natural Health* decision.

THE COURT:  Right.

MR. ZELICHOV: And, you know, in that case Natural Health suspended its business operations in China where it generated substantially all of its revenues after a television show accused it of violating Chinese law.

Based on my understanding of *Natural Health*, this Court held that plaintiff hadn't alleged a claim because the Chinese regulators had never found Natural Health's business model to be unlawful, even though outside sources in the form of news reports were -- had claimed it was, the Chinese regulators had not commenced a specific investigation of the company, though they had started a 100-day campaign against suspected illegal practices in the healthcare industry in which Natural Health operated.  And again, the Court pointed out that Natural Health had issued risk disclosures concerning potential violations of regulations.

I think these same facts here, the USPS --

THE COURT:  Well, counsel, I just have to say I don't.  And obviously I spent a lot of time on that.  And it might be that you've studied it more closely and at this moment know it better than I do, but you have an uphill

battle in convincing me of that.

It went through my mind when I was working on this, but the fact is there one of the reasons that I ruled the way I did is that, again -- it really did there come down to, as it did in the case -- the *Volkswagen* case, on which I relied, on whether there was a duty to disclose that there might be something bad going wrong.

It wasn't here where there is this issue of if your clients had stayed silent and said nothing, was there something that they should have revealed?  It's rather, did they say too much against a backdrop? And that is -- that is really what we have going on here.  I just -- I just don't think the two cases, despite a certain facial similarity, are necessarily all that much alike.

MR. ZELICHOV: I understand the Court's point.  Let me move on as to why the statements that we made here are not rendered misleading by anything that the plaintiff has alleged.

I want to start with the basis for the statements that we made.  And I think those are pretty clearly set out. You have an Exhibit 28, a USPS spokesman named David Partenheimer telling the world that the USPS was pleased with the reseller program, and that the media reports, which came from these short sellers, which plaintiff has copied from liberally, and which the Court has excerpted in numerous

places in the -- in the tentative opinion, were wrong, that the media reports were wrong.

2. You had the USPS chief marketing officer in August of 2007 -- sorry -- 2017 telling the world again that he viewed Stamps.com and other PC postage providers as being excellent partners on bringing the best solution to our customers.

And then maybe most significantly is in August of 2018, so this is almost towards the very end of the class period, the USPS CFO, because the USPS has quarterly conference calls, is asked by an analyst on one of those calls, they ask him about their PC postage providers, which obviously include Stamps, and he says, here we go, They are very, very important partners to us.

And so these statements by the most senior people at the USPS are the basis in why Stamps is perfectly -- Stamps' statements about its relationship with the USPS had a basis in, not just a basis in fact, but a basis from the senior most people at the USPS.

And Your Honor has pointed to I think a few items which suggest that maybe -- Stamps maybe should have known or knew that the -- that this relationship with the USPS was not as great as it was stating.

And the first one I think is sort of these, the move method IntuiShip issues that arose in early 2016. And I

think what the most important thing there is, well, yeah, maybe there is some e-mails going back and forth between IntuiShip and the USPS saying, Hey, we are not 100 percent happy with what you are doing, and maybe if you -- we might terminate your contract, your NSA if it turns out you are doing some bad things. But you know what? The USPS didn't terminate that contract, and plaintiff does not and cannot allege that it did.

Same thing Parcel Partners, right? Parcel Partners is another basis that this Court looks to to say, you know, maybe this relationship wasn't really as good as what the -- that Stamps was saying. But let's look at what happened in Parcel Partners.

First, I just do want to point out that plaintiffs cannot and do not allege who wrote that e-mail from Parcel Partners and they can't allege and do not allege that that -- who at Stamps actually received that e-mail if at all.

Second, even if you look at that e-mail very closely, and, you know, you need to look at that e-mail, that e-mail doesn't say that anybody is engaging in any wrongdoing. It doesn't say that there was anything wrong about discounted sales to low-volume or existing customers. It doesn't -- it just says, We are going to collect some additional information. And even then, even on that limited ground of asking for some additional information, there is no

allegation whatsoever that any of the changes that the USPS suggested that it might make to Parcel Partners were actually implemented.

So we've -- let's just take those two.  These are things where the USPS said, Hey, maybe there is something going on, but then they didn't implement any changes.  That would not give Stamps any reason to think that anything it was doing that it was wrong because the USPS did not make those changes.

Now, and also we've got to keep in mind here, these are not investigations of Stamps itself, it's investigations of third-parties.  And I guess there are a couple of other things, which is, you know, the Parcel Partners e-mail to me is -- and the plaintiffs' purported quotations of it in its -- in the motion -- in the Complaint are really troubling to me, because not only do they not allege that it wasn't sent to Stamps, or -- and which they can't because, well, it wasn't.  But I don't actually believe plaintiffs have even seen that particular thing that they are quoting, because they have -- I didn't notice this until we -- until this argument, until preparing for this argument, they have ellipses in the quote that they have from that particular e-mail, which suggests to me that they are just, you know, that is not a reliable piece of information upon which to rely, if the plaintiff can't actually quote for you the full

aspects of that e-mail.

A few more things, too, with respect to all of this, which is, this is apparently about, you know, our abuse of the reseller program relates causing some affect or impact on our relationship with the USPS.  But this USPS reseller program that Stamps supposedly abused undermining its relationship with the USPS, it just -- it remains in place. It has -- the USPS hasn't changed it even as of now.

Stamps is still able to have its contracts with the resellers whereby it, um, you know, can use those discounted rates and continue to revenue share with the USPS -- with these resellers. Again, showing that the relationship with the USPS remains positive, and it was always good, and continues to be positive.

We also have where Stamps has two of only four PC postage licenses that have been issued to anyone in the entire United States.  Again, another fact that clearly shows that the Stamps and the USPS relationship was entirely positive.

And I want to talk briefly about two -- well, I've got a few other things I want to talk about, and I hope this is okay -- just the lower-level employees that the plaintiffs reference.  They are lower-level employees from Stamps reporting information attributed to other lower-level employees at the USPS who are only providing anecdotes, and

none of whom can allege that they provided any information to the individual defendants, such that those allegations or claims could give rise to anything to do with scienter.

THE COURT:  And I was about to say, for this, are you arguing this in regard that the Complaint fails to allege in the strict, and frankly rather peculiar way required by the Act, the -- that there were the misrepresentations, or is this going to scienter, or is it going to both?

MR. ZELICHOV: I think it goes to both.  I think it goes to falsity in the sense that there is no duty to -- if you looked at the Supreme Court's opinion in *Omnicare*, right? It says, you know, if you've got higher-level people who are telling you that their reseller program, they are pleased with it, that Stamps and the resellers are excellent partners, that Stamps and the resellers are very, very important partners.  You know, what you have from a couple of low-level employees in the U.S. Postal Service is not something that you need to disclose.

And then further, on the scienter side, if that information isn't reported to the individuals who are making those statements, and plaintiffs do not allege that it was, then again it goes to scienter, as well.

There is one other I think argument or piece of information that the Court uses in terms of talking about how the relationship between Stamps and the USPS may not have

been as positive as Stamps stated, and that is sort of the task force report that, you know, that President Trump initiated in April of 2018.

You know, that task force report, one, it's only April of 2018, so that is well into the class period. And then, two, the actual report that comes out of that task force isn't issued until December 4th, 2018.

And, you know, that -- I think we alleged and pointed out, there was an -- you know, that was supposed to come out in August of 2018 but did not. It didn't come out until December of 2018.

And here, we had in August of 2018, when the report was supposedly going to be coming out, the USPS CFO actually making, you know, on a conference call to the world saying that PC postage providers and resellers are very, very important partners to us. Again, supporting everything that Stamps had been saying up to that point in time.

I mean, yes, you know, we got -- there was a market disruption. That is what happened. You got a new administration. It determined that things at the U.S. Postal Service were not going exactly as the way it wanted them to go, and so it put out a task force, but until -- everyone knew about the task force, but until the report of the task force comes out, there is no indication or allegation that Stamps was aware that the USPS might be making certain

changes in connection with its goals for the PC postage program and/or the reseller program.

And I think with that I will reserve time or wait to hear what my --

THE COURT:  I'll give you a chance to respond.

Let me hear from the plaintiffs.

MR. BURKHOLZ: Thank you, Your Honor.

First, I would like to say that -- Spence Burkholz for the plaintiffs -- I appreciate the work that the Court put into the tentative, and although we don't agree with all of it, I just would like to acknowledge the Court's work on this.

Category number 3, the financial results, we disagree with that with respect to the way they broke out the results, they never actually did say how much they got from the reseller program that was improper, but we understand the Court's decision on that.

I would like to just walk through chronologically the fraudulent scheme and see if the Court would reconsider category number 1 and what the company actually disclosed about the reseller program.

So the reseller program was started around 2009, and it started because DHL left the U.S. market, and the Postal Service wanted to get those customers instead of having them go to UPS or FedEx.

So the three resellers that were started at that time were Parcel Partners, IntuiShip and Express 1.  The idea was to get new customers.  It didn't mean they couldn't have low-volume customers, but the high-volume customers was really what the purpose of the program, and the profit margins for the resellers and who they partnered with, because they had to partner with Stamps.com, Endicia or Pitney Bowes, those were the three that had the licenses for the postage.  Those profit margins were very high, and so there was an incentive to get new customers.  The partners -- the reseller was supposed to get the new customers.  They weren't supposed to come from Stamps.com or Endicia or Pitney Bowes.  Those are existing U.S. Postal Service customers.

What happened in 2014, '15 and '16 is Stamps.com acquires four companies:  They acquire Endicia, one of the other three of the -- that has a license.

THE COURT:  That's why they had two of the four.

MR. BURKHOLZ: That's right.

And they also acquire ShipWorks, ShipStation and ShippingEasy.  Those are what they call multi-carrier platforms where customers that go through those entities can ship through the UPS, FedEx or the Postal Service.

What happens is Stamps.com -- and now they have Endicia, also -- they take all of these customers in 2016 and 2017, and they enter into agreements with the reseller

partners, and they split the difference of the increased profit margin, which is a lot more than what they were getting from the base business of the exclusive business they had. And so it's that practice that the Postal Service starts complaining about.

And we have in our Complaint evidence from employees, evidence of e-mails from the Postal Service. In fact, one from the Postal Service to Candi Booth who the employees are complaining to, and she's a pretty high-up executive, sales executive, saying this is not what the reseller program is supposed to be about. There is evidence that they were going to terminate the agreement with IntuiShip, one of the reseller partners. And basically, the response was, These are isolated instances, we'll take care of them, we'll make sure that they don't happen.

But the facts are that the Postal Service was not happy about what was going on in the reseller program. And then you have in the spring of 2017, the beginning of our class period, some rumors that the Postal Service is actually going to do something about it. And they were going to make changes and they were going to monitor the practice more.

And so there is rumors, and then the CEO gets up on the conference calls and says the rumors aren't true, they are happy with the practices, they are happy with us.

But what we do know, and this is the subject of the

argument in the briefing that I didn't really particularly care for, because it was challenging what I had put in our opposition brief, which is the Parcel Partners e-mail.  That e-mail was in a market publication.  That e-mail said -- and it was August 2017 -- it said, To our partners.  Well, their partners are Stamps.com, that is their partner.  And it says, Like we told you back in April, the communication, the Postal Service is going to make these changes. Now, whether or not -- and apparently attached the letter from the Postal Service dated April 10th, 2017.  Whether that letter actually was sent in, whether Stamps.com got the letter, is irrelevant.

What we know is that the Postal Service was upset about the abuses in the program.  They had been upset for a year.  And the August 2017 Parcel Partners e-mail that was in a market publication simply was saying, We told you back in April that the Postal Service was upset, it was going to make these changes.

And it wasn't -- we never pled in our opposition, in our Complaint that there was an April e-mail, like they put in their brief.  Never said that.  I was very careful the way I pled this in the opposition.  I said there was a communication, not an e-mail, of reference to prior communication in April.  And that corresponds with what the company, through e-mails and former employees, were saying

that the Postal Service was upset about the abuses in the program.

And the changes they were talking about, the changes were that the reseller was going to have to do a better job of showing that these customers were their customers, and they weren't existing customers to the Postal Service through Stamps.com, they were their customers. And if they were using additional affiliates, the reseller partners, they had to identify who they were and give the Postal Service information to show that these were really new customers.

And also, that the discounts that were being given to the low-volume customers, there was no reason that -- of course -- and this is where I would like the Court to reconsider on page 19 of its order -- it's not that the low-volume customers were not disclosed and they weren't part of the program. That is not the issue. It's that they were taking existing customers from Stamps.com, moving them over to the reseller program, bundling them up, getting the better profit spread, and sharing that with the reseller partners. That was the abuse of the program, or one of the abuses of the program. And the Postal Service was trying to crack down on that.

Now, the fact that they didn't say that Stamps.com violated any contract, well, of course not. The contract is between the reseller and the Postal Service, but Stamps.com

is benefitting from that contract.  So the threat that they are going to terminate the contract of IntuiShip or they are going to change the rules, well, of course it has to do with the relationship between the Postal Service and the reseller partners, but Stamps.com is the one that is really benefitting from sending customers that were already Postal Service customers to the resellers and getting more profits.

And that really showed up in the way that their revenues exploded after they acquired these companies.  The stock went from 100 to 280 for a reason:  The profits were exploding, they didn't break out how much they were getting from the reseller practices, but intuition is that it had could come from there because what happened after they announced that the -- or they didn't announce, but that there were going to be changes or modifications, a little unclear what happened, but they certainly never got those profits back, never got those revenues back.  The stock took two big hits.  They lost their exclusive agreement with the Postal Service.  And they said, Well, it was our decision, right? This is two months after the task force report comes out.  It was our decision to lose guaranteed revenue of probably 140 million a year.  That is what the analysts thought it approximated to.  We gave that up because we wanted to be able to use other carriers, like UPS and FedEx.  Well, they already had subsidiaries, ShipWorks, ShipStation and

ShippingEasy where they could use those multiple carriers.

So that didn't make sense, and the analysts sort of questioned that also at the time.  And of course, the CEO or president of the company is resigning on the same day as this bad news comes out.  So that is suspicious and leads to indicia that the -- that we've adequately pled, you know, falsity and the scienter in this case.

I don't want to repeat what is in our briefs.  I'll just finish up by responding to a couple of the arguments of defense counsel.

The statements by the Postal Service executives that they were happy with the relationship, well, you also have in footnote 11 we pointed out that one of the executives apparently was -- there was an issue with the statement he made.  There is certainly enough circumstantial evidence that the Postal Service was not happy with the abuses in the program, and maybe what happened was they put in place proper monitoring, and they stopped with the abuses that were taking place, and they lost the revenues, and that is why they stopped -- they decided to go ahead and try to apparently get additional business from other carriers.  That was the reason that they gave.

But back to the categories of statements.  So we would just ask the Court to reconsider category 1, and in particular, page 19, about the fact that the company

disclosed everything about the reseller program and the low-volume customers were part of it. It's the way that they manipulated the low-volume customers and bundled them, and the way that they used existing customers of Stamps and moved them over to the reseller program that was the real manipulation. That was never disclosed. I mean, they were very vague in their disclosures about the reseller program, other than to say that they were a part of it.

The idea behind it was really, though, the customers were supposed to come from the resellers, because they had to use one of the three or four entities that had the license for the postage. It wasn't supposed to go the other way. And that was the manipulation that was going on.

So unless the Court has further questions, I'll sit down.

THE COURT: One is do you have a response to the defense argument about *Express Scripts*, either in the Second Circuit or the Southern District of New York where, you know, essentially what is -- and it's not binding on me, obviously, but still, to the extent it has persuasive authority that there is this somewhat broad definition of puffery, really that is what it boils down to, on what it is that management is allowed to say optimistically?

MR. BURKHOLZ: Well, first of all, the Second Circuit law on puffery is definitely more restrictive than what you

see in the Ninth Circuit.  You have the *Brody* case, which, you know, this Court has cited a number of times, that the state of affairs are different in the company than what you are projecting, but you certainly can't say that you have a strong relationship with the Postal Service and that everything is fine with that relationship, we talk to them all the time, and not disclose -- I mean, those statements on their face are objectively verifiable, either they had a strong relationship or they didn't.

We think we have pled at this stage, as the Court noted in the beginning, you know, it's not summary judgment, it's a pleading stage, but we have e-mails, we have former employees that spoke to some -- one of the top executives, and we have a lot of circumstantial evidence that shows that the state of affairs were different and that those statements were objectively false when they were made.

THE COURT:  Thank you.

All right.  Briefly from the defense.

MR. ZELICHOV: Yes, Your Honor.  I'll be quite brief. I just want to respond to a few of the points that plaintiffs' counsel made.

First, with respect to breaking out revenues, Stamps reported all of its service revenues in a single segment, and that was acceptable under ASC 280, it was -- the reports were in accordance with GAAP, all of which were signed as being

accurate by their auditors.

I think plaintiffs seem to have this very backwards on the exclusive relationship between Stamps and the USPS. Stamps was exclusive to the USPS and couldn't sell other things through its leading brand Stamps and Endicia.  The USPS could deal with whomever it wanted.  Plaintiff just has that one backwards.

The *Brody* point that plaintiffs' counsel made, I actually think what *Brody* shows is that the standard for a misleading omission in this Court is higher and harder to satisfy than in the Second Circuit where they don't have that you have to create an affirmative misimpression.

The idea that -- the April 2017 point that plaintiff keeps making about somehow at that point in time the Parcel Partners or others brought issues about the USPS to Stamps, plaintiffs in paragraph 74 of their Complaint acknowledge that after that point in time, the USPS entered into two new contracts with Stamps with better terms than the earlier ones.  If that April communication was somehow the big deal that plaintiff is alleging, there would not be new contracts. And I think that April 2017 issue is just a complete red herring, has been misstated numerous times, both in the Complaint and in the opposition.

And with that, I have nothing further, Your Honor.

THE COURT:  All right.  Thank you, counsel.  Clearly

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

a very complicated situation, and again, I want to commend you on the effort that went into the briefs.

All right.  The matter is taken under submission.

*****      *****      *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

----------------------------

Amy C. Diaz, RPR, CRR                January 15, 2020

S/  Amy Diaz

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER