ROBBINS GELLER RUDMAN
   & DOWD LLP
STEVEN W. PEPICH (116086)
JASON A. FORGE (181542)
ERIC I. NIEHAUS (239023)
HILLARY B. STAKEM (286152)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
stevep@rgrdlaw.com
jforge@rgrdlaw.com
ericn@rgrdlaw.com
hstakem@rgrdlaw.com
ksciarani@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> STAMPS.COM, INC., et al., <br><br> Defendants. | Case No. 2:19-cv-01828-MWF-SK <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION <br><br> DATE:     TBD <br> TIME:     TBD <br> CTRM:   5A <br> JUDGE:  Hon. Michael W. Fitzgerald |

4837-2668-6144.v1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS COMMON TO THE CLASS ............................ 2

III. THE PROPOSED CLASS REPRESENTATIVE ........................................ 5

IV. THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23 ................................................. 5

    A. The Proposed Class Satisfies the Standards for Class Certification Under Rule 23(a) .......................................................... 9

        1. The Class Is So Numerous that Joinder Is Impracticable ........... 9

        2. Common Questions of Law and Fact Exist ................................ 9

        3. The Proposed Class Representative's Claims Are Typical of Those of the Class ................................................................. 10

        4. The Proposed Class Representative Will Fairly and Adequately Protect the Interests of the Class .......................... 12

    B. The Proposed Class Satisfies the Standard for Class Certification Under Rule 23(b) .......................................................... 14

        1. Common Questions of Law and Fact Predominate .................. 14

        2. Plaintiff Is Entitled to a Presumption of Reliance Under *Basic*'s Fraud on the Market Theory ........................................ 15

            a. Stamps' NASDAQ Listing Is Strong Evidence of Market Efficiency .............................................................. 16

            b. The *Cammer* Factors Establish That Stamps Common Stock Traded in an Efficient Market ............. 16

            c. The *Krogman* Factors Provide Additional Evidence of Market Efficiency .................................... 20

            d. Damages Will Be Calculated Using the Same Methodology for All Class Members ........................... 21

        3. Superiority Is Established ....................................................... 22

    C. Robbins Geller Should Be Appointed Class Counsel ........................ 24

V. CONCLUSION ................................................................................................ 25

- i -

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ...........................................................................................5, 14, 15

*Azar v. Blount Int'l, Inc.*,
2019 WL 7372658 (D. Or. Dec. 31, 2019) ........................................................23

*Baker v. SeaWorld Entm't, Inc.*,
2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) ....................................................18

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ...............................................................................8, 15, 16

*Basile v. Valeant Pharm. Int'l, Inc.*,
2017 WL 3641591 (C.D. Cal. Mar. 15, 2017) .............................................12, 21

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) ............................................................................17

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) .........................................................................6, 10

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ..................................................................*passim*

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .............................................................................................21

*Cooper v. Thoratec Corp.*,
2018 WL 2117337 (N.D. Cal. May 8, 2018) .................................................12, 22

*Di Donato v. Insys Therapeutics, Inc.*,
333 F.R.D. 427 (D. Ariz. 2019)................................................................15, 20, 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ..........................................................................................14

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011)..........................................................................19

**Page**

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ...................................................................................... 15, 19

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ................................................................. 11, 12, 14

*HsingChing Hsu v. Puma Biotechnology, Inc.*,
2017 WL 6210803 (C.D. Cal. Dec. 8, 2017) ......................................... 10, 22, 25

*In re Banc of California Sec. Litig.*,
326 F.R.D. 640 (C.D. Cal. 2018) ................................................................. *passim*

*In re Cooper Cos. Sec. Litig.*,
254 F.R.D. 628 (C.D. Cal. 2009) ................................................................. *passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ........................................................................ 19

*In re Silver Wheaton Corp. Sec. Litig.*,
2017 WL 2039171 (C.D. Cal. May 11, 2017) ................................. 11, 12, 21, 22

*In re VeriSign Inc. Sec. Litig.*,
2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) ..................................................... 23

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ............................................................................... 19

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ....................................................................... 5, 11

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ................................................................. 20, 21

*Maiman v. Talbott*,
2011 WL 13065750 (C.D. Cal. Aug. 29, 2011) ................................. 9, 10, 12, 14

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ........................................................................................... 22

*Smilovits v. First Solar, Inc.*,
295 F.R.D. 423 (D. Ariz. 2013) .................................................................. 7, 8, 18

4837-2668-6144.v1

**Page**

*Sudunagunta v. NantKwest, Inc.*,
 2018 WL 3917865 (C.D. Cal. Aug. 13, 2018) (Fitzgerald, J.) .........................13

*Todd v. STAAR Surgical Corp.*,
 2017 WL 821662 (C.D. Cal. Jan. 5, 2017) (Fitzgerald, J.) .........................*passim*

*Turocy v. El Pollo Loco Holdings, Inc.*,
 2018 WL 3343493 (C.D. Cal. July 3, 2018) .................................................15, 25

*Vaquero v. Ashley Furniture Indus., Inc.*,
 824 F.3d 1150 (9th Cir. 2016).....................................................................21

*Vinh Nguyen v. Radient Pharm. Corp.*,
 287 F.R.D. 563 (C.D. Cal. 2012) ................................................................*passim*

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011) ....................................................................................9

**STATUTES, RULES AND REGULATIONS**

5 U.S.C.
 §552 ............................................................................................................13

15 U.S.C.
 §78 .................................................................................................10, 11, 16
 §78j(b) ...............................................................................................*passim*
 §78t(a)...................................................................................2, 11, 14, 23
 §78t-1 ...................................................................................14, 15, 22

Federal Rules of Civil Procedure
 Rule 23................................................................................................*passim*
 Rule 23(a) ......................................................................................5, 7. 9
 Rule 23(a)(1)...........................................................................................9
 Rule 23(a)(2)...........................................................................................9
 Rule 23(a)(3)........................................................................................10
 Rule 23(a)(4)...................................................................................12, 14
 Rule 23(b) ......................................................................................6, 8, 14, 15
 Rule 23(b)(3) .....................................................................................*passim*
 Rule 23(g)(1) .........................................................................................25
 Rule 23(g)(1)(A)(i)-(iv)...........................................................................25

- iv -

**Page**

17 C.F.R.
    §239.13 ............................................................................................................... 18

## I.   INTRODUCTION

This case alleges a scheme to defraud tens of thousands of investors in Stamps.com, Inc. ("Stamps" or the "Company"), whose shares traded on one of the world's most sophisticated and efficient stock markets (the NASDAQ Stock Market ("NASDAQ")) throughout the proposed class period.  As alleged, Defendants[1] misled the market – and all its participants – through a series of statements that misleadingly portrayed Stamps as enjoying (1)  a strong (exclusive) partnership with the United States Postal Service ("USPS"); and (2)  the USPS's full approval of Stamps' use of its reseller program.  Defendants' scheme began on May 3, 2017 and started unraveling in early 2019.  On February 21, 2019, Stamps admitted its supposedly strong exclusive partnership with the USPS was over and its President, defendant Huebner, was abruptly quitting.  The next day, its stock price dropped almost 60%.  Less than three months later, on May 8, 2019, Stamps admitted impending renegotiations and terminations of its supposedly fully approved use of the USPS's reseller program.  The next day, its stock price dropped another 56%.

This is a prototypical securities fraud case, which, as courts universally recognize, are prototypical cases for class certification.  And, as Congress has recognized, a sophisticated institutional investor like Lead Plaintiff Indiana Public Retirement System ("Lead Plaintiff" or "INPRS") is a prototypical class representative.  Every element of the claims at issue here will be proved with the same evidence and every defense will apply to all class members, with only a slight variation between class members who purchased and/or sold their shares after the February 21, 2019 partial corrective disclosure but before the May 8, 2019 corrective disclosure.  Even this minor variation will apply uniformly to class members who purchased and/or sold their shares in the same window of time.

---

[1]   The "Defendants" are Stamps, Kenneth McBride ("McBride"), Kyle Huebner ("Huebner") and Jeff Carberry ("Carberry").

- 1 -

Notwithstanding Defendants' excessive sabre rattling, there is no good-faith basis to oppose class certification here.   Just as with their failed motion to dismiss, Defendants are exploiting a procedural opportunity to further delay and tax Lead Plaintiff's prosecution of this case to avoid its merits.

## II.    STATEMENT OF FACTS COMMON TO THE CLASS

Lead Plaintiff alleges that Defendants made false and/or misleadingly incomplete statements regarding Stamps' relationship with the USPS and the USPS's approval of Stamps' use of its reseller program during the Class Period (defined below), in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78j(b), 78t(a).   Lead Plaintiff also alleges that defendant McBride violated §20(A) of the Exchange Act by engaging in insider trading during the Class Period.

Stamps is a provider of Internet-based mailing and shipping solutions to customers in the United States and Europe. ¶2.[2]  Under the Company's Stamps.com and Endicia brands, customers during the Class Period could use the Company's software or web interfaces to purchase and print postage for USPS-approved mailing and shipping solutions at discounted rates.  ¶24.  Postage and shipping transactions with the USPS accounted for approximately 87% of the Company's Class Period revenue.  ¶3.  The Company's relationship with the USPS was thus critical, and investors viewed it as a key element of Stamps' business strategy.  ¶¶3-4.

Throughout the Class Period, Defendants assured investors that the Company's mutually beneficial partnership with the USPS was thriving.  ¶¶25, 68-70, 74-75, 80, 86, 89, 92.  On May 3, 2017, for example, defendant McBride told investors and analysts on the Company's first quarter 2017 conference call that they had a "great partnership" with the USPS, and that the "USPS is very happy with the

---

[2]    Unless otherwise specified, all references to "¶" or "¶¶" contained herein are to the Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 71 ("Complaint").

- 2 -

approach they've taken and business model. They're very happy with the relationship with Stamps.com. We talk to them constantly, to the most senior folks there. So we're happy and they're happy." ¶¶68-70. Investors, seeing the Company's 266% increase in revenue between 2013 and 2017, believed these representations. ¶4. Accordingly, Stamps' share price rose from approximately $110 to more than $280 per share during the Class Period. *Id.*

As this Court stated, "[b]ecause Defendants touted its strong relationship with USPS and USPS's approval of Stamps' business model, Stamps had a duty to disclose adverse information that cut against this positive information, including USPS's opposition to Stamps' reseller business practice and its efforts to prevent such practice from continuing." ECF No. 89 at 23. Instead, Defendants concealed that their "strong" relationship with the USPS was extremely strained throughout the Class Period due to the Company's abuse of the USPS reseller program. ¶¶29-33.

Rather than inducing new large-volume shippers to utilize USPS products – the stated purpose of the USPS's partnership with Stamps – the Company had begun funneling existing low-volume USPS customers into the USPS "reseller" programs they would not otherwise qualify for via Stamps subsidiary brands or reseller "partners." ¶¶24-50. This allowed the Company to illicitly capture the spread between what non-qualifying customers paid for discounted reseller postage through the partner program and what the USPS was being paid by the reseller for that same postage. ¶¶29-35.

Stamps' cannibalization of existing USPS customers contributed to an annual revenue shortfall of approximately *$235 million* for the USPS and undermined the long-term financial viability of the agency. ¶¶5-10, 51-60, 71(e). Deeply concerned by the abuse of its programs, the USPS began investigating Stamps' reseller partners and instituting changes to the resellers' contracts with the USPS to reduce or end Stamps' manipulations. ¶¶51-60, 63, 71(e).

- 3 -

4837-2668-6144.v1

On December 18, 2017, before the Company's troubled relationship with the USPS was known by the market, defendant McBride sold 8,115 shares of Stamps common stock for almost $1.5 million in proceeds. ¶134. Just a few months later, in April 2018, a governmental Task Force was established to evaluate the USPS's operations and finances. On the Company's August 1, 2018 conference call, McBride dismissed market concerns about the investigation, assuring analysts that based on the Company's conversations, "the [Task Force] report will come out strongly in favor of the partnerships between the USPS and private industry like the partnerships we've had with the USPS." ¶89. The following quarter, on October 31, 2018, McBride misleadingly stated that the Company "expect[s] that updates to our agreements with the USPS will continue to reflect the critical role that we play in their e-commerce package business." ¶92.

But on February 21, 2019, Stamps stunned investors by announcing the end of its exclusive USPS partnership. ¶10. The Company's stock price plummeted $114 per share on record trading volume of 13.7 million shares, a decline of over 57%. *Id.* Even with this partial revelation, defendant McBride perpetuated Defendants' scheme by falsely assuring investors that it was the Company that had decided to discontinue the relationship in order to better position itself with other shipping carriers. *Id.*

Then, on May 8, 2019, Stamps announced it was lowering its earnings guidance because of potential unfavorable negotiations and terminations of certain contracts between the USPS and the Company's reseller partners. ¶12. As a result of the news, the Company's stock price dropped another $46 per share on record trading volume of 16.8 million shares, a decline of over 56%. *Id.* This drop, combined with the steep decline on February 21, 2019, amounted to a staggering 76% loss in value in over less than three months, as the truth regarding Stamps' deteriorating relationship with the USPS was revealed. *Id.*

- 4 -

4837-2668-6144.v1

## III.    THE PROPOSED CLASS REPRESENTATIVE

Indiana Public Retirement System is among the largest 100 pension funds in the United States, with more than $36.1 billion in assets under management at fiscal year-end 2019.  INPRS purchased approximately 28,300 shares of Stamps common stock during the Class Period and lost more than $2.1 million when Defendants' fraud was revealed.  *See* ECF Nos. 30-2, 30-3.  For example, on December 18, 2017, INPRS purchased shares as defendant McBride was selling.  *Id.*

INPRS has certified that it: (1) has reviewed the Complaint filed in this action; (2) did not purchase securities at the direction of counsel, or in order to participate in any private securities action; (3) is willing to serve as a representative party on behalf of the Class; and (4) will not accept any payment for serving as a representative party for the Class beyond its respective pro rata share of any recovery, except as ordered or approved by the Court.  ECF No. 30-2; *see also* the Declaration of Jeffrey M. Gill in Support of Lead Plaintiff's Motion for Class Certification ("Gill Declaration"), filed concurrently herewith.

## IV.    THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23

At the class certification stage, a movant is only required to demonstrate that the requirements of Rule 23 are met, not that it will ultimately prevail on the merits. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1122 (9th Cir. 2017).  Rule 23(a) sets forth four prerequisites for class certification: (1) the class must be so numerous that joinder of all members is impractical ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims of the representative parties must be typical of the claims of the class ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a).

- 5 -

4837-2668-6144.v1

Once a putative class representative has shown that the proposed class meets these four requirements, a court then must determine whether the action can also be maintained under one of the three subsections of Rule 23(b). Here, Lead Plaintiff seeks class certification under Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Especially in the case of a class action alleging securities fraud . . . '[a]ny doubts a court has about class certification should be resolved in favor of certification.'" *Todd v. STAAR Surgical Corp.*, 2017 WL 821662, at *3 (C.D. Cal. Jan. 5, 2017) (Fitzgerald, J.). As detailed below, because each of Rule 23's requirements is satisfied in this case, the proposed Class should be certified.

This securities fraud action is ideally suited for class treatment, as this District has recognized the efficacy of class actions in pursuing shareholders' actions for securities fraud, finding that class actions:

> "have proved useful where a large number of purchasers or holders of securities claim to have been defrauded by a common course of dealing on the part of the defendants, and have been frequently utilized in such situations. Indeed, it has been suggested that the ultimate effectiveness of the federal remedies in this area may depend in large measure on the applicability of the class action device."

*In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 642 (C.D. Cal. 2009).[3] For this reason, and in recognition of "the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws," the Ninth Circuit takes a liberal approach to class certification in securities fraud actions. *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975).

---

[3]  Unless otherwise stated, all emphasis is added and internal citations and footnotes omitted.

- 6 -

4837-2668-6144.v1

Lead Plaintiff seeks certification of this action as a class action on behalf of a class consisting of:

> All persons who purchased or otherwise acquired Stamps.com, Inc. ("Stamps.com" or the "Company") common stock between May 3, 2017 and May 8, 2019, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

The Class proposed satisfies all requirements of Rule 23(a) and Rule 23(b)(3) for certification.

**Rule 23(a) Requirements**

*First*, numerosity is satisfied, as millions of Stamps common shares traded weekly on the NASDAQ during the Class Period, such that there are likely thousands of potential Class members.

*Second*, the commonality prerequisite is easily met, as there are numerous core questions of law and fact that will be answered with Classwide proof, including: (1) whether Defendants made material misstatements and omissions with regard to Stamps' relationship with the USPS; (2) whether Defendants made such misstatements or omissions knowingly or recklessly; (3) whether Defendants' misrepresentations caused the price of Stamps shares to be artificially inflated, and if so, by how much; (4) whether defendants McBride, Huebner and Carberry were "control persons" of Stamps; and (5) whether defendant McBride traded his Stamps stock while in possession of material, non-public information.

*Third*, the typicality prerequisite is met because Lead Plaintiff's injuries and those of Class members arise from exactly the same alleged fraudulent conduct. Lead Plaintiff and Class members purchased Stamps common stock at market prices

- 7 -

artificially inflated by Defendants' material misrepresentations and omissions. When the information Defendants fraudulently concealed from investors during the Class Period was revealed over two corrective disclosure dates, the price of Stamps common stock plummeted, injuring Lead Plaintiff and the Class.

*Fourth*, the adequacy requirement is met because Lead Plaintiff has demonstrated that it will vigorously prosecute this case and protect the Class' interests. No antagonism exists between Lead Plaintiff and the Class. Additionally, Lead Plaintiff's choice of counsel, Robbins Geller, is extremely experienced in securities class actions and has been appointed by many courts in this Circuit to serve as Class Counsel. *See* Ex. 1.[4]

**Rule 23(b) Requirements**

*First*, this action satisfies the predominance requirement of Rule 23(b)(3). Several issues of fact and law – including falsity, materiality, scienter, loss causation, and damages – are subject to common proof and plainly predominate over any individual issues. Further, all Class members are entitled to the fraud-on-the-market ("FOTM") presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). As shown in the accompanying Expert Report of Zachary Nye, Ph.D. (the "Nye Report" or "Nye Rpt.," attached as Ex. 2 to the Niehaus Declaration), the market for Stamps common stock, which traded on the NASDAQ, was efficient throughout the Class Period. *See* Nye Rpt., §VI. The Nye Report also shows that damages can be calculated on a classwide basis. *Id.*, §VII.

*Second*, the superiority requirement is satisfied because: (1) thousands of geographically-dispersed investors were harmed by Defendants' misconduct; (2) due to litigation costs, it is highly unlikely that investors who lost relatively small amounts of money would file individual actions; (3) it is desirable to hear all such

---

[4] Unless otherwise indicated, all "Ex. __" references are to the Declaration of Eric I. Niehaus in Support of Lead Plaintiff's Motion for Class Certification ("Niehaus Declaration"), filed concurrently herewith.

- 8 -

4837-2668-6144.v1

claims in one court; and (4) there is no difficulty in maintaining this case as a class action.

### A. The Proposed Class Satisfies the Standards for Class Certification Under Rule 23(a)

#### 1. The Class Is So Numerous that Joinder Is Impracticable

Rule 23(a)(1) permits class certification if "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). "It's generally accepted that when a proposed class has at least forty members, joinder is presumptively impracticable based on numbers alone." *In re Banc of California Sec. Litig.*, 326 F.R.D. 640, 646 (C.D. Cal. 2018). Nevertheless, "[t]he Court certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year." *Cooper*, 254 F.R.D. at 634. During the Class Period, there were between 16.9 million and 18.2 million shares of Stamps common stock issued and outstanding. Nye Rpt., ¶25. Additionally, on average, over 2.3 million shares of Stamps stock were exchanged on a weekly basis during the Class Period. *Id*. "Given this trading volume, 'common sense dictates that the proposed class is surely sufficiently large to make joinder impracticable.'" *Maiman v. Talbott*, 2011 WL 13065750, at *3 (C.D. Cal. Aug. 29, 2011) (weekly trading volume of 1.32 million shares supported finding of numerosity). Therefore, the numerosity prong is easily satisfied in this case.

#### 2. Common Questions of Law and Fact Exist

Rule 23(a)(2) requires a showing that "questions of law or fact" are common to the class. Fed. R. Civ. P. 23(a)(2). However, so long as there is "'[e]ven a single [common] question,'" a would-be class satisfies the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). In the Ninth Circuit, when "'[c]onfronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that

- 9 -

the class is united by a common interest . . . which is not defeated by slight differences in class members' positions.'" *HsingChing Hsu v. Puma Biotechnology, Inc.*, 2017 WL 6210803, at *2 (C.D. Cal. Dec. 8, 2017) (quoting *Blackie*, 524 F.2d at 902).

Here, all Class members are alleged to have been harmed as a result of a common course of conduct arising from material misrepresentations and omissions that Defendants made to the investing public.  Thus, there are well-defined common questions of law and fact at issue, including:

> (a)     Whether Defendants violated the Exchange Act;

> (b)     Whether Defendants misrepresented and/or omitted material facts;

> (c)     Whether Defendants knowingly or recklessly disregarded that their statements were misleading;

> (d)     Whether the price of Stamps common stock was artificially inflated as a result of Defendants' misleading statements;

> (e)     Whether and to what extent disclosure of the truth regarding Defendants' misleading statements caused Class members to suffer economic loss and damages; and

> (f)     Whether defendant McBride engaged in illicit insider trading of Stamps stock.

Each of the foregoing questions focuses on Defendants' conduct and their Classwide impact, making the "core" factual and legal issues subject to common proof. *Maiman*, 2011 WL 13065750, at *4.  The commonality requirement is therefore satisfied.

### 3.     The Proposed Class Representative's Claims Are Typical of Those of the Class

Rule 23(a)(3) requires that the class representative's claims or defenses be "typical" of the claims or defenses of the prospective class.  The typicality standard

- 10 -

4837-2668-6144.v1

is permissive; representative claims are "typical" if they "are reasonably co-extensive with those of absent class members[.] . . . [T]hey need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "'[T]he court should look at whether the class members have similar injuries, whether the wrongful activity is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct.'" *Cooper*, 254 F.R.D. at 635. In cases alleging violations of the Exchange Act, "so long as a putative class representative can show that he purchased the stock at the market price and did not consider any unique, *e.g.* insider, information in deciding to purchase it, the putative class representative's claims will likely be typical of the class." *Todd*, 2017 WL 821662, at *4. Typicality is satisfied even if a class representative's "damages differ from the damages of some class members." *Just Film*, 847 F.3d at 1118.

Lead Plaintiff here satisfies the typicality requirement. Lead Plaintiff's §10(b) claims are founded on the same alleged facts and legal theories as the claims of all other Class members. For example: (1) Lead Plaintiff purchased Stamps stock during the Class Period; (2) Defendants made materially misleading statements to the public market; (3) Defendants concealed the truth from investors throughout the Class Period; (4) by hiding this information from investors, Defendants ensured Stamps' stock price remained artificially inflated throughout the Class Period; and (5) Lead Plaintiff suffered the same type of injury as other Class members when the truth was revealed. *See In re Silver Wheaton Corp. Sec. Litig.*, 2017 WL 2039171, at *7 (C.D. Cal. May 11, 2017). Similarly, Lead Plaintiff's §20(A) claims are also based on the same alleged facts and legal theories as the claims of Class members. For example: (1) Defendant McBride violated §10(b) by knowingly or recklessly making materially misleading statements to the public; (2) while wrongfully concealing the truth during the Class Period, McBride sold substantial amounts of his Stamps stock; and (3) Lead Plaintiff, like other Class Members, suffered

- 11 -

damages by buying shares as McBride was selling.  *See Basile v. Valeant Pharm. Int'l, Inc.*, 2017 WL 3641591, at *4 (C.D. Cal. Mar. 15, 2017).

### 4.      The Proposed Class Representative Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In the Ninth Circuit, "'[r]esolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"  *Maiman*, 2011 WL 13065750, at *5 (quoting *Hanlon*, 150 F.3d at 1020).  The adequacy requirement is satisfied here.  Lead Plaintiff's interests are aligned with, and not antagonistic to, those of other Class members, and Lead Plaintiff's counsel is qualified, experienced and fully capable of prosecuting this action on behalf of the Class, as they have done since being appointed Lead Counsel.

As set forth above, Lead Plaintiff purchased Stamps securities at market prices during the Class Period and was injured by the same type of materially misleading statements that injured all proposed Class members.  ECF No. 30-2; *Cooper v. Thoratec Corp.*, 2018 WL 2117337, at *3 (N.D. Cal. May 8, 2018) ("Because class members who purchased both before and after [the potential partial corrective disclosure] may rely on the same theory of liability, there are no divergent claims, and Labak and Cooper are adequate class representatives.").  Thus, Lead Plaintiff's interest in establishing Defendants' liability and obtaining the maximum possible recovery is the same as that of absent Class members.

Lead Plaintiff also understands the role and obligations of a Class Representative and has demonstrated its willingness and ability to serve.  *See* Gill Declaration; *Silver Wheaton*, 2017 WL 2039171, at *7-*8.  Among other actions during the litigation so far, Lead Plaintiff has, either itself or through counsel, (1) moved for and been appointed Lead Plaintiff, (2) supervised and monitored the

- 12 -

progress of court proceedings, (3) discussed case developments and strategy with Lead Counsel, (4) investigated and filed an amended complaint, (5) successfully opposed Defendants' motion to dismiss, (6) served document requests and requests for admission on Defendants, (7) issued and negotiated a Freedom of Information Act request to the USPS, and (8) searched for and produced documents responsive to document requests served by Defendants.  These facts support a finding of adequacy.  *Sudunagunta v. NantKwest, Inc.*, 2018 WL 3917865, at \*7 (C.D. Cal. Aug. 13, 2018) (Fitzgerald, J.) ("That Lead Plaintiffs 'are familiar with the basis for the suit and their responsibilities as [representative] plaintiffs is sufficient to establish their adequacy.'").

As set forth in §IV.C., below, Lead Plaintiff has also engaged qualified, experienced and capable attorneys with an excellent track record in prosecuting complex securities class actions such as this.  *See, e.g.*, *Cooper*, 254 F.R.D. at 636 ("[Robbins Geller] specializes in securities fraud actions and achieved success as lead counsel in one of the largest and highest-profile securities cases of the last decade, the *Enron* case."); *Banc of California*, 326 F.R.D. at 652 ("[T]he work of Robbins Geller lawyers in this case so far indicates that the Court can again expect that Robbins Geller lawyers will effectively help the class representative vigorously prosecute this case."); ECF No. 62 at 3 ("IPRS has selected competent and qualified counsel, Robbins Geller Rudman and Dowd LLP."); Ex. 1.  As their actions in this case demonstrate, Lead Plaintiff's chosen counsel are willing to commit, and have committed, considerable resources to prosecuting this action, and will vigorously represent the interests of the Class.

In sum, Lead Plaintiff is well-suited to represent the Class, has no interests antagonistic to other Class members and, like other Class members, has been injured by Defendants' material misstatements and omissions.  Lead Plaintiff, together with its counsel, is willing and able to prosecute this action on behalf of the Class and

- 13 -

4837-2668-6144.v1

"will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

**B.    The Proposed Class Satisfies the Standard for Class Certification Under Rule 23(b)**

Lead Plaintiff seeks to certify this class pursuant to Rule 23(b)(3), as common questions will predominate over individual ones and a class action is a superior method of litigation this case.  Fed. R. Civ. P. 23(b)(3).

**1.    Common Questions of Law and Fact Predominate**

Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members."  *Id.* This "predominance" requirement is satisfied "'[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'"  *Maiman*, 2011 WL 13065750, at *6 (quoting *Hanlon*, 150 F.3d at 1022).  However, Rule 23(b)(3) "does ***not*** require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof,'" only "that common questions '***predominate*** over any questions affecting only individual [class] members.'"  *Amgen*, 568 U.S. at 469 (emphasis and alterations in original).

And in federal securities fraud cases like the one here, proof of §10(b)'s elements of falsity, scienter, materiality and loss causation are common issues to the entire class because "failure of proof" of any of these elements "would end the case" for all putative class members.  *Id.* at 459-60 ("The alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class."); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) (because it is a common question, a plaintiff is not required to "show loss causation as a condition of obtaining class certification").  Lead Plaintiff's §§20(a) and 20(A) claims are predicated on the same legal and factual basis as Defendants' alleged violations of §10(b) and will be determined by a

- 14 -

4837-2668-6144.v1

common resolution of the same issues. *See Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at \*16-\*17 (C.D. Cal. July 3, 2018) ("'[F]or purposes of class certification,' . . . plaintiffs asserting a Section 20A claim predicated on a Section 10(b) violation, 'need [not] allege or show more than purchase(s) of a security that is actively traded in an efficient market made contemporaneous with a sale by an insider in possession of material, non-public information.'").

### 2.    Plaintiff Is Entitled to a Presumption of Reliance Under *Basic*'s Fraud on the Market Theory

Class-wide reliance is also established in this case through the FOTM presumption of reliance.  The presumption is premised on the fact that "the market price of shares traded on well-developed markets reflects all publicly available information" and that investors in such markets transact "in reliance on the integrity of that price." *Basic*, 485 U.S. at 246-47.  Application of the FOTM presumption dispenses with the requirement that each Class member prove individual reliance on Defendants' alleged misstatements or omissions. *See id.* at 241-42.  To invoke the *Basic* presumption of reliance, a plaintiff must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*").

These prerequisites are readily satisfied here.  First, Defendants made each alleged misleading statement to investors and the marketplace.  ¶¶25, 68-70, 74-75, 80, 86, 89, 92.  Second, "[a]lthough materiality is an essential predicate of the fraud-on-the-market theory, Rule 23(b) does not require a plaintiff invoking the fraud-on-the-market presumption of reliance to prove materiality at the class certification stage because such proof is not necessary to ensure satisfaction of the predominance requirement." *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 437 (D. Ariz. 2019); *see also Amgen*, 568 U.S. at 466-67.  Third, Lead Plaintiff purchased Stamps

- 15 -

securities between the time when the alleged misleading statements were first made, *i.e.*, May 3, 2017, and the end of the Class Period. *See* ECF No. 30-2. And lastly, as detailed below, the market for Stamps common stock was efficient at all relevant times.

### a. Stamps' NASDAQ Listing Is Strong Evidence of Market Efficiency

Throughout the Class Period, Stamps common stock was listed and traded on one of the largest and most developed securities markets in the world, the NASDAQ. *See* ¶131; Nye Rpt., ¶¶18-22. It is widely recognized that the price of stocks traded on such well-developed markets generally reflect publicly available information, the hallmark of an efficient market. *See Basic*, 485 U.S. at 249 n.29. In *Basic*, for example, the Supreme Court noted that "[i]n drafting [the Securities Exchange Act of 1934], Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets." *Id*. at 245-46; *see also Todd*, 2017 WL 821662, at *6 ("'[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency.'"). Thus, the fact that Stamps common stock traded on the NASDAQ throughout the Class Period is a strong indicator of efficiency.

### b. The *Cammer* Factors Establish That Stamps Common Stock Traded in an Efficient Market

Courts in this Circuit routinely consider the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) when evaluating market efficiency. *See, e.g.*, *Todd*, 2017 WL 821662, at *7 ("Accordingly, while the fact that STAAR stock was traded on the NASDAQ is, in itself, a strong indicator of market efficiency, the Court must also consider the five *Cammer* factors to determine whether the market for STAAR stock was efficient."); *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 571 (C.D. Cal. 2012). The five *Cammer* factors are:

- 16 -

> [1] whether the stock trades at a high weekly volume; [2] whether securities analysts follow and report on the stock; [3] whether the stock has market makers and arbitrageurs; [4] whether the company is eligible to file [a short-form registration statement]; and [5] whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."

*Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (quoting *Cammer*, 711 F. Supp. at 1286-87).   Here, each *Cammer* factor supports a finding of market efficiency.

**Factor One – Weekly Trading Volume**: "'[A]verage weekly trading of [2%] or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; [1%] would justify a substantial presumption.'" *Banc of California*, 326 F.R.D. at 649 (quoting *Cammer*, 711 F. Supp. at 1286). During the Class Period, an average of approximately 2.34 million shares of Stamps common stock changed hands weekly, and the weekly trading volume during the Class Period was 13.3% of the shares outstanding.  Nye Rpt., ¶25.  This heavy trading volume is more than six times the amount that the *Cammer* court found sufficient to justify a strong presumption of market efficiency. This factor thus strongly supports a finding that the market for Stamps stock was efficient during the Class Period.

**Factor Two – Analyst Coverage**: "Coverage by securities analysts indicates market efficiency because the price of a company's stock is often affected by analyst reports of information they learn about that stock." *Nguyen*, 287 F.R.D. at 571.  *See Cammer*, 711 F. Supp. at 1286.  During the Class Period, at least eight well-known analyst firms followed Stamps, and between 335 and 427 major institutional investors (many of which would have employed their own financial analysts) owned Stamps common stock.  Nye Rpt., ¶¶29, 40.  In addition, at least 890 articles were

- 17 -

published about the Company during the Class Period. Nye Rpt., ¶30. Each of these facts supports a finding of market efficiency. *See Todd*, 2017 WL 821662, at *7 ("broad coverage" by at least six different analysts supports finding of market efficiency); *Baker v. SeaWorld Entm't, Inc.*, 2017 WL 5885542, at *10 (S.D. Cal. Nov. 29, 2017) (coverage by six analysts and 44 reports on stock sufficient to support market efficiency).

**Factor Three – Market Makers**: "'A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices.'" *Nguyen*, 287 F.R.D. at 572. Significant numbers of market makers "'further provide a mechanism through which the market could be expected to receive information and fully incorporate it into the stock price of a security, as these individuals "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."'" *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 432 (D. Ariz. 2013). Here, there were at least 150 market makers for Stamps common stock during the Class Period. Nye Rpt., ¶35. The presence of so many market makers for Stamps common stock is compelling evidence of market efficiency. *See Todd*, 2017 WL 821662, at *7-*8 ("[T]he presence of large institutional investors and the volume of participating market makers [(91)] indicate that this factor also favors Lead Plaintiff.").

**Factor Four – Form S-3 Eligibility**: A company is eligible to file a Form S-3 registration statement if it has filed U.S. Securities and Exchange Commission reports for 12 consecutive months and possesses a market capitalization of at least $75 million. *See* 17 C.F.R. §239.13. The *Cammer* court found that eligibility to file a Form S-3 supports a finding of an efficient market. *Cammer*, 711 F. Supp. at 1285. Stamps was eligible to file on Form S-3 during the Class Period. Nye Rpt., ¶46. Accordingly, this fact supports a finding of market efficiency.

- 18 -

4837-2668-6144.v1

**Factor Five – The Cause-and-Effect Relationship Between Corporate Disclosures and Stock Price Reactions**: The fifth *Cammer* factor tests whether there is a causal connection between the disclosure of material information and stock price movement.  Event studies, which are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events" (*Halliburton II*, 573 U.S. at 280), "are by far the most common test for a causal connection." *In re Countrywide Fin. Corp. Sec. Litig.,* 273 F.R.D. 586, 614 (C.D. Cal. 2009); *see also In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223, 253 (2d Cir. 2016) (event studies are "'standard operating procedure in federal securities litigation'"); *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("The methodology of event studies has been sustained by many circuits.").

Here, Dr. Nye's event study examined the causal relationship between the announcement of Stamps-specific news and a response in the price of Stamps common stock.  Nye Rpt., ¶¶48-49.  The statistical analysis he conducted determined how much of that price response can be explained by market and peer group factors rather than Company-specific information. *Id.*, ¶49.  The portion of the price change that cannot be attributed to market and peer-group factors is called the "residual return." *Id.*, ¶70.  If the residual return over a particular event period is statistically significant, this indicates that the price movement was caused by Company-specific information. *Id*.  A cause-and-effect relationship between new Stamps-specific information and the reaction in the price of Stamps common stock is evidence of market efficiency. *Id.*, ¶¶47-48.  Based on his thorough event study for Stamps common stock, Dr. Nye concluded that there was a cause-and-effect relationship between new, unexpected, value-relevant Stamps-related information and significant reactions in the market price of Stamps stock, evidencing that it traded in an efficient market during the Class Period. *Id.*, ¶49; *see also Banc of California*, 326 F.R.D. at 650 (finding Dr. Nye's event study "sufficient to show a causal

- 19 -

relationship 'between unexpected corporate events or financial releases and the price reaction of Banc of California stock'").

### c. The *Krogman* Factors Provide Additional Evidence of Market Efficiency

In addition to the *Cammer* factors, the court in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), identified three additional factors relevant to determining market efficiency: (1) the company's market capitalization; (2) the public float; and (3) the bid-ask spreads for stock sales.  Courts in this Circuit have utilized the *Krogman* factors along with the *Cammer* factors, in assessing market efficiency. *See, e.g.*, *Nguyen*, 287 F.R.D. at 574-75.  Each of these factors provides further evidence that Stamps common stock traded in an efficient market during the Class Period.

**Factor One – Market Capitalization**: Market capitalization is an indicator of market efficiency because investors have greater incentive to invest in more highly capitalized corporations, and such companies tend to be more well-known and closely followed.  *See Krogman*, 202 F.R.D. at 478; Nye Rpt., ¶54.  During the Class Period, Stamps' market capitalization ranged between $1.34 billion and $5.10 billion.  Nye Rpt., ¶54.  At its low on April 15, 2020, Stamps' market capitalization was greater than 73.2% of NASDAQ-listed stocks.  *Id*., ¶55.  At its high on June 19, 2018, Stamps' market capitalization was greater than 89.3% of NASDAQ-listed stocks.  *Id*.  These facts support a finding of market efficiency.  *See also Insys*, 333 F.R.D. at 441 ("average market capitalization ($2.2 billion) was greater than at least 68% of the companies whose securities traded on the NYSE and NASDAQ during the Class Period," supporting a finding of market efficiency).

**Factor Two – Float**: A stock's float is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities.  A higher float generally indicates greater market efficiency.  *See Krogman*, 202 F.R.D. at 478.  During the Class Period, Stamps common stock public float averaged 16.5 million

- 20 -

4837-2668-6144.v1

shares, amounting to 93.5% of the Company's shares being held by outsiders. Nye Rpt., ¶57. This factor thus supports a finding of market efficiency. *See Insys*, 333 F.R.D. at 441 (undisputed that outsider ownership of 87.2% of float supports a finding of market efficiency).

**Factor Three – Bid-Ask Spread**: The bid-ask spread is the difference between the prices at which investors are willing to buy shares and current stockholders are willing to sell, with a low bid-ask spread indicating a more efficient market. *See Krogman*, 202 F.R.D. at 478; Nye Rpt., ¶56. During the Class Period, the average bid-ask spread for Stamps common stock was only 0.06%. Nye Rpt., ¶41. By comparison, the average bid-ask spread for a random sample of 100 stocks listed on the NASDAQ Global Select Market was 0.21%. *Id. See, e.g.*, *Krogman*, 202 F.R.D. at 478 (median bid-ask spread of 5.6% supports market efficiency); *Nguyen*, 287 F.R.D. at 574 (noting that a spread of 0.58% supported efficiency). This factor also supports a finding of market efficiency.

#### d.     Damages Will Be Calculated Using the Same Methodology for All Class Members

Both before and after the Supreme Court's ruling in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Ninth Circuit regularly reaffirmed its holding that the "need for individualized damages calculations does not, alone, defeat class certification" under Rule 23(b)(3). *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016); *Todd*, 2017 WL 821662, at *11. That is particularly true for securities fraud cases. *Basile*, 2017 WL 3641591, at *14 ("[T]he Supreme Court has endorsed similar damages calculations. . . . Further, the Ninth Circuit has dismissed any concerns about damages calculations in a similar context, stating 'the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a mechanical task.'").

While not necessary for certification, damages for all members of the proposed Class here can be calculated by the same methodology. *See Silver*

- 21 -

*Wheaton*, 2017 WL 2039171, at *14 ("The Court need not 'decide the precise method for calculating damages at this stage,' but rather must find 'that calculation of damages will be sufficiently mechanical that whatever individualized inquiries need occur do not defeat class certification.'"). Dr. Nye's event-study methodology, set forth in ¶¶58-62 of his report, is fully capable of adequately calculating damages on a classwide basis at a later stage of the litigation and has been upheld by many other courts in securities fraud cases. *See, e.g.*, *Silver Wheaton*, 2017 WL 2039171, at *15; *Todd*, 2017 WL 821662, at *11; *Thoratec*, 2018 WL 2117337, at *7 (finding Dr. Nye's event study-based damages methodology sufficient at class certification stage). As he explains, this methodology is applicable to calculate losses from both §10(b) and §20(A) claims. Nye Rpt., ¶63.

### 3.    Superiority Is Established

Rule 23(b)(3) requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts recognize the class action device as superior to other methods for fairly and efficiently adjudicating large-scale securities class actions on behalf of investors; "[a]s the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'" *Cooper*, 254 F.R.D. at 632; *see also Puma*, 2017 WL 6210803, at *3 ("[A]djudicating this case as a class action makes sense, particularly because of the consistency and efficiency of litigating alleged securities fraud-on-the-market cases all at once."). The Supreme Court has explained that class actions "permit the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (noting that, in the case before it, "most of the plaintiffs would have no realistic day in court if a class action were not available").

In assessing the superiority prong, Rule 23(b)(3) sets forth the following four factors: (1) the interests of members of the class in "individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any

- 22 -

litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). Here, each factor weighs strongly in favor of class certification.

First, the interest of Class members in asserting individual claims is limited. The proposed class consists of many purchasers of Stamps common stock who are geographically dispersed and whose individual damages likely are small enough to keep individual litigation from being economically worthwhile. Absent certification, the burden and expense of litigating would not be distributed among the Class, one of the advantages afforded by the class action mechanism. *See Azar v. Blount Int'l, Inc.*, 2019 WL 7372658, at *6 (D. Or. Dec. 31, 2019) ("'Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants.'") (quoting *In re VeriSign Inc. Sec. Litig.*, 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13, 2005)).

Second, Lead Counsel is not aware of other individual securities litigations alleging violations of §10(b) or §20(A) concerning the fraud alleged. The absence of other matters further confirms the limited ability or interest individual Class members have in prosecuting separate actions. *See Banc of California*, 326 F.R.D. at 651.

Third, concentrating the litigation in this Court has many benefits, including eliminating the risk of inconsistent adjudication and promoting the fair and efficient use of the judicial system. *Todd*, 2017 WL 821662, at *11 ("'Concentrating litigation in one forum is desirable where a company was listed on a national exchange, and no one has identified a meaningful difficulty in managing this class action.'"). As Judge Carney noted in *Cooper*:

- 23 -

4837-2668-6144.v1

> The interests of justice and the perception of equal treatment under the law are perhaps even more important than ensuring judicial economy. If every plaintiff has to bring his or her own action against Defendants, there is a substantial danger of inconsistent findings and judgments. Such a result gives the public a troubling impression that the law is arbitrary – highly dependent on the competency of counsel, the personalities and quirks of judges, and the biases of local jurors. The Court is extremely reluctant to take any action that would foster such a negative impression of our judicial system.

*Cooper*, 254 F.R.D. at 642.

Fourth, Lead Plaintiff does not foresee any management difficulties that will preclude this action from being maintained as a class action. Consistent with Rule 23(b)(3), certification of the case as a class action would not only be superior to other available methods for fairly and efficiently adjudicating the controversy, but also appears to be the sole method for fairly and efficiently litigating the claims of all members of the proposed class. *See Todd*, 2017 WL 821662, at *11 ("'If united by a common core of facts, and a presumption of reliance on an efficient market, class actions are the superior way to litigate a case alleging violations of securities fraud.'").

Thus, each of Rule 23(b)(3)'s factors demonstrates that the class action mechanism is superior to any other method to secure the just, speedy and efficient determination of Class members' claims, such that Rule 23's superiority requirement is satisfied.

### C.    Robbins Geller Should Be Appointed Class Counsel

Lead Plaintiff respectfully requests that the Court appoint its chosen Lead Counsel, Robbins Geller, as Class Counsel. As mentioned previously, Lead Counsel is well-qualified to prosecute this case on behalf of the Class and has already undertaken a vigorous prosecution of this action, including conducting an extensive

- 24 -

investigation of the claims, defeating Defendants' motion to dismiss, engaging in party and third-party discovery, and pursuing class certification. *See* Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) (in appointing class counsel, courts are to consider counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law" and "the resources that counsel will commit to representing the class"). Indeed, acknowledging the firm's experience and ability, courts in this District have frequently appointed Robbins Geller as class counsel in actions alleging violations of the federal securities laws. *See, e.g.*, *Banc of California*, 326 F.R.D. at 652 (noting Court was satisfied with its experience with Robbins Geller, "as the firm resume suggests it would be"); *Puma*, 2017 WL 6210803, at *3; *El Pollo Loco*, 2018 WL 3343493, at *7. Robbins Geller overwhelmingly satisfies Rule 23(g)(1)'s requirements, and Lead Plaintiff's request should be granted.

## V. CONCLUSION

As detailed above, each of Rule 23's requirements for class certification is satisfied in this action. Accordingly, Lead Plaintiff respectfully requests that the Court: (1) certify this action as a class action pursuant to Rule 23(b)(3); (2) appoint Indiana Public Retirement System as Class Representative; and (3) appoint Robbins Geller Rudman & Dowd LLP as Class Counsel.

DATED: June 29, 2020

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
STEVEN W. PEPICH
JASON A. FORGE
ERIC I. NIEHAUS
HILLARY B. STAKEM
KEVIN S. SCIARANI

s/ ERIC I. NIEHAUS
ERIC I. NIEHAUS

- 25 -

4837-2668-6144.v1

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

4837-2668-6144.v1

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on June 29, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ ERIC I. NIEHAUS
ERIC I. NIEHAUS

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  ericn@rgrdlaw.com

- 27 -

4837-2668-6144.v1

**Mailing Information for a Case 2:19-cv-01828-MWF-SK Matt Karinski v. Stamps.com, Inc. et al**

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christina Lucen Costley**
  christina.costley@kattenlaw.com,tamara.vazquez@katten.com,courtalertlax@katten.com

- **Jason A Forge**
  jforge@rgrdlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com,rswartz@scott-scott.com,edewan@scott-scott.com,tlaughlin@scott-scott.com,aweas@scott-scott.com,efile@scott-scott.com

- **Adam C McCall**
  amccall@zlk.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Eric Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw

- **Steven W Pepich**
  stevep@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

- **Kevin S Sciarani**
  ksciarani@rgrdlaw.com,KSciarani@ecf.courtdrive.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Hillary B Stakem**
  hstakem@rgrdlaw.com

- **Paul Satoshi Yong**
  paul.yong@kattenlaw.com,paula.phillips@katten.com,courtalertlax@katten.com,victoria.lippman@katten.com

- **Richard H Zelichov**
  richard.zelichov@katten.com,tamara.vazquez@katten.com,courtalertlax@katten.com,jonathan.rotenberg@katten.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

- 28 -