# EXHIBIT 2

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ (147029)
STEVEN W. PEPICH (116086)
ERIC I. NIEHAUS (239023)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
stevep@rgrdlaw.com
eniehaus@rgrdlaw.com

Lead Counsel for Lead Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>   vs.<br><br>STAMPS.COM, INC., KENNETH McBRIDE, KYLE HUEBNER, and JEFF CARBERRY,<br><br>              Defendants. | Case No. 2:19-cv-01828-MWF(SK)<br><br>CLASS ACTION<br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>           Lead Plaintiff,<br><br>   vs.<br><br>STAMPS.COM, INC., KENNETH McBRIDE, KYLE HUEBNER, and JEFF CARBERRY,<br><br>              Defendants. | DEMAND FOR JURY TRIAL |

4844-8861-5070.v1

Exhibit 2
- 37 -

Case 2:19-cv-01828-MWF-SK Document 71 Filed 08/05/19 Page 2 of 80 Page ID #:871

Lead Plaintiff Indiana Public Retirement System ("Lead Plaintiff" or "INPRS"), by and through its undersigned counsel, brings this federal class action based upon personal knowledge as to those allegations concerning itself and, as to all other matters, upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings made by Stamps.com ("Stamps" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) releases and other publications disseminated by defendants; (c) securities analyst reports, news articles, websites, and other publicly available information concerning defendants and other related non-parties, including the U.S. Postal Service (the "USPS"); and (d) interviews with certain former Stamps employees and consultation with industry experts. Lead Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

**INTRODUCTION**

1. This is a securities fraud class action brought on behalf of all persons who purchased the common stock of Stamps between May 3, 2017 and May 8, 2019, inclusive (the "Class Period"), against Stamps, its Chief Executive Officer ("CEO"), its President and former Chief Financial Officer ("CFO"), and its CFO[1] for violations of the federal securities laws.

2. Defendant Stamps is a provider of Internet-based mailing and shipping solutions to customers in the United States and Europe. Stamps offers customers USPS products at discounted rates that allow them to print "electronic postage" directly onto envelopes, plain paper, or labels using a standard personal computer, printer and Internet connection. During the Class Period, Stamps exploited its

---

[1] The "defendants" are Stamps, Kenneth McBride ("McBride"), Kyle Huebner ("Huebner"), and Jeff Carberry ("Carberry").

4844-8861-5070.v1

Exhibit 2

- 38 -

contractual relationships with the USPS by providing customers unauthorized-discounted USPS shipping under what was known as the "reseller program."

3. Postage and shipping transactions with the USPS accounted for approximately 87% of Stamps' Class Period revenue. Thus, Stamps' operating performance was entirely dependent on maintaining, protecting, and preserving good relations with the USPS. Stamps' relationship with the USPS was largely premised on the notion that Stamps' promotional and business activities would induce large-volume shippers to utilize USPS products. To this end, Stamps was allowed to buy postage from the USPS at prices that were far less than advertised rates and resell that postage at a substantial markup (though still below market price). In fact, this "reselling" market was dominated by Stamps, which had an agreement with the USPS that Stamps would only offer these discounted rates to companies that would ship in large volumes and therefore warranted discounts for buying postage in bulk. In violation of the terms and the spirit of the USPS's reseller program, Stamps, however, was clandestinely offering discounted pricing to small-volume shippers that were already using the USPS for their shipping needs. Once the USPS confirmed Stamps' improper reseller practices, the highly profitable exclusive partnership Stamps had with the USPS was terminated.

4. Notwithstanding the fact that Stamps was aggregating small-volume shippers and providing them unauthorized discounts (by entering reseller partnerships with third parties and secretly skimming USPS profits), Stamps publicly represented throughout the Class Period that its strong operating performance was the result of the Company's strong partnership with the USPS. For example, in August 2017, shortly after questions surfaced regarding Stamps' role in the USPS reseller program, Chairman of the Board ("Chairman") and CEO McBride repudiated any suggestion of tension between Stamps and the USPS, assuring investors that "[w]e continue to enjoy a great partnership with the Postal Service and feel that *we have created a sustainable win-win model for both of us*." To investors,

- 2 -

defendants made it appear that the Company's strategy was a glowing success, as Stamps posted double-digit compounded annual growth in net revenue and earnings, with Stamps' revenue increasing from $128 million in 2013 to $469 million in 2017, a 266% increase. As a result of this perceived success, Stamps' share price rose from approximately $110 to more than $280 per share during the Class Period.

5. The truth, however, was that a majority of Stamps' reported revenue and earnings growth during the Class Period was the product of the undisclosed, improper, and unsustainable business practices detailed herein, including Stamps' manipulation of a USPS reseller program in a manner that was designed to and did effectively cannibalize USPS revenues by an estimated $235 million per year. Specifically, Stamps was secretly bundling small-volume postage customers to make these small-volume customers appear to be large-volume customers and then purchasing postage from the USPS at discounted rates to which small-volume customers were not entitled.

6. As part of defendants' scheme to skim profits from the USPS by bundling small-volume shippers, Stamps utilized its subsidiaries and affiliates to secure discounted postage from the USPS via Negotiated Service Agreements ("NSAs"). The NSAs provided discounted postage for large-volume customers that warranted this special agreement with and treatment by the USPS. The NSAs did **not** permit Stamps to bundle customers and secretly pass on discounts to small-volume shippers. In fact, small-volume shippers did not qualify for NSAs with the USPS and were not authorized to receive the discounted shipping rates that Stamps was providing. By improperly extending the USPS's NSA program to non-qualifying customers, Stamps generated significant profits from the spread between the amount Stamps paid the USPS for postage and the amount customers paid Stamps for this same postage.

7. Knowing it was only a matter of time before Stamps' unauthorized "reselling" of special reduced postage rates would be discovered and shut down by

- 3 -

4844-8861-5070.v1

Exhibit 2
- 40 -

the USPS, the Individual Defendants (defined below) and other Stamps insiders rushed to sell hundreds of millions of dollars in Stamps stock at artificially inflated prices as high as $272 per share. The dramatic stock sales by these Company insiders were unusual in their amount and suspicious in their timing and were completed without first disclosing the adverse facts regarding Stamps' scheme and wrongful course of business. Defendants McBride (the Company's CEO and Chairman), Huebner (the Company's CFO prior to August 2017), and Carberry (the Company's current CFO), collectively sold over 302,000 of their Stamps shares at artificially inflated prices for proceeds of nearly *$59 million*. In total, Stamps insiders dumped over a million shares of stock during the Class Period for proceeds of over *$230 million*.

8. In order to sell the vast majority of their Stamps shares at artificially inflated prices before the truth about defendants' misconduct was revealed, defendants, together with Stamps Board members, also caused the Company to expend approximately *$300 million* in Stamps' own cash to repurchase shares at the same time that Stamps insiders were selling hundreds of millions of dollars' worth of their own Company stock. The concurrent repurchase of Stamps shares by the Company was a key part of defendants' misconduct, as it averted a precipitous decline in Stamps' share price that their massive insider trading would have otherwise caused and allowed defendants to continue selling their own Stamps shares at artificially inflated prices.

9. Stamps' abuse of the USPS reseller program contributed to growing losses at the USPS and helped undermine the long-term financial viability of the agency. In April 2018, a governmental Task Force was established to evaluate the USPS's operations and finances. The Task Force's December 2018 Report (the "Task Force Report") concluded that the USPS was forecasted to lose tens of billions of dollars over the next decade. The Task Force Report listed "product pricing" among the primary reasons for the deterioration in the USPS's financial condition.

- 4 -

4844-8861-5070.v1

Exhibit 2
- 41 -

10.    On February 21, 2019, two months after the Task Force Report was released, Stamps stunned investors by announcing the end of its exclusive USPS partnership.  On a subsequent conference call to discuss Stamps' 4Q18 and FY18 financial results[2], McBride misleadingly represented that it was the Company that had "decided to discontinue [its] shipping partnership with the USPS so that [it could] fully embrace partnerships with other carriers who . . . will be well positioned to win in the shipping business in the next 5 years."  This dramatic revelation confused the market, which attempted to process the inexplicable announcement that Stamps was simply walking away from a business relationship that accounted for a significant portion of its revenue.  As a result of this news, the Company's stock price plummeted $114 per share on record trading volume of 13.7 million shares, dropping from $198 per share to close at less than $84 per share on February 22, 2019, a decline of over **57%**.

11.    Notwithstanding defendant McBride's February 21, 2019 representations about the reasons for the termination, the timing of the dissolution and the conclusions set forth in the Task Force Report indicated that the USPS itself had decided to end its exclusive partnership with Stamps because of the Company's manipulative reseller practices.  Indeed, on February 26, 2019, *The American Conservative* reported that, contrary to defendant McBride's representations that Stamps initiated the dissolution of its USPS exclusive partnership, the USPS had in fact decided to terminate its relationship with Stamps in the face of the Company's "reseller" program abuses, which had an annual cost to the USPS of at least $235 million.

---

[2]  Stamps' fiscal quarters and fiscal years are abbreviated throughout.  Thus, "4Q18" for example, represents the fourth quarter of fiscal year 2018.  "FY18" represents the fiscal year 2018.  Stamps' fiscal year follows the calendar year, beginning on January 1 and ending on December 31.

- 5 -

4844-8861-5070.v1

Exhibit 2

- 42 -

Case 2:19-cv-01828-MWF-SK Document 125-2 Filed 07/01/20 Page 8 of 81 Page
ID #:2821
Case 2:19-cv-01828-MWF-SK Document 71-1 Filed 08/05/19 Page 7 of 80 Page ID #:676

12.     Stamps' reseller scheme finally unraveled on May 8, 2019, when Stamps again shocked investors, slashing the Company's FY19 profit outlook. Stamps announced that it was lowering earnings guidance because of potential unfavorable short- and long-term amendments, renegotiations, and termination of certain NSAs between the USPS and the Company's reseller partners – which defendants had known about and anticipated since the start of the Class Period, despite falsely asserting that they "very recently bec[a]me aware" of these adverse conditions that would have a negative impact on the Company's financials.  The Company further stated that it now expected FY19 profit of $3.35 to $4.85 per share, down from its prior estimate of $5.15 to $6.15 per share.  As a result of this news, Stamps' stock price dropped another $46 per share, on record trading volume of 16.8 million shares, to close at under $37 per share on May 9, 2019, a decline of over *56%*.  The two consecutive 50% slides in Stamps' share price following two consecutive quarterly announcements is extraordinary.[3]  Stamps investors lost *76%* of their investments in only two and a half months as the truth regarding Stamps' deteriorating relationship with the USPS reached the market.

13.     Accordingly, while Company insiders were able to unload over *$230 million* of their own Stamps stock at prices well over $200 per share, Lead Plaintiff and other members of the Class (defined below) who purchased Stamps shares at inflated prices have suffered hundreds of millions of dollars in harm as the truth about, and impact associated with, defendants' misconduct entered the market.

_____

[3]   George Pearkes, a macro strategist at Bespoke Investment Group, noted that there have been "'zero instances,'" based on Bespoke's data, which begins in 2001, of a U.S. stock dropping 50% on two sequential quarterly reports.

- 6 -

4844-8861-5070.v1                    Exhibit 2
- 43 -



**Plummeting Stock**
Stamps.com shares plunge after the company slashed its profit outlook for the year

Source: Bloomberg

## JURISDICTION AND VENUE

14. The claims asserted herein arise under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

16. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District. Stamps' corporate headquarters are located in this District. Stamps also conducts substantial business in California sufficient to provide for general jurisdiction over it in this District.

17. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

- 7 -

4844-8861-5070.v1

Exhibit 2
- 44 -

## PARTIES

**Plaintiff**

18.     Lead Plaintiff Indiana Public Retirement System is among the largest public pension funds in the United States, with more than $34 billion in assets under management at fiscal year-end 2018.  INPRS serves the needs of approximately 467,332 members and retirees representing more than 1,200 employers, including public universities, school corporations, municipalities, and state agencies.  Lead Plaintiff INPRS purchased or otherwise acquired Stamps common stock during the Class Period (as set forth in its previously filed certification) (*see* ECF No. 30-2), and was damaged thereby.

**Defendants**

19.     Defendant Stamps is a provider of Internet-based mailing and shipping solutions in the United States and Europe.  Under the Stamps and Endicia brands, Stamps' customers use USPS solutions to mail and ship a variety of mail pieces and packages through the USPS and customers using Stamps' solutions receive discounted postage rates compared to USPS.com and USPS retail locations on certain mail pieces.  Stamps is incorporated in Delaware, with its principal executive offices located at 1990 E. Grand Avenue, El Segundo, California 90245. Stamps shares trade on the NASDAQ Stock Market, LLC ("NASDAQ") under the ticker symbol "STMP."

20.     Defendant Kenneth McBride has served as Stamps' Chairman and CEO at all relevant times.  During the Class Period, McBride also sold 190,585 of his personally held shares of Stamps stock at artificially inflated prices for proceeds of approximately $35 million while in possession of material non-public information, including shares sold contemporaneously with Lead Plaintiff INPRS on December 18, 2017.  Defendant McBride made numerous false and misleading statements during the Class Period.

4844-8861-5070.v1

- 8 -

Exhibit 2
- 45 -

21. Defendant Kyle Huebner has served as Stamps' President since August 2017. At all relevant times prior to August 2017, Huebner was Stamps' Co-President and CFO. During the Class Period, Huebner also sold 52,183 of his personally held shares of Stamps stock at artificially inflated prices for proceeds of approximately $10 million while in possession of material non-public information. Defendant Huebner made false and misleading statements during the Class Period.

22. Defendant Jeff Carberry has served as Stamps' CFO since August 2017. During the Class Period, Carberry also sold 59,583 of his personally held shares of Stamps stock at artificially inflated prices for proceeds of approximately $13 million while in possession of material, non-public information. Defendant Carberry made false and misleading statements during the Class Period.

23. Defendants McBride, Huebner and Carberry are sometimes collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' RESELLER SCHEME AND WRONGFUL COURSE OF BUSINESS

24. Under the Stamps.com and Endicia brands, customers use the Company's USPS-approved mailing and shipping solutions to mail and ship packages through the USPS. Customers can purchase and print postage twenty-four hours a day, seven days a week through software or web interfaces. The Company's solutions allow customers to receive discounts for most USPS mail and packages.

25. Throughout the Class Period, defendants represented that Stamps' revenue and earnings growth was being driven by its strong and mutually beneficial partnership with the USPS. The key pillar of this partnership was a revenue sharing agreement pursuant to which Stamps served as the official online provider of USPS postage and shipping solutions. This lucrative agreement provided the Company with exclusive access to the USPS's $20 billion postage and delivery market. The USPS, in turn, relied on Stamps to grow the USPS's sales and provide customers with an accessible online interface.

- 9 -

26. During the Class Period, defendants falsely assured the market that the Company's strong revenue and profit growth was based on its mutually-beneficial and stable relationship with the USPS. The relationship between Stamps and the USPS, however, was built upon a foundation of deception, as Stamps was in the midst of a reseller scheme that was designed to and did improperly skim USPS profits in order to artificially inflate Stamps' reported financial results. The undisclosed tension between Stamps and the USPS concerning Stamps' abuse of the USPS reseller program ultimately resulted in the USPS terminating Stamps' highly profitable business model. Rather than benefiting the USPS, Stamps was competing against the USPS by illicitly skimming profits associated with purchases by existing USPS customers.

27. Notwithstanding the tension in the Stamps-USPS relationship, defendants told investors that the USPS was pleased with its contractual arrangements with Stamps, purportedly because Stamps was helping the USPS grow its business. Stamps' conduct, however, was harmful to the USPS, and the growth in USPS business was the result of organic growth in e-commerce shipping. Ultimately, as a result of the undisclosed conflict between the USPS and Stamps, the USPS terminated Stamps' commission-based compensation and restricted its use of the reseller program. As the truth about Stamps' abuse of the reseller program and the impact thereof on Stamps' operations and prospects reached the market, the trading price of Stamps shares collapsed.

**Stamps' Improper Manipulation of the USPS Reseller Program**

28. Stamps was initially enlisted in 1999 to bring new large-volume shipping customers to the USPS by offering Commercial Base Pricing that offered a slight discount from retail price postage rates. Thus, when a Stamps customer printed PC postage from its web-based platform, Stamps would receive a commission from the USPS for providing this business. Stamps customers would

- 10 -

Exhibit 2

- 47 -

also typically pay a monthly subscription fee for access to PC postage and for access to any reduced Commercial Base Pricing rates that they received. However, these commissions and monthly subscription fees could not generate the type of dramatic revenue growth Stamps posted throughout the Class Period.

29. Unbeknownst to investors, Stamps' business model significantly changed by at least 2017. Stamps had begun directly competing with and improperly profiting at the expense of the USPS. The Company's rapid revenue and profit growth during the Class Period was fueled by its clandestine practice of funneling existing USPS customers into a program in which they were not authorized to participate. This allowed Stamps to illicitly capture the spread between what non-qualifying customers paid for discounted reseller postage and what the USPS was being paid for that same postage.

30. Stamps concealed that it was generating a substantial portion of its Class Period revenue through NSAs that were being manipulated in contravention of the reseller program. The USPS initiated its NSA program in 2006 to attract new high-volume business to the USPS in the face of rising competition from FedEx and UPS. Pursuant to these NSAs, the USPS offers discounted postage rates to qualified high-volume end users, typically individual companies shipping more than 50,000 items a year. The USPS did *not* offer discounted postal rates to low-volume shippers, as they typically send smaller packages and were already incentivized to ship with the USPS because the USPS offered the lowest rates of all competing carriers.

31. In 2009, the USPS created a postage reseller program in an effort to expand its package shipping business. This reseller program was created after the international shipping company DHL decided to exit the U.S. market, thereby presenting the USPS with the opportunity to acquire DHL's prior U.S. domestic shipping customers. Starting in 2009, the USPS granted three intermediary companies that had historical ties to DHL (*i.e.*, Parcel Partners, Express 1 and

- 11 -

4844-8861-5070.v1

Exhibit 2

- 48 -

IntuiShip) the right to receive discounted postage in exchange for business from their former DHL customers. The intent and purpose of this reseller program was to acquire new shipping business for the USPS by offering discounted rates to large volume shippers.

32. Contrary to the terms of their contractual agreements, Stamps and its affiliated intermediaries began abusing the NSA and reseller programs as early as 2014 by secretly switching existing USPS customers that had previously paid USPS retail pricing to discounted pricing under the reseller program, effectively cannibalizing the USPS's business so that Stamps could profit from the spread between the discounted postal rates being paid to the USPS and the rate customers paid Stamps for that same postage.

33. To illustrate, if the commercial package base price was $5.00 without resellers, the USPS would receive the full $5.00 (less a small commission paid to Stamps pursuant to their exclusive partnership with the USPS). But when the reseller was inserted into the process, the customer would now pay $4.85, or a slightly lower price, but now the USPS might only get $4.00 per package and the reseller would receive the $.85 difference. The reseller – owned by or partnered with Stamps – would then kick back a large fraction of the $.85 to Stamps as the PC postage provider. In this way, the reseller program was subverted from one designed to provide new package business for the USPS to one that had simply increased the profitability of Stamps and lowered USPS revenues.

4844-8861-5070.v1

Exhibit 2
- 49 -



34. As part of its reseller scheme, Stamps also routed existing USPS customers to the Stamps-controlled reseller that had the lowest postage rates with the USPS because this arrangement would provide Stamps with the largest spread between what a customer paid Stamps for postage and what a reseller (under its NSA) paid the USPS for that same postage. This meant that the USPS would receive the least amount of revenue, while Stamps and its reseller partners maximized their share of the skimmed profits.

35. During the Class Period, Stamps also shifted existing USPS customers to the reseller partner that agreed to give Stamps the largest share of revenue collected from the postal rate spread. Due to Stamps' significant leverage within the marketplace, reseller partners would often allocate the lion's share of skimmed profits to Stamps, because Stamps would otherwise shift its large, existing customer base to a competing reseller.

- 13 -



**Defendants' Reseller Scheme Violated USPS Governance**

36. Defendants' reseller scheme was inconsistent with and in contravention of the Postal Accountability and Enhancement Act of 2006 (the "PAEA"), which governs the USPS's setting of special pricing under NSAs. The USPS's use of an NSA did not give private parties such as Stamps a license to resell USPS discounted postage to any and all potential shippers without the express consent and authorization of the USPS. Rather, the PAEA has strict guidelines authorizing which customers can receive an NSA and under what circumstances it can be used.

37. The USPS has multiple factors for determining whether a potential candidate is entitled to NSA special reduced pricing, including: (1) an analysis of the candidate's historical data showing the mail volumes and use of specific mail services or mail piece characteristics; (2) the candidate's ability to make and present in an acceptable format accurate forecasts of future mail volumes for USPS product and services proposed for an NSA; (3) the candidate's ability to collect necessary data in an acceptable format to support an NSA; (4) the candidate's preparation of

- 14 -

mail using a formal system to ensure proper mail preparation and accurate postage calculations; and (5) the candidate's use or planned implementation of certified mail preparation total quality program to ensure proper mail preparation and to provide accurate documentation of mailings and postage payment.

38. Indeed, the conditions and requirements for obtaining an NSA also provide that an NSA candidate must permit the USPS's inspection of mail content to determine price eligibility and must meet and adhere to quality management standards for classes of mail and prices claimed. Moreover, any counterparty to an NSA must make available to the USPS necessary records and data related to the NSA in a form to enable monitoring of compliance with the terms and conditions of the NSA.

39. Defendants' scheme to secretly manipulate the USPS reseller program by clandestinely offering discounted pricing to small-volume shippers contravened the USPS's safeguards outlined above and was designed to and did evade the USPS's control over which customers received NSA pricing.

40. The applicable regulations governing the issuance of an NSA also provide that, at a minimum, no NSA can have an overall negative financial impact on the USPS. J.P. Klingenberg, Deputy Director, Office of Accountability and Compliance, Postal Regulatory Commission, explained to journalists investigating the reseller program in July 2016 that the USPS would terminate a postage reseller if it was cannibalizing USPS business and that the USPS could terminate a given NSA with a reseller with 30-days' notice to the reseller.

**Stamps Embarked on a Rapid Succession of Acquisitions to Expand Its Scheme**

41. Key to Stamps' massive reseller scheme was its use of a web of intermediaries to conceal its business model. Stamps achieved this by acquiring or otherwise asserting control over a number of multi-carrier platforms. Some of these multi-carriers, such as Endicia and ShipStation, related to publicly disclosed

4844-8861-5070.v1

Exhibit 2
- 52 -

acquisitions by the Company.  Other arrangements, such as those with IntuiShip and Express 1, have not been publicly detailed by the Company.

42.    Thus, in 2014, Stamps began a rapid succession of acquisitions, acquiring companies with customer lists that included many existing USPS shippers. Following the completion of these acquisitions, Stamps converted those existing USPS customers (without any request or consent) into its reseller program.

43.    In essence, Stamps was purchasing companies such as ShipWorks, Endicia, ShippingEasy, and ShipStation in order to obtain their respective customer lists, which included substantial numbers of existing USPS shippers.  Stamps was then taking those existing USPS customers and giving them slight discounts by running them through the reseller program, pocketing the difference between what it and its reseller partners paid the USPS.  Stamps was authorized to provide Commercial Base Pricing in order to bring in new high-volume shippers, but Stamps instead manipulated the reseller program to offer existing USPS shippers the lower Commercial Plus Pricing, while Stamps (along with its reseller partners) was paying the USPS substantially lower NSA rates for that postage.  In this way, it became very profitable for Stamps to acquire companies primarily to convert the target company's existing USPS customers to the reseller program where Stamps obtained a majority of the spread (or difference) between what the customer paid and what the USPS received for postage.

4844-8861-5070.v1

Exhibit 2

- 53 -



44. Defendants' scheme and wrongful course of business funneled existing USPS customers into the reseller program (thereby skimming and reducing the USPS's postage margins) and artificially boosted Stamps' profits. Rather than comporting with the terms of Stamps' agreements with the USPS and identifying and selling to customers who were not already shipping with the USPS, defendants instead determined that it was easier to simply acquire existing companies in the shipping solutions business because those companies already had existing USPS customers that could be profitably transitioned to the reseller program.

45. Following its acquisition of several multi-carrier platforms beginning in 2Q14, Stamps' fortunes suddenly reversed. At the same time, the growth in Stamps' revenues far outstripped revenue increases at the USPS. Between 2013 and 2017, Stamps' revenues increased from $128 million to $469 million, a ***266%*** increase. By comparison, during this same time frame, USPS revenues increased by only ***3%***.

4844-8861-5070.v1

Exhibit 2

- 54 -

**Former Stamps Employees Have
Corroborated Defendants' Reseller Scheme**

46.     Former Stamps employees have corroborated the essential facts of defendants' reseller scheme whereby Stamps has been profiting at the expense of the USPS by effectively stealing the USPS's customers and business.  For example, a former Stamps Account Manager, who was employed by the Company from February 2017 to September 2018 in the Mountain View, California office, confirmed that the Company gave discounted package rates to customers through its Stamps account and also through its multi-carrier platform, in this case ShipStation.  According to this former employee, while customers needed to meet certain volume thresholds to qualify for the reseller discounted rate through Stamps (usually 50,000 "priority mailings" per year), anyone could get the discount by using the ShipStation platform, even if they would not qualify for the USPS reseller discounted rates.

47.     In addition, while these customers needed USPS approval to get the discounted rate through Stamps, Stamps used ShipStation to provide the discount without USPS approval.  This former employee stated that shortly after he began working with the Company he was instructed to persuade some 2,000 existing Stamps clients to switch to the ShipStation service – confirming that significant cannibalization of the USPS (rather than customer growth) served as the key driver of the Company's revenue growth.  The Stamps Account Manager also confirmed that many clients received the preferred discounted rate, referred to internally as the Company's "special sauce," through ShipStation, even though they did not meet the USPS's minimum volume requirements.

48.     Another former Stamps Field Sales Representative, who was originally employed by Endicia and remained with the Company post-acquisition until May 2019 in predominately the Ohio and Pennsylvania markets, also confirmed that the USPS had definitely ("absolutely") been upset "for a few years" with Stamps/Endicia for making available discounted postal rates for customers that did

- 18 -

4844-8861-5070.v1

Exhibit 2

- 55 -

not individually meet the USPS's annual shipping requirements that would make them eligible for the discounted rates. This former employee reiterated that USPS's unhappiness "goes to the top" because the USPS was "losing revenue" by Stamps' practices of using reseller partner NSAs to extend discounts to customers that would not individually qualify for the discounts.

49.     Another former Stamps Field Sales Representative, who was originally employed by the USPS for 36 years and joined the Company in March 2014 through October 2018 in predominately the Midwest markets, also confirmed that certain USPS teams and District Managers would frequently express their displeasure to Stamps/Endicia sales representatives concerning the Company's manipulative practices of offering reseller NSA discounts to existing customers of the USPS who did not otherwise qualify for such prices. This former employee and the other field sales personnel would in turn inform their own District Managers of these events and request guidance for handling the complaints of the USPS personnel. According to this former employee, the response they were given by their superiors up the chain of command was to continue with business as usual, despite the fact that these practices "didn't go over well" with the USPS.

50.     Finally, another former Stamps Account Manager, who was employed by the Company from October 2017 to February 2019 in the East Region office, further confirmed that the Company gave discounted postal rates to customers who were "not fully authorized by the USPS." According to this former employee, Stamps account personnel were instructed by their managers to "keep [the USPS] in the dark" regarding certain discounted postal rates because "we could get in trouble if we tell [the USPS] too much." This former employee was further told by the Company's National Sales Manager (Candi Booth) that at Stamps "[w]e don't rat on one another." Although this former employee followed Booth's directives, the former Stamps Account Manager felt this conduct "was wrong" and expressed these

4844-8861-5070.v1
Exhibit 2
- 56 -

concerns to "upper management" during this former employee's tenure with the Company.

**Defendants' Reseller Scheme Draws**
**Governmental and Public Scrutiny**

51. Prior to the Class Period, the USPS began investigating certain resellers' activities to determine whether they were cannibalizing existing USPS business. In 2016, as part of its investigation, the USPS targeted Stamps and its affiliates, threatening to pull Stamps' PC postage printing license if it was established that Stamps was engaging in a continuing practice of converting existing USPS customers to its reseller program, thereby cannibalizing existing USPS business.

52. The USPS was particularly focused on Stamps affiliate/partner and postage reseller IntuiShip, along with its third-party sales affiliate, Move Method. Move Method was already under USPS scrutiny for funneling existing USPS customers through IntuiShip's reseller NSA. This scrutiny was reflected in a series of communications beginning on February 10, 2016, when Doreen Rathburn, Business Alliances Manager at the USPS, sent an internal email concerning potential cannibalization of existing USPS customers, stating: "They clearly know where I stand on cannibalizing existing business and have stated that was not the intent here." Immediately thereafter, Robert Ross ("Ross"), co-founder of IntuiShip, confirmed with the USPS that IntuiShip was committed to preventing this practice from recurring.

53. On August 2, 2016, Cliff Rucker ("Rucker"), Vice President of Sales at the USPS, sent a letter to Ross of IntuiShip regarding the USPS's investigation into the potential misuse of IntuiShip's NSA in a manner that cannibalized existing USPS business. The letter concluded by stating: "If it is determined that this is the case, your NSA is subject to termination due to violation of the agreed upon terms of the

4844-8861-5070.v1

Exhibit 2
- 57 -

agreement. Please respond within seven days of the date of this letter with an explanation as to a remedy for this situation."

54. Stamps also became aware that the USPS was scrutinizing IntuiShip and Move Method for abuse of the reseller program because Stamps personnel, Candi Booth ("Booth") and Amine Khechfe ("Khechfe") – both of whom worked at Endicia – received copies of the USPS investigative letters that objected to IntuiShip using the reseller program to service existing USPS customers. Indeed, on July 16, 2016, Rucker sent an email to Stamps/Endicia executives Booth and Khechfe alerting them that USPS personnel (Ken Baily, Brian Denneny and Dennis Nicoski) were being instructed to investigate Move Method again cannibalizing USPS business under the reseller program, and that the USPS was prepared to send a "letter to cancel the contract."

55. In January 2017, President Donald J. Trump was inaugurated and the Executive Branch's oversight of the USPS became even more focused on the financial solvency of the government postal provider.[4] Specifically, President Trump held the view that certain private companies, such as Stamps, had been taking unfair advantage of the USPS and that these detrimental business practices were going to be examined immediately.

56. As the Individual Defendants understood from their communications with the USPS, and as they attempted to renegotiate existing contractual arrangements, the USPS was no longer willing to accept economically unfavorable (and improper) business relationships with private parties. Throughout this period, defendants assured investors that Stamps' business model was strong and that the USPS was pleased with its existing relationship with Stamps. The truth was quite

---

[4] The USPS operates at the direction, and with the oversight, of the Executive Branch of the U.S. Government.

- 21 -

Exhibit 2

- 58 -

different, as the USPS had rejected Stamps' reseller scheme and it was in the process of terminating critical aspects of its existing business relationship with Stamps.

57. Stamps was in regular contact with the USPS during the Class Period regarding its contractual requirements. Defendants understood certain adverse changes were coming and would soon be applied to Stamps' existing USPS reseller contracts/agreements. Starting in the first half of 2017, the USPS began revising its existing NSAs (which are subject to periodic/annual renewal) in a manner that was designed to limit and restrict the ability of Stamps to misuse the reseller program. As part of its newly implemented process, the USPS required written permission before a reseller could transition any client to a shipping program that utilized an NSA that provided postage rates below Commercial Plus Pricing.

58. Moreover, just after the start of the Class Period, Stamps received an August 2017 letter from its reseller partner, Parcel Partner, which disclosed the USPS's position and new restrictions designed to reign in abuse of the reseller program. As Parcel Partner's letter stated:

Hi Partner;

***The time has come, we knew the USPS Reseller Model would be changing, that is why we provided you with as much insight as we had into the changes last April. The Post Office has decided to initiate the changes now (see attachment). The letter has some significant changes but nothing that has not already been discussed. We knew they were concerned about short pays and Resellers not having direct relationships with shippers.*** They have structured the program in a way to accomplish both. The direct relationship will allow us to assist more actively on abusers of short pays. The USPS has always seen the Shipper to be the customer of whoever's contract they are shipping on . . . .

4844-8861-5070.v1

Exhibit 2
- 59 -

*Therefore, the USPS is requiring we take more responsibility and have a direct relationship with the shipper*. We have always taken this responsibility upon ourselves and assisted The USPS with analytics and forecasting in the industry . . . .

Our relationship is stronger than ever with the USPS which is why we are prepared for this announcement. Jared and Casey will be traveling to Washington to have more discussions at the highest levels about some of the ambiguity (example: what defines the last 12 months . . . purchasing a stamp or a box?) in the amendment and strategize with them as we consistently do.

*These Postal changes have brought us to a crossroads*. We can partner together or you can find another option . . . .

Alternatively, if our partnership were to part ways the exposure is decreased referrals fees and competition from competitors with more capital. *The recent USPS changes have changed the landscape. These changes position the PC Postage providers in different position*. We can continue to partner together to protect the customers base and continue to grow or you can venture on your own. *Should you choose to continue our partnership, we will need your assistance to help us collect the additional data required of shippers "Third Party" data*.

59. Thus, based on their communications with the USPS and with Stamps' reseller partners, defendants were aware by the start of the Class Period that the USPS was in the process of tightening and restricting the reseller program so as to require resellers to maintain the proper documentation for all shippers, thereby allowing the USPS to monitor, police, and stop the abuses that were resulting from Stamps' improper scheme of converting low-volume existing USPS customers to its reseller program.

- 23 -

60. Defendants were aware that Stamps' manipulative scheme could not continue indefinitely because, as Stamps switched more and more customers to its multi-carrier platforms, it resulted in substantially discounted pricing being paid to the USPS for purchases that had previously been completed at retail pricing.

61. In an effort to avoid public scrutiny, Stamps actively concealed key information regarding its business operations and specifically how Stamps was profiting at the expense of the USPS. On February 22, 2018, analysts at Craig-Hallum issued a report noting that "Management has taken a number of steps recently that have reduced the detail of information provided to investors, including business metrics, acquisitions, and organic growth." For example, the Company declined to break out the proportion of its revenues earned through the reseller program, but instead lumped such revenue together with other revenue earned through the Company's revenue-sharing agreement with the USPS.

62. Defendants repeatedly told investors throughout the Class Period that the USPS was pleased with its contractual relationship with Stamps because Stamps had been growing USPS's business every year. However, during the 2013-2018 time period, e-commerce grew at approximately 15% annually, including from $390 billion in 2016 to $453 billion in 2017 to $517 billion in 2018. This growth in e-commerce generated more than $100 billion of organic growth between 2016 and 2018 in the shipping of e-commerce packages. Because the USPS generally offers the lowest shipping rates for small parcels, the USPS would have naturally benefited from this growth in shipping, notwithstanding any purported contributions by Stamps.

63. Stamps' continued abuse of the reseller program contributed to growing losses at the USPS and helped undermine the long-term financial viability of the agency. In April 2018, a governmental Task Force was established to evaluate the USPS's operations and finances. The Task Force Report confirmed that the USPS was forecasted to lose tens of billions of dollars over the next decade, listing "product

- 24 -

4844-8861-5070.v1

Exhibit 2

- 61 -

pricing" among the primary reasons for the deterioration in the USPS's financial condition. Two months after this report was released, Stamps finally revealed the true state of its relationship with the USPS when it announced the end of its USPS partnership. The timing of the dissolution and the conclusions in the Task Force Report further reflect that the USPS had been unhappy with its relationship with Stamps because of the Company's practice of profiting at the expense of the USPS.

64. Finally, on May 8, 2019, Stamps revealed publicly the extent and impact of defendants' wrongdoing on Stamps and its operations, revealing that, in addition to the loss of the exclusive commission business, the USPS was also restricting and terminating certain NSA contracts with the Company's reseller partners and, thus, that Stamps' expected future earnings would be substantially reduced.

**DEFENDANTS' FALSE AND
MISLEADING CLASS PERIOD STATEMENTS**

65. Throughout the Class Period, defendants touted the Company's strong financial performance, including revenue and earnings growth, while concealing that these financial metrics were the product of an unsustainable and improper reseller scheme to inflate Stamps' financial results at the expense and to the detriment of the USPS.

66. On May 3, 2017, the start of the Class Period, defendants issued a release announcing Stamps' 1Q17 financial results. The release stated:

> "We are very pleased with our continued strong revenue and earnings growth this quarter," said Ken McBride, Stamps.com's chairman and CEO. "***In addition to our overall revenue and earnings growth, during the first quarter we reached our highest level of paid customers, we saw continued strong growth in our shipping business areas, and we experienced strong contributions from all of our subsidiaries. We remain very excited about our future prospects and,***

- 25 -

Case 2:19-cv-01828-MWF-SK Document 71-1 Filed 08/05/19 Page 27 of 80 Page ID #:2841

*combined with our first quarter performance, led us to increase our guidance for 2017*."

67.     The release also reported the following 1Q17 financial results:

First quarter 2017 total revenue was $105.0 million, up 28% compared to the first quarter of 2016. First quarter 2017 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $102.6 million, up 30% versus the first quarter of 2016. First quarter 2017 Customized Postage revenue was $2.4 million, down 7% versus the first quarter of 2016.

First quarter 2017 GAAP income from operations was $34.6 million and GAAP net income was $33.1 million. GAAP net income per share was $1.82 based on 18.2 million fully diluted shares outstanding. This compares to first quarter 2016 GAAP income from operations of $22.2 million and GAAP net income of $13.2 million or $0.71 per share based on fully diluted shares outstanding of 18.7 million. First quarter 2017 GAAP income from operations, GAAP net income and GAAP income per fully diluted share increased by 56%, 150% and 157% year-over- year, respectively.

68.     During the 1Q17 conference call, CEO McBride stated:

In 2017, we plan to increase, optimize and refine our enterprise customer lead generation and sales and marketing efforts. Let me talk a little bit about the USPS. *The USPS has always been one of our most important partners. We both have the common goal of growing USPS package volume and serving and retaining USPS customers*. We've made significant investments in creating, developing and growing the online Mailing and Shipping category since 1999. To date, we've invested more than $1.5 billion in customer service and support,

- 26 -

4844-8861-5070.v1

Exhibit 2

- 63 -

research and development, sales and marketing, technology, infrastructure, product development and other areas in support of helping the USPS grow their business and retain customers. We have generated over $30 billion in cumulative postage printed through all of our brands since the industry first began in 1999, including over $5.5 billion last year in 2016. Last year, the USPS reported 16% growth in its shipping and package revenue for 2016. The overall package industry, on the other hand, grew only 8% domestically when adding together the domestic shipping revenue of the big 3 carriers, which are the vast majority of the industry. So the USPS is growing 2x faster than the overall industry and they're gaining significant market share versus of the private carriers. They're generating their extraordinary growth and market share gains by growing in e-commerce, which of course, is the key battleground in shipping right now. It sets them up well for the future. ***We continue to enjoy a great partnership with USPS and feel that we have created a sustainable win-win model for both of us, which will result in the continued growth of USPS packages, in e-commerce and more generally***. As you would expect, given the extraordinary growth they're generating, the USPS is very happy with their overall strategies, their partnerships and the business models they are pursuing in shipping. ***In particular, the USPS is very happy with the very successful partnership Stamps.com has together with the Postal Service, and that's based on very recent ongoing conversations we have with the most senior executive there***.

69. In response to an analyst question on the 1Q17 conference call concerning "the economics of the relationships you have, whether it's with the USPS or other partners, that would prompt some conservatism on guidance," McBride further reassured investors, stating:

- 27 -

4844-8861-5070.v1

Exhibit 2

- 64 -

There's nothing to point to, specifically. And of course, we wouldn't be disclosing specifics of the partnerships, but it's just the same approach we've taken in years past and *we don't really expect any material changes to any kind of the underlying economics or the revenue share agreements that we have*.

70. On the same call, in response to analyst questions concerning the Company's relationship with the USPS and whether the "USPS had sent a letter around to the participants in the reseller program with some potential changes," McBride further stated:

There was no letter. The rumor is false. I mean, I think I tried to point out some of the broad – the broad global understanding of what the USPS and the partnerships they've done and the revenue share they've offered out to us and the reseller and the e-commerce industry, in general. And I think that one of the key things to focus on is are they being successful or not? And therefore, are they going to make changes or not? And when you look at the big numbers, I mentioned they're growing at 16% last year. They're outgrowing the industry by 2x. And so, USPS is having a ton of success in e-commerce, particularly. *And so, in their shoes, you've got to ask yourself would you make a major change when you're growing twice the industry rate*. They're very happy with how things have gone, the revenue shares they've offered to the industry, to e-commerce, have generated a lot of activity focused on them. They're winning the e-commerce marketplace and they're being very successful doing it. *USPS is very happy with the approach they've taken and business model. They're very happy with the relationship with Stamps.com. We talk to them constantly, to the most senior folks there. So we're happy and they're happy*. And what the

4844-8861-5070.v1
Exhibit 2
- 65 -

letter information that's been propagated, we believe is part of the strategy with our stock. So it's not true.

71.     The statements in ¶¶66-70 above were each false and misleading when made. The true facts, which were then known to, or recklessly disregarded by, the Individual Defendants based upon their access to and review of internal Company information, were:

(a)     that Stamps was not generating "'continued strong growth in [its] shipping business,'" nor was it "'experienc[ing] strong contributions from all of [its] subsidiaries,'" rather, Stamps was engaged in a secret, unsustainable reseller scheme to bundle small-volume shippers and skim profits from the USPS;

(b)     that Stamps was not in a "great partnership with USPS" nor were Stamps' business practices a "sustainable win-win model," rather, the USPS was opposed to Stamps' actions, as they violated both the terms and the spirit of the parties' contractual agreements;

(c)     that the USPS was not "very happy with" Stamps, its "approach" or its "business model," nor were Stamps and the USPS working in a "very successful partnership" together. In fact, by the start of the Class Period, defendants were engaged in a wrongful course of business whereby Stamps, in contravention of USPS governance, was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS;

(d)     that by April 2017, Stamps' reseller partner, Parcel Partners, communicated to Stamps that the USPS was implementing new changes to NSAs that would have a dramatic adverse impact on the profits captured by Stamps' reseller scheme;

(e)     that the Company's strong financial results were entirely dependent on the manipulation of a USPS reseller program that improperly benefited Stamps at the expense of the USPS, which was losing an estimated $235 million per year as a result of defendants' misuse of the reseller program;

- 29 -

Case 2:19-cv-01828-MWF-SK Document 71-1 Filed 08/05/19 Page 31 of 80 Page ID #:2845

(f)     that Stamps' relationship with the USPS had soured prior to the Class Period, and in fact, between 2014 and 2017, USPS teams and District Managers had repeatedly expressed their displeasure to Stamps/Endicia sales representatives concerning the Company's manipulative practice of offering reseller NSA discounts to existing USPS customers that did not otherwise qualify for such pricing;

(g)     that, without obtaining the required approval of the USPS and in contravention of the PAEA and the applicable NSA terms, Stamps was using its ShipStation and Endicia platforms in its West Coast and Midwest operations to clandestinely aggregate customer purchases so as to provide customers with discounted package rates without regard to whether those customers actually satisfied the applicable minimum volume thresholds;

(h)     that Stamps Account Managers were instructed to apply what the Company euphemistically dubbed its "special sauce," that is, the inducement of existing Stamps customers to secretly switch to the Company's ShipStation service – conduct that was designed to and did cause a dramatic short-term spike in Stamps' revenue and earnings by cannibalizing USPS existing revenue;

(i)     that the vast majority of growth in USPS revenue during the Class Period was the result of organic growth in e-commerce shipping and had no correlation with Stamps' purported contributions;

(j)     that Stamps' reseller scheme represented a significant financial risk to Stamps' lucrative exclusive partnership and contractual NSAs with the USPS; and

(k)     that, as a result of (a)-(j) above, defendants had no reasonable basis to expect and did not expect Stamps' revenue and earnings growth to continue, because Stamps could not continue the illicit reseller scheme detailed in ¶¶24-64 herein.

- 30 -

72.     On August 2, 2017, defendants issued a release announcing Stamps' 2Q17 financial results.  The release stated:

We are very pleased with the continued strength of our financial performance this quarter," said Ken McBride, Stamps.com's Chairman and CEO.  "In addition to our strong revenue and earnings growth during the second quarter, we reached our highest level of paid customers and average revenue per paid customer, we saw continued strong growth in our shipping business areas, and we experienced strong contributions from all of our subsidiaries.  ***We remain very excited about our future business opportunities which, combined with our second quarter performance, led us to increase our guidance for 2017***.

73.     The release also reported the following 2Q17 financial results:

Second quarter 2017 total revenue was $116.1 million, up 38% compared to the second quarter of 2016.  Second quarter 2017 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $111.8 million, up 37% versus the second quarter of 2016.  Second quarter 2017 Customized Postage revenue was $4.3 million, up 73% versus the second quarter of 2016.

Second quarter 2017 GAAP income from operations was $41.7 million and GAAP net income was $31.0 million.  GAAP net income per share was $1.71 based on 18.1 million fully diluted shares outstanding.  This compares to second quarter 2016 GAAP income from operations of $25.0 million and GAAP net income of $14.3 million or $0.79 per share based on fully diluted shares outstanding of 18.2 million.  Second quarter 2017 GAAP income from operations,

- 31 -

4844-8861-5070.v1

Exhibit 2
- 68 -

GAAP net income and GAAP income per fully diluted share increased by 67%, 117% and 118% year-over-year, respectively.

74. During the 2Q17 conference call, CEO McBride stated the following concerning the Company's relationship with the USPS:

Resellers are important both for keeping existing business and for growing new business. You have people that are shipping through the reseller channel. It works for the USPS. And if they aren't shipping with the USPS, going after some of that business also works for the USPS. The USPS have to continue to serve customers and to find new customers.

The reseller business is growing to the tune that the USPS reseller program is and is providing solutions downmarket where the USPS doesn't have the sales team to interact. *The USPS doesn't see any reason why the program wouldn't continue to serve both customers and the needs of the Postal Service going forward*.

*Finally, the USPS looked at resellers and PC postage providers like Stamps.com and Endicia as excellent partners on bringing the best solutions to customers*.

*We continue to enjoy a great partnership with the Postal Service and feel that we have created a sustainable win-win model for both of us, which will result in a continued growth of USPS packages and e-commerce and online postage more generally*.

\* \* \*

*[T]he partnership with the Postal Service is continuing to be stronger and stronger* and some of the – we have multiple contracts and various partnerships with the Postal Service. And so in this case, we were able to get a couple of our contracts renewed at improved terms. *So we were*

- 32 -

4844-8861-5070.v1

Exhibit 2

- 69 -

*just trying to give people an insight to the relationship with the Postal Service continues to get healthier and healthier*.

75. On the same call, President Huebner stated the following concerning the Company's relationship with the USPS:

Yes, I would just say, I mean, we've been saying over the last year that it's a win-win partnership. And so the more successful we both are in helping the USPS compete, then I think that benefits both of us, and so I think it was really meant to highlight the win-win nature of the partnership and how both sides are succeeding.

76. On the same call, CFO Carberry stated the following concerning the Company's 2Q17 revenue and current projections:

Total revenue was $116.1 million in Q2, and that was up 38% year-over-year versus Q2 of '16. The strong growth in Q2 revenue was partially attributable to the renewal, with improved economics, of 2 of our agreements with the Postal Service.

\* \* \*

We're really looking at potentially accessing a larger parcel market. We're primarily a USPS shipper today, but as we look out there and the multicarrier opportunity, it's a much larger market. The domestic market for the top 3 carriers is about $90 billion. *So I think there's lots of opportunity for us to grow in all those different areas, and we feel comfortable with our 20% projection over the next 5 years*.

77. The statements in ¶¶72-76 above were each false and misleading when made. The true facts, which were then known to, or recklessly disregarded by, the Individual Defendants based upon their access to and review of internal Company information, were:

(a) that Stamps and the USPS were not in "a sustainable win-win model" and the relationship between the two was neither "get[ting] healthier and

- 33 -

4844-8861-5070.v1

Exhibit 2
- 70 -

healthier," nor was it "continu[ing] to be a stronger and stronger" relationship. In fact, by 2Q17, Stamps and its affiliates were anything but "excellent partners" bringing the best solutions. Rather, Stamps was actively engaged in its deceptive reseller scheme to bundle small-volume shippers and skim profits from the USPS;

(b)     that the Company's strong financial results were entirely dependent on the manipulation of a USPS reseller program that improperly benefited Stamps at the expense of the USPS, which was losing an estimated $235 million annually as a result of defendants' misuse of the reseller program;

(c)     that Stamps' improper reseller scheme inflated its reported revenue and earnings while concealing that its strong revenue and earnings growth was unsustainable because the Company's reseller scheme was damaging to USPS profitability and violated both the terms and the spirit of the parties' contractual agreements;

(d)     that Stamps' relationship with the USPS had in fact soured prior to the Class Period, as USPS teams and District Managers repeatedly expressed their displeasure to Stamps/Endicia sales representatives between 2014 and 2017 about the Company's manipulative practice of offering reseller NSA discounts to existing USPS customers that did not otherwise qualify for such pricing;

(e)     that, without obtaining the required approval of the USPS and in contravention of the PAEA and the applicable NSA terms, Stamps was using its ShipStation and Endicia platforms in its West Coast and Midwest operations to clandestinely aggregate customer purchases so as to provide customers with discounted package rates without regard to whether those customers actually satisfied the applicable minimum volume thresholds;

(f)     that Stamps Account Managers were instructed to apply what the Company euphemistically dubbed its "special sauce," that is, the inducement of existing Stamps customers to secretly switch to the Company's ShipStation service,

- 34 -

4844-8861-5070.v1

Exhibit 2

- 71 -

which conduct was designed to and did cause a dramatic short-term spike in Stamps' revenue and earnings by cannibalizing USPS existing revenue;

(g) that Stamps was not bringing a meaningful amount of new business to the USPS, but instead was cannibalizing the USPS's existing customers by secretly aggregating and bundling them together so that they appeared to be higher volume shippers under NSAs with Stamps and entities it controlled;

(h) that the vast majority of growth in USPS revenue during the Class Period was the result of organic growth in e-commerce shipping and had no correlation with Stamps' purported contributions;

(i) that rather than "creat[ing] value for the USPS," Stamps was improperly profiting from its abuse of the reseller program, which contributed to hundreds of millions of dollars in losses suffered by the USPS;

(j) that Stamps' reseller scheme represented a significant financial risk to Stamps' lucrative exclusive partnership and contractual NSAs with the USPS;

(k) that defendant Carberry had no reasonable basis to believe and did not believe that Stamps could generate 20% growth in revenue over the next 5 years absent a continuation of the wrongful conduct detailed in ¶¶24-64 herein; and

(l) that, as a result of (a)-(k) above, defendants had no reasonable basis to expect and did not expect Stamps' revenue and earnings growth to continue indefinitely because Stamps would not be able to continue the illicit reseller scheme detailed in ¶¶24-64 herein.

78. On November 6, 2017, Stamps issued a release announcing its 3Q17 financial results. The release stated:

> "We are very pleased with our third quarter financial performance," said Ken McBride, Stamps.com's Chairman and CEO. "We achieved strong performance in our financial and customer metrics in a quarter that is both seasonally slower and one in which we saw the anniversary of our most recent acquisition. ***Our shipping***

- 35 -

*business continues to drive our solid top line results and strong margin profile through contributions from each of our shipping subsidiaries.  We believe we are well positioned as we enter the seasonally strong fourth quarter and we remain very excited about our long-term business opportunities*."

79.    The release also reported the following 3Q17 financial results:

Third quarter 2017 total revenue was $115.1 million, up 24% compared to the third quarter of 2016.  Third quarter 2017 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $106.5 million, up 21% versus the third quarter of 2016.  Third quarter 2017 Customized Postage revenue was $8.6 million, up 75% versus the third quarter of 2016.

Third quarter 2017 GAAP income from operations was $35.7 million and GAAP net income was $46.2 million. GAAP net income per share was $2.49 based on 18.5 million fully diluted shares outstanding.  This compares to third quarter 2016 GAAP income from operations of $31.6 million and GAAP net income of $18.7 million or $1.03 per share based on 18.1 million fully diluted shares outstanding.  Third quarter 2017 GAAP income from operations, GAAP net income and GAAP income per fully diluted share increased by 13%, 148% and 142% year-over-year, respectively.

80.    During the 3Q17 conference call, CEO McBride stated:

I think from a competitive perspective, we continue to see USPS as very competitive, particularly in the segments where they are strong. They're very strong in e-commerce, very strong in residential delivery, and then very strong in smaller packages.  *So – and I think we're pleased to see the continued trend on the USPS.  As you know, we*

- 36 -

*succeed when they succeed.  So we were happy with the percentages we saw*.

81.    On February 22, 2018, Stamps issued a release announcing its 4Q17 and FY17 financial results.  The release stated:

"We are pleased with our fourth quarter and fiscal 2017 financial performance," said Ken McBride, Stamps.com's Chairman and CEO. "*We achieved strong financial results driven by exceptional performance in our shipping business.  We believe we are well positioned for 2018 and we remain excited about our long-term business opportunities*."

82.    The release also reported the following 4Q17 financial results:

Fourth quarter 2017 total revenue was $132.5 million, up 25% compared to the fourth quarter of 2016. Fourth quarter 2017 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $128.5 million, up 26% versus the fourth quarter of 2016.  Fourth quarter 2017 Customized Postage revenue was $3.9 million, up 9% versus the fourth quarter of 2016.

Fourth quarter 2017 GAAP income from operations was $51.5 million, GAAP net income was $40.2 million and GAAP net income per share was $2.15 based on 18.7 million fully diluted shares outstanding.  This compares to fourth quarter 2016 GAAP income from operations of $41.4 million, GAAP net income of $29.0 million and GAAP net income per share of $1.61 based on 18.0 million fully diluted shares outstanding.    Fourth quarter 2017 GAAP income from operations, GAAP net income and GAAP income per fully diluted share increased by 24%, 38% and 34% year-over-year, respectively.

4844-8861-5070.v1

Exhibit 2
- 74 -

83. The statements in ¶¶78-82 above were each false and misleading when made. The true facts, which were then known to, or recklessly disregarded by, the Individual Defendants based upon their access to and review of internal Company information, were:

(a) that the Company's strong 3Q17, 4Q17 and FY17 financial results were entirely dependent on the manipulation of a USPS reseller program that improperly benefited Stamps at the expense of the USPS, which was losing an estimated $235 million per year as a result of defendants' misuse of the reseller program;

(b) that, rather than creating a "sustainable win-win model," Stamps was improperly profiting from its abuse of the reseller program, which contributed to hundreds of millions of dollars in losses suffered by the USPS;

(c) that Stamps was not "well positioned for 2018," but rather, its most important long-term business opportunity was unraveling, as the USPS had in fact rejected Stamps' reseller business model and was in the process of terminating critical aspects of its existing business relationship with Stamps;

(d) that Stamps' misuse of the reseller program inflated its reported revenue and earnings while concealing that its strong revenue and earnings growth was unsustainable because the Company's reseller scheme was damaging USPS profitability and the USPS was opposed to Stamps' actions, as they violated both the terms and the spirit of the parties' contractual agreements;

(e) that Stamps' relationship with the USPS had in fact soured prior to the Class Period, as USPS teams and District Managers repeatedly expressed their displeasure to Stamps/Endicia sales representatives between 2014 and 2017 about the Company's manipulative practice of offering reseller NSA discounts to existing USPS customers that did not otherwise qualify for such pricing;

(f) that, without obtaining the required approval of the USPS and in contravention of the PAEA and the applicable NSA terms, Stamps was using its

- 38 -

4844-8861-5070.v1

Exhibit 2

- 75 -

ShipStation and Endicia platforms in its West Coast and Midwest operations to clandestinely aggregate customer purchases so as to provide customers with discounted package rates without regard to whether those customers actually satisfied the applicable minimum volume thresholds;

(g)     that, notwithstanding several warnings by the USPS, Stamps district managers were directed by National Sales Manager Booth to continue Stamps' existing illicit business practices;

(h)     that Stamps was not generating a meaningful amount of new business to the USPS, but instead was cannibalizing the USPS's existing customers by secretly aggregating and bundling them together so that they appeared to be higher volume shippers under NSAs with Stamps and entities it controlled;

(i)     that Stamps' reseller scheme represented a significant financial risk to Stamps' lucrative exclusive partnership and contractual arrangements with the USPS; and

(j)     that, as a result of (a)-(i) above, defendants had no reasonable basis to expect and did not expect Stamps' revenue and earnings growth to continue indefinitely because Stamps would not be able to continue the illicit reseller scheme detailed in ¶¶24-64 herein.

84.     On May 3, 2018, Stamps issued a release announcing its 1Q18 financial results.  The release stated:

> "We were very pleased with our first quarter performance," said Ken McBride, Stamps.com's Chairman and CEO.  "We achieved strong growth driven by continued success in the shipping area of our business.  We are continuing to execute on our 2018 strategic plans and we remain excited about our long-term business opportunities."

85.     The release also reported the following 1Q18 financial results:

> First quarter 2018 total revenue was $133.6 million, up 27% compared to the first quarter of 2017.  First quarter 2018 Mailing and

- 39 -

Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $131.0 million, up 28% versus the first quarter of 2017. First quarter 2018 Customized Postage revenue was $2.6 million, up 6% versus the first quarter of 2017.

First quarter 2018 GAAP income from operations was $49.2 million, GAAP net income was $47.0 million and GAAP net income per share was $2.54 based on 18.5 million fully diluted shares outstanding. This compares to first quarter 2017 GAAP income from operations of $34.6 million, GAAP net income of $33.1 million and GAAP net income per share of $1.82 based on 18.2 million fully diluted shares outstanding. First quarter 2018 GAAP income from operations, GAAP net income, and GAAP income per fully diluted share increased by 42%, 42% and 39% year-over-year, respectively.

86. During the 1Q18 conference call, President Huebner stated:

*[W]e continue to focus on how to create value for the USPS, how to help them be successful in the e-commerce package market*. And so to the extent that we are successful in creating value and helping the USPS be successful in that part of the market, then those create the type of long-term partnership opportunities that we've seen over the past decade.

87. On August 2, 2018, Stamps issued a release announcing its 2Q18 financial results. The release stated:

"We were very pleased with our acquisition of MetaPack and with our second quarter performance," said Ken McBride, Stamps.com's Chairman and CEO. "*Our growth continues to be driven by success in the shipping area of our business*. With MetaPack we will be able to accelerate our focus on international

- 40 -

expansion, and will be in a much better position to address the global e-commerce shipping industry. *We are continuing to execute on our operational and strategic plans and we are excited about our long-term business opportunities*."

88.     The release also reported the following 2Q18 financial results:

Second quarter 2018 total revenue was $139.6 million, up 20% compared to the second quarter of 2017.  Second quarter 2018 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $134.4 million, up 20% versus the second quarter of 2017.  Second quarter 2018 Customized Postage revenue was $5.2 million, up 22% versus the second quarter of 2017.

Second quarter 2018 GAAP income from operations was $46.9 million, GAAP net income was $45.5 million, and GAAP net income per share was $2.41 based on 18.9 million fully diluted shares outstanding.  This compares to second quarter 2017 GAAP income from operations of $41.7 million, GAAP net income of $31.0 million and GAAP net income per share of $1.71 based on 18.1 million fully diluted shares outstanding.  Second quarter 2018 GAAP income from operations, GAAP net income, and GAAP income per fully diluted share increased by 12%, 47% and 41% year-over-year, respectively.

89.     During the 2Q18 conference call, CEO McBride stated the following in response to analyst questions concerning the USPS Task Force investigation and impending report:

The final [Task Force] report is expected to be issued August 10. We don't know the specifics in the report. *But we do think that based on our conversations that the report will come out strongly in favor of*

- 41 -

4844-8861-5070.v1

Exhibit 2

- 78 -

Case 2:19-cv-01828-MWF-SK   Document 125-2   Filed 07/01/20   Page 44 of 81   Page
ID #:2857
Case 2:19-cv-01828-MWF-SK   Document 71   Filed 08/05/19   Page 43 of 80   Page ID #:912

*the partnerships between the USPS and private industry like the partnerships we've had with the USPS*.

90.    On October 31, 2018, Stamps issued a release announcing its 3Q18 financial results.  The release stated:

"We are very pleased with our third quarter financial performance and with the successful closing of our acquisition of MetaPack," said Ken McBride, Stamps.com's Chairman and CEO.  "*We achieved strong organic performance in our financial metrics in a traditionally seasonally slower period.  Our shipping business continues to drive our solid results through contributions from each of our shipping subsidiaries.  We believe we are well positioned as we enter the seasonally strong fourth quarter and we remain very excited about our long-term business opportunities*."

91.    The release also reported the following 3Q18 financial results:

Third quarter 2018 total revenue was $143.5 million, up 25% compared to the third quarter of 2017.  Third quarter 2018 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $136.5 million, up 28% versus the third quarter of 2017.  Third quarter 2018 Customized Postage revenue was $7.0 million, down 19% versus the third quarter of 2017.

Third quarter 2018 GAAP income from operations was $44.3 million, GAAP net income was $33.4 million, and GAAP net income per share was $1.75 based on 19.0 million fully diluted shares outstanding.  This compares to third quarter 2017 GAAP income from operations of $35.7 million, GAAP net income of $46.2 million and GAAP net income per share of $2.49 based on 18.5 million fully diluted shares outstanding.  Third quarter 2018 GAAP income from operations

- 42 -

increased by 24%, and GAAP net income and GAAP income per fully diluted share decreased by 28% and 30% year-over-year, respectively.

92. During the 3Q18 conference call, CEO McBride stated the following in response to analyst questions concerning the USPS Task Force investigation and impending report:

[W]e would have no reason to believe that the USPS is not generally meeting its obligations regarding the NSA program. We would further expect that any commentary on the report on postal partnerships would reflect the very positive effect of partnerships like ours have had on growth in the USPS' package volumes.

*       *       *

On the final issue of the negotiations of important agreements with the USPS, we would note the following general points. Historically, we have had a significant number of agreements with the USPS, and we have negotiated those agreements many times. These types of negotiations are very common for us. Negotiations with the USPS often take many months to finalize. *The USPS has many competing priorities, and the process just takes time. In general, we expect that updates to our agreements with the USPS will continue to reflect the critical role that we play in their e-commerce package business, including that we have the largest private sales force focused on driving USPS growth. We process more than 1/3 of their Priority Mail volume in the U.S. And working hand-in-hand with the USPS through our partnership, we have contributed to a significant portion of overall USPS e-commerce package growth over the past 5 years*.

*       *       *

- 43 -

*I think when we look at the various reports that are out there, the conversations we've had with folks that are working on these reports, the general view is the idea of USPS increasingly embracing partnerships like ours makes a ton of sense for them*.

93. The statements in ¶¶84-92 above were each false and misleading when made. The true facts, which were then known to, or recklessly disregarded by, the Individual Defendants based upon their access to and review of internal Company information, were:

(a) that the Company's strong 1Q18, 2Q18 and 3Q18 financial results were entirely dependent on the manipulation of a USPS reseller program that improperly benefited Stamps at the expense of the USPS, which was losing an estimated $235 million per year as a result of defendants' misuse of the reseller program;

(b) that Stamps' use of this improper reseller scheme inflated its reported revenue and earnings while concealing that the strong revenue and earnings growth it was reporting was unsustainable because the Company's reseller scheme was damaging to USPS profitability and violated both the terms and the spirit of the parties' contractual agreements;

(c) that Stamps concealed the truth about its reseller scheme and instead repeatedly publicly represented that its purportedly strong financial performance was the result of the Company's strong relationship with the USPS;

(d) that Stamps' relationship with the USPS had in fact soured prior to the Class Period, as USPS teams and District Managers repeatedly expressed their displeasure to Stamps/Endicia sales representatives between 2014 and 2017 about the Company's manipulative practice of offering reseller NSA discounts to existing USPS customers that did not otherwise qualify for such prices;

(e) that, without obtaining the required approval of the USPS and in contravention of the PAEA and the applicable NSA terms, Stamps was using its

- 44 -

Exhibit 2

ShipStation and Endicia platforms in its West Coast and Midwest operations to clandestinely aggregate customer purchases so as to provide customers with discounted package rates without regard to whether those customers actually satisfied the applicable minimum volume thresholds;

(f) that Stamps Account Managers were instructed to apply what the Company euphemistically dubbed its "special sauce," that is, the inducement of thousands of existing Stamps customers to secretly switch to the Company's ShipStation service, which conduct was designed to and did cause a dramatic short-term spike in Stamps' revenue and earnings by cannibalizing USPS existing revenue;

(g) that, notwithstanding several warnings in 2017 and 2018, Stamps district managers were directed by National Sales Manager Booth to continue Stamps' existing illicit business practices;

(h) that Stamps was not generating a meaningful amount of new business for the USPS, but instead was cannibalizing existing USPS customers by secretly aggregating and bundling them together so that they appeared to be higher volume shippers;

(i) that the vast majority of growth in USPS revenue during the Class Period was the result of organic growth in e-commerce shipping and had no correlation with Stamps' purported contributions;

(j) that, rather than "creat[ing] value for the USPS," Stamps was improperly profiting from its abuse of the reseller program, which contributed to hundreds of millions of dollars in losses suffered by the USPS;

(k) that Stamps' reseller scheme represented a significant financial risk to Stamps' lucrative exclusive partnership and contractual arrangements with the USPS;

(l) that Stamps was not well positioned for 2019, but rather its most important long-term business opportunity was unraveling, as the USPS had in fact

- 45 -

rejected Stamps' reseller business model and was in the process of terminating critical aspects of its existing business relationship with Stamps; and

(m)    that, as a result of (a)-(l) above, defendants had no reasonable basis to expect and did not expect Stamps' revenue and earnings growth to continue into FY19, because Stamps would not be able to continue the illicit reseller scheme detailed in ¶¶24-64 herein.

94.    On February 21, 2019, after the market closed, Stamps held a conference call to discuss its 2018 financial results as well as its business outlook and "certain strategic items . . . that impact our business outlook for 2019." On the call, Stamps' CEO McBride falsely represented that the Company had been the one that "decided to discontinue [its] shipping partnership with the USPS so that [it could] fully embrace partnerships with other carriers who . . . will be well positioned to win in the shipping business in the next 5 years." The revelation stunned the market, which attempted to process the inexplicable announcement that the Company was simply walking away from a business relationship that had accounted for a significant portion of the Company's revenue.

95.    Subsequently, on February 26, 2019, the market was further perplexed by reports in *The American Conservative* that, contrary to McBride's February 21, 2019 representation, it was the USPS that had decided to terminate its relationship with Stamps in the face of the Company's abuse of the reseller program.

96.    Despite the Company's assurances of "short term pain" to the investing public, the worst was not over for Stamps shareholders, as the stock continued to trade at artificially inflated prices as defendants continued to conceal the truth about the Company's unsustainable reseller scheme.

97.    On May 8, 2019, Stamps further shocked investors by slashing its profit outlook for the full year, further fueling investor concerns about its ability to protect margins in the absence of a key partnership with the USPS. Stamps attributed the lowered guidance to potential unfavorable short- and long-term amendments,

- 46 -

4844-8861-5070.v1

Exhibit 2

- 83 -

renegotiations, and termination of certain NSA contracts between the USPS and the Company's reseller partners – which defendants had known about and anticipated since the start of the Class Period, despite falsely telling investors that they "very recently bec[a]me aware" of these adverse conditions that would have a negative impact on the Company's financials.  The Company further stated that it now expected an FY19 profit of $3.35 to $4.85 per share, down from its prior estimate of $5.15 to $6.15 per share.

## ADDITIONAL SCIENTER ALLEGATIONS

## Stamps Insiders' $230 Million Worth of Insider Trading Further Supports Scienter

98.    While defendants engaged in their scheme to defraud investors during the Class Period by inflating the Company's revenue through abusive reseller practices, Individual Defendants McBride, Huebner, and Carberry, along with other Company insiders, sold significant amounts of Stamps shares at artificially inflated prices.  In total, Stamps insiders dumped over a million shares of stock during the Class Period for proceeds of over *$230 million*.  The sales are summarized in the following chart:

**Stamps.com (STMP)     5/1/17 - 3/10/19     Insider Sales Summary**

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| **Ananda (Mohan)** | 6/16/2017 | $144.45 | 3,914 | $565,377 | |
| Director | 6/16/2017 | $146.33 | 4,410 | $645,315 | |
| | 6/16/2017 | $147.08 | 6,586 | $968,669 | |
| | 6/16/2017 | $142.10 | 15,200 | $2,159,920 | |
| | 6/16/2017 | $145.31 | 9,890 | $1,437,116 | |
| | 8/11/2017 | $210.45 | 1,875 | $394,594 | |
| | 8/11/2017 | $209.47 | 2,694 | $564,312 | |
| | 8/11/2017 | $207.30 | 19,358 | $4,012,913 | |
| | 8/11/2017 | $208.20 | 6,073 | $1,264,399 | |
| | 8/14/2017 | $212.67 | 1,275 | $271,154 | |
| | 8/14/2017 | $213.49 | 138 | $29,462 | |

4844-8861-5070.v1

Exhibit 2

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 8/14/2017 | $211.10 | 3,948 | $833,423 | |
| | 8/14/2017 | $211.71 | 4,639 | $982,123 | |
| | 2/26/2018 | $203.18 | 1,000 | $203,180 | |
| | 6/12/2018 | $270.00 | 20,000 | $5,400,000 | |
| | 3/6/2019 | $93.32 | 1,000 | $93,320 | |
| | | | 102,000 | $19,825,277 | 13.8% |
| **Biswas (Michael John)** | 9/11/2017 | $190.24 | 9,057 | $1,723,004 | |
| Chief Technology Officer | 9/11/2017 | $191.05 | 3,609 | $689,499 | |
| | 9/11/2017 | $193.92 | 2,050 | $397,536 | |
| | 9/11/2017 | $194.92 | 319 | $62,179 | |
| | 9/11/2017 | $192.30 | 10,841 | $2,084,724 | |
| | 9/11/2017 | $193.06 | 13,226 | $2,553,412 | |
| | 9/13/2017 | $201.68 | 10,428 | $2,103,119 | |
| | 9/13/2017 | $202.20 | 11,440 | $2,313,168 | |
| | 9/13/2017 | $200.16 | 15,382 | $3,078,861 | |
| | 9/13/2017 | $203.15 | 250 | $50,788 | |
| | 9/20/2017 | $210.05 | 4,327 | $908,886 | |
| | 9/21/2017 | $210.00 | 6,081 | $1,277,010 | |
| | 9/22/2017 | $211.15 | 6,116 | $1,291,393 | |
| | 9/22/2017 | $210.27 | 20,976 | $4,410,624 | |
| | 10/23/2017 | $225.00 | 400 | $90,000 | |
| | 10/24/2017 | $227.64 | 2,228 | $507,182 | |
| | 10/24/2017 | $229.71 | 12,356 | $2,838,297 | |
| | 10/24/2017 | $230.37 | 9,213 | $2,122,399 | |
| | 10/24/2017 | $228.30 | 2,391 | $545,865 | |
| | 10/24/2017 | $225.05 | 1,400 | $315,070 | |
| | 10/24/2017 | $226.55 | 1,300 | $294,515 | |
| | | | 143,390 | $29,657,531 | 99.8% |
| **Bortnak (James)** | 5/24/2017 | $129.93 | 200 | $25,986 | |
| Co-President | 5/24/2017 | $128.85 | 300 | $38,655 | |
| | 5/24/2017 | $126.95 | 100 | $12,695 | |
| | 5/24/2017 | $132.05 | 1,456 | $192,265 | |
| | 5/24/2017 | $133.08 | 1,094 | $145,590 | |

4844-8861-5070.v1

Exhibit 2

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 5/24/2017 | $131.01 | 850 | $111,359 | |
| | 6/26/2017 | $151.34 | 1,800 | $272,412 | |
| | 6/26/2017 | $149.36 | 1,500 | $224,040 | |
| | 6/26/2017 | $150.44 | 700 | $105,308 | |
| | 7/24/2017 | $151.89 | 2,700 | $410,103 | |
| | 7/24/2017 | $149.91 | 700 | $104,937 | |
| | 7/24/2017 | $150.73 | 600 | $90,438 | |
| | | | **12,000** | **$1,733,787** | **85.8%** |
| **Buerba (Sebastian)** | 9/11/2017 | $193.33 | 10,331 | $1,997,292 | |
| Chief Marketing Officer | 9/11/2017 | $191.18 | 4,638 | $886,693 | |
| | 9/11/2017 | $194.19 | 1,300 | $252,447 | |
| | 9/11/2017 | $190.26 | 10,843 | $2,062,989 | |
| | 9/11/2017 | $192.54 | 17,143 | $3,300,713 | |
| | 10/24/2017 | $230.22 | 16,552 | $3,810,601 | |
| | 10/25/2017 | $230.01 | 3,348 | $770,073 | |
| | 10/25/2017 | $231.20 | 100 | $23,120 | |
| | 2/27/2018 | $200.00 | 200 | $40,000 | |
| | 2/27/2018 | $196.50 | 2,019 | $396,734 | |
| | 2/27/2018 | $199.23 | 1,989 | $396,268 | |
| | 2/27/2018 | $193.58 | 7,167 | $1,387,388 | |
| | 2/27/2018 | $194.56 | 7,270 | $1,414,451 | |
| | 2/27/2018 | $195.53 | 11,314 | $2,212,226 | |
| | 2/27/2018 | $197.87 | 608 | $120,305 | |
| | 3/1/2018 | $187.12 | 1,100 | $205,832 | |
| | 3/1/2018 | $192.12 | 1,584 | $304,318 | |
| | 3/1/2018 | $190.10 | 1,803 | $342,750 | |
| | 3/1/2018 | $191.00 | 2,500 | $477,500 | |
| | 3/1/2018 | $188.09 | 2,700 | $507,843 | |
| | 3/1/2018 | $189.01 | 4,201 | $794,031 | |
| | 3/2/2018 | $200.01 | 4,638 | $927,646 | |
| | 3/7/2018 | $201.65 | 200 | $40,330 | |
| | 3/7/2018 | $200.10 | 8,061 | $1,613,006 | |
| | 3/8/2018 | $200.00 | 2,280 | $456,000 | |
| | 3/8/2018 | $200.75 | 1,900 | $381,425 | |
| | 3/8/2018 | $201.68 | 3,795 | $765,376 | |

- 49 -

Exhibit 2

- 86 -

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 3/9/2018 | $203.13 | 3,637 | $738,784 | |
| | 3/9/2018 | $205.40 | 2,401 | $493,165 | |
| | 3/9/2018 | $204.14 | 1,800 | $367,452 | |
| | 3/9/2018 | $206.08 | 1,185 | $244,205 | |
| | 3/9/2018 | $200.23 | 500 | $100,115 | |
| | 3/9/2018 | $201.45 | 100 | $20,145 | |
| | 6/11/2018 | $265.17 | 1,619 | $429,310 | |
| | 6/11/2018 | $267.94 | 2,799 | $749,964 | |
| | 6/11/2018 | $267.01 | 9,684 | $2,585,725 | |
| | 6/11/2018 | $265.94 | 3,675 | $977,330 | |
| | 6/12/2018 | $272.25 | 738 | $200,921 | |
| | 6/12/2018 | $267.81 | 662 | $177,290 | |
| | 6/12/2018 | $271.70 | 500 | $135,850 | |
| | 6/12/2018 | $269.31 | 400 | $107,724 | |
| | 6/12/2018 | $270.40 | 200 | $54,080 | |
| | 7/2/2018 | $247.65 | 200 | $49,530 | |
| | 7/2/2018 | $249.40 | 100 | $24,940 | |
| | 7/2/2018 | $253.51 | 211 | $53,491 | |
| | 7/2/2018 | $255.98 | 429 | $109,815 | |
| | 7/2/2018 | $251.93 | 528 | $133,019 | |
| | 7/2/2018 | $255.17 | 531 | $135,495 | |
| | 7/2/2018 | $250.94 | 500 | $125,470 | |
| | 8/1/2018 | $258.73 | 1,001 | $258,989 | |
| | 8/1/2018 | $261.34 | 850 | $222,139 | |
| | 8/1/2018 | $259.62 | 550 | $142,791 | |
| | 8/1/2018 | $257.25 | 100 | $25,725 | |
| | 9/4/2018 | $247.89 | 730 | $180,960 | |
| | 9/4/2018 | $249.85 | 50 | $12,493 | |
| | 9/4/2018 | $246.79 | 400 | $98,716 | |
| | 9/4/2018 | $248.83 | 383 | $95,302 | |
| | 9/4/2018 | $251.27 | 150 | $37,691 | |
| | 9/4/2018 | $253.40 | 136 | $34,462 | |
| | 9/4/2018 | $252.94 | 650 | $164,411 | |
| | 10/1/2018 | $223.68 | 450 | $100,656 | |
| | 10/1/2018 | $221.52 | 400 | $88,608 | |
| | 10/1/2018 | $222.48 | 350 | $77,868 | |
| | 10/1/2018 | $219.36 | 251 | $55,059 | |

- 50 -

4844-8861-5070.v1

Exhibit 2

- 87 -

Case 2:19-cv-01828-MWF-SK Document 71-1 Filed 08/05/19 Page 52 of 80 Page ID #:2866

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 10/1/2018 | $225.03 | 250 | $56,258 | |
| | 10/1/2018 | $220.38 | 500 | $110,190 | |
| | 10/1/2018 | $225.99 | 300 | $67,797 | |
| | | | **169,484** | **$35,731,293** | **99.85%** |
| **Carberry (Jeffrey)** | 10/23/2017 | $225.00 | 7,346 | $1,652,850 | |
| CFO | 10/24/2017 | $225.02 | 52,237 | $11,754,370 | |
| | | | **59,583** | **$13,407,220** | **47.3%** |
| **Clem (John Roland)** | 6/7/2017 | $144.00 | 6,170 | $888,480 | |
| Chief Product & Strategy Officer | 9/20/2017 | $210.04 | 2,500 | $525,100 | |
| | 9/21/2017 | $210.00 | 3,200 | $672,000 | |
| | 9/22/2017 | $210.10 | 3,020 | $634,502 | |
| | 9/22/2017 | $211.14 | 1,280 | $270,259 | |
| | 10/3/2017 | $220.00 | 500 | $110,000 | |
| | 10/4/2017 | $220.00 | 300 | $66,000 | |
| | 10/11/2017 | $220.27 | 3,037 | $668,960 | |
| | 10/11/2017 | $221.22 | 435 | $96,231 | |
| | 10/12/2017 | $220.29 | 1,300 | $286,377 | |
| | 10/12/2017 | $222.77 | 2,582 | $575,192 | |
| | 10/12/2017 | $221.58 | 600 | $132,948 | |
| | 10/12/2017 | $223.66 | 1,246 | $278,680 | |
| | 10/24/2017 | $230.20 | 8,410 | $1,935,982 | |
| | 10/25/2017 | $230.02 | 1,590 | $365,732 | |
| | 5/4/2018 | $240.20 | 200 | $48,040 | |
| | 5/7/2018 | $242.33 | 310 | $75,122 | |
| | 5/7/2018 | $241.64 | 900 | $217,476 | |
| | 5/7/2018 | $240.23 | 8,590 | $2,063,576 | |
| | 5/14/2018 | $250.20 | 3,500 | $875,700 | |
| | 5/14/2018 | $251.10 | 200 | $50,220 | |
| | 5/21/2018 | $250.14 | 2,200 | $550,308 | |
| | 5/29/2018 | $251.24 | 150 | $37,686 | |
| | 5/29/2018 | $250.15 | 3,899 | $975,335 | |
| | 5/30/2018 | $250.90 | 51 | $12,796 | |
| | 6/1/2018 | $261.20 | 200 | $52,240 | |
| | 6/1/2018 | $260.08 | 6,014 | $1,564,121 | |

- 51 -

Exhibit 2

- 88 -

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 6/4/2018 | $260.00 | 1,320 | $343,200 | |
| | 6/5/2018 | $260.42 | 588 | $153,127 | |
| | 6/5/2018 | $261.90 | 428 | $112,093 | |
| | 6/6/2018 | $262.59 | 266 | $69,849 | |
| | 6/6/2018 | $261.78 | 841 | $220,157 | |
| | 6/6/2018 | $260.80 | 343 | $89,454 | |
| | 6/12/2018 | $271.70 | 1,885 | $512,155 | |
| | 6/12/2018 | $272.27 | 3,602 | $980,717 | |
| | 6/12/2018 | $270.08 | 4,513 | $1,218,871 | |
| | 6/14/2018 | $281.71 | 2,230 | $628,213 | |
| | 6/14/2018 | $280.01 | 1,400 | $392,014 | |
| | 6/14/2018 | $282.60 | 200 | $56,520 | |
| | | | **80,000** | **$18,805,433** | **51.6%** |
| **Huebner (Kyle)** | 3/5/2018 | $195.32 | 5,567 | $1,087,346 | |
| President & CFO | 3/5/2018 | $196.24 | 7,469 | $1,465,717 | |
| | 3/5/2018 | $194.28 | 18,359 | $3,566,787 | |
| | 3/5/2018 | $197.38 | 1,820 | $359,232 | |
| | 3/5/2018 | $198.43 | 1,000 | $198,430 | |
| | 3/5/2018 | $193.37 | 3,386 | $654,751 | |
| | 3/7/2018 | $200.12 | 5,661 | $1,132,879 | |
| | 3/8/2018 | $202.45 | 200 | $40,490 | |
| | 3/8/2018 | $201.59 | 2,200 | $443,498 | |
| | 3/8/2018 | $200.14 | 2,408 | $481,937 | |
| | 3/9/2018 | $203.35 | 1,313 | $266,999 | |
| | 3/9/2018 | $205.77 | 1,100 | $226,347 | |
| | 3/9/2018 | $204.47 | 800 | $163,576 | |
| | 3/9/2018 | $200.33 | 700 | $140,231 | |
| | 3/9/2018 | $202.80 | 200 | $40,560 | |
| | | | **52,183** | **$10,268,779** | **83.4%** |
| **Jones (Bradford)** | 8/7/2017 | $205.40 | 6,880 | $1,413,152 | |
| Director | 8/7/2017 | $207.45 | 6,500 | $1,348,425 | |
| | 8/7/2017 | $206.48 | 3,820 | $788,754 | |
| | 8/7/2017 | $216.03 | 7,000 | $1,512,210 | |
| | 8/7/2017 | $204.67 | 2,800 | $573,076 | |
| | 6/1/2018 | $260.24 | 4,700 | $1,223,128 | |

- 52 -

4844-8861-5070.v1

Exhibit 2

- 89 -

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 6/1/2018 | $261.41 | 5,300 | $1,385,473 | |
| | | | **37,000** | **$8,244,218** | **34.5%** |
| **Khechfe (Amine)** | 5/4/2017 | $120.00 | 2,400 | $288,000 | |
| Chief Strategy Officer | 6/1/2017 | $137.85 | 1,200 | $165,420 | |
| | 7/3/2017 | $155.15 | 1,200 | $186,180 | |
| | 8/1/2017 | $149.05 | 1,200 | $178,860 | |
| | 9/1/2017 | $191.25 | 1,200 | $229,500 | |
| | 10/2/2017 | $202.90 | 1,200 | $243,480 | |
| | 11/1/2017 | $226.65 | 1,200 | $271,980 | |
| | 12/1/2017 | $167.40 | 1,200 | $200,880 | |
| | 1/2/2018 | $188.25 | 1,200 | $225,900 | |
| | 2/1/2018 | $202.05 | 1,200 | $242,460 | |
| | 3/1/2018 | $191.35 | 1,200 | $229,620 | |
| | 4/2/2018 | $199.55 | 1,200 | $239,460 | |
| | 5/1/2018 | $226.00 | 1,200 | $271,200 | |
| | 6/1/2018 | $253.00 | 6,200 | $1,568,600 | |
| | 7/2/2018 | $249.35 | 1,200 | $299,220 | |
| | 8/1/2018 | $262.80 | 1,200 | $315,360 | |
| | 9/4/2018 | $248.15 | 1,200 | $297,780 | |
| | 10/1/2018 | $226.66 | 1,200 | $271,992 | |
| | 11/1/2018 | $186.24 | 1,200 | $223,488 | |
| | 1/2/2019 | $152.45 | 1,200 | $182,940 | |
| | 2/1/2019 | $185.15 | 1,200 | $222,180 | |
| | 2/15/2019 | $200.00 | 11,100 | $2,220,000 | |
| | 2/15/2019 | $200.07 | 100 | $20,007 | |
| | | | **42,600** | **$8,594,507** | **99.1%** |
| **Lipson (Matthew A.)** | 1/16/2018 | $194.76 | 500 | $97,380 | |
| Chief Legal Officer | 1/16/2018 | $192.99 | 400 | $77,196 | |
| | 1/16/2018 | $185.70 | 700 | $129,990 | |
| | 1/16/2018 | $192.52 | 1,000 | $192,520 | |
| | 1/16/2018 | $189.11 | 1,359 | $257,000 | |
| | 1/16/2018 | $187.13 | 2,130 | $398,587 | |
| | 1/16/2018 | $187.98 | 2,302 | $432,730 | |

- 53 -

4844-8861-5070.v1

Exhibit 2

- 90 -

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 1/16/2018 | $190.24 | 2,435 | $463,234 | |
| | 1/16/2018 | $191.19 | 1,000 | $191,190 | |
| | 2/15/2018 | $190.33 | 135 | $25,695 | |
| | 2/15/2018 | $188.58 | 1,000 | $188,580 | |
| | 2/15/2018 | $189.53 | 1,500 | $284,295 | |
| | 2/15/2018 | $187.39 | 3,902 | $731,196 | |
| | 2/15/2018 | $185.21 | 1,500 | $277,815 | |
| | 2/15/2018 | $186.53 | 1,963 | $366,158 | |
| | 3/15/2018 | $197.82 | 3,434 | $679,314 | |
| | 3/15/2018 | $201.62 | 536 | $108,068 | |
| | 3/15/2018 | $200.88 | 2,014 | $404,572 | |
| | 3/15/2018 | $198.74 | 1,216 | $241,668 | |
| | 3/15/2018 | $199.93 | 2,800 | $559,804 | |
| | 4/16/2018 | $202.87 | 2,737 | $555,255 | |
| | 4/16/2018 | $205.93 | 1,600 | $329,488 | |
| | 4/16/2018 | $201.76 | 1,320 | $266,323 | |
| | 4/16/2018 | $205.22 | 1,317 | $270,275 | |
| | 4/16/2018 | $203.86 | 500 | $101,930 | |
| | 4/16/2018 | $206.93 | 1,200 | $248,316 | |
| | 4/16/2018 | $207.74 | 500 | $103,870 | |
| | 5/15/2018 | $243.80 | 1,281 | $312,308 | |
| | | | **42,281** | **$8,294,758** | **98.2%** |
| **McBride (Kenneth)** | 11/27/2017 | $180.01 | 141,733 | $25,513,357 | |
| Chairman & CEO | 11/28/2017 | $180.59 | 400 | $72,236 | |
| | 12/18/2017 | $183.52 | 2,443 | $448,339 | |
| | 12/18/2017 | $182.48 | 3,012 | $549,630 | |
| | 12/18/2017 | $184.10 | 172 | $31,665 | |
| | 12/18/2017 | $180.00 | 400 | $72,000 | |
| | 12/18/2017 | $181.54 | 2,088 | $379,056 | |
| | 3/2/2018 | $200.01 | 6,362 | $1,272,464 | |
| | 3/7/2018 | $201.45 | 100 | $20,145 | |
| | 3/7/2018 | $200.14 | 9,254 | $1,852,096 | |
| | 3/7/2018 | $201.35 | 127 | $25,571 | |
| | 3/8/2018 | $201.64 | 5,500 | $1,109,020 | |
| | 3/8/2018 | $202.27 | 409 | $82,728 | |
| | 3/8/2018 | $200.22 | 4,528 | $906,596 | |

4844-8861-5070.v1

- 54 -

Exhibit 2

- 91 -

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 3/9/2018 | $203.13 | 5,236 | $1,063,589 | |
| | 3/9/2018 | $205.99 | 2,814 | $579,656 | |
| | 3/9/2018 | $205.18 | 2,704 | $554,807 | |
| | 3/9/2018 | $204.10 | 2,603 | $531,272 | |
| | 3/9/2018 | $200.21 | 700 | $140,147 | |
| | | | **190,585** | **$35,204,374** | **58.2%** |
| **Miller (Lloyd Ivan III)** | 8/24/2017 | $194.75 | 1,000 | $194,750 | |
| Director | 8/25/2017 | $194.72 | 35,983 | $7,006,610 | |
| | 8/25/2017 | $194.72 | 19,376 | $3,772,895 | |
| | 8/28/2017 | $190.63 | 12,889 | $2,457,030 | |
| | 8/28/2017 | $190.63 | 6,941 | $1,323,163 | |
| | 8/29/2017 | $192.53 | 6,128 | $1,179,824 | |
| | 8/29/2017 | $192.53 | 2,989 | $575,472 | |
| | 8/30/2017 | $194.67 | 25,000 | $4,866,750 | |
| | 8/30/2017 | $195.21 | 1,000 | $195,210 | |
| | 8/30/2017 | $194.67 | 2,000 | $389,340 | |
| | 8/31/2017 | $191.32 | 11,000 | $2,104,520 | |
| | 8/31/2017 | $191.32 | 11,000 | $2,104,520 | |
| | 9/1/2017 | $192.95 | 9,000 | $1,736,550 | |
| | 9/1/2017 | $192.95 | 9,000 | $1,736,550 | |
| | 9/7/2017 | $189.00 | 25,000 | $4,725,000 | |
| | | | **178,306** | **$34,368,183** | **93.2%** |
| **Weisberg (Seth David)** | 5/25/2017 | $140.11 | 500 | $70,055 | |
| Chief Legal Officer | 5/26/2017 | $140.33 | 4,219 | $592,052 | |
| | 5/26/2017 | $141.24 | 281 | $39,688 | |
| | 6/19/2017 | $150.15 | 5,000 | $750,750 | |
| | 8/3/2017 | $180.00 | 200 | $36,000 | |
| | 8/3/2017 | $202.20 | 1,425 | $288,135 | |
| | 8/3/2017 | $203.80 | 100 | $20,380 | |
| | 8/3/2017 | $179.00 | 100 | $17,900 | |
| | 8/3/2017 | $183.90 | 300 | $55,170 | |
| | 8/3/2017 | $186.80 | 300 | $56,040 | |
| | 8/3/2017 | $189.15 | 300 | $56,745 | |
| | 8/3/2017 | $190.25 | 550 | $104,638 | |

- 55 -

4844-8861-5070.v1

Exhibit 2

- 92 -

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % of Total Holdings |
|---|---|---|---|---|---|
| | 8/3/2017 | $199.92 | 5,600 | $1,119,552 | |
| | 8/3/2017 | $197.77 | 2,880 | $569,578 | |
| | 8/3/2017 | $198.73 | 2,372 | $471,388 | |
| | 8/3/2017 | $196.68 | 2,200 | $432,696 | |
| | 8/3/2017 | $193.36 | 1,900 | $367,384 | |
| | 8/3/2017 | $194.53 | 1,750 | $340,428 | |
| | 8/3/2017 | $195.68 | 1,520 | $297,434 | |
| | 8/3/2017 | $200.79 | 800 | $160,632 | |
| | 8/3/2017 | $206.06 | 600 | $123,636 | |
| | 8/3/2017 | $191.57 | 900 | $172,413 | |
| | 8/3/2017 | $204.54 | 1,203 | $246,062 | |
| | | | **35,000** | **$6,388,754** | **60.8%** |
| **Grand Total** | | | **1,144,412** | **$230,524,113** | |

99. Further, the insider sales were unusual compared to the prior trading history for James Bortnak, John Clem, Huebner, Bradford Jones, McBride, and Seth Weisberg. The following chart shows these same individuals' insider sales in the two years prior to the Class Period:

**Stamps.com (STMP)      5/1/15 – 5/1/17      Insider Sales Summary**

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Bortnak (James M)** | 5/26/2015 | $68.94 | 12,500 | $861,750 |
| | 11/6/2015 | $100.24 | 9,985 | $1,000,896 |
| | 11/23/2015 | $101.05 | 5,000 | $505,250 |
| | 11/25/2015 | $101.77 | 5,000 | $508,850 |
| | 12/23/2015 | $111.96 | 5,000 | $559,800 |
| | 1/25/2016 | $94.57 | 4,985 | $471,431 |
| | 2/24/2016 | $91.76 | 5,000 | $458,800 |
| | 3/24/2016 | $107.62 | 5,000 | $538,100 |
| | 4/25/2016 | $93.87 | 5,000 | $469,350 |
| | 5/24/2016 | $83.97 | 5,000 | $419,850 |
| | 6/24/2016 | $86.30 | 5,000 | $431,500 |
| | 7/25/2016 | $78.99 | 5,000 | $394,950 |
| | 8/24/2016 | $93.75 | 5,000 | $468,750 |

- 56 -

4844-8861-5070.v1

Exhibit 2

- 93 -

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| | 9/26/2016 | $94.53 | 5,000 | $472,650 |
| | 10/24/2016 | $94.54 | 5,000 | $472,700 |
| | 11/25/2016 | $113.29 | 5,000 | $566,450 |
| | 12/23/2016 | $115.34 | 5,000 | $576,700 |
| | 1/24/2017 | $120.84 | 4,985 | $602,387 |
| | 2/24/2017 | $131.59 | 5,000 | $657,950 |
| | 3/24/2017 | $117.42 | 2,592 | $304,353 |
| | 3/24/2017 | $116.58 | 1,600 | $186,528 |
| | 3/24/2017 | $118.27 | 808 | $95,562 |
| | 4/24/2017 | $112.38 | 1,375 | $154,523 |
| | 4/24/2017 | $111.47 | 2,009 | $223,943 |
| | 4/24/2017 | $110.53 | 800 | $88,424 |
| | | | **116,639** | **$11,491,448** |
| **Clem (John Roland)** | 5/13/2015 | $70.34 | 587 | $41,290 |
| | 5/14/2015 | $70.38 | 5,893 | $414,749 |
| | 5/15/2015 | $69.75 | 1,999 | $139,430 |
| | 5/15/2015 | $70.00 | 1,488 | $104,160 |
| | 3/16/2017 | $132.74 | 2,402 | $318,841 |
| | 3/16/2017 | $130.71 | 709 | $92,673 |
| | 3/16/2017 | $131.59 | 6,301 | $829,149 |
| | | | **19,379** | **$1,940,293** |
| **Huebner (Kyle)[5]** | 2/16/2017 | $130.66 | 3,000 | $391,980 |
| | 2/17/2017 | $130.76 | 7,000 | $915,320 |
| | 3/14/2017 | $130.34 | 10,871 | $1,416,926 |
| | 3/14/2017 | $129.57 | 16,363 | $2,120,154 |
| | 3/14/2017 | $127.71 | 4,800 | $613,008 |
| | 3/14/2017 | $128.35 | 17,966 | $2,305,936 |
| | 3/15/2017 | $130.68 | 6,536 | $854,124 |
| | 3/15/2017 | $129.62 | 2,933 | $380,175 |
| | 3/15/2017 | $131.44 | 17,234 | $2,265,237 |
| | 3/15/2017 | $132.29 | 12,013 | $1,589,200 |
| | 3/15/2017 | $133.23 | 11,284 | $1,503,367 |
| | 3/16/2017 | $132.94 | 5,634 | $748,984 |
| | 3/16/2017 | $131.20 | 15,752 | $2,066,662 |

---

[5]   Prior to his 2017 sales, defendant Huebner had not sold Company stock since 2013.

- 57 -

Exhibit 2

- 94 -

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| | 3/16/2017 | $131.86 | 24,068 | $3,173,606 |
| | | | **155,454** | **$20,344,681** |
| **Jones (G Bradford)** | 5/13/2015 | $69.69 | 5,000 | $348,450 |
| | | | **5,000** | **$348,450** |
| **McBride (Kenneth)[6]** | 3/16/2017 | $132.88 | 627 | $83,316 |
| | 3/16/2017 | $131.26 | 1,800 | $236,268 |
| | 3/16/2017 | $131.84 | 2,573 | $339,224 |
| | 4/17/2017 | $106.74 | 1,771 | $189,037 |
| | 4/17/2017 | $106.22 | 6,752 | $717,197 |
| | 4/17/2017 | $105.05 | 1,477 | $155,159 |
| | | | **15,000** | **$1,720,201** |
| **Weisberg (Seth David)** | 5/8/2015 | $72.56 | 12,902 | $936,169 |
| | 5/11/2015 | $74.29 | 1,400 | $104,006 |
| | 6/23/2015 | $74.27 | 5,698 | $423,190 |
| | 8/7/2015 | $83.32 | 30,000 | $2,499,600 |
| | 3/1/2016 | $120.63 | 11,096 | $1,338,510 |
| | 3/1/2017 | $123.77 | 5,000 | $618,850 |
| | | | **66,096** | **$5,920,326** |
| **Grand Total** | | | **377,568** | **$41,765,399** |

100.   During the two years prior to the Class Period, these same Company insiders sold only 377,568 shares of their Stamps stock, for proceeds of only $41.7 million.  Notably, defendant McBride sold only 15,000 shares for $1.7 million in proceeds in the prior two years – compared to his Class Period sales of 190,000 shares (which equated to 58% of his total holdings) for proceeds of more than $35 million.  Moreover, there were *no reported sales* for seven of the thirteen Company insiders (Ananda, Biswas, Buerba, defendant Carberry, Khechfe, Lipson and Miller) during this time period.  The significantly smaller number of pre-Class Period sales

_____

[6]   Prior to his 2017 sales, defendant McBride had not sold Company stock since January 2014.

- 58 -

Exhibit 2
- 95 -

4844-8861-5070.v1

by such a broad swath of Company insiders highlights the suspicious nature of their Class Period insider sales.

101. The insider sales were also suspicious in timing. As demonstrated above, the sales were predominantly made between August 2017 and June 2018, just after President Trump took office and subsequently announced his intent to eliminate business practices detrimental to the USPS. The sales were also made at times when the stock was trading at over $200 per share as defendants were materially inflating the Company's revenues through their reseller scheme. Indeed, defendant Carberry sold his shares (for over $13 million in proceeds) at prices at and near a 52-week trading high for Stamps stock. The suspiciousness of the insider stock sales and their proximity to the Company's concurrent stock repurchases (*see* ¶¶102-103) raise a strong inference that these insiders were aware of the unsustainability of Stamps' reseller scheme when they sold their shares and used that information in connection with the sales to avoid the significant losses in share value that would follow from the impending collapse of Stamps' key source of revenue and profits.

**Corporate Stock Repurchase**

102. In order to allow Stamps' insiders to sell the vast majority of their Stamps shares at artificially inflated prices before the truth about Stamps' manipulative practices was revealed, defendants and other Stamps board members caused the Company to repurchase approximately $300 million in Stamps shares at the same time Stamps insiders were selling hundreds of millions of dollars' worth of Company stock – thereby averting a precipitous decline in Stamps' share price that the massive insider trading would have otherwise caused.

4844-8861-5070.v1

Exhibit 2
- 96 -



103. Thus, the wrongful course of business alleged herein was designed to allow Stamps' insiders to sell substantial amounts of their Stamps shares at artificially inflated prices before the truth about Stamps' manipulative practices was revealed.

**Defendants' False Exculpatory Statements Are Additional Indicia of Scienter**

104. In addition to concealing its actual business model from investors, throughout the Class Period Stamps repeatedly dispelled investor concerns regarding the reseller program by claiming that the program was beneficial to and, in fact, a major asset of the USPS. For example, in August 2017, shortly after questions surfaced regarding Stamps' role in the USPS reseller program, Chairman and CEO McBride falsely assured investors:

> Resellers are important both for keeping existing business and
> for growing new business. You have people that are shipping through
> the reseller channel. It works for the USPS.
>
> *       *       *

- 60 -

[T]he USPS looked at resellers and PC postage providers like Stamps.com and Endicia as excellent partners on bringing the best solutions to customers.

We continue to enjoy a great partnership with the Postal Service and feel that we have created a sustainable win-win model for both of us, which will result in a continued growth of USPS packages and e-commerce and online postage more generally.

105. Rather than creating a "sustainable win-win model," Stamps was improperly profiting from its misuse of the reseller program, which contributed to hundreds of millions of dollars in losses suffered by the USPS, which inevitably would result in the loss of Stamps' lucrative partnership with the agency.

106. Stamps concealed the existing strain in its relationship with the USPS, while touting the purported strength of its ties to the agency. For example, on August 8, 2018, Stamps revealed in a quarterly Form 10-Q filing with the SEC that the USPS had approached the Company to discuss renegotiating their arrangement. This decision by the USPS occurred during the same quarter (2Q18) that the federal Task Force had launched its investigation of USPS's long-term financial viability. It also followed growing concerns among investors and analysts regarding the propriety of Stamps' reseller relationships.

107. Nevertheless, during an investor conference call, McBride downplayed the significance of the negotiations: "These types of negotiations are very common for us. . . . In general, we expect that updates to our agreements with the USPS will continue to reflect the critical role that we play in their e-commerce package business, including that we have the largest private sales force focused on driving USPS growth." When pressed by an analyst to provide more clarity, McBride again claimed the negotiations reflected no change to prior practice, stating: "[L]ike I mentioned in the prepared remarks, these types of agreements, these types of negotiations are very common for us. We've had – over the span of 20 years, we've

- 61 -

had dozens of these types of negotiations." McBride, however, knew that conditions had changed and that the USPS was no longer willing to accept the status quo. Rather than some routine business discussion, the USPS was on the brink of severing its relationship with the Company.

108. When Stamps finally revealed in February 2019 the termination of its commission-based "profit sharing" relationship with the USPS, the Company continued its deception by misrepresenting the true reasons for the termination. The Company falsely claimed that the decision to terminate its relationship with the USPS was driven by its desire to avoid exclusivity. Not so. The Company was already generating business from carriers other than the USPS through affiliates like ShipStation. Moreover, Stamps derived the majority of its revenue from the USPS and knew it could not make up that lost revenue for several years, if ever.

109. Stamps' explanation also does not comport with the Company's prior statements about the contract negotiations, which made clear that they were initiated by the USPS and not Stamps. Finally, the USPS demanded that Stamps renegotiate the terms of their contract in 2Q18, contemporaneously with the launch of the Task Force, and the relationship was terminated in early 2019, soon after the Task Force Report was published, further confirming that the termination of the partnership was driven by the USPS's dissatisfaction with Stamps and not the other way around.

110. Market commentators likewise were confused by defendants' implausible explanation, noting:

> Something is missing here. . . . I am unclear about the 'exclusivity' they are giving up. Rather I believe this is tied to the reseller programs they participate in, which I believe has been driving their profits. The (USPS) Office of Inspector General reported this as part of the $1 billion in lost revenue lost by USPS (in 2018). ***This is the smoking gun, or it could be the smell of impending lawsuits***.

4844-8861-5070.v1

Exhibit 2
- 99 -

111. Defendants' subsequent disclosures confirm the USPS's unwillingness to indulge Stamps' illicit business practices, which had enabled Stamps to profit at the USPS's expense while effectively cannibalizing the USPS's customers.

112. First, Stamps' shift to a multi-carrier platform prior to the start of the Class Period resulted in Stamps converting existing USPS shippers to alternative carriers, thereby diminishing the USPS's business and profits. Similarly, Stamps' abuse of the reseller program by improperly pilfering existing USPS postal business from existing USPS customers/shippers was adversely impacting the USPS because many of those customers were already utilizing the USPS when Stamps offered them discounted shipping through the misuse of its NSAs. Third, Stamps was bundling small-volume shippers to give them unauthorized discounts by entering reseller partnerships with third parties who also had NSAs with the USPS, which similarly did not allow for aggregating these small-volume shippers in order to secretly skim USPS profits by illicitly providing them with discounted shipping.

113. On May 8, 2019, Stamps finally revealed publicly the extent and impact of defendants' wrongdoing on Stamps and its operations, revealing that in addition to the loss of the exclusive commission business, the USPS was also restricting and terminating certain NSAs with the Company's reseller partners and, thus, Stamps' expected future earnings would be substantially reduced.

**Stamps' Improper Business Practices Were Central to Its Operations**

114. Stamps' reseller scheme was central to the Company's business operations as the USPS accounted for approximately 87% of Stamps' revenue during the Class Period. As a result of its partnership with the USPS, Stamps' revenues increased from $128 million to $469 million, a 266% increase, between 2013 and 2017.

115. Likewise, as government scrutiny by the USPS Task Force intensified, Stamps' ability to perpetuate its reseller scheme unraveled, resulting in the loss of

- 63 -

its lucrative exclusive contract with the USPS and unfavorable renegotiated reseller rates with the USPS. Stamps' expected FY19 profits plummeted and the Company reported significant declines in revenue and earnings guidance as a result thereof, with the Individual Defendants specifically attributing potential unfavorable short- and long-term amendments, renegotiations, and terminations of certain contracts between the USPS and the Company's reseller partners as a primary cause for each.

116. Stamps' partnership with the USPS and use of its reseller rates to grow profits for the Company were fundamental and critically important parts of Stamps' business, and there is a strong inference that Stamps' senior officers and directors were aware of the Company's undisclosed reseller scheme to ramp-up revenues.

**Corporate Scienter**

117. Stamps possessed scienter by virtue of the fact that the Individual Defendants, who acted with scienter as set forth above, had binding authority over the Company as its CEO or CFO. In addition, certain allegations herein establish Stamps' corporate scienter based on: (i) the state of mind of employees whose intent can be imputed to the Company; and/or (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

118. For instance, throughout the Class Period, Stamps' financial operations (including its dealings with the USPS) were overseen by defendants McBride, Carberry and Huebner. The Individual Defendants repeatedly spoke on investors calls concerning the Company's financial results and dealings with the USPS.

119. As discussed in ¶¶49-50, Stamps had in place a process to track any complaints and/or concerns by the USPS regarding its reseller practices. Stamps also had in place extensive processes to track its financial performance on a daily, quarterly, and yearly basis. Thus, the Individual Defendants approved of the false and misleading statements in Stamps' financial statements concerning the source

- 64 -

4844-8861-5070.v1

Exhibit 2
- 101 -

Case 2:19-cv-01828-MWF-SK Document 71-1 Filed 08/05/19 Page 66 of 80 Page ID #:2880

and sustainability of its profits, while knowing that the true source of the profits was predominantly Stamps' improper reseller scheme.

**Stamps' President and Former CFO**
**Abruptly Departed During the Class Period**

120.  On February 21, 2019, two months after the USPS Task Force Report was released, and the same day Stamps stunned investors by announcing the end of its USPS exclusive partnership, Stamps' President and former CFO, defendant Huebner, notified Stamps that he intended to resign after 20 years of service.  This departure was seen as abrupt and unexpected by analysts and industry insiders – especially since Huebner had just been promoted to President of Stamps in August 2017.

## LOSS CAUSATION/ECONOMIC LOSS

121.  Defendants' false and misleading statements artificially inflated Stamps' stock price, deceived Lead Plaintiff and the Class and caused them losses when the truth was revealed.  As the truth about defendants' prior misrepresentations and fraudulent conduct reached the market, it caused Stamps' stock price to fall precipitously as the artificial inflation came out of the stock's price.  As a result of their purchases of Stamps stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

122.  On February 21, 2019, after the market closed, Stamps held a conference call to discuss its financial results for 4Q18 and FY18, as well as its business outlook and "certain strategic items . . . that impact our business outlook for 2019."  On the call, Stamps' CEO McBride falsely represented that the Company had been the one that "decided to discontinue [its] shipping partnership with the USPS so that [it could] fully embrace partnerships with other carriers who . . . will be well positioned to win in the shipping business in the next 5 years."  The revelation stunned the market, which attempted to process the inexplicable

- 65 -

4844-8861-5070.v1

Exhibit 2
- 102 -

announcement that the Company was simply walking away from a business relationship that had accounted for a significant portion of its revenue.

123. Subsequently, on February 26, 2019, the market was further perplexed by reports in *The American Conservative* that, contrary to McBride's February 21, 2019 representation, it was the USPS that had decided to terminate its relationship with Stamps in the face of the Company's abuse of the reseller program.

124. With the removal of the USPS exclusive partnership, analysts estimated that Stamps would suffer an FY19 loss of roughly $140 million (or more than a quarter of its total revenue) in high margin commission revenue attributed to its exclusive NSA with the USPS. The loss of the USPS exclusive partnership caused the Company to further announce on February 21, 2019 that, contrary to previous expectations of strong FY19 growth, FY19 revenue was expected to ***decline*** by 5.4% to $540-$570 million (compared to analyst estimates of $702 million) and earnings per share would decline to $5.63 (compared to analyst estimates of $10.76). Stamps would also be forced to implement a 3% surcharge to its existing customers using its PC software to compensate for the lost commission component of revenues from the USPS – leading to further uncertainty concerning Company growth and the retention of new large-volume shippers to grow its customer base and leverage in the marketplace.

125. On the same day, the President and former CFO of Stamps, defendant Huebner, notified Stamps that he intended to resign. His abrupt departure was unexpected by both analysts and industry insiders.

126. As a result of this news, the Company's stock price plummeted $114 per share on record trading volume of 13.7 million shares to close at just under $84 per share on February 22, 2019, a decline of over ***57%***. Despite the Company's assurances of "short term pain" to the investing public, the worst was not over for Stamps shareholders, as the stock continued to trade at artificially inflated levels as

4844-8861-5070.v1

Exhibit 2
- 103 -

defendants continued to conceal the truth about the Company's unsustainable reseller scheme.

127. On May 8, 2019, Stamps further shocked investors by slashing its profit outlook for the full year, further fueling investor concerns about its ability to protect margins in the absence of a key partnership with the USPS. Stamps announced that the lowered guidance was attributed to potential unfavorable short- and long-term amendments, renegotiations, and terminations of certain NSA contracts between the USPS and the Company's reseller partners – which defendants had known about and anticipated since the start of the Class Period, despite falsely telling investors that they "very recently bec[a]me aware" of these adverse conditions that would have a negative impact on the Company's financials. The Company further stated that it now expected an FY19 profit of $3.35 to $4.85 per share, down from its prior estimate of $5.15 to $6.15 per share.

128. As a result of this news, the Company's stock price dropped $46 per share on record trading volume of 16.8 million shares to close at just under $37 per share on May 9, 2019, a decline of over **56%**.

129. The more than 50% decline in the trading price of Stamps' shares after two consecutive quarterly results is extraordinary, and according to George Pearkes, a macro strategist at Bespoke Investment Group, there are "'zero instances'" of a U.S. stock dropping 50% on earnings twice in a row, since 2001, when Bespoke's data begins. After the dust had cleared, Stamps investors had lost **76%** of their investments in only two and a half months.

130. The declines in the price of Stamps stock after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations and the impact thereof being revealed to investors and the market and were a substantial cause of the decline. The timing and magnitude of the price declines in Stamps stock compared to the market and its peers negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by

- 67 -

4844-8861-5070.v1

Exhibit 2
- 104 -

changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Stamps stock and the subsequent significant decline in the value of Stamps stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

131. At all relevant times, the market for Stamps stock was an efficient market for the following reasons, among others:

(a)　Stamps stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)　as a regulated issuer, Stamps filed periodic public reports with the SEC and the NASDAQ;

(c)　Stamps regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)　Stamps was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(e)　Stamps' stock price reacted in response to new material information about Stamps' business.

132. As a result of the foregoing, the market for Stamps stock promptly digested current information regarding Stamps from all publicly available sources and reflected such information in the price of the stock. Under these circumstances,

- 68 -

all purchasers of Stamps stock during the Class Period suffered similar injury through their purchase of Stamps stock at artificially inflated prices and a presumption of reliance applies.

## DEFENDANT MCBRIDE'S INSIDER TRADING

133. On or about December 18, 2017, defendant McBride sold 8,115 shares of Stamps common stock for almost $1.5 million in proceeds. On the same day, Lead Plaintiff INPRS bought shares of Stamps common stock.

134. Because of his role as Chairman and CEO of Stamps during the Class Period, defendant McBride either knew, or recklessly disregarded, the material adverse non-public information about the improper, unsustainable business practices of Stamps (described herein in ¶¶24-64), including, *inter alia*, that the false and misleading statements and/or omissions alleged herein caused the price of Stamps stock to trade at artificially inflated prices at the same time defendant McBride disposed of $1.5 million worth of Company stock. Defendant McBride was in possession of material non-public information at the time of his December 18, 2017 sales and traded contemporaneously with Lead Plaintiff INPRS, and other Stamps purchasers, on such information.

## CLASS ACTION ALLEGATIONS

135. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Stamps common stock during the Class Period and were harmed thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

136. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Stamps shares were actively traded

- 69 -

on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by Stamps, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

137. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

138. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

139. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Stamps;

(c) whether the price of Stamps stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

140. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

- 70 -

4844-8861-5070.v1

Exhibit 2
- 107 -

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of §10(b) of the 1934 Act and SEC Rule 10b-5
### (Against All Defendants)

141. Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

142. This Count is brought by Lead Plaintiff on behalf of itself and the Class.

143. This Count is brought against Stamps and the Individual Defendants.

144. During the Class Period, each of the defendants named in this Count disseminated or approved the statements as specified above in ¶¶65-94, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

145. Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

    (a)    employed devices, schemes, and artifices to defraud;

    (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Stamps common stock during the Class Period.

146. Defendants, individually and together, directly and indirectly, by the use, means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse

4844-8861-5070.v1

- 71 -

Exhibit 2

- 108 -

material information about Stamps' business, operations, and financial condition as specified herein.

147. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

148. As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Stamps common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), Lead Plaintiff and the other Class members purchased Stamps common stock during the Class Period at artificially high prices and were damaged thereby.

149. Lead Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Stamps common stock, and suffered losses when the relevant truth was revealed. Lead Plaintiff and the Class would not have purchased Stamps common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these defendants' misleading statements.

150. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Stamps common stock.

151. By reason of the foregoing, defendants have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

- 72 -

Exhibit 2
- 109 -

## COUNT II

### For Violations of §20(a) of the 1934 Act
### (Against the Individual Defendants)

152. Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

153. This Count is brought by Lead Plaintiff on behalf of itself and the Class.

154. This Count is brought against the Individual Defendants.

155. The Individual Defendants were each control persons of Stamps during the Class Period by virtue of their positions as directors and/or senior officers of Stamps.

156. Each of the defendants named in this Count acted as a controlling person of Stamps within the meaning of §20(a) of the 1934 Act. By virtue of their high-level positions as officers and/or directors of Stamps, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

157. In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

158. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period when the relevant truth was revealed.

4844-8861-5070.v1

- 73 -

Exhibit 2
- 110 -

159. By reason of the foregoing, the defendants named in this Count violated §20(a) of the 1934 Act.

## COUNT III

### For Violations of §20A of the 1934 Act
### (Against Defendant McBride)

160. Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

161. This Count is brought by Lead Plaintiff on behalf of itself and the members of the Class who purchased Stamps common stock contemporaneously with defendant McBride's sales of Stamps common stock.

162. This Count is brought against defendant McBride.

163. During the Class Period, McBride was privy to confidential information concerning Stamps' operations, finances, financial condition, and future business prospects, including, but not limited to, the false statements disseminated to the investing public. Notwithstanding his duty to refrain from trading in Stamps common stock without disclosing the foregoing materially adverse facts, and in violation of his fiduciary duties to Class members, McBride sold Stamps common stock contemporaneously with INPRS's purchase and the purchases of Stamps common stock by other Class members.

164. Defendant McBride sold his Stamps shares as alleged above at prices artificially inflated by the non-disclosure of material adverse non-public facts, misrepresentations of fact, and the public statements released during the Class Period.

165. Defendant McBride was aware that he was in possession of material adverse information that was not known to the investing public, including INPRS and other members of the Class. McBride was obligated to disclose the material non-public adverse information to Lead Plaintiff and other members of the Class before selling his stock.

- 74 -

4844-8861-5070.v1

Exhibit 2

- 111 -

166. By reason of the foregoing, McBride directly and indirectly, by use of the means and instrumentalities of interstate commerce, electronic communications, mailings and the facilities of a national securities exchange, employed devices, schemes, and artifices to defraud and engaged in acts and transactions and a course of business that operated as a fraud or deceit upon members of the investing public who purchased Stamps common stock contemporaneously with the sales by the defendant named in this Count.

167. As a result of the foregoing, Lead Plaintiff and the other members of the Class who purchased Stamps common stock contemporaneously with the sale of Stamps common stock by McBride have suffered substantial damages measured by the amount of profits gained or losses not incurred by reason of McBride's stock sales.

168. This action was commenced within five years after defendant McBride made his sales while in the possession of material non-public adverse information.

169. By reason of the foregoing, defendant McBride violated §20A of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action by certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

- 75 -

4844-8861-5070.v1

Exhibit 2
- 112 -

D.     Awarding injunctive and such other equitable relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: August 5, 2019

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
STEVEN W. PEPICH
ERIC I. NIEHAUS


                    s/ Eric I. Niehaus
                 ERIC I. NIEHAUS

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

4844-8861-5070.v1

Exhibit 2

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 5, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Eric I. Niehaus
ERIC I. NIEHAUS

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  eniehaus@rgrdlaw.com

4844-8861-5070.v1

Exhibit 2
- 114 -

# Mailing Information for a Case 2:19-cv-01828-MWF-SK Matt Karinski v. Stamps.com, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christina Lucen Costley**
  christina.costley@kattenlaw.com,tamara.vazquez@kattenlaw.com,ecf.lax.docket@kattenlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com,info@glancylaw.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com,rswartz@scott-scott.com,edewan@scott-scott.com,tlaughlin@scott-scott.com,aweas@scott-scott.com,efile@scott-scott.com

- **Adam C McCall**
  amccall@zlk.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Eric Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Steven W Pepich**
  stevep@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

- **Paul Satoshi Yong**
  paul.yong@kattenlaw.com,paula.phillips@kattenlaw.com,ecf.lax.docket@kattenlaw.com

- **Richard H Zelichov**
  richard.zelichov@kattenlaw.com,tamara.vazquez@kattenlaw.com,ecf.lax.docket@kattenlaw.com

## Manual Notice List

Exhibit 2

- 115 -

78

Case 2:19-cv-01828-MWF-SK Document 125-2 Filed 07/01/20 Page 81 of 81 Page ID #:2894

Case 2:15-cv-01828-MWF-SK Document 71 Filed 08/05/19 Page 80 of 80 Page ID #:949

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)