# EXHIBIT 4

Case 2:19-cv-01828-MWF-SK Document 125-4 Filed 07/01/20 Page 2 of 46 Page
Case 2:19-cv-01828-MWF-SK Document 100 Filed 04/20/20 Page 1 of 34 Page ID #:2920
ID #:2902

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ (147029)
JASON A. FORGE (181542)
STEVEN W. PEPICH (116086)
ERIC I. NIEHAUS (239023)
HILLARY B. STAKEM (286152)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
jforge@rgrdlaw.com
stevep@rgrdlaw.com
eniehaus@rgrdlaw.com
hstakem@rgrdlaw.com
ksciarani@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:19-cv-01828-MWF-SK |
| Plaintiff, | CLASS ACTION |
| vs. | JOINT RULE 26(f) REPORT |
| STAMPS.COM, INC., et al., | DATE: May 4, 2020<br>TIME: 11:00 a.m. |
| Defendants. | CTRM: 5A<br>JUDGE: Hon. Michael W. Fitzgerald |

4811-2994-0922.v1

Exhibit 4
- 122 -

## I.     INTRODUCTORY STATEMENT

Pursuant to Federal Rule of Civil Procedure 26(f), the Local Rules of the United States District Court for the Central District of California and the Standing Orders of this Court, and the Court's Order Setting Scheduling Conference (ECF No. 95), counsel for Lead Plaintiff Indiana Public Retirement System ("Lead Plaintiff") and counsel for Defendants Stamps.com Inc. ("Stamps" or the "Company"), Kenneth McBride ("McBride"), Kyle Huebner ("Huebner") and Jeff Carberry ("Carberry") (together, "Defendants") (collectively, the "Parties") in the above-captioned action respectfully submit this Joint Rule 26(f) Report.  The Parties are scheduled to appear before the Court on May 4, 2020 for a Case Management Conference.

## II.     JOINT CASE MANAGEMENT CONFERENCE STATEMENT

### A.     Statement of the Case

This is a putative securities class action asserting claims for violations of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of persons and entities that purchased or otherwise acquired Stamps securities between May 3, 2017 and May 8, 2019, inclusive (the "Class Period").  Lead Plaintiff alleges that during the Class Period, Defendants made materially false and misleading statements and/or failed to disclose adverse information regarding Stamps' relationship with the United States Postal Service ("USPS"), which was fraying due to Stamps' abuses of the reseller program.  On January 17, 2020, the Court issued its Order re: Defendants' Motion to Dismiss (ECF No. 89) ("Order"), granting in part and denying in part Defendants' motion to dismiss, and holding Lead Plaintiff had adequately alleged violations of §10(b) and Rule 10b-5, §20A and §20(a).  *See* Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 71) ("Complaint").

In general, the Parties dispute whether Defendants made false and/or misleading statements or omissions of material fact to the investing public during the Class Period.  More specifically, and without limitation, Defendants dispute Lead Plaintiff's allegations that: (1) Defendants made misrepresentations or omissions of material fact

- 1 -

4811-2994-0922.v1

Exhibit 4

- 123 -

during the Class Period; (2) Defendants had a duty to disclose the purportedly omitted material facts; (3) Defendants made those misrepresentations or omissions of material fact with scienter; (4) Defendants' alleged misstatements or omissions caused the stock price of Stamps' securities to be artificially inflated; (5) members of the putative Class relied on Defendants' alleged misstatements or omissions; (6) the alleged conduct caused any losses to Lead Plaintiff or members of the putative Class; and (7) Lead Plaintiff and members of the putative Class were damaged, and the measure of any such damages.

The Complaint asserts claims under §§10(b), 20A and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and seeks: (1) an order declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"); (2) damages, including prejudgment and post-judgment interest; (3) reasonable costs and expenses incurred in this action, including attorneys' fees; and (4) such other relief as the Court may deem just and proper.

**B. Subject Matter Jurisdiction**

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331 and §27A of the Exchange Act (15 U.S.C. §78aa). Defendants do not contest subject matter jurisdiction, personal jurisdiction or venue. No parties remain to be served.

**C. Legal Issues**

The principal legal issues in dispute include: (1) whether Defendants violated §10(b) of the Exchange Act and Rule 10b-5; (2) whether McBride, Huebner and Carberry violated §20(a) of the Exchange Act; (3) whether McBride violated §20A of the Exchange Act; (4) whether Defendants misrepresented material facts; (5) whether Defendants omitted to state any material facts that were necessary to make their statements not misleading in light of the circumstances under which they were made; (6) whether Defendants had a duty to disclose any alleged material omission; (7) whether any Defendant acted with scienter in making any alleged

- 2 -

4811-2994-0922.v1

Exhibit 4
- 124 -

misrepresentations or omissions; (8) whether the price of Stamps securities were artificially inflated as a result of Defendants' alleged misrepresentations and/or omissions; (9) whether Lead Plaintiff and putative Class members relied on Defendants' alleged misrepresentations and/or omissions; (10) whether Lead Plaintiff and putative Class members were damaged as a result of Defendants' alleged misrepresentations and/or omissions; (11) the proper measure of any such damages; and (12) whether this action may proceed as a class action under Rule 23 and if so, the definition of that class.

### D. Parties, Evidence, etc.

#### 1. Parties

Lead Plaintiff is Indiana Public Retirement System. The Defendants are Stamps, McBride, Huebner and Carberry. The Parties believe it is not likely additional parties will be added.

The Company discloses its subsidiaries, parents and affiliates as follows: PhotoStamps Inc., Auctane LLC d/b/a ShipStation, Interapptive Inc. d/b/a ShipWorks, PSI Systems, Inc. d/b/a Endicia, Shipping Easy Group, Inc., ShipEngine, Inc., and Pacific Shelf 1855 Limited.

#### 2. Evidence

Without the benefit of discovery (and without either party conceding the relevance of any particular witness identified below), percipient witnesses include, but are not limited to: Defendants, J.P. Klingenberg, Candi Booth, Robert Ross, Cliff Rucker, Amine Khechfe, Ken Baily, Brian Denneny, Dennis Nicoski, Sebastian Buerba, John Roland Clem, Steve Rifai, representatives of Lead Plaintiff and its investment advisors, if any, and the former employees of Stamps described in ¶¶46-50 of the Complaint.[1] Additional witnesses might include employees of Stamps and its subsidiaries, the USPS, IntuiShip, Express1, and Parcel Partners.

---

[1] All "¶" references are to the Complaint.

4811-2994-0922.v1

Exhibit 4

- 125 -

Case 2:19-cv-01820-MWF-SK Document 100 Filed 04/20/20 Page 5 of 34 Page ID #:2906

Without the benefit of discovery (and without either party conceding the relevance of any category of documents identified below), key documents include, but are not limited to: Contracts and agreements between the USPS and Stamps, the Negotiated Service Agreements ("NSAs") of Stamps' reseller partners, communications between Stamps and the USPS regarding issues the USPS had with Stamps' use or misuse of the reseller program and with respect to the renewal, modification or termination of contracts and agreements between the USPS and Stamps, documents concerning Lead Plaintiff's purchases of Stamps' common stock, including documents regarding Lead Plaintiff's decision to purchase, hold, or sell Stamps' common stock.

### E. Damages

The calculation of damages in this complex securities fraud class action will be the subject of expert opinion.

### F. Insurance

Defendants have Directors and Officers liability insurance coverage subject to a reservation of rights. As part of their initial disclosures on March 12, 2020, Defendants identified all potentially applicable policies and produced such policies on March 27, 2020.

### G. Motions

Lead Plaintiff intends to move for class certification under Rule 23, and Defendants may oppose. The Parties' proposed cut-off dates by which these motions must be filed are set forth in in §V.H, *infra*. Defendants intend to move for summary judgment at the appropriate time. Otherwise, the Parties believe that, absent the benefit of discovery, it is too early to determine whether they will file any additional motions.

### H. Manual for Complex Litigation

The Parties agree that, given the nature of the claims at issue, the provisions set forth in the Manual for Complex Litigation (the "Manual") may be instructive during

- 4 -

4811-2994-0922.v1

Exhibit 4
- 126 -

the course of the case. Should the need arise, the Parties agree to meet and confer as necessary to determine if the Manual should be consulted as a case management tool by the Court and the Parties.

## I. Status of Discovery

In accordance with Federal Rule of Civil Procedure 26(d), the stay of discovery imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and the agreement of the Parties, discovery in this action commenced on February 27, 2020. The Parties exchanged Federal Rule of Civil Procedure 26(a) disclosures on March 12, 2020 without making any changes in the content of these disclosures from what is set forth in Federal Rule of Civil Procedure 26(a)(1)(A).

## J. Discovery Plan

**Lead Plaintiff's Statement**: Lead Plaintiff is actively pursuing discovery from Defendants and third parties concerning, *inter alia*: Stamps' practices with respect to its use and/or abuse of the reseller program; communications between the USPS and Defendants concerning the status of the Stamps-USPS relationship, and the negotiation, renewal, modification and/or termination of their agreements and contracts; the USPS's notification to Stamps and its partners of the abuse of the reseller program; the contracts and agreements between Stamps and the USPS, Stamps and its partners, and its partners and the USPS; the statements and omissions as alleged in the Complaint; investors' and analysts' reactions to Defendants' statements and omissions as alleged in the Complaint; Defendants' knowledge of Stamps' and its partners' reseller program abuses and the USPS's actions in response to the abuse; and the reasons Stamps suffered or expected to suffer stock price declines on February 22, 2019 and May 9, 2019.

Among third parties, Lead Plaintiff is pursuing, or will likely pursue, discovery from: Stamps' partners, including IntuiShip, Express1 and Parcel Partners; its accountants and auditors; consulting firms; public relations companies; investment bankers and analysts; the USPS and other governmental entities; and former

- 5 -

employees, directors, and representatives of the Company. Lead Plaintiff believes that based on the case's complexity and the numerous witnesses and third parties already known to be relevant, it should be permitted to take 30 fact depositions and serve 25 additional interrogatories in excess of the limit imposed by the Federal Rules of Civil Procedure.

Defendants want to delay merits discovery – in addition to the mandatory stay of discovery Lead Plaintiff overcame on January 17, 2020, when the Court denied Defendants' motion to dismiss Lead Plaintiff's Complaint. Rather than file a motion three months ago seeking such relief, Defendants have effectively executed their own self-imposed stay. Defendants set forth below their purported justification for continuing to delay discovery, which is followed by Lead Plaintiff's response.

**Defendants' Statement**: Defendants request that the Court bifurcate discovery with class certification preceding full merits discovery. Defendants believe that this is the most efficient way to litigate this case. Defendants' explanation for this position as well as their positions on other issues related to discovery and other deadlines in this case are set forth below.[2]

---

[2] Plaintiff and defendants started the meet and confer process on this submission in February 2020. On March 6, 2020, defendants informed plaintiff that defendants were likely to seek bifurcated discovery and that defendants intended to present the reasons for bifurcation as part of this Rule 26(f) Report. Plaintiff indicated that it would oppose the request, but did not oppose including the arguments in the Rule 26(f) Report. Defendants then provided plaintiff with a near complete draft of their position concerning bifurcation on March 30, 2020 with a request and expectation that defendants would have a chance to review and reply to plaintiff's position statement on bifurcation, if necessary. Despite repeated requests by defendants, plaintiff did not provide defendants with any version of plaintiff's submission until the day the Rule 26(f) Report had to be filed with the Court. Defendants therefore did not have the opportunity to reply to plaintiff's position in this Rule 26(f) Report. Defendants understand that the Court is only conducting hearings in civil cases for emergency time-sensitive matters and that a Rule 26(f) Report does not constitute such an emergency. *See* C.D. Cal. COVID-19 Notice. Given the circumstances described above, however, Defendants request that the Court conduct a telephonic hearing in connection with this Rule 26(f) Report.

- 6 -

4811-2994-0922.v1

Exhibit 4
- 128 -

## III. Discovery Should Be Bifurcated

### A. Background Related To Bifurcation

Plaintiff's Consolidated Complaint alleged that defendants made 25 false and misleading statements on seven different days during a putative class period of May 3, 2017 and May 8, 2019. Plaintiff's primary theory was that Defendants failed to disclose that Stamps.com was using reseller rates for lower volume and/or existing USPS customers. ECF No. 71; ECF No. 83-1 (Exhibit A to Opposition . . . identifying each of the statements Plaintiff claimed to be false or misleading). Defendants moved to dismiss, and after briefing and argument, the Court issued an Order on Defendants' Motion to Dismiss on January 17, 2020. ECF No. 89 ("Order"). The Court rejected Plaintiff's theory that Defendants failed to disclose that Stamps.com was using reseller rates for lower volume and/or existing USPS customers. Order at 18-19. The Court thus held that the statements made by Stamps that survived the motion to dismiss were only Defendants' statements that Stamps had a positive relationship with the USPS and that the USPS had positive views concerning the reseller business model. Order at 20-25.[3]

The effect of the Court's order reduced the scope of the case to certain statements made on May 3, 2017 and August 2, 2017 (and being generous to Plaintiff, one further statement made by Defendants on October 31, 2018). As discussed in more detail below, the significantly reduced scope of the case makes it much more efficient to bifurcate discovery between discovery relevant to class certification and discovery with respect to the merits of the case.

---

[3] Plaintiff did not allege that the USPS was considering changes to Stamps' package business incentive agreement ("Incentive Agreement") in August 2017. Nor could Plaintiffs allege such facts since Stamps and the USPS signed the agreement on June 13, 2017, just 49 days earlier. Neither Parcel Partners nor Stamps's former employees nor anything else cited in the Complaint reflects any potential changes or risks to the Incentive Agreement until the USPS sent the "notice requiring the renegotiation" of that contract in the second quarter of 2018 (which Stamps disclosed in its Form 10-Q filed on August 8, 2018). *See* ECF No. 81-6 at 6.

- 7 -

Case 2:19-cv-01828-MWF-SK Document 125-4 Filed 07/01/20 Page 10 of 46 Page
ID #:1928
Case 2:19-cv-01828-MWF-SK Document 100-2 Filed 04/20/20 Page 9 of 94 Page ID #:2910

**B.      Standard for Bifurcation**

This Court is vested with "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) ("District courts have broad discretion to control the class certification process," including whether discovery will be permitted.) (citations omitted).  Providing for sequenced discovery in class actions is particularly appropriate.  The 2003 Advisory Committee Notes to Rule 23 recognize that bifurcation "is appropriate to conduct controlled discovery . . . relevant to making the certification decision on an informed basis." Leading treatises on federal practice underscore the utility of bifurcation in class actions: "Discovery relevant only to the merits . . . may ultimately be unnecessary. Courts often bifurcate discovery between certification issues and those related to the merits of the allegations."  Manual for Complex Litig., §21.14 (4th ed.); *see also* Moore's Federal Practice-Civil, §23.85 ("Often, district courts will attempt to limit pre-certification discovery to class certification issues, and will postpone discovery on the merits until after the certification decision").[4]  Courts typically consider three factors when determining whether to bifurcate discovery: "(1) expediency, meaning whether bifurcated discovery will aid the court in making a timely determination on the class certification motion; (2) economy, meaning the potential impact a grant or denial of certification would have upon the pending litigation and whether the definition of the class would help determine the limits of discovery on the merits; and (3) severability, meaning whether class certification and merits issues are closely enmeshed."  Ann. Manual for Complex Litig., §11.23 (4th ed. May 2019 Update); *see also* 1 McLaughlin on Class Actions, §3:10 (16th ed.  Oct. 2019 update) (same).  Each

---

[4]  *See also Construction Laborers Pension Trust for Southern California v. CBS Corp.*, No. 18-CV-7796 (S.D.N.Y.), Civil Case Management Plan and Scheduling Order dated March 17, 2020 (order bifurcating class certification and merits discovery in a putative securities class action); *Munro v. University of Southern California*, 2018 WL 2584611, at *2 (C.D. Cal. May 11, 2018) (noting that "discovery has been bifurcated into a class certification phase and a merits phase").

of those factors weighs strongly in favor of class discovery proceeding before merits discovery in this case.

### C. There Is Very Little (If Any) Overlap Between Class And Merits Discovery In This Case

Bifurcation of discovery is particularly appropriate because, unlike in other types of class actions, a clear line divides merits discovery and class certification discovery in a securities class action. The class certification analysis is likely to turn on questions relating to adequacy and typicality of the proposed class representative, which are separate from merits discovery related to falsity and scienter. *See, e.g.*, *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). And whether common issues predominate almost always turns on the element of reliance (regardless of how many common issues on falsity, scienter, and otherwise might exist). *See, e.g.*, *Haliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("[i]f every plaintiff had to prove direct reliance on the defendant's misrepresentation, 'individual issues then would . . . overwhelm[] the common ones,' making certification under Rule 23(b)(3) inappropriate") (citing and quoting *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)); *In re IPO Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006) ("[w]ithout the *Basic* presumption, individual questions of relaiance would predominate over common questions"). Thus, where as here, plaintiffs claim reliance by invoking the "fraud on the market." doctrine (Complaint, ¶¶131-132), "demonstrating market efficiency is in essence a lynchpin" for plaintiffs to show that individual issues do not predominate over common ones. *Brown v. China Integrated Energy, Inc.*, No. 11-02559, 2014 WL 12576643, at *4 (C.D. Cal. Aug. 4, 2014). Plaintiff must "prov[e] 'the prerequisites for invoking the [Basic] presumption – namely, publicity, materiality, market efficiency, and market timing . . . before class certification.'" *Id.* (citation omitted.).[5] A fraud-on-the-market inquiry at class

---

[5] Plaintiff may attempt to pivot from what it alleged in the Complaint and attempt to rely upon a presumption of reliance for omissions described in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). The Ninth Circuit has limited the

- 9 -

certification turns on the analysis of public information, and the market's reaction to that information, not on an analysis of falsity or scienter. What matters is the perception by the market of the Defendants' public statements and the company's prospects based on information that is publicly known about it. This does not require internal documents or information from Defendants.

### D. Class Certification Discovery Will Be Much Less Extensive Than Merits Discovery

Concerns about the costs of merits discovery have particular merit here. Defendants believe that discovery related to class certification can be very limited and focused, likely limited to documents and depositions from only five persons on limited topics. Defendants likely will require certain documents and depositions from Plaintiff, the two investment advisors seemingly involved in Plaintiff's decisions to engage in transactions of Stamps's stock, and any expert Plaintiff retains to opine on market efficiency and price impact. Defendants expect that Plaintiff likely will require documents and a deposition from any expert Defendant retains to opine on market efficiency and price impact. In contrast, Plaintiff seems to want to impose discovery costs immediately beyond all proportion to the scope of this case.[6] Just by

---

application of this presumption to cases that allege only omissions and not any affirmative misrepresentations, *Binder v. Gillespie*, 184 F.3d 1059, 1063-65 (9th Cir. 1999), and the presumption does not apply when a plaintiff alleges that an omission rendered an affirmative statement misleading, *see, e.g.*, *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 667 (9th Cir. 2004). Furthermore, the *Affiliated Ute* presumption is rebuttable in the same manner as the *Basic* presumption and so would similarly be rebutted for the reasons described in the text. *See, e.g., In re Allergan, Inc. Sec. Litig.*, 2016 WL 5929250, at *4 n.4 (C.D. Cal. Oct. 5, 2016).

[6] Courts and Congress long have recognized that plaintiffs use discovery in securities class actions "to impose costs so burdensome" as to induce "in terrorem" settlements. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d. 970, 978 (9th Cir. 1999), abrogated on other grounds as stated in *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (recognizing that securities class actions "can be employed abusively to impose substantial costs on companies and individuals"); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (recognizing that burdensome and "vexatious discovery requests" among abuses in securities cases that contribute to "extortionate" settlement demands). Over ten years ago, the average discovery costs of a medium- size civil case were estimated to exceed $3.5 million. *See Institute for the Advancement of the American Legal System, Electronic Discovery: A view from*

<div align="center">- 10 -</div>

way of some examples, Plaintiff's first request for production served on February 27, 2020 seeks over seven years of documents, starting in 2013 (4.5 years before start of the putative class period). Plaintiff seeks every communication during that time period between Stamps and any of the postage resellers (RFP Nos. 7, 8, 9, 12); every communication during that time period between Stamps and numerous current and former USPS or PRC officials (RFP Nos. 11, 13, 15, 16, 17, 18, 19, 20, 21); all documents concerning Stamps.com's acquisitions (the last of which occurred nearly one year before the putative class period) (RFP No. 22); all documents concerning every contract or arrangement that Stamps had with the USPS (RFP No. 24); and all documents concerning Stamps' customers who were offered or used reseller rates (RFP Nos. 23, 44, 45). Furthermore, in each of these requests, Plaintiff purports to define relevance to include "any other matter alleged in the Complaint," ignoring that the Court dismissed many of the claims in the Complaint in the Order. *See also* RFP No. 33 (request for all documents supporting every public statement mentioned in the Complaint). Plaintiff also wants to take 30 fact depositions including accountants and auditors (even though the Court dismissed Plaintiff's claims related to Stamps' financials) and all manner of other persons who have no information relevant to the theories remaining in the case.

### E. Class Certification Is Doubtful Here

There are very good reasons to doubt class certification (or at least a significant reduction in the length of the class period) in this case that justify bifurcation of class and merits discovery. While Plaintiff has not filed its motion for class certification, Plaintiff is likely relying on the fraud on the market presumption to establish class wide reliance. To do so, the Supreme Court has held that a "a plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given

_____

*the front lines*, at 4 (2008). The costs of discovery for a more complex case like this have only risen since that report was written, particularly in securities class actions – a fact that Plaintiff cannot reasonably dispute.

4811-2994-0922.v1

Exhibit 4

case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Haliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).

Even if a plaintiff is able to meet these standards, the defendants may still rebut the presumption of reliance with "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id.* The defendants can make such a showing either by demonstrating that the company's stock price did not react positively to the alleged misleading statements or by demonstrating that the company's stock price did not react negatively to the alleged corrective disclosure. *Id.*; *see also IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017). Defendants are also able to reduce the proposed length of the class period when there is a curative disclosure after the alleged misrepresentations but before the corrective disclosure claimed by the plaintiff. *See, e.g., Hayes v. MagnaChip Semiconductor Corp.*, 2016 7406418, at *7-8 (N.D. Cal. Dec. 22, 2016); *see also West Virginia Pipe Trades Health & Welfare Fund v. Medtronic*, 325 F.R.D. 280, 293-95 (D. Minn. 2018).

As discussed above, this Court held that Plaintiff had stated a claim with respect to Defendants' statements about its positive relationship with the USPS and that the USPS had positive views concerning the reseller business model. Order at 20-25. Stamps only made such statements on May 3, 2017, August 2, 2017, and (being generous to Plaintiff), October 31, 2018.

### 1. May 3, 2017 and August 2, 2017 Statements

The applicable class period for the May and August 2017 statements should end no later than August 24, 2017, when Capitol Forum published the exact same Parcel

- 12 -

Partners email that Plaintiff quoted in Paragraph 58 and on which this Court relied when holding that Plaintiff had adequately pled that the USPS was considering making changes to the reseller program. *See* Ex. A; *see also* Order at 21 (plaintiff has alleged that statements were not puffery because USPS "implementing changes to the resellers' NSAs); Order at 24 ("August 2017 USPS letter that Stamps received from Parcel Partners" provides the support for Plaintiff's claim). Not only did Capitol Forum publish the Parcel Partners email, it expressly noted that the email reflected "changes to the reseller program." Moreover, three days earlier, on August 21, 2017, Capitol Forum published the USPS's new marketplace requirements for NSA's, which included language intended to prevent "offer[ing] discounted rates to 'existing USPS customers'" and to limit "rebates, discounts, gratuities, freebies, promotions, inducements or other incentives that could be perceived as further discounting Product prices." Ex. B. As a result of these public disclosures, it would be unreasonable for any person purchasing Stamps' stock to believe, after August 24, 2017, that the USPS was not considering changes to the reseller program or did not have some concerns about product pricing. Thus, the class period in connection with those statements should end no later than August 24, 2017.[7]

The corrected class period required by the Capitol Forum report renders Plaintiff atypical to serve as a class representative. Plaintiff did not purchase any shares during the class period before August 24, 2017. ECF No. 76 (Plaintiff first

---

[7] The USPS did not make changes to its reseller program in 2017 or 2018 thereby further reflecting its support for the program and how it was being used by the extended ecosystem, including, but not limited to Stamps.com and its subsidiaries, to help grow USPS volume. Stamps announced on May 8, 2019 that the USPS might make changes to the reseller program that year after it had received specific and credible information from its reseller partners in the spring of 2019. Stamps stock price fell in response to that disclosure. Just three months later on August 7, 2019, however, Stamps told the market in a conference call that the USPS had determined not to make such changes in 2019 and its stock price went back up. The USPS did make certain changes to the reseller program in 2020 (nearly three years after plaintiff seems to claim that defendants should have disclosed that changes were coming), and when on February 19, 2020, Stamps' described the actual changes that the USPS implemented with respect to the reseller program, Stamps stock price increased significantly from $95.46 to $157.99.

4811-2994-0922.v1

purchased stock during the class period on September 6, 2017). Plaintiff therefore does not have standing to assert claims for any alleged misstatements made on May 3, 2017 or August 2, 2017. *See, e.g.*, *In re Dr. Reddy's Lab. Ltd. Sec.* Litig., 2019 WL 1299673, at *13 (D.N.J. Mar. 21, 2019) ("Plaintiff [] lacked standing to assert claims relating to alleged misstatements" where it purchased stock after curative disclosure"). It is blackletter law that a "a plaintiff whose relevant transactions were not executed between the time the misrepresentation was made and the time the truth was revealed" would not satisfy the typicality requirement for class certification. *See Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 472-73 (2013); *see also Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002) (plaintiff without standing does not have the requisite typicality to raise a claim on behalf of a class).

It makes sense to determine these issues before commencing merits discovery. A decision that the class period should end on August 24, 2017 and/or that Plaintiff cannot even serve as the class representative would significantly reduce the scope of merits discovery (or eliminate the need for merits discovery for this period in its entirety).

### 2. August 2017 to October 30, 2018

Stamps made no further statements about its relationship with the USPS or the USPS's views concerning the reseller program after August 2017. It accurately disclosed its financial results, made quarterly projections, and made some general statements about its results. The Court correctly held that "Plaintiff has failed to demonstrate that Stamps' discussion of, and positive statements about, its past and future financial results were misleading." Order at 26.

### 3. October 31, 2018

As for Stamps' statements on October 31, 2018, Stamps did not make any statements whatsoever about the quality of its partnership with the USPS or the USPS's views concerning the reseller program. It did state accurately that it believed

- 14 -

4811-2994-0922.v1

Exhibit 4

- 136 -

its partnership with the USPS had "contributed to a significant portion of overall USPS e-commerce package growth over the past 5 years," ¶92, as a basis for Stamps' belief that the "update" to its package business incentive agreement would be successful, but such statement did not survive Defendants' motion to dismiss. The statement relates to Stamps' future financial performance which the Court held did not state a claim. Order at 26. Moreover, Mr. McBride's statement closely mirrored the USPS's Chief Financial Officer August 9, 2018 statement that PC Postage partners, like Stamps, are "very, very important partners to for us in terms of increasing volumes from year to year and have been a major contributor to the double digit growth we saw in the last three years in packages and also continue to contribute to the growth we're seeing this year of about 6.5% in packages." Furthermore, as discussed in the motion to dismiss and in n.3 above, Stamps issued a very particular warning about the package business incentive agreement in its August 8, 2018 10-Q.

Even if this statement is still at issue after the Court's decision on the motion to dismiss, however, Plaintiff cannot use this statement as a basis for any motion for class certification because Stamps' stock price did not show a positive price impact in response to that statement – the stock price actually fell nearly $20 per share from $202.17 to $182.47 – thereby rebutting the presumption of reliance based on the fraud on the market theory upon which plaintiff depends to establish "predominance" for purposes of class certification. *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017). Each member of the class will have to prove individually that it relied upon Stamps' October 31, 2018 statements in the decision to purchase Stamps stock.

In addition, even if the October 31, 2018 statement was still at issue (and Defendants do not believe it is), the class period for such statement would end no later than February 21, 2019, when Stamps announced that the package business incentive agreement between Stamps and the USPS ended on December 31, 2018 (such that any

class period would be limited to the period from October 31, 2018 to February 21, 2019) and any merits discovery for that period would be limited to the renegotiation of the package business incentive agreement (and would not encompass any issues purported related to the reseller program).

Again, it makes sense to determine these issues before commencing merits discovery. A decision that the October 31, 2018 statement is no longer part of the case, that stockholders will have to prove individually that they relied on this statement, and/or that the class period for any such statement covers only the period from October 31, 2018 to February 21, 2019 would significantly reduce the scope of merits discovery (or eliminate the need for merits discovery for this period in its entirety).

### F. Conclusion

In short, Defendants class certification arguments are likely to eliminate or significantly reduce the scope of merits discovery. It would therefore be a tremendous waste of resources for merits discovery to commence before the Court determines whether to certify this case as a class action and if so, what the relevant class period should be.

## IV. Bifurcation of Discovery Would be Inappropriate

Bifurcating discovery in this case between "class certification discovery" and "merits discovery" will serve no purpose other than to further delay the litigation, create unnecessary complications, and prejudice Lead Plaintiff and the Class. Over two months ago, after denying Defendants' motion to dismiss this case, the District Court "encourage[d] counsel to agree to begin to conduct discovery actively *before* the [May 4, 2020] Scheduling Conference." ECF No. 95 at 2 (emphasis in original). Obviously, the Court was aware of the option of bifurcating discovery, but plainly did not encourage that route to the Parties. If Defendants had wanted to postpone merits discovery even longer than Lead Plaintiff has already had to wait due to the PSLRA discovery stay, the time to bring such a motion was in early February – after the Court

- 16 -

4811-2994-0922.v1

Exhibit 4
- 138 -

denied their motion to dismiss or immediately upon receipt of the Court's scheduling order. Had Defendants done so, the issue of bifurcation would likely have been resolved by now.

Instead, Defendants unilaterally imposed a one-way stay on merits discovery – refusing to produce any merits-related documents while simultaneously propounding requests for merits-related documents from Lead Plaintiff (which Lead Plaintiff has been producing). Worse, Defendants still have not filed a motion requesting bifurcation, but instead chose to add the foregoing lengthy argument to their portion of the Joint Rule 26(f) Report. This is just another delay tactic. The current pandemic-related restrictions make this the perfect time for both sides to gather and produce all discoverable ESI. That way, when the current restrictions are lifted, the Parties will be able to hit the ground running with depositions. Lead Plaintiff respectfully urges the Court not to reward Defendants with any additional delay for their failure to file a timely bifurcation motion and their ongoing self-imposed one-way discovery stay.

In determining whether or not to bifurcate discovery prior to class certification, courts in the Ninth Circuit consider the following: "(1) the overlap between individual and class discovery, (2) whether bifurcation will promote Federal Rule of Civil Procedure 23's requirement that certification be decided at 'an early practicable time,' (3) judicial economy, and (4) any prejudice reasonably likely to flow from the grant or denial of a stay of class discovery." *True Health Chiropractic Inc v. McKesson Corp.*, 2015 WL 273188, at *1 (N.D. Cal. Jan. 20, 2015) (citation omitted). Here, each of these factors weighs against further delaying this litigation by bifurcating class certification and merits discovery.

### A. Merits and Class Discovery are Intertwined

At the risk of stating the obvious, in complex class actions, "'[t]he merits/certification distinction is not always clear.'" *Id*. at *2 (citation omitted); *Mbazomo v. ETourandTravel, Inc.*, 2017 WL 2346981, at *2 (E.D. Cal. May 30, 2017) (citation omitted) ("Indeed, '[f]acts that are relevant to the class determination

- 17 -

4811-2994-0922.v1

Exhibit 4
- 139 -

frequently will overlap with those relevant to the merits of the case.'"); Manual for Complex Litigation (Fourth), §21.14 (2004) ("Arbitrary insistence on the merits/class discovery distinction sometimes thwarts the informed judicial assessment that current class certification practice emphasizes.").

This overlap is nearly complete here, where Defendants intend to assert a truth-on-the-market defense in an attempt to narrow the Class Period. *See supra* §III.E.1 ("As a result of these public disclosures, it would be unreasonable for any person purchasing Stamps' stock to believe, after August 24, 2017, that the USPS was not considering changes to the reseller program or did not have some concerns about product pricing."). No opposition to class certification could be more intertwined with the merits than what Defendants foreshadow. It calls for discovery of what Defendants knew and when compared to what Defendants revealed and concealed, and what impact, if any, Defendants' statements and omissions had on artificially inflating or maintaining Stamps' share price. These issues touch upon all the basic elements of the securities fraud claim here.[8] Defendants want to argue that the Capitol Forum's publication of a single letter revealed their entire scheme, but Defendants' myopia and implausibility of this argument are clear from its presentation.

Defendants' citation to the Court's Order overstates the significance of this letter:

> Capitol Forum published the exact same Parcel Partners email that Plaintiff quoted in Paragraph 58 and on which this Court relied when holding that Plaintiff had adequately pled that the USPS was considering making changes to the reseller program. *See* Ex. A; *see also* Order at 21 (plaintiff has alleged that statements were not puffery because USPS "implementing changes to the resellers' NSAs); Order at 24 ("August 2017 USPS letter that Stamps received from Parcel Partners" provides the support for Plaintiff's claim).

---

[8] "To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations and internal quotation marks omitted).

- 18 -

*See supra* §III.E.1. In truth, the Court's Order included the following express disclaimer:

> The Court does not determine whether the confidential witness' statements and the letter are sufficient on their own to establish material misrepresentations. Before the Court is a **complaint**, not a summary judgment record or trial transcript. At a minimum, the statements and letter further support Plaintiff's allegation that the USPS was not happy with Stamps' reseller business model.

Order at 24 (emphasis in original). Clearly, the confidential witnesses are a significant part of the equation here. Their information goes far beyond what the letter revealed, so their evidence (*e.g.*, documents and deposition testimony) would have to be considered when assessing any sort of truth-on-the-market defense – whether raised at class certification, summary judgment, or trial. If the confidential witnesses **and** the USPS letter are not necessarily sufficient to establish material misrepresentations, the letter alone certainly would not be. And if the letter alone is not sufficient to establish materially misleading statements, its disclosure would be insufficient to reveal Defendants' scheme that consisted of such statements. This exposes the fallacy of Defendants' argument.

A prospective Stamps investor would have no way of knowing whether the USPS's "concern[s] about short pays and Resellers not having direct relationships with shippers" (¶58) had anything to do with Stamps. The same goes for the other warnings, including the USPS requiring unidentified vendors to take "more responsibility and have a direct relationship with the shipper." *Id*. In fact, given Defendants' affirmative statements about the strength of the USPS-Stamps relationship – including statements defendants McBride, Huebner, and Carberry had made just a few weeks earlier (¶¶72-76) – the most reasonable inference an investor could have drawn would have been that the USPS letter referred to resellers **other than** Stamps, putting Stamps in an even stronger competitive position. In fact, as The Capitol Forum (a subscription-based service) explained, the USPS letter its article discussed was dated April 10, 2017. Yet, on May 3, 2017, when an analyst asked

- 19 -

4811-2994-0922.v1

Exhibit 4

- 141 -

about rumors of such a letter, defendant McBride responded, "There was no letter. The rumor is false." ¶70. At a minimum, therefore, to respond to Defendants' truth-on-the market defense, Lead Plaintiff would be entitled to take discovery (including depositions) from McBride, Huebner and Carberry, as well as third-party analysts.

These are just examples of the nearly complete overlap between merits and class certification discovery here, given Defendants' stated plan for opposing class certification. Indeed, disputes between the Parties as to what is "class certification" versus "merits" discovery are already apparent. Defendants have propounded 59 requests for production ("RFP") on Lead Plaintiff, unlimited as to time and seeking documents unrelated to the typicality or adequacy of Lead Plaintiff as a class representative. For example, Defendants seek documents concerning the substantive allegations in the Complaint (*e.g.*, RFP Nos. 44 (allegations of materially false and misleading statements and omissions), 45 (scienter allegations), 57 (Defendants' insider trading)), as well as documents Lead Plaintiff intends to use to prove its claims (RFP No. 52), and documents concerning the information Lead Plaintiff has gathered to support its allegations thus far (RFP No. 26). Defendants' simultaneous pursuit of merits and class certification discovery is also evident in the discovery they intend to propound on Lead Plaintiff's investment managers, who each will receive subpoenas with 44 broad requests seeking documents not limited to Lead Plaintiff's Class Period transactions in Stamps' securities, but also documents related to the merits of Lead Plaintiff's allegations.

Lead Plaintiff has also begun seeking discovery from Defendants and third parties that implicates both class certification and merits issues. For example, as referenced above, Lead Plaintiff is prepared to serve several subpoenas to third-party analysts seeking documents relating to Defendants' alleged misstatements and omissions, how the analysts interpreted those statements, what the analysts knew about Stamps' relationship with the USPS and/or particular resellers, and whether the analysts viewed the alleged corrective disclosures as revealing previously undisclosed

- 20 -

Exhibit 4
- 142 -

information about the Company. These requests bear directly on merits issues, such as falsity and materiality, as well as on class certification issues like truth-on-the-market and price impact/maintenance.

### B. Bifurcation Will Not Promote an Early Decision on Class Certification

Although Lead Plaintiff is committed to moving for class certification as early as practicable, the ongoing global pandemic and the speed with which Defendants and third parties produce documents will dictate when the Parties can fully brief class certification. Defendants maintain that prior to responding to Lead Plaintiff's forthcoming motion for class certification, they will need to depose Lead Plaintiff, its two investment advisors, and any experts Lead Plaintiff retains on market efficiency and price impact. To be ready to respond to Defendants' truth-on-the-market opposition, Lead Plaintiff will need to depose the three individual defendants, multiple third-party analysts, and perhaps one or more confidential witnesses, as well as any rebuttal expert that Defendants retain. This means that, in addition to the production and analysis of documents, the Parties will need to complete over 10 depositions before they can fully brief class certification. Given the ongoing restrictions imposed to reduce transmission of COVID-19 (restrictions with no known end-date), it will be very difficult to obtain documents and complete these depositions prior to July 31, 2020 (Defendants' proposed date for opposing class certification) or even August 31, 2020 (the date that Defendants propose Lead Plaintiff's reply be due).

Of course, the sooner Defendants and third parties produce documents, the sooner Lead Plaintiff can depose the witnesses, but allowing Defendants to continue delaying their discovery responsibilities will only delay the Parties' completion of these depositions and the completion of the briefing on Lead Plaintiff's motion for class certification. Under these circumstances, there is simply no way that bifurcation will promote an earlier decision on class certification than would otherwise be obtained by conducting all discovery concurrently.

- 21 -

4811-2994-0922.v1

Exhibit 4
- 143 -

## C. Bifurcation Will Not Enhance Judicial Economy

As the Court has likely already discerned, attempting to bifurcate discovery here would *create* significant inefficiencies, rather than facilitate great efficiency. The most obvious inefficiency that bifurcation would create has already surfaced: "[i]f the Court were to bifurcate discovery it would likely be forced to spend time and resources resolving endless discovery disputes over what is merit discovery and what is class discovery." *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, 2015 WL 11120408, at *1 (W.D. Ark. June 18, 2015); *see also In re Semgroup Energy Partners, L.P., Sec. Litig.*, 2010 WL 5376262, at *2 (N.D. Okla. Dec. 21, 2010) (citation omitted) ("'Under such circumstances, bifurcation of discovery may well increase litigation expenses by protracting the completion of discovery, coupled with endless disputes over what is "merit" verses "class" discovery.'"). Such disputes have arisen over document requests. One can only imagine the number of arguments regarding depositions: who can be deposed, what questions can be posed, etc. Consider also the number of witnesses who would have to be deposed twice, including the three individual defendants and third-party analysts.

Ignoring these practical realities, Defendants offer two arguments for why bifurcation would supposedly increase the efficiency of this litigation. First, Defendants argue that they will likely be able to defeat class certification entirely or limit the Class Period significantly. They contend that if they show Lead Plaintiff is an inadequate or atypical class representative, the lawsuit is likely to go away altogether and Defendants will have avoided unnecessary discovery. As set forth above, these arguments are inextricably intertwined with the merits of this case, rendering them circular. Defendants seek to oppose class certification with a merits-based argument while depriving Lead Plaintiff of merits-based discovery.

Moreover, even if Defendants try to carve up the Class Period in a way that raises questions as to the timing of Lead Plaintiff's stock purchases (an effort that will fail), another representative would come forward (and the case could always proceed

- 22 -

4811-2994-0922.v1

Exhibit 4
- 144 -

on an individual basis). *See True Health*, 2015 WL 273188, at *3; *Ahmed v. HSBC Bank USA, Nat'l Ass'n*, 2018 WL 501413, at *3 (C.D. Cal. Jan. 5, 2018); *Semgroup*, 2010 WL 5376262, at *3. Thus, it is highly unlikely that bifurcation would ultimately spare Defendants the expense of merits-related discovery – and it would create a whole new class of expense for having to litigate the difference between merits-related and class-related discovery.

Defendants' second argument is that if they succeed in limiting the Class Period, they will substantially reduce the scope of merits discovery. This is yet another circular argument that effectively applies to every class action case. Applying Defendants' logic, Lead Plaintiff could move for summary judgment right now and urge the Court to reap the efficiencies and lower discovery expenses by granting it. As set forth above, Defendants' plan to use the Capitol Forum's publication of Parcel Partners' email to support a truth-on-the-market defense prior to merits discovery is no more reasonable than Lead Plaintiff moving for summary judgment prior to merits discovery.

### D.    The Prejudice to Lead Plaintiff and the Class Weighs Against Bifurcation

Because this case is brought under the PSLRA, Lead Plaintiff has already endured a lengthy discovery stay because Defendants chose to file a motion to dismiss the entire matter. Defendants were not forced to bring this motion. They chose to do so and its failure to end this case, as Defendants demanded, is a limited, but ominous, indication of Defendants' skewed perspective on the strength of their arguments.

As this Court has observed in the context of a ***plaintiff*** delaying the prosecution of an action, "'[u]nnecessary delay inherently increases the risk that witnesses' memories will fade and evidence will become stale.'" *Bazemore v. Entzel*, 2018 WL 1384459, at *2 (C.D. Cal. Mar. 13, 2018) (quoting *Pagtalunan v. Galaza*, 291 F.3d 639, 643 (9th Cir. 2002)). These consequences are no less detrimental or prejudicial when defendants cause delays. Having already paid the price of delay for Defendants'

4811-2994-0922.v1

Exhibit 4
- 145 -

motion to dismiss, Lead Plaintiff deserves to pursue its investigation in earnest before memories fade any further and evidence becomes any staler.

In addition to prejudicing Lead Plaintiff's ability to prove the merits of its case, bifurcation risks prejudicing Lead Plaintiff's opportunity to obtain class certification by impeding the pursuit of evidence to overcome Defendants' truth-on-the-market argument in opposition to class certification. Following the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), courts must undertake a "rigorous analysis" at the class certification stage that frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim" because the ""class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."" *Id*. at 351 (citations omitted). Accordingly, district courts have been reluctant to bifurcate class certification and merits discovery, recognizing that doing so can put the putative class at a significant disadvantage. *See Ahmed*, 2018 WL 501413, at *3.[9] "For example, bifurcation often creates unnecessary gaps in the evidence as a defendant has a strong incentive to withhold evidence even if such evidence 'overlap[s] with the merits of the plaintiff's underlying claim' or 'involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id*. (citation omitted); *see also Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 487 (C.D. Cal. 2012) ("Indeed, it is often easy for a defendant to paint a dismal picture of plaintiffs' prospects because, at the class certification stage, plaintiffs do not have the benefit of discovery into the merits of a case and defendants frequently have withheld exactly the information needed to prove plaintiffs' case."); *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 2011 WL 486123, at *2 (M.D. Fla. Feb. 7, 2011) ("Simply stated, if district courts as neutral arbiters of the law find the distinction between merits and class issues to be murky at best, and impossible to discern at worst, the

---

[9] Tellingly, Defendants do not cite a single court in this Circuit that has bifurcated discovery.

- 24 -

Court cannot imagine how parties with an incentive to hold back damaging evidence, can properly draw the line between these categories of evidence during 'phased' discovery.").

### E.     Conclusion

Defendants were wrong about the sufficiency of Lead Plaintiff's Complaint, and they are wrong about the strength of their planned opposition to class certification. More importantly, given Defendants' planned attack on class certification, merits discovery and class certification discovery are inseparable. This makes bifurcation impractical to the point of being effectively impossible, and disagreements over the extent of this overlap will spawn a whole new category of disputes that the Court and Parties would avoid altogether by simply allowing Lead Plaintiff to prosecute its case. Too much time has already been lost, too many memories are fading, and too much evidence is growing stale to allow Defendants to hijack this litigation in direct contravention of the most fundamental purpose of the Federal Rules of Civil Procedure, which "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

## V.     Additional Discovery Issues and Other Deadlines

Defendants' proposed dates set forth in the timetable below as well as in the Schedule of Pretrial and Trial Dates Worksheet depend in part on when various cities and states lift or modify orders addressing the novel coronavirus and COVID-19. Defendants have included deadlines for various stages after class certification just for sake of completeness. Defendants expect that the case will end or resolve shortly after the Court's decision with respect to class certification. If it does not, with respect to the merits, Defendants intend to seek discovery relating to the allegations underlying Lead Plaintiff's remaining claims, including statements provided by the former employees identified in ¶¶46-50 of the Complaint for Violations of the Federal

4811-2994-0922.v1

- 25 -

Exhibit 4

- 147 -

Securities Laws. Defendants also reserve the right to explore additional topics in discovery as the case progresses.

Defendants have placed an N/A in connection with the deadline for completion of defendants' document productions. Defendants do not believe that there is any need to impose a deadline for completing document productions. No such a deadline that is not required under the Federal Rules of Civil Procedure, the Local Rules of the Central District of California, or this Court's Order Setting Scheduling Conference.

Defendants have placed an N/A in connection with the last date to hear motion to amend pleadings/add parties. Defendants believe that the last day for Plaintiff to amend pleadings/add parties has already passed. The United States Court of Appeals for the Ninth Circuit held that "Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed." *SG Cowen Securities Corp. v. United States Dist. Ct.*, 189 F.3d 909, 912 (9th Cir. 1999); *Medhekar v. United States Dist. Ct.*, 99 F.3d 325, 328 (9th Cir. 1996).

Defendants do not agree that either Party should be permitted more depositions or interrogatories than are provided for in the Federal Rules of Civil Procedure. Defendants assert that each side should be permitted to take 10 depositions (excluding expert depositions). Defendants propose that any party who wishes to take more than 10 depositions (excluding expert depositions) must establish the necessity for specific additional depositions and why the additional depositions could not be conducted within the 10 deposition limit. Defendants assert that each side should be permitted to serve up to twenty-five interrogatories.

The parties submitted a Stipulated Protective Order to govern confidential information on March 23, 2020. The Court entered an Order approving that Stipulated Protective Order on March 24, 2020. The parties will submit a Stipulation and Order Regarding the Format of Document Productions before May 4, 2020.

4811-2994-0922.v1
Exhibit 4
- 148 -

## A.     Discovery Cut-off

The Parties propose the deadlines set forth on the Timetable in §V.H, *infra*.

## B.     Expert Discovery

The Parties propose the deadlines set forth on the Timetable in §V.H, *infra*.

## C.     Dispositive Motions

Lead Plaintiff does not expect that any of its claims to be resolvable by a motion for summary judgment.  Lead Plaintiff may be able to move for partial summary judgment, but that will depend on the evidence gathered through discovery.  Lead Plaintiff anticipates filing motions *in limine* with respect to certain facts alleged by Defendants in their motion to dismiss briefing, expert reports and their Answer.

Defendants anticipate that issues of liability as to all of Lead Plaintiff's remaining claims may be appropriate for resolution summary judgment.  Defendants also anticipate filing motions *in limine* at the appropriate time.

## D.     Settlement/Alternative Dispute Resolution (ADR)

The Parties met and conferred and have agreed that private mediation would be appropriate at a later date.

## E.     Trial Estimate

Lead Plaintiff has requested a jury trial.  On presently known information, the Parties estimate the trial, given the complexity of the issues, would take 14 to 17 Court days.  Defendants reserve their rights to modify these estimates as the case progresses.

## F.     Trial Counsel

Lead Plaintiff's lead trial counsel is Jason A. Forge, Eric I. Niehaus, and Steven W. Pepich.

Defendants' lead trial counsel is Richard H. Zelichov, Bruce G. Vanyo, Chistina L. Costley, and Paul S. Yong.

## G. Independent Expert or Master

The Parties agree that the Court should not consider appointing a master or independent scientific expert.

## H. Timetable

The Schedule of Pretrial and Trial Dates Worksheet, attached as Exhibit A to the Court's Standing Order Setting Scheduling Conference, is reproduced below with additional dates as requested by the Parties.

| Event | Proposed Dates (Lead Plaintiff) | Proposed Dates (Defendants) |
|---|---|---|
| Answer | January 31, 2020 | January 31, 2020 |
| Discovery to commence | February 27, 2020 | February 27, 2020 |
| Rule 26 disclosures | March 12, 2020 | March 12, 2020 |
| Lead Plaintiff to file class certification motion | June 29, 2020 | June 1, 2020 |
| Defendants to respond to Lead Plaintiff's class certification motion | August 10, 2020 | July 31, 2020 |
| Lead Plaintiff's reply in support of class certification motion | September 21, 2020 | August 31, 2020 |
| Deadline for completion of Defendants' document productions | August 28, 2020 | N/A |
| Last Date to Hear Motion to Amend Pleadings/Add Parties | December 14, 2020 | N/A |
| Non-Expert Discovery Cut-Off | January 19, 2021 | April 16, 2021 |
| Expert Disclosure (Initial) | February 16, 2021 | May 14, 2021 |
| Expert Disclosure (Rebuttal) | March 15, 2021 | June 28, 2021 |
| Expert Discovery Cut-Off | March 29, 2021 | August 13, 2021 |

4811-2994-0922.v1

Exhibit 4

- 150 -

| Event | Proposed Dates (Lead Plaintiff) | Proposed Dates (Defendants) |
|---|---|---|
| Dispositive motions and/or *Daubert* motions due | April 5, 2021 | August 27, 2021 |
| Responses to dispositive and/or *Daubert* motions due | May 17, 2021 | October 8, 2021 |
| Reply to dispositive and/or *Daubert* motions due | June 28, 2021 | November 5, 2021 |
| Last Date to **Hear** Motions | August 2, 2021 | December 6, 2021 |
| Last Date to Conduct Settlement Conference | August 16, 2021 | December 28, 2021 |
| **For Jury Trial:**<br><br>File Memorandum of Contentions of Fact and Law, LR 16-4<br><br>File Exhibit and Witness Lists, LR 16-5.6<br><br>File Status Report Regarding Settlement<br><br>File Motions *in Limine* | September 27, 2021 | February 8, 2022 |
| **For Jury Trial:**<br>Lodge Pretrial Conference Order, LR 16-7<br><br>File Agreed Set of Jury Instructions and Verdict Forms<br><br>File Statement Regarding Disputed Instructions, Verdicts, etc. | October 4, 2021 | February 15, 2022 |

- 29 -

Exhibit 4

- 151 -

| Event | Proposed Dates (Lead Plaintiff) | Proposed Dates (Defendants) |
|---|---|---|
| File Oppositions to Motions *in Limine* | | |
| Final Pretrial Conference | October 18, 2021 at 10:00 a.m. | February 28, 2022 at 11 a.m. |
| Jury Trial | November 8, 2021 at 8:30 a.m. | March 22, 2022 at 8:30 a.m. |

### I.     Other Issues

None.

DATED:  April 20, 2020

ROBBINS GELLER RUDMAN
 & DOWD LLP
SPENCER A. BURKHOLZ
JASON A. FORGE
STEVEN W. PEPICH
ERIC I. NIEHAUS
HILLARY B. STAKEM
KEVIN S. SCIARANI


                    s/ Eric I. Niehaus
               ERIC I. NIEHAUS

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

DATED:  April 20, 2020

KATTEN MUCHIN ROSENMAN LLP
RICHARD H. ZELICHOV
CHRISTINA L. COSTLEY
PAUL S. YONG


                    s/ Richard H. Zelichov
               RICHARD H. ZELICHOV

4811-2994-0922.v1

2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310/788-4400
310/788-4471 (fax)

Attorneys for Defendants Stamps.com
Inc., Kenneth McBride, Kyle Huebner,
and Jeff Carberry

## ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4

This certifies, pursuant to Local Rule 5-4.3.4, that all signatories to this document concur in its content and have authorized this filing.

DATED: April 20, 2020

s/ Eric I. Niehaus
ERIC I. NIEHAUS

4811-2994-0922.v1

- 31 -

Exhibit 4
- 153 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 20, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<div align="right">

 s/ Eric I. Niehaus
ERIC I. NIEHAUS

ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  ericn@rgrdlaw.com

</div>

4811-2994-0922.v1

Exhibit 4

- 32 -

4/20/2020                                                CM/ECF - California Central District-

Case 2:19-cv-01828-MWF-SK   Document 125-4   Filed 07/01/20   Page 35 of 46   Page ID #:1553
Case 2:19-cv-01828-MWF-SK   Document 100-4   Filed 04/20/20   Page 34 of 34   Page ID #:2935

# Mailing Information for a Case 2:19-cv-01828-MWF-SK Matt Karinski v. Stamps.com, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christina Lucen Costley**
  christina.costley@kattenlaw.com,tamara.vazquez@katten.com,courtalertlax@katten.com

- **Jason A Forge**
  jforge@rgrdlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com,rswartz@scott-scott.com,edewan@scott-scott.com,tlaughlin@scott-scott.com,aweas@scott-scott.com,efile@scott-scott.com

- **Adam C McCall**
  amccall@zlk.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Eric Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **Steven W Pepich**
  stevep@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

- **Kevin S Sciarani**
  ksciarani@rgrdlaw.com,KSciarani@ecf.courtdrive.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Hillary B Stakem**
  hstakem@rgrdlaw.com

- **Paul Satoshi Yong**
  paul.yong@kattenlaw.com,paula.phillips@katten.com,courtalertlax@katten.com

- **Richard H Zelichov**
  richard.zelichov@katten.com,tamara.vazquez@katten.com,courtalertlax@katten.com,jonathan.rotenberg@katten.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Exhibit 4

- 33 -

- 155 -

Case 2:19-cv-01828-MWF-SK Document 100-1 Filed 04/20/20 Page 1 of 4 Page ID #:1954

# Exhibit A

Exhibit 4
- 156 -

# THE CAPITOL FORUM

[thecapitolforum.cmail19.com]

**Stamps.com: Parcel Partners Sends Email to Partners Regarding Changes to USPS Reseller Model; Email States Parcel Partners Knew Reseller Model Would be Changing and Parcel Partners Provided Partners with Insight into Changes in April**

*Vol. 5 No. 287 - August 24, 2017 - **Click here[thecapitolforum.cmail19.com]** to access our library.*

**Reseller Update**

Multiple industry sources indicated that they recently received an email from Parcel Partners about changes to the reseller program. Parcel Partners is a postage reseller that provides discounted USPS postage to shipping customers like ShipWorks, a multicarrier software platform owned by Stamps.com. Excerpts of the email are in italics below (Note: any typos appear in original email):

*Hi Partner,*

*The time has come, we knew the USPS Reseller Model would be changing, that is why we provided you with as much insight as we had into the changes last April. The Post Office has decided to initiate the changes now (see attachment). The letter has some significant changes but nothing that has not already discussed. We knew they were concerned about short pays and Resellers not having direct relationships with shippers. They have structured the program in a way to accomplish both. The direct relationship will allow us to assist more actively on abusers of short pays. The USPS has always seen the Shipper to be the customer of whoever's contract they are shipping on...*

*Therefore, the USPS is requiring we take more responsibility and have a direct relationship with the shipper. We have always taken this responsibility upon ourselves and assisted The USPS with analytics and forecasting in the industry...*

*Our relationship is stronger than ever with the USPS which is why we are prepared for this announcement. Jared and Casey will be traveling to Washington to have more discussions at the highest levels about some of the ambiguity (example: what defines the last 12 months...purchasing a stamp or a box?) in the amendment and strategize with them as we consistently do.*

*These Postal changes have brought us to a crossroads. We can partner together or you can find another option...*

*Alternatively, if our partnership were to part ways the exposure is decreased referrals fees and competition from competitors with more capital. The recent USPS changes have changed the landscape. These changes position the PC Postage providers in different position. We can continue to partner together to protect the*

**EXHIBIT A**

Exhibit 4

-34-

- 157 -

STMP-SCA00000269

*customers base and continue to grow or you can venture on your own. Should you choose to continue our partnership, we will need your assistance to help us collect the additional data required of shippers "Third Party" data.*

**Unanswered Questions**

**Potential Implications.** Parcel Partner's email to partners does not provide a clear picture of the potential consequences or implications of the USPS letter referenced in the email. However, certain sections of the Parcel Partners email appear to indicate that the changes the USPS is making are dramatic. We are still speaking with industry sources to get a better understanding of the potential implications for postage resellers and their partners.

**Timing.** Even though the Parcel Partner's email references previous communications with partners in April, the sources that we spoke to all indicated that they only recently received the Parcel Partners email. At least one source told us that they did receive verbal guidance that changes to the program were being considered and that an announcement was forthcoming at the May National Postal Forum conference.

The sources indicated, however, that the attachment to the Parcel Partners email is a letter from the USPS and dated April 10, 2017. It is unclear if the USPS only recently sent the letter dated April 10, 2017 to Parcel Partners or whether Parcel Partners only recently decided to share the USPS letter with its partners. The existence of a USPS letter to resellers was a widely discussed rumor in the postal industry, as evidenced by an analyst asking Stamps.com about a letter on the Q1 2017 earnings call on May 3, 2017:

<Q - Darren Aftahi>: "Got it. And then just one more, we've heard some chatter that the USPS had sent a letter around to the participants in the reseller program with some potential changes. I'm just wondering if you have any commentary around that and whether Stamps is going to receive that letter. Thanks."

<A - Kenneth Thomas McBride>: "There was no letter. The rumor is false…"

Parcel Partner's email states that it informed its partners of forthcoming changes to the "Reseller Model" in April, which suggests that the USPS likely conveyed the forthcoming changes to Parcel Partners and other resellers as early as April. According to a source, Stamps.com, as the largest PC Postage vendor, would likely have been aware of any discussions between resellers and the USPS.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

1233 20th St. NW
Washington, DC, 20036
202-601-2300

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The

**EXHIBIT A**
Exhibit - 35 -

STMP-SCA00000270

Capitol Forum. Recipients shall not directly or indirectly reproduce,
download or otherwise distribute (in print, electronic, or intranet format)
this content without prior written permission from The Capitol Forum.
Unauthorized reproduction or distribution is a violation of Federal
Copyright Law.

**Edit your subscription[thecapitolforum.updatemyprofile.com] |
Unsubscribe[thecapitolforum.cmail19.com]**

Exhibit 4
- 159 -

**EXHIBIT A**
**- 36 -**

STMP-SCA00000271

Case 2:19-cv-01828-MWF-SK Document 100-2 Filed 04/20/20 Page 1 of 5 Page ID #:2940

# Exhibit B

Exhibit 4
- 160 -

# THE CAPITOL FORUM

[thecapitolforum.cmail20.com]

## Stamps.com: USPS New Marketplace Requirements Language Suggests Changes to Both NSA and Reseller Programs

*Vol. 5 No. 281 - August 21, 2017 - **Click here[thecapitolforum.cmail20.com]** to access our library.*

### Reseller Update

Our review of the Postal Regulatory Commission **website[thecapitolforum.cmail20.com]** indicates that starting in **June[thecapitolforum.cmail20.com]** of this year, the USPS began entering new "Marketplace Requirements" language into Negotiated Service Agreements (NSAs) it filed with the Postal Regulatory Commission for PRC approval. The USPS has also amended some existing NSAs to add the Marketplace Requirements language. Based on our review of the PRC website, the new Marketplace Requirements language is being added to NSAs in the form of an appendix entitled "Appendix to Shipping Services Contract."

In a filing on **August 9, 2017[thecapitolforum.cmail20.com]**, the USPS moved for temporary relief to allow an existing contract to remain in effect until a successor contract could take effect. In that case, the USPS noted that "the successor contract (Priority Mail Contract 340) was delayed because of the need for additional legal review by the customer regarding the marketplace requirements language in the Appendix to the contract. That language was not present in the customer's original contract with the Postal Service, and thus required further review by the customer prior to signature."

It is worth noting that the underlying contract was previously amended on **January 20, 2016[thecapitolforum.cmail20.com]**, which further suggests that the "Marketplace Requirements" language is new. The USPS and PRC both declined to comment about the new Marketplace Requirements.

### New Marketplace Requirement Language

Section I.A of the appendices to shipping services contracts is redacted in every NSA we viewed on the PRC website. We recently reviewed several non-redacted NSAs that include the boilerplate language we believe is in the redacted appendices. Key passages from Section A are shown it italics below:

*Except as set forth below, the minimum price offered by Customer to Third Party (i) for packages constituting Contract Packages (as defined in the Contract) must be equal to or greater than the current published Commercial Plus pricing available for Product, and (ii) for packages not*

**EXHIBIT B**

Exhibit 4

- 27 -

- 161 -

STMP-SCA00000265

Case 2:19-cv-01828-MWF-SK   Document 125-4   Filed 07/01/20   Page 42 of 46   Page
ID #:3560
Case 2:19-cv-01828-MWF-SK   Document 100-2   Filed 04/20/20   Page 5 of 5   Page ID #:2942

*constituting Contract Packages (as defined in the Contract) must be equal to or greater than the current published Commercial Base pricing available for Product.*

*Customer is prohibited from offering to the Third Party any rebates, discounts, gratuities, freebies, promotions, inducements or other incentives that could be perceived as further discounting Product prices.*

*The Customer shall have submitted to the Postal Service in writing, or in an electronic file format as specified by the Postal Service, with respect to the Third Party, all current and prior legal names and DBAs, domestic and foreign jurisdictions of organization, all shipping and headquarter locations, the types of items to be shipped, prior shipping history for the prior twelve (12)-month period, good faith estimates of expected monthly volume and revenue, and all other information that the Postal Service shall reasonably request regarding the Third Party (collectively, "Third Party Data"). In addition, if requested by the Postal Service, the Customer shall have delivered to the Postal Service in writing or in electronic file format as specified by the Postal Service, the Third Party's package level detail data, including but not limited to, package volumes, dimensions, weights, origin and destination ZIP Codes for the prior twelve (12)-month period, and such data shall constitute Third Party Data hereunder. The Third Party Data shall be complete and accurate in all material respects and in a form reasonably acceptable to the Postal Service.*

*The Third Party is not an existing Postal Service customer and has not purchased Postal Service shipping services during the prior twelve (12)-month period, unless the Third Party has a negotiated service agreement with the Postal Service.*

*The Third Party is an end user who will physically prepare packages for shipping using the Product, and not a multi-carrier shipping platform, third-party consultant, postage reseller, third-party freight payment and/or audit firm, online marketplace, affinity group, consolidator, wholesaler, freight forwarder, or other intermediary or logistics service provider.*

*To the best of Customer's knowledge, the Postal Service does not provide specialized or customized packaging to the Third Party.*

*The Postal Service, in its sole discretion, shall have expressly approved the Third Party in writing.*

*The Postal Service, in its sole discretion, may revoke its prior approval of any Third Party by providing not less than thirty (30) calendar days' prior written notice to Customer. The Postal Service reserves the right in its sole discretion to waive any of the requirements set forth in clauses I.A.2 through I.A.5 above. However, any such waiver must be expressly provided to the Customer by the Postal Service in writing, signed by an authorized USPS representative having the requisite authority. Notwithstanding clause I.A.1 above, provided that clauses I.A.2 through I.A.6 have been satisfied in full, the Customer may offer access to the Product to the Third Party for packages constituting Contract Packages at prices that are less than Commercial Plus pricing, but equal to or greater than the prices approved in the Contract, if the Customer has submitted a request in writing to the Postal Service and the Postal Service in its sole discretion has expressly approved the request in writing.*

**Oversight and reporting requirements.** The **unredacted[thecapitolforum.cmail20.com]**

**EXHIBIT B**
Exhibit 4

- 38 -

- 162 -

STMP-SCA00000266

portions of section B of the appendix contain reporting and additional marketplace requirements. These requirements provide that if the USPS authorizes the party to the NSA to offer discounted products to one or more third parties, the party to the NSA is subject to certain reporting requirements, including those in italics below:

*Upon request of the Postal Service (not more than four (4) times per Contract year), deliver complete and accurate transaction level data for all Third Party transactions within four (4) weeks of the date of the written request, which data shall be sufficient for the Postal Service to accurately compare postage amounts paid to the Postal Service by Customer with postage amounts paid to Customer by each Third Party and shall be in an electronic file format as specified by the Postal Service.*

*Upon request of the Postal Service, deliver to the Postal Service the Shipper Information and Payment Information listed below, as well as such other information that may be reasonably requested (not more than four (4) times per Contract year, except in cases of suspected fraud, short-paid postage or breach of any Contract term), within four (4) weeks of the date of the written request. Notwithstanding the foregoing, in the event that the Postal Service suspects that a Third Party has short-paid postage, committed fraud or breached any Contract term, Customer shall furnish the Shipper Information and Payment Information listed below, as well as such other information that may be reasonably requested, to the Postal Service immediately upon receipt of a written request from the Postal service. The Customer shall ensure that any and all Shipper Information, Payment Information and other information furnished to the Postal Service hereunder shall be complete and accurate in all respects and in an electronic file format as specified by the Postal Service.*

### Potential Implications for Stamps.com

Based on conversations with industry sources, the new Marketplace Requirements language is showing up in new NSAs and also as amendments to existing NSAs, and appears to be aimed at the Postage Resellers. The specific language addresses certain problems that have been identified in the reseller program. And the reporting requirements—including providing the USPS with third-party information and prior shipping history—appear to provide the USPS with an oversight role that is designed to deter and prevent abuses of the reseller program.

First, by requiring that entities with contract NSAs with the USPS not offer discounted rates to "existing" USPS customers, the USPS appears to be attacking cannibalization. These new requirements may also prevent Stamps.com from engaging in what is known in the industry as the "back-end switcharoo" whereby Stamps.com moves customers from one reseller to another to maximize the postage spread—as Stamps.com did with Gizmotrader volume in May.

Second, by requiring shipping data for the prior 12-month period for any third parties, the USPS could be cracking down on the practice of aggregating lower volume shipping customers to justify giving those customers commercial plus rates, which are typically reserved for customers who ship 50,000 Priority Mail packages a year. To the extent Stamps.com shared in the postage spread by routing low volume shipping customers through reseller accounts, it may no longer be able to do so.

STMP-SCA00000267

Finally, the USPS is limiting the number of entities with which NSA holders can share discounted rates by limiting it to end users who will physically prepare packages for shipping and excluding intermediaries or logistics service providers, which would likely include Stamps.com. In particular, the language specifically prohibits the third party receiving discounts from being a multi-carrier shipping platform. Our analysis of Stamps.com-owned multicarrier platforms (ShipStation, ShippingEasy, and ShipWorks) indicated that customer volume on those platforms was automatically routed through resellers and the underlying postage was purchased at discounted rates.

Our investigation into the reseller industry has revealed that the party that brings the customer to the reseller can receive as much as 90% of the postal spread. To the extent the USPS perceives the sharing of the postal spread and the purchase of postage at significantly discounted rates to be "rebates, discounts, gratuities, freebies, promotions, inducements or other incentives that could be perceived as further discounting Product prices," those practices may run afoul of the USPS' new Marketplace Requirements.

We will continue to monitor reseller discounts on Stamps.com platforms to get a better understanding of these changes and how they will impact various participants in the postal industry. At this point, there is no indication that the changes or new Marketplace Requirements are retroactive, and we do not know how willing the USPS will be to exercise its discretion to allow certain third parties to share in discounted shipping rates.

The Capitol Forum is a subscription news service providing comprehensive coverage of competition policy and in-depth market and political analysis of specific transactions and investigations.

1233 20th St. NW
Washington, DC, 20036
202-601-2300

By using our email delivery service, you acknowledge and agree that, in order to ensure electronic delivery accuracy and copyright compliance, we may use electronic delivery software, which may forward to us certain technical data and newsletter usage information from any computer that opens this email. We will not share this information with anyone outside the company, nor will we use it for any commercial purpose.

© 2017 by The Capitol Forum. The contents of this email and any proprietary content it enables you to access are copyrighted by The Capitol Forum. Recipients shall not directly or indirectly reproduce, download or otherwise distribute (in print, electronic, or intranet format) this content without prior written permission from The Capitol Forum. Unauthorized reproduction or distribution is a violation of Federal Copyright Law.

**Edit your subscription[thecapitolforum.updatemyprofile.com]** |
**Unsubscribe[thecapitolforum.cmail20.com]**

Exhibit 4

**EXHIBIT B**
**- 40 -**

- 164 -

STMP-SCA00000268

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

STAMPS.COM, INC., et al.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:19-cv-01828-MWF-SK

CLASS ACTION

[PROPOSED] ORDER GRANTING SCHEDULE OF PRETRIAL DATES

4827-0667-1546.v1

Exhibit 4
- 165 -

The Court GRANTS the Parties' Joint Rule 26(f) Report ("Report") and the Proposed Timetable in §V.H of the Report, as modified by the Court, is approved as the Case Management Order for this case and all Parties shall comply with its provisions.

IT IS SO ORDERED.

DATED: _____  _____

THE HON. MICHAEL W. FITZGERALD
UNITED STATES DISTRICT JUDGE

- 1 -

4827-0667-1546.v1

Exhibit 4
- 166 -