# EXHIBIT 12

RICHARD H. ZELICHOV (SBN 193858)
richard.zelichov@kattenlaw.com
CHRISTINA L. COSTLEY (SBN 227134)
christina.costley@kattenlaw.com
PAUL S. YONG (SBN 303164)
paul.yong@kattenlaw.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: (310) 788-4400
Facsimile: (310) 788-4471

*Attorneys for Stamps.com Inc., Kenneth McBride,
Kyle Huebner, and Jeff Carberry*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>STAMPS.COM, INC., KENNETH MCBRIDE, KYLE HUEBNER, and JEFF CARBERRY,<br><br>Defendants. | Case No. 2:19-cv-01828-MWF (SK)<br><br>DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT<br><br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A<br>Date: January 13, 2020<br>Time: 10:00 a.m. |
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Lead Plaintiff,<br><br>vs.<br><br>STAMPS.COM, INC., KENNETH McBRIDE, KYLE HUEBNER, and JEFF CARBERRY,<br><br>Defendants. | |

*Katten*
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Exhibit 12

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

- 220 -

Case 2:19-cv-01828-MWF-SK   Document 125-12   Filed 07/01/20   Page 3 of 66   Page
ID #:3009
Case 2:19-cv-01828-MWF-SK   Document 79   Filed 10/04/19   Page 2 of 49   Page ID #:791

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I. INTRODUCTION ................................................................................... 1

II. FACTUAL BACKGROUND ................................................................. 3

    A. Indiana Public Retirement System .......................................... 3

    B. Stamps.com ............................................................................... 3

    C. United States Postal Service ..................................................... 4

    D. The USPS and Stamps Respond to Decreased Mail Volume .............. 5

    E. Both Stamps and the USPS Publicly Discuss Stamps' Sales to Small-Volume and Existing USPS Customers ..................... 6

    F. Stamps Warns About Its Dependence on the USPS ............................ 8

    G. USPS and Stamps Do Not Reach Agreement on Extension of Incentive Agreement ................................................................ 9

    H. Plaintiff Sues ........................................................................... 12

ARGUMENT ........................................................................................................ 12

I. STANDARD OF REVIEW ................................................................... 12

II. PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION ........................................................ 13

    A. Plaintiff's Puzzle Pleading Does Not Satisfy the Reform Act ........... 15

    B. The Complaint Should Be Dismissed Because the Alleged Omissions Were Fully Disclosed .......................................... 16

    C. Stamps' Statements About Its Relationship with the USPS Were Not Misleading ............................................................. 17

        1. Plaintiff Has Not Pled a Breach or a Statutory Violation ......... 19

        2. No Omission Based on Unnamed USPS Employees ............... 20

        3. Plaintiff Has at Most Pled a "Difference of Opinion" ............. 22

    D. Stamps Did Not Mislead Investors by Reporting Historic Results ........................................................................ 23

    E. Statements about a Future Partnership Did Not Mislead .................... 26

III. PLAINTIFF FAILS TO ADEQUATELY PLEAD SCIENTER ................. 28

    A. Pleading Standard ................................................................... 28

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

i

Exhibit 12

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

B.  Plaintiff Fails to Plead Scienter Based on Stock Sales .......................29

C.  Plaintiff's Reliance on Disfavored Methods of Pleading
Scienter Does Not Contribute to a Strong Inference of Scienter .......32

D.  Plaintiff Fails to Plead a Holistic Inference of Scienter ....................34

IV.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ..............................36

V.   PLAINTIFF'S SECTION 20A CLAIM FAILS ..........................................39

VI.   DISMISSAL SHOULD BE WITH PREJUDICE..........................................39

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re 3Com Sec. Litig.*,
1999 WL 1039715 (N.D. Cal. July 8, 1999) ......................................................... 39

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 174119 (C.D. Cal. Jan. 16, 2013) .......................................................... 33

*Arkansas Teacher Ret. Sys. v. OSI Sys., Inc.*,
2019 WL 2895625 (C.D. Cal. May 7, 2019) .......................................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................... 12, 19

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................. 14

*In re Blue Earth, Inc. Sec. Class Action Litig.*,
2015 WL 12001274 (C.D. Cal. Nov. 3, 2015) ....................................................... 37

*In re Blue Rhino Corp. Sec. Litig.*,
2004 WL 5681763 (C.D. Cal. Oct. 7, 2004) .......................................................... 22

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) ............................................................. 31, 36

*Brody v. Transitional Hospitals Corp.*,
280 F.3d 997 (9th Cir. 2002) .................................................................................. 14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .................................................................................. 28

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) ................................................................................... 22

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ................................................................................... 20

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................. 32

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) .................................................................................. 24

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) ..................................................... 25, 31, 33

*In re Countrywide Fin. Corp. Sec. Litig.*,
2009 WL 943271 (C.D. Cal. Apr. 6, 2009) ............................................................ 39

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ......................................................................... 25, 27, 28

*Diaz v. N. Dynasty Minerals Ltd.*,
2018 WL 5099749 (C.D. Cal. Apr. 30, 2018) ......................................................... 22

*In re Dot Hill Sys. Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008) ............................................................. 18, 37

*In re ECOtality, Inc. Sec. Litig.*,
2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ........................................................ 15

*In re Express Scripts Holdings Co. Sec. Litig.*,
773 F. App'x 9 (2d Cir. 2019) ........................................................................... 18, 35

*Gammel v. Hewlett-Packard Co.*,
905 F. Supp. 2d 1052 (C.D. Cal. 2012) ................................................................... 36

*Greebel v. FTP Software*,
194 F.3d 185 (1st Cir. 1999) ................................................................................... 30

*Greenstone v. Cambex Corp.*,
777 F. Supp. 88 (D. Mass. 1991), *aff'd*, 975 F.2d 22 (1st Cir. 1992) ................ 24

*Haberland v. Bulkeley*,
896 F. Supp. 2d 410 (E.D.N.C. 2012) ..................................................................... 20

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ............................................................ 13, 33

*In re Herbalife, Ltd. Sec. Litig.*,
2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) ........................................................ 37

*In re Impax Labs., Inc. Sec. Litig.*,
2008 WL 1766943 (N.D. Cal. Apr. 17, 2008) ........................................................ 24

*In re Kalobios Pharm., Inc. Sec. Litig.*,
258 F. Supp. 3d 999 (N.D. Cal. 2017) .................................................................... 17

*Kane v. Madge Networks N.V.*,
2000 WL 33208116 (N.D. Cal. May 26, 2000) ...................................................... 18

*Karam v. Corinthian Colls., Inc.*,
2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) ........................................................ 21

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................... 13

*Lapiner v. Camtek, Ltd.*,
2011 WL 445849 (N.D. Cal. Feb. 2, 2011) ............................................................ 15

*Lefter v. Yirendai Ltd.*,
2017 WL 2857535 (C.D. Cal. June 20, 2017) ........................................................ 14

*Lifschitz v. NextWave Wireless Inc.*,
2011 WL 5839682 (S.D. Cal. Nov. 21, 2011) ........................................................ 21

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

iv

Exhibit 12

Case 2:19-cv-01828-MWF-SK    Document 125-12    Filed 07/01/20    Page 7 of 66    Page
Case 2:19-cv-01828-MWF-SK    Document 79-2    Filed 10/04/19    Page 6 of 49    Page ID #:795
ID #:3013

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ........................................................................ 39

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .................................................................... 37, 38

*Magro v. Freeport McMoran Inc.*,
2018 WL 3725781 (D. Ariz. Aug. 3, 2018) ...................................................... 32

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ........................................................................................ 14

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................. *passim*

*Miller v. PCM, Inc.*,
2018 WL 5099722 (C.D. Cal. Jan. 3, 2018) .................................................... 34

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993) .............................................................................. 39

*In re Neustar Sec. Litig.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) ................................................................ 34

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) ........................................................................ 37

*In re Nvidia Corp. Sec. Litig.*,
2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) .................................................. 31

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ........................................................................ 28

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ............................................ 29, 31

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .................................................... 14, 36, 37, 38

*Plevy v. Haggerty*,
38 F. Supp. 2d 816 (C.D. Cal. 1998) .............................................................. 30

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ................................................................. *passim*

*Prodanova v. H.C. Wainwright & Co., LLC*,
2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) ................................................. 13

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v.
Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) .................................................................. 13, 14

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................................... 27

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

v

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ........................................................................................ 13

*Siegel v. Lyons*,
1996 WL 438793 (N.D. Cal. Apr. 26, 1996) ................................................................ 16

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ............................................................................ 13, 34, 35

*In re Sina Corp. Sec. Litig.*,
2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006) ............................................................. 30

*In re Skechers U.S.A., Inc. Sec. Litig.*,
2004 WL 1080174 (C.D. Cal. May 7, 2004) ................................................................ 25

*In re Sofamor Danek Grp., Inc.*,
123 F.3d 394 (6th Cir. 1997) ........................................................................................ 24

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ........................................................................................ 12

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ............................................................................ 12, 22, 33

*Steamfitters Local 449 Pension Plan v. Molina Healthcare*,
2018 WL 6787349 (C.D. Cal. Dec. 13, 2018) ............................................................. 25

*Tellabs, Inc. v. Makor Issues & Rights*,
551 U.S. 308 (2007) .......................................................................................... 28, 34, 35

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ................................................................................ 29, 30

*In re Verifone Sec. Litig.*,
11 F.3d 865 (9th Cir. 1993) .......................................................................................... 39

*In re Verifone Sec. Litig.*
784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd sub nom.* 11 F.3d 865
(9th Cir. 1993) ............................................................................................................... 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod.
Liab. Litig.*,
258 F. Supp. 3d 1037 (N.D. Cal. 2017) ....................................................................... 20

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018) .................................................................................. 12, 28

*Welgus v. TriNet Group, Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ............................................................. 30

*Wenger v. Lumisys, Inc.*,
2 F. Supp. 2d 1231 (N.D. Cal. 1998) ........................................................................... 24

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) .................................................................. 34, 39

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel 310.788.4471 fax

vi

Case 2:19-cv-01828-MWF-SK   Document 125-12   Filed 07/01/20   Page 9 of 66   Page
ID #:3015
Case 2:19-cv-01828-MWF-SK   Document 79   Filed 10/04/19   Page 8 of 49   Page ID #:797

*Wietschner v. Monterey Pasta Co.*,
   294 F. Supp. 2d 1102 (N.D. Cal. 2003) ............................................................ 30

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ............................................................................ 35

*In re Zillow Grp., Inc. Sec. Litig.*,
   2018 WL 4735711 (W.D. Wash. Oct. 2, 2018) ................................................ 36

*Zucco Partners v. Digimarc Corp*,
   552 F.3d 981 (9th Cir. 2009) ......................................................................*passim*

**Statutes**

15 U.S.C. § 78u-4(b)(1) ......................................................................................... 13

15 U.S.C. § 78u-4(b)(2)(A) .................................................................................... 28

15 U.S.C. § 78u-4(b)(3)(A) .................................................................................... 28

39 U.S.C. § 501 ......................................................................................................... 4

39 U.S.C. § 502 ......................................................................................................... 4

39 U.S.C. § 3633 ....................................................................................................... 5

**Regulations**

39 C.F.R. § 501.1 ...................................................................................................... 4

39 C.F.R. § 501.21 .................................................................................................... 4

39 C.F.R. § 3015.7 .................................................................................................... 5

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on January 13, 2020, at 10:00 a.m., or as soon thereafter as this Motion may be heard in Courtroom 5A of the above-captioned Court, located at 350 W. 1st Street, 6th Floor, Los Angeles, California, 90012, defendants Stamps.com Inc. ("Stamps" or the "Company"), Kenneth McBride, Kyle Huebner, and Jeff Carberry (the "Individual Defendants") (collectively, "Defendants") will and hereby do move to dismiss with prejudice all claims asserted against them in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint" or "¶") (Dkt. No. 71) filed by lead plaintiff Indiana Public Retirement System ("Plaintiff").   Defendants' Motion is filed pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(6), and 15 U.S.C. §§ 78u-4, *et seq*.   Defendants' Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on September 24, 2019, and is based on the accompanying Memorandum of Points and Authorities, Defendants' Request for Judicial Notice and Consideration of Documents Incorporated by Reference, the Declaration of Paul S. Yong and exhibits thereto ("Yong Decl." and "Exs."), all pleadings and papers on file in this action, and such other matters as may be presented to the Court at the time of the hearing.

Dated:  October 4, 2019               KATTEN MUCHIN ROSENMAN LLP

By:   */s/ Richard. H. Zelichov*

Richard H. Zelichov
richard.zelichov@kattenlaw.com
Christina L. Costley
christina.costley@kattenlaw.com
Paul S. Yong
paul.yong@kattenlaw.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4400
Facsimile:  (310) 788-4471
*Attorneys for Stamps.com Inc., Kenneth McBride, Kyle Huebner, and Jeff Carberry*

Case 2:19-cv-01828-MWF-SK   Document 79   Filed 10/04/19   Page 10 of 49   Page ID #:709

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Complaint substitutes hindsight and innuendo for the factual particularity required to state a claim for securities fraud.  Plaintiff alleges that Stamps deceived investors by failing to disclose that it was selling postage to small-volume shippers and existing USPS customers using discounted, reseller rates.  Plaintiff further alleges that these sales violated an unidentified contract between Stamps and the USPS and unspecified USPS "governance" that allowed Stamps and/or the resellers to provide discounts only to new, high-volume shippers.  As a result of these so-called violations and claimed abuse, Plaintiff speculates, the USPS terminated its package business incentive agreement with Stamps, causing Stamps' stock price to decline.

Plaintiff's attempts to characterize Stamps' conduct as a secret scheme is inexplicable, however, because both Stamps and senior executives at the USPS repeatedly disclosed that Stamps and others were selling discounted postage to small-volume and existing USPS customers through the USPS reseller program.  As early as 2015, Stamps wrote in a periodic filing with the SEC that it was providing reseller discounts to "lower volume customers."  Likewise, during a publicly broadcast and transcribed conference call in mid-2016, Stamps confirmed that it was using resellers to extend "discounted rates to smaller shippers" and "existing" USPS customers.  Stamps openly disclosed these practices yet again in a conference call in mid-2017.

The USPS also has never asserted any claim against Stamps for violating any statute, regulation, or contract.  Rather, the USPS has acknowledged that Stamps, other PC Postage providers, and the resellers were making discounted sales to small-volume and existing USPS customers.  In 2016, the former head of the Postal Regulatory Commission ("PRC") confirmed to financial analysts that the reseller program was for "small businesses and start-ups" and for "new or existing

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Exhibit 12
- 229 -

customers." In August 2017, the USPS's Chief Marketing Officer ("CMO") stated that the "reseller" program was mostly for "small, medium-sized businesses," for "smaller volume shippers," and to "help[] keep existing business" and that "PC Postage providers" (like Stamps) and resellers are "excellent partners on bringing the best solution to customers." And, in 2018, the USPS's Chief Financial Officer ("CFO") stated during a USPS quarterly conference call that "resellers" and "PC Postage partners" are very important to the USPS "in order to be able to reach small and medium business" and are "very, very important partners for us in terms of increasing volumes and from year-to-year have been a major contributor to the double digit growth we saw in the last 3 years in packages." The thorough disclosure of discounted, reseller rate sales to small-volume and existing USPS customers by both Stamps and the USPS serves as an absolute bar to Plaintiff's attempts to characterize these sales as a secret (or wrongful).

Plaintiff's allegations are also speculative. Plaintiff alleges that Stamps' fully-disclosed conduct constituted a secret "scheme" to violate USPS rules, but Plaintiff fails to identify a single law, regulation, or contractual agreement that prohibited Stamps from making these sales. Plaintiff simply rehashes claims from old shortseller and market reports that themselves were previously discredited. Indeed, and as noted above, senior executives at the USPS publicly expressed the view that discounted sales to small-volume and existing USPS customers were not just permissible but actually desirable.

Plaintiff also fails to plead scienter, *i.e.*, specific, particularized allegations about what the Individual Defendants actually knew. Instead, Plaintiff alleges that scienter can be inferred from stock sales, high-level corporate positions, and the importance of the USPS to Stamps. But Plaintiff has grossly exaggerated the number of stock sales, by both extending the putative class period and adding sales by individuals who did not make any of the challenged statements. Moreover, because most of the challenged statements are forward-looking or statements of opinion,

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

2

Plaintiff cannot rely on circumstantial allegations and instead must specifically allege facts supporting a strong inference that Defendants had actual knowledge the challenged statements were false when made. Because Plaintiff does not even attempt to meet this standard, the Complaint should be dismissed.

Plaintiff also does not, and cannot, plead loss causation. Stamps' practice of selling discounted postage to low-volume shippers and existing USPS customers could not have caused Stamps' February and May 2019 stock price drops because these practices had been known to the market for years. Instead, and as Plaintiff admits in the Complaint, Stamps' stock price fell when it issued guidance for 2019 that was lower than what analysts expected because Stamps discontinued its exclusive relationship with the USPS and announced an increased likelihood that the USPS might change its contract terms with the third-party resellers – neither of which revealed the allegedly concealed "scheme."

For these reasons, and as more fully discussed below, the Complaint should be dismissed.

## II.    FACTUAL BACKGROUND

### A.    Indiana Public Retirement System

This Court appointed Indiana Public Retirement System lead plaintiff on June 5, 2019. Dkt. No. 62. Plaintiff claims that it purchased Stamps common stock starting in September 2017 and at various times through March 15, 2019, with the vast majority of its purchases occurring in November 2018. Dkt. No. 76.

### B.    Stamps.com

Stamps has been a nimble market leader from its inception, able to evolve its business model to get ahead of rapidly changing market conditions in the mail and shipping industry. It was founded in 1996 with the goal of making the process of sending mail more convenient. Ex. 2, at 5-8; ¶ 2. Before that, customers had to drive to a post office and wait in line or lease an expensive postage meter from Pitney Bowes. *See id.* In 1999, Stamps became the first ever software-only, USPS-

3

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

approved PC Postage provider, allowing customers to print electronic stamps directly onto envelopes and labels using an ordinary printer. Ex. 4, at 4; ¶¶ 2, 28.[1]

As the use of the mail decreased due to the explosion of email and internet advertising, Stamps focused on supporting e-commerce merchants, developing its own e-commerce shipping software and acquiring e-commerce shipping companies including ShipStation and ShipWorks (2014), Endicia (2015), and ShippingEasy (2016). *See* Ex. 4, at 5; *see also* ¶ 43.

Throughout the class period, Stamps operated primarily under five brands in the United States, including its lead brands, Stamps.com and Endicia, and also under ShipStation, ShipWorks, and ShippingEasy. *Id.* During most of the class period, Stamps.com and Endicia were exclusive to the USPS while ShipStation, ShipWorks, and ShippingEasy are multi-carrier solutions offering the option to use private carriers like UPS and FedEx in addition to the USPS. *See id.*; ¶ 108.

## C. United States Postal Service

The USPS is an independent agency of the executive branch of the federal government responsible for providing postal service in the United States. Ex. 24. It delivers mail and packages to over 155 million residences, businesses, and post office boxes in the United States. *Id.* It has nearly 32,000 retail locations and employs over 500,000 individuals. *Id.* Another independent agency of the federal government, the Postal Regulatory Commission ("PRC"), regulates the USPS. *See* 39 U.S.C. §§ 501, 502; *see also* ¶¶ 40, 55 & n.4. Despite popular misconception, *the USPS is not taxpayer funded*. It funds its operations solely through the sale of postage, products and services. Ex. 24.

---

[1] The USPS acts as the regulator for the PC Postage industry to ensure that each PC Postage provider conforms with the relevant requirements. *See, e.g.*, 39 C.F.R. §§ 501.1-501.21. The USPS does not regulate a PC Postage provider's contracts with customers, partners, or even many contracts with the USPS itself. These contracts are simply arms-length commercial agreements between two or more parties.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

4

### D. The USPS and Stamps Respond to Decreased Mail Volume

In 2006, Congress passed the Postal Accountability and Enhancement Act (the "Postal Act"), which allowed the USPS to customize negotiated service agreements ("NSAs") to better compete with private carriers (*e.g.*, FedEx, UPS, Amazon, and DHL). *See* ¶¶ 30, 36. To prevent the USPS from using its "monopoly" in "market dominant products" (standard mail, first class mail, periodicals) to subsidize prices for "competitive products" (first-class packages, parcel select, and priority mail – which private package delivery services also offer), the Postal Act requires: (1) an NSA for a competitive product to cover the direct costs for shipping that product; and (2) NSAs for competitive products as a whole to cover a minimum of the USPS's fixed, institutional costs. *See* 39 C.F.R. § 3015.7; 39 U.S.C. § 3633. The PRC reviews NSAs before they are signed to ensure compliance. *See, e.g.*, Ex. 21.

In addition to NSAs with marketplaces, like eBay and Etsy, and companies that ship their own products directly, like Amazon, the PRC has approved NSAs with postal "resellers," including Express 1, IntuiShip, and Parcel Partners. *See* ¶ 31. Reseller NSAs permit these companies to buy postage from the USPS at one price and resell postage at a higher price, with the contractual right to the spread between these prices (a wholesale model common to numerous industries). *See* Ex. 11, at 4; ¶ 33. These NSAs are also subject to PRC review on the same basis as marketplace and direct NSAs. *See* Ex. 11, at 5.

The USPS also entered into certain incentive or revenue share arrangements with third parties – including Stamps – to encourage them to promote the USPS for package shipments. *See* ¶ 25; Ex. 2, at 10. These agreements are not NSAs; they are not governed by the Postal Act (or other statute) and are not subject to PRC review. Pursuant to Stamps' package business incentive agreement, the USPS paid Stamps part of the USPS's revenue from shipping certain "competitive products," and, in return, Stamps provided software, sales, and support to shippers using USPS

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Exhibit 12
- 233 -

for packages and agreed that its two leading brands (Stamps.com and Endicia) would partner "exclusively" with the USPS.  *See* ¶¶ 25, 124; Ex. 15, at 9.

Stamps also works with resellers to support certain package shipments, and Stamps has certain contracts with the resellers.  *See* ¶ 33.  The USPS is not a party to these agreements.  These contracts provide that Stamps will receive some portion of the reseller's "spread" – the difference between the price the reseller paid for the postage and the price that the reseller charged for the postage – in a revenue-sharing business arrangement.  *See* Ex. 11, at 4; ¶ 33.

### E.  Both Stamps and the USPS Publicly Discuss Stamps' Sales to Small-Volume and Existing USPS Customers

Stamps disclosed as early as 2015 (well before the putative class period) that it was using the reseller program to sell discounted postage to both "lower volume"/"downmarket" customers and to existing USPS customers.  On August 7, 2015, Stamps stated that "[t]hrough our partnership with [a reseller], Stamps.com and our subsidiaries are able to provide [the reseller's] shipping discounts to our lower volume customers."  Ex. 1, at 3.

On July 28, 2016, in response to shortseller attacks, Stamps stated that: (1) "resellers are explicitly authorized by the USPS to offer discounted rates to smaller shippers"; (2) "the reseller program was meant to provide attractive rates to lower-volume shippers"; (3) "another important goal [of the reseller program] is the retention of existing customers"; (4) Stamps had offered discounted reseller rates to approximately 19,000 existing USPS customers; and (5) customers "acquired onto our multicarrier solutions – ShipStation, ShipWorks, and Shipping Easy" are "utilizing reseller rates."  Ex. 11, at 4-7.  And on August 2, 2017, Stamps explained that:  (1) resellers help the USPS "on existing business, because it's very competitive"; (2) "resellers are important, both for keeping existing business and for growing new business"; (3) "resellers were an excellent opportunity to bring the USPS brand and shipping solutions downmarket to smaller volume shippers"; and

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

6

(4) "the USPS reseller program . . . is providing solutions downmarket where the USPS doesn't have the sales team to interact." Ex. 14, at 3; ¶ 74.

Stamps also disclosed in its SEC filings that it earns revenue in "several different ways," including "compensat[ion] directly by the USPS for certain qualifying customers under our USPS partnership," and "compensation by offering customers a discounted postage rate that is provided to the customers by our integration partners." Ex. 2, at 14; Ex. 4, at 17. It similarly stated on its quarterly conference calls with financial analysts that it had revenue-share arrangements with both the USPS and resellers. *See, e.g.*, Ex. 11, at 8 (affirming that "revenues today come from resellers in the form of . . . revenue-share arrangements"); Ex. 12, at 2 ("[s]hipping numbers . . . include service fees and partner revenue shares"); Ex. 13, at 9, 11 ("[a]s we've mentioned many times, shippers have additional revenue shares that we have with various partners"; "I think – I tried to point out . . . the USPS . . . revenue share they've offered out to us"). Stamps even listed the resellers with whom it worked, noting that it had a "partnership with Express 1" that was going to "continue and expand going forward" and identifying IntuiShip and Parcel Partners as integration partners on its website. Ex. 1, at 2-3; *see also* Ex. 25, at 6 (screenshot from Stamps' website identifying IntuiShip and Parcel Partners as integration partners).

The USPS and public commentators made similar statements confirming that using reseller rates for low-volume or existing customers was not abusive. During a conference call, the former Chairwoman of the Postal Regulatory Commission confirmed that the reseller program was intended to grow package volume for small-volume shippers and regardless of whether a customer was new or existing. Ex. 27; *see also* Ex. 26, at 2 ("[i]t is a common and accepted process, per the experts, to aggregate volume of smaller shippers to receive price breaks, which is part of the role of the resellers").

7

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Similarly, the Chief Customer and Marketing Officer of the USPS, Jim Cochrane (who reported directly to the Postmaster General), explained that the USPS used NSAs "***to attract new clients, and . . . keep existing business***" and that "resellers were an excellent opportunity to bring our brands and our shipping solutions ***down-market to smaller volume shippers***."  Ex. 18, at 3, 5; *see also* Ex. 28, at 2 (USPS spokesperson told reporter that the USPS was pleased with the reseller program and even stated that "some coverage in the media regarding the reseller program has been both inaccurate and misleading").

Consistent with these statements, in mid-2017, the USPS and Stamps entered into a new package business incentive agreement, with terms more favorable for Stamps.  *See* Ex. 14, at 8 (Stamps was "able to get a couple of our contracts [with the USPS] renewed at improved terms"); ¶ 74.

### F.     Stamps Warns About Its Dependence on the USPS

Stamps also expressly warned investors about the possibility that changes in USPS policies could adversely affect Stamps' business.  For example, Stamps stated in its February 28, 2018 Form 10-K that:

> ***The USPS could modify or terminate agreements and other financial compensation arrangements, which would have an adverse effect on our revenues and operating results.***
>
> . . . if the USPS decides to amend or renegotiate our arrangements under which we are compensated directly by the USPS for shipping customers or integration partners who print a certain amount of postage, our revenue and operating results may be negatively impacted.  If the USPS decides to terminate our agreements or our integration partners' agreements under which we are compensated directly or indirectly by the USPS or integration partners for shipping customers who print a certain amount of postage, our revenue and operating results would suffer.
>
> \*\*\*\*\*\*
>
> ***Strategic business partners or carriers could modify or terminate agreements and other financial compensation arrangements, which could materially adversely affect our results of operations and prospects.***
>
> Strategic business partners, such as the USPS . . . could decide to amend, renegotiate or terminate agreements or financial compensation arrangements that exist now or in the future.  For instance, if these partners amend,

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Exhibit 12
- 236 -

renegotiate or terminate agreements allowing us to integrate their services with our products and services, our revenues and operating results could suffer and our ability to attract customers that rely on these services could suffer.

Ex. 4, at 14; *see also* Ex. 2, at 10-11.

In addition, Stamps warned that the USPS could terminate its relationship with the third-party resellers: "The USPS or our integration partners could cause discounts our customers receive to be diminished or terminated, which would have an adverse effect on our results of operations, reputation and competitiveness." Ex. 4, at 14. Stamps further stated that: "We also earn compensation by offering customers a discounted postage rate that is provided to the customers by our integration partners. If the USPS decides to withdraw certain discounts or even remove the discounts entirely, our revenue and operating results will suffer." *Id.* And it disclosed that the resellers could stop making their discounts available to Stamps and Stamps' customers. *Id.* ("[t]hese discounts are subject to terms and conditions of agreements between third parties and the USPS, and there can be no assurance that our integration partners will continue to have access to such discounts or that they will continue to make them available to our customers on favorable terms or at all"); *see also* Ex. 2, at 10-11.

### G.   USPS and Stamps Do Not Reach Agreement on Extension of Incentive Agreement

The USPS and Stamps continued to build USPS package volume throughout 2017 and 2018. In the second quarter of 2018, the President of the United States issued a series of tweets complaining about the USPS's contracts with Amazon. *See* Ex. 31. Following these tweets, on April 12, 2018, the President issued an executive order creating a Task Force on the USPS. Ex. 22; ¶¶ 9, 63.

On August 9, 2018, the USPS's CFO, Joseph Corbett, reaffirmed the USPS's strong relationship with its PC Postage partners and resellers, stating during a conference call that:

9

[W]e have resellers, we have PC Postage partners, we also have negotiated service agreements with large customers. And in order to be able to further our sales efforts . . . they're very, very important partners for us in terms of increasing volumes and from year to year have been a major contributor to the double digit growth we saw in the last three years in packages and also continue to contribute to the growth we're seeing this year of about 6.5% in packages. ***So they're very important to us in order to be able to reach small and medium businesses and grow the business***.

*See* Ex. 19, at 17 (emphasis added).

Shortly thereafter, on August 31, 2018, the Senate announced that it was cancelling postal service hearings and that the Task Force Report would be delayed. Ex. 32.

On December 4, 2018, the Task Force issued a report that suggested greater use of public-private partnerships to help reduce certain USPS costs. Ex. 23, at 9 (the "Task Force Report"). It also, however, called on the USPS to "price its competitive products in a manner that is not geared simply toward maximizing volume, but instead toward generating income that can be used to fund its capital expenditures and long-term liabilities." *See id.* at 58; *see also* ¶¶ 9, 63.

While the Task Force was conducting its analysis (but without any reference to it by the USPS), the USPS requested renegotiation of Stamps' package business incentive agreement. Ex. 6, at 6. Although Stamps expected that these negotiations would be similar to the prior ones and would result in better terms for Stamps, it nonetheless added a new risk disclosure to its Form 10-Q for the second quarter of 2018 warning that:

While we believe that this agreement is mutually beneficial to the USPS and to us, there is a risk that renegotiation is unsuccessful and leads to materially less favorable terms or that the USPS decides to not renew one or more of these financial compensation arrangements. In such case, our revenue and operating results will be materially affected unless we are successful in timely replacing the lost revenue with similar compensation from other potential partners.

Ex. 6, at 6.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

10

Case 2:19-cv-01828-MWF-SK   Document 79-2   Filed 10/04/19   Page 20 of 49   Page ID #:789

Stamps and the USPS continued to negotiate until early 2019, but Stamps was ultimately unwilling to agree to a deal that would prohibit its leading brands, Stamps.com and Endicia, from working with other carriers.  Ex. 15, at 9; *see* ¶¶ 93, 94.

On February 21, 2019, Stamps disclosed to its shareholders that it had "decided to discontinue our shipping partnership with the USPS," "revenue and operating results will be adversely affected," and its revenue and income in 2019 would be lower than in 2018.  Ex. 15, at 9; Ex. 7, at 6; *see* ¶ 94.  Stamps also explained that it intended to "fully embrace partnerships" with other package carriers including FedEx, UPS, and Amazon.  Ex. 15, at 8-9.  Even though Stamps had warned that the renegotiation with the USPS might fail in its August 8, 2018 Form 10-Q, Stamps' stock price reacted negatively to the disclosure, falling from $198 to $84 per share.  *See* ¶ 10; Ex. 6, at 6.

After its failed renegotiation with Stamps in 2018 and early 2019, the USPS began renegotiating the terms of its NSAs with some of the resellers with whom Stamps had contracts.  Stamps updated its prior risk warnings in May 2019, stating that while it had "limited visibility given that the negotiations are being conducted solely between the USPS and the resellers," the USPS's attempts to decrease the economics for the resellers also would negatively affect Stamps' financial results.  Ex. 16, at 3; *see* ¶ 97.  Stamps also reduced its revenue and income projections.  *Id.* Its stock price reacted negatively, falling from $83 to $37 per share.  *See* ¶ 12.  Just one quarter later, however, Stamps increased its guidance as the USPS reversed course by deciding not to alter its contracts with the resellers in 2019.  Ex. 17, at 3. Stamps' stock price increased on this news from $46 to $59.  Ex. 34, at 1.

At this time, although Stamps no longer has a package business incentive agreement with the USPS, it still holds two of only four existing PC Postage licenses. Ex. 7, at 4.  The third-party resellers – including Express 1, IntuiShip, and Parcel Partners – still have NSAs with the USPS that were approved by the PRC, and

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

11

Stamps still earns income from its revenue-sharing agreements with the resellers. *See* Ex. 17, at 3, 5. Stamps is still able to offer the same products and services that it offered before the discontinuation of the package business incentive agreement with the USPS. *See* Ex. 15, at 15. Stamps also has never received any notice of violation of any statute, regulatory requirement, or contract with the USPS, let alone been subject to a lawsuit by the USPS making such a claim.

### H.   Plaintiff Sues

Shortly after Stamps' first stock drop on February 22, 2019, purported stockholders filed putative class action complaints alleging violations of the Securities Exchange Act. This Court appointed a lead plaintiff on June 5, 2019, and the lead plaintiff filed the Complaint on August 5, 2019. The lead plaintiff largely copied theories previously set forth in shortseller and other reports about Stamps from 2016 and thereafter, and claimed, based on these old reports (but without even acknowledging the source of its allegations), that shareholders had been defrauded.

### ARGUMENT

## I.   STANDARD OF REVIEW

To state a claim under Rule 10b-5, Plaintiff must plead specific facts showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Webb v. SolarCity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018) (citation omitted). The Court need not accept conclusions stated as "facts" or any other unsupported, conclusory allegations. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Nor should the Court accept as true unsupported factual assertions, bare legal conclusions, unwarranted inferences, or allegations contradicted by documents subject to judicial notice. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

12

Case 2:19-cv-01828-MWF-SK   Document 125-12   Filed 07/01/20   Page 23 of 66   Page
ID #:3029
Case 2:19-cv-01828-MWF-SK   Document 79-2   Filed 10/04/19   Page 22 of 49   Page ID #:791

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

(9th Cir. 2001); *see also Prodanova v. H.C. Wainwright & Co., LLC*, 2018 WL 8017791, at *9 (C.D. Cal. Dec. 11, 2018).

Under the Private Securities Litigation Reform Act's ("Reform Act") heightened pleading standard, allegations sufficient to survive a conventional motion to dismiss governed by Rule 8 or even Rule 9(b), are not adequate in a securities class action. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008) (plaintiffs in securities class actions face particularly "formidable pleading requirements"). The Reform Act requires plaintiffs to plead "the who, what, when, where and how." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 998 (9th Cir. 1999). It also requires that, when "an allegation regarding [a defendant's] statement or omission is made on information and belief," plaintiff also must "state with particularity ***all facts*** on which that belief is formed." 15 U.S.C. § 78u–4(b)(1) (emphasis added); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1152 (C.D. Cal. 2007) (the "all facts" requirement is "the PSLRA's single most important weapon against pleading fraud by hindsight because it forces plaintiffs to reveal whether they base their allegations on an inference of earlier knowledge drawn from later disclosures or from contemporaneous documents or other facts").

## II.   PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

To plead falsity under the Reform Act, Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). For a statement to be false or misleading, it must be "capable of objective verification." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). In other words, plaintiff must allege facts that directly contradict the statement at issue. *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018); *see also Ronconi v. Larkin*, 253 F.3d 423, 432-33 (9th Cir. 2001) (statement

13

not false where facts alleged "not necessarily inconsistent" with statement). "[V]ague statement of optimism" and statements not "capable of objective verification" do not suffice. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014); *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

Moreover, where, as here, Plaintiff attempts to bring suit based on omissions, it must do more than simply identify a material omission. "Silence, absent a duty to disclose is not misleading under Rule 10b-5." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). "Often, a statement will not mislead even if it is incomplete or does not include all relevant facts." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Rather, a plaintiff must allege that the omission "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*; *see also Retail Wholesale*, 845 F.3d 1268 at 1278; *Arkansas Teacher Ret. Sys. v. OSI Sys., Inc.*, 2019 WL 2895625, at *3-4 (C.D. Cal. May 7, 2019); *Lefter v. Yirendai Ltd.*, 2017 WL 2857535, at *6-7 (C.D. Cal. June 20, 2017) (Fitzgerald, J.).

Plaintiff here alleges that Stamps misled investors by failing to disclose that it was "engaged in a secret . . . scheme" to sell discounted postage to small-volume and existing USPS customers upon which Stamps' financial results were dependent. It also alleges that Stamps' positive statements about its relationship with the USPS were false or misleading for failing to disclose that Stamps violated some contractual agreement with the USPS and/or "USPS governance." Plaintiff claims that Stamps' historical financial results were misleading because such results would not continue into the future. And plaintiff alleges that Stamps' positive statements about working with the USPS in the third and fourth quarters of 2018 were false or misleading. Each of Plaintiff's theories is wrong as described in more detail below in Parts II.B (addressing Plaintiff's theory of a "secret scheme" which Stamps fully disclosed);

14

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Case 2:19-cv-01828-MWF-SK   Document 79-1   Filed 10/04/19   Page 24 of 49   Page ID #:793

II.C (discussing Plaintiff's claim that Stamps engaged in some type of unspecified wrongdoing); II.D (explaining that the accurate disclosure of historical results does not constitute a guarantee of future results, especially when Stamps provided detailed warnings concerning the future); and II.E (noting that Stamps included numerous specific warnings concerning potential future agreements with the USPS).

## A.   Plaintiff's Puzzle Pleading Does Not Satisfy the Reform Act

As a threshold matter, the Complaint should be dismissed because Plaintiff fails to meet even the most basic requirements of the Reform Act.  Instead of identifying particular misstatements and specifying why they are false, Plaintiff resorts to "puzzle-pleading," *i.e.*, copying Stamps' public statements, "highlight[ing] certain portions . . . with bold and italic type," and then listing "various alleged deficiencies" without "connect[ing] any of the allegedly misleading statements with contradictory facts known to defendants at the time." *In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280, at *3 (N.D. Cal. Sept. 16, 2014) ("The Court will not attempt to divine Plaintiffs' intentions by trying to match potentially misleading statements with the alleged problems facing [Defendant]."); *see Lapiner v. Camtek, Ltd.*, 2011 WL 445849, at *4 (N.D. Cal. Feb. 2, 2011) ("[T]he Court is not required 'to search through' the [complaint] in an effort to link the allegedly false statements to the reasons those statements purportedly are false.").

Defendants are unable to discern why Plaintiff alleges that many of the quoted statements are false.  For example, in paragraph 81, Plaintiff quotes a February 22, 2018 earnings release that states: "We achieved strong financial results driven by exceptional performance in our shipping business.  We believe we are well positioned for 2018 and we remain excited about our long-term business opportunities."  Plaintiff alleges this statement was false, but does not specify whether it challenges the results themselves, Stamps' vague characterization of the results as "strong" and its performance as "exceptional," Stamps' opinion (also phrased in general terms) that it was "well positioned" for 2018, or Stamps'

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

15

Case 2:19-cv-01828-MWF-SK   Document 79-2   Filed 10/04/19   Page 25 of 49   Page ID #:794

forward-looking statement about "long-term business opportunities." ¶ 81. Two paragraphs later, Plaintiff lists ten alleged "omissions" that purportedly rendered Stamps' statements from November 6, 2017 to February 22, 2018 false, but Plaintiff does not specifically connect any of the alleged omissions to any of the misstatements. ¶ 83. Similar examples abound throughout the Complaint. *See, e.g.*, ¶¶ 66-70, 71; 72-76, 77; 78-82, 83; 84-92, 93. Standing alone, this is grounds for dismissal.

### B. The Complaint Should Be Dismissed Because the Alleged Omissions Were Fully Disclosed

Plaintiff repeatedly characterizes Stamps' use of the reseller program to sell discounted postage to low-volume and existing USPS customers as "secret" and "clandestine." *See, e.g.*, ¶¶ 71(a), (g); 77(e), (g); 83(f), (h); 93(f). These allegations, however, have no factual basis because Stamps repeatedly disclosed that it was utilizing the reseller program to sell discounted postage to small and existing USPS customers. *Siegel v. Lyons*, 1996 WL 438793, at *4 (N.D. Cal. Apr. 26, 1996) ("[w]here SEC filings actually disclose allegedly omitted information, dismissal of a claim premised upon nondisclosure is proper").

For example, Plaintiff alleges that Stamps failed to disclose that it "was engaged in a secret, unsustainable reseller scheme to bundle small-volume shippers." ¶¶ 71(a), 77(a); *see also* ¶¶ 71(e); 77(b), (c); 83(a), (b), (g); 93(a), (b), (g), (j). Stamps, however, has disclosed since at least 2015 (years before the putative class period) that, through its "partnership" with resellers, it was "able to provide [the reseller's] shipping discounts to our lower volume customers." Ex. 1, at 3. Stamps also disclosed in 2016 that "resellers are explicitly authorized by the USPS to offer discounted rates to *smaller shippers*." Ex. 1, at 3 (emphasis added). And Stamps disclosed in 2017 that "resellers were an excellent opportunity to bring the USPS brand and shipping solutions downmarket to smaller volume shippers." Ex. 14, at 3.

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

16

Plaintiff also alleges that Stamps failed to disclose that it was "secretly aggregating and bundling" existing customers and selling discounted postage through the reseller program.  ¶¶ 77(g), 83(h), 93(h); *see also* ¶¶ 71(c), (e); 77(b), (c); 83(a), (b), (g); 93(a), (b), (g), (j).  But Stamps disclosed in 2016, before the putative class period, that "the retention of existing customers" was one of the reseller program's key purposes and that Stamps had used "reseller rates in order to retain" customers with the USPS. Ex. 11, at 4-5.  Stamps also stated that the reseller program "is meant both for the acquisition of new volume and the retention of existing volume." *Id*. at 7.  Stamps repeated these points again in August 2017 by stating that resellers are "important . . . for keeping existing [USPS] business." *See* Ex. 14, at 3; ¶ 74.  Based on these disclosures, no reasonable investor would have been misled about whether Stamps was using the reseller program to sell discounted postage to existing USPS customers.[2]

### C.  Stamps' Statements About Its Relationship with the USPS Were Not Misleading

Plaintiff alleges that Stamps' positive statements about its relationship with the USPS and its position in the market were misleading because:  (a) Stamps was violating a USPS contract and/or "governance" that might have affected its relationship with the USPS; and (b) unidentified USPS employees purportedly criticized the prices Stamps was charging.  ¶¶ 71(b), (c); 77(a), (c), (g), (i); 83(b), (e), (h); 93(d), (h).

---

[2]    The shortsellers from whom Plaintiff borrowed the allegations in the Complaint also have reported on Stamps' discounted postage sales – and their supposition that it violates USPS policies – in detailed attacks starting in April 2016. *See* Ex. 11, at 4-7.  Since this information was actually disclosed, it cannot be the basis for a securities fraud claim. *In re Kalobios Pharm., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1008 (N.D. Cal. 2017) (where information plaintiff claims was not disclosed by defendant was "made available to the market through a different source," plaintiff cannot assert a claim for securities fraud).

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

17

Case 2:19-cv-01828-MWF-SK Document 125-12 Filed 07/01/20 Page 28 of 66 Page
ID #:3034
Case 2:19-cv-01828-MWF-SK Document 79-2 Filed 10/04/19 Page 27 of 49 Page ID #:796

As an initial matter, these allegations fail because the challenged statements are inactionable as corporate puffery. *Intuitive Surgical*, 759 F.3d at 1060 (defining "puffery" as "vague statement of general optimism"); *Kane v. Madge Networks N.V.*, 2000 WL 33208116, at \*2 (N.D. Cal. May 26, 2000) (statements that companies were "working together" and "made great strides" are "immaterial puffery"); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1159-60 (S.D. Cal. 2008) (reference to relationship as "excellent," "highly positive and mutually beneficial," and "a success" inactionable puffery); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) ("[S]tatements that the relationship was 'great' and 'very, very solid' and [the Company] 'really enjoys' the relationship are expressions of puffery and optimism."). Because puffery "cannot be false or misleading," Plaintiff cannot, as a matter of law, state a claim based on Stamps' positive statements about the USPS or Stamps' position in the market. For this reason alone, this Court should dismiss the vast majority of the statements Plaintiff challenges. *See, e.g.*, ¶¶ 66 ("strong growth"; "very excited"); 68 ("common goal of growing USPS package volume"; "great partnership"; "win-win model"; "USPS is very happy"); 70 ("USPS is very happy"); 72 ("very excited"); 74 ("excellent partners"; "great partnership"; "win-win model"; "partnership . . . is continuing to be stronger and stronger"); 78 ("solid top line"; "strong margin profile"; "well positioned"; "very excited"); 80 ("we succeed when they succeed"; "we were happy"); 81 ("strong financial results"; "remain excited"); 86 ("create value"; "help them be successful"); 87 ("we are excited about our long-term business opportunities"); 90 ("strong organic performance"; "solid results"; "well positioned"; "we remain very excited").

Even if this Court were to hold that these statements are not puffery, however, these allegations should still be dismissed because Plaintiff has not pled an actionable omission or other facts establishing falsity.

Exhibit 12
- 246 -

### 1.      Plaintiff Has Not Pled a Breach or a Statutory Violation

Plaintiff alleges that Stamps' positive statements about its relationship with the USPS were false because Stamps failed to disclose that its sales to small-volume and existing USPS customers violated either Stamps' contract with the USPS or unspecified USPS "governance," but Plaintiff does not specify either the contract or the statute/regulation that Stamps purportedly breached.  *See, e.g.*, ¶ 74 ("we have multiple contracts and various partnerships . . . we were able to get a couple of our contracts renewed at improved terms"); *see also* ¶¶ 77(c); 83(d); 93(b).

Instead, Plaintiff attempts to plead a breach of contract based solely on an August 2, 2016 letter to a completely different company, IntuiShip, stating that, "[i]f it is determined that *this* is the case" – Plaintiff does not specify what "this" is – "your NSA is subject to termination due to violation of the agreed upon terms of the agreement."  ¶ 53 (emphasis added).  But IntuiShip and Stamps did not even have similar USPS contracts; Plaintiff alleges that IntuiShip had a NSA (¶¶ 30, 31), whereas Stamps had a package business incentive agreement (*i.e.*, revenue sharing agreement).  *See* ¶¶ 25, 61.  Nor does Plaintiff allege that Stamps also did whatever the "this" referenced in the IntuiShip letter was.  In fact, Plaintiff does not and cannot even allege that IntuiShip's NSA was terminated for whatever "this" conduct was such that the conduct actually violated Intuiship's NSA with the USPS.[3]

Plaintiff also alleges that "USPS governance" required Stamps to obtain USPS approval prior to extending reseller rates to small and/or existing customers. Plaintiff, however, cites a statute that spans the bulk of an entire title of the US Code (Title 39), without identifying which section within that title purports to impose this requirement.  ¶ 36.  There is no such provision because there is no such requirement. As for the "regulation" Plaintiff paraphrases (¶ 37), it governs a completely different

---

[3]      Plaintiff alleges, without support and without even defining the term, that IntuiShip was a Stamps "affiliate."  *See* ¶¶ 6, 33, 52.  This is insufficient even under Rule 8.  *Iqbal*, 556 U.S. at 678.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Exhibit 12

- 247 -

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

situation (the information that an entity must provide to apply for its own NSA, *not* the entity to whom postage may be resold once a NSA with a reseller is approved by the PRC) that is not applicable to Stamps. *See* Ex. 20.

Even if Plaintiff had pled particularized facts establishing that Stamps had violated a contract, statute, or regulation (which it has not), dismissal would still be required because Stamps had no duty "to accuse itself of wrongdoing." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 258 F. Supp. 3d 1037, 1043 (N.D. Cal. 2017). "Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014); *see also Haberland v. Bulkeley*, 896 F. Supp. 2d 410, 426 (E.D.N.C. 2012) ("neither a company's board nor its corporate executives is required to engage in self-flagellation" (internal alterations omitted)).

### 2. No Omission Based on Unnamed USPS Employees

Plaintiff also alleges that Stamps' positive statements about its relationship with the USPS were false because Stamps did not disclose that unidentified USPS employees told unidentified Stamps employees that the USPS might have preferred that Stamps charge customers more.

Plaintiff primarily relies on allegations attributed to: (1) one former Field Sales Representative, employed by Stamps' subsidiary (Endicia) until Stamps acquired it on November 18, 2015, then by Stamps until May 2019, who "confirmed that the USPS had definitely ('absolutely') been upset 'for a few years' with Stamps/Endicia for making available discounted postal rates for customers that did not individually meet the USPS's annual shipping requirements" (¶ 48); and (2) a second Field Sales Representative, employed by Stamps from March 2014 to October 2018, who purportedly stated that "certain USPS teams and District Managers would express their displeasure to Stamps/Endicia sales representatives" (¶ 49).

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

20

Courts are "generally skeptical" of allegations attributed to confidential witnesses. *Lifschitz v. NextWave Wireless Inc*., 2011 WL 5839682, at \*2 (S.D. Cal. Nov. 21, 2011). To rely on confidential witness allegations, Plaintiff must describe the confidential witnesses with sufficient particularity to establish their reliability and personal knowledge and must allege that "a person in the position occupied by the source would possess the information alleged." *Zucco Partners v. Digimarc Corp*, 552 F.3d 981, 995 (9th Cir. 2009). Plaintiff has not done so here.

First, Plaintiff's allegations are double hearsay in which an unnamed former employee purportedly reported information from unnamed USPS employees. Such allegations are not sufficiently reliable to plead falsity under the Reform Act. *See Zucco*, 552 F.3d at 996. Plaintiff also fails to specify who made these statements, what exactly the USPS employees said, and what basis the USPS "teams and District Managers" have to describe overall USPS policies or impressions concerning Stamps. Absent such allegations, these confidential witness allegations are inadequate, as a matter of law, to plead falsity. *See Intuitive Surgical*, 759 F.3d at 1063 (securities claim may not rest on "impression of a low-level employee" lacking "substance or context"); *Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135, at \*11 (C.D. Cal. Aug. 20, 2012) ("anecdotal accounts of the CWs are insufficient to demonstrate . . . a materially widespread practice").

Plaintiff also alleges that "Stamps received an August 2017 letter from its reseller partner, Parcel Partner[s], which disclosed the USPS's position and new restrictions designed to reign in abuse of the reseller program." ¶ 58; *compare with* ¶ 71(d).[4] When relying on written documents, plaintiff must "provide the title and

---

[4]    Once again, Plaintiff does not specify which alleged statements were purportedly rendered false by nondisclosure of the Parcel Partners letter. To the extent that Plaintiff challenges Stamps' May 3, 2017 statement that there was no letter to resellers (¶ 70), this allegation also fails because Plaintiff does not allege that the Parcel Partners letter existed prior to "August 2017." ¶ 58 (referring to the "August 2017 letter").

21

Exhibit 12

- 249 -

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

Case 2:19-cv-01828-MWF-SK   Document 79   Filed 10/04/19   Page 30 of 49   Page ID #:799

author of the document, the date it was prepared and, if not a publicly-available document, name of the person or persons who reviewed it." *In re Blue Rhino Corp. Sec. Litig.*, 2004 WL 5681763, at \*10 & n.12 (C.D. Cal. Oct. 7, 2004) (quoting *In re Autodesk Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 846 (N.D. Cal. 2000)).   Here, however, Plaintiff fails to provide the author of the letter, the contents of the underlying attachment from the USPS that serves as the apparent basis for the letter, the person(s) at Stamps who purportedly reviewed the letter, or when the Stamps employees purportedly saw it. *See id.*; *Diaz v. N. Dynasty Minerals Ltd.*, 2018 WL 5099749, at \*7 (C.D. Cal. Apr. 30, 2018) (allegations based on internal reports must allege "such facts as may indicate their reliability").   Again, just like the purported IntuiShip letter, Plaintiff does not allege that the USPS or Parcel Partners ever implemented these restrictions.   In any event, the letter is about Parcel Partners – not Stamps – and therefore does not refute Stamps' statements about its relationship with the USPS.

### 3.     Plaintiff Has at Most Pled a "Difference of Opinion"

Finally, even if this Court were inclined to credit allegations from anonymous witnesses and an inadequately described precatory letter, Plaintiff has at most pled "a difference of opinion" between anonymous, low-level employees and the USPS's senior executives, which is not sufficient to state a securities fraud claim. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170-71 (3d Cir. 2014) ("a difference of opinion within [the organization]" is not sufficient to state a securities fraud claim); *see also Metzler*, 540 F.3d at 1069 (internal disagreement is not sufficient); *Stac*, 89 F.3d at 1407 (company does not have to disclose what third party has told it concerning its plans because company does not know what third party will actually do).[5]   As discussed in the statement of facts, the USPS's senior executives not only

---

[5]     Plaintiff also alleges that Stamps' sale of discount postage to small and existing USPS customers was "cannibalizing" revenue from the USPS at a rate of $235 million per year. *See* ¶¶ 5, 11, 71(e), 77(b), 83(a), 93(a).   Again, however, Plaintiff does not and cannot plead a factual basis for this allegation.   The apparent

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Case 2:19-cv-01828-MWF-SK   Document 125-12   Filed 07/01/20   Page 33 of 66   Page
ID #:3039
Case 2:19-cv-01828-MWF-SK   Document 79-2   Filed 10/04/19   Page 32 of 49   Page ID #:301

disclosed that Stamps and others were selling discounted postage to low-volume shippers and existing USPS customers, they used phrases identical to those used by Stamps when characterizing the relationship between Stamps and the USPS. *See, e.g.*, Ex.18, at 3, 5 (August 1, 2017 statement by USPS CMO that the USPS uses NSAs "to attract new clients, and . . . keep existing business" and that "resellers were an excellent opportunity to bring our brands and our shipping solutions down-market to smaller volume shippers"); Ex. 19, at 17 (August 9, 2018 statement by USPS CFO that resellers and PC Postage partners (like Stamps) are "very, very important partners for us in terms of increasing volumes and from year to year have been a major contributor to the double digit growth we saw in the last three years in packages" and are "very important in order to be able to reach small and medium businesses and grow the business").

## D.     Stamps Did Not Mislead Investors by Reporting Historic Results

Plaintiff also alleges that Stamps' discussion of, and positive statements about, its past and future financial results were misleading. *See* ¶¶ 71(a), (e); 77(b)-(c); 83(a), (c)-(d); 93(a)-(c). Although Plaintiff does not specify the basis for these allegations, Plaintiff appears to allege that Stamps misled investors by failing to disclose that its future results would not be as strong as its past results. *See, e.g.*, ¶¶ 65 ("defendants touted the Company's strong financial performance, including revenue and earnings growth, while concealing that these financial metrics were the product of an unsustainable and improper reseller scheme to inflate Stamps' financial results"); 70(e); 77(b); 83(a); 93(a) (Stamps misled investors by reporting its financial results without disclosing that its revenue was "entirely dependent" on

source of the allegation – a January 31, 2019 report prepared by the self-proclaimed "Taxpayers Protection Alliance" – actually refutes it. *See* Ex. 33, at 2 (citing "Taxpayers Protection Alliance" report claiming that the USPS lost a total of $235 million each year due to *multiple* entities mislabeling or misweighing packages, ***not*** from reseller rates or NSAs).

23

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

the reseller program); 93(m) ("defendants had no reasonable basis to expect and did not expect Stamps' revenue and earnings growth to continue indefinitely").[6]

It is well settled, however, that a company cannot be liable for securities fraud if it has accurately "report[ed] past performance," even if such performance might not continue in the future. *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513, 516 (9th Cir. 1991); *see also In re Verifone Sec. Litig.* 784 F. Supp. 1471, 1485 (N.D. Cal. 1992), *aff'd sub nom.* 11 F.3d 865 (9th Cir. 1993); *In re Impax Labs., Inc. Sec. Litig.*, 2008 WL 1766943, at *4-5 (N.D. Cal. Apr. 17, 2008) (collecting cases); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.").

Nor is a company's accurate discussion of its historical results rendered misleading by failure to disclose that those results purportedly resulted from wrongdoing. *See In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997) ("[i]t is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data" even where such historical financials resulted from alleged wrongdoing); *Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 91 (D. Mass. 1991) (dismissing securities claim because the plaintiff did "not allege that the revenues actually received by [the Company] differed from those reported to the SEC," but argued "instead that the reports would have been more accurate and complete if the defendants had revealed their improper activities because such activities allegedly influenced the financial success of [the Company]"), *aff'd*, 975 F.2d 22 (1st Cir. 1992).

---

[6] Plaintiff does not allege that the financial results were actually untrue. *Compare* ¶¶ 66, 72-93 (no allegation that Stamps restated its financial results or that the auditors withdrew any clean audit opinion), *with Metzler*, 540 F.3d at 1068-69 (affirming dismissal where the complaint "does not allege that [the company's] external auditors counselled against the practice or that [defendant] admitted or was aware it was improper"). Similarly, Plaintiff does not allege that Stamps ever missed any of the financial projections it provided to the market.

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

24

Moreover, because the alleged omission (a decline in future results) did not occur until 2019, well after the alleged misstatements, Stamps' discussion of its financial results, to the extent that Plaintiff wants to interpret them as predicting the future, is also shielded by the Reform Act's safe harbor for forward-looking statements. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (a present-tense statement may qualify as forward-looking "if the truth or falsity of the statement cannot be discerned until some point in time after the statement is made"); *see also Steamfitters Local 449 Pension Plan v. Molina Healthcare*, 2018 WL 6787349, at *2 (C.D. Cal. Dec. 13, 2018). Forward-looking statements are inactionable *either* if they are: (1) accompanied by "meaningful cautionary language," *or* (2) Plaintiff fails to plead that Defendants did not actually believe the statements. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1113 (9th Cir. 2010). Both grounds exist here.

First, Stamps used extensive cautionary language when describing both its historical and future results. It expressly warned that "[o]ur historical results are not necessarily indicative of the results to be expected for any future period and the results for any interim period are not necessarily indicative of the results to be expected in the full year." Ex. 4, at 16; Ex. 2, at 12; *see also In re Skechers U.S.A., Inc. Sec. Litig.*, 2004 WL 1080174, at *1, 7 (C.D. Cal. May 7, 2004). It also warned that "the modification or termination of financial compensation arrangements with the USPS, strategic business partners and other carriers" may "limit our growth, adversely affect our business and cause the price of our common stock to decline" and "might cause our revenues, margins and operating rates to fluctuate." Ex. 4, at 12-13. It detailed two further pages of risks related to its relationship with the USPS and the industry in which it operated in both the 2017 and 2018 Form 10-Ks, including that:

- The USPS could decide to amend, renegotiate or terminate agreements or financial compensation arrangements that exist now or in the future;

25

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

- We also earn compensation by offering customers a discounted postage rate that is provided to the customers by our integration partners. If the USPS decides to withdraw certain discounts or even remove the discounts entirely, our revenue and operating results will suffer; and

- These discounts are subject to terms and conditions of agreements between third parties and the USPS, and there can be no assurance that our integration partners will continue to have access to such discounts or that they will continue to make them available to our customers on favorable terms or at all.

Ex. 4, at 14-15; *see also* Ex. 2, at 10-11. Because Stamps expressly warned about the exact risks that came to pass, the Reform Act's safe harbor applies and requires dismissal of Plaintiff's allegations about Stamps' future growth. *See Intuitive Surgical*, 759 F.3d at 1059-60.

Finally, and as further discussed below, Plaintiff does not and cannot allege that Defendants did not actually believe any optimistic statements about its future results.

### E.     Statements about a Future Partnership Did Not Mislead

Plaintiff also challenges Stamps' forward-looking statements between August 2, 2018 and October 31, 2018 about its hopes for a continued partnership with the USPS, including a new package business incentive agreement. *See* ¶¶ 89-92.

Again, Stamps had specifically and expressly warned that "[t]he USPS could modify, discontinue or terminate agreements and other financial compensation arrangements, which would have an adverse effect on our revenues and operating results." Ex. 6, at 6; Ex. 4, at 12; Ex. 2, at 10. It also disclosed that it competed with the USPS, stating: "We compete with all of the alternate ways that consumers and businesses may access the services of the USPS, including . . . USPS online products [and] USPS software solutions." Ex. 4, at 6-7; Ex. 2, at 5-7. And it added a very specific warning in its Form 10-Q for the second quarter of 2018 concerning the package business incentive agreement, stating that "[d]uring the previous calendar quarter, the USPS provided a notice requiring the renegotiation of one of our

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

26

important financial compensation arrangements." Ex. 6, at 6. It further noted that: "While we believe that this agreement is mutually beneficial to the USPS and to us, there is a risk that renegotiation is unsuccessful and leads to materially less favorable terms or that the USPS decides to not renew one or more of these financial compensation arrangements. In such case, our revenue and operating results will be materially affected unless we are successful in timely replacing the lost revenue with similar compensation from other potential partners." *Id.* These disclosures alone are a sufficient basis for dismissal. *See Intuitive Surgical*, 759 F.3d at 1059-60; *Cutera*, 610 F.3d at 1112-13.

As further discussed below, Plaintiff also does not, and cannot, plead that Stamps did not actually believe its statements about a continued partnership with the USPS because the USPS's CFO reiterated in that same time period that online postage sellers and resellers are "very, very ***important partners*** for us." Ex. 19, at 17 (emphasis added); *see also Rombach*, 355 F.3d at 174 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").[7]

---

[7]    Plaintiff also might be challenging Stamps' statement of reasons for the discontinuation of the package business incentive agreement with the USPS. *See* ¶¶ 94, 95. Plaintiff, however, relies solely on completely unsupported speculation in an article from *The American Conservative* to make this argument. *See* Ex. 33. The article cites no source for its claim. The article also demonstrates a lack of understanding of the USPS ecosystem as: (1) the very title of the article – *Taxpayers Win as the Postal Service Gives Stamps.com the Boot* – reflects the common misunderstanding that the USPS is taxpayer funded (*see* Ex. 24), and (2) it is written as if the package business incentive agreement between Stamps and the USPS and the NSAs between the USPS and the third-party resellers are the same thing (which they are not). *See generally* Ex. 33.

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

## III.   PLAINTIFF FAILS TO ADEQUATELY PLEAD SCIENTER

### A.   Pleading Standard

To state a claim under the Reform Act, Plaintiff must "state with particularity facts giving rise to a strong inference" of scienter.   15 U.S.C. § 78u-4(b)(2)(A). Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014).

Because the challenged statements here are primarily, if not all, statements of opinion or forward-looking statements, Plaintiff must allege that the person who made those statements either did not actually believe them (statements of opinion) or had actual knowledge the statements were false (forward-looking statements). *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *Cutera*, 610 F.3d at 1113.

To state a claim based on any other statements, Plaintiff must plead deliberate recklessness or conscious misconduct.   *See id.*   "[M]ere recklessness or a motive to commit fraud and opportunity to do so" are insufficient.   *Zucco*, 552 F.3d at 991. Rather, deliberate recklessness "is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb*, 884 F.3d at 851 (emphasis in original).

In determining whether Plaintiff has pled the requisite "strong inference" of scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."   *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 323-24 (2007).   Courts consider scienter allegations holistically. *Id.* at 326.   "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.   This "bar set by *Tellabs* is not easy to satisfy."   *Webb*, 884 F.3d at 855.   A complaint not meeting these high pleading requirements "shall" be dismissed.   15 U.S.C. § 78u-4(b)(3)(A).

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

### B.      Plaintiff Fails to Plead Scienter Based on Stock Sales

Despite the Ninth Circuit's admonition that "[i]nsider stock sales are not inherently suspicious," Plaintiff devotes 13 pages of the Complaint to allegations that all of Stamps' directors and officers (even those not named in this lawsuit) were motivated to commit fraud because they sold stock during the over two-year putative class period. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002); CC at 47-60. These allegations fail for several reasons.

First, the extraordinarily long putative class period of over two years itself precludes an inference of scienter based on stock sales. *Vantive*, 283 F.3d at 1092 (63-week class period is "unusually long"); ¶ 1 (alleging 105-week class period); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *35 (C.D. Cal. Apr. 14, 2015). This is particularly so because, here, Plaintiff appears to have selected May 3, 2017 as the start of the putative class period solely to exaggerate the appearance of class period stock sales. Plaintiff alleges that the class period began "just after President Trump took office and subsequently announced his intent to eliminate business practices detrimental to the USPS" (¶ 101), but President Trump did not sign the executive order forming the Task Force concerning the USPS until almost one year later in April 2018 (Ex. 22; ¶¶ 9, 63), the USPS continued to make positive statements about Stamps publicly until at least August 2018 (Exs. 18, 19, 27), and the Task Force did not release its report until December 2018 (Ex. 23; ¶¶ 9, 63). Had Plaintiff used either August 2018 or December 2018 as the beginning of the putative class period, however, Plaintiff would not have been able to allege stock sales at all because ***none*** of the named defendants sold any shares after March 2018 nearly one full year before Stamps' first stock price drop. *See Metzler*, 540 F.3d at 1067 (no scienter where class period stock sales took place before government disclosed to defendants that it had initiated investigation of "allegedly" improper practices); *see also Vantive*, 283 F.3d at 1093-94 (stock sales over a year before the adverse disclosure and below class period highs do not help

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

29

establish scienter); *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at \*12 (S.D.N.Y. Sept. 26, 2006); ¶ 98.

Second, Plaintiff attempts to exaggerate the volume of stock sales by listing sales from individuals not named as defendants and not alleged to have made any challenged statements.[8]  ¶¶ 98, 99.  A non-defendants' transactions "are irrelevant to alleging scienter against the [] named Defendants," and their inclusion in the Complaint is "misleading."  *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 834 n.12 (C.D. Cal. 1998); *see also Vantive*, 283 F.3d at 1994 (sales by company chairman "not alleged to have uttered a word" during the class period provide no basis "for finding circumstantial evidence of fraud").  Plaintiff even identifies non-defendants who sold stock as they were leaving the Company (Biswas, Bortnak, Miller, and Weisberg), which courts routinely hold is neither unusual nor suspicious.  *See, e.g.*, *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1116 (N.D. Cal. 2003); *Greebel v. FTP Software*, 194 F.3d 185, 206 (1st Cir. 1999).[9]

Third, Plaintiff ignores that all of the class period stock sales by the three named defendants (as well as almost all the sales by the non-defendants) were made pursuant to SEC Rule 10b5-1 trading plans, which "allow[] corporate insiders to set a schedule by which to sell shares."  *Wietschner*, 294 F. Supp. 2d at 1117; Ex. 8, at 5-9 (McBride Form 4s); Ex. 9 (Huebner Form 4s); Ex. 10 (Carberry Form 4s).  Sales according to Rule 10b5-1 plans "may rebut [] an inference of scienter."  *Metzler*, 540 F.3d at 1067 n.11 (9th Cir. 2008); *see also Wietschner*, 294 F. Supp. 2d at 1117; *Welgus v. TriNet Group, Inc.*, 2017 WL 6466264, at \*18 (N.D. Cal. Dec. 18, 2017).

---

[8]    The listed non-defendants are Ananda, Biswas, Bortnak, Buerba, Clem, Jones, Khechfe, Lipson, Miller, and Weisberg.

[9]    Biswas, a former CTO, left February 27, 2018 (Ex. 30, at 1); Bortnak, a former Co-President and Corporate & Business Development Officer, left August 2, 2017 (Ex. 29, at 1); Miller, a former outside director, resigned for health reasons in January 2018 (Ex. 5, at 2); and Weisberg, Stamps' former Chief Legal Officer, transitioned to a part-time role in January 2018 (Ex. 3, at 2).

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Exhibit 12

- 258 -

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

Case 2:19-cv-01828-MWF-SK   Document 125-12   Filed 07/01/20   Page 41 of 66   Page
ID #:3047
Case 2:19-cv-01828-MWF-SK   Document 79-2   Filed 10/04/19   Page 40 of 49   Page ID #:809

Fourth, Plaintiff fails to plead that the timing of Defendants' stock sales is suspicious. To the contrary, Plaintiff admits that one of the named Defendants, Huebner, sold more stock in the two years prior to the class period than during the class period. *See* ¶¶ 98, 99 (approximately 155,000 shares in the two years before the class period, compared to approximately 52,000 during the class period); *Copper Mountain*, 311 F. Supp. 2d at 874 (no scienter where person sold more stock before class period than during the class period). Plaintiff fails to plead any trading history at all for Carberry. *See, e.g.*, *Zucco*, 552 F.3d at 1005 ("[e]ven if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history"). And Plaintiff completely understates the pre-class period sales by McBride, the final named defendant, alleging that he sold 15,000 shares when he actually sold 85,000 shares. *Compare* ¶ 99, *with* Ex. 8, at 1-4. Any inference of scienter is further rebutted by the fact that the stock sales occurred shortly after the Defendants received new option grants in April and/or August 2017. *See* Ex. 5, at 3-5; *see also Ixia*, 2015 WL 1775221 at *41 (defendant's stock sales not suspicious where more plausible inference was that sales were to "maintain his overall holdings at a similar level").

Finally, Plaintiff attempts to supplement its deficient stock sale allegations by pointing to Stamps' $300 million stock repurchases, but stock repurchases actually negate an inference of scienter. *See Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017) ("it is illogical that [the Company] would have been repurchasing its shares had it been aware of facts that would indicate the price would fall" (citing *In re Cisco Sys., Inc. Sec. Litig.*, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013))); *see also In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *11 n.11 (N.D. Cal. Oct. 19, 2010)). Plaintiff tries to avoid this by inventing a plan by Stamps' executives to "buy back" stock in order to increase the price at which their own shares were sold, but as the chart Plaintiff includes in the Complaint establishes, Stamps actually bought back the *least* stock in the quarters in which its insiders

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

31

bought the most (and vice versa). *See* ¶ 102. For example, in the third quarter of 2017, Plaintiff alleges that stock sales by insiders were at their highest, but this was also when share repurchases were at their lowest. *Id.* By contrast, Stamps repurchased the most stock in fourth quarter of 2018, when Defendants sold nothing and total sales by all insiders were less than $1 million. *See id.*; ¶ 98.

### C.    Plaintiff's Reliance on Disfavored Methods of Pleading Scienter Does Not Contribute to a Strong Inference of Scienter

In the absence of specific and particularized facts establishing that Defendants knew that Stamps' historical relationship with the USPS and financial results would not continue, Plaintiff asks this Court to infer scienter based on various disfavored doctrines that try to substitute assumptions for factual particularity. *See* ¶¶ 114-120.

First, Plaintiff invokes the "core operations" doctrine, asking this Court to simply assume that Defendants knew what the USPS would do because of the USPS's importance to Stamps. ¶¶ 114-116. These allegations fail, however, because the core operations doctrine cannot be used to plead "actual knowledge," as Plaintiff here must do for forward-looking statements and statements of opinion. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063, 1069 (N.D. Cal. 2012) (rejecting core operations where plaintiffs failed to allege defendants had "actual knowledge that their future projections were false at the time they made them"). Plaintiff also cannot rely on the core operations inference to plead scienter with respect to acts that had not transpired – here, termination of Stamps' package business incentive agreement with the USPS – at the time when the challenged statements were made. *See Magro v. Freeport McMoran Inc.*, 2018 WL 3725781, at *7-8 (D. Ariz. Aug. 3, 2018) (core operations theory based on defendants' knowledge that "the [contract] negotiations were not going well and that [defendants'] important mining operations might encounter difficulties" insufficient to plead scienter). And once again, even if Stamps did a lot of business with the

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

32

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

USPS, it could not know what the USPS might actually do since it is a third party. *Copper Mountain*, 311 F. Supp. at 872; *Stac*, 89 F.3d at 1407.

Second, Plaintiff asks this Court to infer knowledge from the Individual Defendants' senior roles at the company. *See* ¶¶ 117-119. Numerous courts, however, have confirmed that "the high rank of various Individual Defendants . . . is insufficient, without more, to infer a strong inference of scienter." *Hansen*, 527 F. Supp. 2d at 1158; *see also In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at \*29 (C.D. Cal. Jan. 16, 2013) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud" (quoting *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 993 (D. Ariz. 1999))).

Third, Plaintiff alleges that Stamps' "President and former CFO" resigned "after 20 years of service." ¶ 120; *see Zucco*, 552 F.3d at 1002 ("Mere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter."). Absent particularized allegations that he resigned because of wrongdoing or other misconduct, however, this resignation does not contribute to the strong inference of scienter Plaintiff must plead. *Id.* ("[A] plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one."). In addition, if Huebner had engaged in wrongdoing, then the Company would not have had him continue to do part-time work for Stamps. *See* Ex. 15, at 2.

Fourth, in a glaring example of circular reasoning, Plaintiff alleges that scienter can be inferred from the fact that Stamps purportedly made false exculpatory statements about the contract negotiations and the reasons that Stamps' contract with the USPS was terminated. ¶¶ 106-109.[10] Scienter requires Plaintiff to plead actual

---

[10]    Plaintiff also cites McBride's August 2017 statement that Stamps "continue[d] to enjoy a great partnership with the Postal Service." ¶ 104. Plaintiff alleges this "falsely assured" investors, but Plaintiff does not specify what exactly McBride was providing reassurance about. *See id.* In any event, Stamps' August

facts, not just innuendo. *See Silicon Graphics*, 183 F.3d at 985. Absent admissions by Stamps, regulatory findings, or, indeed, any particularized facts establishing falsity, Plaintiff cannot rely on Stamps' statements themselves to plead scienter. *See In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 685 (E.D. Va. 2015) ("Lead Plaintiff used the [shortseller] reports to detail its allegations in the Amended Complaint and then holds out the Amended Complaint as corroboration for the allegations. Such circularity does not qualify as corroboration.").

Finally, Plaintiff cites critical commentary by a shortseller about impending lawsuits by the USPS. ¶ 110; *see Miller v. PCM, Inc.*, 2018 WL 5099722, at \*8-9 (C.D. Cal. Jan. 3, 2018) (shortseller speculation regarding dissolution of key partnership did not provide strong inference of scienter). But the USPS has not brought claims against Stamps on any grounds – statute, regulation, or contract – even though Stamps has been under public attack by shortsellers and others on the exact issues raised in this lawsuit for over three years.

### D.   **Plaintiff Fails to Plead a Holistic Inference of Scienter**

To plead scienter, Plaintiff must allege facts that, when taken together and weighed against any competing, non-culpable explanation for the defendants' conduct, support an inference of scienter that is at least as strong as any competing, non-fraudulent inference. *See Tellabs*, 551 U.S. at 323-24. Plaintiff fails to meet this burden because the facts undermining scienter far outweigh any culpable inferences.

***First***, Stamps' fulsome disclosures – including its express and repeated statements that it was using resellers "to provide [the reseller's] shipping discounts to our lower volume customers" and that "[r]esellers are important . . . for keeping existing USPS business" (Ex. 1, at 3; Ex. 14, at 3; ¶ 74) – weigh strongly against an inference of scienter. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, _____ 2017 statement simply summarized the positive statements that the USPS CMO made publicly that same month. *See* Ex. 18.

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1171-72 (C.D. Cal. 2007) (no scienter where defendants repeatedly disclosed allegedly improper practice; "if such a situation 'guaranteed' failure, the industry would have been alert to it").

***Second***, the lack of any claim by the USPS itself that Stamps violated any statute, regulation, or contract and the repeated public statements by "the most senior executive[s]" at the USPS and PRC weigh decisively against scienter. *See* ¶ 68; Ex. 18, at 5 (referring to Stamps as an "excellent partner[]"); Exs. 19, 27; *Express Scripts*, 2017 WL 3278930 at \*18 (no scienter where third-party partner "stated publically that it was 'hopeful' that it would reach resolution with [defendants]").[11] Plaintiff does not, and cannot, identify any intervening facts that would have undermined the Individual Defendants' good-faith belief in the assurances by these senior officials. Consequently, these statements rebut any conceivable inference that Stamps did not actually believe it had a strong relationship with the USPS that would continue into the future.

***Third***, Stamps' detailed disclosure of risks to Stamps' agreements with the USPS, the agreements between resellers and the USPS, and Stamps' agreements with resellers, all undermine any inference of scienter. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994).

***Fourth***, Plaintiff fails to allege that any of the alleged omissions had even transpired, let alone been communicated to the Individual Defendants, when Stamps made the challenged statements. *See Silicon Graphics*, 183 F.3d at 988 ("Congress enacted the [Reform Act] to put an end to the practice of pleading 'fraud by hindsight.'"). For example, Plaintiff alleges that Stamps' positive statements about its relationship with the USPS were misleading because Stamps did not disclose critical comments by unidentified USPS employees, but Stamps made most of the challenged statements about its relationship with the USPS on or before August 2,

---

[11]   The Supreme Court has specifically held that judicially noticeable documents must be considered when analyzing scienter. *Tellabs*, 551 U.S. at 322.

35

Case 2:19-cv-01828-MWF-SK    Document 79-2    Filed 10/04/19    Page 45 of 49    Page ID #:814

2017, *before* Plaintiff alleges any of the critical comments were made. *Compare* ¶¶ 66-70, 72-76, *with* ¶ 58 (alleging that the Parcel Partners letter was sent to Parcel Partners on an unspecified date in August 2017); ¶¶ 46-50 (no allegations about when the USPS salespeople made critical comments to former Stamps salespeople). Plaintiff similarly alleges that Stamps misled investors on or before October 31, 2018 by making optimistic statements about future financial results and contract renegotiations without disclosing that "the USPS had in fact rejected Stamps' business model and was in the process of terminating" its contract with Stamps. *See* ¶ 93(l). Again, however, the "omitted" acts transpired after the "misstatement" – the Task Force did not release its report until December 2018 (Ex. 23; ¶¶ 9, 63), and Plaintiff does not allege that contract negotiations broke down prior to 2019 (*see* ¶¶ 11, 63, 94). *See In re Zillow Grp., Inc. Sec. Litig.*, 2018 WL 4735711, at \*16 (W.D. Wash. Oct. 2, 2018) (no inference of scienter where challenged statements touting Company's regulatory compliance were made prior to the initiation of the government investigation). Plaintiff's attempt to plead fraud by hindsight weighs strongly against an inference of scienter. *See Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1079 (C.D. Cal. 2012) (where the "inevitable demise of the webOS strategy became apparent to Defendants *after* they made their optimistic statements . . . those statements could not have been *intentionally* false when made") (emphasis in original).

*Finally*, any conceivable inference of scienter is negated by the fact that the company bought stock in the fourth quarter of 2018 and first quarter of 2019, even after it received the Task Force Report. *See Bodri*, 252 F. Supp. 3d at 933; ¶ 102.

## IV.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Plaintiff also fails to plead "loss causation" – a "causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014). To plead loss causation, Plaintiff must allege

36

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

particularized facts establishing that the market "learned of and reacted to th[e] fraud."[12]  *Metzler*, 540 F.3d at 1063; *see also Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  Plaintiff does not meet this standard with respect to either the February 21, 2019 and May 8, 2019 announcements because these disclosures do not correspond to Plaintiff's theory of fraud.

Although the Complaint identifies Stamps' February 21, 2019 announcement that it had discontinued its package business incentive agreement with the USPS as a "corrective disclosure" purportedly revealing its scheme, Plaintiff does not assert that this disclosure actually revealed the alleged fraud.  *See* ¶¶ 122, 130; Ex. 15.  To the contrary, even after this disclosure, Plaintiff alleges that "defendants ***continued to conceal the truth*** about the Company's unsustainable reseller scheme."  ¶¶ 96, 126; *see In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1164 (S.D. Cal. 2008) (no loss causation where the complaint contradicts allegations regarding corrective disclosure).  Stamps, in fact, explicitly stated that it still had its "revenue sharing arrangements" with "the resellers" by which it sold discounted postage to small-volume and existing USPS customers.  *See* Ex. 15, at 15.  Plaintiff further fails to plead particularized facts explaining how the announcement of the end of this contract between Stamps and the USPS demonstrates that Stamps was improperly selling discounted postage to small-volume and existing USPS customers.  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120, 1123 (9th Cir. 2013) (plaintiffs must allege that the market learned of the "very facts" previously concealed); *In re Blue Earth, Inc. Sec. Class Action Litig.*, 2015 WL 12001274, at *2 (C.D. Cal. Nov. 3, 2015) ("To be corrective, a disclosure must relate back to the misrepresentation and not to some other negative information about the

---

[12]    Plaintiffs must plead loss causation with "particularity." *Or. Pub. Emps. Ret. Fund*, 774 at 605; *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *2 (C.D. Cal. Mar. 16, 2015).

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

37

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Exhibit 12
- 265 -

company." (citation omitted)).[13]

Plaintiff likewise fails to plead particularized facts establishing that Stamps' May 8, 2019 announcement was corrective.  *See* ¶¶ 127, 130; Ex. 16.  In this announcement, Stamps revealed only that it had become aware of *"potential"* amendments, renegotiations, and terminations of NSAs *between the USPS and the third-party resellers*.  ¶ 127; *see also* Ex. 16.  Stamps did not reveal that the USPS was in fact terminating or changing its NSAs with the third-party resellers (only that it was "potential"),[14] nor did Stamps reveal that the resellers – let alone Stamps itself – had committed "actual wrongdoing."  *Loos*, 762 F.3d at 890 & n.3 ("the announcement of an investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything").  At most, the May 8 announcement revealed that the USPS was increasing its attention on certain reseller practices in the "industry as a whole," which the Ninth Circuit has held is insufficient to establish loss causation.  *Apollo*, 774 F.3d at 608 (no loss causation on basis of government report that "revealed a systemic practice of manipulative and deceptive recruitment practices within [defendant]'s industry").

In short, Plaintiff's theory of fraud was not revealed:  Stamps remains an authorized USPS PC Postage provider and is now able to partner with growing private carriers like Amazon, FedEx, UPS, and Uber; the USPS reseller program remains in effect; and Stamps' agreements with the third-party resellers by which it can sell discounted postage to small-volume and existing USPS customers continue generating revenue for Stamps.  *See* Ex. 7, at 4; Ex. 15, at 8-9, 15.  The Complaint should be dismissed for this reason as well.

---

[13]  The stock price appears to have dropped in response to the negative news reducing Stamps' expected revenue.  *See* Ex. 15, at 11; ¶ 122.

[14]  The following quarter, Stamps announced that the "potential" risk had not come to pass, and the stock price rebounded.  *See* Ex. 17, at 3; Ex. 34, at 1.

38

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

## V.   PLAINTIFF'S SECTION 20A CLAIM FAILS

Plaintiff's claim under Section 20A of the 1934 Act against McBride fails as a matter of law because Plaintiff fails to plead an underlying 10(b) violation. *In re Verifone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).[15]

The claim also fails for the independent reason that Plaintiff does not plead particularized facts establishing that McBride sold shares on the basis of material non-public information. *See In re 3Com Sec. Litig.*, 1999 WL 1039715, at *8 (N.D. Cal. July 8, 1999) (boilerplate allegation that defendants had "material adverse non-public information" is "too conclusory to give rise to liability for insider trading under Section 20A"); *Wet Seal*, 518 F. Supp. 2d at 1181; *see also In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *4 (C.D. Cal. Apr. 6, 2009) (dismissing 20A claim where the trades were executed pursuant to Rule 10b5-1 trading plans).[16]

## VI.   DISMISSAL SHOULD BE WITH PREJUDICE

Leave to amend need not be granted if amendment would be futile. The problems with the Complaint stem from a flawed theory of liability, not just a shortage of well-pled facts. Those problems cannot be cured by amendment as Stamps publicly disclosed the conduct Plaintiff claims was not disclosed, *see* Part II.B above; the USPS has never asserted any statute, regulatory, or contract breach against Stamps (indeed, senior USPS officials publicly stated that Stamps' conduct was perfectly appropriate), *see* Part II.C above; and Stamps provided ample

---

[15]   Plaintiff's Section 20(a) claim should also be dismissed because Plaintiff failed to plead a primary violation of Section 10(b). *Zucco*, 552 F.3d 981 at 990.

[16]   Plaintiff's failure to identify the sale on which it bases this claim alone requires dismissal. *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993) ("contemporaneous trading must be pleaded with particularity under Rule 9(b)"). For purposes of this Motion, Defendants assume the sale upon which the claim is based occurred on December 18, 2017 (*see* Dkt. No. 76) – the only date on which McBride sold stock and Plaintiff purportedly purchased it – and was therefore made pursuant to a Rule 10b5-1 trading plan. *See infra* at Part III.B; Ex. 8, at 6.

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

39

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Exhibit 12
- 267 -

Case 2:19-cv-01828-MWF-SK   Document 79   Filed 10/04/19   Page 49 of 49   Page ID #:318

warnings concerning potential changes or termination to its agreements with the USPS and others, *see* Parts II.D-E above.  The Complaint should be dismissed with prejudice.

Dated:  October 4, 2019       KATTEN MUCHIN ROSENMAN LLP

By:   */s/ Richard H. Zelichov*

Richard H. Zelichov
richard.zelichov@kattenlaw.com
Christina L. Costley
christina.costley@kattenlaw.com
Paul S. Yong
paul.yong@kattenlaw.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4400
Facsimile:  (310) 788-4471
*Attorneys for Stamps.com Inc., Kenneth McBride, Kyle Huebner, and Jeff Carberry*

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

40

RICHARD H. ZELICHOV (SBN 193858)
richard.zelichov@kattenlaw.com
CHRISTINA L. COSTLEY (SBN 227134)
christina.costley@kattenlaw.com
PAUL S. YONG (SBN 303164)
paul.yong@kattenlaw.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4400
Facsimile:  (310) 788-4471

*Attorneys for Stamps.com Inc., Kenneth McBride,
Kyle Huebner, and Jeff Carberry*

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>STAMPS.COM, INC., KENNETH MCBRIDE, KYLE HUEBNER, and JEFF CARBERRY,<br><br>Defendants. | Case No. 2:19-cv-01828-MWF (SK)<br><br>[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT<br><br>Judge:  Hon. Michael W. Fitzgerald<br>Courtroom:  5A<br>Date:  January 13, 2020<br>Time:  10:00 a.m. |
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Lead Plaintiff,<br><br>vs.<br><br>STAMPS.COM, INC., KENNETH McBRIDE, KYLE HUEBNER, and JEFF CARBERRY,<br><br>Defendants. | |

1

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Exhibit 12
- 269 -

The Motion to Dismiss the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") (Dkt. No. 71) (the "Motion to Dismiss") and Request for Judicial Notice and Consideration of Documents Incorporated by Reference Into the Class Action Complaint filed by Defendants Stamps.com Inc. ("Stamps"), Kenneth McBride, Kyle Huebner, and Jeff Carberry (collectively, "Defendants") were heard on January 13, 2020, before the Honorable Michael W. Fitzgerald.  Having considered all the papers and arguments in support of and in opposition to the Motion to Dismiss, as well as any pleadings, papers, records, and documentary materials on file in this action, the Court makes the following findings and orders as follows:

1.     Count One of the Complaint for violations of §10(b) of the 1934 Act and SEC Rule 10b-5 fails to state a claim upon which relief may be granted.

2.     Count Two of the Complaint for violations of §20(a) of the 1934 Act fails to state a claim upon which relief may be granted.

3.     Count Three of the Complaint for violations of §20A of the 1934 Act against Defendant McBride fails to state a claim upon which relief may be granted.

4.     Exhibits 1-34 to the Declaration of Paul S. Yong in Support of Defendants' Motion to Dismiss are incorporated by reference into the Complaint and/or are properly subject to judicial notice, and the Court will consider them in ruling on Defendants' Motion to Dismiss.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.     Defendants' Motion to Dismiss the Complaint is **GRANTED**;

2.     Defendants' Request for Judicial Notice and Consideration of Documents Incorporated by Reference is **GRANTED**; and

3.     The Complaint and all claims for relief therein are hereby **DISMISSED WITH PREJUDICE** since amendment would be futile.

**IT IS SO ORDERED.**

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Case 2:19-cv-01828-MWF-SK   Document 79-1   Filed 10/04/19   Page 3 of 3   Page ID #:821

Dated: _____    _____
HON. MICHAEL W. FITZGERALD
UNITED STATES DISTRICT JUDGE

Case 2:19-cv-01928-MWF-SK   Document 61-17   Filed 10/04/19   Page 9 of 13   Page ID
#:1039

# **Exhibit 17**

Exhibit 12
- 272 -

**FINAL**

**Bloomberg Transcript**

| | | |
|---|---|---|
| Company Name: Stamps.com | Market Cap: 801.24815092 | Bloomberg Estimates - EPS |
| Company Ticker: STMP US | Current PX: 46.27 | Current Quarter: 0.734 |
| Date: 2019-08-07 | YTD Change($): -109.37 | Current Year: 3.962 |
| Event Description: Q2 2019 Earnings Call | YTD Change(%): -70.271 | Bloomberg Estimates - Sales |
| | | Current Quarter: 120.4 |
| | | Current Year: 526.8 |

# Q2 2019 Earnings Call

## Company Participants

- Suzanne Park, Senior Director, Finance
- Ken McBride, Chairman and Chief Executive Officer
- Jeff Carberry, Chief Financial Officer

## Other Participants

- George Sutton, Analyst
- Zach Cummins, Analyst
- Kevin Liu, Analyst
- Allen Klee, Analyst
- Tyler Wood, Analyst

## Presentation

### Operator

Good day, ladies and gentlemen. Thank you for standing by, and welcome to the Stamps.com Second Quarter 2019 Financial Results. At this time, all participants are in a listen-only mode. Later, we will conduct a question-and-answer session, and instructions will follow at that time. (Operator Instructions)

I would now like to turn the conference over to your host Ms. Suzanne Park. Please go ahead.

### Suzanne Park, Senior Director, Finance

Thank you. On the call today are CEO, Ken McBride; and CFO, Jeff Carberry. The agenda for today's call is as follows: we'll review the results of our second quarter 2019; we'll provide an update on elements of our business model and partnerships; and, finally, we'll discuss our financial results and talk about our business outlook.

But first the Safe Harbor statement. Safe Harbor statement under the Private Securities Litigation Reform Act of 1995. This release includes forward-looking statements about our anticipated financial metrics and results, all of which involve risks and uncertainties. Important factors, including the company's ability to successfully integrate and realize the benefits of its past or future strategic acquisitions or investments, including the company's ability to complete and ship its products, maintain desirable economics for its products, the timing of when the company will utilize its deferred tax assets and obtain or maintain regulatory approval, which could cause actual results to differ materially from those in the forward-looking statements are detailed in filings with the Securities and Exchange Commission made from time-to-time by Stamps.com, including its Annual Report on Form 10-K for the fiscal year ended December 31, 2018, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K.

Stamps.com undertakes no obligation to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

The financial results we will discuss on the call today include non-GAAP financial measures. In the second quarter of 2019, GAAP net income was $14.0 million and GAAP net income per fully diluted share was $0.79. Our non-GAAP financial measures excludes the following second quarter items: $9.8 million of non-cash stock-based compensation,

Exhibit 12
Page 1 of 12
- 273 -

Ex. 17, at 1

| Company Name: Stamps.com | Market Cap: 801.24815092 | Bloomberg Estimates - EPS |
| Company Ticker: STMP US | Current PX: 46.27 | Current Quarter: 0.734 |
| Date: 2019-08-07 | YTD Change($): -109.37 | Current Year: 3.962 |
| Event Description: Q2 2019 Earnings Call | YTD Change(%): -70.271 | Bloomberg Estimates - Sales |
| | | Current Quarter: 120.4 |
| | | Current Year: 526.8 |

and $5.6 million of non-cash amortization expense of acquired intangibles and debt issuance costs. Our non-GAAP financial measures include $7.2 million of additional non-GAAP income tax expense in the second quarter. Our mailing and shipping numbers include service revenue, product revenue and insurance revenue and do not include any revenue from customize postage. Please see our second quarter 2019 earnings release and 2019 metrics posted on our Investor website for a reconciliation of our non-GAAP financial measures to the corresponding GAAP measures.

Now, let me hand the call over to Ken.

## Ken McBride, Chairman and Chief Executive Officer

Thanks, Suzanne. Thank you for joining us today. Today, we announced our second quarter results, which included GAAP revenue of $138.8 million, that was down 1% year-over-year; the non-GAAP adjusted EBITDA of $39.3 million, down 38% year-over-year. During the second quarter, we continued to make progress in the efforts to diversify from a domestic single carrier business model to a global multicarrier business model. We continued to work proactively with the USPS to drive value for our customers as the USPS remains a very important carrier partner for us. We also continued to make strides in our diversification of our carrier relationships with international posts, including Royal Mail, French Post, Australia -- Austria Post, non-traditional carriers with our Global Advantage Program. Our financial results for the second quarter were in line with our expectations in light of our new strategic direction.

Now, I'd like to spend a bit of time discussing some of the most recent changes in the shipping industry. The shipping industry continues to change rapidly. The announcements we've seen recently from both shipping industry incumbents as well as other newer entrants into the carrier market highlight the pace of change in the market, which has continued to accelerate.

UPS recently made some very meaningful announcements. They announced that they'll be adding Sunday pickup and delivery in order to move to a seven-day delivery starting in January of 2020. They also announced the addition of 12,000 new pickup and drop-off points for packages in partnership with CBS, Michaels and Advance Auto Parts. That dramatically expands their already broad reach. UPS also continues to add more automation to its ground sort centers and to increase its airlift capacity with 44 new wide-body jets by 2022.

Likewise, FedEx has made several significant announcements and continues to rapidly evolve its business model to more squarely focused on e-commerce. In June, FedEx announced the termination of its air shipping contract with Amazon. Earlier this morning announced, it was ending its ground network relationship as well which have stated will allow it to focus more clearly on serving the broad e-commerce market. FedEx also announced that it plans to in-source the balance of its low-cost smart post business that traditionally utilized the USPS for last-mile delivery with the goal of increasing its ability to meet the demands of e-commerce shippers and online shoppers.

FedEx also recently announced the addition of 8,000 pickup and drop-off points inside Dollar General stores by 2020. They recently just stated that their goal was to be the low-cost producer in the e-commerce space for residential deliveries, which of course positions them directly in competition with the USPS's traditional area of strength. The non-traditional carriers and logistics providers continue to evolve and create new and exciting changes in the e-commerce shipping industry. Amazon continues to expand its shipping and logistics capabilities with the recent announcement of one-day prime service, further expansion of its air shipping network, and investments in newer technologies like electric vehicles to improve the economics of its shipping operations.

eBay and Shopify both recently announced new fulfillment services that will launch in the US this year and next year and a significant number of new entrants such as Uber, Postmates and Deliv continue to make progress on their businesses focused on same-day delivery. The shipping industry is showing itself to be extraordinarily dynamic. We see ourselves as very strong driver of value to both traditional and non-traditional carriers and logistics providers. Let me now provide an update on the latest developments in the USPS reseller area. As a refresher for everyone, resellers have what are called negotiated service agreements or NSAs, which are customized negotiated contracts between the Postal Service and an individual customer or a reseller, which provides discounted rates that can vary based on each agreement.

Exhibit 12
Page 2 of 12
- 274 -

Ex. 17, at 2

Case 2:19-cv-01828-MWF-SK   Document 125-12   Filed 07/01/20   Page 57 of 66   Page ID #:13063



Company Name: Stamps.com
Company Ticker: STMP US
Date: 2019-08-07
Event Description: Q2 2019 Earnings Call

Market Cap: 801.24815092
Current PX: 46.27
YTD Change($): -109.37
YTD Change(%): -70.271

Bloomberg Estimates - EPS
Current Quarter: 0.734
Current Year: 3.962
Bloomberg Estimates - Sales
Current Quarter: 120.4
Current Year: 526.8

Companies with reseller NSAs come in many forms from companies that are primarily in the business of being resellers to marketplaces like Amazon, eBay and Etsy to third-party logistics providers like fulfillment houses. Each reseller's NSA allows a reseller partner to buy postage for shipping a package at one rate from the USPS and then to resell that postage to customers at a higher rate and it's precisely those margins that have created a deep and robust ecosystem of e-commerce companies and partnerships fueling innovation. We're aware of approximately 125 e-commerce marketplaces, software tools, small business software solutions, order and management fulfillment solutions, multi-carrier software solutions and other shipping solutions that in some way participate in a portion of the margins created by these USPS reseller NSAs.

The benefits of this innovative, deep and robust ecosystem have in our opinion largely accrue to the USPS and have driven USPS to be the market leader and the e-commerce-related shipping with phenomenal growth. Over the past 10 years, the USPS has seen a 21% compound growth rate for their total shipping volume through their PC Postage and their reseller partnerships. We discussed at length last quarter, the negotiation that the USPS has initiated with certain seller partners of ours. While these are ongoing negotiations with uncertain outcomes, we have limited visibility given that the negotiations are being conducted solely between the USPS and the resellers. We like to provide our investors with our current understanding of the status of those negotiations. Since our last earnings call, we've seen a positive shift in the USPS's negotiating position with respect to its reseller partners. Back in April, the USPS told some of the resellers that their economics would be decreasing starting in June of 2019. Recently however, the USPS extended the NSAs of some of our reseller partners at their current margins through the end of 2019.

The USPS has also recently engaged in more productive conversations that seem to recognize the value that resellers bring to the post office. It remains our understanding that the USPS intends to decrease margins for resellers in 2020, but we believe that the latest collaborative conversations are a positive sign. While we continue to disagree with the USPS's strategy of reducing the incentive structures for programs that have driven strong growth over the past 10 years, we're encouraged by the recent positive shift in the USPS's apparent approach to this negotiation. We hope that as discussions continue regarding the complex and rapidly evolving e-commerce ecosystem, the USPS becomes less focused on cutting costs more focused on growing its package business and supporting its very important e-commerce technology partners.

Our goal is to position this company for the best long-term outcome as all of these trends play out and to continue to diversify our business. We have amassed a significant number of assets and world wide e-commerce shipping that have put us in a great position to succeed as all of these rapidly changing global shipping trends unfold. Worldwide the volume of shipping done by our customers is over $11 billion. We're currently the largest shipping partner of the USPS with 5.5 billion in packages that we generate for the USPS representing over 35% of their US domestic priority mail packages. We're also -- we also have significant strength in our partnership network worldwide with over 450 partnerships where our solutions are embedded into or integrated with those partner software solutions.

We have the market-leading e-commerce multi-carrier software solutions with ShipStation, ShippingEasy and ShipWorks. We've built a US sales force that is over 100 strong and they're all highly knowledgeable in shipping logistics software and technology. We have significant external -- internal expertise in marketing where we spend more than $65 million per year. We have significant technology resources, customer onboarding capabilities, account management and customer support and our acquisition of MetaPack has also positioned us to take our multi-carrier strategy worldwide.

Following the business model changes that we announced in February, we have had multiple very productive discussions with traditional and non-traditional carriers both domestic and international regarding new and enhanced relationships. These discussions have been very positive. They recognize the strong value proposition we provide driven by the strength of our multicarrier properties, the level and number of our partnerships and integration the size and strength of our national sales force and the scales and success of our marketing programs. Overall, we've built an extraordinary company with incredible assets and amazing workforce. We're exceptionally well positioned to continue to drive our organization in this new direction. We're confident we will become a global leader in multicarrier e-commerce shipping.

Exhibit 12
Page 3 of 12
- 275 -

Ex. 17, at 3

| | |
|---|---|
| Company Name: Stamps.com | Market Cap: 801.24815092 | Bloomberg Estimates - EPS |
| Company Ticker: STMP US | Current PX: 46.27 | Current Quarter: 0.734 |
| Date: 2019-08-07 | YTD Change($): -109.37 | Current Year: 3.962 |
| Event Description: Q2 2019 Earnings Call | YTD Change(%): -70.271 | Bloomberg Estimates - Sales |
| | | Current Quarter: 120.4 |
| | | Current Year: 526.8 |

With that, now, I will turn the call over to Jeff.

## Jeff Carberry, Chief Financial Officer

Thanks Ken. We'll now review our second quarter 2019 financial results. The discussion of our financial results today, include non-GAAP financial measures. As Suzanne described a reconciliation of non-GAAP financial measures to the corresponding GAAP measures can be found in our earnings release, in our 2019 metrics on our investor website. Total revenue was $138.8 million. In Q2 that was down 1% year-over-year versus Q2 of 2018. Total revenue excluding MetaPack was $126.3 million in Q2 and that was down 10% year-over-year versus Q2 of 2018. The decrease in revenue in the second quarter was driven by the elimination of the USPS commission revenue offset by the inclusion of MetaPack revenue and by growth in our global managed program. Mailing and Shipping revenue was $135.6 million in Q2 and that was up 1% year-over-year versus Q2 of 2018. Mailing and Shipping revenue excluding MetaPack was $123.2 million in Q2 and that was down 8% year-over-year versus Q2 of 2018. The growth in total Mailing and Shipping revenue was driven by the inclusion of MetaPack revenue and growth in our Global Advantage Program and was offset by the elimination of the USPS commission revenue.

We estimate that revenue derived from our shipping customers was approximately flat year-over-year and as a percentage of total revenue in Q2, was in the high 70% range. We estimate that revenue derived from our shipping customers in Q2 excluding MetaPack declined year-over-year at a low-double-digit rate and as a percentage of total revenue was in the high 60% range. We estimate that our Mailing and Shipping revenue derived from our several mailers, as a percentage of total revenue was in the high-teens and grew year-over-year at a low single-digit rate. Mailing and Shipping gross margin was 75.3% in Q2 versus 81.9% in Q2 of 2018. The decrease in gross margins was primarily attributable to the elimination of USPS commission revenue. It also was negatively impacted by our continued increase of our international offerings including our Global Advantage Program.

These programs tend to have a lower gross margin profile than our other service fee revenue components. The gross margins were also negatively impacted by the inclusion of MetaPack which under US, GAAP generated gross margin of approximately 65% in Q2. We had a year-over-year increase in our Q2 operating cost including sales and marketing, R&D and G&A primarily related to strategic investments to support the strong growth and innovation in our Mailing and Shipping business and due to the inclusion of MetaPack. Non-GAAP operating income was $37.8 million in Q2 and that was down 39% year-over-year versus Q2 of 2018. Adjusted EBITDA was $39.3 million in Q2 and that was down 38% year-over-year versus Q2 of 2018. Adjusted EBITDA margin was 28.3% in Q2 versus 45.6% in Q2 of 2018.

The decreases in adjusted non-GAAP operating income, adjusted EBITDA and adjusted EBITDA margin were primarily attributable to the following: the elimination of USPS commission revenue; lower gross margins associated with the scaling of our international offerings; higher operating expenses associated with our shipping-related investments; and the inclusion of MetaPack which has again lower gross and EBITDA margins. Non-GAAP adjusted income for fully diluted share was $1.25 in Q2 based on a non-GAAP tax expense rate of 40% and that was down 54% year-over-year versus $2.75 per share in Q2 of 2018, based on a non-GAAP tax expense rate of 16%. Fully diluted shares used in the EPS calculation was 17.8 million for Q2 and 18.9 million for Q2 of 2018. Let's now discuss our customer metrics. Our total paid customer metric was 742,000, our churn rate was 3.4% and our ARPU was $60.96 for the second quarter. Paid customers were up 1% year-over-year, churn was up 0.2% year-over-year, but broadly in line with the churn we've seen over the past several quarters. And ARPU was flat year-over-year.

As we discussed last quarter a segment of our higher volume customers continue to receive our technology solution without our customary monthly service fee which with the elimination of our USPS commission revenue results in some of those customers being excluded from our paid customer count. The exclusion of those customers from our paid customer count, accordingly impacts our paid customer metric, churn metric and ARPU metric.

Additionally, our ARPU metric benefited from the inclusion of MetaPack revenue in our financials this quarter and also benefited from growth in our Global Advantage Program. Total second quarter USPS postage printed was $1.6 billion,



Exhibit 12
Page 4 of 12
- 276 -

Ex. 17, at 4

Bloomberg

FINAL

Company Name: Stamps.com
Company Ticker: STMP US
Date: 2019-08-07
Event Description: Q2 2019 Earnings Call

Market Cap: 801.24815092
Current PX: 46.27
YTD Change($): -109.37
YTD Change(%): -70.271

Bloomberg Estimates - EPS
Current Quarter: 0.734
Current Year: 3.962
Bloomberg Estimates - Sales
Current Quarter: 120.4
Current Year: 526.8

and that was up 4% versus the second quarter of 2018. Total USPS postage printed that metric includes both higher growth per shipping volume and traditional non-package volume, related to mail which continues to see a steady decline. Let's now discuss our cash, debt and uses of cash. We ended Q2 with $110 million in cash and investments, which was down $1 million from $111 million at the end of Q1. The decrease in cash and investments was primarily driven by the following: share repurchases, changes in net working capital and a scheduled debt repayment and was partially offset by strong operating cash flow.

During Q2, we made a required principal repayment of $2.6 million resulting in total debt under the credit agreement excluding debt issuance cost of $56.2 million. During Q2, the company repurchased approximately 296,000 shares, at a total cost of approximately $20 million. On March 8 2019, our board approved a $60 million share repurchase plan, which is scheduled to expire in September of 2019. On May 1 2019, the Board of Directors adjusted the repurchase parameters of the plan as discussed last quarter. And on July 29 of this year, the Board of Directors approved an extension of the current plan through February 2020 from its prior expiration in September of this year. To date, approximately 30 million has been purchased under that plan.

Now turning to guidance, as Ken discussed today, USPS negotiations with our reseller partners are ongoing and we have limited visibility into those negotiations. It is our understanding that some of our reseller partners have received extensions of their current agreements through the end of 2018 while others have not yet received extensions. And these margins could decline in the second half of 2019 We have therefore refined our guidance to reflect our current understanding of the contract margins of our reseller partners for this year. We expect fiscal 2019 revenue to be in the range of $520 million to $560 million, which compares to our previous guidance of $510 million to $560 million. With the elimination of USPS commission revenue and the expected decrease in revenues earned through some reseller revenue sharing arrangements, our shipping-related revenue is expected to continue to decline year-over-year.

We expect mailing and shipping revenue derived from our SOHO mailers will be approximately flat year-over-year. And we expect our customized postage revenue to be down between 30% and 40% year-over-year. We expect operating expenses to increase in 2019, reflecting the strategic investments we made in 2018 and the additional investments we anticipate continuing to make in 2019 as well as the inclusion of MetaPack in our financials. We expect fiscal 2019 adjusted EBITDA to be in the range of $120 million to $150 million, which compares to previous guidance of $110 million to $150 million. Our revised guidance implies a full year adjusted EBITDA margin in the low to mid-20% range, based on all of the aforementioned factors affecting our business.

Our margin guidance again reflects the inclusion of MetaPack in our financials. The inclusion of headcount expense increases, the elimination of USPS commission revenue had an expected decrease in revenue earned through reseller revenue sharing arrangements. We expect non-GAAP tax expense will be approximately 40% of non-GAAP pre-tax income for 2019, which remains unchanged from our previous estimates. Our full year 2019 effective tax rate could differ from our current estimates based on a number of factors. We expect fully diluted shares to be between $17.6 million and $18.7 million in 2019, which compares to our previous estimate of $17.6 million and $18.4 million. We expect fiscal 2019 non-GAAP adjusted income per fully diluted share to be in the range between $3.60 and $4.85, which compares to our previous estimate of $3.35 to $4.85.

With our increased focus on shipping, our financial metrics would ordinarily exhibit seasonality reflective of the customer shipping usage during the year. However, we would not necessarily expect that trend to continue this year to the same degree with a negative financial impact associated with the elimination of the USPS commission revenue and reduction of reseller-related partner revenue shares with the latter of that now to a lesser degree even in our previous guidance due to some of our reseller partners received extensions. In particular, we expect second half revenue and adjusted EBITDA to be particularly negatively impacted.

And, finally, we continue to expect capital expenditures to be approximately $2 million to $4 million in 2019. Although, we do not provide guidance beyond 2019, the current USPS proposals as we currently understand them at least, could also result in meaningful reductions in margins earned by resellers in 2020 and 2021. This in turn could have a significant impact on our revenues and earnings in those years. And while we do not know what ultimately will become of the USPS's proposed changes, it does not alter our long-term global multicarrier business strategies, which

Bloomberg Transcript

Exhibit 12
Page 5 of 12
- 277 -

Bloomberg

FINAL

Company Name: Stamps.com
Company Ticker: STMP US
Date: 2019-08-07
Event Description: Q2 2019 Earnings Call

Market Cap: 801.24815092
Current PX: 46.27
YTD Change($): -109.37
YTD Change(%): -70.271

Bloomberg Estimates - EPS
Current Quarter: 0.734
Current Year: 3.962
Bloomberg Estimates - Sales
Current Quarter: 120.4
Current Year: 526.8

Bloomberg Transcript

we be believe will be successful.

And with that, we'll open up the call for questions.

# Questions And Answers

## Operator

(Operator Instructions) Your first question comes from the line of George Sutton with Craig-Hallum. Your line is open.

## George Sutton, Analyst

Thank you. I appreciate your -- I would call relative enthusiasm with respect to some of the reseller negotiations as you understand them. I'm curious if you can compartmentalize those in terms of timeframe. Are you specifically referring to what people are hearing relative to 2019, or is that some indication relative to the speed at, which some of these changes might make and therefore affect 2020?

## Ken McBride, Chairman and Chief Executive Officer

Well, I mean I think just in general we've -- based on what we've heard, of course, we're not -- again we're not a part of the negotiation, but there's been -- I think initially in April it was -- largely what came down was very concrete and clear and the reseller economics were going to be decreasing. The NSAs were terminated and starting in June of 2019, the economics would be decreasing.

And so what happened was some discussions ensued. We believe some partners came forward and perhaps there was just more digging into the area, it's a very complicated area. And so the conversation shifted. The tenor of the USPS seemed to change. The June 2019 decrease was removed for at least some of the resellers. And we believe some of the other resellers are still in conversations. And so the conversation around 2020 to our knowledge has not really changed at this point, but I think the general change in attitude and the tenor gives us hope that the collaborative conversations are a positive sign that perhaps that will be looked at as well.

## George Sutton, Analyst

Okay. That's helpful. So it's been six months effectively since the commission program was terminated with the US Postal Service. And your thought at that point was we now can pursue opportunities with other growing carriers. Obviously there has been a tremendous amount of moves made since then. I'm wondering if you can characterize your relative position in this game of musical chairs versus what you might have anticipated six months ago.

## Ken McBride, Chairman and Chief Executive Officer

Yeah, I mean I don't think we thought the changes we were making were going to be simple or easy or were going to immediately result in some massive change in terms of our carrier partnerships. The carriers we're talking to -- it's a complicated space of course and some of them are very large organizations and it takes time for large organizations to examine their strategies.

I think starting in February when we came out with our announcements certainly the conversations took a step up across the board with carriers both domestically and internationally. And I think there was a clear recognition that given the assets that we built that we would be a very strong player to add to your team if we get behind your organization and your -- and driving your carrier revenues.

Exhibit 12
Page 6 of 12
- 278 -

Bloomberg
Ex. 17, at 6

Case 2:19-cv-01828-MWF-SK   Document 51-17   Filed 10/04/19   Page 9 of 13   Page ID #:1046



**FINAL**

**Bloomberg Transcript**

Company Name: Stamps.com     Market Cap: 801.24815092     Bloomberg Estimates - EPS

Company Ticker: STMP US     Current PX: 46.27     Current Quarter: 0.734

Date: 2019-08-07     YTD Change($): -109.37     Current Year: 3.962

Event Description: Q2 2019 Earnings Call     YTD Change(%): -70.271     Bloomberg Estimates - Sales

    Current Quarter: 120.4

    Current Year: 526.8

So the conversations really increased dramatically in February. The conversations have continued to be very active. I think we're hopeful that we'll have more to discuss in the coming months around some concrete changes. But I don't think we ever thought that this would be something that would happen very quickly in terms of the changes in the new partnerships.

### George Sutton, Analyst

Last question, if I could. You have a very strong sales force. You have a lot of integrations in the e-commerce space. I'm curious, if you could just update us on sort of sales force retention and integration. If you want to call it retention or any changes that might have occurred there again relative to say six months ago.

### Ken McBride, Chairman and Chief Executive Officer

Yeah, it's been -- I mean I think in terms of our sales team, we've continued down the same path that we would have otherwise done without the -- with the commission still in place this year. We continue to drive the USPS's business. We continue to gain new customers. Our commission plans haven't changed and overall we haven't seen any change in terms of our retention of the sales personnel since the changes were made.

I think they're all excited about the opportunity to potentially broaden their portfolio of solutions they can offer to customers beyond just the USPS. I think they're waiting to hear what the new direction is and we're -- as our conversations are progressing with the carriers we're keeping them in the loop, but also hopeful that soon perhaps the second half of this year if not early next year we'll be able to alter their path and their direction and really get them focused on driving revenue for additional carriers.

### George Sutton, Analyst

Thank you very much. Appreciate it.

### Operator

Your next question comes from the line of Zach Cummins with B. Riley FBR. Your line is open.

### Zach Cummins, Analyst

Hi. Good afternoon. Thanks for taking my questions. In terms of the reseller contracts that were extended to the end of 2019 are these back up for renegotiation, again, right there at the beginning of 2020? Just sort of any incremental color around that would be helpful.

### Jeff Carberry, Chief Financial Officer

Yes, Zach. So the contracts are currently being negotiated. The resellers received -- some of the resellers received an extension under their current margin through the end of the year. That simply creates additional runway for those negotiations to happen. So it's still our understanding that those reseller contracts will continue, but will continue at lower margins in the coming years. But to answer your question, the negotiations are ongoing between the resellers and the USPS to our understanding.

### Zach Cummins, Analyst

**Bloomberg**

Exhibit 12

- 279 -

Ex. 17, at 7

| Company Name: Stamps.com | Market Cap: 801.24815092 | Bloomberg Estimates - EPS |
| Company Ticker: STMP US | Current PX: 46.27 | Current Quarter: 0.734 |
| Date: 2019-08-07 | YTD Change($): -109.37 | Current Year: 3.962 |
| Event Description: Q2 2019 Earnings Call | YTD Change(%): -70.271 | Bloomberg Estimates - Sales |
| | | Current Quarter: 120.4 |
| | | Current Year: 526.8 |

Understood. That's helpful. And then, I guess, in terms of the high-volume customers that are not being currently charged to use your software, what's going to be your approach with them at this standpoint? Is it a matter of looking for other ways to monetize that down the road? Just kind of curious as to your approach to that customer set.

## Ken McBride, Chairman and Chief Executive Officer

Yes. I think we talked about potentially adding a surcharge, when we're looking at really a small segment of our customers that are on these high-volume negotiated service agreements so that -- and where we aren't, we haven't been traditionally charging a fee, because of the commission agreement where the USPS was really picking up the fee -- the cost of serving those customers.

We had conversations -- we have had conversations with those customers. We've discussed adding a surcharge to their solutions. They understand the reasoning behind that. Of course, the alternative carriers UPS and FedEx do not charge for their solutions, so that certainly has been a factor in making sure that we move slowly and cautiously about how we approach it.

We don't want to lose the customers, particularly as we're looking at potentially monetizing them through new relationships with other carriers. We have -- in some selected cases, we have charged -- we have begun charging service commission -- a surcharge to customers. But by and large, we've been cautious in our approach in that area.

## Zach Cummins, Analyst

Understood. And then, I guess, just final question. I don't know if you've ever divulged this, but could you give us any sort of indication as to the number of reseller partners, or anything along those lines? And it sounds like based on your commentary that some of the agreements have been terminated, while others are still in ongoing negotiation. Just any sort of incremental color would be helpful.

## Ken McBride, Chairman and Chief Executive Officer

Yes. And I think broadly there's -- I think we counted at one point some time back and there's north of 20 different companies out there that have some form of reseller agreement with the USPS from some of the marketplaces we mentioned like Amazon and Etsy to some of the fulfillment houses that have the ability to resell at a higher margin.

And then, what we would call the traditional resellers really the ones that are -- primarily have been in the business of driving the USPS business through activities like business development and through sales kind of call those maybe more the pure play resellers.

There's really three large ones and the conversations that we're aware of have primarily been focused on those three organizations. So when you look at the shift in the conversations we're really talking about, primarily those three conversations.

## Zach Cummins, Analyst

Understood. That's helpful. Well, thank you again for taking my questions and best of luck in the second half of the year.

## Ken McBride, Chairman and Chief Executive Officer

Thank you, Zach.

Exhibit 12
Page 8 of 12
- 280 -

FINAL

| | | |
|---|---|---|
| Company Name: Stamps.com | Market Cap: 801.24815092 | Bloomberg Estimates - EPS |
| Company Ticker: STMP US | Current PX: 46.27 | Current Quarter: 0.734 |
| Date: 2019-08-07 | YTD Change($): -109.37 | Current Year: 3.962 |
| Event Description: Q2 2019 Earnings Call | YTD Change(%): -70.271 | Bloomberg Estimates - Sales |
| | | Current Quarter: 120.4 |
| | | Current Year: 526.8 |

## Operator

Your next question comes from the line of Kevin Liu with K. Liu & Company. Your line is open.

## Kevin Liu, Analyst

Hi. Good afternoon. First question for me. Just in terms of some of the new NSAs that are being approved by the USPS, has your ability to pursue those changed at all since you guys kind of moved away strategically? And just generally, I would be curious if you could kind of update us on what sort of run rates you have for those NSAs versus things like eVS and other alternatives that those customers could use?

## Ken McBride, Chairman and Chief Executive Officer

I mean, NSAs, I guess, there's multiple flavors of NSA. We talked about NSAs in our business or customers within those agreements are directly between the USPS and the customer. And I think we saw with some of the changes in the Board of Governors and some of the other areas of the USPS and some new board members came on board, we saw some clear slowdown in the approval of the NSA. I think we've seen some improvement in that area for customer NSAs. So I don't know if I answered your question. Perhaps, there's -- if I haven't, you can ask some follow-ups.

## Kevin Liu, Analyst

Yes. Just a follow-up to that would be, as these NSAs are being approved, historically, it seems like you guys would be kind of in the pole position to take those. Are you guys adding NSA volumes still with some of these new approvals, or do you think that's going to other alternatives like eVS or other PC Postage providers?

## Ken McBride, Chairman and Chief Executive Officer

No, I think the vast majority of those are still coming to us in terms of the customer relationships. We're by and large the PC Postage industry. We haven't really seen any significant customer defections to other alternatives out there. And we really haven't seen an uptick in eVS adoptions on the behalf of customers. So, it's really by and large still coming to stamps.com and its properties.

## Kevin Liu, Analyst

That's great to hear. And then your paid customer count was up nicely on a sequential basis as well as year-over-year. I'm just curious if you could talk about if there are any particular marketing channels or maybe specific brands within your portfolio of products that are driving most of that growth today.

## Jeff Carberry, Chief Financial Officer

Yes. Good question Kevin. So, as you know with us we take a portfolio approach to marketing and we're highly innovative and experimental in testing new things. So, generally what we find is that in any given quarter it's generally more of a mixed bag of things that are working better than they were previously and other things that may not be working as well.

There's nothing I would particularly point to at this quarter that I can say drove a lot of that change. I will say that we're having good success in TV and radio and we continue to experiment in those two channels.

Bloomberg Transcript

Exhibit 12

- 281 -

Ex. 17, at 9

Case 2:19-cv-01828-MWF-SK    Document 81-17    Filed 10/04/19    Page 11 of 13    Page ID
#:10490

**Company Name:** Stamps.com
**Company Ticker:** STMP US
**Date:** 2019-08-07
**Event Description:** Q2 2019 Earnings Call

Market Cap: 801.24815092
**Current PX:** 46.27
**YTD Change($):** -109.37
**YTD Change(%):** -70.271

**Bloomberg Estimates - EPS**
Current Quarter: 0.734
Current Year: 3.962
**Bloomberg Estimates - Sales**
Current Quarter: 120.4
Current Year: 526.8

## Kevin Liu, Analyst

Got it. And then just lastly for me. You talk about your international expansion opportunity and you're in discussions with some of the carriers out there. Are these -- do these tend to be more of the private carriers, or are you in talks with some of the national postal services that are out there?

## Ken McBride, Chairman and Chief Executive Officer

We're both. I think we're in conversations with the -- there's -- obviously there's a lot of carriers when you talk about international. There's a lot of smaller carriers, there's larger national post and we're having conversations with all of them. We do have -- when you talk about carriers worldwide, we do have existing agreements with many carriers and we continue to have conversations as we move more into the international arena with both ShipStation and also MetaPack. Those conversations have accelerated and we're very encouraged by the openness of some of the carriers out there to potentially share the economics with both ShipStation as well as MetaPack.

## Kevin Liu, Analyst

Great. Thanks for taking the questions.

## Jeff Carberry, Chief Financial Officer

Thanks, Kevin.

## Ken McBride, Chairman and Chief Executive Officer

Thanks, Kevin.

## Operator

(Operator Instructions) Your next question comes from the line of Allen Klee with Maxim Group. Your line is open.

## Allen Klee, Analyst

Yes, hi. Just following up also on USPS resellers. I just wanted to make sure I understand. Of the three major ones, you said that it's been postponed for some, but is it true then for one or two of them that they actually did cut rates and that you're now in your new guidance you're taking into account that you're actually getting paid at a lower rate?

## Ken McBride, Chairman and Chief Executive Officer

The answer is amongst the three they're -- they either definitively delayed any cuts to the end of the year and continued in conversations that like we characterized have been positive or they're still in conversations around potential changes they might make. So at this point, we're assuming I think within our guidance to be conservative that the ones that haven't received the definitive new agreement that postpones those rate cuts that we're assuming that the rate cuts happen for purposes of guidance. But the conversations to our knowledge have continued and the conversations are all very positive.

Exhibit 12
Page 10 of 12
- 282 -

Ex. 17, at 10

Case 2:19-cv-01828-MWF-SK   Document 125-12   Filed 07/01/20   Page 65 of 66   Page
ID #:10901

Case 2:19-cv-01828-MWF-SK   Document 81-17   Filed 10/04/19   Page 12 of 13   Page ID
#:1098

| | | |
|---|---|---|
| Company Name: Stamps.com | Market Cap: 801.24815092 | Bloomberg Estimates - EPS |
| Company Ticker: STMP US | Current PX: 46.27 | Current Quarter: 0.734 |
| Date: 2019-08-07 | YTD Change($): -109.37 | Current Year: 3.962 |
| Event Description: Q2 2019 Earnings Call | YTD Change(%): -70.271 | Bloomberg Estimates - Sales |
| | | Current Quarter: 120.4 |
| | | Current Year: 526.8 |



## Allen Klee, Analyst

Okay. Thank you. And then for potentially winning business with a large US carrier or the likes of something like Amazon, you commented in your presentation how these negotiations have gone on and -- positively. But what do you think needs to happen on your side or their side to make one of those deals happen?

## Ken McBride, Chairman and Chief Executive Officer

Well, I think part of it is just the complexity of a new partnership the likes of which has never been done with some of these larger carriers to the extent that our businesses has such a significant footprint in e-commerce and the multicarrier properties we have and the approach we take into the market, the position in small business, the sales team.

There's a lot of complexity around how do you work together across the Board? How do you have the sales teams coordinate? How do you work to on board customers? How do you potentially migrate existing customers onto new solutions? There's just a lot of complexity around how things work. I mean our agreement with USPS was 10 years in the making and was very complicated. And likewise, I think the larger organizations we're talking to have a large footprint. And our large footprint in e-commerce trying to meld those two together in a way that works for both organizations is really kind of what needs to happen.

## Allen Klee, Analyst

Okay. Recently Alibaba made an announcement they were opening up their marketplaces to US small businesses to go on and I believe ShipStation is partnered with them in that. How do you think about this as a -- if you were going to size such an opportunity, do you think this could be -- this is something that could be pretty significant?

## Ken McBride, Chairman and Chief Executive Officer

Yes. I mean, we're very excited about that. I mean, I think the Alibaba integration is early. We just did it. We just announced it, but we integrated between Alibaba. And as they've opened up their -- not just allowing the purchases of small business, but now allowing the sales of small businesses in the US I think to my knowledge their first integration was with ShipStation really ShipEngine. And so I think our philosophy has always been to go out there and do partnerships rapidly and aggressively. And as a result, we have over 200 sales channels and various partnerships just in the ShipStation property. And so Alibaba is yet another one of those. We're excited about that opportunity for sure. And like I said, it's early but everybody knows the size of Alibaba and the potential volume they could drive as they move into the market.

## Allen Klee, Analyst

Great. Thank you so much.

## Operator

Your final question comes from the line of Tim Klasell with Northland Securities. Your line is open.

## Ken McBride, Chairman and Chief Executive Officer

Hey, Tim.

Bloomberg

Exhibit 12
Page 11 of 12
- 283 -

Ex. 17, at 11

FINAL

**Company Name:** Stamps.com
**Company Ticker:** STMP US
**Date:** 2019-08-07
**Event Description:** Q2 2019 Earnings Call
**Market Cap:** 801.24815092
**Current PX:** 46.27
**YTD Change($):** -109.37
**YTD Change(%):** -70.271
**Bloomberg Estimates - EPS**
**Current Quarter:** 0.734
**Current Year:** 3.962
**Bloomberg Estimates - Sales**
**Current Quarter:** 120.4
**Current Year:** 526.8

## Tyler Wood, Analyst

Hey. This is Tyler Wood on for Tim actually. Thanks for taking our question. As we think about source of growth going forward under the new strategy, is there any specific numbers you can put on growth rates for the shipping software fees and also the international side of the business? Thanks.

## Jeff Carberry, Chief Financial Officer

Yes, Tyler. I think broadly what we're looking at from a global perspective is ever increasing percentages of dollars going through e-commerce and those broader e-commerce trends correlating with our business. Now ultimately growth rates will be a function of when revenue structures stabilize and anniversary with other carriers both domestically and internationally for us. So I think it's premature to say when and what those numbers will look like. But I think the broad strokes are that we are effectively monetizing transactions and therefore you would see a strong correlation with broader e-commerce trends both domestically and internationally in terms of our future business.

## Tyler Wood, Analyst

Thank you.

## Jeff Carberry, Chief Financial Officer

Thank you.

## Operator

There are no further questions at this time. I will now turn the call back over to Ken McBride.

## Ken McBride, Chairman and Chief Executive Officer

Thank you for joining us. So as always, if you have questions follow-up we're available anytime at our Investor Relations hotline (310) 482-5830. Thank you very much.

## Operator

This concludes today's teleconference. You may now disconnect.

*This transcript may not be 100 percent accurate and may contain misspellings and other inaccuracies. This transcript is provided "as is", without express or implied warranties of any kind. Bloomberg retains all rights to this transcript and provides it solely for your personal, non-commercial use. Bloomberg, its suppliers and third-party agents shall have no liability for errors in this transcript or for lost profits, losses, or direct, indirect, incidental, consequential, special or punitive damages in connection with the furnishing, performance or use of such transcript. Neither the information nor any opinion expressed in this transcript constitutes a solicitation of the purchase or sale of securities or commodities. Any opinion expressed in the transcript does not necessarily reflect the views of Bloomberg LP.*

*© COPYRIGHT 2019, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.*

Bloomberg Transcript

Exhibit 12
Page 12 of 12
- 284 -
Ex. 17, at 12