# Exhibit 16



**Testimony of Chairman Ruth Y. Goldway**
**Postal Regulatory Commission**
**Before the U.S. House of Representatives Committee on Oversight**
**And Government Reform Subcommittee on Federal Workforce,**
**Postal Service and the District of Columbia**
**10 a.m., November 5, 2009**

Chairman Lynch, Ranking Member Chaffetz and members of the Subcommittee, thank you for the opportunity to testify.  I am pleased to represent the Commission to discuss the Postal Service's progress in implementing new flexibilities provided to it under the Postal Accountability and Enhancement Act (PAEA) of 2006.

As the Committee suggests in the title to this hearing, the Postal Service is "more than stamps."  It is a government agency that connects together every American household, business and institution through its universal service network.  It is an economic engine for a several hundred billion dollar industry that employs nearly 8 million people.  The Postal Service is literally part of the fabric of the nation, supporting its educational, political and charitable traditions.

To individual Americans, the Postal Service is a part of daily life taken for granted until taken away.  The regular visit of a letter carrier and the convenience of a local post office are of tremendous value to the customers and communities they serve.  The Postal Service represents to a disparate nation that its government is always there, able to assist and interact with citizens each day.

The Congress reaffirmed these historic functions in enacting the PAEA while it established a new framework for a self-sustaining Postal Service that was capable of competing in the 21st century marketplace.  The focus of this hearing is on whether the current Postal Service revenue generation efforts enabled by the PAEA can add enough value in a changing economy to fund its widely acknowledged mission.  To the extent that other revenue generation schemes employed by postal administrations around the

Exhibit 16

- 37 -

world may have applicability in the United States, they must also conform to this core mission.

Although the PAEA allows the Postal Service to make a profit, it imposes clear obligations.  The Postal Service must provide universal service to bind the Nation together, compete fairly and legally, afford preferential price treatment to some mailers, operate with transparency and accountability, and refrain from abusing its monopoly power.  The Postal Service is also expected to pay its own way.  And the Regulatory Commission was given expanded powers.  In all our deliberations, the Commission regularly reviews the progress of the Postal Service in the context of those obligations as well as in the context of the market environment in which it operates.

Although the topics are inherently interrelated, today I will discuss the Postal Service's revenue efforts in terms of three basic challenges:

1) The intent and expectations of the PAEA

2) The ongoing financial crisis facing the Postal Service, and

3) The Postal Service's mission to provide universal service to bind the Nation together

Postal reform and the PAEA

It has been nearly three years since the PAEA became law, following more than a decade of work and debate by the Congress and all members of the Postal community.  Throughout that time, a consistent view developed that the Postal Service faced a fundamental long-term problem due to the gradual erosion of its First-Class Mail franchise by the Internet and other emerging technologies.  In effect, the Postal Service's monopoly was being circumvented, particularly by the use of online bill payment systems.

The Commission examined these effects in conducting its Annual Compliance Determination of the Postal Service for 2008.  The Commission found that between 2000 and 2007, the volume of single-piece First-Class Mail fell by an average of 3.6 percent a year.  This is the mail, bearing a single First-Class stamp, by which U.S. households have typically paid their bills.  As a result, the Postal Service was being squeezed to fund a growing universal delivery network with a declining revenue base.  It is this

Exhibit 16
- 38 -

persistent, gradual decline in high-margin First-Class Mail that was at the heart of the postal reform movement.

The PAEA addressed this problem by allowing the Postal Service to seek new revenue and volume by engaging more freely in competitive "postal" growth markets, primarily domestic express and parcel services and international services.  At the same time, the PAEA sought to reduce red tape with monopoly products by establishing a rate cap, simplifying rate making and encouraging innovation.  The Postal Service was also encouraged to make a profit instead of just break even.

The Postal Service and the Commission have worked cooperatively and successfully to implement new revenue measures as envisioned by the PAEA.  Within the first 18 months following enactment of the PAEA, the Commission led a successful transition to the new operating framework including the division of the Postal Service into competitive and market-dominant products with appropriate financial firewalls, establishment of new accounting rules and reporting requirements, creation of new rate setting mechanisms and the development of modern service standards, targets and measurement systems.  While work to fine tune and expand these accomplishments continues, the modern regulatory model envisioned by the PAEA is in full operation.

PAEA flexibilities to increase mail volume and revenue

One of the goals of the PAEA was to promote the use of competitive business practices by the Postal Service such as contract rates with individual mailers, often called Negotiated Service Agreements (NSAs).  These agreements with major customers are viewed by the Postal Service as a key strategic tool to protect existing mail volume and to promote new volume growth, usually through volume-based pricing incentives.  In 2002, the Postal Service filed its first NSA with the Commission.  Through December of 2006 when the PAEA was signed into law, the Postal Service filed a total of 10 NSAs, including one that was later withdrawn.  All were approved.

In the first full fiscal year following enactment of the PAEA and the new flexibilities that accelerated the NSA process, the Postal Service filed 21 NSAs.  That figure tripled in FY 2009 with the filing of an additional 63 NSAs.  To date, the Postal Service has filed a total of 90 NSAs under the PAEA.  This performance represents a nine-fold increase in NSA contracts under the PAEA in less than three years.  The PAEA

Exhibit 16

flexibilities are clearly having a positive effect on the use of this competitive tool.  It is not yet clear, however, how much the NSAs may be driving increased volume and revenue.  The contracts run from one to three years.  Early returns involving several contracts indicate that the net effects are generally positive but not relatively large.  These results, like all revenue and volume efforts, will have to be further evaluated in light of the overall downturn in mail volume resulting from the weak economy.

The PAEA also authorized the Postal Service to take advantage of its pricing power in the competitive parcel and express side of its business, which accounts for 10 percent of overall revenue, although only one percent of mail volume.  Commission analysis of revenue and volume figures indicate that the Postal Service has effectively leveraged its competitive pricing flexibility to improve its margins and revenue performance.

On the market-dominant side of the business, year to date volumes through quarter 3 of FY 2009 were down by 12.6 percent and revenues were down by 9.8 percent from the same period last year.  The better revenue performance roughly approximates the effects of increases in market-dominant rates that took place during the year.  On the competitive side, the Postal Service's financial performance for the same period is markedly better.  Although shipping volumes declined by 13.7 percent, revenue fell by just 3.8 percent.  These results indicate that the Postal Service was able to use its competitive pricing flexibilities to offset the effect of the volume losses on the corresponding revenue.  To put it in a different context, in a better economic environment where the overall package delivery market is growing, these results suggest that the pricing flexibilities may produce higher margins and increased profitability in the Postal Service's competitive business, as envisioned in the PAEA.

The PAEA also sought to promote product innovation by the Postal Service.  On May 7 of this year, the Commission approved the first and only experimental product proposed by the Postal Service under the law.  "Collaborative Logistics," as the Postal Service calls it, is a less-than-truck-load (LTL) pallet service that seeks to monetize under-utilized space on the Postal Service's national truck transportation fleet.  This is a decidedly different enterprise for the Postal Service; however, the Commission found that it is complementary to its core function of collecting, transporting and delivering the mail.  It is too early to assess whether this experiment will be successful.

Exhibit 16
- 40 -

With only a single experimental product introduced in nearly three years, it appears that the Postal Service may not have taken sufficient advantage of this flexibility.  Recent news reports have used the term "experiment" to describe a Postal Service test of a new approach to selling greeting cards; however, this a product they have offered prior to enactment of the PAEA.  The Commission found greeting cards to be a postal product during its review of postal and nonpostal services and currently we are considering a Postal Service request to add the product to the Competitive Products list

The Commission has encouraged the Postal Service to make further experimental filings.  At the same time, we are aware that meaningful product innovations are not something that can be produced on an assembly line.  As the GAO has pointed out, a number of postal experiments in past years have not performed well in the crucible of the marketplace.  And the U.S. delivery market is certainly not an easy place to stake a new claim.  In recent years, a large, competent and well-financed shipping company, known popularly as DHL, attempted to enter the highly competitive U.S. domestic express delivery market.  After several years and the loss of billions of dollars, DHL concluded its experiment and largely exited the market.  Expectations that experimental products can result in large revenue growth must be tempered by reality.

On the market-dominant side of the business, after more than two years, the Commission received two filings from the Postal Service seeking to use its flexibility to implement seasonal discount pricing programs to incent increased mail volume.  Much like current competitive NSAs, these programs allow mailers who meet certain thresholds to earn discounts on incremental mail volume above what would otherwise be expected.  On June 4, the Commission approved the first filing, for a summer sale in Standard Mail, which ran from July 1 through September 30 of this year.  The Postal Service has indicated in various public pronouncements that the sale appears to have been successful.  The Commission looks forward to reviewing the data once the Postal Service closes out its books, pays the rebates and provides the Commission with the needed documentation.  The second filing, for discount pricing of First-Class Mail, was approved by the Commission on September 16.  It starts on October 1 and will run through December 31.

Exhibit 16
- 41 -

The Postal Service clearly is beginning to make use of the new flexibilities in the law.  It is too early to assess whether most of these activities will produce and sustain the hoped for results.  It is possible, though not certain, that these and future efforts currently allowed by law may be capable of providing the Postal Service with some of the revenue needed to ameliorate the structural erosion of the mail that precipitated postal reform and the PAEA.  The flexibilities enacted under the PAEA, however, may not prove to be as effective as had been envisioned in meeting the challenges that they were designed to meet.

Financial crisis and RHBF funding

For the immediate future, and perhaps for some time to come, the effectiveness of the PAEA flexibilities has been rendered moot by the financial crisis now facing the Postal Service.  There is an enormous difference between a gradual annual volume decline of 2 or 3 percent in single piece First-Class Mail and a 13 percent drop across the entire spectrum of the mail.  In fact, single piece First-Class letter volume, which was down 8.5 percent through the third quarter, is a relative bright spot compared to the rate of overall volume decline and a nearly 16 percent drop in standard mail volume.  The downdrafts of the economy have overwhelmed the effects of diversion.  The competitive flexibilities of the PAEA were not designed to deal with the current financial crisis.

In the face of declining revenue, the Postal Service directed most of its management resources and creativity toward reducing its costs in FY 2009 by more than $6 billion.  Despite these reductions, the Postal Service required emergency action by the Congress to avoid running out of cash at year's end.  The situation may remain critical until there is sustained recovery from the recession because the Postal Service cannot raise overall prices under the PAEA CPI price cap for market-dominant products.  The Postal Service must continue to pay approximately $5.5 billion per year to the retiree health benefit fund (RHBF) through 2017.

Prefunding retiree health care benefits

When the PAEA was enacted in 2006, the economy was strong and the Postal Service was concluding one of the most prolific four-year periods in its history.  Driven by booming financial and housing sectors, overall mail volume increased by nearly 11 billion pieces from 2003-2006, reaching a record volume of 213 billion pieces.  During

Exhibit 16

- 42 -

that period, the Postal Service was exceedingly profitable, earning more than $9 billion in net income.  A substantial portion of this profit was due to a change in the law that reduced Postal Service funding for retiree pensions, which OPM had found to be overfunded.  Nevertheless, at the close of FY 2006, the Postal Service and the mail appeared in good financial health.

It was in this climate that Congress mandated the Postal Service to make an ambitious 10-year series of payments averaging about $5.5 billion per year to address a growing unfunded liability for future postal retiree health benefits.  At the time, the Postal Service viewed the payment schedule as demanding but achievable.  To date, through a variety of mechanisms dictated in the law, the Postal Service has contributed approximately $34 billion to the RHFB fund.  This is substantial improvement from 2006 before enactment of the PAEA, and it is a signal achievement of the law.

In the current economic climate and with the severe decline in mail volume, the annual payment has proven to be out of reach for the Postal Service.  In view of this, Congress may wish to amend and accelerate the provision in the PAEA that calls for a recalculation of the RHBF liability and payment schedules in 2017.  At the request of the Subcommittee, the Commission conducted a study earlier this year of alternate RHBF valuations.  Our findings suggested an alternative calculation that could result in significantly lower payments by the Postal Service than current law allows while still meeting the original funding objectives of the PAEA.  This outcome also would give the Postal Service the financial stability to implement new long-range plans and related capital investments, and to expand efforts to use the flexibility of the PAEA.  Such a Congressional review would be particularly timely as it would capture the impact of the sizeable workforce reductions that have been made by the Postal Service. <u>Preserving the Postal Service mission and universal service</u>

Even if the RHBF payment schedule is adjusted, the Postal Service remains under pressure to address mounting financial shortfalls.  The Postal Service has suggested that one option to address this challenge is to revisit the PAEA to allow the Postal Service to pursue currently proscribed commercial activities that some foreign postal administrations now provide.  While the Commission is open to considering new perspectives and solutions to the problems that confront the U.S. Postal Service, we also believe that American experience and tradition should not be dismissed.  We

Exhibit 16
- 43 -

believe that any new business activity should meet a set of reasonable but specific criteria based on the core mission of the Postal Service, the needs of society and the expectation of a positive outcome for both.  The rationale that others are doing it or that others may make money doing it, does not, by itself, satisfy the criteria.

Nonpostal products

Among various non-postal activities conducted by foreign posts, the Postmaster General has expressed a strong interest in banking.  The old Post Office Department did provide a rudimentary banking service in the first half of the 20th century.  The Department effectively served as a government storefront for private banks not easily accessible in many communities, by accepting deposits from customers, issuing savings certificates and depositing the funds into local banks.  The Department earned a small float on the difference between the interest it guaranteed to depositors and the interest it received on the deposits.  In the 1940's the Department also issued savings stamps.  The Postal Savings System ended in 1967 and subsequent postal reforms in 1971 and 2006 did not identify banking as a needed core function or mission of the Postal Service.

The international record on postal banking is mixed.  In Germany, for example, where the government provided banking, telecommunications and mail services prior to privatizing all three in the late 1990s, the privatized post subsequently went through a series of moves entering and exiting banking, finally deciding to sell off their bank stock holdings to focus on the core businesses of mail and logistics.  In Japan, the new government declared that banking should remain in the postal sphere as part of their campaign platform.  Their victory was due in part to the national unease over the previous administration's planned privatization of the post and its banking services.  Poste Italiane Group derives approximately one-third of its revenue from financial services, one-third from the sale of insurance and one-third from postal services.  Further study would be needed to determine the synergies of these arrangements and how they fit into the landscape of Italian society and the Italian marketplace.

Although the recent financial crisis has raised alarms, the lack of varied and accessible banking services does not appear to be a problem in the American marketplace.  In addition, the Postal Service's relatively high wage and benefit structure would not appear to be advantageous in either the banking or insurance industries, or in expanded retail trade.  Although banking does not appear to satisfy the criteria for a non-

Page **8** of **11**

Exhibit 16
- 44 -

traditional product, if banking or any other non-postal activity is accepted by the Congress for possible provision by the Postal Service, it should be required to operate under a robust regulatory review from both a business and a societal perspective.

A common avenue for commercial expansion by foreign posts is the acquisition of private companies, often in related fields of express delivery or logistics services. Deutsche Post and Australia Post have completed dozens of acquisitions. Canada Post has acquired the overnight delivery company Purolator Courier and a logistics provider known as SCI Group. Current law does not provide this flexibility to the U.S. Postal Service, and it is not clear from the experience of foreign posts that such acquisitions would make sense for the United States. In Germany and the Netherlands, for example, it is the mail that provides the better financial returns, and not the acquired companies. In fact, over the last two years, Deutsche Post has seen billions of dollars of profits in its mail division offset by billion-dollar losses in the express division.

Expanded government related services

The Postal Service currently provides a number of non-postal services that suggest possible avenues for new revenue producing initiatives. For example, the Postal Service now processes two out of every three passport applications for the State Department. Other Federal and state agencies that issue licenses, permits, and passes or have retail initiatives of general interest might benefit from a similar partnership that increases service to American citizens while also earning incremental revenue for both themselves and the Postal Service. The "America the Beautiful" passes sold to the public by the National Park Service is an idea I have suggested to the Postal Service. The Postal Service might seek the assistance of the Administration, which has expressed interest in improving citizen access to government services.

The Administration also has set a priority to make the United States more energy efficient and independent. The Postal Service could help to achieve this goal while also addressing its own vulnerability to volatile fuel prices. The Postal Service has the nation's largest civilian vehicle fleet, which could provide the critical mass needed to test and develop the technologies and infrastructure to transform transportation and meet our national energy goals. Research indicates, for example, that postal delivery routes are especially well-suited to the characteristics of electric vehicles. Postal vehicles are on average 18 years old and get 8-10 miles per gallon, but only travel 25 miles per day. A

Exhibit 16
- 45 -

national investment in a new fleet for the Postal Service would speed transformation, add green jobs, and reduce the Postal Service's operational overhead for the foreseeable future.

Also, the Postal Service yet may find the spark of innovation to create viable new classes of mail and other products that are consistent with its mission as envisioned by the PAEA. The Commission looks forward to reviewing additional proposals from the Postal Service for experimental products or pricing initiatives that may provide new, sustainable sources of revenue for the future.

Finally, it should be emphasized that the most important catalyst for postal mail volume and revenue growth is a healthy economy. Twice in this decade we have seen mail volume plunge with recession. After the shock of 9/11, it recovered rapidly when the economy rebounded. The key questions now are: When will recovery occur? And will the mail prove to be as resilient this time around?

As we have seen, the Postal Service has responded to the downturn by emphasizing, not flexibility or innovation, but almost exclusively by finding ways to make significant cost reductions throughout its entire operation -- from adjusting mail routes and renegotiating purchasing agreements to removing collection boxes, consolidating plants and closing post offices. The Postmaster General also has asked Congress to lift statutory restrictions that currently prevent the Postal Service from reducing the frequency of mail delivery service from six to five days per week.

Caution must be exercised with regard to these initiatives. Cuts made to address near-term financial difficulties may have harmful long-term consequences for universal service and the vitality of the mail system. From a market perspective, the Postal Service could lose its greatest strategic advantage – ubiquity. Reducing service is detrimental to mail growth and to public perception of the value of the mail system. Importantly, it may also undermine the justification for the postal monopolies.

Those of us in the mailing community have confidence in the value of the mail as an important channel of communications and commerce, and believe that mail, letter carriers and post offices serve a vital role in our communities. The mail will come back. How far it comes back, however, may well depend on how deeply service is cut while

Exhibit 16

- 46 -

mail is down.   Cutting service should be considered only as a last resort with full awareness of the consequences.

Thank you.  That concludes my prepared remarks.  I would be pleased to answer any questions you may have.

# # # #

Exhibit 16