RICHARD H. ZELICHOV (SBN 193858)
richard.zelichov@katten.com
CHRISTINA L. COSTLEY (SBN 227134)
christina.costley@katten.com
PAUL S. YONG (SBN 303164)
paul.yong@katten.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4400
Facsimile:  (310) 788-4471

Attorneys for Stamps.com Inc., Kenneth McBride,
Kyle Huebner, and Jeff Carberry

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> STAMPS.COM, INC., KENNETH MCBRIDE, KYLE HUEBNER, and JEFF CARBERRY, <br><br> Defendants. | Case No. 2:19-cv-01828-MWF (SK) <br><br> CLASS ACTION <br><br> MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION <br><br> Date: November 2, 2020 <br> Time: 10:00 a.m. <br><br> Judge: Hon. Michael W. Fitzgerald <br> Courtroom: 5A |

**[REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL]**

# **TABLE OF CONTENTS**

**Page**

BACKGROUND ..................................................................................................... 2

I.      STAMPS'S AGREEMENTS AND EXTENSIVE RISK DISCLOSURES ................................................................................ 2

II.     THE STATEMENTS AT ISSUE .................................................................. 5

III.    PROPOSED LEAD PLAINTIFF AND ITS INVESTMENT ADVISORS ................................................................................ 6

ARGUMENT ......................................................................................................... 7

I.      LEAD PLAINTIFF BOTH BY ITSELF AND THROUGH ITS INVESTMENT ADVISORS IS ATYPICAL OF THE CLASS ................... 8

II.     PLAINTIFF CANNOT PROVE RULE 23(B)(3) PREDOMINANCE .......... 9

        A.    The Lack of Price Impact Rebuts Any Presumption of Reliance ....... 10
        B.    There Was No Price Impact Based on Stamps's Positive Statements about Its Relationship With the USPS ........................... 12

              1.    The May 3, 2017 Statements ........................................... 13
              2.    The August 1 and August 2, 2017 Statements .............. 14
              3.    Plaintiff's Claimed Corrective Disclosures Did Not Concern Stamps's Relationship With The USPS In 2017 ................................................................................ 15

        C.    Any Price Impact From Defendants' Statements About Task Force Report Ended When The Task Force Report Was Released On December 4, 2018 ................................................................. 17
        D.    Any Price Impact From Statements About PBIA Negotiation Ended When Defendants Disclosed Discontinuation of PBIA .......... 19

III.    PLAINTIFF HAS NOT PROVIDED A CLASSWIDE DAMAGES MODEL ................................................................................ 20

              1.    Lead Plaintiff's Damages Framework Is Not Limited To Its Remaining Liability Theories ................ 20
              2.    The Damages Theory Would Overcompensate Investors ................................................................................ 24

CONCLUSION ..................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angley v. UTi Worldwide Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018)..................................................................22

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018) ..................................................................................10

*Beach v. Healthways, Inc.*,
2009 WL 3245393 (M.D. Tenn. Oct. 5, 2009)........................................................9

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................................*passim*

*Erickson v. Snap, Inc.*,
2017 U.S. Dist. LEXIS 221050 (C.D. Cal. Sep. 18, 2017)....................................9

*Forrand v. Fed. Express Corp.*,
2013 WL 1793951 (C.D. Cal. Apr. 25, 2013).......................................................22

*GAMCO Investors, Inc. v. Vivendi, S.A.*,
917 F. Supp. 2d 246 (S.D.N.Y. 2013).....................................................................9

*George v. China Automotive Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. Jul. 3, 2013) .............................................................9

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004)..................................................................12, 15, 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ....................................................................10, 11, 14, 16

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992)...................................................................................8

*Hayes v. MagnaChip Semiconductor Corp.*,
2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ......................................................18

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016)..........................................................11, 12, 14, 15

*In re Allstate Corp. Sec. Litig.*,
No. 19-1830, 2020 WL 4013360 (7th Cir. July 16, 2020)....................................10

*In re BP P.L.C. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ........................................................21

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015)..................................................................25

MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*In re Cardinal Health, Inc. Sec. Litig.*,
    226 F.R.D. 298 (S.D. Ohio 2005) ........................................................................ 9

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ........................................... 11, 15, 18

*In re Intuitive Surgical Sec. Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 12, 2016) ...................................................... 16

*In re Juniper Networks Sec. Litig.*,
    264 F.R.D. 584 (N.D. Cal. 2009) ......................................................................... 2

*In re McKesson HBOC, Inc. Sec. Litig.*,
    97 F. Supp. 2d 993 (N.D. Cal. 1999)..................................................................... 9

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011)......................................................................... 12

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
    2011 WL 1842819 (N.D. Cal. May 16, 2011) ..................................................... 16

*Kauffman v. Natural Health Trends Corp.*,
    2019 WL 7165921 (C.D. Cal. Dec. 20, 2019) ..................................................... 23

*Loritz v. Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015) ...................................................... 20

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012)................................................................................. 7

*Public Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) .............................................................................. 16

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d (9th Cir. 2015) ..................................................................................... 22

*Ravens v. Iftikar*,
    174 F.R.D. 651 (N.D. Cal. 1997) ........................................................................ 18

*Shiring v. Tier Techs., Inc.*,
    244 F.R.D. 307 (E.D. Va. 2007).......................................................................... 9

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    2018 WL 2958361 (S.D.N.Y. June 13, 2018)....................................................... 8

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................................. 7

*West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018)................................................................... 18, 19

**Rules**

Fed. R. Civ. P. 23............................................................................................... 7

Fed. R. Civ. P. 23(a) .............................................................................. 1, 7, 8, 10

iii

Fed. R. Civ. P. 23(a)(3) ........................................................................................ 8

Fed. R. Civ. P. 23(a)(4) ........................................................................................ 8

Fed. R. Civ. P. 23(b) ..................................................................................... 1, 2, 7

Fed. R. Civ. P. 23(b)(3) ........................................................................... 7, 9, 10, 20

**Other Authorities**

1 McLaughlin on Class Actions § 4:20 (16th ed. 2019) ........................................ 8

Capitol Forum, *About Us,* https://thecapitolforum.com/staff/ ................................ 12

iv

The Lead Plaintiff in this action, ████████████████████████████ ██████████████████████████████████ seeks to cast itself as a "typical" class member, capable of representing persons who collectively assert they lost money. Class certification should be denied for this and other reasons described below.

First, Lead Plaintiff cannot meet the typicality requirements of Rule 23(a) because it is in fact not representative of the class as a whole.  To the contrary, ██ ████████ its status as a net seller of Stamps's stock during most of the putative class period, and its investment advisors' access to Stamps's management all illustrate, Lead Plaintiff could not be less representative.

Second, Lead Plaintiff cannot meet the predominance requirement of Rule 23(b) because it has failed to proffer a viable theory of class-wide reliance.  Contrary to Lead Plaintiff's simplification, this is not a typical securities fraud action in which a "corrective disclosure" reveals a previously unknown fraud. In this case, Lead Plaintiff's invocation of the fraud-on-the-market presumption is contradicted by direct evidence—including Lead Plaintiff's expert's own report, event study, and deposition and Defendants' expert report and event study—that rebuts the presumption by demonstrating that most of the alleged misrepresentations had no impact on the price of Stamps's stock. Lead Plaintiff's own regression model demonstrates that Stamps's stock price *declined* after May 3, 2017, when Stamps made its first putative class period statements about its relationship with the USPS, and *declined again* after August 1, 2017, when Stamps published the USPS's positive statements about its relationship with Stamps (which Stamps repeated on August 2, 2017). Lead Plaintiff is likewise unable to point to any corrective disclosure that revealed that Stamps did not, in fact, have a "strong relationship" with the USPS when it said it did **in 2017**. Finally, with respect to the 2018 statements about Stamps's expectations regarding the then ongoing Task Force on the United States Postal System ("Task Force"), Lead Plaintiff is unable to rely on

1

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

the fraud-on-the-market presumption after December 4, 2018, when the Task Force published its Report and revealed the true contents of the Task Force Report.

Third, Lead Plaintiff cannot meet the predominance requirement of Rule 23(b) because it has failed to proffer a damages methodology that can be applied on a class-wide basis as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Lead Plaintiff's expert offers a mere 3½ page "general economic framework" that he claims can apply to any case asserting claims under Section 10(b). He never explains, however, how this "framework" can be applied on a class-wide basis consistent with Lead Plaintiff's theory of liability in this case. In addition, his "general economic framework" does not address that this Court dismissed two out of the three theories of fraud included in the Complaint.  And this "general economic framework" yields economically impossible results including that Stamps had a negative value on 93 trading days during the class period.

Lastly, if a class is certified, this Court should expressly exclude in/out traders—investors who sold their shares before the first corrective disclosure.  *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009).

## BACKGROUND

## I.      STAMPS'S AGREEMENTS AND EXTENSIVE RISK DISCLOSURES

Throughout most of the putative class period (May 3, 2017 through May 8, 2019), Stamps operated its PC Postage business under five brands in the United States, two of which were exclusive to the USPS, and three of which were multi-carrier solutions offering the option to use private carriers (*e.g.*, UPS and FedEx) in addition to the USPS. *See* ¶¶2, 28, 43, 108.[1] Prior to this period, Stamps and the USPS had entered into a package business incentive agreement ("PBIA" or

---

[1] All citations to ¶ ___ are references to Lead Plaintiff's Consolidated Class Action Complaint ("Complaint," Dkt. 71).  Capitalized terms not defined herein have the meanings ascribed to them in the Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("MtD," Dkt. 79).  Defendants are not re-submitting the exhibits that they attached to the Declaration of Paul S. Yong in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint [Dkt. No. 81].  The cites to those documents will be in the format of Dkt. No. 81, Ex. __ at __.

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

2

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

"commission agreement"), pursuant to which the USPS paid Stamps part of the USPS's revenue from shipping certain "competitive products." ¶¶25, 124. In return, Stamps provided software, sales, and support to shippers using USPS for packages, and agreed that its two leading brands (Stamps.com and Endicia) would partner "exclusively" with the USPS. ¶¶25, 124. Stamps had also entered into agreements with certain postal "resellers," which in turn had entered into negotiated service agreements ("NSAs") with the USPS that permitted these resellers to buy postage from the USPS at one price and resell postage at a higher price (*i.e.*, giving them the contractual right to the "spread" between these prices). ¶33. Stamps's agreements with these resellers provided that Stamps will receive some portion of that "spread." *Id.*

Both before and during the putative class period, Stamps expressly and repeatedly warned investors about the possibility that changes in USPS policies, including termination of agreements and other financial arrangements with Stamps, could adversely affect Stamps's business. For example, Stamps stated in its 2017 Form 10-K, filed on February 28, 2018, that:

> **The USPS could modify or terminate agreements and other financial compensation arrangements, which would have an adverse effect on our revenues and operating results.**
>
> . . . if the USPS decides to amend or renegotiate our arrangements under which we are compensated directly by the USPS for shipping customers or integration partners who print a certain amount of postage, our revenue and operating results may be negatively impacted. If the USPS decides to terminate our agreements or our integration partners' agreements under which we are compensated directly or indirectly by the USPS or integration partners for shipping customers who print a certain amount of postage, our revenue and operating results would suffer.

Dkt. No. 81, Ex. 4, at 14; *see also* Dkt. No. 81, Ex. 2, at 10.

In June 2017, Stamps and the USPS entered into a new version of the PBIA. *See* Zelichov Decl., Ex. 8. In 2018, upon notice from the USPS, Stamps and the USPS began to renegotiate this contract. *See* ¶¶63, 109. Stamps therefore added a

new risk disclosure to its Form 10-Q for 2Q 2018 filed on August 8, 2018 that warned:

> During the previous calendar quarter, the USPS provided a notice requiring the renegotiation of one of our important financial compensation arrangements. While we believe that this agreement is mutually beneficial to the USPS and to us, there is a risk that renegotiation is unsuccessful and leads to materially less favorable terms or that the USPS decides to not renew one or more of these financial compensation arrangements. In such case, our revenue and operating results will be materially affected unless we are successful in timely replacing the lost revenue with similar compensation from other potential partners.

Dkt. No. 81, Ex. 6, at 6.

Stamps also warned, both before and during the putative class period, that the USPS could terminate its relationship with the resellers: "We also earn compensation by offering customers a discounted postage rate that is provided to the customers by our integration partners. If the USPS decides to withdraw certain discounts or even remove the discounts entirely, our revenue and operating results will suffer." Dkt. No. 81, Ex. 4, at 14. In addition, Stamps warned that the resellers could stop making their discounts available to Stamps and Stamps's customers. *See Id.*; *see also* Dkt. No. 81, Ex. 2, at 10-11.

On December 4, 2018, the Task Force issued a Report that stated, among many other things, that the USPS should "expand third-party relationships" and "price [its] competitive products to generate income rather than maximize volume." Dkt. No. 81, Ex. 23, at 56-57.

On February 21, 2019, Stamps disclosed that, following unsuccessful renegotiations of the PBIA, Stamps "decided to discontinue our shipping partnership with the USPS." ¶94. In spring 2019, the USPS also began renegotiating the terms of its NSAs with some of the resellers with whom Stamps had contracts. The USPS, however, reversed course just one quarter later by deciding not to alter the terms of those NSAs in 2019. *See* Dkt. No. 81, Ex. 17, at 3. The USPS and its resellers ultimately entered into new, long-term agreements in December 2019 that

4

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

"provide[d] both relative stability and predictability for the resellers and for their various partners," including Stamps. Zelichov Decl., Ex. 7 at 4. Stamps was therefore going to be able to "continu[e] to promote the USPS's services under [its] partnerships with the resellers, where appropriate, for [Stamps's] customers." *Id.* at 5.

## II. THE STATEMENTS AT ISSUE

While the Complaint challenged 25 statements made on seven different dates during the putative class period, this Court dismissed Lead Plaintiff's claims as to 18 of those statements, and held that only statements which "touted" the Stamps-USPS relationship were actionable. *See* Dkt. Nos. 89, 143. Only seven statements, made during four earnings calls, remain at issue:

**May 3, 2017 Statements.** During Stamps's Q1 2017 earnings call, McBride stated that, among other things, Stamps "continue[s] to enjoy a great partnership with USPS," "the USPS is very happy with the very successful partnership," and "we don't really expect any material changes to any kind of the underlying economics or the revenue share agreements that we have." ¶¶68-70.[2]

**August 2, 2017 Statements.** During its Q2 2017 earnings call, Stamps repeated comments by the USPS that had been published the prior day. McBride stated that "the USPS looked at resellers and PC postage providers like Stamps.com and Endicia as excellent partners," and "the partnership with the Postal Service is continuing to be stronger." ¶74. Huebner stated that Stamps had a "win-win partnership" with the USPS. ¶75.

**August 1, 2018 Statements.** During Stamps's Q2 2018 earnings call, McBride stated in response to an analyst's question concerning the USPS Task

---

[2] Defendants have attached as Exhibit 5 to the Declaration of Richard H. Zelichov in Support of Opposition to Motion for Class Certification ("Zelichov Decl.") a full list of the statements that remain in the case after the Order re: Defendants' Motion to Dismiss ("Order") [Dkt. No. 89]; Order Granting in Part Defendants' Motion to Clarify Order on Motion to Dismiss ("Clarification Order") [Dkt No. 143]. Defendants have included the relevant context for the statements in regular font and then bolded and highlighted the statements that the Court did not dismiss.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel +1.310.788.4471 fax

Force's inquiry that "we do think that based on our conversations that the report will come out strongly in favor of the partnerships between the USPS and private industry like the partnerships we've had with the USPS." ¶89.

**October 31, 2018 Statements.** Similarly, during Stamps's Q3 2018 earnings call, McBride stated in response to an analyst's question that "the general view is the idea of USPS increasingly embracing partnerships like ours makes a tons of sense for them." He also noted that "we expect that updates to our agreements with the USPS will continue to reflect the critical role that we play in their e-commerce package business." ¶92.

In its Complaint, Lead Plaintiff identifies two statements that purportedly revealed Defendants' fraud to the market. The first is Stamps's February 21, 2019 announcement that it had "discontinue[d] [its] shipping partnership with the USPS" (¶94), and the second is Stamps's announcement, on May 8, 2019, that it was revising its financial guidance downward as a result of potentially unfavorable renegotiations of certain NSAs between the USPS and the USPS resellers (¶97).

## III.   PROPOSED LEAD PLAINTIFF AND ITS INVESTMENT ADVISORS

On June 5, 2019, this Court appointed Indiana Public Retirement System ("INPRS") as Lead Plaintiff. *See* Dkt. No. 62. Each of Lead Plaintiff's purchases of Stamps's stocks was made on its behalf by its investment advisers, Disciplined Growth Investors, Inc. ("DGI") and Rhumbline Advisers ("Rhumbline"),

*See* Zelichov Decl., Ex. 9 ("INPRS Dep. Tr.") at 138:21-139:16, 140:14-142:4, 199:6-12, 213:7-9; *see also id*., Ex. 2 (Declarations of Nicholas Hansen and Rob Nicoski and Frederick Martin) ("DGI Decls.") ¶3. While Rhumbline purchased Stamps's stock on Lead Plaintiff's behalf at various points during the putative class period, the majority of Lead Plaintiff's purchases were made by DGI in November 2018 and February 2019.  *See* Dkt. 76, at 7; *see also* Zelichov Decl., Ex. 2.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

DGI had purchased Stamps's stock on its own account and on behalf of other clients since at least 2013 but was decreasing its ownership position during most of the class period from 397,394 shares on March 31, 2017 to 282,290 on October 31, 2018. *See* DGI Decls. ¶4. As part of its role as an investment advisor, DGI has closely followed Stamps, including through one-on-one meetings and calls with Stamps's personnel, and by monitoring and analyzing Stamps's public statements and other publicly available information. *See id*. at ¶¶4, 7.

Lead Plaintiff, through its investment advisers, continued to purchase Stamps's stock in large volume following the close of the putative class period, purchasing 54,744 shares in June 2019. *See id*. at ¶5*; see also* Zelichov Decl., Ex. 4.

## ARGUMENT

Lead Plaintiff has the burden of proving, by a preponderance of the evidence, that the putative class satisfies all of the requirements of Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). This requires Lead Plaintiff to prove that the proposed class meets each of the four Rule 23(a) prerequisites—numerosity, commonality, typicality, and adequacy—as well as at least one of the three Rule 23(b) criteria. Fed. R. Civ. P. 23. Lead Plaintiff here seeks certification pursuant to Rule 23(b)(3), which requires Lead Plaintiff to prove that common questions of law or fact predominate over individualized ones and that a class action is superior to other possible methods of adjudicating the case, Fed. R. Civ. P. 23(b)(3).

Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores*, 564 U.S. at 350. Instead, the Rule calls for a "rigorous analysis," even though this analysis may overlap with a merits inquiry. *See, e.g.*, *Comcast*, 569 U.S. at 35 ("[O]ur cases requir[e] a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim."); *Wal-Mart Stores,* 564 U.S. at 351 (class certification questions "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.").

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

7

## I. LEAD PLAINTIFF BOTH BY ITSELF AND THROUGH ITS INVESTMENT ADVISORS IS ATYPICAL OF THE CLASS

Rule 23(a) requires, among other things, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3)-(4). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508-09 (9th Cir. 1992) (quotation marks and citation omitted) ("[T]here is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." (citation omitted)). "An investment advisor's knowledge and actions are imputed to a plaintiff when determining its suitability to serve as a class representative." 1 McLaughlin on Class Actions § 4:20 (16th ed. 2019); *Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *4-5 (S.D.N.Y. June 13, 2018) (investment advisor strategies are determinative when assessing reliance) (collecting cases).

Lead Plaintiff and its investment advisor's unique trading patterns of Stamps's stock render Lead Plaintiff atypical. First, Lead Plaintiff ███████████████ ███████ from its investment in Stamps's stock, ██████ that make Lead Plaintiff manifestly unsuitable to represent a putative class that purports to have *lost* money as a result of Stamps's conduct. *See* Zelichov Decl. ¶ 12 (share price closed on August 28, 2020 at $$252.72); *see also id.*, Ex. 3 ████████████████████ ████████████████████████████████████████████████

Second, Lead Plaintiff bought most of its stock – 71% of its overall Stamps holdings – after the so-called "corrective disclosures" on February 21, 2019 and May 8, 2019. Not surprisingly, courts have held that such high levels of post-corrective disclosure purchases cast doubt on a plaintiff's ability to allege reliance, further making this Lead Plaintiff atypical. *See, e.g.*, *Erickson v. Snap, Inc.*, 2017 U.S. Dist.

8

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

LEXIS 221050, at \*8-9 (C.D. Cal. Sep. 18, 2017) (60% of purchases post disclosure defeats typicality); *GAMCO Investors, Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261-62 (S.D.N.Y. 2013) (approximately 33% of purchases post-corrective disclosure constitutes a "disproportionately large percentage" that casts doubt on claim that plaintiff relied on market price); *George v. China Automotive Sys., Inc.*, 2013 WL 3357170, at \*6 (S.D.N.Y. Jul. 3, 2013) (denying class certification when named plaintiffs "continued to make purchases of the securities at issue following the alleged 'truthful' disclosure").

Third, both Lead Plaintiff and its investment advisor were "net sellers" for most of the putative class period, potentially subjecting Lead Plaintiff to unique defenses that also render it inadequate as a class representative. *See, e.g.*, *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996-97 (N.D. Cal. 1999) (net seller less appropriate as lead plaintiff); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005).[3]

Finally, one of Lead Plaintiff's investment advisors had individual one-on-one meetings with Stamps that give rise to additional unique defenses. *Beach v. Healthways, Inc.*, 2009 WL 3245393, at \*5 (M.D. Tenn. Oct. 5, 2009) ("personal contact with corporate officers and special meetings at the company will render a plaintiff atypical to represent the class"). "[W]hether these defenses will be successful is of no matter. The fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 314 (E.D. Va. 2007).

## II. PLAINTIFF CANNOT PROVE RULE 23(B)(3) PREDOMINANCE

Rule 23(b)(3) requires plaintiffs to demonstrate by a preponderance of the evidence that "questions of law or fact common to class members predominate over

---

[3] Lead Plaintiff and its investment advisor were both net sellers for 17 months of the 24 month putative class period: Lead Plaintiff did not become a net purchaser until September 21, 2018, while its investment advisor sold through at least September 30, 2018. *See* Zelichov Decl., Ex. 4; *see also* DGI Decls. ¶4.

9

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Court's inquiry under Rule 23(b)(3) is "even more demanding" than the already "rigorous" Rule 23(a) analysis. *See Comcast*, 569 U.S. at 34.

### A.    The Lack of Price Impact Rebuts Any Presumption of Reliance

Predictably, Lead Plaintiff relies on *Basic's* fraud-on-the-market presumption to establish reliance. *Basic* allows a plaintiff to substitute reliance on a company's stock price for actual reliance on a company's false statement as long as a company's stock trades in an efficient market (which Defendants here do not contest). Defendants, however, can "defeat [*Basic's*] presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock . . . that is, that the misrepresentation had no 'price impact.'"[4] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264, 284 (2014) ("*Halliburton II*"). As the Second Circuit has explained:

> If a defendant shows that an "alleged misrepresentation did not, for whatever reason, actually affect the market price" of defendant's stock, "there is no grounding for any contention that the investor indirectly relied on that misrepresentation through his reliance on the integrity of the market price"; the fraud-on-the-market theory underlying the presumption would "completely collapse []."

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018) (quoting *Halliburton II*, 573 U.S. at 269, 278, 283). Thus, if Defendants establish a lack of price impact, a class cannot be certified because "individual

---

[4] While plaintiffs often object that such an inquiry overlaps with the merits, and is therefore inappropriate at class certification, every circuit court that has reached this issue has reached the same conclusion: "the district court must decide at the class stage the price impact issue posed by the defendants' price impact evidence and plaintiffs' rebuttal. The court may not defer that question for the merits." *In re Allstate Corp. Sec. Litig.*, No. 19-1830, 2020 WL 4013360, at *1 (7th Cir. July 16, 2020) (reversing grant of class certification); *see also Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018). Defendants recognize that most, but not all, courts have held that defendants bear the burden of proof of establishing lack of price impact rather than that the plaintiff bears the burden of proving price impact. The issue of who bears the burden of proof is the subject of a recent petition for certiorari to the United States Supreme Court.

10

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

questions of reliance will predominate over common questions of law and fact." *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 779 (8th Cir. 2016).

Defendants may establish lack of price impact by pointing to the failure of the stock price *either* to increase on the day when the alleged misrepresentation was made (referred to as "front-end price impact") *or* to decrease on the date of the alleged corrective disclosure ("back-end price impact."). *See Best Buy*, 818 F.3d at 782-83 (holding that "overwhelming evidence of no 'front-end' price impact rebutted the *Basic* presumption" and rejecting argument that plaintiff could establish price impact based only on stock price decline after the corrective disclosure); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017) (relying on *Best Buy* and finding "no flaw" in the defense expert's analysis "simply because it focuses on the date of the alleged misstatement rather than the date of the alleged corrective disclosure").[5] Any evidence that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," is sufficient, under *Basic*, to rebut the presumption of reliance because "the basis for finding that the fraud has been transmitted through the market price would be gone." *Halliburton II*, 573 U.S. at 268-69, 281 (quotation marks and citation omitted).

Defendants here have established a lack of stock price impact on both grounds, first by establishing a lack of statistically significant, positive price movement when most of the alleged misstatements were made and second, by establishing the absence of a "corrective disclosure" that revealed Stamps's prior

---

[5] In *Finisar,* the Northern District of California recognized that, because "[n]either the Supreme Court nor the Ninth Circuit" has reached the issue yet, defendants must be allowed to sever the presumption of reliance by showing that the stock price *either* failed to rise (when the statement was made) or failed to fall (when the statement was corrected) to comply with the Supreme Court's mandate that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff" is sufficient. *Finisar*, 2017 WL 6026244, at *7 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988)).

11

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

statements were false at the time when they were made. *See* Zelichov Decl., Ex. 1 (Rebuttal Report of Paul Zurek, Ph.D. ("Zurek Rpt.")) §§V.C, D, G.

### B.    There Was No Price Impact Based on Stamps's Positive Statements about Its Relationship with the USPS

It is well settled that information that is not "new" does not impact the market price in an efficient market. *See* Zurek Rpt. ¶26.  As the Eighth Circuit has explained, a statement is not actionable when it "add[s] nothing to what was already public" or "just reflect[s] the status quo." *Best Buy*, 818 F.3d at 782; *see Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665-66 (5th Cir. 2004) ("confirmatory information cannot be the basis for a fraud-on-the-market claim"); *see also In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011).

In this case, the market was aware before the putative class period that opinions varied about the state of Stamps's relationship with the USPS. Numerous market commentators published negative information about that relationship, with details purportedly substantiated from sources at the USPS. For example, beginning in July 2016 and continuing monthly until April 2017, The Capitol Forum (a self-described in-depth news & analysis service dedicated to informing policymakers, investors and industry stakeholders on how policy affects market competition[6]) published articles stating that the USPS was going to terminate the reseller program due to abuses of that program by Stamps. In contrast, also beginning in July 2016, Stamps made positive statements about its relationship, including specifically stating in February 2017 that the USPS is "always and [has] been always our most important partner," that Stamps "enjoy[s] a great partnership with the USPS," and that "we've created a sustainable win-win model, both of us, that will result in the continued growth of USPS packages." Zelichov Decl., Ex. 6, at 6.

As a result of these disclosures, when the putative class period started, Stamps's stock price already reflected the market's understanding of the potential

---

[6] The Capitol Forum, *About Us,* https://thecapitolforum.com/staff/

12

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

benefits and drawbacks of the reseller program and its assessment of the risk of Stamps's contracts with resellers posed to Stamps's relationship with the USPS. *See* Zurek Rpt. §V.C, Appendix C.

### 1.    The May 3, 2017 Statements

Plaintiff alleges that Stamps first misled investors by stating on May 3, 2017, among other things, that it had a "great partnership with USPS," that "we have created a sustainable win-win model," and that the USPS was "very happy" with the relationship. ¶¶68-70; *see also* Dkt. No. 89; Dkt No. 143; Zelichov Decl., Ex. 5. Instead of causing Stamps's stock price to increase, however, Stamps's stock price actually decreased on the trading day after May 3, 2017, albeit by an insignificant amount (-0.41%). *See* Zurek Rpt. ¶45 ("there is no economic evidence that information released on Stamps.com's May 3, 2017, conference call caused its stock price to increase, which would have been expected if these statements reassured the market about the relationship with the USPS given information about potential concerns that was already available to the market prior to May 3, 2017.").

This was not because Stamps's positive statements artificially propped up a stock price that otherwise would have declined more on May 4, 2017;[7] as Plaintiff's expert, Zachary Nye, Ph.D., has admitted, the market expected all of the news that it got on May 3. *See* Niehaus Decl., Ex. 2 ("Nye Report"), Ex. 12, at Pg. 10 of 76 ("Remark" after "Event Date" of May 3, 2017 states that information disclosed was "expected"); *see also* Zelichov Decl., Ex. 10 ("Nye Depo") at 72:6-12 (Q: "So is it fair, then, that the remark part [following each Event Date of Exhibit 12 to your report] is the -- what you understood to be the most important points that had come up in the press release, conference calls and analyst reports from the particular date?" "A: "Yes, I think so."). Rather, the price did not react because Stamps's representation that it had a "great partnership" merely reiterated the "status quo,"

---

[7] All of the statements at issue were made after close of market, which means the stock price impact would not occur until the following trading day.

13

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

information that had been baked into Stamps's stock price well before the putative class period began. *See* Zurek Rpt. §V.C.  Consequently, under *Halliburton II*, no class can be certified as to the May 3, 2017 statement. *See Halliburton II*, 573 U.S. at 283 ("Defendants may seek to defeat the *Basic* presumption at [class certification] through direct as well as indirect price impact evidence.").

### 2.   The August 1 and August 2, 2017 Statements

The statements about Stamps's relationship with the USPS, which Stamps released on August 1, 2017 and repeated on August 2, 2017, also did not have a positive impact on Stamps's stock price. ¶¶ 74-75; *see also* Dkt. No. 89; Dkt No. 143; Zelichov Decl., Ex. 5. Stamps's stock price declined on August 2, 2017 following Stamps's publication, on its website, of USPS Chief Marketing Officer Jimmy Cochrane's positive statements about the USPS's relationship with Stamps. Plaintiff's own expert admits that these August 1, 2017 statements had no positive price impact on Stamps's stock price. *See* Nye Report, Ex. 11B, at Pg. 2 of 12 (Stamps had a negative company-specific return on August 2, 2017 of -0.26% that was not statistically significant). Although Stamps's stock price did increase on August 3, 2017, after Stamps repeated Cochrane's statements, this stock price increase cannot be attributed to Stamps's August 2 statements about its relationship with the USPS because those statements "add nothing" to what was already public. *Best Buy*, 818 F.3d at 782; *see* Zurek Rpt. §V.D.[8]  The chart below illustrates this, with the USPS's statements (for which there was no price impact) on the left and Stamps's repetition of those statements on the right.

---

[8] Plaintiff also continues to challenge Stamps's August 2, 2017 statements repeating its prior characterization of Stamps's partnership with the USPS as "great," "healthier and healthier," "stronger and stronger," and "win-win partnership." ¶¶ 74-75. These statements, however, could not have had a positive price impact for the same reasons the May 3, 2017 statements did not, because they merely reiterated information reflected in Stamps's stock price before the class period even started. Zurek Rpt. ¶50.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

| USPS August 1, 2017 Statements | Stamps August 2, 2017 Statements |
|---|---|
| "Resellers are a fact of American commerce. . . we looked at resellers and things like PC Postage providers, like Stamps . . .and Endicia as excellent partners on bringing the best solution to customers." | "the USPS looked at resellers and PC postage providers like Stamps.com and Endicia as excellent partners on bringing the best solutions to customers." |
| "I do not see a reason why [the reseller program] would not continue to serve both customers and the needs of the Postal Service, going forward." | "The USPS doesn't see any reason why the program wouldn't continue to serve both customers and the needs of the Postal Service going forward." |

Instead, as Zurek explains in his report, analysts attributed the August 3 stock price reaction to: (a) very positive earnings driven by increased revenue per customer and customer growth; (b) upward guidance revision; and (c) Stamps's re-signing of two contracts with the USPS. *See* Zurek Rpt. ¶57. Plaintiff's expert, Nye, similarly attributed the stock price increase on August 3, 2017 to Stamps's third quarter results, upward guidance, and "signing of some new agreements with the USPS early in the quarter which benefited the entire quarter and the foreseeable future." Nye Report, Ex. 12 at Page 18-19 of 76 ("Remark" after August 2, 2017); *see Greenberg*, 364 F.3d at 661-62, 667 (if, by "[c]omparing the relative seriousness of all the information released" on a particular day, a defendant can show that the alleged misrepresentation did not "play[] a significant role" in the stock price's movement, then that showing "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff" and rebuts the presumption of reliance (quoting *Basic*, 485 U.S. at 248)).

### 3. Plaintiff's Claimed Corrective Disclosures Did Not Concern Stamps's Relationship with the USPS in 2017

While not necessary to conclude that there was no price impact from Stamps's May 3, 2017 and August 2, 2017 statements, the absence of stock price impact based on Stamps's 2017 statements about its relationship with the USPS is further confirmed by the absence of any corrective disclosure related to those statements.

15

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

*See Best Buy*, 818 F.3d at 782-83; *Finisar*, 2017 WL 6026244, at \*7. It is black letter law that a decrease in price following a corrective disclosure necessarily requires that the disclosure in fact *be corrective* – i.e., "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Public Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014); *see also In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at \*15-16 (N.D. Cal. Dec. 12, 2016) (decline in stock price based on disclosure of poor financial results did not correct alleged false statements concerning safety problems). If a defendant shows that an alleged corrective disclosure does not actually *correct* an alleged prior misrepresentation, then that disclosure cannot be "the revelation of the truth" purportedly obscured by the fraudulent statements. *Greenberg,* 364 F.3d at 665. And if the alleged corrective disclosure is not corrective, then any adverse market reaction is no more than a straightforward "decrease in price following the release of negative information." *Id.* Showing a lack of correctiveness, therefore, "severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff," and "rebut[s] the presumption of reliance." *Halliburton II*, 573 U.S. at 281 (ellipsis in original) (quoting *Basic,* 485 U.S. at 248).

Here, Lead Plaintiff has identified two "corrective disclosures:" (1) Stamps's February 21, 2019 announcement that it had terminated its commission agreement with the USPS by which the USPS made payments to Stamps in return for exclusivity on the Stamps.com and Endicia brands and (2) its May 8, 2019 announcement that USPS "was also restricting and terminating certain NSA contracts with the Company's reseller[s]." ¶¶64, 113, 122, 127. While it is true that Stamps's stock price declined after each of these statements, neither reveals that Stamps's statements two years earlier about its "strong relationship" with the USPS were false. *See, e.g.*, *In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at \*12 (N.D. Cal. May 16, 2011) (multiple years between the alleged

16

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

misrepresentations and the purported corrective disclosures shows lack of link between them). Analysts also did not read the "corrective" disclosures as relating to Stamps's relationship with the USPS (let alone, its relationship in 2017). After an exhaustive review of analyst reports, Zurek has noted that none of the analysts discussed the strength of Stamps's relationship with the USPS. *See* Zurek Rpt. §V.G. Nye likewise did not identify any analyst reports that viewed discontinuation of the agreement as a revelation of a bad relationship between the USPS and Stamps as of February 2019 (let alone, as of May or August 2017). *See* Nye Depo. at 132:20-136:1. Nye's testimony with respect to the May 8, 2019 disclosures also acknowledged that no analyst interpreted the May 8, 2019 disclosures as reflecting anything about the status of the relationship between Stamps and the USPS. *See* Nye Depo. at 166:11-167:20. Stamps's May 8, 2019 announcement, moreover, concerned contracts to which Stamps was not even a party. ¶127; *see also* Nye Depo. at 164:2-11. Moreover, the USPS resellers and the USPS actually signed new contracts in December 2019 as disclosed by Stamps on February 19, 2020. This further show that the May 8, 2019 disclosure does not reflect a supposed negative relationship between Stamps and the USPS. *See* Zelichov Decl., Ex. 7.

C.  **<u>Any Price Impact from Defendants' Statements about Task Force Report Ended When the Task Force Report Was Released on December 4, 2018</u>**

The remaining statements in the case, which did not occur until about a year later, generally pertain to Stamps's expectations about the outcome of the USPS Task Force. On August 1, 2018, Stamps stated in response to a question about the Task Force Report that "[t]he final [task force] report is expected to be issued August 10. We don't know the specifics of the report. But we do think that based on our conversations that the report will come out strongly in favor of the partnerships between the USPS and private industry like the partnerships we've had with the USPS." ¶89; *see also* Nye Depo. at 186:5-187:22 (answer to question from Kevin

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

17

Liu on August 1, 2018 concerns the Task Force Report). The report, however, did not come out on August 10, 2018 as expected. Again on October 31, 2018, Stamps stated in response to a question about the Task Force, "I think … the general view is the idea of the USPS increasingly embracing partnerships like ours makes a tons of sense for them." ¶92; *see also* Nye Depo. at 188:18-190:14 (response to question from George Sutton on October 31, 2018 concerns the Task Force Report).

As Nye admitted during his deposition, to the extent that these statements had any positive price impact at all – Nye did not reference Stamps's statements about the Task Force Report as "important" to Stamps's stock price reaction on August 2, 2018 and Stamps's stock price again *declined* following the October 31, 2018 statement (Nye Report., Ex. 12 at Pgs. 1 and 45 of 76) – Lead Plaintiff's possible reliance on the inflated price ended when the Task Force issued its Report on December 4, 2018. *See* Dkt. No. 81, Ex. 23; *see also* Nye Depo. at 193:5-194:10 ("truth or falsity of statements about the contents of the task force report would be resolved upon release of the task force report"). The actual contents of the Task Force Report would reveal the truth or falsity of any earlier statements about it, would thereby remove any related price inflation, and would "sever the link" between the alleged misstatement and the stock price. *See* Zurek Rpt. §V.E; *Finisar*, 2017 WL 6026244, at *8 (N.D. Cal. Dec. 5, 2017) (analyst reports issued before an alleged corrective disclosure "sever the link" sufficient to rebut presumption of reliance); *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *8-9 (N.D. Cal. Dec. 22, 2016) (class period ends when disclosures curing allegedly misleading statements released); *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 294-95 (D. Minn. 2018) (class period ended when curative disclosure issued in a medical journal article); *Ravens v. Iftikar*, 174 F.R.D. 651, 670 (N.D. Cal. 1997) ("presence in the market of

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

18

information corrective of the fraud – whatever its source – snaps the causal link between misinformation and any injury of plaintiffs").[9]

### D. Any Price Impact from Statements about PBIA Negotiation Ended When Defendants Disclosed Discontinuation of PBIA

Lead Plaintiff also challenges Stamps's October 31, 2018 statements about "negotiations of important agreements with the USPS." The Court held that this statement presented a "close call" as to whether Plaintiff had sufficiently alleged that it was false or misleading. *See* Dkt No. 143, at 8. Defendants continue to maintain that Lead Plaintiff has not so alleged especially given Stamps's August 8, 2018 disclosure that "the USPS provided a notice requiring the renegotiation of one of our important financial compensation arrangements." Dkt. No. 81, Ex. 6, at 6; *see also* Zurek Rpt. ¶¶71-72. In any event, the class period related to this statement must end no later than February 21, 2019 when Stamps disclosed that its negotiations with the USPS regarding renewal of the PBIA had not been successful. *See* Dkt. No. 81, Ex. 15; *see also* Zurek Rpt. §V.F. Indeed, Lead Plaintiff alleged that Stamps "revealed the true state of its relationship with the USPS when it announced the end of its USPS partnership" such that any class period in this case must end no later than February 21, 2019. ¶63; *see also* ¶27 ("USPS terminated Stamps' commission-based compensation" as a result of "the undisclosed conflict between the USPS and Stamps"); Dkt. No. 1, ¶¶ 1, 3-4, 20, 23-25 (initial class action complaint in this case provided for a class period of May 3, 2017 to February 21, 2019 alleging that disclosures on February 21, 2019 revealed truth about Stamps's partnership with the USPS and "manipulation of a USPS reseller program").

---

[9] To the extent that Stamps's 2017 statements introduced price inflation (which they did not for the reasons discussed above), any class period related to those statements should end by August 24, 2017, when Capitol Forum published the last of the reports from which Lead Plaintiff copied the allegations in the Complaint. *Compare* ¶¶51-58 (copying Capitol Forum reports without attribution) *with* Zurek Rpt., Appendix C, ¶¶12, 18, 19, 25, 32, 33 & n.25 (describing the assertions in the Capitol Forum reports); *see also MagnaChip*, 2016 WL 7406418, at *8-9; *Medtronic*, 325 F.R.D. at 294-95.

19

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

## III.    PLAINTIFF HAS NOT PROVIDED A CLASSWIDE DAMAGES MODEL

The Supreme Court held in *Comcast* that, to meet its burden under Rule 23(b)(3), a plaintiff must proffer a damages model that: (1) is consistent with its theories of liability; (2) "measures only those damages attributable to that theory"; and (3) is capable of measuring those damages on a class-wide basis. 569 U.S. at 35. Plaintiff here fails these requirements.

First, Lead Plaintiff's expert, Nye, has not provided a methodology that fits the theories remaining in this case. *See* Zurek Rpt. §VI.A; *see, e.g.*, *Loritz v. Exide Techs.*, 2015 WL 6790247, at \*22 (C.D. Cal. July 21, 2015). Instead, Nye's "general economic framework" does not address that the Court dismissed two out of the three theories of falsity in the Complaint. *See* ¶¶27, 130; *see* Zurek Rpt. §VI.B.  Second, even if Lead Plaintiff's "general economic framework" could address this issue, Nye seems to assume that the full amount of any alleged inflation existed at the very beginning of the class period. This is an economic impossibility both because (1) Stamps could not have disclosed the information that it revealed at the end of the class period at the beginning and (2) such an approach requires Stamps's market value to have been "negative" on 93 days of the putative class period. *See* Zurek Rpt. §VI.C.

Both of these flaws, if overlooked, would have the effect of exaggerating damages and providing Plaintiff with a windfall – the very outcome prohibited by the Supreme Court in *Comcast*. For these reasons, class certification should be denied. *See* Zurek Rpt. §VI.D-E.

### 1.    <u>Lead Plaintiff's Damages Framework Is Not Limited to Its Remaining Liability Theories</u>

In promulgating a "general economic framework" that did not change after claims were dismissed, Lead Plaintiff violates the central holding in *Comcast* that "at the class-certification stage (as at trial), any model supporting a plaintiff's

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

20

damages case must be consistent with its liability case." 569 U.S. at 35 (quotation marks and citation omitted). Plaintiffs in *Comcast* brought antitrust claims under four theories. *Id.* at 31. The district court granted defendants' motion to dismiss three of these theories and, subsequently, granted plaintiffs' motion to certify a class. *Id.* at 31-32. At class certification, plaintiffs' expert calculated price inflation on a class-wide basis but failed to "isolate damages resulting from any one theory of antitrust impact." *Id.* at 32, 36-37. Defendants argued that this precluded class certification because it rendered plaintiffs' damages model incapable of measuring class-wide damages. The appellate court declined to entertain this argument, holding that it would touch on the merits. *Id.* at 32.

The Supreme Court disagreed, holding that a class could not be certified because plaintiffs' model fell "far short of establishing that damages are capable of measurement on a classwide basis," due to its failure to distinguish between the dismissed and still-live liability theories. *Id.* at 34. The Court explained:

> We start with an unremarkable premise. If respondents prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).

*Id.* at 35.

While courts have split on how broadly *Comcast* should be applied, even under its most narrow reading, the decision prohibits plaintiffs who seek to certify a class from relying on a damages theory that incorporates allegations that have already been dismissed from the case. *See also In re BP P.L.C. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("*Comcast* signals a significant shift" from a time when "the Court may have been satisfied that Plaintiffs' invocation of the event study methodology alone showed the predominance of common issues."). As the Central District of California has previously explained in another securities class

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

21

action, when a "[p]laintiff's proposed damages model is [] tied to multiple theories of liability, some of which are no longer at issue in the case," *Comcast* requires that class certification be denied. *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1129 (C.D. Cal. 2018); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d at 979, 988 (9th Cir. 2015) ("[T]he putative class's problem in *Comcast* was that the damages model did not isolate damages resulting from any one theory of antitrust impact" (quotation marks and citation omitted)); *Forrand v. Fed. Express Corp.*, 2013 WL 1793951, at \*3 (C.D. Cal. Apr. 25, 2013).

Here, as in *Comcast,* Lead Plaintiff initially alleged three distinct theories of liability, asserting that Stamps misled investors with 25 different statements about: (1) Stamps's secret "abuse" of the reseller program; (2) its "strong relationship" with the USPS; and (3) its past and future results. *See generally* Order at 18-26. Plaintiff also attributed damages to all three theories, alleging that each category of statement, when corrected, contributed to Stamps's stock price decline on February 21, 2019 and May 9, 2019. *See* ¶27 ("As the truth about Stamps' abuse of the reseller program and the impact thereof on Stamps' operations and prospects reached the market, the trading price of Stamps shares collapsed"); ¶130 ("[t]he declines in the price of Stamps stock after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations and the impact thereof being revealed to investors and the market") (emphasis added).

Also as in *Comcast,* this Court subsequently dismissed two of these three theories, holding that "Plaintiff may not base its claims on Defendants' alleged omission of their reseller scheme" (Order at 19) and "Plaintiff has failed to demonstrate that Stamps' discussion of, and positive statements about, its past and future financial results were misleading" (Order at 26).  Lead Plaintiff's third theory about the nature of Stamps's relationship with the USPS survived only partially as the Court held that Plaintiff had not alleged that Stamps violated any USPS governance or contractual agreements. *See* Order at 21-22. The Court thus narrowed

22

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

the case down to seven allegedly false or misleading statements from the 25 Lead Plaintiff initially alleged. *See* Zelichov Decl., Ex. 5.

Finally, again as in *Comcast,* Lead Plaintiff has made no attempt to limit its proposed damages model to the single theory of liability that remains. Lead Plaintiff argues that "Dr. Nye's event-study methodology, set forth in ¶¶58-62 of his report, is fully capable of adequately calculating damages on a classwide basis at a later stage of the litigation," but Nye does not even claim to be able to separate damages attributable to the claims remaining in the case from those that have been dismissed. *See* Dkt. No. 120, at 22.  Instead, he offers an opinion based on the claims "set forth in the 'Consolidated Class Action Complaint for Violations of the Federal Securities Laws,' dated August 5, 2019" (Nye Rpt. at 2, n.1). The mere 3½ page "general economic framework" did not change as a result of either this Court's Order or Clarification Order. Nye, in fact, expressed no surprise that the description of his "general economic framework" was the same in this case as in cases related to Mylan, AMC, and Yelp. *See* Nye Depo. at 22:8-22. At no point does Nye specify any method for identifying the price inflation attributable to the "strong relationship" statements, alone, nor does he explain how he would exclude damages arising out of the claims this Court has dismissed. Therefore, even under a very narrow reading of *Comcast*, no class should be certified. *See* Zurek Rpt. §§VI.A-B.[10]

---

[10] Nye testified that damages would be the same regardless of how many statements were dismissed because the case had "an omissions theme or sentiment at least from an economic perspective."  Nye Depo. at 113:15-114:5.  This Court, however, held that Plaintiff had only successfully alleged any claims whatsoever because Defendants "[chose] to tout positive information to the market" thereby giving rise to a duty to disclose negative information.  Order at 23; *see also* ¶¶65-97 (identifying "**FALSE AND MISLEADING . . . STATEMENTS**," not omissions). At oral argument, the Court, in fact, distinguished a similar case it had recently dismissed where the defendants had not spoken at all on the particular topic at issue, which the Court viewed as an "omissions" case. *See Kauffman v. Natural Health Trends Corp.*, 2019 WL 7165921 (C.D. Cal. Dec. 20, 2019). This case is thus not a pure "omissions" case.

23

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

## 2.    **The Damages Theory Would Overcompensate Investors**

Lead Plaintiff also has not met its burden to proffer a damages model that can establish class-wide damages consistent with its theory of liability for another reason. To apply its "general economic framework" here, Plaintiff must prove that Stamps could have disclosed the "corrective" information issued on February 21, 2019 and May 8, 2019 on the very first day of the class period. Indeed, Nye acknowledged at his deposition that the "economic framework for estimating damage that [he] outlined" depends upon assuming that "the inflation in Stamps' stock price resulting from alleged misstatements … began ... in full at the beginning of the class period." Nye Depo. at 144:9-22. This assumption, however, cannot withstand even slight scrutiny. Stamps could not have disclosed that its package business incentive agreement with the USPS had been discontinued on May 3, 2017. The agreement was not even signed until June 13, 2017. *See* Zelichov Decl, Ex. 8. Stamps also could not have disclosed that the USPS had commenced renegotiations with its resellers that would reduce Stamps's 2019 forecasts on May 3, 2017. Stamps had not even issued any forecasts for 2019 until over 21 months later, and the USPS did not commence renegotiations with its resellers until spring of 2019. *See* Dkt. No. 81, Ex. 15; *see also* Zurek Rpt. §VI.C. Stamps fully disclosed the risks to these contracts throughout the class period, but it could not disclose that any had come to fruition by May 3, 2017 (as they had not). Moreover, the USPS and its resellers ultimately entered into new, long-term agreements in December 2019 that "provide[d] both relative stability and predictability for the resellers and for their various partners," including Stamps. Zelichov Decl., Ex. 7, at 4.

Even if Lead Plaintiff is able to prove the impossible, the "general economic framework" yields another impossible result. The cumulative residual stock price drops on February 22, 2019 and May 9, 2019 equate to $163.20 using Lead Plaintiff's expert's regression model. *See* Nye Depo. at 141:24-142:21, 145:5-16; 175:3-19.  Stamps's stock price, however, was lower than $163.20 on 93 days of the

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

24

putative class period. *See* Zurek Rpt. §VI.C; *see also* Nye Report, Ex. 11B. This result too cannot withstand the slightest bit of scrutiny as the true price of Stamps's stock could never have been negative. Nye says that he can address this economic impossibility by arbitrarily "truncating" the value of Stamps's stock at zero, but he admitted that he both has and has not seen this work in other cases. *See* Nye Depo. at 176:9-24. Nye also tried to justify the economically impossible result by claiming that Stamps "would have been approximately worthless" without its commission agreement with the USPS and if USPS was renegotiating its agreements with the resellers, but Stamps's stock price never got close to $0 even after the purported truth was revealed. Nye Depo. at 178:16-179:3. After both of the alleged corrective disclosures, Stamps's stock price was still $36.90 and its market capitalization was over $650 million. The fact that the "general economic framework" gives rise to impossible results on some days shows that it is not valid. *See also In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at \*10-12 (S.D. Tex. 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015).

## **CONCLUSION**

The Motion for Class Certification should be denied. Alternatively, this Court should certify a class that lasts no longer than from August 1, 2018 through February 21, 2019. The statements that Lead Plaintiff challenges from May 3, 2017 and August 2, 2017 had no price impact, neither Lead Plaintiff nor its investment advisor were net purchasers of Stamps's stock during this period (investment advisor sold shares through September 30, 2018 and Lead Plaintiff did not become a net purchaser until September 21, 2018), and Lead Plaintiff's expert's general economic framework to calculate damages results in the economically impossible results of Stamps's stock price having a negative value during these three months.

25

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

Dated:  August 31, 2020                KATTEN MUCHIN ROSENMAN LLP

By:   */s/ Richard H. Zelichov*
Richard H. Zelichov
richard.zelichov@katten.com
Christina L. Costley
christina.costley@katten.com
Paul S. Yong
paul.yong@katten.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:  (310) 788-4400
Facsimile:  (310) 788-4471
Attorneys for Stamps.com Inc., Kenneth McBride, Kyle Huebner, and Jeff Carberry

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

26