# Exhibit 10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATT KARINSKI, Individually     )

and on Behalf of All Others     )

Similarly Situated;             )

            Plaintiff,       )

   vs.                          )   Case No.

STAMPS.COM, INC., KENNETH        )   2:19-cv-01828-MWF

MCBRIDE, KYLE HUEBNER, and       )   (SK)

JEFF CARBERRY;                   )

           Defendants.      )

_____)

VIDEOTAPED DEPOSITION VIA VIDEOCONFERENCE OF

ZACHARY NYE, Ph.D.

Redwood City, California

Friday, August 14, 2020

Reported by:

Lynda L. Fenn, CSR, RPR

CSR No. 12566

JOB No. 4215740

PAGES 1 - 227

Page 1

Exhibit 10 at 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


MATT KARINSKI, Individually      )

and on Behalf of All Others      )

Similarly Situated;              )

          Plaintiff,        )

   vs.                           )   Case No.

STAMPS.COM, INC., KENNETH         )   2:19-cv-01828-MWF

MCBRIDE, KYLE HUEBNER, and        )   (SK)

JEFF CARBERRY;                    )

         Defendants.       )

_____)


    VIDEOTAPED DEPOSITION VIA VIDEOCONFERENCE

    of ZACHARY NYE, Ph.D., taken on behalf of

    Defendants, Redwood City, California, at 9:32

    a.m. and ending at 4:23 p.m., Friday, August

    14, 2020, reported by Lynda L. Fenn,

    CSR No. 12566, Certified Shorthand Reporter

    within and for the State of California,

    pursuant to notice.

Page 2

Exhibit 10 at 2

APPEARANCES (Appearing via Videoconference):

For the Plaintiff:

    ROBBINS GELLER RUDMAN & DOWD LLP

    BY:   ERIC NIEHUAS, ESQ.

         HILLARY B. STAKEM, ESQ.

    655 West Broadway, Suite 1900

    San Diego, California  92101

    (619) 231-1058

    ericn@rgrdlaw.com

    hstakem@rgrdlaw.com

For the Defendants:

    KATTEN MUCHIN ROSENMAN LLP

    BY:   RICHARD J. ZELICHOV, ESQ.

         PAUL S. YONG, ESQ.

    2029 Century Park East, Suite 2600

    Los Angeles, California  90067

    (310) 788-4400

    richard.zelichov@katten.com

    paul.yong@katten.com

Also Connected:

    Jeffrey W. Nichols, Videographer

    Nicholas D. Yavorsky

    Cornerstone Research

    Principal

Page 3

Exhibit 10 at 3

Q   Okay.  And in your report if you look at --   09:50:41

and this is Nye Exhibit No. 1, there's a section   09:50:50

seven which is entitled "Damages Can Be Measured on a   09:50:53

Class-Wide Basis and in a Manner Consistent with Lead   09:51:01

Plaintiff's Theory of Liability."   09:51:05

Do you see that?   09:50:?

A   I do.   09:51:10

Q   Okay.  And I have looked at some reports   09:51:10

that you've issued in other cases that -- Mylan, AMC,   09:51:17

Yelp, there are a few -- Carabia and from my review   09:51:27

of those reports, they contain sections that are   09:51:33

almost identical to what is section seven here.   09:51:38

Does that surprise you?   09:51:42

MR. NIEHUAS:  Objection; form.   09:51:43

THE WITNESS:  No, not at all.  All of those   09:51:45

pieces, they -- they're theories of liability are   09:51:48

clearly related to this economic framework I've   09:51:51

described here for Stamps.  And so this methodology,   09:51:54

you know, frankly fits these types of cases like a   09:52:00

glove and I've explained it as I would to anybody in   09:52:04

all of these cases thoroughly, so it doesn't surprise   09:52:08

me at all.   09:52:13

BY MR. ZELICHOV:   09:52:14

Q   What is it about all of these cases that   09:52:14

makes it possible for damages to be measured on a   09:52:17

Page 22

Exhibit 10 at 4

No. 8B to your report?                              10:50:19

A    I recall that it was higher in the very        10:50:20

beginning of the class period.                      10:50:23

Q    Okay.  And what's the significance of          10:50:23

Stamps' short position being sort of significantly  10:50:28

higher than the U.S. average during this period?    10:50:33

MR. NIEHUAS:  Objection to form.  Sorry.            10:50:37

THE WITNESS:  It just -- just shows that            10:50:39

there's a lot of short sellers out there that wanted 10:50:42

to bet on the stock price declining which is --     10:50:46

that's not the highest I've ever seen by far, but   10:50:49

it's in a range of what I would say is, you know, I  10:50:52

can see the normal short interest.  It's on the      10:50:56

higher end.                                          10:51:00

But really the thing to consider here is            10:51:01

the -- is whether there's a short selling constraint 10:51:05

that would prevent investors with negative opinions  10:51:08

from conveying those negative opinions and having    10:51:11

that reflected into the market price.                10:51:14

Here, though, the level of institutional            10:51:16

ownership in holdings was, you know, much higher     10:51:21

throughout the class period, so there's no evidence  10:51:25

that there was short selling constraints and, indeed, 10:51:27

the fact that it got up than high shows that there   10:51:30

was really no short selling constraints.  When people 10:51:32

Page 56

Exhibit 10 at 5

wanted to go short, they had access to it.                    10:51:35

BY MR. ZELICHOV:                                              10:51:37

    Q    But it does reflect -- you would agree that    10:51:38

it reflects that were a lot of short sellers out        10:51:40

there with respect to Stamps.com; correct?              10:51:43

        MR. NIEHUAS:  Objection to form.                10:51:46

        THE WITNESS:   There was more at the            10:51:47

beginning of the class period than at the end of the    10:51:49

class period.                                            10:51:51

BY MR. ZELICHOV:                                         10:51:52

    Q    And as part of your analysis in this case,     10:51:52

were you aware that there were quite a few short        10:51:57

reports issued about Stamps both before and during      10:52:01

the class period?                                        10:52:04

        MR. NIEHUAS:  Objection.                        10:52:06

        THE WITNESS:  It wouldn't surprise me.  The     10:52:08

short sellers are a bigger and bigger part of the       10:52:10

dissemination and interpretation of the information     10:52:13

in the stock market these days.                         10:52:16

BY MR. ZELICHOV:                                         10:52:20

    Q    And would you agree that the relatively        10:52:20

high percentage short interest in Stamps reflects       10:52:22

that the info in those short reports was incorporated   10:52:25

into Stamps stock price?                                10:52:30

        MR. NIEHUAS:  Objection to form.                10:52:33

Page 57

Exhibit 10 at 6

THE WITNESS:  I don't -- I don't look at it       10:52:34

like that.  I don't look at it like that.         10:52:35

The short selling reports are only                10:52:37

pertinent to short sellers because I think they   10:52:39

inform, you know, people that are uninvested or even  10:52:41

long in the stock because it's basically critical  10:52:45

analysis of the company's prospects and current   10:52:49

situations, so I think it can be important to all  10:52:51

investors.                                        10:52:52

But to the extent it was any short seller         10:52:53

report is publicly available or widely disseminated,  10:52:56

I would expect it to be incorporated into the stock  10:53:00

price.                                            10:53:04

BY MR. ZELICHOV:                                  10:53:05

Q    Just sticking with just that last part to   10:53:05

the extent that any short report was publicly     10:53:07

available, you would expect that it would have been  10:53:11

incorporated into Stamps stock price; correct?    10:53:13

MR. NIEHUAS:  Objection to form.                  10:53:16

THE WITNESS:  Yeah, to a certain degree.  I       10:53:17

think that degree depends on the level of         10:53:23

availability.  Some are harder to get or less     10:53:26

publicized so that can influence the impact given --  10:53:29

any given piece of news can have on the stock price.  10:53:34

//                                                10:53:37

Page 58

Exhibit 10 at 7

A    Yes. 10:54:49

Q    Okay.  Let's look at your report again and 10:54:51 I would like you to turn to page six, please? 10:55:00

A    Okay. 10:55:13

Q    And in footnote 14 you write that, "In 10:55:14 fraud-on-the-market litigation, several courts 10:55:18 reference the semi-strong form of efficiency, which 10:55:21 implies that market prices incorporate all publically 10:55:26 available  information," and it says, period, "In 10:55:28 all -- in academic literature, this is referred to as 10:55:30 informational efficiency." 10:55:33

Do you see that? 

A    Yes. 10:55:37

Q    And is that the definition of market 10:55:38 efficiency that you applied to this case in 10:55:43 determining that Stamps stock was traded on a 10:55:49 efficient market? 10:55:52

A    So my understanding is that the relevant 10:55:54 standard is what's described in paragraph 13 of my 10:55:58 report which, you know, I believe the Supreme Court 10:56:02 laid out which was that the fraud in the market 10:56:07 theory is based on the fairly modest premise that 10:56:09 market professionals generally consider most publicly 10:56:13 announced material statements about companies thereby 10:56:16 affecting the stock market prices. 10:56:19

Page 60

Exhibit 10 at 8

I think that the analyses that I have    10:56:21
performed and the results of those analyses strongly    10:56:26
support that notion of market efficiency here for    10:56:29
Stamps.com.    10:56:31

I will say, though, that of the three    10:56:31
standards that I've laid out in that footnote which    10:56:33
are the typical business school standards, you know,    10:56:36
that were taught, the -- I think my analysis    10:56:38
demonstrates that of those three Stamps stock price    10:56:44
was more closely associated with the semi strong form    10:56:48
of market efficiency.    10:56:52

Q    Okay.  If you look at paragraph 17 of your    10:56:54
report.  You write -- this is on page eight -- you    10:56:58
write, "As demonstrated in section VI.A to VI.H an    10:57:03
analysis of these factors supports my conclusion that    10:57:10
the market for Stamps stock was informationally    10:57:12
efficient throughout the class period."    10:57:19

Do you see that?    10:57:21

A    Yes.    10:57:21

Q    And you use the phrase in footnote 14 that    10:57:21
said, "In academic finance literature this," meaning    10:57:26
the semi strong form of efficiency, "is referred to    10:57:29
as informational efficiency"; correct?    10:57:33

A    Yes.  By certain authors and certain    10:57:37
context, yes.    10:57:43

Page 61

Exhibit 10 at 9

compared the stock price.   11:12:35

In these instances, I found that the   11:12:36 information conveyed and the reactions of analysts   11:12:39 were -- and news commentators was consistent with   11:12:42 what you would expect in an efficient market.   11:12:46

Q   So is it fair, then, that the remark part   11:12:49 is the -- what you understood to be the most   11:12:51 important points that had come up in the press   11:12:54 release, conference calls and analyst reports from   11:13:01 the particular date?   11:13:04

MR. NIEHUAS:   Objection to form.   11:13:05

THE WITNESS:   Yes, I think so.   11:13:06

BY MR. ZELICHOV:   11:13:10

Q   And then in -- if you look back at page --   11:13:10 the very first page of Exhibit No. 12 -- or Exhibit   11:13:17 No. 12 to your report, which is Exhibit No. 4 to your   11:13:23 deposition -- I'm going to hate dealing with this   11:13:28 later.   Sorry, strike that.   11:13:30

If you can look back to Exhibit No. 4 to   11:13:32 your deposition in the first page, which is page one   11:13:36 of 76 which is the chart?   11:13:39

A   I'm there.   11:13:40

Q   For each of these dates you selected a   11:13:41 one-day event window to look at the actual return and   11:13:45 the residual return; is that correct?   11:13:49

Page  72

Exhibit 10 at 10

A   I can't recall.  I mean they -- pretty much   12:22:37
statements.   12:22:43

Q   Okay.  And then did you -- after your   12:22:48
review on the court order of the motion to dismiss,   12:22:50
you recognize that the court had dismissed or --   12:22:54
certain statements from the case; correct?   12:22:59

A   There were certain items that were -- like   12:23:09
the numeric results that were presented were not   12:23:11
considered, if I'm recalling now, that were   12:23:17
misleading because they were alleged to be false, so   12:23:21
that's an example.   12:23:28

I think there -- there might be some   12:23:29
corporate puffery in there, but I can't -- maybe I'm   12:23:31
getting that wrong.   12:23:33

Q   Okay.  And did plaintiff's counsel provide   12:23:34
you with a interpretation as to how many false or   12:23:40
misleading statements on how many days during the   12:23:42
class period were left after the court's decision on   12:23:42
the motion to dismiss?   12:23:46

A   No.  But my reading of the motion to   12:23:47
dismiss is that the substantive allegations that,   12:23:49
indeed, were -- created a situation of a foreseeable   12:23:52
consequence were still at issue given the, you know,   12:23:57
unawareness by the market of the deteriorating and   12:24:00
poor relationship as alleged between USPS and Stamps.   12:24:03

Page 113

So the number of misstatements and the specific misstatements is not really a concern for me in this case, especially because it's more of an omissions theme or sentiment case at least from an economic perspective.

Q   We were discussing earlier before the complaint in the list of statements there or in paragraphs 65 to 97 and it was titled a section called "Defendant's False and Misleading Class Period Statements"; correct?  Do you recall that?

A   Yeah, we started out reading the first bullet.

Q   Okay.  And that title doesn't mention -- it doesn't say defendant's false and misleading omissions during the class period; correct?

A   I can't recall it saying that, but I think there were found to be misleading and false because they failed to state the full truth when choosing to speak.  That's -- that's my understanding.

Q   Okay.  And so based on that you see no difference between whether there are 25 false and misleading statements alleged on seven days or nine false or misleading statements made on six days.

You're -- you think that your damages calculations would be identical in both of those

Page 114

Exhibit 10 at 12

of my tongue.  It just being how -- or assessing via

the tools available to an economist how a sub part to

the guidance may have influence on price.  Looking at

the ratio, you know, can be helpful between what part

was, you know, due to the USPS deal versus other

factors.

And also discovery evidence is going to be,

I think, crucial in determining what exactly caused

the full value reduction.

Q   As an economist and an expert in corporate

finance, would you agree that two entities can have a

good commercial relationship and still fail to reach

an agreement on a particular contract?

MR. NIEHUAS:  Objection to form.

THE WITNESS:  Yes, I think that's common

sense.  I don't think you need a degree or any

expertise in corporate finance to think that way.

MR. ZELICHOV:  All right.

BY MR. ZELICHOV:

Q   And would you further agree that the near

termination of the contract between the parties does

not establish that the relationship was not good?

MR. NIEHUAS:  Objection to form.

THE WITNESS:  That could be the case, yes.

//

Page 132

Veritext Legal Solutions
866 299-5127

Exhibit 10 at 13

BY MR. ZELICHOV:

Q   And, furthermore, would you agree that even   12:49:00
if two entities didn't have a good relationship in   12:49:02
2019, it doesn't necessarily address the strength of   12:49:05
the relationship in 2017?   12:49:08

MR. NIEHUAS:  Objection to form.  Calls for   12:49:09
speculation.   12:49:12

THE WITNESS:  Yeah, it could.  It just   12:49:12
depends, you know, on the facts.   12:49:15

BY MR. ZELICHOV:   12:49:16

Q   And-- or even 2018; correct?   12:49:16

MR. NIEHUAS:  Objection to form.   12:49:19

THE WITNESS:  It's something to consider   12:49:20
for sure.   12:49:22

MR. ZELICHOV:  Okay.   12:49:23

BY MR. ZELICHOV:   12:49:24

Q   And there's nothing in the press releases,   12:49:24
conference calls or analyst reports that you reviewed   12:49:28
indicating that Stamps and USPS didn't have a good   12:49:33
relationship even as of February 21st, 2019; correct?   12:49:38

MR. NIEHUAS:  Objection to form.   12:49:41

THE WITNESS:  Did you ask me if there was   12:49:43
nothing that --   12:49:46

MR. ZELICHOV:  Yeah.   12:49:46

THE WITNESS:  I'm sorry, you cut out.   12:49:48

Page 133

Exhibit 10 at 14

MR. ZELICHOV:  Yes.    12:49:50

THE WITNESS:  Okay.    12:49:52

BY MR. ZELICHOV:    12:49:52

Q   I asked you is there anything in the press    12:49:52
releases, conference calls or analyst reports    12:49:55
indicating that Stamps and the USPS did not have a    12:49:58
good relationship as of February 21st, 2019?    12:50:01

MR. NIEHUAS:  Objection to form.    12:50:03

THE WITNESS:  I don't recall anything as of    12:50:05
February.  You know, there might have been something    12:50:06
out there, of course.    12:50:08

But my recollection, you know, just from my    12:50:10
work on the event study was that, you know, there was    12:50:12
speculation about a renegotiation of change to the    12:50:17
relationship between -- of the deals, excuse me,    12:50:25
between USPS and Stamps, but -- anyway, right now my    12:50:28
recollection is that, you know, the market at that    12:50:33
point did think there was a good overall relationship    12:50:35
between the two in the sense that, I think, the CEO    12:50:38
had described it as that, at least in terms of the    12:50:42
sentiment he used.    12:50:46

BY MR. ZELICHOV:    12:50:47

Q   I'm sorry, I'm asking you none of the --    12:50:47
the Stamps press release from February 21, 2019,    12:50:56
doesn't state that Stamps and the USPS did not have a    12:51:00

Page 134

Exhibit 10 at 15

good relationship; correct?

    MR. NIEHUAS:  Objection to form.

    THE WITNESS:  No, they announced they terminated the deal with USPS.

BY MR. ZELICHOV:

Q   But they didn't say they didn't have a good relationship; correct?

A   I don't think they used those words.

Q   Okay.  And Stamps didn't use that in the conference call either; correct?

A   I can't recall anything in the conference call, but I don't think so.

Q   And none of the analyst reports that you reviewed stated after February 21st, 2019, that Stamps and the USPS had a bad relationship now; correct?

A   I think that's true.  I think it was more they were wondering why this happened now in February, and that it was obviously detrimental to the value of Stamps, but they -- they did accept the company's, you know, statements that they had terminated the deal and -- with the USPS and that they had chosen to do this to work with in a non-exclusive nature with other carriers.

    So, but no, I don't think they described

Page 135

Exhibit 10 at 16

a -- an unhealthy relationship explicitly.                12:52:22

THE VIDEOGRAPHER:  This is the                12:52:30

videographer.  I apologize for the interruption.          12:52:30

Could we briefly just go off -- literally just go off     12:52:33

and go back on?  I need to start a new recording.         12:52:38

MR. ZELICHOV:  Why don't we go off and take     12:52:41

lunch.  Since we're around one, I think it's probably     12:52:43

a decent time to have lunch.                              12:52:46

Is that okay with others?                       12:52:48

MR. NIEHUAS:  Yeah, we would just ask           12:52:50

that -- I understand that there's a lot of people         12:52:52

involved here, but if we could just do a short lunch      12:52:54

that would be great.                                      12:52:58

MR. ZELICHOV:  Sure.  Why don't we aim for      12:52:59

30 minutes --                                             12:53:02

MR. NIEHUAS:  That's fine.                      12:53:03

MR. ZELICHOV:  -- if that works for others      12:53:04

and the court reporter as well.                           12:53:06

THE VIDEOGRAPHER:  We are going off the         12:53:07

record.  The time is 12:53 p.m.                           12:53:08

(Lunch recess taken.)                           13:30:51

THE VIDEOGRAPHER:  We are back on the           13:31:08

record.  The time is 1:31 p.m.                            13:31:33

BY MR. ZELICHOV:                                          13:31:36

Q   Good afternoon, Dr. Nye.                    13:31:36

Page 136

Exhibit 10 at 17

noting that it "has long saw Stamps relationship with 13:37:08 the USPS as its biggest risk"; correct? 13:37:14

A   That's what they -- they say, yeah. 13:37:20

Q   Okay.  And then let me ask you sort of a 13:37:22 different question or move on to a slightly different 13:37:27 question. 13:37:30

On February 21st, 2019, right, Stamps 13:37:31 disclosed that it had actually discontinued the 13:37:36 specific partnership with the USPS; right? 13:37:41

A   Correct. 13:37:43

Q   And based on that disclosure and the other 13:37:44 information that Stamps disclosed that day, Stamps 13:37:47 had a -- at least according to your Exhibit No. 12, a 13:37:50 company specific return of minus 59.10 percent; 13:37:56 correct?

A   Right. 13:38:05

Q   And if I wanted to try and convert that 13:38:06 59.10 percent into a -- call it a dollar drop, how 13:38:14 would I go about doing that? 13:38:23

A   Typically, you know, in a damages per share 13:38:26 calculation what we do is multiply the previous day's 13:38:32 closing price times the residual or company specific 13:38:37 return on the event date -- corrective event date. 13:38:40

MR. ZELICHOV:  Paul, could you mark as next 13:38:45 exhibit -- I guess it's Exhibit No. 11B to Dr. Nye's 13:38:48

Page 141

Exhibit 10 at 18

report.                                                    13:38:56

        (Defendant's Exhibit 7 was marked for             13:39:20

identification by the Certified Shorthand Reporter

and is attached hereto.)                                   13:39:20

BY MR. ZELICHOV:                                           13:39:20

        Q   Apparently, it's there.                        13:39:21

        A   I have it open.                                13:39:29

        Q   All right.  And if I go -- wow, the            13:39:30

ophthalmologist needs me or I need it.                     13:39:37

        If I go to the -- call it the row that you         13:39:40

have for 2-22-2019, that which again then has as the       13:39:42

company specific return, minus 59.10 percent, what         13:39:55

you're saying is I would multiply that times the           13:40:00

previous date's closing price of 198.08 in order to        13:40:03

get a -- to convert that percentage drop into a            13:40:08

dollar drop; is that right?                                13:40:11

        A   That's right.                                  13:40:13

        Q   Okay.  And so I think I did this but I         13:40:14

should probably do it accurately.  I think that is         13:40:24

$117.07; is that correct?                                  13:40:26

        A   It's -- it's in the ballpark for sure.         13:40:30

        Q   Okay.  And that's the stock price dropped      13:40:32

result that resulted from the actual discontinuation       13:40:35

of the commission agreement and the other information      13:40:39

that was disclosed on February 21st, 2019; correct?        13:40:42

                                             Page 142

Exhibit 10 at 19

Stamps and the USPS would be terminated?    13:42:12

A    I'm not saying that.  Plaintiff's theory of    13:42:18
liability in their complaint is what it is and they    13:42:23
can prove what they can.  But -- and this is not an    13:42:25
economic analysis.  This is a damages construct that    13:42:30
is legal and -- by nature.  So it's just a matter of    13:42:34
what -- you know, represents damages in a court's    13:42:38
eyes.    13:42:47

Q    Okay.  And let me ask the sort of follow-up    13:42:49
question.    13:43:01

Have you made a determination as to whether    13:43:02
the inflation in Stamps' stock price resulting from    13:43:05
alleged misstatements about the commission agreement    13:43:08
began sort of in full at the beginning of the class    13:43:12
period or at some different point during the class    13:43:16
period?    13:43:21

A    I haven't performed that analysis but I do    13:43:21
think that that is part of the economic framework for    13:43:29
estimating damage that I've outlined.  So it's    13:43:33
something that would be -- result from the damage    13:43:36
analysis that I've described and it can commonly    13:43:38
apply across the class.    13:43:40

Q    We were briefly talking earlier about sort    13:43:43
of a -- you didn't like the word, but we were briefly    13:43:53
talking about "back-casting" and the stock price    13:43:59

Page 144

Exhibit 10 at 20

drops upon the corrected disclosures to earlier 13:44:03
periods in the class period; correct? 13:44:08

A   Yeah, and I don't dislike the word.  I just 13:44:12
don't use it a lot. 13:44:17

Q   Okay.  And based on what you've analyzed 13:44:18
thus far, you were of the opinion that the entire 13:44:20
$117.07 in stock price drop on February 22, 2019, 13:44:25
should be or could be back-cast all the way to the 13:44:34
first day of the class period of May third, 2017? 13:44:38

A   I think could be is the -- is the correct 13:44:44
answer at least as far as I'm concerned because, you 13:44:47
know, what the actual amount of price inflation and 13:44:50
damages per share ends up being is going to be the 13:44:52
product of discovery in what plaintiffs can prove and 13:44:58
what they're alleging at the, you know, at the time 13:45:01
the analysis is conducted so... 13:45:04

Q   Okay.  But it's not the -- it's not an 13:45:06
analysis that you've done thus far? 13:45:16

A   No, I have not quantified future damages or 13:45:18
price inflation.  I've described the methodology that 13:45:20
has been accepted numerous times by federal courts 13:45:23
and I think it fits the case as it stands right now. 13:45:28

Q   All right.  I'm going to represent to you 13:45:31
accurately that Stamps and the USPS signed the 13:45:37
commission agreement that was -- a discontinuation 13:45:47

Page 145

A    I do.                                                    14:18:17

Q    Okay.  And would you agree that these                   14:18:18
disclosures on May eight, 2019, either in Stamps'            14:18:21
press release, its conference call or even in the            14:18:28
analyst's reports that came after do not relate to           14:18:31
any changes in contracts between Stamps and the USPS.        14:18:36

A    Direct contracts, I think that's true.  I'm             14:18:45
just a little uncertain about it if what we count as         14:18:54
being a contract if it's with an owned reseller or           14:18:58
something like that.  I know it gets a little blurry         14:19:00
with Stamps in their corporate structure.                    14:19:03

Q    Okay.  But -- so you would agree at least              14:19:06
that the disclosures do not relate to changes in the        14:19:11
direct contracts between Stamps and the USPS?               14:19:15

        MR. NIEHUAS:  Objection to form.  Calls for          14:19:16
speculation.                                                 14:19:18

        THE WITNESS:  I just don't know, I -- you            14:19:18
know, what's considered a direct contract or not, I         14:19:21
don't have the knowledge of that.  You know, it             14:19:25
sounds like it's a legally relevant term.  They're          14:19:27
certainly affected by these renegotiations between          14:19:33
the resellers and USPS, but yeah, that's -- that's          14:19:36
really my only understanding of it right now.               14:19:41

BY MR. ZELICHOV:                                             14:19:43

Q    Do you have a sense or based on your                    14:19:44

Page 164

Exhibit 10 at 22

and IntuiSHIP are affiliates of Stamps.com, would you   14:21:08

agree that the disclosures of May eight, 2019, did   14:21:14

not relate to changes in any direct contracts between   14:21:20

Stamps and the USPS?   14:21:23

        MR. NIEHUAS:  Objection to form.   14:21:26

        MR. ZELICHOV:  Okay.   14:21:35

        THE WITNESS:  I don't -- I don't know that.

I just don't have an opinion on that.  It sounds like

a legal issue.   14:21:44

BY MR. ZELICHOV:   14:21:44

    Q   Okay.  Would you agree that there is   14:21:44

nothing in the press releases, conference call   14:21:46

transcripts or analyst reports issued on either May   14:21:50

eight, 2019, or May ninth, 2019, that directly   14:22:01

address the relationship between Stamps and the USPS   14:22:07

as it existed in 2017?   14:22:09

        MR. NIEHUAS:  Objection to form.   14:22:18

        THE WITNESS:  I don't recall everything in   14:22:19

the analyst report so it could be the case, you know,   14:22:20

but the big deal was the -- certainly the analysts   14:22:23

and financial press thought that this was related   14:22:29

to -- well, it was.  It's related to the USPS and the   14:22:32

amount of money Stamps is going to make going   14:22:35

forward.  And so that's why it was relevant but I   14:22:37

can't recall right now anybody talking about things   14:22:41

Page 166

Exhibit 10 at 23

going back to 2017 right now.

BY MR. ZELICHOV:

Q   And you can't recall anything even to --
discussing anything about the relationship between
Stamps and the USPS and these press releases,
conference call transcripts and analyst reports in
May eighth and ninth, 2019; correct?

A   Yeah, same answer I think I gave you with
respect to February.  I don't remember everything
that was said.  It certainly wasn't the -- it doesn't
stick out to me though right now.

Q   And the same thing when -- with respect to
2018; correct?

A   Yes.

Q   Okay.  Would you agree that it's possible
that the USPS could approve of its reseller model and
still contemplate changes to it?

MR. NIEHUAS:  Objection to form.

THE WITNESS:  Sure.  I mean, that's
certainly possible.

MR. ZELICHOV:  Okay.

BY MR. ZELICHOV:

Q   I want to ask you now a couple more
questions about this May disclosure.  And if we go
back to the first page of Exhibit No. 4 to your

Page 167

Exhibit 10 at 24

something to consider.

BY MR. ZELICHOV:

Q   Okay.   We calculated -- I think we agree to some extent or at least based on the numbers that the stock price drop on the -- strike that.

I believe we agreed earlier that when we translated the company specific return from February 21st, 2019, into a dollar drop, we -- it was $117.07.

Does that sound correct?

And then we just did a calculation with respect to the May eighth, 2019 -- May eighth, 2019, corrective disclosure and worked that out to be a dollar drop of $46.16 at least.

Do you recall that, that sounds approximately right?

And if you add those up you get a total of $163.23 that -- we're in the ballpark there; right?

A   We are.

Q   And $163.53 is higher than Stamps' stock price during many days during the -- before the class period.

Is that consistent with your recollection?

A   I don't recall that but it may be the case. Maybe it's not the case.  They are either

Page 175

Exhibit 10 at 25

catastrophic declines over 50 percent so that 14:36:34 wouldn't surprise me. 14:36:36

Q   So why don't we look at -- well, I think 14:36:37 you have apprised -- somewhere here there must be a 14:36:42 chart of Stamps' actual stock prices during the class 14:36:47 period.  I can't believe that wouldn't be part of -- 14:36:52

A   I have an Exhibit No. 11-B so I can see at 14:36:55 the beginning of the class period it's about $110. 14:36:58

Q   Okay.  And how would you address the -- if 14:37:03 you were going to engage in the sort of back-casting 14:37:10 approach we were discussing earlier, how would you 14:37:15 address the issue that the total of the two 14:37:22 returns -- the two residual returns is actually 14:37:25 higher than the closing price of Stamps' stock price 14:37:31 during -- many days during the class period. 14:37:36

A   I've seen it in other cases.  I don't think 14:37:38 I've encountered a case where that's happened.  But 14:37:41 in other matters it's been accepted at, you know, a 14:37:44 district level at least to truncate price inflation 14:37:47 at the closing price and you can't have more in price 14:37:52 inflation than the closing price on that day, because 14:37:58 that the would be one way to do it.  It's not the 14:37:59 only way, it's just something that I've seen done 14:38:03 before. 14:38:04

Q   And -- okay.  And is that not an indication 14:38:05

Page 176

Veritext Legal Solutions
866 299-5127

Exhibit 10 at 26

-- or strike that.                                      14:38:14

        Does that not give you any pause that a       14:38:17

back-casting approach that adds the residuals on       14:38:20

those two particular days has some fundamental         14:38:24

economic failure if it's going to suggest that         14:38:31

Stamps' stock was actually worth a negative amount of  14:38:35

money on various points during the class period?       14:38:38

        MR. NIEHUAS:  Objection.                       14:38:40

        THE WITNESS:  Not at all.  So those, that      14:38:40

$116, whatever, if the actual loss incurred by anyone  14:38:42

regardless when you purchased during the -- if you     14:38:45

purchased prior to February 21st, 2019, and you held   14:38:48

past May whatever, ninth, 2019, that's the actual      14:38:51

amount of money you lost.  So to me that seems like a  14:38:55

measure of damages that's been upheld, you know, as    14:38:58

far as I understand many times.                        14:39:02

BY MR. ZELICHOV:                                       14:39:07

   Q   You see nothing unusual or strange about        14:39:07

that?                                                  14:39:09

   A   No, it's measuring the actual loss and it's     14:39:10

a measure of damages and there you go.                 14:39:14

   Q   All right.  And you actually think it's         14:39:16

possible that Stamps' stock price was worth nothing    14:39:27

at various points during the class period?             14:39:31

        MR. NIEHUAS:  Objection to form.               14:39:35

                                        Page  177

Exhibit 10 at 27

THE WITNESS: I think that Stamps under a glance there of liability caused very substantial losses to investors that held across those dates. And the measure of damages under the method would compensate investors for those losses that they actually suffered.

BY MR. ZELICHOV:

Q  And again, so there's -- there's -- there's nothing unusual that Stamps, to you, that Stamps' stock price is actually worth less than zero at points during the class period?

MR. NIEHUAS: Objection.

THE WITNESS: I'm not saying that they're -- it was worth less than zero.

BY MR. ZELICHOV:

Q  You are saying that it's not unusual or you don't think there's anything unusual about Stamps' stock price being worth zero at various points during the class period?

A  No, I mean, I'm saying that -- and I'm not saying that it's worthless. It would have been approximately worthless if it had no, you know, prospects of achieving this, you know, this -- these extremely profitable ventures with the United States Postal Service. That's for sure.

Page 178

Veritext Legal Solutions
866 299-5127

Exhibit 10 at 28

And -- but what I'm saying is if the actual   14:40:45
losses occurred are reflected in the measure of   14:40:47
damages.   14:40:51

Q   If you could read -- turn to the complaint   14:40:51
and I think it is paragraph 25.   14:41:15

A   Okay.   14:41:37

Q   All right.  And the -- the -- there's a   14:41:38
sentence -- a couple words -- the third sentence   14:41:41
says, "This lucrative agreement provided the company   14:41:44
with exclusive access to the USPS' 20 billion dollar   14:41:48
postage and delivery market."   14:41:54

Do you see that?   14:42:02

A   I do.   14:42:02

Q   And as an economist and based on your   14:42:03
knowledge of this -- the case so far, did Stamps ever   14:42:06
have exclusive access to the USPS' 20 billion dollar   14:42:09
postage and delivery market?   14:42:13

MR. NIEHUAS:  Objection to form.   14:42:14

THE WITNESS:  That's what's alleged.  They   14:42:15
certainly had an exclusive deal as far as the online   14:42:20
postage is concerned with the USPS.   14:42:24

BY MR. ZELICHOV:   14:42:27

Q   You believe -- it is your understanding   14:42:28
that Stamps was the exclusive provider of online   14:42:29
postage for the USPS?   14:42:34

Page 179

basically towards the bottom of this page, there is a question from Kevin D. Liu that starts with "Got it."

     Do you see that?

     A   Yes.

     Q   All right.  And Mr. Liu says, "Got it, that's helpful.  Switching gears a little bit.  With the Trump task force and the USPS set to release a report sometime in the near future, I was wondering if you guys participated in any sort of conversations with the task force and is there anything you would infer from either of those conversations or maybe the USPS OIG's report last month on kind of the postal partner ecosystem that would suggest any significant changes are coming?"

     Do you see that?

     A   I do.

     Q   And then Mr. McBride answers, "Yes, so the task force was formed and it's doing a lot of interviews with all the various constituents out there.  We have spoken to the members of the task force several times, the final report is expected to be issued August ten.  We don't know the specifics in the report but we do think that based on our conversations that the report will come out strongly in favor of the partnerships between the USPS and

Page 186

Exhibit 10 at 30

private industry like the partnerships we've had with    14:53:44

the USPS, so we'll be interested to see what comes    14:53:46

out in the report on August tenth."    14:53:48

        Do you see that?

    A    I do.    14:53:52

    Q    And would you agree -- and is this -- this    14:53:53

is a conference call transcript that you looked at    14:53:57

because August first, 2018, is one of the event dates    14:54:02

in your study; correct?    14:54:07

    A    Correct.    14:54:08

    Q    And would you agree that this -- this    14:54:08

statement where Mr. McBride's statement here in    14:54:12

response to Mr. Liu's questions is a statement about    14:54:17

what would be included in the USPS task force report?    14:54:19

        MR. NIEHUAS:   Objection.    14:54:28

        THE WITNESS:   I mean, he's talking about    14:54:30

what he expects based on his conversations with the    14:54:32

task force.    14:54:35

BY MR. ZELICHOV:    14:54:35

    Q    And he's talking about what he expects in    14:54:35

the task force report; correct?    14:54:37

    A    Yes.    14:54:43

    Q    Okay.   And if we could move now to the next    14:54:43

tab which is --    14:54:47

        MR. ZELICHOV:   Paul, can you introduce tab    14:54:48

                                            Page 187

Exhibit 10 at 31

ten?  Oh, sorry not tab ten the October 31st, 2018 conference call transcript.

(Defendant's Exhibit 11 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

BY MR. ZELICHOV:

Q   Let's see how long this one takes -- sorry, to introduce.

It should be in there, sir, I think it's Nye Exhibit No. 11?

A   Here we go.

Q   And if you could turn to page -- what is it?  Page seven?

A   I'm there.

Q   And it says -- I'm looking at the -- where am I actually?  I apologize.  I've lost my place.  Okay.

At the bottom of page seven there's a question from George Frederick Sutton.

Do you see that?

A   I see a few questions from him.

Q   Oh, that's a -- is there a question just at the bottom of page seven that starts "I appreciate all the updates"?

A   I see that.

Page 188

Exhibit 10 at 32

Q   Okay.  And Mr. Sutton says, "I appreciate all the updates, so I'm curious with respect to the OIG and the task force review.  Generally our belief has been that the value will increasingly be moving to generators of new customers and incremental revenues, which in our view, would be a benefit to the model that you have now.  I'm curious if you can comment on that.

Is it your belief that the summation of all of these different reports could end up leading to more value for you versus less that I think most people would assume."

Do you see that?

A   Yes.

Q   And then Mr. McBride answers that question and he says, "Yes, I think that's an accurate assumption.  I think when we look at the various reports that are out there, the conversations we've had with folks that are working on these reports, the general view is the idea of the USPS increasingly embracing partnerships like ours makes a ton of sense for them.  I think we mentioned the full-blown privatization isn't really something that we see as likely but it's more and more partnerships with private companies that allow them to embrace a

Page 189

Exhibit 10 at 33

pseudo-privatization, if you will, has been something 14:57:52
that we seem to be the task force and other members 14:57:53
of the community in the USPS world have been focused 14:57:56
on." 14:58:00
Do you see that? 14:58:02
A    Yes. 14:58:02
Q    And do you agree that this too is also a 14:58:03
statement about what is going to be included in a 14:58:05
task force report that is to be released at some 14:58:09
point soon? 14:58:14
MR. NIEHUAS:  Objection to form. 14:58:17
THE WITNESS:  Yes.  They're talking about 14:58:20
the OIG task force review in the question so it 14:58:22
appears to me that CEO McBride is addressing that. 14:58:27

BY MR. ZELICHOV: 14:58:33

Q    Okay.  If you could then look at -- back to 14:58:33
your Exhibit No. 12 in your analyst (sic) that is 14:58:36
attached to your report, which I -- oh -- I can't 14:58:40
find, but here it is from an email.  But if you could 14:58:47
turn to the page, let's see, it is in your remarks 14:58:52
after October 31st, 2018 so it is -- let's see, I'm 14:59:01
trying to figure out.  I'm sorry.  It's page 55 of 14:59:12
76. 14:59:21
A    I'm there. 14:59:22
Q    And in your remark there you have I guess 14:59:23

Page 190

BY MR. ZELICHOV:

Q    And then do you have this in front of you?    15:03:33

A    It's opening.    15:03:35

I do.    15:03:42

Q    And it is a document entitled "United    15:03:43
States Postal Service Sustainable Path Forward Report
From the Task Force from the United States Postal    15:03:48
System. "    15:03:50

A    I see that.    15:03:50

Q    Have you read this document before?    15:03:52

A    No.    15:03:53

Q    Okay.  If you turn to -- I'm not    15:03:56
recommending it, but if you could turn to the second    15:04:01
page of the document there's a date on it, which is    15:04:05
December fourth, 2018.    15:04:08

Do you see that?    15:04:15

A    Yes.    15:04:19

Q    And December fourth, 2018, is before the    15:04:19
first corrective disclosure that was alleged in the    15:04:22
complaint; correct?    15:04:26

A    Correct.    15:04:27

Q    And would you agree with me that the    15:04:27
content of the task force report is contained in the    15:04:30
task force report itself?    15:04:34

A    I would expect it to be but I don't have    15:04:36

Page 193

Exhibit 10 at 35

any reason to speak of --

Q   Okay.  And that the truth or falsity of statements about the contents of the task force report would be resolved upon release of the task force report?

MR. NIEHUAS:  Objection to form.

THE WITNESS:  Right.  Whatever information is in this report, you know, is discussed, it will -- to the extent it's disseminated and publicly available to be reflected in its stock price.

BY MR. ZELICHOV:

Q   Okay.  Thanks.

MR. ZELICHOV:  Why don't we take a break I don't know if we've been going for an hour but I need to sort out my outline.

Can we go off the record?

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:05 p.m.

(Brief interruption in proceedings.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:22 p.m.

BY MR. ZELICHOV:

Q   Dr. Nye, if you could turn back to the consolidated class amended complaint again, which I believe is Nye Exhibit No. 3.

Page 194

Exhibit 10 at 36

dated December 22nd, 2016.    16:03:27

(Defendant's Exhibit 17 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)    16:03:56

BY MR. ZELICHOV:    16:03:56

Q   I think Nye Exhibit No. 17 has now been loaded, sir.    16:03:56    16:03:59

A   Okay.    16:04:00

Q   This is a Capital Forum report dated December 22nd, 2017 -- '16.    16:04:00    16:04:09

Do you see that?

A   I do.    16:04:19

Q   And the title of the report -- is it fair to understand this report is concerning issues related to Stamps.com?    16:04:19    16:04:22    16:04:26

A   Again, it's in the title so yes, it appears to be.    16:04:27    16:04:30

Q   All right.  And the title indicates that USPS' sales report rates are not competitive with the reseller rates?    16:04:30    16:04:33

Do you see that?

A   I do.    16:04:39

Q   And as an economist and sort of an expert on corporate finance would you agree that a sales representative who cannot offer rates as low as their    16:04:39    16:04:46    16:04:50

Page 219

competition would be unhappy with that particular   16:04:52

state of affairs?   16:04:57

MR. NIEHUAS:   Objection to form.   16:05:00

THE WITNESS:   I don't know how they're   16:05:01

going to feel about it.   It's certainly not a   16:05:02

competitive position.   16:05:04

BY MR. ZELICHOV:   16:05:10

Q   And you didn't read any of these Capital   16:05:16

Forum reports in preparation of your report to the   16:05:25

best of your recollection; correct?   16:05:29

A   Right.   I don't recall reading any of   16:05:30

these.   16:05:32

Q   Okay.   And do you know why you didn't   16:05:32

create any of them?   16:05:48

A   Yes, they're not surrounding the -- the   16:05:49

dates I examined for my efficiency analysis and my   16:05:52

event study.   Those were dictated -- the set of news   16:05:57

and analyst reports that I read around, felt that the   16:06:02

analyst and news reports that I read for those dates   16:06:04

gave me a full picture of the information set before   16:06:07

and after each of those events.   So that's my   16:06:10

standard procedure and that's what I did again here.   16:06:13

Q   Okay.   Speaking about, you know, just sort   16:06:15

of switching topics a little bit here.   You've said   16:06:24

that your, you know, the general economic model that   16:06:27

Page 220

STATE OF CALIFORNIA          )

                             )     ss.

COUNTY OF LOS ANGELES     )

     I, Lynda L. Fenn, Certified Shorthand Reporter No. 12566 for the State of California, do hereby certify:

     That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

     That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced by me to typewritten form and that the same is a true, correct, and complete transcript of said proceedings.

     Before completion of the deposition, review of the transcript [ X ] was [  ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

     I further certify that I am not interested in the outcome of the action.

     Witness my hand this 17th day of August, 2020.

     Lynda L. Fenn, CSR, RPR

                                        Page 227

Exhibit 10 at 39

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 10 at 40