# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br><br>vs.<br>STAMPS.COM, INC., KENNETH McBRIDE, KYLE HUEBNER, and JEFF CARBERRY,<br><br>　　　　　Defendants. | Case No. 2:19-cv-01828-MWF(SK) |
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　Lead Plaintiff,<br><br>vs.<br><br>STAMPS.COM, INC., KENNETH McBRIDE, KYLE HUEBNER, and JEFF CARBERRY,<br><br>　　　　　Defendants. | |

EXPERT REPLY REPORT OF ZACHARY NYE, PH.D.

October 15, 2020

Exhibit 2
- 9 -

**Table of Contents**

I.     Background and Qualifications ................................................................................1

II.    Scope of Engagement ............................................................................................2

III.   Bases for Opinions .................................................................................................2

IV.    Dr. Zurek Does Not Dispute That the Alleged Misrepresentations Had Price Impact and His Opinions Are Premised on an Incorrect and Overly Narrow View of Plaintiff's Theory of Liability ..............................................................3

   A.   Dr. Zurek's Analysis of Price Impact Associated With the Alleged Misstatements on May 3, 2017 and August 2, 2017 is Fatally Flawed—When Statements Are Confirmatory and/or Alleged to Have Omitted Material Information, Price Impact is Measured at the Time Corrective Information Is Disclosed ..............................................................7

   B.   The Public Availability of "Substantial Information" Regarding Stamps' Relationship with the USPS and Resellers Does Not Imply the Alleged Misrepresentations Lacked Price Impact ....................................................18

   C.   Price Impact Associated With the Alleged Misstatements on August 1, 2018 and October 31, 2018 Regarding the Task Force Report Was Not "Resolved" on December 4, 2018 .....................................................28

   D.   Price Impact Associated With the Alleged Misstatements on October 31, 2018 Regarding USPS Contract Negotiations Was Not "Resolved" on February 21, 2019 ...............................................................33

   E.   Dr. Zurek's Failure to Analyze Whether Fraud-Related Information Impacted Stamps' Stock Price on the Alleged Corrective Event Dates Renders His Analysis Unreliable and Incomplete ........................................38

V.    Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent with Lead Plaintiff's Theory of Liability ..........................................49

   A.   Dr. Zurek's Criticisms of My Damages Methodology Are Meritless, Have Been Rejected, and Would Require Analysis of Loss Causation ...............................50

   B.   Dr. Zurek's Speculations Regarding the Evolution of Price Inflation Are Irrelevant ...............................................................................56

   C.   Dr. Zurek's Criticism of the Event Study Methodology Is Meritless; An Event Study Can Control for Confounding Company-Specific Information .........................58

   D.   Dr. Zurek's Criticism of My Damages Methodology for Section 20A Claims Is Unwarranted ...............................................................................59

Exhibit 2
- 10 -

## I.  Background and Qualifications

1.    Previously in this matter, I submitted the Expert Report of Zachary Nye, Ph.D., dated June 29, 2020 (the "Nye Report"), in which I opined that:

   i.    the common stock of Stamps.com, Inc. ("Stamps" or the "Company") traded in an efficient market during the period May 3, 2017 through May 8, 2019, inclusive (the "Class Period");[1] and

   ii.   damages under §10(b) ("Section 10(b)") and under §20A ("Section 20A") of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC, can be calculated using a method that is common to each Class member and in a manner consistent with Lead Plaintiff's theory of liability,[2, 3] for investors who purchased or otherwise acquired Stamps stock during the Class Period.[4]

I was deposed in this matter on August 14, 2020.

2.    My qualifications are contained in ¶1 of the Nye Report.  My curriculum vitae, which includes my academic research, publications in the past ten years, and prior expert testimony in the past four years, is attached as Exhibit 1 to this Report.

---

[1] Nye Report, §VI.

[2] The claims in this action are set forth in the "Consolidated Class Action Complaint For Violations of the Federal Securities Laws," dated August 5, 2019 (the "Complaint").

[3] I understand that in its ruling on Defendants' Motion to Dismiss, the

> Court determined that Plaintiff has sufficiently alleged one of [three] theories. Specifically, Plaintiff has sufficiently alleged that "Defendants' representation that it had a strong relationship with USPS or that USPS was 'very happy' with Plaintiff's business practice was [allegedly] misleading."  However, the Court determined that Plaintiff has failed to demonstrate the two other theories: that (1) Defendants omitted material information about Stamps' alleged abuse of the USPS reseller program; and that (2) "Stamps' discussion of, and positive statements about, its past and future financial results were misleading."  (Order Granting in Part Defendants' Motion to Clarify Order on Motion to Dismiss Case [111], dated July 14, 2020, p. 3, internal citations omitted.  *See also* Order re: Defendants' Motion to Dismiss [79], dated January 17, 2020, (ECN 89), p. 1.)

[4] Nye Report, §VII.

- 1 -

Exhibit 2

- 11 -

## II.    Scope of Engagement

3.    I now have been asked by Counsel for Lead Plaintiff to analyze and respond to the Rebuttal Report of Paul Zurek, Ph.D., dated August 31, 2020 (the "Zurek Report").[5]

4.    As he states in his report, Dr. Zurek "[has] not been asked to and [has] not formed an independent opinion as to whether Stamps.com's shares traded in an efficient market."[6]  Rather, "[a]s part of [his] analysis," he has "been asked to assume that Stamps.com's shares traded in an efficient market, consistent with [my] analysis and [my] claimed findings."[7]  In addition, his "overall findings and opinions in [his] report are the same regardless of whether the residual return results and determination of statistical significance from [his] or [my] event study are used."[8]  Therefore, I conclude that he has no disagreement with my event study analysis or my conclusion that the market for Stamps stock was efficient throughout the Class Period as stated in the Nye Report, and I do not address these issues again here.

## III.    Bases for Opinions

5.    My opinions are based upon my professional knowledge and experience, my review of documents and information relevant to this matter (*see* Exhibit 2 to the Nye Report), and the analyses described in this Report.  Documents, data, and other information that I have relied upon as bases for my opinions are cited in this Report and the Nye Report.  Such documents and information are typically relied upon by financial experts in securities class actions and by financial economists in their research.

---

[5] Dr. Zurek was deposed in this matter on October 5, 2020 ("Zurek Tr.").

[6] Zurek Report, ¶4.

[7] *Ibid*.  *See also* Zurek Tr. 40:20–23, 51:20–52:10.

[8] Zurek Report, ¶30.  *See also* Zurek Tr. 54:24–55:5.

6.  Counsel for Lead Plaintiff has informed me that the record in this matter continues to be developed and that fact discovery is ongoing.  To the extent relevant, I would expect to review additional information that may become available through discovery as well as the reports and depositions of other expert witnesses.  The opinions offered in this Report are subject to refinement or revision based on continuing analysis of the documents and information listed above, as well as new or additional information that may be provided to or obtained by me in the course of this matter.

**IV.   Dr. Zurek Does Not Dispute That the Alleged Misrepresentations Had Price Impact and His Opinions Are Premised on an Incorrect and Overly Narrow View of Plaintiff's Theory of Liability**

7.  Dr. Zurek states that he has "been asked to evaluate economic evidence regarding whether the alleged misstatements impacted Stamps.com's stock price."[9]  As part of his analysis, he states that he has "analyzed the alleged misstatements that remain in this litigation, other information available to the market regarding Stamps.com and its relationship with the United States Postal Service ('USPS'), as well as Stamps.com's stock price movements using an event study."[10]  The alleged misstatements analyzed by Dr. Zurek occurred on four dates: (i) after market close on May 3, 2017; (ii) after market close on August 2, 2017; (iii) after market close on August 1, 2018; and (iv) after market close on October 31, 2018.[11]  He draws the following conclusions with respect to each of these alleged misstatements, which I address in turn:

    i.  With respect to May 3, 2017, Dr. Zurek concludes that the "alleged misstatements did not convey new information to the market and thus had no price impact."[12]

---

[9] Zurek Report, ¶3.

[10] Zurek Report, ¶6.

[11] Zurek Report, ¶15.

[12] Zurek Report, §V.C.

ii.  With respect to August 2, 2017, Dr. Zurek concludes that the "alleged misstatements did not convey new information to the market and thus had no price impact."[13]

iii. With respect to August 1, 2018, Dr. Zurek concludes that "the alleged misstatement [] would not have impacted Stamps.com's stock price after December 4, 2018."[14]

iv. With respect to October 31, 2018, Dr. Zurek concludes that "to the extent that the alleged misstatement had any price impact as a result of Stamps.com's response to questions about the USPS Task Force Report,[15] the alleged misstatement would not have impacted Stamps.com's stock price after December 4, 2018."[16]

v.  Also with respect to October 31, 2018, Dr. Zurek claims that "to the extent that the October 31, 2018, alleged misstatements had price impact by influencing the market's assessment of the likelihood of Stamps.com being able to renew the USPS contract that was subject to being renegotiated, that impact would have ceased at the latest by the time of the February 21, 2019, disclosure that the contract had ended."[17]

8.     With respect to the alleged corrective events on February 21, 2019 and May 8, 2019, Dr. Zurek opines that "there is no reliable basis to conclude that the value of the information that was released in the alleged corrective disclosures is a measure of the value of the information allegedly withheld from the market."[18]  According to Dr. Zurek, this is because "the information that was disclosed in the alleged corrective disclosures is different from the information allegedly withheld from the market earlier."[19]

---

[13] Zurek Report, §V.D.

[14] Zurek Report, ¶61.

[15] "United States Postal Service: A Sustainable Path Forward Report from the Task Force on the United States Postal System," dated December 4, 2018, (the "Task Force Report"), available online at: https://home.treasury.gov/system/files/136/USPS_A_Sustainable_Path_Forward _report_12-04-2018.pdf.

[16] Zurek Report, ¶67.

[17] Zurek Report, ¶68.

[18] Zurek Report, ¶78.

[19] Zurek Report, ¶78.

9.      Crucially, Dr. Zurek does **not** dispute that there was price impact associated with the alleged misrepresentations as a whole.  He concedes that corrective information may have been disclosed on February 21, 2019, regarding alleged misstatements on October 31, 2018 related to Stamps' contract negotiations with the USPS:

> [I]f Lead Plaintiff's allegations are correct, the February 21, 2019, alleged disclosure removes the impact of the October 31, 2018, misstatement because the misstatement addresses the risks surrounding the renegotiation of the USPS contract, and the February 21, 2019, disclosure informs the market that the contract had in fact not been renegotiated.[20]

Dr. Zurek also declines to dispute price impact associated with the alleged misstatements on August 1, 2018 and October 31, 2018.[21]  Furthermore, his opinions appear to be solely geared towards shortening the proposed Class Period.  Indeed, relying on Dr. Zurek's opinions, Defendants argue that Plaintiff's proposed Class Period should be limited to August 1, 2018 through February 21, 2019, inclusive.[22]

10.     However, as discussed further below, Dr. Zurek's price impact opinions are based on an incorrect and overly narrow view of Plaintiff's theory of liability, which render his conclusions unreliable and irrelevant at best.  Indeed, Dr. Zurek does not even consider the price impact associated with Plaintiff's allegation that, contrary to Defendants' misrepresentations, "the USPS was not 'very happy with' Stamps, its 'approach' or its 'business model,' nor were Stamps and the USPS working in a 'very successful partnership' together."[23]  According to Dr. Zurek, such a

---

[20] Zurek Report, ¶68.

[21] Zurek Tr. 59:16–18 ("For the two remaining misstatements, August 2018 and October 2018, I did not reach a conclusion of no price impact …."). *See also* Zurek Tr. 60:4–22.

[22] Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification, dated August 31, 2020, p. 25.

[23] Complaint, ¶71. *See also, e.g.*, Complaint, ¶¶77, 93.

- 5 -
Exhibit 2
- 15 -

"but-for" corrective disclosure would have been "a very unrealistic statement,"[24] and he "[does not] think saying we don't have a great relationship is something that the company would have disclosed."[25]  Instead, Dr. Zurek "analyzed what [he] think[s] is a reasonable disclosure."[26]  Specifically, he "analyzed what would have happened had they said that there are **wrinkles in the relationship** and that there are both positives and negatives."[27]  Not surprisingly, Dr. Zurek then concludes that such a "reasonable disclosure," which bears almost no resemblance to Plaintiff's theory of liability, "would not have price impact."[28]  Of course, Dr. Zurek's personal views on the merits of Plaintiff's allegations are irrelevant, and his rewriting of Plaintiff's theory of liability in no way demonstrates a lack of price impact associated with the misrepresentations actually alleged in the Complaint.

11.     Instead, Plaintiff alleges that each of the remaining misstatements are "clearly part of [Defendants'] overarching scheme to give investors the misleading impression 'that Stamps had a strong relationship with USPS and that USPS fully approved Stamps' use of the [USPS] reseller program,' when in reality 'USPS as a whole was unhappy with Stamps' business practices and … was working on stopping Stamps from continuing with its reseller program.'"[29]  As the Court has stated, "the alleged misrepresentations or omissions in Plaintiff's Complaint" center around the theory that: "Defendants misleadingly represented that Stamps had a strong

---

[24] Zurek Tr. 98:11.

[25] Zurek Tr. 99:21–23.

[26] Zurek Tr. 100:12–13.

[27] Zurek Tr. 100:24–101:2.  (Emphasis added.)

[28] Zurek Tr. 100:14–15.

[29] Plaintiff's Response to Defendants' Motion for Clarification of Order Re: Defendants' Motion To Dismiss, dated June 29, 2020, Docket No. 116, p. 5, citing Order Re: Defendants' Motion to Dismiss [79], dated January 17, 2020, Docket No. 89, pp. 1, 24.

partnership with the USPS and that the USPS fully approved Stamps' use of the reseller program."[30, 31]  However, Dr. Zurek does not consider Plaintiff's theory of liability as a whole,[32] but rather parses each of the alleged misstatements into discrete pieces of information to be analyzed separately (or ignored altogether) for purposes of assessing price impact.  As a result, Dr. Zurek's opinions are merely the product of his incorrect and overly narrow view of Plaintiff's single overarching theory of liability, and in no way demonstrate that the alleged misstatements lacked price impact.

**A. Dr. Zurek's Analysis of Price Impact Associated With the Alleged Misstatements on May 3, 2017 and August 2, 2017 is Fatally Flawed— When Statements Are Confirmatory and/or Alleged to Have Omitted**

---

[30] Order Granting in Part Defendants' Motion to Clarify Order on Motion to Dismiss Case [111], dated July 14, 2020, Docket No. 143, p. 9.

[31] *See also* Zurek Tr. 80:18–81:3; and Zurek Report, ¶96:

> the Court has summarized Lead Plaintiff's alleged misstatements as concerning three broad categories: (1) Stamps.com's alleged reseller scheme, (2) Stamps.com's alleged strong partnership with the USPS, and (3) Stamps.com's statements regarding its historical results and future growth estimates. … Ultimately, the only theory remaining is Stamps.com's alleged misstatements regarding the strength of its relationship with the USPS, with the Court stating that "Plaintiff has sufficiently alleged that Defendants made a material misrepresentation by stating that Stamps had a strong partnership with USPS and that USPS fully approved Stamps' use of the reseller program."

[32] *See* Zurek Tr. 71:11–72:2:

> Q. When you performed this mirroring analysis, how did you analyze whether there was price impact associated with plaintiffs' overarching theory in this case, which is, as we've described, Stamps' relationship with the USPS?

> A. My understanding is that price impact is something that exists in connection with the particular misstatements and not necessarily an overarching theory. … I'm not sure how the overarching theory is relevant if none of the underlining [*sic*] misstatements have price impact.

- 7 -

Exhibit 2

- 17 -

**Material Information, Price Impact is Measured at the Time Corrective Information Is Disclosed**

12.     A fatal flaw of Dr. Zurek's price impact analysis for alleged misstatements on May 3, 2017 and August 2, 2017 (both after market close), is his presumption that price impact can be measured at the time these alleged misstatements were made.  He states that his "event study shows no discernible price reaction on May 4, 2017, following the alleged misstatements even though a positive price reaction would have been expected in an efficient market if the alleged misstatements affected Stamps.com's stock price."[33]  He makes the same observation with respect to alleged misstatements on August 2, 2017.[34]  According to Dr. Zurek, the lack of a statistically significant Company-specific stock price increase "is consistent with a conclusion that these alleged misstatements did not convey new and value relevant information to the market that would have shifted the balance of probabilities associated with an adverse outcome to the economics of Stamps.com's relationship with the USPS."[35]

13.     However, Dr. Zurek has misapplied the event study and, therefore, his conclusions regarding the May 3 and August 2, 2017 alleged misstatements are unreliable.  An event study is designed to quantify the effect of the disclosure of new, material information on the price of a security.[36]  Dr. Zurek fails to recognize that when alleged misrepresentations comprise

---

[33] Zurek Report, ¶6(a).

[34] Zurek Report, ¶6(b) ("There was no discernible price movement according to my event study when the information underlying the August 2, 2017, alleged misstatements was first released on the prior day.")

[35] Zurek Report, ¶6(a), regarding May 3, 2017.  *See also* Zurek Report, ¶6(b), regarding August 2, 2017.

[36] Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, 49, pp. 545–590 at pp. 545, 546: "An event study, a technique developed and refined by financial economists, can be very useful in securities fraud cases.  An event study relates changes in stock prices to the release of new information."

confirmatory statements and/or omissions of material information, as is the case here, analyzing the market's reaction to a disclosure of corrective information is typically the only appropriate means to measure price impact. By focusing on whether Stamps' stock price increased on these dates, Dr. Zurek fails to consider that material misstatements and/or omissions may also "prevent[] preexisting inflation in a stock price from dissipating," thereby "caus[ing] inflation not simply by *adding* it to a stock, but by maintaining it."[37]

14.       According to Plaintiff, throughout the Class Period, Defendants "misleadingly portrayed Stamps as enjoying (1) a strong (exclusive) partnership with the [USPS]; and (2) the USPS's full approval of Stamps' use of its reseller program," when in reality its relationship was "extremely strained due to the Company's abuse of the USPS reseller program," and the USPS was making "efforts to prevent such practices from continuing."[38]  The alleged misstatements on May 3, 2017 occurred during Stamps' quarterly conference call with analysts, when Defendant McBride spoke of Stamps' relationship with the USPS, as follows:

- "CEO McBride stated: '***The USPS has always been one of our most important partners.  We both have the common goal of growing USPS package volume and serving and retaining USPS customers.*** …

  ***We continue to enjoy a great partnership with USPS and feel that we have created a sustainable win-win model for both of us, which will result in the continued growth of USPS packages in e-commerce and more generally.*** …

  ***In particular, the USPS is very happy with the very successful partnership Stamps.com has together with the Postal Service, and that's based on very***

---

[37] Nye Report, ¶59, quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).  *See also FindWhat*, 658 F.3d at 1317 (holding that "[d]efendants whose fraud prevents preexisting inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock price in the first instance").

[38] Lead Plaintiff's Memorandum in Support of Motion for Class Certification, June 29, 2020, pp. 1, 3.

*recent ongoing conversations we have with the most senior executive there.*'"[39]

- "In response to an analyst question on the 1Q17 conference call concerning 'the economics of the relationships you have, whether it's with the USPS or other partners, that would prompt some conservatism on guidance,' McBride further reassured investors, stating:

  There's nothing to point to, specifically. And of course, we wouldn't be disclosing specifics of the partnerships, but it's just the same approach we've taken in years past and *we don't really expect any material changes to any kind of the underlying economics or the revenue share agreements that we have*."[40]

- "[I]n response to analyst questions concerning the Company's relationship with the USPS and whether the 'USPS had sent a letter around to the participants in the reseller program with some potential changes,' McBride further stated:

  There was no letter. The rumor is false. … *USPS is very happy with the approach they've taken and business model. They're very happy with the relationship with Stamps.com. We talk to them constantly, to the most senior folks there. So we're happy and they're happy*. And what the letter information that's been propagated, we believe is part of the strategy with our stock. So it's not true."[41]

15.    Plaintiff alleges that Defendants made similar false and misleading statements regarding the health of Stamps' relationship with the USPS during its quarterly conference call with analysts on August 2, 2017:

- "During the 2Q17 conference call, CEO McBride stated the following concerning the Company's relationship with the USPS:

  '… *The USPS doesn't see any reason why the program wouldn't continue to serve both customers and the needs of the Postal Service going forward. Finally, the USPS looked at resellers and PC postage providers like Stamps.com and Endicia as excellent partners on bringing the best solutions to customers. We continue to enjoy a great partnership with the Postal Service and*

---

[39] Complaint, ¶68. (Emphasis in original.) *See also* Zurek Report, ¶15.

[40] Complaint, ¶69. (Emphasis in original.) *See also* Zurek Report, ¶15.

[41] Complaint, ¶70. (Emphasis in original.) *See also* Zurek Report, ¶15.

*feel that we have created a sustainable win-win model for both of us, which will result in a continued growth of USPS packages and e-commerce and online postage more generally. …*

*[T]he partnership with the Postal Service is continuing to be stronger and stronger … So we were just trying to give people an insight to the relationship with the Postal Service continues to get healthier and healthier.*'"[42]

- "President Huebner stated the following concerning the Company's relationship with the USPS:

    'Yes, I would just say, I mean, we've been saying over the last year that it's a win-win partnership. And so the more successful we both are in helping the USPS compete, then I think that benefits both of us, and so I think it was really meant to highlight the win-win nature of the partnership and how both sides are succeeding.'"[43]

16.     While the above statements made by the Company on May 3 and August 2, 2017 are alleged to have been false and misleading, they were not the first time Stamps touted the strength and importance of its relationship with the USPS. For example, prior to the Class Period on July 28, 2016, McBride stated: "It is true, and has always been true, that we rely on the USPS as our most important partner for many reasons."[44] In Stamps' February 23, 2017 conference call, McBride stated:

    [L]et me just mention about the USPS. They're always and have been always our most important partner. We have a common goal with the USPS, which is growing package volume and serving and retaining USPS customers … we continue to enjoy a great partnership with the USPS. We feel that we've created a sustainable win-win model, both of us, that will result in continued growth of USPS packages.[45]

---

[42] Complaint, ¶74. (Emphasis in original.) *See also* Zurek Report, ¶15.

[43] Complaint, ¶75. *See also* Zurek Report, ¶15.

[44] *Thomson Reuters StreetEvents*, "Edited Transcript, STMP - Q2 2016 Stamps.Com Inc Earnings Call, Event Date/Time: July 28, 2016 / 9:00PM GMT," (5:00 PM ET).

[45] *Thomson Reuters StreetEvents*, "Edited Transcript, STMP - Q4 2016 Stamps.Com Inc Earnings Call, Event Date/Time: February 23, 2017 / 10:00PM GMT," (6:00 PM ET).

17.    Plaintiff alleges that the Company's statements on May 3 and August 2, 2017 were false and misleading because, contrary to such assurances, "Stamps was not in a 'great partnership with USPS' nor were Stamps' business practices a 'sustainable win-win model,' rather, the USPS was opposed to Stamps' actions, as they violated both the terms and the spirit of the parties' contractual agreements."[46]  According to Plaintiff, "Stamps' relationship with the USPS had in fact soured prior to the Class Period,"[47]and unbeknownst to investors, "the USPS was not 'very happy with' Stamps, its 'approach' or its 'business model,' nor were Stamps and the USPS working in a 'very successful partnership' together."[48]  With respect to "McBride's [August 2, 2017] statement to investors about no expected material changes to revenue sharing agreements with a partner such as the USPS," Plaintiff alleges this statement "is, at a minimum, inconsistent with [McBride's] awareness (as alleged) that 'USPS as a whole was unhappy with Stamps' business practices and  … was working on stopping Stamps from continuing with its reseller program.'"[49]

18.    Accordingly, it is clear that the alleged misstatements that occurred on May 3, 2017 and August 2, 2017, amount to false assurances of maintaining the status quo—*i.e.*, that Stamps continued to the enjoy the healthy and stable "win-win" relationship it reportedly had with the USPS prior to the Class Period.  Indeed, this is the obvious interpretation of statements like: "USPS has always been one of our most important partners"; "We continue to enjoy a great partnership"; "it's just the same approach we've taken in years past and we don't really expect

---

[46] Complaint, ¶71(b).  *See also* Complaint, ¶77(b).

[47] Complaint, ¶77(d).

[48] Complaint, ¶71(c).  *See also* Complaint, ¶77(b).

[49] Plaintiff's Response To Defendants' Motion For Clarification Of Order Re: Defendants' Motion To Dismiss, dated June 29, 2020, p. 5, citing ECF 89 at 1, 24.

any material changes"; and "we've been saying over the last year that it's a win-win partnership."  Given that the alleged misstatements on May 3, 2017 and August 2, 2017 encompass confirmatory statements and/or omissions of material facts, they would not be expected to coincide with a statistically significant stock price increase, and the absence of a statistically significant stock price increase on these dates of alleged misrepresentations does not negate the presence of price impact during the Class Period.

19.    While Dr. Zurek acknowledges that the Company made "generally positive" statements about its relationship with the USPS prior to the Class Period,[50] at deposition he argued that the "set of circumstances" on May 3, 2017 was "very different" than before.  He claims that because there was "increasing concern in the market," one would expect assurance by the Company to "engender a positive price reaction" at the start of the Class Period:

> Q. Dr. Zurek, what is your understanding of the term "price maintenance" in the context of securities litigation?
>
> A. So I've -- I've heard this term before, and usually in the context of plaintiffs' allegations.  And the way I understand it, is it's an allegation that a company speaks through some sort of a statement.  And I don't know if this is the only way, but this is an example.  And the statement doesn't in any way affect what the market is already thinking.  And so there is no discernible price movement, right? So this is -- to me, that's a very different set of circumstances than what you have here, given the increasing concern in the market, and then an arguably positive statement about the company that would be expected to reassure the market and, in my opinion, engender a positive price reaction.[51]

However, Dr. Zurek's position here is at odds with his claim elsewhere (which I address below) that "substantial information regarding Stamps.com's relationship with the USPS and resellers was already publicly available" for almost a year prior to the Class Period.[52]  Dr. Zurek cannot

---

[50] Zurek Tr. 83:21–84:5.

[51] Zurek Tr. 87:5–23.  *See also* Zurek Tr. 84:9–85:4.

[52] Zurek Report, ¶6(a).  *See also* Zurek Report, ¶34.

- 13 -
Exhibit 2
- 23 -

have it both ways—the information set on May 3, 2017 cannot be both: (i) "already publicly available"; and (ii) "very different" from what was available prior to the start of the Class Period.

20.     It is both logical and well understood by economists that the lack of disclosure of material information would not be expected to impact a stock price at the time the non-disclosure is made.[53]  Simply put, the market cannot respond to what it does not know.  A paper published by NERA Economic Consulting explains that "one would **not** expect the stock price to move when defendants did not make a statement, so there is no reason to examine the stock price at the time of an alleged omission."[54]  Similarly, "a misstatement that confirms prior market expectations would not be expected to result in a price movement."[55]  This is because, "[a]s a general proposition, modern finance theory holds that the market price of a stock reflects the expected discounted value of future cash flows to equity holders.  Thus, new information that

---

[53] Torchio, Frank, 2009, "Proper Event Study Analysis in Securities Litigation," *Journal of Corporation Law*, Vol. 35, Issue 1, pp. 159–168 ("Torchio (2009)") at 164 ("It is an oxymoron to have an event study of an omitted piece of information.  Consequently, it is incorrect and improper to use an event study to analyze or quantify the effect of information that was alleged to have been omitted.").

[54] Tabak, David, 2004, "Loss Causation and Damages in Shareholder Class Actions: When it Takes Two Steps to Tango," NERA Economic Consulting, working paper, 1–16 ("Tabak (2004)") at 6.  (Emphasis added.)

[55] Torchio (2009) at 160.  *See also id.* at p. 164 ("[C]are must be taken when conducting an event study of an alleged misrepresentation to ensure that the misrepresented information does not merely confirm or coincide with prior market expectations.  This is because significant stock price reactions are not expected in an efficient market when alleged misstatements merely confirm the market's prior expectations."); and Tabak (2004) at 6 ("If the case involves a misstatement, plaintiffs may be able to show that the stock price moved up in response to the false information.  Unfortunately, this is not always even possible.  For example, suppose a company was expected to earn fifty cents a share but actually only earned forty cents.  If the company falsely announces earnings of forty-five cents, the market will be disappointed and the stock price will fall, even though the company has overstated its earnings.  Thus, stock price evidence to support an allegation of loss causation based on an inflated purchase price will only be readily available in cases where the defendant makes an affirmative misstatement relative to market expectations.").

- 14 -
Exhibit 2
- 24 -

causes the market to significantly alter its expectation of future cash flows will cause a prompt repricing of the stock to reflect the new expectations."[56]  But false assurances that maintain the status quo, by definition, do nothing to alter investor expectations of future cash flows, and will not induce a price reaction.

21.    Though Dr. Zurek conceded at his deposition that omissions and confirmatory statements can induce price inflation,[57] his price impact analysis is incorrectly premised on his own personal view of what Defendants could have said during the Class Period.  In stark contrast to Plaintiff's allegations, Dr. Zurek assumes that the allegedly omitted information was "no different" than what was publicly available:

> A. … given what **I think** Stamps could have disclosed that that was no different than the information the market already had.  And so the price wouldn't have been, you know, any different if that disclosure were made.[58]

Indeed, he has not even considered whether there would be price impact had Defendants disclosed at the start of the Class Period that "Stamps' relationship with the USPS had in fact soured prior to the Class Period,"[59] and that "the USPS was not 'very happy with' Stamps, its 'approach' or its 'business model,' nor were Stamps and the USPS working in a 'very successful partnership' together."[60]

22.    According to Dr. Zurek, such a "but-for" disclosure would have been "a very unrealistic statement,"[61] and he "[does not] think saying we don't have a great relationship is something that

---

[56] Torchio (2009), p. 160.

[57] Zurek Tr. 88:13–90:1.

[58] Zurek Tr. 90:20–24.  (Emphasis added.)

[59] Complaint, ¶77(d).

[60] Complaint, ¶71(c).  *See also* Complaint, ¶77(b).

[61] Zurek Tr. 98:11.

- 15 -
Exhibit 2

the company would have disclosed."[62]  Instead, Dr. Zurek "analyzed what [he] think[s] is a reasonable disclosure."[63] Specifically, he "analyzed what would have happened had they said that there are **wrinkles in the relationship** and that there are both positives and negatives":[64]

> Q. … If the disclosures on May 3rd, 2017 would have been we do not have a great partnership relationship with the USPS, is it your testimony that there would be no stock price movement, negative movement, on that day?
>
> MR. ZELICHOV: Incomplete hypothetical.
>
> THE WITNESS: I think that's a very -- **that's a very unrealistic statement**. … What I'm saying is, if the alternative disclosure was acknowledging both the positives and the negatives, then the market price would not have, in my opinion, moved if that were the disclosure.
>
> BY MR. NIEHAUS:
>
> Q. Again, you're distorting and conflating my question.  It's very simple.  On May 3rd, 2017, the company had disclosed that they did not have a great partnership with USPS.  Is it your testimony that there would be no negative stock price movement of Stamps.com's stock?
>
> MR. ZELICHOV: Objection.  Asked and answered.
>
> THE WITNESS: I already answered your question.  **I did not consider that statement as being a reasonable disclosure of the company, the company saying we don't have a great relationship and just leaving it at that**.  If there was an alternative disclosure, based on all the commentary in the market, based on the statements from senior management, based on the contract being renegotiated, based that nothing really changed for the next two years, **I don't think saying we don't have a great relationship is something that the company would have disclosed.**
>
> BY MR. NIEHAUS:
>
> Q. You're simply just not accepting the premise, but you clearly haven't done the analysis, right?  If the company says that they have a great relationship, why is it implausible that they would say that they don't have a great relationship?

---

[62] Zurek Tr. 99:21–23.

[63] Zurek Tr. 100:12–13.

[64] Zurek Tr. 100:24–101:2.  (Emphasis added.)

- 16 -
Exhibit 2
- 26 -

MR. ZELICHOV: Objection.  Asked and answered.

THE WITNESS: I -- what I've analyzed is in my report.  I considered very strong evidence affirmatively of no price increase.  As I said, Dr. Nye raised the possibility that this is an omissions case.  **And I've analyzed what I think is a reasonable disclosure**, and that reasonable disclosure, in my opinion, would not have price impact.  And this is what I've done and it's documented in my report.  **I haven't analyzed statements beyond what I have in my report**.

BY MR. NIEHAUS:

Q. So you didn't analyze whether there would be price impact on May 3rd, 2017, if the company simply stated that they don't have a great relationship with the USPS?

A. **I've analyzed what would have happened had they said that there are wrinkles in the relationship and that there are both positives and negatives.**[65]

Accordingly, Dr. Zurek's price impact analysis is predicted on his personal views on the merits of Plaintiff's theory of liability, rather than a robust analysis using accepted economic methodologies to evaluate Plaintiff's actual allegations.

23.     Because there is "no discernible price reaction" to the May 3 and August 2, 2017 alleged misstatements, Dr. Zurek concludes that they "did not convey new and value relevant information to the market."[66]  However, as discussed above, Dr. Zurek's opinions are unreliable and irrelevant at best, given his adoption of an incorrect and overly narrow view of Plaintiff's theory of liability.  As noted in the circuit court decision on appeal in *Halliburton II*,[67] "[p]rice impact can be shown either by an increase in price following a fraudulent public statement **or a**

---

[65] Zurek Tr. 98:3–101:2.  (Emphasis added.)

[66] Zurek Report, ¶¶6(a), 6(b).

[67] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*"),

**decrease in price following a revelation of the fraud**."[68, 69]  Where, as here, the alleged

misrepresentations are confirmatory statements and/or omitted material information, the

appropriate methodology to measure price impact is to analyze any stock price change in

response to the disclosure of corrective information.  As discussed below, the alleged corrective

events in this case occurred on February 21 and May 8, 2019, and these disclosures were

followed by statistically significant price declines of -59.10% and -55.33% (*n.b.*, -59.12%

and -55.36% under Dr. Zurek's event study), respectively.[70]  These facts alone provide ample

evidence of price impact in this matter.

### B. The Public Availability of "Substantial Information" Regarding Stamps' Relationship with the USPS and Resellers Does Not Imply the Alleged Misrepresentations Lacked Price Impact

24.     Dr. Zurek argues that "substantial information" released prior to and during the Class

Period "regarding Stamps.com's relationship with the USPS, its relationship with resellers, the

mechanics and economics of Stamps.com's use of the reseller program, and how the reseller

program impacted and was viewed by the USPS," supports his opinion that the alleged

misstatements on May 3 and August 2, 2017 "did not convey new information to the market

regarding these reseller relationships, the economics of the relationship, or how they impacted

---

[68] *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013) *vacated and remanded on other grounds,* 134 S. Ct. 2398 (U.S. 2014).  (Emphasis added.)  My understanding is that this definition of price impact was not challenged in the Supreme Court.

[69] In his discussion of "economic damages in securities litigation," Dr. Zurek concedes that:

> the price impact of information can be measured using the observed price increase in the stock price at the time an alleged misrepresentation is made, assuming one can isolate the price movement that is specific to the alleged misstatement (i.e., one can account for any confounding information).  In other circumstances, **a price decline upon the revelation of the alleged truth can represent the price impact of information**, again assuming that one can isolate the price movement specific to that revelation.  (Zurek Report, ¶93.  Emphasis added.)

[70] Nye Report, Exhibit 11B; Zurek Report, Exhibit 4.

Exhibit 2

the USPS such that they would have shifted the balance of probabilities associated with an adverse outcome to the economics of Stamps.com's relationship with the USPS."[71]  The vast majority of the information upon which Dr. Zurek relies comes from a series of articles published by *The Capitol Forum*, "addressing Stamps.com, its relationship with the USPS, and its relationship with resellers."[72]  He also cites articles by short sellers[73] and "articles discussing the USPS's views on the reseller program and the benefits and drawbacks to the USPS of customers utilizing the reseller program."[74]  Dr. Zurek also argues that "elevated" short interest is consistent with his conclusion that information regarding Stamps' relationship with the USPS and resellers was incorporated into the Company's stock price prior to May 3, 2017.[75]

25.    However, once again, Dr. Zurek's opinions are predicated on an incorrect and overly narrow interpretation of Plaintiff's theory of liability, thereby rendering his price impact analysis incomplete and unreliable.  Simply stated, by failing to consider the true scope of Plaintiff's allegations, Dr. Zurek has no basis for opining that the May 3, 2017 and August 2, 2017 alleged misstatements lacked price impact.  Indeed, Plaintiff acknowledges that "Defendants' reseller scheme [drew] governmental and public scrutiny," and that "[p]rior the Class Period, the USPS began investigating certain resellers' activities to determine whether they were cannibalizing

---

[71] Zurek Report, ¶¶32, 33 (regarding May 3, 2017).  *See also* Zurek Report, ¶50 (regarding August 2, 2017).

[72] Zurek Report, footnote 68, Appendix C ("Beginning around July 2016, there was increased public attention on Stamps.com's relationship with postage resellers, much of which was published by The Capitol Forum ….").

[73] Zurek Report, ¶34.

[74] Zurek Report, ¶35.

[75] Zurek Report, ¶39.

- 19 -
Exhibit 2

existing USPS business."[76]  In fact, the Complaint discusses some of the very same articles relied on by Dr. Zurek.

26.     For example, Dr. Zurek cites a December 14, 2016 *The Capitol Forum* article "disclosing USPS emails obtained via Freedom of Information Act ('FOIA') requests."  According to Dr. Zurek, the "article stated that the emails 'indicate[d] that the USPS ha[d] been concerned about cannibalization of existing USPS customers since at least February of [2016],' that 'the USPS appeared to take an even stronger position against cannibalization after [*The Capitol Forum*] published [its] first article on the USPS reseller program on July 8, 2016,' and that the emails 'confirm[ed] that USPS sent a warning letter to IntuiShip.'"[77]  Yet, the Complaint expressly discusses these pre-Class Period events regarding the USPS's concerns over whether Stamps was "cannibalizing existing USPS business," including the various email exchanges between USPS employees and Stamps to which Dr. Zurek cites:

---

[76] Complaint, ¶51.

[77] Zurek Report, ¶18, citing *The Capitol Forum*, "Stamps.com: USPS Emails Undermine Statements by Stamps.com; Emails Indicate USPS Does Not Support Targeting of Existing USPS Customers," December 14, 2016.  Footnote 25 to the Zurek Report states:

> Specifically, the article noted that Doreen Rathburn, a Business Alliance Manager at USPS, sent an email to other USPS employees on February 10, 2016, about the potential cannibalization of business by an entity named Move Method (a supposed third party sales force for USPS reseller Intuiship) that stated "[t]hey clearly know where I stand on cannibalizing existing business and have stated that was not the intent here."  The article also noted that the co-founder of Intuiship sent a letter to the USPS the next day noting that Intuiship "will continue to emphasis [sic] the importance of doing our best to prevent [cannibalizing existing business] from happening in the future."  The article indicates that Cliff Rucker of the USPS then sent an email to persons at the USPS on July 16, 2016, in which he copied Amine Khechfe and Candi Booth from Stamps.com subsidiary Endicia.  Cliff Rucker's email instructed USPS personnel to prepare a letter to cancel the contract by which Intuiship served as a USPS reseller if Move Method's "cannibalization of an existing USPS customer in July was 'just a pure move with nothing else'…."

- 20 -
Exhibit 2

In 2016, as part of its investigation, the USPS targeted Stamps and its affiliates, threatening to pull Stamps' PC postage printing license if it was established that Stamps was engaging in a continuing practice of converting existing USPS customers to its reseller program, thereby cannibalizing existing USPS business.[78]

27.     Likewise, Dr. Zurek relies on an August 24, 2017 *The Capitol Forum* article that "included an email from Parcel Partners, a reseller, that '[m]ultiple industry sources indicated that they recently received' and that discussed forthcoming 'changes to the reseller program.'"[79] However, the Complaint also describes that "Stamps received an August 2017 letter from its reseller partner, Parcel Partner, which disclosed the USPS's position and new restrictions designed to reign in abuse of the reseller program."[80]

28.     The fact that information concerning "Stamps.com's relationship with the USPS approved reseller" was in the marketplace prior to and during the Class Period,[81] by no means undermines Plaintiff's allegations.  On the contrary, under Plaintiff's theory of liability, "[i]n an effort **to avoid public scrutiny**, Stamps actively concealed key information regarding its business operations and specifically how Stamps was profiting at the expense of the USPS."[82] According to the Complaint, throughout the Class Period, "**defendants assured investors** that Stamps' business model was strong and that the USPS was pleased with its existing relationship

---

[78] Complaint, ¶51.  *See also* Complaint, ¶¶52–54, discussing "a series of communications beginning on February 10, 2016" involving Doreen Rathburn, Business Alliances Manager at the USPS, Robert Ross, co-founder of IntuiShip, Cliff Rucker, Vice President of Sales at the USPS, Stamps personnel, Candi Booth and Amine Khechfe, "both of whom worked at Endicia."

[79] Zurek Report, ¶33, citing *The Capitol Forum*, "Stamps.com: Parcel Partners Sends Email to Partners Regarding Changes to USPS Reseller Model; Email States Parcel Partners Knew Reseller Model Would be Changing and Parcel Partners Provided Partners with Insight into Changes in April," August 24, 2017.

[80] Complaint, ¶58.

[81] Zurek Report, Appendix C.

[82] Complaint, ¶61.  (Emphasis added.)

with Stamps";[83] "Defendants repeatedly told investors … that the USPS was pleased with its contractual relationship with Stamps because Stamps had been growing USPS's business every year."[84]  Plaintiff further alleges that "[i]n addition to concealing its actual business model from investors, throughout the Class Period Stamps repeatedly **dispelled investor concerns** regarding the reseller program by claiming that the program was beneficial to and, in fact, a major asset of the USPS."[85]  By way of example, Plaintiff points to the Company's statements during its August 2, 2017 quarterly conference call with analysts:

> For example, in August 2017, shortly after questions surfaced regarding Stamps' role in the USPS reseller program, Chairman and CEO McBride falsely assured investors:
>
>> Resellers are important both for keeping existing business and for growing new business.  You have people that are shipping through the reseller channel.  It works for the USPS.
>
> ***
>
>> [T]he USPS looked at resellers and PC postage providers like Stamps.com and Endicia as excellent partners on bringing the best solutions to customers.
>
>> We continue to enjoy a great partnership with the Postal Service and feel that we have created a sustainable win-win model for both of us, which will result in a continued growth of USPS packages and ecommerce and online postage more generally.
>
> Rather than creating a "sustainable win-win model," Stamps was improperly profiting from its misuse of the reseller program, which contributed to hundreds of millions of dollars in losses suffered by the USPS, which inevitably would result in the loss of Stamps' lucrative partnership with the agency.[86]

---

[83] Complaint, ¶56.  (Emphasis added.)

[84] Complaint, ¶62.

[85] Complaint, ¶104.  (Emphasis added.)

[86] Complaint, ¶¶104, 105.

- 22 -

Exhibit 2

- 32 -

29.     In fact, there are several other instances both before and during the Class Period where the Company and/or third-party sources allayed investors' concerns over Stamps' relationship with the USPS and the reseller program.  Such sources directly refute the "allegations from short sellers" upon which Dr. Zurek relies.[87]  For example, as Dr. Zurek describes, on each of its three quarterly conference calls with analysts prior to the Class Period, the Company addressed claims made by short sellers head on:

- **Company Conference Call (7/28/2016):** "On July 28, 2016, CEO McBride addressed the claims in the Prescience Point and The Capitol Forum reports in a discussion of the reseller program during the Q2 2016 conference call.  CEO McBride stated, among other comments, that: (a) 'the reseller program was meant to provide attractive rates to lower-volume shippers, which are too numerous for the USPS to support with their own individual discounts;' (b) '[a]n important goal of the reseller program [was] in fact acquiring new customers, but another important goal [was] the retention of existing customers;' (c) '[t]he USPS regulates [Stamps.com], and they regulate the resellers very closely, and they understand and support the business practices of both;' (d) 'intuiSHIP represent[ed] less than 10% of [Stamps.com] revenue;' and (e) 'only approximately 3% of [Stamps.com's] customers have been offered discounts with reseller rates in order to retain their volume with the USPS.'"[88]

- **Company Conference Call (11/3/2016):** "On November 3, 2016, CEO McBride provided an update on the reseller program during the Q3 2016 conference call.  CEO McBride noted, among other comments:

    We're in frequent contact with the top management at the USPS, and they continue to be in support of the reseller program.  In fact, we're aware of one reseller agreement where a long-term extension was proposed by the USPS management and was approved by the Postal Regulatory Commission in July after the initial reports came out.  The USPS has consistently extended the reseller program, and the Postal Regulatory Commission has consistently approved the program for the past 7 years.  We expect them to continue to do so in the future. …

---

[87] Zurek Report, ¶39.

[88] Zurek Report, Appendix C, ¶8, citing *Thomson Reuters StreetEvents*, "Edited Transcript, STMP - Q2 2016 Stamps.Com Inc Earnings Call, Event Date/Time: July 28, 2016 / 9:00PM GMT," (5:00 PM ET).

Ms. Goldway [former Chair of the Postal Regulatory Commission] … provided information which supported our assertion that there are not any restrictions on the types of channels or customers that the resellers were allowed to target.  She provided some history of the reseller program and said that what the USPS was hoping for at the time that they established the program was the small volume package shippers, which had been the business of DHL when they exited the U.S. market in 2009. … Ms. Goldway also added a few additional viewpoints and told her audience that the PC Postage companies are considered to be the Postal Services' most valued partners.  And she also said that in her opinion, the reseller program has been very successful and it has benefited the USPS in terms of meeting its initial goals."[89]

- **Company Conference Call (2/23/2017):** "On February 23, 2017, CEO McBride made the following statements regarding Stamps.com's relationship with the USPS on the Q4 2016 conference call:

  With that, let me just mention about the USPS.  They're always, and have been always, our most important partner.  We have a common goal with the USPS, which is growing package volume and serving and retaining USPS customers.

  We've made significant investments in creating, developing and growing the online mailing and shipping category since 1999 … and all that's gone in to support of helping the USPS grow their business and retain their customers. …

  And we continue to enjoy a great partnership with USPS.  We feel that we've created a sustainable win-win model for both of us that will result in continued growth of the USPS packages."[90]

30.    Analysts and market commentators echoed the Company's assurances about its relationship with the USPS, and likewise refuted such short seller allegations:

- *Bloomberg News* **(7/11/2016):** "On July 11, 2016, Bloomberg News published an email interview with Stamps.com spokesman Eric Nash that addressed The Capitol Forum article.  Mr. Nash noted that 'the accuracy of

---

[89] Zurek Report, Appendix C, ¶15, citing *Thomson Reuters StreetEvents*, "Edited Transcript, STMP – Q3 2016 Stamps.Com Inc Earnings Call, Event Date/Time: November 03, 2016 / 9:00PM GMT," (5:00 PM ET).

[90] Zurek Report, Appendix C, ¶22, citing *Thomson Reuters StreetEvents*, "Edited Transcript, STMP - Q4 2016 Stamps.Com Inc Earnings Call, Event Date/Time: February 23, 2017 / 10:00PM GMT," (6:00 PM ET).

the article should be viewed in light of the fact that the primary source cited for the article was Pitney Bowes, one of Stamps.com's biggest competitors,' and stated that the 'USPS reseller program has been successful in helping USPS generate growth in its package business.'"[91]

- **Sidoti (7/14/2016):** "We would argue that the removal of any of these contracts would not be in the USPS best interests, as it would likely result in business switching over to competitors. … We would argue that Stamps.com's partnership with these resellers has been beneficial to the USPS, as it has enabled the USPS to grow package volumes in a competitive market.  In addition, the Postal Regulatory Commission's (PRC) review of these contracts does not focus on the type of customers, but only determines if revenue from the program covers its costs.  We would also note that we called up a third party shipper referenced in the research note, and this party's comments regarding eligibility for the discounts refuted the Capital Forum article's claims … We note that the USPS is fully aware of these contracts, and we would argue that it would be against the USPS's best interest to cancel these contracts."[92]

- **Craig Hallum (7/19/2016):** Short sellers "thesis boils down to this: these programs (and their positive revenue and earnings impact to Stamps.com) are going away.  In talking to industry experts who do this for a living, we have found no evidence to support the shorts' claim. … [A]ll the industry contacts we spoke with provided us with strong comfort in the programs above and the Stamps.com position, despite our efforts to find any credibility in the short thesis points."[93]

- **B Riley (7/29/2016):** "[A]ll ears were on the company's earnings call to hear management's take on allegations that STMP has been abusing the USPS' reseller program to its own advantage.  CEO Ken McBride methodically dissected the misleading claims alleged in recent short reports targeted at STMP with many of the points made affirming the contentions we made in our earnings preview.  In short, management made clear that 1) the USPS' reseller program is working exactly as intended, allowing resellers and technology vendors to partner together in an effort to aggregate lower volume

---

[91] Zurek Report, Appendix C, ¶3, citing *Bloomberg News*, "Stamps.com Disagrees With Capitol Forum on USPS Cancellation," July 11, 2016.

[92] Sidoti & Company, LLC, "Stamps.com, Morning Meeting Note; View The Pullback In The Stock Following A Negative Research Piece As An Opportunity; We Dispute The Article's Claims; Fundamentals Remain Strong; Reiterate BUY And $150 Target," July 14, 2016.  (Cited at Zurek Report, Appendix B, p. 5.)

[93] Craig Hallum, "Stamps.com, Playing The Stamps.com Whack-A-Mole Game. We See The Fundamental Strengths Continuing To Shine And The Stock Way Oversold," July 20, 2016.  (Cited at Zurek Report, footnote 71.)

but critical e-commerce shippers that can add meaningful volumes to the USPS' network; 2) the reseller program has successfully driven volume increases for the USPS and has fostered significant innovation in the development of new shipping-focused technology solutions, all of which would be at risk if the program was eliminated; and 3) potential changes to the USPS' published commercial rates and their impact on resellers are seemingly being addressed already with amendments to an existing NSA dictating what discounts will be available in the event Commercial Plus Pricing is eliminated."[94]

- **Roth Capital Markets (7/29/2016):** "2Q outperformance by STMP was coupled with a lengthy rebuttal from its management on recent 'bear' reports, especially surrounding the topic of negotiated service agreements (NSA). Our own diligence finds some flaw in the bear stance as several ecommerce marketplaces, many who have their own NSAs, would be adversely impacted, as would the USPS, if these NSAs were done away with."[95]

- **Sidoti (9/21/2016):** "During our travels with STMP, management addressed market concerns related to third-party resellers by highlighting how the U.S. Postal Service (USPS) benefits from reseller relationships and how business is spread amongst multiple providers. …

  While there had been some allegations of inappropriate discounts being given out, Stamps.com is not aware of any actions from the resellers it uses and is in constant contact with the USPS on all aspects of its relations. … [W]e think it is extremely unlikely that the USPS would take a negative view on business that Stamps.com receives in partnership from third-party resellers."[96]

- **Sidoti (4/24/2017):** "The recent allegations from short sellers are not new and we think they have no merit; however, they have resulted in a pullback in the stock, which creates a compelling buying opportunity, in our view. While claims have been made that Stamps.com's relationship with resellers is unfavorable to the U.S. Post Office (USPS), we dispute this and point out that the USPS has grown its Shipping and Packages segment revenue 15.8% in 2016 compared to 2015. We argue Stamps.com is supporting the USPS'

---

[94] B Riley, "Stamps.com, Delivers Another Beat and Raise; Management Refutes Misleading Short Report Claims; Raising Estimates and Increasing Price Target from $150 to $160; Reiterate Buy Rating," July 29, 2016. (Cited at Zurek Report, Appendix B, p. 6.)

[95] Roth Capital Markets, "STMP: 2Q Outperformance and Some Bear Thesis Rebuttal," July 29, 2016. (Cited at Zurek Report, Appendix B, p. 6.)

[96] Sidoti & Company, LLC, "Stamps.com, Travels With Management Address Reseller Concerns And Highlight Market Opportunities From Acquisitions And High-Volume Shipping Customers; Reiterate BUY Rating, Maintain $160 Target," September 21, 2016. (Cited at Zurek Report, Appendix B, p. 6.)

objective to find revenue growth with small and midsized shippers that utilize reseller agreements."[97]

- **B Riley (5/23/2017):** "We were primarily interested in determining whether changes to the USPS reseller program could be forthcoming as rumored in negatively-biased reports on Stamps.com (STMP), the sustainability of the USPS' strong growth in Shipping and Packages, and any changes from a competitive standpoint.  While not definitive by any means, our checks leave us convinced that the short thesis has little merit."[98]

- **Roth Capital Partners (5/30/2017):** "Our recent checks with industry participants following the 2017 National Postal Forum last week suggest the U.S. Postal service's reseller program is little changed.  This has been the topic of much debate (and candidly volatility surrounding shares) recently.  Our checks give us greater comfort STMP's relationship with the USPS remains in good standing, which reinforces commentary made on its last conference call."[99]

31.     Based on his observation that there was "substantial information regarding Stamps.com's relationship with the USPS and resellers," Dr. Zurek contends that "the risks associated with an adverse outcome to the economics of Stamps.com's relationship with the USPS would have been priced into Stamps.com's stock prior to the beginning of the proposed Class Period if the stock was traded in an efficient market."[100]  However, Dr. Zurek improperly assumes that the publicly available information *fully* revealed the same information Plaintiff alleges was concealed by Defendants.  Contrary to Dr. Zurek's incorrect and overly narrow view of Plaintiff's theory of liability, Plaintiff alleges that Defendants not only knew that "the USPS was not 'very happy

[97] Sidoti & Company, LLC, "Stamps.com, Outlook Is Positive For High Volume Shipper Business: Model Solid Pretax Gains Coupled With EPS Declines In 1Q:17 And Full Year 2017, Due To Higher Tax Rate; Maintain BUY, $175 Target," April 24, 2017.  (Cited at Zurek Report, footnote 79.)

[98] B Riley, "Stamps.com, Takeaways from 2017 National Postal Forum; Reiterate Buy Rating and $210.00 Price Target," May 23, 2017.  (Cited at Zurek Report, footnote 86.)

[99] Roth Capital Partners, "STMP: Checks Indicate USPS Reseller Program Likely Unchanged," May 30, 2017.  *See also* Roth Capital Partners, "Morning Summary," May 31, 2017.  (Cited at Zurek Report, footnote 40.)

[100] Zurek Report, ¶6(a).

with' Stamps,"[101] and that "Stamps' relationship with the USPS had in fact soured prior to the Class Period,"[102] but that, when confronted by mounting media reports, Defendants downplayed, denied, and deflected risks associated with its exclusive partnership with the USPS.  Dr. Zurek fails to consider that only Stamps had access to the full mosaic of relevant information regarding its relationship with the USPS and the stability of its exclusive partnership, thereby granting heightened credibility to the Company's reassuring statements (*e.g.*, "STMP's CEO has more insight than the anonymous sources referenced in short reports"[103]).  Accordingly, Dr. Zurek's analysis is flawed and irrelevant because he fails to consider the countervailing effects of: (i) Stamps' repeated insistence prior to and during the Class Period that it continued to enjoy a healthy and stable "win-win" relationship with the USPS; and (ii) Stamps' deflection of public scrutiny over its relationship with the USPS and the reseller program.

### C. Price Impact Associated With the Alleged Misstatements on August 1, 2018 and October 31, 2018 Regarding the Task Force Report Was Not "Resolved" on December 4, 2018

32.     In April 2018, U.S. President Donald Trump signed an executive order establishing a task force

> to evaluate the operations and finances of the United States Postal Service (USPS) and develop recommendations for administrative and legislative reforms for the U.S. postal system.  The goal of these recommendations [was] to identify a path for the USPS to operate under a sustainable business model, providing necessary mail services to citizens and businesses, while competing fairly in commercial markets.[104]

---

[101] Complaint, ¶71(c).  *See also* Complaint, ¶77(b).

[102] Complaint, ¶77(d).

[103] B Riley, "Stamps.com, Takeaways from 2017 National Postal Forum; Reiterate Buy Rating and $210.00 Price Target," May 23, 2017.

[104] Task Force Report, cover letter.  The executive order is available online at: https://www.whitehouse.gov/presidential-actions/executive-order-task-force-united-states-postal-system/.

- 28 -
Exhibit 2
- 38 -

The Task Force Report was due and submitted to the President on August 10, 2018.[105]  However, it was not publicly released until December 4, 2018.[106]

33.     After market close on August 1, 2018, during its second-quarter 2018 conference call with analysts, Stamps' CEO, McBride, made the following statements "in response to analyst questions concerning the USPS Task Force investigation and impending report,"[107] which are alleged to be false and misleading:

> The final [Task Force] report is expected to be issued August 10.  We don't know the specifics in the report.  ***But we do think that based on our conversations that the report will come out strongly in favor of the partnerships between the USPS and private industry like the partnerships we've had with the USPS***.[108, 109]

34.     After market close on October 31, 2018, during its third-quarter 2018 conference call with analysts, CEO McBride once again addressed the Task Force Report, making the following statements which are also alleged to be false and misleading:

> [W]e would have no reason to believe that the USPS is not generally meeting its obligations regarding the NSA program.  We would further expect that any commentary on the report on postal partnerships would reflect the very positive effect of partnerships like ours have had on growth in the USPS' package volumes.
>
> * * *
>
> ***I think when we look at the various reports that are out there, the conversations we've had with folks that are working on these reports, the general view is the***

---

[105] Delivering Government Solutions in the 21st Century Reform Plan and Reorganization Recommendations, p. 70 (available online at https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf).

[106] Task Force Report, cover letter.

[107] Complaint, ¶89.

[108] Complaint, ¶89.  (Emphasis in original.)

[109] Following the Company's second-quarter 2018 earnings announcements and conference call, Stamps' stock price experienced a statistically significant Company-specific stock price increase on August 2, 2018 of +7.50% under Dr. Zurek's event study, and +7.49% under the Nye event study.  (Zurek Report, Exhibit 4; Nye Report, Exhibit 11B.)

- 29 -
Exhibit 2
- 39 -

*idea of USPS increasingly embracing partnerships like ours makes a ton of sense for them.*[110]

35.    Dr. Zurek does not dispute that the above alleged misstatements on August 1, 2018 and October 31, 2018 had price impact.  However, he argues that "any uncertainty" associated with the "content of the USPS Task Force Report was resolved no later than December 4, 2018," with the public release of the report.[111]  Yet, contrary to Dr. Zurek's contention, the alleged misstatements on August 1 and October 31, 2018 were not merely about the "content" of the Task Force Report.[112]  Under Plaintiff's theory of liability, Stamps' assurances, which were reportedly based "conversations" with "folks … working on these reports," that the report would "come out strongly in favor of" partnerships like the Stamps-USPS partnership, and that the "USPS [was] increasingly embracing partnerships" like it had with Stamps, indicated that the Company continued to enjoy a healthy and stable "win-win" relationship with the USPS. However, according to Plaintiff, the relationship was "built upon a foundation of deception,"[113] and as a result it was "extremely strained due to the Company's abuse of the USPS reseller program," and the USPS was making "efforts to prevent such practices from continuing."[114, 115]

---

[110] Complaint, ¶92.  (Emphasis in original.)

[111] Zurek Report, ¶61,

[112] Zurek Report, ¶61.

[113] Complaint, ¶26.

[114] Lead Plaintiff's Memorandum in Support of Motion for Class Certification," June 29, 2020, p. 3.  *See also* Complaint, ¶93.

[115] *See also* Plaintiff's Response to Defendants' Motion for Clarification of Order Re: Defendants' Motion To Dismiss, dated June 29, 2020, Docket No. 116, pp. 7, 8:

> [Regarding August 1, 2018:] There is no doubt that here McBride was conveying that the Stamps-USPS partnership was so strong and so beneficial for the USPS that the Task Force would not only support it but would come out "strongly in favor" of more of these partnerships … which directly contradicts McBride and

36.      When the Task Force Report was released on December 4, 2018, it by no means revealed the alleged true state of the Company's relationship with the USPS and its resellers during the Class Period.  First, the report does not even mention Stamps or its resellers.[116, 117]  Second, as Dr. Zurek himself points out, as far as its implications for Stamps were concerned, the Task Force Report was considered to be a positive development.  For example, Dr. Zurek cites "[a]nalyst commentary following the release of the USPS Task Force Report … consistent with the contents of the report being new and positive information for Stamps.com":[118, 119]

---

the other Defendants' awareness that Stamps' USPS partnership was so weak that the USPS was determined not just to avoid replicating it but also to end it.

[Regarding October 31, 2018:] Boasting about the "very positive effect of partnerships like ours," the "critical role that we play [with the USPS], "driving USPS growth," and "the idea of USPS increasingly embracing partnerships like ours makes a ton of sense for them" unmistakably conveys the notion of a strong partnership between Stamps and the USPS. … This was a scheme to cultivate a false impression of a strong partnership with the USPS that Defendants executed through many thematically similar statements made over the course of many months, not some sort of one- or two-off slip of the tongue.

[116] *See* the Task Force Report.  *See also* Craig-Hallum, "There Is No Boogeyman.  Trump Task Force Conclusions Consistent With Our Expectations And Substantially De-Risk The Story.  Reiterating BUY Rating And $265 Price Target," December 6, 2018.  ("[T]there is NO mention of resellers, the PC postage program or Stamps.com itself.")

[117] At deposition, Dr. Zurek conceded that Task Force Report did not specifically discuss the Stamps-USPS relationship, although he could not recall whether Stamps was mentioned.  He did not analyze whether the Task Force Report disclosed the alleged true state of affairs with regard to the USPS-Stamps relationship, yet he acknowledged that it did not reveal that the USPS-Stamps relationship was strained in any way.  (Zurek Tr. 105:16–107:8, 110:23–111:10.)

[118] Zurek Report, ¶64.

[119] According to Dr. Zurek, the Task Force Report was release "no later than at 3:00pm ET" on December 4, 2014.  He states:

Stamps.com's stock price experienced a residual decline of 0.64% on December 4, 2018, which was not statistically significant according to my event study.  On the following trading day, December 6, 2018, Stamps.com's stock price experienced a residual increase of 7.30%, which was statistically significant according to my event study.  (Zurek Report, ¶¶62, 63.)

- 31 -

Exhibit 2

- **B Riley:** "[W]e believe the report could not only serve as means of relief for recent investor concerns around STMP's viability as a partner with the USPS, but could ultimately provide a net benefit to the business over the longer term."[120]

- **Craig Hallum:** "It is clear the TTFR … clearly endorses the NSA program … Finally, there is a desire to turn more work over to third parties, in effect entirely endorsing the work it does with Stamps.com … there is NO mention of resellers, the PC postage program or Stamps.com itself.  For investors, there should be a collective sigh of relief that the best and brightest minds, with scrutiny from the highest levels do not have the Postal Service's best package success story and partner in its sights."[121]

- **Maxim Group:** "Main takeaways from Government Task Force Report on USPS are recommendations to provide more autonomy to run their business with focus on pricing and cost, and supportive of partnerships and SMB e-commerce.  We believe this removes a big overhang on the STMP stock that the report might make negative recommendations relative to STMP or resellers, which it did not."[122]

- **Roth Capital Partners:** "USPS Task Force report suggests little adverse impact to STMP; potential for pricing changes could actually be beneficial to STMP… any prior investor concern over the risk of it having a dramatically different digital postage partnership with the USPS is likely mitigated, thus removing some overhang on shares."[123]

37.     Given that, according to Dr. Zurek, the Task Force Report revealed only new and positive implications for Stamps, his claim that the report somehow "resolved" any "uncertainty" associated with the alleged misstatements about the true state of the Stamps-USPS relationship is illogical.  Moreover, as discussed below, Dr. Zurek fails to adequately examine whether fraud-

---

[120] Zurek Report, ¶64, citing B. Riley, "Our Takeaways from the Task Force Report on the United States Postal Service; Reiterate Buy, $300 PT," December 6, 2018.

[121] Zurek Report, ¶64, citing Craig-Hallum, "There Is No Boogeyman. Trump Task Force Conclusions Consistent With Our Expectations And Substantially De-Risk The Story. Reiterating BUY Rating And $265 Price Target," December 6, 2018.

[122] Zurek Report, ¶64, citing Maxim Group, "Positive Travels with Management - Reiterate Buy, $320 PT," December 13, 2018.

[123] Zurek Report, ¶64, citing Roth Capital Partners, "STMP: USPS Task Force Report Takeaways," December 6, 2018.

related information impacted Stamps' stock price on February 22 or May 9, 2019, thereby rendering his analysis incapable of demonstrating a lack of price impact associated with the alleged corrective events. Accordingly, he has no basis to conclude that the price impact associated with any of the alleged misrepresentations was resolved prior to the end of the Class Period.

### D. Price Impact Associated With the Alleged Misstatements on October 31, 2018 Regarding USPS Contract Negotiations Was Not "Resolved" on February 21, 2019

38. In its quarterly conference call with analysts on October 31, 2018, addressing the "issue of the negotiations of important agreements with the USPS," CEO McBride made the following statements, which are alleged to be false and misleading:

> Historically, we have had a significant number of agreements with the USPS, and we have negotiated those agreements many times. These types of negotiations are very common for us. Negotiations with the USPS often take many months to finalize. ***The USPS has many competing priorities, and the process just takes time. In general, we expect that updates to our agreements with the USPS will continue to reflect the critical role that we play in their e-commerce package business, including that we have the largest private sales force focused on driving USPS growth. We process more than 1/3 of their Priority Mail volume in the U.S. And working hand-in-hand with the USPS through our partnership, we have contributed to a significant portion of overall USPS e-commerce package growth over the past 5 years***.[124]

39. Dr. Zurek asserts that:

> to the extent that the October 31, 2018, alleged misstatements had price impact by influencing the market's assessment of the likelihood of Stamps.com being able to renew the USPS contract that was subject to being renegotiated, that impact would have ceased at the latest by the time of the February 21, 2019, disclosure that the contract had ended.[125]

---

[124] Complaint, ¶92. (Emphasis in original.)

[125] Zurek Report, ¶68.

- 33 -

Exhibit 2

40.    Importantly, Dr. Zurek limits his analysis of price impact associated with these alleged misstatements "to the extent" they misrepresented the "likelihood" of a contract renewal. However, the Company's statements on October 31, 2018 are not alleged to have been false and misleading solely because they misled the market about the precise probability of a contract renewal.  CEO McBride's statements informed the market that Stamps continued to play a "critical role" in the USPS's e-commerce packages business, and that the Company was working "hand-in-hand with the USPS through [its] partnership."  Such statements clearly spoke to the strength and importance of Stamps' relationship with the USPS, which, according to Plaintiff, was falsely portrayed throughout the Class Period.

41.    Furthermore, while the Company's February 21, 2019 disclosure informed the market that Stamps would discontinue its shipping partnership with the USPS, under Plaintiff's theory of liability, this event only partially revealed the true state of the Company's relationship with the USPS.  Dr. Zurek conveniently ignores Plaintiff's claim that on February 21, 2019, Stamps "continued its deception by misrepresenting the true reasons for the termination," and "falsely claimed that the decision to terminate its relationship with the USPS was driven by its desire to avoid exclusivity."[126]  Indeed, it was not until May 8, 2019 that "Stamps finally revealed publicly the extent and impact of defendants' wrongdoing on Stamps and its operations, revealing that in addition to the loss of the exclusive commission business, the USPS was also restricting and terminating certain NSAs with the Company's reseller partners and, thus, Stamps' expected future earnings would be substantially reduced."[127]  Given his failure to consider the full scope of Plaintiff's allegations, Dr. Zurek has no basis for his assertion that price impact associated with

---

[126] Complaint, ¶108.

[127] Complaint, ¶113.

the October 31, 2018 alleged misstatements "ceased at the latest by the time of the February 21, 2019, disclosure that the contract had ended."[128]

42.     Dr. Zurek also argues that "Stamps.com had disclosed to the market the risk of potential contract non-renewal in its Form 10-Q filed August 8, 2018."[129]  Notwithstanding the fact that this risk disclosure was not published until approximately 1½ years into the Class Period and therefore has no bearing on alleged misrepresentations prior to August 8, 2018, the Company's vague risk disclosure in its Form 10-Q falls far short of revealing the alleged true risk associated with the USPS partnership and the reseller program.  As described in the Complaint, unbeknownst to investors, Stamps exploited its contractual relationships with the USPS, and in doing so, the Company's "reseller scheme represented a significant financial risk to Stamps' lucrative exclusive partnership and contractual NSAs with the USPS."[130]  Plaintiff also alleges that "defendants had known about and anticipated since the start of the Class Period," "potential unfavorable short- and long-term amendments, renegotiations, and termination of certain NSAs between the USPS and the Company's reseller partners."[131]  Indeed, Defendants were allegedly aware "that Stamps' USPS partnership was so weak that the USPS was determined not just to avoid replicating it but also to end it altogether."[132]  Tellingly, Dr. Zurek testified that he has not

---

[128] Zurek Report, ¶68.

[129] Zurek Report, ¶66.  *See also* Zurek Report, ¶71, citing Stamps.com Inc, SEC Form 10-Q, filed August 8, 2018.

[130] Complaint, ¶¶71(j), 77(j).

[131] Complaint, ¶12.

[132] Plaintiff's Response to Defendants' Motion for Clarification of Order Re: Defendants' Motion To Dismiss, dated June 29, 2020, Docket No. 116, p. 7.  *See also* Complaint, ¶105.

analyzed, nor is he offering an opinion, as to whether the alleged true risks associated with the USPS relationship and contract renewal were fully disclosed throughout the Class Period.[133]

43.     As explained by Craig Hallum, the Company's August 8, 2018 risk disclosure was about "one of its handful of contracts with the USPS."  In Craig Hallum's "history covering [Stamps] stock, these renegotiations have happened several times and have generally resulted in favorable outcomes for both the USPS and for Stamps.com."  The analyst noted that prior negotiations had "proved to be a catalyst for improved results," and these contracts "are drafted in a way to drive incentives for Stamps.com and resultant financial benefits for the USPS."  Craig Hallum concluded that the reason the Company "disclosed this specific contract now,' was that "the lawyers determined it was a disclosable item."  The analyst also highlighted the Company's reassuring statement that it "'believe[d] that this agreement [wa]s mutually beneficial to the USPS and [Stamps],' which would be consistent with how the prior negotiations have concluded."[134]  Thus, far from revealing the alleged true risk associated with the USPS partnership and the reseller program, the Company's vague August 8, 2018 risk disclosure was viewed as merely a formality.

44.     Dr. Zurek also maintains that Stamps' stock price reflected "risks associated with the USPS relationship and the contract negotiation" following the Company's October 31, 2018 disclosures.[135]  He relies on various analyst commentary, and also notes that Stamps' stock price experienced a statistically significant decline following the October 31, 2018 disclosures.[136]

---

[133] Zurek Tr. 140:19–141:15.

[134] Craig Hallum, "Nothing Unprecedented About A Renegotiation – Aside From The Environment – This Is "Normal Course" For Stamps.com," August 9, 2018, cited at Zurek Report, ¶72.

[135] Zurek Report, ¶66.  *See also* Zurek Report, §V.F.2.

[136] Zurek Report, ¶¶74–76.

- 36 -
Exhibit 2
- 46 -

However, the analyst commentary Dr. Zurek relies on provides ample evidence that, subsequent to October 31, 2018, the market's understanding of the Stamps-USPS relationship and risks associated with the contract re-negotiation, were far from the eventual outcome disclosed on February 21, 2019 and May 8, 2019:

- **Craig Hallum:** "Our belief is that the outcomes [from the OIG or Trump Task Force] (in whatever form they come) could be quite positive … management remains confident with its position –so are we … We believe that Stamp's [*sic*] position is great, serving as both an effective outsourced marketing and technology arm for the Postal Service, while providing the vast majority of the growth seen in packaged volume.  Finally, the company remains in a renewal negotiation for one of its contracts…and we expect this will be concluded with nary an update or a noticeable impact.  If we are right and the above get resolved in a way such that Stamps.com's opportunity gets even bigger, the stock could become even more attractive given the multi-year skeptical view on these moves."[137]

- **B. Riley:** "[M]anagement remains confident in its value proposition and the strength of its relationship with the USPS… on the issue of negotiations of important agreements with the USPS, management noted that STMP has had numerous agreements with the USPS that they have negotiated many times.  These negotiations are very common for company and often take many months to finalize.  Overall, STMP expects that updates to its agreements will continue to reflect its critical role that it plays in the USPS's e-commerce package business."[138]

- **Northland Capital Markets:** "Between some contract renewal negotiations, UPU concerns and unreleased administration studies, investor have concerns with STMP's USPS relationship.  We continue to believe no major changes are in store as per our previous notes."[139]

- **Maxim Group:** "Management did a very good job of addressing investors' concerns, which had been weighing on the stock. … We view STMP's USPS

---

[137] Zurek Report, ¶75, citing Craig-Hallum, "Organic Growth Remains 20% – Now We Layer in the Rest of the World.  Reiterating BUY Rating, Lowering Price Target To $265," November 1, 2018.

[138] Zurek Report, ¶75, citing B. Riley, "3Q Results Exceed Expectations; Increases FY18 Revenue and Pro Forma EPS Guidance; Addresses Key Investor Concerns; Reiterate Buy, $300 PT," November 1, 2018.

[139] Zurek Report, ¶75, citing Northland Capital Markets, "Good Q; Guidance Tweaked UP; Govt Concerns Provide Buying Opportunity," November 1, 2018.

contract negotiations as normal for the company, and as previous contract negotiations have been agreed upon, we believe this is a reflection of value that STMP brings with growing ecommerce volumes representing a significant amount of volume and contributing to ecommerce growth."[140]

45.    In sum, given that: (i) nowhere in his report does Dr. Zurek affirmatively opine that the alleged misstatements on October 31, 2018 lacked price impact; (ii) Dr. Zurek only analyzes such misstatements "to the extent" they had price impact related to the "likelihood" of a contract renewal,[141] thereby ignoring the full scope of Plaintiff's allegations concerning the Stamps-USPS relationship and the risks associated with the reseller program; (iii) his limited opinion only addresses whether such price impact (*i.e.*, about the "likelihood" of a contract renewal) ceased on February 21, 2019;[142] and (iv) as discussed below, Dr. Zurek fails to adequately examine whether fraud-related information impacted Stamps' stock price on February 22 or May 9, 2019—he has no basis to conclude that the price impact associated with any of the alleged misrepresentations was resolved prior to the end of the Class Period.

### E.    Dr. Zurek's Failure to Analyze Whether Fraud-Related Information Impacted Stamps' Stock Price on the Alleged Corrective Event Dates Renders His Analysis Unreliable and Incomplete

46.    It is my and Dr. Zurek's understanding that Plaintiff does not bear the burden of proving price impact,[143] and I have not determined the degree to which alleged corrective disclosures contributed to the decline in the price of Stamps stock relative to other negative Company-specific information released contemporaneously.  However, the circuit court decision on appeal in *Halliburton II* defines price impact as follows: "Price impact can be shown either by an

---

[140] Zurek Report, ¶75, citing *Maxim Group*, "3Q18 EPS and Revenue Beat our Estimates, Positive Outlook, Maintain Estimates and $320 PT," November 2, 2018.

[141] Zurek Report, ¶68.

[142] Zurek Report, ¶68.

[143] Zurek Report, footnote 2.

- 38 -

Exhibit 2

- 48 -

increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud."[144]  Plaintiff alleges "the truth about defendants' prior misrepresentations and fraudulent conduct reached the market" after market close on February 21, 2019 and after market close on March 8, 2019.[145]  It is undisputed that such disclosures triggered Company-specific declines in the price of Stamps stock that were statistically significant at above the 95% confidence level:

| Corrective Event Impact Date | Nye Report[146] | | Zurek Report[147] | |
| --- | --- | --- | --- | --- |
| | Company-Specific Return | Confidence Level | Company-Specific Return | Confidence Level |
| 2/22/2019 | -59.10% | 100.0% | -59.12% | 100.0% |
| 5/9/2019 | -55.33% | 100.0% | -55.36% | 100.0% |

47.     Dr. Zurek asserts that the February 21 and May 8, 2019 disclosures "do not provide equivalent corrective information that could have been disclosed earlier regarding any of the alleged misstatements."[148]  Based on this, he concludes that "from a financial economics perspective, Stamps.com's stock price declines following the alleged corrective disclosures are not necessarily informative as to whether the alleged false and misleading statements affected Stamps.com's stock price when they were made."[149]  However, as discussed further below, by

---

[144] *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013) *vacated and remanded on other grounds,* 134 S. Ct. 2398 (U.S. 2014).

[145] Complaint, ¶121.

[146] Nye Report, Exhibit 11B.

[147] Zurek Report, Exhibit 4.

[148] Zurek Report, ¶6(e).  *See also* Zurek Report, ¶78.  Notably Dr. Zurek does not make this argument with respect to alleged misstatements on October 31, 2018 concerning the USPS contract re-negotiations.  His opinion here is limited to alleged misstatements on May 3, 2017, August 2, 2017, and August 1, 2018, as well as misstatements on October 31, 2018 regarding "whether the USPS Task Force Report would come out in favor of partnerships like the one between the USPS and Stamps.com."  (Zurek Report, ¶78.)

[149] Zurek Report, ¶78.  *See also* Zurek Report, ¶6(e).

- 39 -
Exhibit 2
- 49 -

focusing entirely on whether the information disclosed on February 21 and March 8, 2019 was in any way "different" from allegedly withheld information on the misstatement dates,[150] Dr. Zurek improperly circumvents the analysis of whether these disclosures revealed, even in part, the alleged true state of Stamps' relationship with the USPS and risks associated with the reseller program. In fact, other than the "bundle of information" that was released by the Company, Dr. Zurek has no opinion as to what caused the decline in Stamp's stock price following the alleged corrective events.[151] Furthermore, Dr. Zurek appears to define "equivalent corrective information" to include only admissions of fraud by Defendants or statements by Defendants which explicitly mirror their prior misrepresentations on a one-to-one basis.[152] It is my understanding that no such "mirror image" disclosure is required under the relevant law. As such, Zurek's price impact analysis of the alleged corrective events is incomplete (at best), thereby rendering his conclusions unreliable.

---

[150] Zurek Report, ¶78. *See also* Zurek Report, ¶6(e).

[151] Zurek Tr. 64:15–17, 66:16–19.

[152] Zurek Tr. 70:13–71:10:

> Q. When you analyzed the two corrective disclosures in this case that we just mentioned, February and May of 2019, did you perform any mirroring analysis to determine a relationship between the corrective disclosure and the earlier misstatements and omissions?
>
> A. Did you say mirroring analysis to try and compare the misstatement to the alleged corrective disclosure?
>
> Q. Correct.
>
> A. In a general sense, I think the answer is yes for the February statement -- for the February alleged corrective disclosure, rather. The information that plaintiffs allege was corrective was the fact that the contracts were not renewed, which does not mirror the information or the reality in May and August 2017. And then in February [*sic*] 2019, the information is that the USPS was taking concrete negative to Stamps' steps with respect to its resellers. And, again, that's information that was not -- as I understand it, was not the case in May and August 2017.

#### i.        February 21, 2019 Alleged Corrective Event

48.        After market close on February 21, 2019, the Company reported its fourth-quarter 2018 financial results.  For the quarter, Stamps reported total revenue of $170.2 million, and adjusted EPS of $3.73.[153]  The consensus estimates of quarterly revenue and adjusted EPS were $160 million and $2.90, respectively.[154]  The Company also issued guidance for 2019, including revenue of $540–$570 million and adjusted EPS of $5.15–$6.15.[155]  This compared to consensus estimates of revenue of $689.0 million and adjusted EPS $10.79.[156]  During its conference call with analysts, Stamps announced that it had "decided to discontinue [its] shipping partnership with the USPS so that [it could] fully embrace partnerships with other carriers who [it thought would] be well positioned to win in the shipping business in the next 5 years."[157]  The Company also announced the retirement of its then-President, Kyle Huebner.[158]  Following these disclosures, Stamps' stock price experienced a -59.10% Company-specific stock price decline (-59.12% under Dr. Zurek's event study).[159]

49.        Plaintiff alleges that the decline in Stamps' stock price following the February 21, 2019 disclosures was "a direct result of the nature and extent of defendants' fraudulent

---

[153] *Business Wire*, "Stamps.com Reports Fourth Quarter and Fiscal 2018 Results," February 21, 2019, 4:30 PM.

[154] *Bloomberg*, "Stamps.com Plunges After 2019 Revenue, Ebitda Views Miss Ests," February 21, 2019, 5:08 PM.

[155] *Business Wire*, "Stamps.com Reports Fourth Quarter and Fiscal 2018 Results," February 21, 2019, 4:30 PM.

[156] *Bloomberg*, "Stamps.com 2019 Rev. View Misses Lowest Est.; Shares Fall 31.8%," February 21, 2019, 4:35 PM.

[157] *Thomson Reuters, StreetEvents*, "STMP – Q4 2018 Stamps.Com Inc Earnings Call, Event Date/Time: February 21, 2019 / 10:00PM GMT," February 3, 2019, 5:00 PM.

[158] *Ibid*.

[159] Nye Report, Exhibit 11B; Zurek Report, Exhibit 4.

misrepresentations and the impact thereof being revealed to investors and the market."[160]  Dr. Zurek argues that "because Stamps.com and the USPS discontinuing its exclusive shipping partnership in February 2019 was an event that had not yet occurred earlier,"

> it is not informative about the magnitude of the reaction to hypothetical disclosures to the market about the strength of Stamps.com's relationship with the USPS in May 2017 and August 2017, whether the USPS was "happy" with the relationship in May 2017 and August 2017, the USPS's approval of Stamps.com's use of the reseller program in May 2017 and August 2017, or the USPS Task Force's stance on partnerships like the one between the USPS and Stamps.com.[161]

He goes on to state that "a stock price reaction to the disclosure of different information from what could have been disclosed earlier … does not demonstrate that the alleged false and misleading statements affected Stamps.com's stock price at the time they were made."[162]  Dr. Zurek apparently also requires admissions of fraud by Defendants for a finding of price impact, noting that following the February 21, 2019 disclosures there was "lack of analyst commentary … regarding the truthfulness of Stamps.com's prior alleged false and misleading statements."[163]

50.    Dr. Zurek's contention about what could have (or could not have) been disclosed earlier in the Class Period ignores the fact that discovery is ongoing.  I assume for the purposes of my Reports that Plaintiff will prove at trial that the following allegations were true throughout the entire Class Period:

   i.   Defendants "misleadingly portrayed Stamps as enjoying … a strong (exclusive) partnership with the [USPS]";[164]

---

[160] Complaint, ¶130.

[161] Zurek Report, ¶79.

[162] Zurek Report, ¶79.

[163] Zurek Report, ¶79.

[164] Lead Plaintiff's Memorandum in Support of Motion for Class Certification, June 29, 2020, p. 1.

ii.  Defendants falsely assured investors of "the USPS's full approval of Stamps' use of its reseller program";[165]

iii. Unbeknownst to investors, the Stamps-USPS relationship was "extremely strained … due to the Company's abuse of the USPS reseller program."[166]  In fact, "Stamps' relationship with the USPS had soured prior to the Class Period";[167]

iv.  Unbeknownst to investors, the USPS was making "efforts to prevent such practices from continuing";[168]

v.  "[U]ndisclosed tension between Stamps and the USPS concerning Stamps' abuse of the USPS reseller program ultimately resulted in the USPS terminating Stamps' highly profitable business model";[169] and

vi.  Defendants scheme began on May 3, 2017.[170]

51.  Furthermore, Plaintiff alleges that, throughout the Class Period, Defendants were "aware[] that Stamps' USPS partnership was so weak that the USPS was determined not just to avoid replicating it but also to end it altogether."[171]  Thus, as alleged, the corrective events on February 21, 2019 are clearly informative as to whether the alleged misrepresentations impacted Stamps' stock price.  For Dr. Zurek to contend otherwise, as he does, effectively ignores Plaintiff's actual theory of liability.

52.  Notably, in his discussion of a methodology for calculating Class-wide damages, Dr. Zurek concedes that "[i]f Lead Plaintiff is correct about its allegations, the news on [February 21,

---

[165] *Ibid.*

[166] *Id.*, p. 3.

[167] Complaint, ¶71(f)

[168] Lead Plaintiff's Memorandum in Support of Motion for Class Certification, June 29, 2020, p. 3.

[169] Complaint, ¶26.  *See also* Complaint, ¶¶3, 27, 71(j), 77(j).

[170] Complaint, ¶66.

[171] Plaintiff's Response to Defendants' Motion for Clarification of Order Re: Defendants' Motion To Dismiss, dated June 29, 2020, Docket No. 116, p. 7.  *See also* Complaint, ¶105.

2019] is at least in part an adverse development in the relationship with the USPS as manifested in the non-renewal of a contract."[172]  As noted above, Dr. Zurek does not deny that the Company's February 21, 2019 disclosure of the terminated contract triggered a statistically significant Company-specific decline in Stamps' stock price (-59.12% under Zurek's event study; -59.10% under the Nye event study[173]).[174]  Nor does he dispute my conclusion regarding the cause-and-effect relationship between the information disclosed and the resulting change in Stamps' stock price on February 22, 2019:

> Given that: (i) analysts "did not expect" the termination of the USPS agreement, which "will have a painful start that results in some revenue and plenty of EBITDA loss"; (ii) "2019 guidance [was] well below expectations"; and (iii) the Company's "Q4 was good," but "[i]nvestors will most likely write off Q4 results as the sudden shift in strategy renders them unrepresentative of future results," the statistically significant Company-specific stock price decline on February 22, 2019 is consistent with that expected in an efficient market.[175]

53.    Given that: (i) Plaintiff alleges that the termination of the exclusive Stamps-USPS partnership, as disclosed on February 21, 2019, was "a direct result of the nature and extent of defendants' fraudulent misrepresentations";[176] and (ii) "[p]rice impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a

---

[172] Zurek Report, ¶105.

[173] Zurek Report, Exhibit 4; Nye Report, Exhibit 11B.

[174] *See* Zurek Tr. 62:3–64:19, stating that he agrees Stamps' February 22, 2019 stock price decline was statistically significant, was unlikely due to "pure random noise," was "substantially caused by Stamps' specific information," and that the return "followed the release of new and value relevant information."

[175] Nye Report, Exhibit 12, pp. 65, 66.  (Internal citations omitted.)

[176] Complaint, ¶130.

revelation of the fraud,"[177] the statistically significant decline in Stamps' stock price on February 22, 2019 provides ample evidence of price impact in this matter.

### ii.      May 8, 2019 Alleged Corrective Event

54.      After market close on May 8, 2019, the Company reported its first-quarter 2019 financial results.  For the quarter, Stamps reported revenue of $136.0 million, and adjusted EPS of $1.23.[178]  The consensus estimates of quarterly revenue and adjusted EPS were $126.0 million and $1.07, respectively.[179]  The Company also reduced its 2019 guidance, lowering revenue guidance to a range of $510–$560 million from $540–$570 million, and adjusted EPS to a range of $3.35–$4.85 from $5.15–$6.15.[180]  According to the Company, the revision to its guidance was "principally the result of potential short and long term adverse amendments, renegotiations, changes, or termination of certain contracts between the USPS and certain of [its] strategic partners who are part of the USPS's reseller program, that [it had] recently become aware of…."[181]

55.      The same day, Stamps held a conference call with investment analysts.  During the call, then-CFO Jeffrey Carberry discussed the potential impact of the negotiations, stating:

> [W]e believe it is reasonably possible that the margins associated and earned by the resellers as a result of these negotiations will begin to decrease around the second half of 2019.  We have therefore reduced our 2019 guidance to reflect this potential reduction as we currently understand it. …

---

[177] *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013) *vacated and remanded on other grounds,* 134 S. Ct. 2398 (U.S. 2014).  (Emphasis added.)

[178] *Business Wire*, "Stamps.com Reports First Quarter Results," May 8, 2019, 4:30 PM.

[179] *Bloomberg*, "Stamps.com FY Adjusted EPS View Misses Lowest Est.; Shares Fall," May 8, 2019 4:34 PM.

[180] *Business Wire*, "Stamps.com Reports First Quarter Results," May 8, 2019, 4:30 PM.

[181] *Ibid.*

Although we do not provide guidance beyond 2019, the current U.S. proposals as we currently understand them could also result in additional meaningful reductions in margins earned by resellers in 2020 and '21. This in turn could have a significant impact on our revenues and earnings in those years. And while we do not know what ultimately will become of the USPS' proposed changes, it does not alter our own long-term global multicarrier business strategies, which we believe will be successful. However, we believe it is prudent to explain the near-term and medium-term risks as we currently understand them to be.[182]

56. Plaintiff alleges that decline in Stamps' stock price following the May 8, 2019 disclosures was "a direct result of the nature and extent of defendants' fraudulent misrepresentations and the impact thereof being revealed to investors and the market."[183] In his analysis of price impact associated with the May 8, 2019 alleged corrective event, Dr. Zurek makes virtually identical arguments to those he makes for February 21, 2019:

USPS's decision to begin renegotiations with Stamps.com's reseller partners in spring 2019 is not informative about the magnitude of the market's reaction to hypothetical earlier disclosures about the strength of Stamps.com's relationship with the USPS in May 2017 and August 2017, whether the USPS was "happy" with the relationship in May 2017 and August 2017, the USPS's approval of Stamps.com's use of the reseller program in May 2017 and August 2017, or the USPS Task Force's stance on partnerships like the one between the USPS and Stamps.com.[184]

He again states that "any stock price reaction to the disclosure of different information from what could have been disclosed earlier … does not demonstrate that the alleged false and misleading statements affected Stamps.com's stock price."[185] Dr. Zurek appears to (again) require admissions of fraud by Defendants for price impact, noting that there was "lack of analyst

---

[182] *Thomson Reuters, StreetEvents*, "STMP – Q1 2019 Stamps.Com Inc Earnings Call, Event Date/Time: May 08, 2019 / 9:00PM GMT," May 8, 2019, 5:00 PM.

[183] Complaint, ¶130.

[184] Zurek Report, ¶80.

[185] Zurek Report, ¶80.

- 46 -
Exhibit 2

commentary following the May 8, 2019, alleged corrective disclosure regarding the truthfulness of Stamps.com's prior alleged false and misleading statements."[186]

57.    However, Dr. Zurek blatantly ignores Plaintiff's allegation that, on May 8, 2019, "despite falsely asserting that they 'very recently bec[a]me aware' of these adverse conditions that would have a negative impact on the Company's financials," Defendants "[knew] about and anticipated since the start of the Class Period" the "unfavorable short- and long-term amendments, renegotiations, and termination of certain NSAs between the USPS and the Company's reseller partners."[187]  Thus, assuming Plaintiff's allegations are true, by the start of the Class Period, Defendants could have and should have informed the market that it anticipated such adverse changes to the reseller program and the NSA contracts as disclosed on May 8, 2019.

58.    In his discussion of a methodology for calculating Class-wide damages, Dr. Zurek concedes that, "if Lead Plaintiff's allegations are proven, the news on [May 8, 2019] is an adverse development in the relationship with the USPS as manifested in news that the USPS would make changes to the reseller program in a way that adversely affected the economics of Stamps.com's partnership with the USPS."[188]  As noted above, Dr. Zurek does not deny that the Company's May 8, 2019 guidance reduction (attributed to potential adverse changes to certain NSA contracts) triggered a statistically significant Company-specific decline in Stamps' stock

---

[186] Zurek Report, ¶80.

[187] Complaint, ¶12.

[188] Zurek Report, ¶114.

price (-55.36% under Zurek's event study; -55.33% under the Nye event study[189]).[190]  Nor does he dispute my conclusion that:

> Though the Company's quarterly results "were well better than [] estimated," given that: (i) "[g]uidance for the year was materially reduced following the decision by the USPS to renegotiate reseller agreements"; (ii) the Company "indicated that the next couple of years could be difficult as well"; and (iii) analysts unanimously reduced their price targets for Stamps' stock by at least 39% following the Company's announcements, the statistically significant Company-specific stock price decline on May 9, 2019 is consistent with that expected in an efficient market.[191]

59.     Given that: (i) Plaintiff alleges the May 8, 2019 disclosure of lowered guidance due to potential short- and long-term adverse amendments, renegotiations, changes, or termination of certain contracts between the USPS and the Company's resellers was a "direct result of the nature and extent of defendants' fraudulent misrepresentations";[192] and (ii) "[p]rice impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud,"[193] the statistically significant decline in Stamps' stock price on May 9, 2019 provides ample evidence of price impact in this matter.

---

[189] Zurek Report, Exhibit 4; Nye Report, Exhibit 11B.

[190] *See also* Zurek Tr. 65:1–67:5, stating that he agrees Stamps' May 9, 2019 stock price decline was statistically significant, was unlikely due to random noise, and was caused by the "company-specific bundle of information that was released at that time,"  and that the information was "new and value relevant."

[191] Nye Report, Exhibit 12, pp. 75–76.  (Internal citations omitted.)

[192] Complaint, ¶130.

[193] *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013) *vacated and remanded on other grounds,* 134 S. Ct. 2398 (U.S. 2014).  (Emphasis added.)

- 48 -

Exhibit 2

**V.      Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent with Lead Plaintiff's Theory of Liability**

60.      The analyses set forth in the Nye Report establish a foundation for estimating damages on a Class-wide basis.[194]  Specifically, by controlling for changes in market and industry effects, the event study set forth in the Nye Report isolates the price change of the stock due to the release of Company-specific information on every day of the Class Period, including the alleged corrective event dates.  Thus, as the decline in a security's price in response to corrective disclosures and/or the materialization of a concealed risk reflects the dissipation of price inflation created by earlier misrepresentations and/or omissions, such Company-specific price changes are the natural starting point from which to measure the level of price inflation present during the Class Period.

61.      At this early stage of the litigation, I have not conducted an analysis of loss causation or calculated Class-wide damages in this matter.  Nonetheless, as described in the Nye Report, a damages methodology that can be commonly applied to all Class members involves measuring the abnormal returns in response to the alleged corrective disclosures and/or risk materialization events, adjusting for any confounding news, and then calculating the amount of inflation in Stamps stock throughout the Class Period.[195]  "Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis."[196]  This is precisely the same damages methodology that I put forth at the class certification phase in *Waggoner* v. *Barclays PLC*, which was endorsed by the Second Circuit.[197]

---

[194] Nye Report, §VII.

[195] Nye Report, ¶60, citing *In re Pfizer, Inc. Sec. Litig.*, Case No. 14-2853-cv (2d Cir. Apr. 12, 2016), pp. 16, 17.

[196] Nye Report, ¶61.

[197] *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017).

- 49 -
Exhibit 2
- 59 -

62.     Here, my understanding of Plaintiff's theory of liability is that: (i) Defendants' false statements and omissions regarding the strength of Stamps' relationship with the USPS, and the USPS's approval of Stamps' reseller program, caused the price of Stamps stock to be artificially inflated throughout the Class Period;[198] and (ii) "[a]s the truth about [D]efendants' prior misrepresentations and fraudulent conduct reached the market [on February 21, 2019 and May 8, 2019], it caused Stamps' stock price to fall precipitously as the artificial inflation came out of the stock's price."[199]  Furthermore, Plaintiff's proposed "out-of-pocket, or event study, method is the standard measurement of damages in Section 10(b) securities cases,"[200] which is designed to measure the artificial inflation caused by Defendants' alleged misrepresentations. Accordingly, it is clear that "this is a case in which the Plaintiff's 'proposed measure for damages is ... directly linked with their underlying theory of classwide liability ... and is therefore in accord with the Supreme Court's ... decision in *Comcast.' U.S. Foodservice,* 729 F.3d at 123 n.8."[201]

### A. Dr. Zurek's Criticisms of My Damages Methodology Are Meritless, Have Been Rejected, and Would Require Analysis of Loss Causation

63.     Dr. Zurek fails to provide any evidence contradicting my opinion that "out-of-pocket" damages in this matter can be calculated formulaically on a Class-wide basis using a method that

---

[198] Complaint, ¶148.

[199] Complaint, ¶121.  *See also* Complaint, ¶¶122–130.

[200] *City of Miami Gen. Empls. Ret. Trust v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018).  *See also, e.g., Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (out-of-pocket method is "the correct measure of damages" in Exchange Act case); *Hatamaian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016); *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) ("The out-of-pocket method is widely considered an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation."); *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).

[201] *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

- 50 -
Exhibit 2
- 60 -

is common to the Class and consistent with Plaintiff's theory of liability.[202]  Rather, without

basis, Dr. Zurek insists that Plaintiff must establish "the feasibility of calculating inflation-based

damages" by analyzing:

> **first**, which information would have been available to the market absent the alleged misrepresentations; and **second**, whether a methodology exists to translate that information into a hypothetical market price.  The first step requires consideration of what is alleged to have been misrepresented and how those misrepresentations affected the information available to the market.  The second step is an assessment of whether one can measure the price impact of the difference in the information available to the market with and without the alleged misrepresentations at a given point in time.[203]

64.     As described below, Dr. Zurek is effectively raising a loss causation inquiry.  Indeed,

analyzing "what is alleged to have been misrepresented and how those misrepresentations

affected the information available to the market," and then "measur[ing] the price impact of the

difference in the information available to the market with and without the alleged

misrepresentations at a given point in time,"[204] necessarily requires an assessment of "loss

causation—a causal connection between the defendants' alleged misrepresentations and the

plaintiffs' economic losses,"[205] which I have not been asked to perform and understand is not

required at this stage of the litigation.[206]  The same is true of Dr. Zurek's requirement that

Plaintiff describe with specificity how his damages methodology will: (i) "isolate the stock price

impact from the correction of the alleged misstatements that remain in this case from the

---

[202] At deposition, Dr. Zurek conceded that he is "not offering an opinion that it's impossible to" calculate Class-wide damages in this matter.  (Zurek Tr. 146:17–147:11; *See also* Zurek Tr. 150:21–151:3.)

[203] Zurek Report, ¶91.  (Emphasis added.)

[204] Zurek Report, ¶91.

[205] *Halliburton II*, 134 S. Ct. at 2406.  (Internal quotations omitted.)

[206] *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804 (2011).  *See also* Zurek Tr. 154:8–13.

correction of alleged misstatements that are no longer included in this case";[207] and (ii) "isolate the impact of the alleged corrective disclosures from other new information released to the market on the alleged corrective disclosure dates that may not be corrective."[208, 209] These are all quintessential and, moreover, hypothetical loss causation issues, which will depend on the outcome of fact discovery.

65.     Moreover, Dr. Zurek provides absolutely no basis (legal or academic) for his understanding of the "economics of damages in securities litigation and out of pocket damages."[210] According to Dr. Zurek, a proper "calculation of damages would require assessing what Stamps.com could have disclosed and based on that **hypothetical** disclosure, the market's assessment of the value implications of a future adverse development to the economics of the USPS partnership at different times during the proposed Class Period (on every day a class member bought or sold shares)."[211] Thus, rather than measure price inflation based on an observed, empirical fact—the price reaction upon the disclosure of corrective information—Dr. Zurek would measure inflation based on a counterfactual hypothetical constructed for each day of the Class Period and then "translate that information into a hypothetical market price."[212] Notwithstanding his pessimistic concession that such a task "would be challenging, assuming it

---

[207] Zurek Report, ¶97.

[208] Zurek Report, ¶98.

[209] At deposition, Dr. Zurek conceded that: (i) he has not attempted to conduct any parsing of the corrective disclosures in this matter; (ii) there are techniques that can be used to value different pieces of information; (iii) he has personally applied parsing to calculate damages in other matters on a consulting basis; and (iv) he has seen other experts employ parsing methodologies in other matters. (Zurek Tr. 137:8–138:15, 145:9–146:8.)

[210] Zurek Report, §VI.A.

[211] Zurek Report, ¶120.  (Emphasis added.)

[212] Zurek Report, ¶91.  (Emphasis added.)

would be possible at all,"[213] Dr. Zurek's prescription for how to calculate out-of-pocket damages under Section 10(b) amounts to pure *ipse dixit*.

66.    Indeed, Dr. Zurek advocates for the measurement of damages "at the moment the transaction takes place,"[214] by arguing that price inflation can only be measured by speculating as to the effect counterfactual information, which was never actually disclosed, might have had on a security's price had it been disclosed earlier in the Class Period.  His position on this form of "front-end" damages estimation is cemented by his assertion that "the value implications of a hypothetical disclosure regarding a possible adverse development to the economics of the USPS partnership would change over time":[215]

> The declines following the February 21, 2019, and May 8, 2019, disclosures produce, at best, a static (as of a single point in time) measure of the value implications that does not vary over time.  However, the value implications would vary with the size and profitability of the shipping business, through the USPS and overall, which depended on economic conditions, regulatory changes regarding the USPS, and changes to the shipping industry.  For example, expectations of Amazon entering the shipping business, and the possible implications of its entry for the industry, changed throughout the proposed Class Period.  In addition, the USPS increased its shipping prices throughout the proposed Class Period, and the Trump administrations' plan to withdraw from the Universal Postal Union led to uncertainty regarding the ultimate result of the plan and the implications for the USPS and by extension for its partners.[216]

As discussed below, Dr. Zurek provides no explanation as to why such speculative non-fraud-related factors mitigate the tangible harm caused to investors when Stamps' stock price declined in reaction to the revelation of the relevant truth, as alleged in the Complaint.

---

[213] Zurek Report, ¶120.

[214] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005).

[215] Zurek Report, ¶122.

[216] Zurek Report, ¶122.

Exhibit 2

67.    On the contrary, as noted in the Nye Report, the Second Circuit's decision in *Pfizer*

clearly states that price inflation is appropriately measured based on the "residual return" (*i.e.*,

the Company-specific return) "on a day when the market discovers allegedly concealed

information":

> Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information inflated the defendant company's stock.  As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections.  Thus, an expert using an event study can estimate the amount of artificial inflation in the defendant company's stock price when shareholders purchased their shares, which is equivalent to estimating the difference between what those investors should have paid for the shares but-for the alleged fraud, and what they actually paid.[217]

68.    Similarly, my understanding of the Supreme Court's decision in *Dura* is that the measure

of price inflation, and thus per-share damages, is premised on the actual losses suffered by

investors when "the truth makes its way into the marketplace,"[218] rather than on speculation

---

[217] Nye Report, footnote 90, quoting *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).  (Internal citations omitted.  Emphasis in original.)

[218] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005).  Specifically, the *Dura* court stated that:

> [A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value.  Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong.  Shares are normally purchased with an eye toward a later sale.  But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-

- 54 -

Exhibit 2

regarding the "value implications of a [hypothetical disclosure]," as Dr. Zurek would have it.[219]

Dr. Zurek is also wrong to suggest that the general economic framework for quantifying per-share damages on a Class-wide basis described in the Nye Report is inconsistent with "the Supreme Court's decision in *Comcast*."[220] It is my understanding that "*Comcast* does not suggest that damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that '[c]alculations need not be exact.' 569 U.S. at 35."[221, 222] Accordingly, Dr. Zurek's criticisms of Plaintiff's proposed damages methodology are meritless.

69.     Furthermore, it is my understanding that evidence produced during discovery may demonstrate that potential "confounding" negative developments on the alleged corrective event dates were in fact related to the allegations in this matter. Such evidence may also establish what Defendants could or could not have disclosed at various points during the Class Period.[223] Nevertheless, to the extent it is necessary at the merits stage, and after the benefit of full discovery, to disentangle "confounding" information and/or account for time-varying price inflation, those analyses will focus on events applicable to *all* market participants transacting

---

specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been—a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.,* the more likely that other factors caused the loss. (Emphasis in original.)

[219] Zurek Report, ¶120.

[220] Zurek Report, ¶88.

[221] *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

[222] At deposition, Dr. Zurek conceded that the level of detail plaintiff must provide at the class certification phase with respect to class-wide damages is "ultimately not for [him] to decide." (Zurek Tr. 151:15–23.)

[223] *See* Zurek Tr. 150:2–18, stating that "material from the record may be relevant in some circumstances for establishing a causal connection."

Stamps stock at a given time, not the specific circumstances of individual investors.  Thus, even the premature loss causation analyses Dr. Zurek advances could be established with common proof.

**B. Dr. Zurek's Speculations Regarding the Evolution of Price Inflation Are Irrelevant**

70.    Dr. Zurek criticizes my damages methodology as not considering "the information that could have been disclosed and [that] its value implications would have been changing over time with Stamps.com's disclosures and market and industry developments."[224]  Similarly, Dr. Zurek argues that "using the price declines on the days of the alleged corrective disclosures in this case as a measure of inflation … implies an impossible result—namely, that inflation at certain points earlier during the proposed Class Period exceeds the entire value of Stamps.com's shares."[225, 226]  However, his opinions regarding the level of price inflation at various points during the Class Period is misplaced and untimely.  I have yet to conduct an analysis of loss causation or calculate damages in this matter, and fact discovery is ongoing.  Furthermore, it is my understanding that the Second Circuit's decision in "*Waggoner* explicitly rejected the notion that *Comcast* requires 'that damage calculations [ ] be so precise' as to account for 'variations in inflation over time.'"[227]  To the extent it is necessary at the merits stage, and after the benefit of full discovery, to account for time-varying price inflation, such an analysis will focus on events applicable to *all*

---

[224] Zurek Report, ¶120.

[225] Zurek Report, ¶99.

[226] At deposition, Dr. Zurek stated that he is not opining that the method of "back-casting" is unreliable as a general matter.  (Zurek Tr. 163:21–23.)

[227] *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 U.S. Dist. LEXIS 114695, at *59 (S.D.N.Y. July 10, 2019), quoting *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).  *See also, e.g., Papa*, 333 F.R.D. at 88 ("Defendants' criticisms about Dr. Nye's methodologies are largely focused on Dr. Nye's failure to make precise damage calculations, which are not required for class certification."); *In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *3 (D.N.J. Jan. 31, 2020).

market participants transacting Stamps stock at a given time, not the specific circumstances of individual investors.  Thus, any variations in price inflation over time could be established with common proof.

71.    With respect to "the information that could have been disclosed" and its potentially changing value implications,[228] Dr. Zurek once again ignores that fact discovery is ongoing.  He also fails to consider that Plaintiff's theory of liability strongly implies that the alleged corrective events on February 21 and May 8, 2019 are directly related to and a foreseeable consequence of Defendants' false statements regarding the strength of Stamps' relationship with the USPS, and the USPS's approval of Stamps' reseller program.[229]  Indeed, Plaintiff alleges that "[a]s the truth about [D]efendants' prior misrepresentations and fraudulent conduct reached the market, it caused Stamps' stock price to fall precipitously as the artificial inflation came out of the stock's price."[230]  Dr. Zurek fails to demonstrate how speculative non-fraud-related factors, such as "market and industry developments,"[231] "expectations of Amazon entering the shipping business,"[232] or "the Trump administrations' plan to withdraw from the Universal Postal Union,"[233] mitigate the tangible harm caused to investors when Stamps' stock price declined in reaction to the revelation of the relevant truth, as alleged in the Complaint.  Given the lack of academic, evidentiary or empirical support cited for the notion that price inflation in Stamps stock would have been affected by such non-fraud-related circumstances, Dr. Zurek's arguments

---

[228] Zurek Report, ¶120.

[229] Complaint, ¶148.

[230] Complaint, ¶121.  *See also* Complaint, ¶¶122–130.

[231] Zurek Report, ¶120.

[232] Zurek Report, ¶122.

[233] Zurek Report, ¶122.

amount to pure speculation, and in no way show that damages cannot be calculated on a Class-wide basis.

### C. Dr. Zurek's Criticism of the Event Study Methodology Is Meritless; An Event Study Can Control for Confounding Company-Specific Information

72.    Dr. Zurek has not offered an affirmative opinion that the event-study methodology cannot be used in this case to calculate damages on a Class-wide basis.  To the extent he states that an event study cannot be used to isolate the impact of corrective information from confounding Company-specific information, unrelated to Plaintiff's allegations, he is simply wrong.[234]  Not surprisingly, Dr. Zurek provides no academic support for this bold assertion.  On the contrary, to the extent that any truly confounding information, unrelated to Plaintiff's allegations, affected Stamps' stock price on February 22, 2019 and/or May 9, 2019, it is widely recognized in the academic literature that an event study can be fashioned so as to isolate the effects of such confounding effects.  Specifically, MacKinlay (1997) states that:

> Over the decades from the early 1930s until the late 1960s the level of sophistication of event studies increased.  John H. Myers and Archie Bakay (1948), C. Austin Barker (1956, 1957, 1958), and John Ashley (1962) are examples of studies during this time period.  The improvements included removing general stock market price movements and separating out confounding events.
>
> ***
>
> Ideally the empirical results will lead to insights relating to understanding the sources and causes of the effects (or lack of effects) of the event under study.  Additional analysis may be included to distinguish between competing explanations.[235]

---

[234] Zurek Report, footnote 171.

[235] MacKinlay, A., 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39, at 14–16.

### D. Dr. Zurek's Criticism of My Damages Methodology for Section 20A Claims Is Unwarranted

73.     With respect to the Dr. Zurek's argument that I do not "account for any potential double counting of damages for class members who can recover both under Section 20A and Section 10(b),"[236] nowhere in the Nye Report do I insist that damages under 10(b) and 20A are additive of one another for Class members eligible for both claims. This is a legal, not economic, question. Ultimately, the trier of fact can determine what constitutes excess recovery, and apply a Class-wide rule in the claims process to prevent such an occurrence.

74.     My work in this matter is ongoing. My opinions in this Report are subject to refinement or revision based on analysis of new information which may be provided to me, including the opinions of other experts, receipt of additional documents and data, and based on further analysis of the data and materials described herein. I understand that discovery is ongoing. Should additional relevant information be provided to me, my opinions may be supplemented at a later date.

Executed on October 15, 2020, at Redwood City, California.

Zachary Nye, Ph.D.

---

[236] Zurek Report, ¶7(e).

**Exhibit 1**



702 MARSHALL STREET, SUITE 200
REDWOOD CITY, CA 94063
650.298.0200
WWW.SCGINC.COM

## Zachary R. Nye
*Email:* zach@scginc.com

---

### Education

**Ph.D. – University of California, Irvine** 2009
Finance                                                                        Irvine, California

- Dissertation: Macro-Augmented Volatility Forecasting.

- Research Interests: Market efficiency of underlying and derivative securities, volatility forecasting, risk management, financial econometrics, valuation and corporate finance.

- Teaching Experience: Corporate Finance, Investments, and Risk Management.

**M.Sc. – London Business School** 2004
Finance                                                                        London, England

- Earned distinction for Masters Thesis on the informational efficiency of credit-linked notes.

**A.B. – Princeton University** 2001
Economics                                                                Princeton, New Jersey

---

### Employment History

**Vice President**                                               Summer 2015 – present
Stanford Consulting Group, Inc.                              Redwood City, California

The Stanford Consulting Group, Inc. provides economic research and expert testimony for business litigation, as well as regulatory and legislative proceedings.

Responsibilities include:

- quantifying economic damages (*e.g.*, present value of expected future earnings, price inflation, lost profits, unjust enrichment, reasonable royalties);

- enterprise, project, equity, debt, derivative-security and intellectual-property valuation;

- assessing the informational efficiency of financial securities;

- analyzing fairness opinions related to corporate mergers and acquisitions;

- econometric modeling and analysis;

- marginal cost analysis;

- preparing expert reports and declarations;

- providing deposition and trial testimony; and

- supporting counsel in preparation for cross examination of opposing experts.

**Senior Consultant**                                    Summer 2009 – Summer 2015
Stanford Consulting Group, Inc.                              Redwood City, California

Page | 1

Exhibit 2
- 70 -

**Exhibit 1**

| | |
|---|---|
| **Associate** | Summer 2004 – Summer 2005 |
| Stanford Consulting Group, Inc. | Redwood City, California |
| | |
| **Mortgage Consultant** | Fall 2002 – Summer 2003 |
| Woolwich PLC | Oxford, UK |
| | |
| **Trading Desk Specialist** | Fall 2001 – Summer 2002 |
| Merrill Lynch, Defined Asset Funds | Plainsboro, New Jersey |

---

### Academic Research

Nye, Zachary and Mark Washburn, 2013, "Macro-Augmented Volatility Forecasting," *Western Decision Sciences Institute Proceedings*. Paper presented at the WDSI Annual Meeting, Long Beach, California, March 27, 2013. Winner of the 2013 Best Theoretical/Empirical Research Paper Awards.

Nye, Zachary and Philippe Jorion, 2009, "Macro-Augmented Volatility Forecasting," Working Paper, University of California at Irvine.

Nye, Zachary and Timothy C. Johnson, 2005, "Market Efficiency's Hidden Teeth: An Unambiguous Test for Derivative Securities," Working Paper, London Business School.

---

### Testimony

Matt Karinski, et al. v. Stamps.com, Inc., et al., United States District Court, Central District of California, Case No. 2:19-cv-01828-MWF-SK
        Deposition                August 14, 2020

Montcrieff, et al. v. Peripheral Vascular Associates, P.A., United States District Court, Western District of Texas, Case No. SA-17-CA-0317FB
        Deposition                July 31, 2020

Alexandre Pelletier, et al. v. Endo International PLC, et al., United States District Court, Eastern District of New Pennsylvania, Civil Action No. 2:17-cv-05114-MMB
        Deposition                July 27, 2020

In re Advance Auto Parts, Inc. Securities Litigation, United States District Court, District of Delaware, Case No. 1:18-CV-00212-RGA
        Deposition                July 14, 2020

Hawaii Structural Ironworkers Pension Trust Fund, et al. v. AMC Entertainment Holdings, Inc., et al., United States District Court, Southern District of New York, Case 1:18-cv-00299-AJN-SLC
        Deposition                July 9, 2020

In re Allergan PLC Securities Litigation, United States District Court, Southern District of New York, Civil Action No. 18-CV-12089-CM
        Deposition                May 19, 2020

In re Zillow Group, Inc. Securities Litigation, United States District Court, Western District of Washington at Seattle, Case No. 2:17-cv-01387-JCC
        Deposition                March 10, 2020

Page | 2

Exhibit 2

**Exhibit 1**

Joseph Prause, et al. v. TechnipFMC plc, et al., United States District Court, Southern District of Texas, Houston Division, Case No. 4:17-cv-02368

          Deposition             February 5, 2020
          Deposition             March 9, 2020

In re Quorum Health Securities Litigation, United States District Court, Middle District of Tennessee, Case No. 3:16-cv-02475

          Deposition             August 17, 2018
          Deposition             January 14, 2020

In re Snap Inc. Securities Litigation, United States District Court, Central District of California, Western Division, Case No. 2:17-cv-03679-SVW-AGR

          Deposition             December 13, 2019

In re Mylan N.V. Securities Litigation, United States District Court, Southern District of New York, Case No. 1:16-CV-07926 (JPO)

          Deposition             November 22, 2019

Jet Capital Master Fund, L.P., et al. v. American Realty Capital Properties, Inc., et al., United States District Court, Southern District of New York, Case No. 1:15-cv-00307-AKH

          Deposition             July 26, 2019

Roofers' Pension Fund, et al. v. Joseph C. Papa, et al., United States District Court, District of New Jersey, Civil Action No. 2:16-cv-02805-MCA-LDW

          Deposition             April 2, 2019

United States of America ex rel. Lori Morsell, et al. v. Symantec Corporation, United States District Court for the District of Columbia, Civil Action No. 12-cv-0800 (RC)

          Deposition             March 13, 2019

City of Pontiac General Employees' Retirement System, et al. v. Dell Inc., et al., United States District Court, Western District of Texas, Austin Division, Case No. 1:15-cv-00374-LY

          Deposition             April 19, 2017
          Deposition             November 6, 2018

Pirnik v. Fiat Chrysler Automobiles N.V., et al., United States District Court, Southern District of New York, Case No. 1:15-CV-07199-JMF

          Deposition             February 2, 2018
           Deposition             September 13, 2018

Teresa Doskocz, et al. v. ALS Lien Services, et al., Superior Court of California, County of Contra Costa, Case No. C17-01486

          Deposition             April 23, 2018

Bradley Cooper, et al. v. Thoratec Corporation, et al., United States District Court, Northern District of California, Oakland Division, Case No. 4:14-cv-00360-CW

          Deposition             March 6, 2018

L-3 Communications Corporation, et al. v. Serco, Inc., United States District Court for the Eastern District of Virginia, Case No. 1:15-cv-701-GBL-JFA

          Deposition             October 22, 2015
          Deposition             October 18, 2017

In re Juno Therapeutics, Inc., United States District Court of Western District of Washington at Seattle, Case No. C16-1069RSM

          Deposition             October 4, 2017

Page | 3

**Exhibit 2**

**Exhibit 1**

Brad Mauss, et al. v. NuVasive, Inc., et al., United States District Court, Southern District of California, Case No.: 13-cv-02005-JM

| | |
|---|---|
| Deposition | December 20, 2016 |
| Deposition | August 28, 2017 |

In re Akorn, Inc. Securities Litigation, United States District Court, Northern District of Illinois, Eastern Division, Case No. 15-CV-01944

| | |
|---|---|
| Deposition | June 21, 2017 |

In re Ocwen Financial Corporation Securities Litigation, United States District Court, Southern District of Florida, Case 14-81057-CIV-WPD

| | |
|---|---|
| Deposition | September 23, 2016 |
| Deposition | March 28, 2017 |

Stephen Calfo, et al. v. John P. Messina, Sr., et al., United States District Court, Southern District of New York, Civil Action No. 15 Civ. 04010 (LGS)

| | |
|---|---|
| Deposition | January 5, 2017 |

In re EZCORP, Inc. Securities Litigation, United States District Court, Southern District of New York, Case No. 14-cv-6834 (ALC)

| | |
|---|---|
| Deposition | October 14, 2016 |

Arthur Menaldi, et al. v. Och-Ziff Capital Management Group LLC, et al., United States District Court, Southern District of New York, No. 14-CV-03251-JPO

| | |
|---|---|
| Deposition | October 3, 2016 |

Keith Thomas, et al. v. MagnaChip Semiconductor Corp., et al., United States District Court, Northern District of California, Case No. 3:14-cv-01160-JST

| | |
|---|---|
| Deposition | September 16, 2016 |

In re Rocket Fuel, Inc. Securities Litigation, United States District Court, Northern District of California, Oakland Division, Case No. 4:14-cv-03998-PJH

| | |
|---|---|
| Deposition | September 14, 2016 |

Barbara Strougo, Individually and on Behalf of All Others Similarly Situated v. Barclays PLC, et al., United States District Court, Southern District of New York, Case No. 14-cv-5797 (SAS)

| | |
|---|---|
| Deposition | August 11, 2015 |
| Evidentiary Hearing | November 5, 2015 |
| Deposition | June 16, 2016 |

In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation, United States District Court, District of New Jersey, Case Numbers: 05-cv-5060; 07-cv-4021; 07-cv-4022; 07-cv-4023; 07-cv-4024; 07-cv-4546; 11-cv-6259; and 15-cv-518

| | |
|---|---|
| Deposition | December 6, 2013 |
| Deposition | October 1, 2015 |

Richard Thorpe and Darrel Weisheit, Individually and on Behalf of All Others Similarly Situated v. Walter Investment Management Corp., et al., United States District Court, Southern District of Florida, Case No. 1:14-cv-20880-UU

| | |
|---|---|
| Deposition | September 16, 2015 |

City of Austin Police Retirement System, *Individually and on Behalf of All Others Similarly Situated* v. Kinross Gold Corporation, et al., United States District Court, Southern District of New York, Civil Action No. 1:12-cv-01203-VEC-KNF

| | |
|---|---|
| Deposition | November 19, 2014 |

Page | 4

**Exhibit 2**

**Exhibit 1**

In re El Paso Partners, L.P. Derivative Litigation, Court of Chancery of the State of Delaware, C.A. No. 7141-CS
        Deposition                    September 24, 2013
        Trial                         November 12 and 13, 2014

L-3 Communications Corporation, et al. v. Jaxon Engineering & Maintenance, Inc., et al., United States District Court for the District of Colorado, Civil Action No. 10-cv-02868-MSK-KMT
        Deposition                    August 7, 2014

Axa Corporate Solutions Assurance, et al. v. Honeywell International, Inc., et al., Superior Court of the State of Arizona in and for the County of Maricopa, No. CV2011-019334
        Deposition                    February 24, 2014

In re Heckmann Corporation Securities Litigation, United States District Court for the District of Delaware, Case No. 1:10-cv-00378-LPS-MPT
        Deposition                    November 9, 2012

Exhibit 2