# EXHIBIT 11

EFiled: May 18 2020 05:03PM EDT
Transaction ID 65643287
Case No. 2019-0658-AGB

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MACOMB COUNTY EMPLOYEES' RETIREMENT SYSTEM, derivatively on behalf of Nominal Defendant, STAMPS.COM INC.,

Plaintiff,

v.

KENNETH T. MCBRIDE, MOHAN P. ANANDA, DAVID C. HABIGER, G. BRADFORD JONES, THEODORE R. SAMUELS II, KATIE ANN MAY, KYLE HUEBNER, JEFFREY CARBERRY, SEBASTIAN BUERBA, JOHN ROLAND CLEM, MATTHEW LIPSON, and AMINE KHECHFE,

Defendants,

- and -

STAMPS.COM INC.,

Nominal Defendant.

C.A. No. 2019-0658-AGB

**Redacted Version Dated**: May 18, 2020

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT IN INTERVENTION

Plaintiff Macomb County Employees' Retirement System ("Plaintiff"), a stockholder of Stamps.com Inc. ("Stamps.com" or the "Company"), brings this action on behalf of Stamps.com seeking relief from certain current and former officers and directors of the Company identified below (collectively, "Defendants") for breaches of fiduciary duty, insider trading, corporate waste, and unjust enrichment.

Exhibit 11
205

STMP-SCA00007460

Plaintiff's allegations are based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on the ongoing investigation of its undersigned counsel, which includes: (i) internal corporate documents obtained from the Company pursuant to 8 *Del. C.* § 220 ("Section 220"); (ii) Stamps.com's public filings with the Securities & Exchange Commission ("SEC"); (iii) research reports from market analysts; (iv) Company press releases and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) statements made by a confidential witness during Plaintiff's counsel's pre-filing investigation; (vii) additional material and data concerning the Company and industry as identified herein. Plaintiff, through its counsel, has conducted an investigation into the facts supporting the allegations in this Complaint and believes discovery will elicit further evidentiary support for its allegations.

PRELIMINARY STATEMENT

1. This derivative action arises from the Board's and senior executives' long-running, systemic and fraudulent implementation and concealment of an unsustainable business strategy premised on abusing the United States Postal Service's ("USPS") Reseller Program (defined below); approving acquisitions of companies on unfair terms and premised on further abuse of the Reseller Program; engaging in insider trading while in possession of material, nonpublic information

2

Exhibit11

206

STMP-SCA00007461

relating to the Company's unsustainable business practices and complaints from the USPS; and knowingly approving hundreds of millions of dollars of share repurchases at inflated prices while in possession of material, nonpublic information with the objective of soaking up the newfound shares that hit the market as a result of the fiduciaries' insider selling. Simply put, this case is about how the wayward stewards of Stamps.com prioritized personal profit over the best interests of the Company.

2.    Stamps.com is an Internet-based company that provides mailing and shipping services to customers. Since 1999, Stamps.com is one of only three companies to receive regulatory approval from the Postal Service to sell USPS postage over the Internet. Given the Company's unique control over USPS postage, the USPS over time became a critical partner to Stamps.com. During various periods, the USPS accounted for approximately 87% of Stamps.com's total revenues.

3.    For years, Stamps.com's primary source of revenues was monthly subscription fees paid by customers who used the Company's online platform to purchase and print USPS postage. However, the Company's business model quickly shifted in 2009, after the USPS created the postage reseller program (the "Reseller Program").

3

Exhibit11
207

STMP-SCA00007462

4.      The Reseller Program was a USPS initiative designed to increase shipping volumes and worked as follows.  The USPS contracted with third-parties (aka "Resellers") pursuant to negotiated service agreements ("NSA").  Pursuant to an NSA, the Reseller had a contractual right to purchase USPS postage at a steep discount and then "resell" that postage to customers for a profit.  The difference between the Reseller's *purchase* price and the Reseller's *sale* price is known as the "Reseller Spread," which the Reseller kept as essentially a commission for sourcing and obtaining new customers for the USPS.

5.      The sole purpose of the Reseller Program was to attract new customers to the USPS.  Because the Resellers could undercut publicly available USPS postage rates via the discounts they received, the USPS made clear to Resellers that they could not call on or offer discounted Reseller rates to pre-existing USPS customers.  According to the USPS, selling discounted postage to existing customers would cannibalize USPS's existing revenue stream.

6.      Importantly, the USPS took the position that Stamps.com (and similar companies that already sold USPS postage online) should not participate in the Reseller Program because all of their customers only purchased USPS postage, *i.e.,* Stamps.com's involvement would not net the USPS any new customers.

7.      Rather than compensate Stamps.com via the Reseller Program, the USPS entered into a commission agreement with Stamps.com (the "USPS

4

Exhibit 11
208

STMP-SCA00007463

Commission Agreement") whereby the Company received a set percentage of USPS revenues (and growth) generated on the Company's website. The USPS Commission Agreement also contained an exclusivity provision, meaning Stamps.com could only offer USPS postage on its website (not postage of competing carriers, such as FedEx and UPS).

8.    The Reseller Program was ███████████████████ Stamps.com's USPS Commission Agreement. For example, a Reseller could expect to realize ███████████ in Reseller Spread for facilitating the shipment of a package that would yield Stamps.com ███████████ commission under the USPS Commission Agreement.

9.    The Board and senior executives of Stamps.com thus devised a plan to profit from both the Reseller Program and the USPS Commission Agreement. To that end, the Company would enter into undisclosed back-end agreements with Resellers. The Resellers loved the idea. For them, they would no longer have to seek out new USPS customers. Rather, Stamps.com would merely call on and shift pre-existing USPS customers into the Reseller Program and receive all or most of the Reseller Spread via the back-end agreement with the Reseller. In some cases, Stamps.com received ████ of the Reseller Spread.

10.    As early abuse of the Reseller Program proved fruitful, in 2014, the Board approved an expansion of the abusive business strategy, dubbed internally

5

Exhibit11
209

STMP-SCA00007464

██████████   According to Board materials, ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

In the Board's own words, ████████████████████████

████████████████████████████████████████████████

████████████████████████████[1]

11.   ████████████   was not a legitimate business strategy.   At the time of approval, internal corporate documents show that the Board ████████████

████████████████████████████████████████████████

████████████████████████████████   The Board also recognized ████

████████████████████████████████████████████████

████████████████████████████████████████████████

According to the Board, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

12.   The Board-approved plan was wildly successful at first.   The Company's revenues grew at a staggering pace, as the Company acquired more and more competitors.   During that time, internal corporate documents show that

---

[1] Unless otherwise stated, emphasis added.

6

Exhibit11
210

STMP-SCA00007465



13.    The Company's directors and officers plainly knew that Stamps.com's abuse of the Reseller Program threatened the Company's ongoing and essential relationship with the USPS, making the business strategy unsustainable and harmful to the Company.  Nonetheless, the Board continued to oversee expansion of the abuse and made numerous false and misleading statements regarding the Company's business practices to investors during that time.

14.    Specifically, in 2016, the Board ███████████████████████ ████████████████████████████ The Board, however, did not stop the misconduct.  Around that same time, market commentators began to call into question the Company's abusive practices, but the Board approved, and Defendant Kenneth McBride ("McBride") made, false and misleading statements to conceal the scope of the Company's misconduct.

15.    Then, starting in the second quarter of 2017 and continuing to mid-2018, Stamps.com's officers and directors began to receive complaints from the USPS itself regarding the Company's abusive business practices.  According to a former employee of Stamps.com, the USPS's complaints were discussed internally

7

Exhibit11
211

STMP-SCA00007466

on a monthly basis.    That same former employee explained that the USPS expressed disapproval of Stamps.com's newfound business model.    Instead of stopping the Company's illicit practices or disclosing the USPS's concerns to the market, the Company's officers and directors opted to escalate the abuse, sell millions of dollars' worth of stock, approve a massive increase to the Company's share repurchase plan, and publicly lie about the deteriorating relationship between the Company and the USPS.

16.    By June 2018, ███████████████████ At that time, Stamps.com's officers and directors ██████████████████



███████████████████. Although the USPS ████████

████████████████████████

████████████████████████

████████████. The USPS explained ██████████

████████████████████████

███████████████████. Incredibly, the

---

[2] As explained below, in 2015, Stamps.com acquired one of its competitors, Endicia. ████████████████████████ ████████████████████████ ████████████.

Exhibit11
212

STMP-SCA00007467

officers and directors failed to truthfully disclose ██████████████████

██████████████████████.

17.   Ultimately, Stamps.com's agreement with the USPS terminated according to its own terms on December 31, 2018.  However, the Defendants did not disclose this fact until the end of February 2019.  When the truth was finally revealed, the Company's stock price immediately dropped *58%*, from $198.08 to $83.65.

18.   Even upon the announcement of the cancellation of the USPS contract, Stamps.com's officers and directors continued to brazenly lie to the markets.  Rather than truthfully explain that the████████████████████

████████████████████████, Defendants falsely stated that Stamps.com (not the USPS) had voluntarily terminated the USPS Commission Agreement because the USPS had demanded that Stamps.com continue its exclusive arrangement with the USPS.  Apparently, the Defendants' desire to hide their fraudulent practices was so great, they preferred the public believe they voluntarily decided to eliminate 58% of the Company's market capitalization.

19.   The final shoe dropped on May 8, 2019, when Stamps.com finally disclosed that the USPS was in negotiations with Resellers to reform the Reseller Program, likely ending the Company's ability to generate revenues from a massive

9

Exhibit11
213

STMP-SCA00007468

scheme that bilked hundreds of millions of dollars from the USPS annually. The Company's stock declined a further 56%, from $83.39 to $36.90.

20. During their concealment of the Company's abuse of the Reseller Program, the Board knowingly caused the Company to repurchase *$327.7 million* worth of its own shares at wildly inflated prices, costing the Company over *$231 million*. At the same time, certain Defendants sold a total of roughly *$190 million* worth of Stamps.com stock, avoiding over *$150 million* in losses. As such, the Defendants breached their fiduciary duties to the Company. Plaintiff brings this action to seek financial redress for Stamps.com.

## PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiff

21. Plaintiff Macomb County Employees' Retirement System ("Plaintiff") is a beneficial owner of Stamps.com common stock and has held Stamps.com stock continuously since July 20, 2015.

### B. Nominal Defendant

22. Nominal Defendant Stamps.com Inc. ("Stamps.com" or the "Company") is a Delaware corporation with its principal executive offices located in El Segundo, California. Stamps.com's common stock trades on the NASDAQ Global Select Market under the ticker symbol "STMP."

Exhibit11
214

STMP-SCA00007469

C.     **Director Defendants**

23.     Defendant Kenneth T. McBride ("McBride") has served as Chairman of the Company since January 2012 and as the Company's Chief Executive Officer and a member of the Board since 2001.  Beginning in 1999, McBride has held various positions at the Company: President from 2001 until January 2012; Chief Financial Officer from August 2000 to January 2004; and Senior Director and Vice President of Finance from 1999 to 2000.

24.     Defendant Mohan P. Ananda ("Ananda") has served as a director of the Company since 1998.  Ananda has served continuously as a member of the Company's Audit Committee since 2008 and as a member of the Compensation Committee since 2001.  From 1997 to January 1, 1999, Ananda served as Chief Executive Officer of the Company.  Ananda developed much of the Company's intellectual property prior to and during his role as Chief Executive Officer.  Upon his resignation as Chief Executive Officer, Ananda entered into a separation agreement and a license agreement with the Company to formalize his resignation and to redefine his intellectual property rights.

25.     Defendant David C. Habiger ("Habiger") has served as a director of the Company since October 25, 2016.  Habiger has also served as a member of the Compensation Committee since October 25, 2016.

11

Exhibit11
215

STMP-SCA00007470

26.    Defendant G. Bradford Jones ("Jones") has served as a director of the Company since 1998.  Jones has also served as a member of the Company's Audit Committee since 2001.

27.    Defendant Theodore R. Samuels II ("Samuels") has served as a director of the Company since January 4, 2017.  Samuels has also served as a member of the Company's Audit Committee since January 4, 2017.

28.    Defendant Katie Ann May ("May") has served as a director of the Company since March 2019.  May has also served as the Chief Executive Officer of the Company's ShippingEasy subsidiary since Stamps.com acquired the company on July 1, 2016, and the Board determined that she was an executive officer of the Company on July 25, 2018.  In connection with the Company's acquisition of ShippingEasy, the Company entered into a Management Incentive Plan, which named May as a Participant Representative.  Under the Management Incentive Plan, May received 10,892 shares, 28,319 shares and 4,356 shares of the Company's common stock in each of March 2017, March 2018 and March 2019 valued at approximately $1,293,980, $5,646,921 and $380,042, respectively, on the dates of issuance.  Given May's ongoing role as an executive of the Company's ShippingEasy subsidiary, as well as her recent payouts relating to the acquisition of ShippingEasy, the Company admits in its public filings that May is not independent.

Exhibit11
216

STMP-SCA00007471

29. Defendants McBride, Ananda, Habiger, Jones, Samuels, and May are referred to collectively herein as the "Director Defendants" or the "Board."

**D. Officer Defendants**

30. Defendant Jeffrey Carberry ("Carberry") has served as the Company's Chief Financial Officer since July 31, 2017. Previously, Carberry was the Company's Vice President of Finance from April 2014 to July 2017.

31. Defendant Kyle Huebner ("Huebner") served as the Company's President from July 31, 2017 to May 2, 2019. Prior to July 31, 2017, Huebner had been the Company's Chief Financial Officer since 2004 and the Company's Co-President since January 13, 2012. Previously, Huebner was the Company's Vice President of Marketing from 2001 to 2004, Vice President of Corporate Strategy from 2000 to 2001, and Senior Director of Corporate Strategy from 1999 to 2000.

32. Defendant Sebastian Buerba ("Buerba") has served as the Company's Chief Marketing Officer since January 2012. Previously, Buerba served as the Company's Vice President of Marketing from April 2009 to January 2012, Director of Marketing from April 2006 to April 2009, and as Product Strategy Manager from July 2004 to April 2006.

33. Defendant John Roland Clem ("Clem") has served as Chief Product Officer since July 2016. Previously, Clem served as the Company's Chief Product and Strategy Officer from January 2012 to July 2016, Vice President of Product

13

Exhibit 11
217

STMP-SCA00007472

and Service Operations from March 2006 to January 2012, Director of Marketing from March 2004 to February 2006, and Director of Corporate Strategy from March 2003 to February 2004.

34.    Defendant Matt Lipson ("Lipson") has served as the Company's Chief Legal Officer and Secretary since January 15, 2018.  Previously, Lipson served as the Company's Vice President and General Counsel from May 2017 to January 2018, Deputy General Counsel from April 2016 until May 2017, Associate General Counsel from 2006 until April 2016, and Senior Counsel from 2002 through 2006.

35.    Defendant Amine Khechfe ("Khechfe") has served as the Company's Chief Strategy Officer since July 2016.  From November 18, 2015 to July 20, 2016, Khechfe served as General Manager of Endicia, the Company's wholly owned subsidiary.

36.    Defendants McBride, Carberry, Huebner, Buerba, Clem, Lipson and Khechfe are referred to collectively herein as the "Officer Defendants."

### E.    Relevant Non-Party Entities

#### 1.    Stamps.com Subsidiaries

37.    Endicia is a PC Postage Company (as defined below) that provides access to USPS postage to high volume shippers.  Endicia was acquired by Stamps.com in March 2015.  As alleged herein, the Board ███████████

███████████████████████████████████

14

Exhibit11
218

STMP-SCA00007473

██████████████████████████████████████████████████████

████████████████

38.     ShipStation is a web-based shipping platform designed to help online retailers process, fulfill, and ship their orders from over 40 popular marketplaces and shipping carts, including eBay, Amazon, Shopify, Bigcommerce, Volusion, Squarespace and others.    As alleged herein, ShipStation was acquired by Stamps.com on June 10, 2014.  The Board viewed ShipStation as the "cornerstone" of the Company's unsustainable business strategy designed to abuse the Reseller Program and cannibalize USPS revenues, costing the USPS at least $235 million per year in revenues.

39.     ShipWorks is a web-based shipping platform that offers monthly subscription based e-commerce shipping software to online sellers. ShipWorks solutions integrate with over 50 popular online sales and marketplaces systems including eBay, PayPal, Amazon, Yahoo! and others.  ShipWorks was acquired by Stamps.com on August 29, 2014.  The Board acquired ShipWorks as part of the Company's unsustainable business model designed to intentionally abuse the Reseller Program and cannibalize USPS revenues, costing the USPS up to $235 million per year in revenues.

40.     ShippingEasy is a web-based shipping platform that integrates with eCommerce platforms, allowing customers to download their orders, track

15

Exhibit11
219

STMP-SCA00007474

shipments and order status, print labels, and save on postage. ShippingEasy was acquired by Stamps.com on June 21, 2016. The Board acquired ShippingEasy as part of the Company's unsustainable business model designed to intentionally abuse the Reseller Program and cannibalize USPS revenues, costing the USPS at least $235 million per year in revenues.

### 2. USPS Resellers

41. Express 1 is a registered reseller pursuant to the USPS Reseller Program. Express 1 is a sales and support business partner for the USPS that provides discounted shipping rates and technology solutions to lower volume USPS shippers. As alleged herein, the Board had specific knowledge that

42. Intuiship (aka USS) is a registered reseller pursuant to the USPS Reseller Program. Intuiship offers USPS postage products for online sellers and small/medium size businesses. As alleged herein, the Board had specific knowledge that

16

Exhibit11
220

STMP-SCA00007475



43.    Parcel Partners is a registered reseller pursuant to the USPS Reseller Program.    Parcel Partners offers USPS postage products for online sellers and small/medium size businesses.    As alleged herein, the Board had specific knowledge that

## SUBSTANTIVE ALLEGATIONS

## I.    COMPANY BACKGROUND

44.    Stamps.com operates a technology platform, or user interface ("UI"), that enables customers to buy and print USPS postage online with just a personal computer ("PC"), printer and Internet connection, right from their home or office.

45.    On March 31, 1998, the USPS approved a new technology called Electronic Postage which allows anyone to purchase and print postage using a personal computer and an internet connection.    The digital stamp, referred to as Information-Based Indicia, appeared on envelopes and labels as human-readable

17

Exhibit11
221

STMP-SCA00007476

text, a two-dimensional barcode (containing data to identify the user and the mail piece), and a cryptographic signature.  This technology became known as "PC Postage."

46.    In 1999, Stamps.com became the first ever vendor licensed by the USPS to offer PC Postage online.  Since 1999, only two other companies—Endicia and Pitney Bowes—have received authorization to offer customers the ability to print USPS postage online.

47.    The Company's website also serves as a "back-end integration solution" for certain customers, automatically providing electronic postage for those customers' shipments of products to third parties.  For example, Stamps.com's software integrates directly into the most popular e-commerce platforms, allowing web store managers to completely automate their order fulfillment process by processing, managing, and shipping orders from virtually any e-commerce source through a single interface without manual data entry.

48.    Following authorization by the USPS in 1999, Stamps.com established itself as the preeminent online USPS postage company.  For years, the Company catered to small and home businesses, such as sole proprietorships and licensed professionals.  From 1999 to 2009, Stamps.com derived most of its revenues from charging customers a subscription fee for use of its online platform. The Company offered a variety of different subscription plans at different price

18

Exhibit 11
222

STMP-SCA00007477

points, including the Pro Plan, Premiere Plan, Professional Shipper Plan, and Enterprise Plan. According to the Company's public filings, customers typically paid Stamps.com a monthly service fee ranging from $15.99 to $39.99 depending on which plan they subscribed to.

49. Because the Company's success relied upon subscription fees, the Company invested substantial capital into marketing to attract new customers and offset any customer turnover (or churn). By the end of 2009, the Company grew its paying customer base to 320,000 paying customers, with the Company's monthly subscription fees ███████████████. This constituted █████ of the Company's $82.124 million in total revenues.

50. Starting in 2009, the USPS introduced a series of initiatives designed to increase shipping volumes. These new initiatives brought about a drastic shift in Stamps.com's business model, which became focused on generating profits through unsustainable abuses of the USPS's new programs. As discussed below, the Company's implementation and continued maintenance of these abusive and unsustainable business practices were the product of a conscious decision made by the Board and the Officer Defendants (at that time), which put the Company's critical relationship with the USPS in jeopardy.

19

Exhibit11
223

STMP-SCA00007478

## II.    OVERVIEW OF USPS'S INITIATIVES TO INCREASE SHIPPING VOLUMES

51.    In 2009 and again in 2011, the USPS established two relevant initiatives to incentivize third-party companies to assist in increasing USPS shipping volumes: (i) the Reseller Program (defined below); and (ii) USPS incentive agreements with PC Postage companies.    This Section provides a general overview of these two initiatives to provide the necessary background for understanding how Defendants decided to abuse Stamps.com's important relationship with the USPS in an unsustainable manner.

### A.    The USPS Reseller Program

52.    In 2008, DHL U.S. Express ("DHL") decided to withdraw from U.S. domestic shipments because it could not reach a critical mass of customers.  At that time, DHL employees informed the USPS that they knew of former high-volume DHL customers that they could bring to the USPS if the USPS created a discount postage program that could be used to entice large customers to choose the USPS over rivals UPS and FedEx.  As a result, the USPS created an initiative to win over former DHL high volume shippers, called the "Reseller Program."

53.    The Reseller Program sought to enlist certain third-parties (previously defined as "Resellers") to assist the USPS in sourcing and obtaining new USPS customers that were high volume shippers.  Resellers effectively acted as sales representatives for the USPS, helping to recruit new customers and sell postage.

20

Exhibit11
224

STMP-SCA00007479

At all relevant times, the lion's share of the reseller market was dominated by three Utah-based companies: Express 1, Parcel Partners, and USS (d/b/a Intuiship).

54.     Pursuant to the Reseller Program, the USPS granted each Reseller an NSA,[3] which is a customized, negotiated contract with the USPS that provides discounted rates to Resellers that vary based on each agreement.  Each NSA typically worked as follows.  The Reseller had a contractual right to buy postage from the USPS at a steep discount to publicly advertised rates and then "resell" that postage to customers at a higher rate.  The difference in the price paid by the Reseller and sold to the customer is known in the industry as the "Reseller Spread," which represents compensation for the Reseller's efforts in sourcing and securing new USPS customers.

55.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ .

56.     Generally speaking, the discounted USPS postage rates provided to Resellers were far more favorable than the USPS's retail or commercial rates. Although the terms of NSAs are not public, market commentators have reported

---

[3] The USPS has also approved NSAs with direct customers, such as Amazon. However, those customer NSAs are not relevant to this action.

Exhibit11
225

STMP-SCA00007480

that NSAs provided for tiered pricing—meaning, the more USPS volume that the Reseller secured, the less the Reseller would have to pay the USPS for the postage in the aggregate. The purpose of the tiered pricing was to allow Resellers the ability to provide greater discounts to higher volume shippers. As such, Resellers had an incentive to meet or exceed certain volume requirements in order to qualify for the best rates under the NSAs for the benefit of their customers.

57. Because the Reseller Program was originally designed to acquire former DHL customers (*i.e.*, non-USPS customers), the USPS prohibited Resellers from calling on any pre-existing USPS customers to offer them discounted rates pursuant to the NSA. The reason for this prohibition was simple: if Resellers were permitted to call on current USPS customers, they would be offering steep discounts to pre-existing USPS customers, leading to cannibalization of USPS revenues. Thus, the USPS took the sensible position that the Resellers should only offer discounts to customers using competing carriers (primarily, FedEx and UPS).

58. Similarly, according to market commentators who spoke to and quoted industry sources, the USPS took the position that the PC Postage providers (*e.g.*, Stamps.com and Endicia) were not supposed to participate in the Reseller Program. This is because Stamps.com and Endicia had already been long-term partners with the USPS, and therefore most (if not all) of their customers were pre-existing USPS customers. There are key facts that support this contention.

22

Exhibit11
226

STMP-SCA00007481

Stamps.com never applied for nor received its own NSA from the USPS pursuant to the Reseller Program.  Further, Defendant Huebner admitted on the Company's Q2 2016 earnings call that "in terms of [Stamps.com's] own NSA [pursuant to the Reseller Program], traditionally, USPS has really viewed [Stamps.com] as a technology partner and they've really chose to compensate [the Company] for that—our role as a technology partner."

59.    How the USPS decided to compensate Stamps.com as a technology partner is discussed in the next subsection.

**B.    The USPS Commission Agreement**

60.    Rather than taking part in the Reseller Program, the USPS agreed to enter into a commission agreement[4] with Stamps.com to compensate the Company as a technology partner (the "USPS Commission Agreement").[5]   The USPS Commission Agreement lays out the parties' intent quite clearly.  The Company and the USPS agreed ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████.  As noted

---

[4] ████████████████████████████████████████████.

[5] Although the USPS Commission Agreement and subsequent amendments thereto were material to the Company's revenues, the Company did not publicly disclose any of the terms of the Commission Agreement to investors.

23

Exhibit11
227

STMP-SCA00007482

below, the USPS agreed to pay Stamps.com ████████████████████████

████████████████████████████████████. Moreover,

the USPS agreed ████████████████████████████████████

██████████████████████████.

61.   Pursuant to the USPS Commission Agreement, Stamps.com received

two types of fees: (i) ███████████████; and (ii) ████████████████.

62.   ███████████████ paid the Company ████████████████

████████████████████████████████████

███████. For instance, Stamps.com received ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████.

63.   ███████████████ represented ████████████████

████████████████████████████████████

███████████████ The ███████████████ was calculated based on the ███████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

24

Exhibit11
228

STMP-SCA00007483

████████████████████████████████████████████████████████████

███████████████████████████████.

64.    The Company also received payments from USPS in the form of

████████████████████████████████████████████████████████████

████████████████████████████████████.    Again,  the  ██████████

██████████████  were  calculated  based  on  ██████████████.    ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

65.    Importantly,  the  USPS  Commission  Agreement  included  an exclusivity provision that prohibited Stamps.com from working with competing carriers.    According  to  ██████████████  of  the  USPS  Commission  Agreement, Stamps.com agreed that "████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████    Thus,  the  Company  could  not  offer  customers  the  ability  to purchase competing carrier postage without running afoul of the exclusivity provision.

25

Exhibit11
229

STMP-SCA00007484

## III. THE DIRECTOR AND OFFICER DEFENDANTS APPROVE AN UNSUSTAINABLE BUSINESS MODEL PREMISED ON ABUSING THE RESELLER PROGRAM AND DOUBLE-DIPPING ON USPS REVENUES

### A. Overview of the Postal Arbitrage Scheme and Early Efforts By the Company

66. The USPS initiatives discussed above were supposed to work independently to increase USPS shipping volumes. However, the Company quickly realized that the discounts provided to Resellers ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮. For example, according to Board materials, a Reseller could expect to realize ▮▮▮▮▮ in Reseller Spread for facilitating the shipment of a package that would yield Stamps.com ▮▮▮▮▮ commission under the USPS Commission Agreement.

67. Given the ▮▮▮▮▮▮ paid pursuant to the Reseller Program, the Resellers were able to charge customers less to ship packages than could Stamps.com. Unsurprisingly, the Resellers began to attract Stamps.com's customers. According to one market commentator citing a source, Stamps.com recognized an opportunity to substantially increase profitability by injecting itself into the Reseller Program. To that end, Stamps.com struck secret back-end agreements with Resellers whereby Stamps.com would place a substantial portion of its customers into the Reseller Program through the Resellers, allowing the

26

Exhibit 11
230

STMP-SCA00007485

Company to profit both directly from the USPS and indirectly from Resellers through receipt of an undisclosed and unknown portion of the Reseller Spread. This practice, however, was at odds with the USPS's mandates that PC Postage providers not offer customers Reseller discounts and that the Reseller Program exists only to capture new customers not already using the USPS.

68.    The undisclosed terms of the Company's contractual arrangements with Resellers show how lucrative it was for the Company to abuse the Reseller Program.   According to Board materials, ███████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████. If the Company was entitled to receive ██████████████ of the Reseller Spread, then a reasonable person must ask: why did the Company not just apply to the USPS for its own NSA?  As discussed above, the answer is because the Company was not

---

[6] It is likely that Stamps.com received ██████████████████████ as the result of settling a lawsuit between the Company and Express 1.  Specifically, Express 1 had filed a lawsuit against ShipStation, an online shipping platform, alleging breach of contract based on violation of an exclusivity provision. Following Stamps.com's acquisition of ShipStation in July 2014, Express 1 added additional claims and added Stamps.com and its CEO as named defendants in December 2014.  On August 6, 2015, Stamps.com and Express 1 entered into a settlement agreement that resolved all disputes between the parties, with Stamps.com agreeing to pay Express 1 $10 million.  The two companies also agreed to continue and expand their business relationship going forward.  Upon information and belief, the Company paid Express 1 $10 million in order to gain access to Express 1's NSA.

Exhibit11
231

STMP-SCA00007486

allowed to participate in the Reseller Program due to the very real risk that Stamps.com would call on and transfer pre-existing USPS customers into the Reseller Program in order to profit at the expense of the USPS (*i.e.*, cannibalize USPS revenues).

69.    By entering into back-end agreements with the Resellers, Stamps.com was able to circumvent the USPS, ███████████████████████████ ████████████████████████████████████. This short-term business practice was a blatant abuse of the Reseller Program and resulted in the Company profiting at the expense of the USPS.

70.    In short, Stamps.com collected a substantial commission for merely transferring pre-existing USPS customers, or USPS customer leads from its marketing efforts (paid for by the USPS), into the Reseller Program. Because most Stamps.com customers were mom and pop shops (such as small businesses or sole proprietors), Stamps.com was not only providing discounts to pre-existing USPS customers but to customers with very small shipping volumes. The Company's scheme flew in the face of the intent of the Reseller Program, did not have the blessing of the USPS, and represented a short-term attempt to maximize profits without any regard for the impact it would have on the Company's relationship with its most important partner, the USPS.

28

Exhibit11
232

STMP-SCA00007487

71.     The Company's early efforts to abuse the Reseller Program proved fruitful.  Whereas the Company had witnessed 10% and 5% growth in service revenues in 2009 and 2010, respectively, thereafter, the Company's growth skyrocketed, with consistent 17% growth from 2011 to 2014.  These figures indicate that the Company began abusing the Reseller Program as early as 2011.  As explained in detail below, the Company formalized abuse of the Reseller Program as part of its business model beginning in 2014.

B.      ███████████: **The Company's Clandestine Scheme To Bilk the USPS Out of Hundreds of Millions of Dollars in Revenues Becomes a Cornerstone of the Company's Business Strategy**

72.     Starting in 2014, the Director and Officer Defendants consciously decided to shift the Company's strategic plan towards focusing on acquiring new customers through acquisitions and then shifting those acquired companies' customers into the Reseller Program to generate a Reseller Spread out of thin air.[7]  According to a 2014 Board presentation, the Board and the Officer Defendants dubbed ████████████████████

---

[7] In 2014, Defendants Ananda, Jones, and McBride were members of the Board, and Defendants McBride, Carberry, Huebner, Buerba, Clem, and Lipson all served as executives of the Company.  Although the Company refused to produce Board minutes and materials for any period predating February 2016, the Board's 2016 presentations included legacy slides from that period that are incorporated into this Section.

29

Exhibit11
233

STMP-SCA00007488

73.     As discussed in the below Board presentation slide, ▮▮▮▮▮▮▮ was an intentional and wrongful plan premised on abusing the Reseller Program without the USPS's or investors' knowledge:



74.     As the slide above describes, the Board ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." The Board knew that the business plan presented serious risks, and therefore sought to ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To that

30

Exhibit11
234

STMP-SCA00007489

end, the Board ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████    Once acquired, the Board ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████    As

alleged herein, the Board's actions following USPS inquiries about the Company's

business plan show that this most likely means the Board planned to escalate the

abusive practices once the USPS caught on, riding out the unsustainable business

plan for as long as possible.  The Board's reference to ████████████████████

██████████████████████████████████████

75.  The Board and the Officer Defendants also outlined criteria for

suitable acquisition targets, ██████████████████████████████.  As discussed

in the below slide summarizing the 2014 Strategy, ████████████████████████

████████████████████████████████████████████████████████████

The Board and the Officer Defendants identified certain acquisition targets to

further the unsustainable business practice, ███████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████.  The Board

slide explaining this plan follows:

31

Exhibit11
235

STMP-SCA00007490



76.     Perhaps most egregious, the Board and the Officer Defendants

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.     The Board and the Officer Defendants

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.     The Board slide explaining these plans follows:

32

Exhibit11
236

STMP-SCA00007491



77.    ███████████    was    unsustainable    and    the    Board's    and    Officer

Defendants' conscious decision to adopt it knowingly put the Company's critical

relationship with the USPS in jeopardy.    The above slides show that the Board

███████████████████████████████████████████████████

███████████████████████████████████████████. In fact, at no

time    did    the    Director    or    Officer    Defendants    disclose    that    the    Company's

acquisitions    ██████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

33

Exhibit11
237

STMP-SCA00007492

78.    Despite the substantial risks involved with ███████, the Board and the Officer Defendants consciously decided to move forward with their plan. To that end, in 2014, the Board and the Officer Defendants approved the acquisition of two e-commerce shipping solution companies—ShipStation and ShipWorks.

79.    *First*, on June 10, 2014, the Company announced that the Board had approved the acquisition of Auctane, LLC, which operates ShipStation, for $50 million in cash plus performance-linked earn-out consideration of up to 768,900 shares of Stamps.com stock.    During the July 30, 2014 earnings call, McBride stated: "In our high volume shipper area, we're continuing to ramp up our efforts. The Stamps.com and ShipStation platforms offer great solutions for high volume shippers such as warehouses, fulfillment houses, e-commerce shippers, large retailers and other types of high volume shippers."

80.    *Second*, on August 29, 2014, the Company announced that the Board had approved the acquisition of Interapptive Inc., which operates ShipWorks. ShipWorks offers monthly subscription based e-commerce shipping software that provides simple, powerful and easy to use solutions for online sellers. ShipWorks solutions integrate with over 50 popular online sales and marketplaces systems including eBay, PayPal, Amazon, Yahoo! and others.

34

Exhibit 11
238

STMP-SCA00007493

81.    Following the acquisitions, the Board received repeated updates regarding ███████████ .  For instance, in nearly every Board presentation from 2016 to 2019, the Board reviewed the following slide ████████████████

████████████████████████████████████████

████████ :



82.    Similarly, the Board consistently reviewed ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

35

Exhibit11
239

STMP-SCA00007494



83.     The Board-approved business plan did not provide any benefit to the USPS.  E-commerce websites typically allow small businesses (or individuals) to sell individual items to consumers.   These small packages are typically light weight.  According to numerous industry sources, the USPS prices its postage so that packages under 2 pounds will always be cheaper than FedEx and UPS.  Thus, basic economic principles mean that offering further discounts like those offered by the USPS through the Reseller Program would not drive customer behavior. Moreover, if an online seller grew its business to a certain size where competing

Exhibit11
240                                                        STMP-SCA00007495

carriers offered discounts to attract them, then that seller would likely be entitled to apply for its own NSA with the USPS (as Amazon and others had done).

84.     Simply put, the Board's plan had nothing to do with increasing USPS volume. Instead, the entire plan was premised on abusing the Reseller Program to profit at the expense of the USPS. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

## C.     The Endicia Acquisition: Acquire Postage Volume At Any Cost

85.     Consistent with plans to acquire USPS volume at any cost, in March 2015, the Board and the Officer Defendants turned their attention to a new acquisition target—Endicia, which they referred to internally as "Viking." Endicia was another PC Postage provider. Unlike Stamps.com, however, Endicia focused on acquiring and serving high volume shippers.

86.     On March 20, 2015, the Board approved the acquisition of Endicia for $215 million in cash. The Board ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Thus, the Board and the Officer Defendants knew that, through abuse of the Reseller Program, the Company could generate from the Endicia acquisition significant revenue synergies and improved margins because

37

Exhibit11
241                                                                              STMP-SCA00007496

the Company could shift Endicia's USPS customers into the illicit Reseller arrangements and thereby skim additional profit at the expense of the USPS.

87.    At the time of the acquisition, the Board recognized a substantial risk involved with the acquisition. ███████████████████████████ ███████████████████████████████████████. Thus, as the Board had noted in 2014, ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Exhibit11
242

STMP-SCA00007497



88.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮.    Despite the importance of the Company's relationship with the USPS, the Board's presentation ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

89.    Following the acquisition of Endicia, the Board initially discussed ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮    An early presentation shows that the Board ▮▮▮▮▮▮▮▮

39

Exhibit11
243                                                                                    STMP-SCA00007498

██████████████████████████████████████

████████████████████████. For instance, an early presentation from

February 2016 ████████████████████████████████

█████████████████████. As discussed in the following slide, the Board

recognized that ████████████████████████████████

██████████████████████████ Thus, although it would later do so, the

Board clearly understood that the Company could██████████████████████

██████████████████████████████████████

████████

██████████████████████████████████████

40

Exhibit11
244

STMP-SCA00007499

90.    Other slides from the February 2016 meeting further support the Board's understanding that ███████████████████████ ███████████████████████████ For example, in discussing the Company's ongoing plans to ███████████████████████████████████, the Board was told that management would ████████████████████████ ████████████████████████████████████████ ███████████████████████████ The reference to ██████████████ ████████further shows that the Board understood that ██████████████████████ ██████████████████████████████████████████████. The

slide presented to the Board follows:

41

Exhibit11
245

STMP-SCA00007500



91.    As discussed in more detail below, the Board's original decision ▮

▮▮▮▮▮▮▮▮▮▮ in clear violation of the Reseller Program.

**D.    The Final Piece: The Acquisition of Shipping Easy (aka Neptune)**

92.    The Board capped off ▮▮▮▮ with the acquisition of

ShippingEasy on June 21, 2016.  Although the Section 220 documents ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.

42

Exhibit11
246

STMP-SCA00007501

93.   In one slide, the Board ███████████████████████████████

██████████████████████████████████████████████ The

slide is as follows:



94.   More importantly, the Board reviewed a slide ████████████ The

██████████████████████████. As noted in the below slide, the

Board sought to ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████. In addition, the Board knew that █████████████

43

Exhibit11
247

STMP-SCA00007502

██████████████████████████████████████████████████

████████████████████████████████████. Based on the Board materials, the

Board knew that ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████. While ████████████████

████████████████ the Board seems to have discussed ████████████

██████████████████████████████████████████████████

████████████████████████████████████. Thus, although

████████████████████████████ the Board planned to ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

This clearly indicates that the Board's and management's acquisition was premised

on cannibalizing USPS revenues.

44

Exhibit11
248

STMP-SCA00007503



95.   Following the acquisition of ShippingEasy, Defendant Huebner stated that the company would "start the process of leveraging our company's collective resources and expertise and sales and marketing, customer service, product development, and technology innovation to help accelerate their growth."  At no time did Defendant Huebner disclose that the Company's real interest in acquiring ShippingEasy was ███████████████████████████████

████████████████████████████████████████

██████

Exhibit11
249

STMP-SCA00007504

**E.    The Final Results Are In: The Reseller Abuse Is Wildly Successful**

96.    By the end of 2015, ███████████ had met or exceeded expectations. On February 4, 2016, the Board held a meeting at which Defendants Ananda, Jones, McBride, and Huebner were also present.[8] ████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████.

97.    During the Shipping update, McBride provided ███████████████ ███████████████████████████. The Board reviewed the following slide:

---

[8] While the Company agreed to produce annual business plans for 2017 and 2018, the Company did not produce an annual business plan for 2016. ███████████████ ████████████████████████████████████████ ██████████████████████████████████

46

Exhibit11
250

STMP-SCA00007505



98.    Additionally, while Stamps.com recognized consistent (albeit limited) growth in service revenue, which presumably included revenues from subscription fees and commission paid by USPS and Resellers, immediately after the creation of the Reseller Program, ranging from 5% to 17%, from 2009 to 2014, starting in 2015, the Company began witnessing substantial and outsized growth in service revenues, which was inconsistent with previous years.  For example, the Company's service revenues increased 53% in a single year and then continued on an unusual growth trajectory in subsequent years.  A summary of the Company's

47

Exhibit11
251

STMP-SCA00007506

service revenue figures and service revenue growth is provided in the following chart:

| Fiscal Year Form 10-K[9] | Service Revenue | YOY % Growth |
|---|---|---|
| 2009 | $61.6 million | 10% |
| 2010 | $64.6 million | 5% |
| 2011 | $75.5 million | 17% |
| 2012 | $88.2 million | 17% |
| 2013 | $99.0 million | 17% |
| 2014 | $115.7 million | 17% |
| 2015 | $176.7 million | *53%* |
| 2016 | $313.1 million | *77%* |
| 2017 | $411.3 million | *31%* |
| 2018 | $530.7 million | *29%* |

99.    Based on the Company's internal documents, ███████████████

███████████████████████████████████████████████

████████████████████████████████    Although the exact

reason for the substantial increase in service revenue growth was not disclosed in

2015 or thereafter, the Company did disclose in 2016, for the first time, how it

earned service revenue.  The 2015 Form 10-K, filed on February 29, 2016, and

signed by Defendants McBride, Jones, and Ananda, stated as follows:

> For service revenue, we earn revenue in several different
> ways: (1) customers may pay us a monthly fee based on a
> subscription plan; (2) customers may qualify under our
> USPS partnership to have their service fees waived or
> refunded and then we are compensated directly by the

---

[9] All information is compiled from the Company's Form 10-Ks, which were signed by each of the Company's then-directors.

48

Exhibit11
252

STMP-SCA00007507

USPS; (3) customers may pay us a fee per shipping label printed; *(4) we may earn compensation by offering customers a discounted postage rate that is provided to the customers by our partners;* and *(5) we may earn other types of revenue shares or other compensation from specific customers or partners.*

100.    This disclosure was opaque and misleading.  The Board at the time (including Defendants McBride, Jones, and Ananda) failed to disclose that the Company had ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████  In fact, the Board's disclosure does not provide any information on the economics of the Company's side agreements with Resellers ██████████████████████████████████ ████████  Nor did the Board disclose the amount of revenues generated from the illicit back-end arrangements with Resellers.  Finally, nowhere did the Board disclose ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ As noted above, ███████████████████████████████████ ██████████████████████████████████████ ████████████████████.

49

Exhibit11
253

STMP-SCA00007508

101. Then, on the Company's first quarter 2016 earnings call, McBride offered another vague statement about the ways Stamps.com monetizes postage volume. On that call, Ken McBride stated:

> Average monthly revenue per paid customer, or ARPU [average revenue per paid user], was $40.65 in the first quarter and that was up 58% versus the first quarter of 2015. The growth in ARPU benefited from continued growth in the shipping business, including **positive contributions from the traditional high volume shipping area as well as from all of our acquisitions, Endicia, ShipStation and ShipWorks**. Specifically, the growth in ARPU has been driven by the higher ARPU typically associated with higher volume shippers. All three of our acquisitions ShipStation, ShipWorks and Endicia have higher ARPU than our historical average. **And also, ARPU is now directly correlated with the postage growth owing to the various ways we are now able to monetize the postage volume.**

102. McBride, like the Board at the time, did not disclose that the Company's service revenue growth was premised on an unsustainable business practice ███████████████████████████████████████████████████████████████. The dramatic increase in high volume shipping and the disclosure of new sources of revenue (albeit incomplete disclosures) was a direct result of the Board-approved unsustainable business strategy (*i.e.*, ████████████). ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

50

Exhibit11
254

STMP-SCA00007509

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ .

## IV.  INSIDERS ARE MADE AWARE OF USPS COMPLAINTS, BUT THE BOARD CONTINUES TO RUBBER STAMP THE ABUSIVE PRACTICES

**A.**  ████████████████████████████████████████████████

**Put Management on Notice of Serious Problems With the Company's Business Model**

103.  Almost immediately after the acquisitions of Endicia, ShipStation, and

ShipWorks, ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ .

104.  The USPS was specifically focused on Intuiship, along with its third-party sales affiliate, Move Method.[10]  Move Method was already under USPS scrutiny for funneling existing USPS customers through Intuiship's NSA.

---

[10] According to its website, MoveMethod employs consultants to support organizations with streamlining logistics operations.  Information is limited regarding Move Method's relationship with Intuiship.  Upon information and belief, Move Method acted as a third-party sales agent that assisted Intuiship with sourcing clients for the Reseller Program.

Exhibit11

255

STMP-SCA00007510

According to an email sent by Doreen Rathburn, USPS Business Alliances Manager, she stated about cannibalization: "They clearly know where I stand on cannibalizing existing business and have stated that was not the intent here."

105. Then, on August 2, 2016, Cliff Rucker ("Rucker"), USPS Vice President of Sales, sent a letter to Intuiship regarding the USPS's investigation into the potential misuse of Intuiship's NSA in a manner that cannibalized existing USPS business. The letter concluded by stating: "If it is determined that this is the case, your NSA is subject to termination due to violation of the agreed upon terms of the agreement."

106. Stamps.com also became aware that the USPS was scrutinizing Intuiship and Move Method for abuse of the Reseller Program. On July 16, 2016, Rucker sent an email to Stamps.com executives Candi Booth and Amine Khechfe alerting them that USPS personnel were being instructed to investigate Move Method for cannibalizing USPS business under the Reseller Program.

**B. Market Commentators Begin To Probe the Company's Misconduct, But the Board Oversees the Issuance of False Denials**

107. In or around July 2016, following the above investigations into Reseller abuse, market commentators began to raise questions publicly about the Company's remarkable performance over the past few years.

Exhibit11
256

STMP-SCA00007511

108.    For instance, on July 8 and 12, 2016, the Capitol Forum[11] issued two reports to its subscribers discussing Stamps.com's postage arbitrage scheme.  In a report, entitled "*Stamps.com: Reliance on Negotiated Service Agreements with USPS, Relationship with IntuiShip Leaves Stamps.com with Significant Regulatory Risk; USPS Can Terminate NSA with 30 Days' Notice if Agency Finds Abuse*," citing numerous industry sources, including within the Postal Regulatory Commission, the Capitol Forum explained Stamps.com's postage scheme, highlighted the reasons why it was abusive, called out Stamps.com's "partnership" with IntuiShip, and concluded that regulatory scrutiny and a severe regulatory response was very likely.[12]  The report could not definitively estimate the losses suffered by the USPS as a result of the Company's abuse of the Reseller Program, but claimed the abusive practices were cannibalizing USPS revenues.

---

[11] According to its website, the Capitol Forum is an investigative news and legal analysis company dedicated to informing policymakers, investors, and industry stakeholders on how policy affects market competition.  The Capital Forum is a subscription-based service, costing subscribers approximately $20,000 per year to access most investigative reports.

[12] The Capitol Forum report is not publicly available.  This description of the Capitol Forum report is based on a review of numerous blogposts and other market commentary in response to the report, including a report issued by Prescience Point on July 14, 2016. *See* Stamps.com: The Software Valent?, Prescience Point (July 14, 2016), *available at*: https://www.presciencepoint.com/wp-content/uploads/2016/07/PresciencePoint_STMP_Report_7-16-2016.pdf    (last visited on Aug. 13, 2019).

53

Exhibit11
257

STMP-SCA00007512

109. On July 27, 2016, the Board held a meeting at which Defendants Ananda, Jones, McBride, and Huebner were present. According to the minutes, ███████████████████████████████████████████████ ████████████████████ ."

110. Although no presentation accompanied the July 27, 2016 Board meeting, an August 2, 2016 Board presentation for a meeting that occurred a mere four business days later provides insight into what the Board likely discussed. In that presentation, McBride laid out the key arguments set forth by market commentators: █████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████[13]

111. The Board discussed certain rebuttal points to the market commentator criticism.

112. *First*, the Board was told that ███████████████ However, the Board knew that ████████████████████████ ████████████████████████████████████████████ ████████ In a later slide in the same presentation, the Board was told that ████████ ████████████████████████████████████████████

_____

[13] ████████████████████████████████████████████ ████████████████████████████████████████████ However, that point is not relevant to the issues raised in this action.

54

Exhibit11
258

STMP-SCA00007513

████████████████████████████████████████. Given Stamps.com recognized $84.01 million in revenues in that quarter, Stamps.com's revenues from Resellers actually represented ████ of the Company's revenues at the time. By limiting the focus to ████████ the Board knew McBride was misrepresenting the situation.

113. **Second,** the Board was told that ████████████████████ ██████████████ The Board, however, knew ██████████████████ ████████████████████████████. As noted above, in 2014, the Board ████████████████████████████████

████████████████████████████████████████

██████████████████████

114. **Third,** the Board was told that "██████████████████



██████████████████████ The Board, however, did not even discuss the fact that this point was inconsistent with the Company's USPS Commission Agreement at the time, ████████████████████

████████████████████████████████████████

██████

115. At the conclusion of the discussion, the Board reviewed certain ██████████████ relating to the market commentators criticism. Everything about

55

Exhibit11
259

STMP-SCA00007514

the following slide shows that ██████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

116.    ██████████████████████████████████

██████████████████████████████████████████

████████████████.

117.    Following the Board meeting, the Company held its second quarter 2016 earnings call on July 28, 2016. On that call, McBride disclosed to the market

56

Exhibit11
260

STMP-SCA00007515

a number of false and misleading statements regarding the Reseller Program, which had previously been discussed with the Board.

118. As an initial matter, during the earnings call, McBride failed to disclose that ███████████████████████████████████████████

███████████████████████ McBride never mentioned that █████████

███████████████████████████████████████████████████████████

███████████████████████████████████████. Moreover,

McBride did not disclose that the Board itself had just discussed that ██████████

██████████████████████████████████



119. Rather, McBride provided a number of canned responses to rebut the market commentators' concerns about the Company's abuse of the Reseller Program. By failing to address the actual issues, McBride felt that he could control the narrative and hide the Board's intentional and abusive business practices.

120. For instance, McBride explained that "our business with Intuiship represents less than 10% of our total revenue." In response, an analyst asked, "What percentage of your revenues today come from *resellers* in the form of, kind of the referral fees or revenue share arrangements that you have in place?" McBride dodged the question, stating "we wanted to provide some insight into some of the metrics in the business and in order to help explain the reseller

57

Exhibit11
261

STMP-SCA00007516

program, we don't like to disclose specific partner information beyond that, and there is very confidential competitive information so we – *IntuiShip is less than 10% and that's the main bullet point we like put out there*." McBride, with Board support, once again misrepresented the true scope of the Company's abuse of the Reseller Program.

121. Additionally, McBride stated as follows:

> The third main negative argument being advanced in the investor community, which falls on the prior arguments, is that once the USPS has investigated the reseller program, they will then determine that it is not helping you USPS growth and it is solely cannibalizing existing volume. This argument is based on a single data point, which is that Priority Mail volume growth in the first calendar quarter of 2016 was flat. This argument cherry-picks the data, distorts the facts, misuses several underlying trends and is logically flawed and false for many reasons.

122. McBride's statement was misleading. He failed to disclose that the Board ████████████████████████████████████████████

████████████████████████████████████████████

Moreover, he failed to disclose that the Board had ████████████████

████████████████████████

58

Exhibit11
262

STMP-SCA00007517

**C.    The Board ███████████████████████████████████
███████    But  Takes  No  Action  To  Stop  the  Company's
Widespread Abuse of the Same Program**

123.  On  October  25,  2016,  the  Board  convened  a  meeting  at  which

Defendants  Ananda,  Habiger,  Jones,  McBride,  and  Huebner  were  present.  ████

████████████████████████████████████████████████████████

████████████████████  Thus,  the  Board  understood  that  ████████████

████████████████████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

59

Exhibit11
263

STMP-SCA00007518

124.   At this meeting, the Board did not even discuss the implications of this investigation into the Company's ongoing abuse of the Reseller Program or how this investigation should have been disclosed in the second quarter of 2016 to investors. The Board knew the USPS had just started to scratch the surface of the abuse and that the USPS's focus would quickly turn attention to the Company's role in bilking the USPS out of hundreds of millions of dollars in revenue per year. Simply put, no matter how hard the Board tried to hide it, the USPS was on a mission to determine what was going on with the Reseller Program.

125.   Incredibly, despite McBride's statements on the Company's second quarter 2016 earnings call that the Reseller Program was not cannibalizing USPS revenues, at this meeting, the Board reviewed the ███████████████████ ██████████████████. As noted above, the Board slides from 2014 contained the following plans:

A) ██████████████████████████████████
████████████████████████████████████
███

B) ██████████████████████████████████
████████████████████████████████

C) ██████████████████████████████████
██████████████████████████

Exhibit11
264

STMP-SCA00007519

D)

E)

126. The Board, however, did not take any action to correct McBride's misstatements during the Company's second quarter earnings call.

## V. THE BOARD ███████████," APPROVING A MASSIVE EXPANSION OF THE ABUSIVE BUSINESS PRACTICES

### A. The Board ████████████████████, But the Abusive Practices Continue Unabated

127. In early 2017, despite having knowledge of the USPS's complaints and investigations, the Board and management further ████████

████████████████████████████████████████

████████████████████████████████████████

████████████

128. As noted above, the USPS had taken specific and targeted action to avoid this type of abuse of the Reseller Program. Stamps.com's decision to offer discounted rates to current USPS customers was in direct violation of the Reseller

61

Exhibit11
265

STMP-SCA00007520

NSAs.  The USPS designed the Reseller NSAs to prohibit resellers from calling on current USPS customers—*i.e.*, to avoid cannibalization of USPS existing revenues.

129.    According to a former employee of Stamps.com (the "Former Employee"),[14] the USPS sales representatives provided the most lead generation for the Company.  The Former Employee stated that, in late 2016 or early 2017, the Company began a huge push to call on pre-existing USPS customers and move them into the Reseller Program.

130.



According to the Company's 2017 Annual Plan, presented to the Board in February 2017, the Board was told that:



---

[14] Prior to filing this action, Plaintiff's counsel conducted an investigation into the underlying facts pertaining to this action.  During that investigation, Plaintiff's counsel had numerous conversations with the Former Employee, who worked at Stamps.com's corporate headquarters.

Exhibit11
266

STMP-SCA00007521

131. Despite the USPS raising concerns about the Company's abuse of the Reseller Program, the Company did not stop the misconduct. Rather, the Former Employee stated that, in the second quarter of 2017, Stamps.com became even more aggressive with the Reseller Program.

132. Section 220 documents once again corroborate the Former Employee's account. At the February 14, 2017 Board meeting, at which Defendants Ananda, Habiger, Jones, McBride, Samuels, and Huebner were present, Mr. McBride led a discussion of management's proposed business plan for 2017. The 2017 Annual Business Plan outlines ████████████ ████████████████████

133. For instance, ████████████████████████ ████████ the 2017 Annual Plan explained that ████████ ████████████████████████████ ████████ Thus, the Company continued to actively promote Reseller rates to USPS customers, despite the USPS's objections.

134. Moreover, the Board was told about the Company's plans ████ ████████████. For instance, the Board reviewed an annual plan for ShippingEasy that stated ████████████████████ ████████████████ The slide presented to the Board follows:

63

Exhibit11
267

STMP-SCA00007522

███████████████████████████████████████████████████████████

135.   Further, the Board was told that ████████████████████

████████████████████████████ To illustrate the benefit of

rolling out Reseller rates, management provided the Board with ████████

██████████████████████████████████████████████████████████

████████████████████████ Thus, although the Board previously was

told that management ████████████████████████████████████████

████████████████████████████████ this time the Board was

told   that   █████████████████████████████████████████████

████████████████████ . The slide reviewed by the Board follows:

64

Exhibit11
268

STMP-SCA00007523

136. Finally, the Board was told that management had ██████████

████████████████████████████████████████████████████

According to the Board presentation, ██████████████████████

████████████████████████████████████████████████████

████████████████████    ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

137. The Board's review of the Company's plans to ██████████████

██████████████████████████ did not evidence any benefit for the USPS.

65

Exhibit11
269

STMP-SCA00007524

138.  Overall, the Board was told ██████████████████████

██████████████████████████████████████████████

████████.  The Board was told that ███████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████

139.  Incredibly, the Board then discussed ██████████████

██████████████████████████████████████████████

██████████████████████████████ Management recommended,

and the Board approved, ████████████████████████████████

██████████████████████████████████████████████

The Board-approved █████████████████████████ are summarized in the

slide below:

66

Exhibit11
270

STMP-SCA00007525



140.   Management's recommendation was intended to facilitate self-dealing.  As set forth in more detail in Section X, *infra*, ███████████████ ████████████████████████████████ each of Defendants McBride, Huebner, Clem, and Khechfe began dumping millions of dollars of Stamps.com stock into the open market, with other insiders following suit shortly thereafter. The Board's ████████████████████████████████ allowed these executives and directors to sell into the open market without disturbing the Company's stock price or lowering the Company's earnings per share metrics.

67

Exhibit11
271

STMP-SCA00007526

## B.    McBride Reassures Investors That The Business Model Is A "Win-Win"

141.    In an earnings call in February 2017, McBride continued to issue false

and misleading statements to investors, which the Board had previously discussed.

On February 23, 2017, McBride stated:

> With that, let me just mention about the USPS. They are always and have been always our most important partner. We have a common goal with the USPS which is growing package volume and serving and retaining USPS customers. We've made significant investments in creating, developing and growing the online mailing and shipping category since 1999.
>
> We've invested more than $1.5 billion from 1999 through 2016 in customer service and support, research and development, sales and marketing, technology, infrastructure, product development and other areas. And all that's gone into support of helping the USPS grow their business and retain their customers. We've had over 15 billion in cumulative postage printed through our solutions since we launched in 1999.
>
> USPS recently reported that they processed and delivered a record volume of packages during the 2016 holiday season and for the entire quarter. USPS stated when they reported their fiscal 2016 result last fall, they continue to win e-commerce customers, grow their package delivery business and they delivered more e-commerce packages to the home than any other shipper because of their application service, their enhanced visibility and competitive pricing. And we continue to enjoy a great partnership with the USPS. We feel that we've created a sustainable win-win model [for] both of us that will result in the continued growth of USPS packages.

68

Exhibit11
272

STMP-SCA00007527

142.   McBride failed, however, to disclose

 He created the impression that the Company created a "win-win"

business model, but he failed to disclose that

 Further, McBride failed to disclose that



 As discussed below, the directors and

143.   Following McBride's misstatements, on April 25, 2017, the Board

held a meeting at which Defendants Ananda, Jones, Habiger, Samuels, McBride,

Huebner, Carberry, and Lipson were present.  At that meeting,

officers would continue or begin to sell significant amounts of stock into the

markets following this meeting.

69

Exhibit11
273

STMP-SCA00007528

**C.    The USPS Lashes Out At Stamps.com Again and Begins the Process of Reforming the Reseller Program**

144.    While the Company executed on its abusive practices, the USPS began to take notice, and Company insiders were told that the Company's relationship with the USPS was falling apart.

145.    According to the Former Employee, no later than early 2017, "the USPS got pissed because they realized they were losing money on the Reseller Program with Stamps.com." The Former Employee noted that calling on existing USPS accounts for the Reseller Program was against the USPS NSAs.

146.    The Former Employee also explained that the USPS conveyed its disapproval of Stamps.com's business practices at the National Postal Conference, held on May 21-24, 2017. While the Former Employee did not know the exact nature of the discussion, he or she stated that certain executives attended the conference (including Chief Sales Officer Steve Rifai) and, upon their return from the conference, it became apparent that the USPS was angered by Stamps.com's abuse of the Reseller Program. The Former Employee indicated that by the second quarter of 2017, it was apparent that the contract with the USPS was not going to be a long term one because Stamps.com was abusing the Reseller Program.

147.    Thereafter, the Former Employee explained that he or she was tasked with conducting analyses to determine how much revenue Stamps.com was going

70

Exhibit11
274

STMP-SCA00007529

to lose as a result.  The Former Employee also attended in-person monthly revenue meetings (at the end of each month) held at the Company's corporate headquarters, where managers met with Candi Booth and Steve Rifai.  At those meetings, the Former Employee stated that the issues the USPS had with the Company's practices became a topic at most meetings after the second quarter of 2017.

148.   The Former Employee's recollection of the events is corroborated by statements made by McBride on the Company's earnings call held on May 3, 2017. In addition to the following statements being misleading or false, the following questions and answers imply that McBride had knowledge that changes to the Reseller Program were on the horizon:

**Kevin Liu**

Understood and is there anything that's changing in terms of kind of the economics of the relationships you have whether it's with the USPS or other partners that would prompt some conservatives on guidance or is it really just kind of the form you're going about guidance the same way you always have.

**Kenneth McBride**

*Yeah, there's nothing that points you specifically* and of course we wouldn't be disclosing specifics of the partnerships, but it's just the same approach we've taken in years past and *we don't really expect any **material** changes to any kind of the underlying economics or the revenue share agreements that we have.*

71

Exhibit11
275

STMP-SCA00007530

149. McBride's statements seem to imply that the Company was aware of some changes to the Reseller Program. In hindsight, there is no other reason why McBride would qualify his expectation with the term "material."

150. Further, the Former Employee's statements are corroborated by a blog post written in September 2017 relating to the National Postal Conference. In that post, Gordon Glazer, an industry expert, states:

> In April of this year [2017], rumors were flying around amongst postal industry insiders regarding major changes to the Reseller program; that a letter was "on the way" to the 3 licensed Reseller holders that would further define the use and administration of the programs. While no letters ostensibly arrived, rumors further circulated that all would be revealed by the National Postal Forum in May 2017. While there were reported closed-door meetings with senior USPS officials and the Resellers, no written guidance was released or revealed publicly.

151. █████████████████████████████████

152. In August 2017, Stamps.com received a letter from its reseller partner, Parcel Partners, which disclosed the USPS's position and new restrictions designed to reign in abuse of the Reseller Program. Parcel Partners' letter stated as follows:

> The time has come, we knew the USPS Reseller Model would be changing, that is why we provided you with as

72

Exhibit11
276

STMP-SCA00007531

much insight as we had into the changes last April.  The Post Office has decided to initiate the changes now (see attachment).  ***The letter has some significant changes but nothing that has not already been discussed.  We knew they were concerned with short pay and Resellers not having direct relationships with shippers.***  They have structured the program in a way to accomplish both.  The direct relationship will allow us to assist more actively on abusers of short pays.  The USPS has always seen the Shipper to be the customer of whoever's contract they are shipping on . . . .

These changes have brought us at a crossroads.  We can partner together or you can find another option . . .

Alternatively, if our partnership were to part ways the exposure is decreased referral fees and competition from competitors with more capital.  The recent USPS changes have changed the landscape.  These changes position the PC Postage providers in different position.  We can continue to partner together to protect the customers base and continue to grow or you can venture on your own.  Should you choose to continue our partnership, we will need your assistance to help us collect the additional data required of shippers "Third Party" data.

153.  Gordon Glazer noted in September 2017 that the changes to the Reseller Program would "require a herculean effort to collect the required client information and prior usage history for each user."

154.  Although the Company has not produced emails regarding the existence of the USPS letter sent to Resellers, the events described above call into question McBride's statements made on the Company's May 3, 2017 earnings call, which were never corrected, where he stated as follows:

73

Exhibit11
277

STMP-SCA00007532

**Darren Aftahi**

Got it and then just one more, we've heard some chatter that the USPS is kind of let around the participants in the reseller program with some potential changes. I'm just wondering if you have any commentary around that and whether Stamps kind of received that letter. Thanks

**Kenneth McBride**

There was no letter. The rumor is false. I mean think I tried to point out some of the broad global understanding of what the USPS and the partnerships they've done and the revenue share they've offered out to us in the reseller and the e-commerce industry in general. I think that one of the key things to focus on is, are they being successful or not and therefore are they going to make changes or not. And when you look at the big numbers, I mentioned they're growing at 16% last year. They're outgrowing the industry by 2X and so USPS is having a ton of success in e-commerce particularly and so in their shoes you got to ask yourself would you make a major change when you're growing twice the industry rate. *The[y] are very happy with how things have gone.* The revenue shares they've offered to the industry to e-commerce have generated a lot of activity focused on them. They're winning the e-commerce marketplace and they're being very successful doing it. *USPS is very happy with the approach they've taken in business model and they're very happy with the relationship with Stamps.com. We talk to them constantly, to the more senior folks there, so we're happy and they're happy.* The letter information has been propagated we believe is part of the strategy with our stock, so it's not true.

74

Exhibit11
278

STMP-SCA00007533

**D.     Despite Clear Warnings, The Board Continues to Oversee and Endorse the Company's Abusive Business Practices**

155.    On July 25, 2017, the Board held a meeting at which Defendants Ananda, Habiger, Jones, Samuels, McBride, Huebner, and Lipson were present. At the meeting, Defendant McBride presented an overview of the Company's business, including second quarter financial results and business operations results.

156.    The Board was told that ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ The Board was shown the following slide:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

75

Exhibit11
279

STMP-SCA00007534

157. Then, on October 24, 2017, the Board held another meeting at which Defendants Ananda, Habiger, Jones, Samuels, McBride, Huebner, Carberry and Lipson were present. ██████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████. The Board was shown the following slide:



76

Exhibit11
280                                                                STMP-SCA00007535

**E.    The Board Receives** ███████████████████████ **, But Does Nothing to Correct Prior Misstatements or Stop the Continued Abuse At the Company**

158.    On February 16, 2018, the Board held a meeting █████████

████████████████████████████████████████

████████    At the meeting, Mr. McBride presented the Company's proposed business plan for 2018, which the Board reviewed and endorsed.  Mr. McBride explained to the Board that ████████████████████████████████.″  In the Company's 2018 Annual Plan, Mr. McBride provided a more detailed explanation, stating as follows:



*ility to migrate customers between reseller rate cards.*

159.    McBride also disclosed to the Board ██████████████



Mr. McBride stated as follows:



Exhibit11
281

STMP-SCA00007536



160. Further, McBride explained that in

161. At that same meeting, the Board analyzed

162. Additionally,

. Mr. Cochrane would later open Cochrane Strategic Advisors, providing advice to companies and agencies on e-Commerce strategies. Mr. Rucker would subsequently announce his joining Pitney Bowes, a competitor of Stamps.com, as Vice President of Business Development.

78

Exhibit11
282

STMP-SCA00007537

163.  On April 25, 2018, the Board held a meeting at which Defendants Ananda, Habiger, Jones, McBride, Samuels, Huebner, Carberry, and Lipson were present.  At that meeting, Defendant McBride gave a presentation concerning the Company's financial performance and business strategies. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

164.  The relevant slide shown to the Board follow:



79

Exhibit11
283

STMP-SCA00007538



165.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████    ██████

████████████████████████████████████

████████████████████████████████████

███████████████    noting that    █████████████

████████████████████████████████████

██████████    Importantly, the Board    ████████████

████████████████████████████████████

████████████    All the while, directors and executives continued to dump millions of dollars of stock into the open market at inflated values.

**VI.**

166.    Following years of failed attempts to reign in the Reseller abuse, the USPS took direct action to cut off the Company's abusive business practices. To that end, on June 7, 2018, Dennis Nicoski, acting Senior Vice President of Sales and Customer Relations for the USPS, gave a presentation to Nicholas Barranca,

80

Exhibit11
284

STMP-SCA00007539

Vice President of Government Relations for Stamps.com, entitled "Stamps.com Successor Incentive Agreement." The presentation spelled out ████████

████████████████████████████████████████████████

████████████████████████████

167. Specifically, the presentation ████████ ██████████ ██ █

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[15] Clearly, the USPS found that the Company's business model had ████████████████████████████████

████████████████████████████████████████████████

████████████ As such, the USPS listed a series of objectives ████████████

█ ████████ █ ████████ ██ ████████ ████████ █ ████████

████████████████████████████████████



168. That same day, Barranca sent an email to Nicoski asking, "Do you have a digital version of today's presentation that *I can share with the West*

---

[15] The USPS's statement that ████████████████████████ ████████████ calls into question statements made by Defendant McBride on the Company's July 28, 2016 earnings call. During that call, McBride stated, "In our view, the USPS management has a very thorough knowledge of the reseller market and the USPS management is very deliberate in the steps it has taken in the market; they audit data, they hold regular business reviews with all of the resellers."

Exhibit11
285

STMP-SCA00007540

*Coast*?"[16]  In response, on June 10, 2018, Nicoski emailed Barranca a copy of the USPS presentation. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ .

169.  ███████████████████████████████████████

██████████████████████████████  ████████████████████████

██████████████  █  ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████

170.  ███████████████████████████████████████

██████████████████████████████████ . The ████████████████

was material to the Company's business strategy and revenues.  The Company has not produced email communications showing that the Board received access to the ███████████████████████████████ at this time.  However, the Board would subsequently discuss ███████████████████████████████████████

---

[16] The Company's Headquarters are located in El Segundo, California.

Exhibit11
286

STMP-SCA00007541



83

Exhibit11
287                                                                        STMP-SCA00007542



174. Then, on July 23, 2018, the Office of Inspector General issued a confidential report entitled, "Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business." The report is not public, ███████ ████████████████████████████ it is reasonable to infer that the USPS was moving to curtail the Company's abuse of the Reseller Program.

175. Following ███████████████████, the Board had an affirmative duty to disclose ███████████ in the Company's next periodic report, especially if the Company planned to continue repurchasing its common stock on open markets. But the Board opted not to disclose the full truth.

176. To that end, on July 25, 2018, the Board held a meeting at which Defendants Ananda, Habiger, Jones, McBride, Samuels, Huebner, Carberry, and Lipson were present. At that meeting, Mr. McBride gave a presentation concerning ████████████████████████████

████████████████████████████████

████████████████████████████████

---

[17] ████████████████████████████████████████████████████████

84

Exhibit11
288

STMP-SCA00007543



177. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████ ██ █ ████ ████ ██ ██ ██ █

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ The effect of

failing to fully and accurately disclose ███████████████ rendered the

Company's stock price inflated, especially because the Board and senior

executives knew that ████████████████████████████

████████████████████. As discussed below, the ███████████

██████████████████████ was such a material fact that *its*

*eventual disclosure caused the Company's stock price to immediately fall by*

*58%.*

178. Following the Board meeting, the Audit Committee held a meeting

that same day ████████████████████████████████

████████████████████ At the meeting, ██████████

85

Exhibit11
289                                                                                     STMP-SCA00007544

██████████████████████████████████████████████

████████████████████████████████████████. The

Company did not produce the precise document that the Audit Committee

reviewed at this meeting, despite being asked to produce this information in

response to the Demand. However, within the next few days, the Company would

issue its quarterly report.

179. On August 1, 2018, the Company issued its Q2 2018 results ████

████████████████████████████.

180. On the following earnings call, held on August 1, 2018, Defendant

McBride continued to falsely portray to the investing public that the USPS viewed

the Reseller Program positively and that the Company's long-term partnership with

the USPS was on solid footing, stating:

**Kevin Liu**

Got it. That's helpful. Switching gears a little bit with the
Trump Task Force on the USPS ... Was wondering if you
guys participated in any sort of conversations with the
Task Force and if so is there anything you wouldn't
heard from either those conversations or maybe the
USPS OIGs report last month on kind of the postal
partner ecosystem that would suggest any significant
changes are coming?

**Ken McBride**

Yes, so the Task Force was formed and it's doing lots of
interviews with all the various constituents out there. We
have spoken to the members of the Task Force several

86

Exhibit11
290

STMP-SCA00007545

times the final report is expected to be issued August 10. We don't know th[e] specific[s] in their report, but you know when you think that based on our conversations the report will you know come out strongly in favor of partnerships between the USPS and private industry like the partnerships we've had with the USPS. So we'll be interested to see what comes out on the report on August 10.

181.   For the first time, on August 8, 2018, the Company issued a Form 10-Q that included a disclosure regarding ████████████████████████

███████████. The disclosure was fraudulent and misleading. Buried in a list of

ten (10) risk disclosures, the Board and senior executives disclosed the following:

*The USPS could modify, discontinue or terminate agreements and other financial compensation arrangements, which would have an adverse effect on our revenues and operating results.*

The USPS could decide to amend, renegotiate, discontinue or terminate one or more of our financial compensation arrangements that exist now or in the future. If the USPS decides to amend, renegotiate, discontinue or terminate any of our agreements or our integration partners' agreements under which we are compensated directly or indirectly by the USPS or integration partners for shipping customers who print a certain amount of postage, or our credit card cost sharing agreements which govern the allocation of credit card fees paid by the USPS and us, then our revenue and operating results would suffer. *In the history of our relationship with the USPS, we have had many of these important agreements renewed only on short-term extensions and without assurances of any long-term commitments by the USPS.* During the previous calendar quarter, the USPS provided *a notice requiring the*

87

Exhibit11
291

STMP-SCA00007546

*renegotiation of one of our important financial compensation arrangements. While we believe that this agreement is mutually beneficial to the USPS and to us*, there is a risk that renegotiation is unsuccessful and leads to materially less favorable terms *or that the USPS decides to not renew one or more of these financial compensation arrangements*. In such case, our revenue and operating results will be materially affected unless we are successful in timely replacing the lost revenue with similar compensation from other potential partners.

182.  The disclosure was (and remains) completely false and misleading. According to the Section 220 production, the Company had received a number of short-term renewals of the USPS Commission Agreements in years prior. ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████ in response to the Section 220 demand before stating that the production was "a complete response" to Plaintiff's demand.

183.  However, on August 28, 2019, nine days after City of Cambridge Retirement System filed its initial complaint and 28 days after Company counsel affirmatively stated that the Company had produced all documents in response to Plaintiff's Section 220 demand, Company counsel produced ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

88

Exhibit11
292

STMP-SCA00007547

Defendants have produced this letter likely in an attempt to show that the ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

(*See* ¶187).  Simply put, the USPS's position ████████████████████████████

████████████████████████████.[18]

184.  Moreover, the August 2018 10-Q disclosure is misleading because███

████████████████████████████████████████████████████████████

██████████████████████████████  Nowhere does the disclosure state that ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.  Similarly,

the disclosure is misleading because it ███████████████████████████████

---

[18]In any event, the Court should infer that the belated production reflects Defendants' best efforts to exculpate themselves, *i.e.*, no documents exist that even conceivably refute any other allegation in the complaint, and if anything, Defendants are withholding inculpatory documents.

89

Exhibit11
293

STMP-SCA00007548



185.    Finally, the August 2018 10-Q disclosure failed to explain that, ▮

**VII.**    ▮

186.    In the following months, the USPS began to request diligence from Stamps.com to determine ▮ ▮. The data requests show ▮ ▮. As noted above, the Board had ▮

187.    On August 28, 2018, Mr. Nicoski sent Messrs. Barranca and Rifai a list of questions in advance of a call to be held on August 30, 2018. According to Mr. Nicoski, the purpose of the list of questions was to "provide some background on the items we'd like to address during the discussion." While the Company did

90

Exhibit11
294

STMP-SCA00007549

not produce any contemporaneous notes from the meeting, the list of questions

provides ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. The following diligence questions

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████:





188. The Board subsequently ███████████████████████████

███████████████ At that meeting, held October 24, 2018, at which Defendants

Exhibit11
295
STMP-SCA00007550

Ananda, Habiger, Jones, McBride, Samuels, Huebner, Carberry, and Lipson were present, McBride presented on ████████████████████ ████████████" During the ████████," Mr. Bride provided ████████████ ████████████████████████████ Although the relevant slide does not include any further information, McBride's presentation most likely included ████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

189.  Incredibly, at that same meeting, the Board ████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████ Following approval, the Company would execute tens of millions of dollars' worth of stock repurchases from November 2018 to March 2019.

190.  The Board's cursory analysis for approving additional share repurchases was done in bad faith, was not a valid exercise of business judgment,

92

Exhibit11
296

STMP-SCA00007551

and represents corporate waste.

[19]

191. On October 31, 2018, the Company held its 2018 third quarter earnings call. During that call, McBride continued to misrepresent the Company's deteriorating relationship with the USPS. ████████████████████

████████████████████████████,

Defendant McBride engaged in the following question and answer without any truthful disclosure of the Company's ongoing, contentious negotiations with the USPS:

---

[19] It is not as if the Board was ████████████████████

████████████████████.

Exhibit11
297

STMP-SCA00007552

**George Sutton**

Thank you, and I appreciate all the updates. So I'm curious with respect to the OIG and the task force review, generically our belief has been that the value will increasingly be moving to generators of new customers and incremental revenues, which in our view would be a benefit to the model that you have now. I'm curious, if you can comment on that. Is it your belief that the summation of all of these different reports could end up leading to more value for you versus less that I think most people would assume?

**Ken McBride**

Yes. No, *I think that's an accurate assumption*. I think when we look at the various reports that are out there, the conversations we've had with folks that are working on these reports, *the general view is the idea of USPS increasingly embracing partnerships like ours*, it makes a ton of sense for them. I think we mentioned the full blown privatization isn't really something that we see as likely, but I think more and more partnerships with private companies that allowed them to more embrace the pseudo privatization, if you will. It has been something that we seem to be the task force and other members of the community in the USPS world had been focused on.

192.    In sum, Defendant McBride affirmatively stated to investors that the

Company expected any changes to the Reseller Program to *positively impact the*

*Company*. This is simply not true. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

94

Exhibit 11
298

STMP-SCA00007553

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████. By agreeing with the assumption that the Company would see improved value from the USPS negotiation and due diligence process, a clear directive given by OIG and the Trump Task Force, Defendant McBride continued to lie about the true nature of the Company's ongoing, contentious negotiations with the USPS, as evidenced by the Section 220 documents.

193.    Further, during that same call, market analysts for the first time had a chance to question Defendants about the misleading disclosure in the Company's August 2018 10-Q regarding the Company's ongoing negotiations with the USPS. In response to that question, Defendant Huebner resorted to obfuscation and misrepresentations rather than honest commentary:

**George Sutton**

Okay, great. Lastly a lot of questions came up obviously when you add a new disclosure in your last 10-Q. I wonder if you could just address the logic for having that now and will we get updates regularly when there are additional programs or conclusions to those negotiations? Thanks.

**Kyle Huebner**

I think that in general, like I mentioned in the prepared remarks that these types of agreements, these types of negotiations are very common for us. We've had over the span of 20 years we've had dozens of these types of negotiations. I think it's simply, ***this time is just an***

95

Exhibit11
299

STMP-SCA00007554

*example of us deciding to provide some additional insight into the negotiations.* As I mentioned earlier, the negotiation with the USPS [may] take many, many months to finalize. And so, the USPS obviously has a lot on their plate, there's a lot of things going on in the USPS world. So, we're working with them closely on the negotiation, but it's just going to take some time. So I think we just felt like in terms of the 10-Q that making that update was appropriate at this time.

194. Defendant Huebner failed to disclose that the reason the Company actually informed investors of the renegotiation (albeit untruthfully) is because the Company knew ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

195. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████. Although the exact substance of the discussions was not made available to Plaintiff's counsel, a subsequent presentation from the USPS lays out in detail what was likely discussed at this meeting.

96

Exhibit11
300



196. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

197. *First*, the USPS provided an overview of Stamps.com's recent

acquisitions ████████████████████████████████

████████████████████████████████████.



198. *Second*, the USPS noted that Stamps.com had witnessed a substantial

increase in incentive fee revenue, while simultaneously capturing revenues from

NSA (Reseller) contracts.

97

Exhibit11
301

STMP-SCA00007556



98

Exhibit11
302                                                                          STMP-SCA00007557



199.  **Third**, the USPS reiterated what the Board and senior executives had

known since December 2016: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Exhibit11

303                                                          STMP-SCA00007558



200. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.

100

Exhibit11
304

STMP-SCA00007559



201.  **Finally**, the USPS outlined ██████████████████████████████████ ████████████████████████████ The presentation explicitly references ████████ ███████████████████████████████ Among other things, the presentation states: █████████████████████████████████

████████████████████████████████████

████████████

202.  ████████████████████████████████████

████████████████████████████████████

101

Exhibit11
305                                            STMP-SCA00007560



203.   Further, for nearly three years,  the Board: ▮▮▮▮▮▮▮▮▮

Exhibit11
306

STMP-SCA00007561

**VIII.**

204. ██████████████████████████████████████████████

███████████████████████████████████████████████

███████ .

205.   On December 11, 2018, Defendant McBride sent an email to Megan

Brennan, the Postmaster General of the USPS, asking ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████   McBride made clear that the Company

wanted to ██████████████████████████████████████████

███████████████████████████████████████████

206.   Thereafter, on December 12, 2018, Megan Brennan replied to

Defendant McBride stating as follows:



Exhibit11
307

STMP-SCA00007562



207.    On December 19, 2018, Defendant McBride sent the following email

to Megan Brennan, the USPS Post Master General:



Exhibit11
308

STMP-SCA00007563

208. On December 20, 2018, Brennan responded to McBride's email with



209. On December 21, 2018, McBride responded to Brennan once again

stating ███████████████████████████████████████. McBride invited

Brennan to have a call to discuss the negotiations via phone, which happened on

December 24, 2018.

105

Exhibit11
309

STMP-SCA00007564

210. Thereafter, McBride forwarded the email chain to Defendants Jones, Ananda, Habiger and Samuels.[20]



211. Unsurprisingly, Defendant Jones responded as follows:



212.

---

[20] In the initial email, McBride forgot to add Habiger to the email chain. He immediately sent a second email with identical information to the same group adding Defendant Habiger to the email chain.

106

Exhibit11
310

STMP-SCA00007565

213. ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐ What became clear when the Company ultimately disclosed the cancellation of the contract in February 2019 was that the Board members realized they needed a defensible excuse to attempt to avoid liability for the massive breach of trust and insider selling carried out by the Board and the Officer Defendants.

214. On December 21, 2018, the Board held a meeting at which Defendants Ananda, Habiger, Jones, Samuels, McBride, Carberry, and Lipson were present. At that meeting, for the first time, the Board received ▐▐▐▐

107

Exhibit11
311

STMP-SCA00007566

215.    The December 21, 2018 Board meeting is evidence of the Board's bad faith actions relating to the Company's abuse of the Reseller Program, insider sales, and continued expansion and maintenance of the Company's stock repurchase program. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

## IX.    **THE BOARD** ████████████████████████████████
████████████████████████████████████████████
████████████

216.    On February 15, 2019, the Board held a meeting at which Defendants Ananda, Jones, Samuels, McBride, Carberry, Clem, and Lipson were present.  In discussing the Company's share repurchase program, the Board was told that

████████████████████████████████████████████████████████

████████████    The Board then approved a new share repurchase plan after reviewing the following slide:

Exhibit11
312

STMP-SCA00007567



217.   As an initial matter, the Board approved a share repurchase program

It is clear that the Board understood that the Company's stock price would decline precipitously as a result of disclosing the cancellation of the Company's USPS Commission Agreements.

109

Exhibit11
313

STMP-SCA00007568

218. The Board's approval of the share repurchase plan was made in bad faith and was not a valid exercise of business judgment. The Board knew that ▮



219. Further, the Board also discussed ▮

▮ Thereafter, on February 21, 2019, Stamps.com held its earnings call where McBride disclosed the bad news (with his own spin) to the market:

> As everyone knows, we've been in discussions with the USPS about a renewal of our long-standing revenue share agreement that we utilized to drive their shipping business. We have proposed our terms of renewal to the USPS. One of our nonnegotiable items is that within our significant single carrier efforts offered under the brand name Stamps.com and Endicia, offered by our large national sale team, we will no longer be exclusive to the USPS. And that's non-negotiable.
>
> USPS has not agreed to accept these terms or any other terms of our partnership proposal. So, at this point we decided to discontinue our shipping partnership with the USPS so that we can fully embrace partnerships with other carriers who we think will be well positioned to win in a shipping business in the next five years.

110

Exhibit11
314

STMP-SCA00007569

And we now plan to turn our significant assets such as our technology and product development, our salesforce, our significant marketing budget and our marketing organization towards the focus on partnerships with the carriers that will help our customers succeed over the next five years. We're going to align ourselves with the carriers that we think are going to be the winners in the shipping business.

We will continue to bring USPS products to our customers where it makes sense but in many segments of the business we will start bringing in the more competitive products from other carriers. We are currently in discussions or already have partnerships with all of the major incumbent private carriers and we're also in discussion with many of the new entrants into the U.S. shipping business.

Note that our decision to discontinue our exclusive partnership with the USPS does not in any way impact our regulatory relationship with them or the products and services we are able to offer our customers. The USPS regulatory group is governed in a separate part of the organization. We will continue to work constructively with them and we will comply with all their requirements as we always have.

220. McBride's commentary on the reasons for the cancellation of the

USPS Commission Agreements was false. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ The USPS repeatedly explained to management that the

Exhibit11
315

STMP-SCA00007570

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████. This is simply not what McBride stated and his deceit is further evidence that the Board knew what it had done was wrongful.[21]

221. On the news of the cancellation of the USPS Commission Agreement, Stamps.com's stock fell *58%* from 198.08 to $83.65. The market reaction alone shows that even if the Board voluntarily decided to cancel the USPS Commission Agreement, that decision could not be the result of valid exercise of business judgment.

222. ████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████.

223. After the call, McBride sent around the earnings call transcript to the full Board. In the email, McBride stated, ███████████████████████████████

███████████████████████████████████████████████████████

---

[21] Importantly, McBride's statements about aligning the Company with other carriers must be read in context of the ██████████████████████████████████ ███████████████████████████████████████████████████████.

112

Exhibit11
316

STMP-SCA00007571



[BLACK BAR]    The right focus, actually, was telling the truth.

224.    Thereafter, Stamps.com held another earnings call on May 8, 2019. On that call, McBride disclosed for the first time that the Company was aware that the USPS was in negotiations with the Resellers, which such negotiations would likely lead to lower economics for all parties involved with the Reseller Program. When asked pointedly by an analyst when McBride knew of the USPS negotiations with the Resellers or potential changes to the Reseller Program, McBride responded as follows:

> **Q - Zach Cummins**
>
> Hi, good afternoon. I guess, just starting off, when did you *really* become aware of the potential changes to the reseller arrangements?
>
> **Ken McBride**
>
> It was just very recently.

225.    This question presupposes that McBride was not forthcoming. [BLACK BAR]

[BLACK BAR]

[BLACK BAR]

113

Exhibit11
317

STMP-SCA00007572



226. Following the May 2019 earnings call, the Company's stock plummeted once again, falling 55.8% from $83.39 to $36.90.

227. All told, from January 2014 to May 2019, the Company's stock traded in a Mt. Everest formation, as follows:



114

Exhibit11
318

STMP-SCA00007573

## X.  DURING THE EVENTS DESCRIBED ABOVE, THE BOARD INEXPLICABLY APPROVES HUNDREDS OF MILLIONS OF DOLLARS OF STOCK REPURCHASES, WHILE INSIDERS WITH KNOWLEDGE SELL

228.  As described in detail above, the Director and Officer Defendants knew that ███████████████████████████████████████████ ██████████████████████████████████████████. During that time, certain Director Defendants and all of the Officer Defendants engaged in massive insider trading to profit personally from the Board-approved unsustainable business model.  In total, Stamps.com insiders dumped over a million shares of stock for proceeds of over $190 million.

229.  In order to sell the vast majority of their shares at inflated prices, the Board approved a massive expansion and continued maintenance of the Company's share buyback plan, totaling $327 million in repurchases during the same time period.  The reason for the share buyback plan is simple.  By having the Company commit to purchase its own stock, the insiders could sell their stock at a profit without driving down the Company's stock price and while ensuring that proper volume existed in the markets to absorb the shares sold.

### A.  The Board Approved Massive Buybacks In Violation of Their Fiduciary Duties

230.  While the Board implemented and oversaw the Company's cannibalization of USPS revenues, and with knowledge that the business practice

115

Exhibit11
319

STMP-SCA00007574

was unsustainable, between June 2016 and December 2018, the Board approved

the repurchase of Company stock pursuant to a stock repurchase plan on six

separate occasions.

- On July 27, 2016, the Board approved new stock repurchase plan authorizing the Company to repurchase up to $40 million of common stock during the next six months.

- On October 25, 2016, the Board approved new stock repurchase plan, which became effective November 7, 2016, authorizing the Company to repurchase up to $90 million of common stock during the next six months.

- On April 24, 2017, the Board approved new stock repurchase plan, which took effect upon expiration of the plan in place on May 8, 2017, authorizing the Company to repurchase up to $90 million of common stock over the six months following the effective date of the plan.

- On October 24, 2017, the Board approved new stock repurchase plan, which took effect upon expiration of the plan in place on November 10, 2017, authorizing the Company to repurchase up to $90 million of common stock over the six months following the effective date of the plan.

- On April 25, 2018, the Board approved new stock repurchase plan, which took effect upon expiration of the plan in place on May 11, 2018, authorizing the Company to repurchase up to $90 million of common stock over the six months following the effective date of the plan.

- On October 24, 2018, the Board approved new stock repurchase plan, which took effect upon expiration of the plan in place on November 11, 2018, authorizing the Company to repurchase up to $90 million of common stock over the six months following the effective date of the plan.

116

Exhibit11
320

STMP-SCA00007575

231.   As summarized below, as a result of the Board's actions, since June 2016, the Company has repurchased a total of **2,618,462 shares** of Stamps.com stock using a total of **$327,714,470.99** in corporate capital:

| Month | Total Shares Repurchased | Average Price | Aggregate Purchase Price |
|---|---|---|---|
| June 2016 | 131,135 | $89.61 | $11,751,007.35 |
| August 2016 | 103,427 | $87.23 | $9,021,937.21 |
| September 2016 | 89,903 | $93.14 | $8,373,565.42 |
| October 2016 | 86,455 | $93.59 | $8,091,323.45 |
| November 2016 | 118,782 | $105.93 | $12,582,577.26 |
| December 2016 | 110,999 | $112.39 | $12,475,177.61 |
| January 2017 | 101,161 | $118.61 | $11,998,706.21 |
| February 2017 | 91,557 | $127.78 | $11,699,153.46 |
| March 2017 | 163,124 | $123.76 | $20,188,229.24 |
| April 2017 | 156,566 | $109.19 | $17,095,441.54 |
| May 2017 | 163,195 | $116.81 | $19,062,807.95 |
| June 2017 | 54,000 | $145.44 | $7,853,760.00 |
| July 2017 | 46,300 | $147.35 | $6,822,305.00 |
| August 2017 | 23,400 | $196.06 | $4,587,804.00 |
| September 2017 | 19,000 | $199.77 | $3,795,630.00 |
| October 2017 | 19,300 | $219.34 | $4,233,262.00 |
| November 2017 | 65,800 | $176.54 | $11,616,332.00 |
| December 2017 | 84,100 | $175.78 | $14,783,098.00 |
| January 2018 | 42,300 | $193.56 | $8,187,588.00 |
| February 2018 | 40,290 | $188.62 | $7,599,499.80 |
| March 2018 | 37,600 | $197.57 | $7,428,632.00 |
| April 2018 | 21,700 | $211.97 | $4,599,749.00 |
| May 2018 | 17,300 | $244.34 | $4,227,082.00 |
| June 2018 | 15,100 | $263.76 | $3,982,776.00 |
| July 2018 | 14,700 | $270.07 | $3,970,029.00 |
| August 2018 | 18,500 | $244.69 | $4,526,765.00 |
| September 2018 | 16,000 | $234.36 | $3,749,760.00 |
| October 2018 | 73,761 | $202.41 | $14,929,964.01 |
| November 2018 | 223,619 | $163.18 | $36,490,148.42 |
| December 2018 | 233,927 | $158.70 | $37,124,214.90 |

117

Exhibit 11
321

STMP-SCA00007576

| January 2019 | 151,604 | $164.45 | $24,931,277.80 |
| February 2019 | N/A | N/A | N/A |
| March 2019 | 83,857 | $84.18 | $7,059,082.26 |
| **Total** | **2,618,462** | | **$327,714,470.99** |

232.  The Company's stock repurchase program was anything but typical. At the time of these approvals, the Board was aware that

That business plan sought to

" The Board knew at the time that

.

233.  In July 2016 and October 2016, the Board approved stock repurchase plans while knowing that the Company's revenue growth was unsustainable given the abusive practices.  Further, the Board knew that

Despite these warnings, the Board failed to adequately disclose the truth about the Company's reliance on abuse of the Reseller Program to generate revenue growth,

118

Exhibit11
322                                                              STMP-SCA00007577

234.    Following the false statements made by McBride, with approval of the Board, in response to market commentator reports, the Board approved ███ ████████████████████████████████████████████████████.    As discussed in the next section, the Board's approval coincided perfectly with the time period during which executives and directors would begin selling hundreds of millions of dollars in stock on the open market.  It is reasonable to infer that the Board's decision to accelerate and increase the stock repurchase program in April 2017 was done to provide sufficient volume for the executives and directors to sell their shares.

235.    Then, in April 2018, the Board approved another share repurchase program.  However, ██████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ the Company had received a letter from Parcel Partners regarding such reforms. Despite these warnings, the Board approved this repurchase plan after failing to correct the unsustainable business practices in the face of USPS complaints.

236.    Finally, and perhaps most egregiously, the Board approved the final share repurchase plan in October 2018.  The approval was done in bad faith and was not a valid exercise of business judgment because at the time the Board knew that ███████████████████████████████████████

119

Exhibit11
323

STMP-SCA00007578

. The Board, however,

failed to disclose ███████████████████████████. In fact, the ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

237.  As a result of ████████████████████████████████████

████████████████████████████████, had the Board not repurchased an

enormous amount of shares while in possession of material information regarding

the deterioration of the Company's business relationship with the USPS, the

Company would have saved approximately *$231,093,223*.

B.  **Insiders Dumped Hundreds of Millions of Dollars of Company Stock At Opportune Times, Avoiding Over A Hundred Million Dollars in Losses**

238.  Perhaps most importantly, the Board decided to approve, renew, and

escalate the Company's share repurchases at the exact time (and continuously

thereafter) that the Company's insiders started to sell off massive amounts of stock,

ultimately totaling approximately $190 million in insider sales.  Each of the

following Defendants engaged in insider trading and should be required to

disgorge their profits.

120

Exhibit11
324

STMP-SCA00007579

### 1.    Defendant Ananda

239.    Defendant Ananda made the following trades during the events described above:

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| June 16, 2017 | 15,200 | $142.10 | $2,159,920 |
| June 16, 2017 | 3,914 | $144.4464 | $565,363.21 |
| June 16, 2017 | 9,890 | $145.3112 | $1,437,127.77 |
| June 16, 2017 | 4,410 | $146.3268 | $645,301.19 |
| June 16, 2017 | 6,586 | $147.0841 | $968,695.88 |
| August 11, 2017 | 19,358 | $207.2965 | $4,012,845.65 |
| August 11, 2017 | 6,073 | $208.2036 | $1,264,420.46 |
| August 11, 2017 | 2,694 | $209.4694 | $564,310.56 |
| August 11, 2017 | 1,875 | $210.45 | $394,593.75 |
| August 14, 2017 | 3,948 | $211.1034 | $833,436.22 |
| August 14, 2017 | 4,639 | $211.7088 | $982,117.12 |
| August 14, 2017 | 1,275 | $212.6714 | $271,156.04 |
| August 14, 2017 | 138 | $213.4928 | $29,462.01 |
| February 26, 2018 | 1,000 | $203.18 | $203,180.00 |
| June 12, 2018 | 20,000 | $270.0003 | $5,400,006.00 |
| March 6, 2019 | 1,000 | $93.3223 | $93,322.30 |
| **Totals** | **102,000** | | **$19,525,258.16** |

240.    Defendant Ananda's trades are suspiciously timed for the following reasons.  As an initial matter, Ananda was on the Board in 2014 and approved the Company's business plan to ███████████████████████████████ ███████████████████████████████ Ananda also identified █ ███████████████████████████████ ███████████████████████████████ ██████████████

121

Exhibit11
325

STMP-SCA00007580

241.   Prior to June 16, 2017, Ananda had not sold any of his Stamps.com stock.  The Company did not produce a trading plan for Ananda's trades in June 2017.  Those trades, however, are suspicious because they coincided with ███ ███████████████████████████████████████████████████████ ██████████████████████████████████████████████.  Ananda knew that the Board ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████ Ananda also knew that ███████████████████ ████████████████████████████████████.

242.   For his trades starting in August 2017, Defendant Ananda previously disclosed in several Form 4s filed with the SEC that his trades on August 11 and 14, 2017, where made pursuant to a 10b5-1 trading plan.  However, on August 23, 2019, a few days after Plaintiff filed its initial complaint, the Company filed amended Form 4s admitting that, "As originally filed, footnote 1 of this Form 4 *mistakenly* stated that sales were 'executed pursuant to a prearranged trading plan complaint with Rule 10b5-1.'  In fact, the sales were not made pursuant to such a trading plan."

243.   The Company's change to Defendant Ananda's Form 4s came in response to the allegations in Plaintiff's initial complaint.  As noted, the trades on August 11 and 14, 2017, predated Defendant Ananda's trading plan entered into on

122

Exhibit11
326

STMP-SCA00007581

August 16, 2017. The "mistake" in earlier filed Form 4s further supports a finding that Defendant Ananda's trading (and disclosure thereof) was suspicious.

244. Further, Defendant Ananda's trading plans themselves do not alter the fact that he engaged in insider trading. Specifically, Defendant Ananda entered into two 10b5-1 trading plans at or around the time he had access to material, nonpublic information. *First*, on August 16, 2017, Ananda entered into a trading plan. At that time, Ananda was aware that ███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████. Ananda knew that the Company continued to abuse the Reseller Program ███████████████ ███████████████████████████. Importantly, the trading plan was entered into ███████████████████████████████████ ███████████████████████████. As such, Ananda's trades pursuant to the trading plan were made while he was in possession of material, nonpublic information.

245. *Second*, Ananda entered into a second trading plan on November 5, 2018. The timing of entry into Ananda's second plan is suspicious given that at that time the Company ████████████████████████████ ███████████████████████████████████████████

123

Exhibit11
327

STMP-SCA00007582

████████████████████████ Further, Ananda likely became aware of the USPS

management changes that were on the horizon, ████████████████████

████████████████████████████████████████████████████

████████████████████.

### 2.    Defendant Jones

246.    Defendant Jones made the following trades during the events

described above:

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| August 7, 2017 | 2,800 | $204.6687 | $573,072.36 |
| August 7, 2017 | 6,880 | $205.3978 | $1,413,136.86 |
| August 7, 2017 | 3,820 | $206.4837 | $788,767.73 |
| August 7, 2017 | 6,500 | $207.4488 | $1,348,417.20 |
| August 7, 2017 | 7,000 | $216.0264 | $1,512,184.80 |
| June 1, 2018 | 4,700 | $260.2431 | $1,223,142.57 |
| June 1, 2018 | 5,300 | $261.4118 | $1,385,482.54 |
| **Totals** | **37,000** | | **$8,244,204.06** |

247.    Defendant Jones's trades are suspiciously timed for the following

reasons. Jones did not trade any stock pursuant to 10b5-1 trading plans. During

the time period above, Jones sold nearly 30% of his stock holdings while in

possession of material, nonpublic information.

248.    As an initial matter, Jones was on the Board in 2014 and approved the

Company's business plan to ████████████████████████████

████████████████████████████████████ At that time, as a Board

member, Jones also identified that the Company's ████████████████

124

Exhibit11
328

STMP-SCA00007583



249. The timing of Jones's trades (like Defendant Ananda's) in August 2017 and June 2018 coincide with the Board's knowledge of █████████████. Jones also knew that ██████. Further, Jones made trades following changes to USPS management, ████████████████████████████.

### 3.    Defendant McBride

250. Defendant McBride made the following trades during the events described above:

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| March 8, 2017 | 23,830 | $127.1873 | $3,030,873.36 |
| March 8, 2017 | 6,170 | $127.7576 | $788,264.39 |
| March 10, 2017 | 4,000 | $129.4431 | $517,772.40 |
| March 10, 2017 | 10,420 | $129.9538 | $1,354,118.60 |
| March 10, 2017 | 25,580 | $130.4757 | $3,337,568.41 |
| March 16, 2017 | 1,800 | $131.2639 | $236,275.02 |
| March 16, 2017 | 2,573 | $131.8413 | $339,227.67 |
| March 16, 2017 | 627 | $132.8829 | $83,317.58 |
| April 17, 2017 | 1,477 | $105.0505 | $155,159.59 |
| April 17, 2017 | 6,752 | $106.2162 | $717,171.78 |

125

Exhibit11
329

STMP-SCA00007584

| | | | |
|---|---|---|---|
| April 17, 2017 | 1,771 | $106.7378 | $189,032.64 |
| November 27, 2017 | 141,733 | $180.0145 | $25,513,995.13 |
| November 28, 2017 | 400 | $180.5938 | $72,237.52 |
| December 18, 2017 | 400 | $180.00 | $72,000.00 |
| December 18, 2017 | 2,088 | $181.542 | $379,059.70 |
| December 18, 2017 | 3,012 | $182.4778 | $549,623.13 |
| December 18, 2017 | 2,443 | $183.5184 | $448,335.45 |
| December 18, 2017 | 172 | $184.10 | $31,665.20 |
| March 2, 2018 | 6,362 | $200.0143 | $1,272,490.98 |
| March 7, 2018 | 9,254 | $200.1382 | $1,852,078.90 |
| March 7, 2018 | 127 | $201.35 | $25,571.45 |
| March 7, 2018 | 100 | $201.45 | $20,145.00 |
| March 8, 2018 | 4,528 | $200.2158 | $906,577.14 |
| March 8, 2018 | 5,500 | $201.6355 | $1,108,995.25 |
| March 8, 2018 | 409 | $202.2711 | $82,728.88 |
| March 9, 2018 | 700 | $200.2107 | $140,147.49 |
| March 9, 2018 | 5,236 | $203.1255 | $1,063,565.12 |
| March 9, 2018 | 2,603 | $204.1012 | $531,275.42 |
| March 9, 2018 | 2,704 | $205.1823 | $554,812.94 |
| March 9, 2018 | 2,814 | $205.9923 | $579,662.33 |
| **Totals** | **275,585** | | **$45,953,748.00** |

251.   Defendant McBride's trades are suspiciously timed for the following reasons.  Although Defendant McBride had executed some trades prior to January 2014, after the Board approved ▮▮▮▮▮▮, Defendant McBride did not execute any trades until March 2017.

252.   At the time of the first trade in March 2017, McBride held 43,693 shares of Company stock and 320,585 stock options referencing the Company's stock.   By the end of the trading above, McBride had exercised all but approximately 61,662 of his vested stock options.  At the same time, McBride sold

126

Exhibit11
330

STMP-SCA00007585

all but 2,030 shares held in Stamps.com stock.  McBride's exercise and sale of nearly his entire alienable position in the Company's stock is suspicious, but also shows he had no "skin in the game," ████████████████████████████████

████████████████████████████████████████████████████

███████████.

253.  Of course, as a member of the Board in 2014, McBride knew that the Company had implemented and was executing a business plan designed to



████████████████████████  At that time, McBride also recognized that the Company's business plan could ████████████████████████████████

████████████████████████████████████████████████████

██████.

254.  For the trades in the above chart predating April 2017, McBride sold Company stock without any trading plans in place.  Then, in April 2017, Defendant McBride purportedly traded pursuant to a 10b5-1 trading plan. However, the Company failed to produce any trading plan referencing the April 2017 time period.

255.  In any event, McBride (like Defendant Huebner and Clem) started to execute trades in April 2017 at or around the same time the Board approved an acceleration of the Company's stock repurchase program in April 2017.  Moreover,

127

Exhibit11
331

STMP-SCA00007586

his trades came immediately after ███████████████████████████████

███████████████████████████. McBride's early 2017 trades

also coincide with ███████████████████████████████████████

████████████ Interestingly, at or around that time, ███████████████

██████████████████████████████████████████████████

██████████████████████████ McBride knew that ██████████████

██████████████████████████████████████████.

256. The Company only produced one 10b5-1 trading plan for McBride,

entered on August 15, 2017. That trading plan, however, was entered into at a time

when the Board ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████. The Board would

subsequently be told ████████████████████████████████████

████████████████████████, a fact likely known by

management and others long before the Board's formal discussion.

### 4. Defendant Huebner

257. Defendant Huebner made the following trades during the events

described above:

128

Exhibit11
332

STMP-SCA00007587

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| February 16, 2017 | 3,000 | $130.6558 | $391,967.40 |
| February 16, 2017 | 7,000 | $130.7616 | $915,331.20 |
| March 14, 2017 | 17,966 | $128.3513 | $2,305,959.46 |
| March 14, 2017 | 16,363 | $129.5699 | $2,120,152.27 |
| March 14, 2017 | 10,871 | $130.3405 | $1,416,931.58 |
| March 15, 2017 | 2,933 | $129.6204 | $380,176.63 |
| March 15, 2017 | 6,536 | $130.6754 | $854,094.41 |
| March 15, 2017 | 17,234 | $131.4367 | $2,265,180.09 |
| March 15, 2017 | 12,013 | $132.285 | $1,589,139.71 |
| March 15, 2017 | 11,284 | $133.2255 | $1,503,316.54 |
| March 16, 2017 | 15,752 | $131.1975 | $2,066,623.02 |
| March 16, 2017 | 24,068 | $131.8637 | $3,173,695.53 |
| March 16, 2017 | 5,634 | $132.9359 | $748,960.86 |
| March 5, 2018 | 3,386 | $193.3737 | $654,763.35 |
| March 5, 2018 | 18,359 | $194.2758 | $3,566,709.41 |
| March 5, 2018 | 5,567 | $195.3189 | $1,087,340.32 |
| March 5, 2018 | 7,469 | $196.2418 | $1,465,730.00 |
| March 5, 2018 | 1,820 | $197.3753 | $359,223.05 |
| March 5, 2018 | 1,000 | $198.425 | $198,425.00 |
| March 7, 2018 | 5,661 | $200.1236 | $1,132,899.70 |
| March 8, 2018 | 2,408 | $200.1431 | $481,944.58 |
| March 8, 2018 | 2,200 | $201.5864 | $443,490.08 |
| March 8, 2018 | 200 | $202.45 | $40,490.00 |
| March 9, 2018 | 700 | $200.3321 | $140,232.47 |
| March 9, 2018 | 200 | $202.80 | $40,560.00 |
| March 9, 2018 | 1,313 | $203.3533 | $267,002.88 |
| March 9, 2018 | 800 | $204.4688 | $163,575.04 |
| March 9, 2018 | 1,100 | $205.7727 | $226,349.97 |
| **Totals** | **202,837** | | **$30,000,264.55** |

258. Defendant Huebner's trades are suspiciously timed for the following reasons. From January 2014 until January 2017, Huebner did not sell any of his Company stock. Similar to McBride, Huebner held on to his holdings while the

129

Exhibit11
333

Company began implementing and executing the unsustainable business strategy, known as Project Solar.

259.   Of course, as a party present at the Company's October 2016 Board meeting, Huebner knew that the Company had implemented and was executing a business plan designed to ██████████████████████████████████ ████████████████████████████████ Huebner also knew that the Company's business plan could ██████████████████████████ ████████████████████████████████████████████ ████████████. At the same time, Huebner knew that ████████████ ██████████████████████████████████████████.

260.   Starting in February 2017, Huebner began to unload millions of dollars in Company stock.   His trades coincided with the Board's decision to accelerate the stock repurchase program and the time period Defendant McBride started dumping stock, which makes the trading pattern suspicious.   Huebner started to execute trades in the Company's stock ████████████████ ████████████████████████████████████████. Huebner's early 2017 trades also coincide with ██████████████████ ████████████████████████████ Interestingly, ██████████████ ████████████████████████████████████████████ ████████████████████████████. Again, at this time,

130

Exhibit11
334

STMP-SCA00007589

Huebner knew that ███████████████████████████████████████

███████████████████████████ .

261.   The Company only produced one 10b5-1 trading plan for Huebner, executed on December 8, 2017.  However, Huebner's trading plan was entered into while he was in possession of material, nonpublic information.  In addition to the above information, as of December 2017, Huebner knew ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  Huebner also entered into the trading plan only a few months before █████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████  Given his open lines of communications with management, it is likely that Huebner knew that ███████████████████████

█████████████████████████

   5.   *Defendant Clem*

262.  Defendant Clem made the following trades during the events described above:

131

Exhibit11
335

STMP-SCA00007590

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| March 16, 2017 | 709 | $130.7091 | $92,672.75 |
| March 16, 2017 | 6,301 | $131.5924 | $829,163.71 |
| March 16, 2017 | 2,402 | $132.7376 | $318,835.72 |
| June 7, 2017 | 6,170 | $144.00 | $888,480.00 |
| September 20, 2017 | 2,500 | $210.037 | $525,092.50 |
| September 21, 2017 | 3,200 | $210.001 | $672,003.20 |
| September 22, 2017 | 3,020 | $210.0998 | $634,501.40 |
| September 22, 2017 | 1,280 | $211.1445 | $270,264.96 |
| October 3, 2017 | 500 | $220.00 | $110,000.00 |
| October 4, 2017 | 300 | $220.00 | $66,000.00 |
| October 11, 2017 | 3,037 | $220.2673 | $668,951.79 |
| October 11, 2017 | 435 | $221.2184 | $96,230.00 |
| October 12, 2017 | 1,300 | $220.2885 | $286,375.05 |
| October 12, 2017 | 600 | $221.575 | $132,945.00 |
| October 12, 2017 | 2,582 | $222.7654 | $575,180.26 |
| October 12, 2017 | 1,246 | $223.6555 | $278,674.75 |
| October 24, 2017 | 8,410 | $230.2049 | $1,936,023.21 |
| October 24, 2017 | 1,590 | $230.0196 | $365,731.16 |
| May 4, 2018 | 200 | $240.20 | $48,040.00 |
| May 7, 2018 | 8,590 | $240.2266 | $2,063,546.49 |
| May 7, 2018 | 900 | $241.6389 | $217,475.01 |
| May 7, 2018 | 310 | $242.3306 | $75,122.49 |
| May 14, 2018 | 3,500 | $250.2036 | $875,712.60 |
| May 14, 2018 | 200 | $251.10 | $50,220.00 |
| May 21, 2018 | 2,200 | $250.142 | $550,312.40 |
| May 29, 2018 | 3,899 | $250.1452 | $975,316.14 |
| May 29, 2018 | 150 | $251.2433 | $37,686.50 |
| May 30, 2018 | 51 | $250.90 | $12,795.90 |
| June 1, 2018 | 6,014 | $260.0777 | $1,564,107.29 |
| June 1, 2018 | 200 | $261.20 | $52,240.00 |
| June 4, 2018 | 1,320 | $260.0038 | $343,205.02 |
| June 5, 2018 | 588 | $260.4201 | $153,127.02 |
| June 5, 2018 | 428 | $261.8964 | $112,091.66 |
| June 6, 2018 | 343 | $260.8025 | $89,455.26 |
| June 6, 2018 | 841 | $261.7818 | $220,158.49 |
| June 6, 2018 | 266 | $262.5859 | $69,847.85 |
| June 12, 2018 | 4,513 | $270.0801 | $1,218,871.49 |

132

Exhibit11
336

STMP-SCA00007591

| June 12, 2018 | 1,885 | $271.7005 | $512,155.44 |
|---|---|---|---|
| June 12, 2018 | 3,602 | $272.2687 | $980,711.86 |
| June 14, 2018 | 1,400 | $280.0071 | $392,009.94 |
| June 14, 2018 | 2,230 | $281.7081 | $628,209.06 |
| June 14, 2018 | 200 | $282.60 | $56,520.00 |
| **Totals** | **89,412** | | **$19,249,063.37** |

263. Defendant Clem's trades are suspiciously timed for the following reasons. Defendant Clem's trading began at or around the same time the Board approved an acceleration of the Company's stock repurchase program and when both Defendants McBride and Huebner began to dump millions of dollars in stock on the open market. At that time, ███████████████████████ ████████████████████████████████████. Clem's early 2017 trades also coincide with ████████████████████████████ ██████████ Interestingly, at or around that time, ████████████████ ████████████████████████████████████████████ ██████████████████████████████. Again, at this time, the Board and management (including Clem's superiors) knew that ████████████████ ████████████████████████████████.

264. The Company only produced one 10b5-1 trading plan for Clem, executed on August 10, 2017. That trading plan was entered into at a time when the Company knew ████████████████████████████ ████████████████████████████.

133

Exhibit11
337

STMP-SCA00007592



The Board would subsequently be told ████████████████████████████████, a fact likely known by management and others long before the Board's formal discussion.

### 6.    Defendant Buerba

265.    Defendant Buerba made the following trades during the events described above:

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| September 11, 2017 | 10,843 | $190.2626 | $2,063,017.37 |
| September 11, 2017 | 4,638 | $191.1791 | $886,688.67 |
| September 11, 2017 | 17,143 | $192.5407 | $3,300,725.22 |
| September 11, 2017 | 10,331 | $193.3335 | $1,997,328.39 |
| September 11, 2017 | 1,300 | $194.1934 | $252,451.42 |
| October 24, 2017 | 16,552 | $230.2224 | $3,810,641.17 |
| October 25, 2017 | 3,348 | $230.0127 | $770,082.52 |
| October 25, 2017 | 100 | $231.20 | $23,120.00 |
| February 27, 2018 | 7,167 | $193.5827 | $1,387,407.21 |
| February 27, 2018 | 7,270 | $194.5571 | $1,414,430.12 |
| February 27, 2018 | 11,314 | $195.532 | $2,212,249.05 |
| February 27, 2018 | 2,019 | $196.4977 | $396,728.86 |
| February 27, 2018 | 608 | $197.8747 | $120,307.82 |
| February 27, 2018 | 1,989 | $199.2284 | $396,265.29 |
| February 27, 2018 | 200 | $200.00 | $40,000.00 |
| March 1, 2018 | 1,100 | $187.1227 | $205,834.97 |
| March 1, 2018 | 2,700 | $188.0909 | $507,845.43 |
| March 1, 2018 | 4,201 | $189.0094 | $794,028.49 |
| March 1, 2018 | 1,803 | $190.0965 | $342,743.99 |
| March 1, 2018 | 2,500 | $191.004 | $477,510.00 |
| March 1, 2018 | 1,584 | $192.1215 | $304,320.46 |

134

Exhibit11
338

STMP-SCA00007593

| | | | |
|---|---|---|---|
| March 2, 2018 | 4,638 | $200.0075 | $327,634.79 |
| March 7, 2018 | 8,061 | $200.1035 | $1,613,034.31 |
| March 7, 2018 | 200 | $201.65 | $40,330.00 |
| March 8, 2018 | 2,280 | $200.00 | $456,000.00 |
| March 8, 2018 | 1,900 | $200.7526 | $381,429.94 |
| March 8, 2018 | 3,795 | $201.6785 | $765,369.91 |
| March 9, 2018 | 500 | $200.23 | $100,115.00 |
| March 9, 2018 | 100 | $201.45 | $20,145.00 |
| March 9, 2018 | 3,637 | $203.1265 | $738,771.08 |
| March 9, 2018 | 1,800 | $204.1389 | $367,450.02 |
| March 9, 2018 | 2,401 | $205.4022 | $493,170.68 |
| March 9, 2018 | 1,185 | $206.0825 | $244,207.76 |
| June 11, 2018 | 1,619 | $265.1659 | $429,303.59 |
| June 11, 2018 | 3,675 | $265.9412 | $977,333.91 |
| June 11, 2018 | 9,684 | $267.0054 | $2,585,680.29 |
| June 11, 2018 | 2,799 | $267.9445 | $749,976.66 |
| June 12, 2018 | 662 | $267.8051 | $177,286.98 |
| June 12, 2018 | 400 | $269.3125 | $107,725.00 |
| June 12, 2018 | 200 | $270.40 | $54,080.00 |
| June 12, 2018 | 500 | $271.70 | $135,850.00 |
| June 12, 2018 | 738 | $272.2458 | $200,917.40 |
| July 2, 2018 | 200 | $247.65 | $49,530.00 |
| July 2, 2018 | 100 | $249.40 | $24,940.00 |
| July 2, 2018 | 500 | $250.94 | $125,470.00 |
| July 2, 2018 | 528 | $251.9304 | $133,019.25 |
| July 2, 2018 | 211 | $253.5078 | $53,490.15 |
| July 2, 2018 | 531 | $255.1688 | $135,494.63 |
| July 2, 2018 | 429 | $255.9804 | $109,815.59 |
| August 1, 2018 | 100 | $257.25 | $25,725.00 |
| August 1, 2018 | 1,001 | $258.7296 | $258,988.33 |
| August 1, 2018 | 550 | $259.6227 | $142,792.49 |
| August 1, 2018 | 850 | $261.3353 | $222,135.01 |
| September 4, 2018 | 400 | $246.794 | $98,717.60 |
| September 4, 2018 | 730 | $247.889 | $180,958.97 |
| September 4, 2018 | 383 | $248.8273 | $95,300.86 |
| September 4, 2018 | 50 | $249.85 | $12,492.50 |
| September 4, 2018 | 150 | $251.2667 | $37,690.01 |
| September 4, 2018 | 650 | $252.9362 | $164,408.53 |

135

Exhibit11
339

STMP-SCA00007594

| September 4, 2018 | 136 | $253.4023 | $34,462.71 |
|---|---|---|---|
| October 1, 2018 | 251 | $219.3625 | $55,059.99 |
| October 1, 2018 | 500 | $220.3791 | $110,189.55 |
| October 1, 2018 | 400 | $221.5213 | $88,608.52 |
| October 1, 2018 | 350 | $222.4767 | $77,866.85 |
| October 1, 2018 | 450 | $223.6811 | $100,656.50 |
| October 1, 2018 | 250 | $225.026 | $56,256.50 |
| October 1, 2018 | 300 | $225.9917 | $67,797.51 |
| **Totals** | **169,484** | | **$35,648,442.50** |

266.    Defendant Buerba's trades are suspicious because he sold nearly all his stock during this period, opting to retain only 164 shares as of October 1, 2018.

267.    The Company produced one trading plan for Defendant Buerba, executed on March 9, 2018.  However, as discussed below, Buerba was most likely in possession of material, nonpublic information at that time.

268.    Defendant Buerba began trading in the Company's stock when the Company knew that █████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████.  Buerba also entered into the trading plan only a few months before the Board was told that ████████████████████████████████████ ████████████████████████.  Given his open

136

Exhibit11
340

STMP-SCA00007595

lines of communications with management, it is likely that Buerba knew that ████

████████████████████████████████████████████████████████████████████.

### 7.     Defendant Carberry

269.     Defendant Carberry made the following trades during the events described above:

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| October 23, 2017 | 7,346 | $225.00 | $1,652,850.00 |
| October 24, 2017 | 52,237 | $225.017 | $11,754,213.03 |
| **Totals** | **59,583** | | **$13,407,063.03** |

270.     Defendant Carberry's trades are suspiciously timed for the following reasons.  Defendant Carberry has only made two trades in the Company's stock during his tenure at the Company.   Following the above trades, Defendant Carberry beneficial owns only 9,433 shares of the Company's common stock. Therefore, Defendant Carberry sold more than 86% of his holdings in October 2017.

271.     Defendant Carberry made these trades at a time when the Company knew that ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████     Carberry also made these

137

Exhibit11
341

STMP-SCA00007596

trades █████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████. Given his open

lines of communications with management, it is likely that Carberry knew that ████

████████████████████████████████████████████████

### 8. Defendant Lipson

272. Defendant Lipson made the following trades during the events described above:

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| January 16, 2018 | 700 | $185.70 | $129,990.00 |
| January 16, 2018 | 2,130 | $187.13 | $398,586.90 |
| January 16, 2018 | 2,302 | $187.9804 | $432,730.88 |
| January 16, 2018 | 1,359 | $189.1107 | $257,001.44 |
| January 16, 2018 | 2,435 | $190.2413 | $463,237.57 |
| January 16, 2018 | 1,000 | $191.185 | $191,185.00 |
| January 16, 2018 | 1,000 | $192.515 | $192,515.00 |
| January 16, 2018 | 400 | $192.9875 | $77,195.00 |
| January 16, 2018 | 500 | $194.76 | $97,380.00 |
| February 15, 2018 | 1,500 | $185.21 | $277,815.00 |
| February 15, 2018 | 1,963 | $186.5298 | $366,158.00 |
| February 15, 2018 | 3,902 | $187.3893 | $731,193.05 |
| February 15, 2018 | 1,000 | $188.575 | $188,575.00 |
| February 15, 2018 | 1,500 | $189.5333 | $284,299.95 |
| February 15, 2018 | 135 | $190.3259 | $25,694.00 |
| March 15, 2018 | 3,434 | $197.8178 | $679,306.33 |
| March 15, 2018 | 1,116 | $198.7447 | $221,799.09 |
| March 15, 2018 | 2,800 | $199.9268 | $559,795.04 |
| March 15, 2018 | 2,014 | $200.8825 | $404,577.36 |
| March 15, 2018 | 536 | $201.6179 | $108,067.19 |
| April 16, 2018 | 1,320 | $201.7614 | $266,325.05 |

138

Exhibit11
342

STMP-SCA00007597

| April 16, 2018 | 2,737 | $202.869 | $555,252.45 |
| April 16, 2018 | 500 | $203.86 | $101,930.00 |
| April 16, 2018 | 1,317 | $205.2235 | $270,279.35 |
| April 16, 2018 | 1,600 | $205.9344 | $329,495.04 |
| April 16, 2018 | 1,200 | $206.925 | $248,310.00 |
| April 16, 2018 | 500 | $207.74 | $103,870.00 |
| May 15, 2018 | 1,281 | $243.80 | $542,887.80 |
| **Totals** | **42,181** | | **$8,505,451.49** |

273. Defendant Lipson's trades are suspiciously timed for the following reasons. As a result of the trades listed above, Defendant Lipson sold all but 650 shares of Company stock he beneficially owned. Defendant Lipson had made these trades pursuant to a trading plan, executed on August 7, 2017. However, the trading plan was entered into while Lipson was in possession of material, nonpublic information. At that time, the Company knew that █████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

### 9. Defendant Khechfe

274. Defendant Khechfe made the following trades during the events described above:

139

Exhibit11
343

STMP-SCA00007598

| Trade Date | Shares Sold | Avg. Price | Total Proceeds |
|---|---|---|---|
| May 4, 2017 | 2,400 | $120.00 | $288,000.00 |
| June 1, 2017 | 1,200 | $137.85 | $165,420.00 |
| July 3, 2017 | 1,200 | $155.15 | $186,180.00 |
| August 1, 2017 | 1,200 | $149.05 | $178,860.00 |
| September 1, 2017 | 1,200 | $191.25 | $229,500.00 |
| October 2, 2017 | 1,200 | $202.90 | $243,480.00 |
| November 1, 2017 | 1,200 | $226.65 | $271,980.00 |
| December 1, 2017 | 1,200 | $167.40 | $200,880.00 |
| January 2, 2018 | 1,200 | $188.25 | $225,900.00 |
| February 1, 2018 | 1,200 | $202.05 | $242,460.00 |
| March 1, 2018 | 1,200 | $191.35 | $229,620.00 |
| April 2, 2018 | 1,200 | $199.55 | $239,460.00 |
| May 1, 2018 | 1,200 | $226.00 | $271,200.00 |
| June 1, 2018 | 6,200 | $253.00 | $1,568,600.00 |
| July 2, 2018 | 1,200 | $249.35 | $299,220.00 |
| August 1, 2018 | 1,200 | $262.80 | $315,360.00 |
| September 4, 2018 | 1,200 | $248.15 | $297,780.00 |
| October 1, 2018 | 1,200 | $226.66 | $271,992.00 |
| November 1, 2018 | 1,200 | $186.24 | $223,488.00 |
| January 2, 2019 | 1,200 | $152.45 | $182,940.00 |
| February 1, 2019 | 1,200 | $185.15 | $222,180.00 |
| February 15, 2019 | 11,100 | $200.00 | $2,220,000.00 |
| February 15, 2019 | 100 | $200.07 | $20,007.00 |
| **Totals** | **42,600** | | **$8,594,507.00** |

275. Defendant Khechfe's trades are suspiciously timed for the following reasons. Defendant Khechfe is the co-founder of Endicia. Following the acquisition of Endicia by Stamps.com, Khechfe became the Company's primary contact with the USPS. The Company has produced only two trading plans for Khechfe, executed on March 5, 2018 and August 4, 2018. However, as discussed

140

Exhibit11
344

STMP-SCA00007599

below, Khechfe entered into the trading plans while in possession of material, nonpublic information.

276.    Khechfe began making trades in the Company's stock while knowing that the Company was shifting pre-existing USPS customers into the Reseller Program.  Given his prior role at Endicia, Khechfe understood that the Company's strategy of shifting pre-existing USPS customers into the Reseller Program had generated substantial new revenues.  Moreover, Khechfe made trades when the Company knew that ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████.  Khechfe also entered into the trading plans after the Board ████████████████████ ████████████████████████████████████████████ ████████████████████████ Further, Khechfe entered into a second trading plan ███████████████████████████████████████████ ████████████

\*        \*        \*

141

Exhibit11
345

STMP-SCA00007600

277.   All told, by trading on material, nonpublic information, Defendants Ananda, Jones, McBride, Huebner, Clem, Buerba, Carberry, Lipson, and Khechfe avoided losses totaling *$150,347,128.81*.   A summary of the losses avoided for each director and officer who traded is provided below:

- Ananda avoided a total of *$16,005,039.16* in losses.
- Jones avoided a total of *$6,878,904.07* in losses.
- McBride avoided a total of *$35,784,678.43* in losses.
- Huebner avoided a total of *$22,515,579.25* in losses.
- Clem avoided a total of *$16,746,760.56* in losses.
- Buerba avoided a total of *$29,477,446.16* in losses.
- Carberry avoided a total of *$11,208,450.33* in losses.
- Lipson avoided a total of *$6,718,392.57* in losses.
- Khechfe avoided a total of *$7,022,567* in losses.

## DERIVATIVE ALLEGATIONS

278.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress breaches of fiduciary duty by its officers and directors.

279.   Plaintiff is a stockholder of Stamps.com, was a stockholder of the Company at the time of the wrongdoing alleged herein, and has been a stockholder of the Company continuously since that time.

280.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

142

Exhibit11
346

STMP-SCA00007601

## DEMAND FUTILITY ALLEGATIONS

281. Plaintiff did not make a demand on the Board to institute this action because pre-suit demand is excused. The facts alleged in the preceding paragraphs raise a reasonable doubt that, at a minimum, a majority of the current Board was disinterested and independent, or whether the approval of the Company's business plan and stock repurchases was a product of a valid exercise of business judgment.

282. Demand is excused because Plaintiff raises a reasonable doubt that at least half of the Board at the time of the filing of this Complaint could properly exercise independent and disinterested judgment in responding to a demand. The Board has six members: Defendants Ananda, Jones, McBride, Samuels, Habiger, and May. Each of these directors is either interested or lacks independence, and therefore is unable to make an impartial decision concerning a litigation demand.

283. Plaintiff realleges each allegation above, as though fully set forth herein.

284. *First,* Defendants McBride, Jones, and Ananda in bad faith approved the Company's abusive and unsustainable ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

143

Exhibit11
347

████████████████████████████████████████████████

████████████

285.    In advancing this unsustainable business plan, Defendants Ananda, Jones, and McBride in bad faith approved numerous acquisitions, including ShipStation, ShipWorks, Endicia, and ShippingEasy, at an unfair price because the valuation of these acquisitions ████████████████████████████████████

████████████████████████████████████████████████

████████████████

286.    **_Second,_** Defendants McBride, Jones, Ananda, Samuels, and Habiger in bad faith maintained and expanded the Company's abusive business practices despite repeated warnings that those practices were cannibalizing USPS revenues and leading to USPS complaints, investigations, and (ultimately) cancellation of the Company's most lucrative business contract with the USPS.

287.    **_Third,_** Defendants McBride, Jones, Ananda, Samuels, Habiger, and May in bad faith oversaw and allowed the Company (namely, McBride) to make numerous false statements about Stamps.com's business practices and its agreement with the USPS to both investors and the USPS, which resulted in the Company's stock price trading at an artificially inflated value.  At the same time, these Defendants approved an expansion of the Company's share repurchase program and failed to stop the Company's repurchases despite having knowledge

144

Exhibit11
348

STMP-SCA00007603

of material, nonpublic information and while knowingly and consciously failing to disclose the truth to the market.

288. **Fourth,** while the Company's stock price traded at inflated levels, Defendants McBride, Jones, and Ananda disloyally engaged in insider selling, reaping millions of dollars in personal profit while possession of material, nonpublic information.

289. **Finally,** Defendant May is incapable of assessing a demand because she is not independent of the Company and its officers and directors. Director May is an executive of ShippingEasy – one of the acquired companies that engaged in abuse of the Reseller Program. She currently reports to Defendant McBride. The Company also admits that Defendant May is not independent according to the rules of The NASDAQ Stock Market. Because her livelihood depends on her executive position at the Company and remaining in McBride's (and others') good graces, she cannot objectively assess whether to bring claims against her superiors at Stamps.com.

## CLAIMS FOR RELIEF

### COUNT I
**Derivative Claim for Breach of Fiduciary Duty**
**(Against the Director Defendants)**

290. Plaintiff realleges each allegation above, as though fully set forth herein.

145

Exhibit11
349

STMP-SCA00007604

291. The Director Defendants owed and owe fiduciary duties to Stamps.com and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owned and continue to owe Plaintiff and Stamps.com the highest obligation of due care and loyalty in the administration of the Company's affairs.

292. The Director Defendants consciously and willfully breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

a) Consciously and willfully approving and pursuing an unsustainable, offensive, and harmful business plan premised on abusing the Reseller Program, including purchasing companies at an unfair price to carry out such scheme;

b) Consciously and willfully failing to stop the Company's abusive and harmful business practices;

c) Knowingly overseeing, approving, and making false and misleading statements of material fact about the Company's abusive and harmful business practices; and

d) Consciously and willfully approving share repurchases while knowing that the Company's stock price was trading at an inflated value.

146

Exhibit11
350

STMP-SCA00007605

293.    As a direct and proximate result of the foregoing breaches of fiduciary duty, Stamps.com has sustained, and will continue to sustain, significant damages and reputational harm, including financially and to its corporate image and goodwill.

294.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**COUNT II**
**Derivative Claim for Breach of Fiduciary Duty**
**(Against the Officer Defendants)**

295.    Plaintiff realleges each allegation above, as though fully set forth herein.

296.    The Officer Defendants owed and owe fiduciary duties to Stamps.com and its stockholders.  By reason of their fiduciary relationships, the Officer Defendants specifically owed and continue to owe Plaintiff and Stamps.com the highest obligation of due care and loyalty in the administration of the Company's affairs.

297.    The Officer Defendants consciously and willfully breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

> e)    Consciously and willfully approving and pursuing an unsustainable, offensive, and harmful business plan premised

147

Exhibit11
351

STMP-SCA00007606

on abusing the Reseller Program, including purchasing companies at an unfair price to carry out such scheme;

f) Consciously and willfully failing to stop the Company's abusive and harmful business practices;

g) Knowingly overseeing, approving, and making false and misleading statements of material fact about the Company's abusive and harmful business practices; and

h) Consciously and willfully approving share repurchases while knowing that the Company's stock price was trading at an inflated value.

298. As a direct and proximate result of the foregoing breaches of fiduciary duty, Stamps.com has sustained, and will continue to sustain, significant damages and reputational harm, including financially and to its corporate image and goodwill.

299. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

## COUNT III
### Derivative Claim for Insider Selling
### (Against Defendants Ananda, Jones, and the Officer Defendants)

300. Plaintiff realleges each allegation above, as though fully set forth herein.

148

Exhibit11
352

STMP-SCA00007607

301. Defendants Ananda, Jones, and the Officer Defendants, by virtue of their position and relationship with Stamps.com, including as officers and/or directors, had access, directly or indirectly, to material information about Stamps.com that was not generally available to the public, as described above, including the true nature and extent of the Company's abusive business practices, USPS complaints and investigations, and the Company's failure to stop the abusive practices.

302. The information described above was proprietary nonpublic information concerning the Company's abuse of the Reseller Program. It was a proprietary asset belonging to the Company, which the Defendants used for their own benefit when they sold Stamps.com common stock.

303. The Defendants' sales of Stamps.com common stock while in possession and control of this material adverse nonpublic information was a breach of their fiduciary duty of loyalty.

304. Because the use of the Company's proprietary information for their own gain constitutes a breach of the Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Defendants obtained thereby.

149

Exhibit11
353

STMP-SCA00007608

## COUNT IV
## Unjust Enrichment
### (Against Defendants Ananda, Jones, and McBride)

305.    Plaintiff realleges each allegation above, as though fully set forth herein.

306.    Defendants Ananda, Jones, and McBride were unjustly enriched at the expense of Stamps.com.    Each Defendant approved the Company's stock repurchases and simultaneously sold their own personal stock holdings for profit, while in possession of material, nonpublic information.

307.    These Defendants should be ordered to disgorge all profits and benefits received as a result of their abusive scheme and breaches of fiduciary duty.

## COUNT V
## Corporate Waste
### (Against the Director Defendants)

308.    Plaintiff realleges each allegation above, as though fully set forth herein.

309.    The Director Defendants owed Stamps.com the obligation to avoid wasting Stamps.com's assets.

310.    The stock repurchases served no legitimate corporate purpose of Stamps.com and could not have been a valid assessment of Stamps.com's best interests.  Rather, the stock repurchases were orchestrated and executed in order to

150

Exhibit11
354

STMP-SCA00007609

advance the interests of the Director and Officer Defendants, including allowing them to sell their own personal holdings of Stamps.com common stock for a profit or otherwise conceal the Company's ongoing abusive practices.

311.   The stock repurchases are so one sided that no business person of ordinary, sound judgment could conclude that Stamps.com received adequate value in the transactions.

312.   The Director Defendants breached their obligations to Stamps.com and wasted corporate assets by proposing, approving, and implementing the stock repurchases without proper corporate purpose, resulting in a needless and wasteful use of corporate assets.

313.   As a direct and proximate result of the waste of corporate assets by the Director Defendants, Stamps.com has been damaged.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

a) Determining that this action is a proper derivative action maintainable under the law and demand is excused;

b) Finding that the Defendants breached their fiduciary duties, have been unjustly enriched, and have engaged in corporate waste;

c) Against all Defendants and in favor of the Company for the amount of any and all damages sustained by Stamps.com as a result of Defendants'

151

Exhibit11
355

STMP-SCA00007610

breaches of fiduciary duties, unjust enrichment, and corporate waste, including any and all damages compensable by statute and/or law;

d) Against all Defendants and in favor of the Company for extraordinary equitable and injunctive relief as permitted by law and/or equity;

e) Directing Stamps.com to take all necessary actions to reform and improve its compliance procedures and governance policies to comply with applicable laws and to protect Stamps.com and its stockholders from a repeat of the damaging events described herein;

f) Awarding Stamps.com restitution from all Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

g) Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants', consultants' and experts' fees, costs, and expenses; and

h) Granting such further relief as the Court deems just and proper.

Exhibit11
356

STMP-SCA00007611

LABATON SUCHAROW LLP

/s/ *Ned Weinberger*

OF COUNSEL:

David MacIsaac
John Vielandi
LABATON SUCHAROW LLP
140 Broadway Avenue
New York, NY 10005
(212) 907-0700

Ned Weinberger (Bar No. 5256)
Derrick Farrell (Bar No. 57547)
Mark Richardson (Bar No. 6575)
Thomas Curry (Bar No. 5877)
300 Delaware Avenue, Suite 1340
Wilmington, DE  19801
(302) 573-2540

*Counsel of Plaintiff Macomb County
Employees' Retirement System*

Guillaume Buell
THORNTON LAW FIRM LLP
1 Lincoln Street
Boston, MA 02111
(617) 720-1333

Dated: May 11, 2020
**Redacted Version Dated**:
May 18, 2020

153

Exhibit11
357

STMP-SCA00007612

# CERTIFICATE OF SERVICE

I, Ned Weinberger, hereby certify that on this 18th day of May, 2020, I caused a copy of the foregoing Redacted Version of Verified Stockholder Derivative Complaint in Intervention to be served via File & ServeXpress upon the following attorneys of record:

Jon E. Abramczyk
D. McKinley Measley
Alexandra M. Cumings
Riley T. Svikhart
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801

_/s/ Ned Weinberger_
Ned Weinberger (Bar No. 5256)

Exhibit11
358

STMP-SCA00007613