# EXHIBIT 18

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MACOMB COUNTY EMPLOYEES' RETIREMENT    :
SYSTEM, derivatively on behalf of      :
Nominal Defendant, STAMPS.COM INC.,    :
                                       :
            Plaintiff,                 :
                                       :
      v                                : C. A. No.
                                       : 2019-0658-AGB
KENNETH T. MCBRIDE, MOHAN P. ANANDA,   :
DAVID C. HABIGER, G. BRADFORD JONES,   :
THEODORE R. SAMUELS II, KATIE ANN MAY, :
JEFFREY CARBERRY, SEBASTIAN BUERBA,    :
JOHN ROLAND CLEM, KYLE HUEBNER,        :
MATTHEW LIPSON, and AMINE KHECHFE,     :
                                       :
            Defendants,                :
                                       :
      and                              :
                                       :
STAMPS.COM INC.,                       :
                                       :
            Nominal Defendant.         :

                     - - -
            Chancery Court Chambers
            Leonard L. Williams Justice Center
            500 North King Street
            Wilmington, Delaware
            Friday, August 7, 2020
            11:11 a.m.
                     - - -

BEFORE: HON. ANDRE G. BOUCHARD, Chancellor

                     - - -

      TELEPHONIC ORAL ARGUMENT ON DEFENDANTS'
                MOTION TO DISMISS

---------------------------------------------------------
            CHANCERY COURT REPORTERS
      Leonard L. Williams Justice Center
      500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                (302) 255-0523

Exhibit 18
121

2

APPEARANCES:

    NED C. WEINBERGER, ESQ.
    MARK RICHARDSON, ESQ.
    Labaton Sucharow LLP
        -and-
    DAVID MacISAAC, ESQ.
    of the New York Bar
    Landis, Rath & Cobb LLP
      for Plaintiff

    JON E. ABRAMCZYK, ESQ.
    Morris, Nichols, Arsht  Tunnell LLP
        -and-
    RICHARD H. ZELICHOV, ESQ.
    JONATHAN ROTENBERG, ESQ.
    of the California Bar
    Katten Muchin Rosenman LLP
      for Defendants and Nominal Defendant

                - - -

Exhibit 18

122

5

around 30 minutes or so.

THE COURT:  And, Mr. MacIsaac, are you in a similar time frame?

MR. MacISAAC:  I would hope so, Your Honor.  You know, 30 to 40 minutes, yes.

THE COURT:  All right.  I ask in particular because I do have another matter a little later in the day that's going to require some time for me, and I just didn't want to give you the misimpression that we could go on endlessly.  So I appreciate that guidance.

So, Mr. Zelichov, you may begin.

MR. ZELICHOV:  Good morning, Your Honor, and may it please the Court.  This case presents a relatively straightforward situation where plaintiff and the Court should not be second-guessing the loyalty of Stamps' board of directors with respect to decisions that did not violate any positive law and were attempting to maximize the revenue and profits of Stamps.com, the statements made by Stamps over the years about its business, ordinary stock sales by directors and officers, and repurchasing of Stamps' stock at market prices.

Stamps' board of directors decided to

Exhibit 18
123

6

pursue a business strategy to diversify the company's revenues from simply charging a monthly subscription for individuals and small-volume customers to print postage from their computers in accordance with Stamps' PC postage license obtained in 1999, to try to become a larger player in e-commerce shipping.  It did this by developing technology and software for these types of customers to make use of USPS package services, the type of technology and software that FedEx and UPS, United Parcel Service, automatically provided their customers for free, but which the USPS did not even have.  And in return for this, the USPS paid Stamps an incentive fee under package business incentive agreements.

Stamps also partnered with USPS resellers by providing back-office services to the resellers as well as expanding the resellers' sales forces with Stamps' growing sales force, in return for a portion of the revenue that these entities were earning from buying postage from the USPS at one price and selling it to e-commerce shippers at a higher price under negotiated service agreements, which from now on I'm going to refer to as "NSAs."  And then Stamps acquired a number of multi-carrier solutions

Exhibit 18
124

7

who serviced e-commerce shippers by offering discount USPS rates through the USPS resellers, and then also provided e-commerce shippers access to other carriers, such as UPS and FedEx.

Plaintiff alleges, however, that Stamps' conduct abused the reseller program from which it was supposedly barred and, therefore, put its payments under the package business incentive agreement at risk. Plaintiff seems to think that Stamps should have simply accepted the incentive payments under the PBIA, which it acknowledges were lower than the revenue shares Stamps obtained from the resellers, and presumably stood by idly while the resellers and multi-carrier solution providers who could offer lower prices took Stamps' customers.

Despite plaintiff's claim, Stamps' strategy worked for eight years, as Stamps' revenues, profits, and stock price went up, to the benefit of the company and its stockholders. It also benefited the company's most important partner, the USPS, as the USPS generated significant volume and revenue from its package services that offset ever-increasing losses with respect to first class mail and other market-dominant products. Both the USPS chief

CHANCERY COURT REPORTERS

Exhibit 18
125

8

marketing officer and the USPS chief financial officer acknowledged these benefits publicly in August 2017 and August 2018 respectively.

Stamps, however, did hit a snag in 2019, and it discontinued the package business incentive agreement with the USPS after the USPS offered reduced economics under that agreement and still expected exclusivity from Stamps on its leading brands, Stamps.com and Endicia.  Stamps made a decision to stand tough in its negotiations with the USPS, as it could not accept the reduced economics in conjunction with the exclusive arrangement, believed that left it exposed.  The USPS did the same, and the parties were not able to reach an agreement.

Shortly thereafter, Stamps learned that the USPS was planning on renegotiating some of the reseller NSAs, thereby reducing the economics in 2019, with further likely reductions in 2020 and 2021, and announced this on a May 8, 2019, call.  Stamps then updated this information on an August 7 call to note that the USPS was not going to reduce the economics, at least for 2019.

So we've had a number of various complaints filed in this case over time, but as of the

CHANCERY COURT REPORTERS

Exhibit 18
126

9

time of the initial verified stockholder derivative complaint on August 19, 2019, Stamps no longer had a package business incentive agreement with the USPS, but it still held two of only four existing PC postage licenses.

The third-party resellers -- Express 1, intuiSHIP, and Parcel Partners -- still had negotiated service agreements with the USPS, and Stamps still earned income from its revenue-sharing agreements with them.  Stamps is also able to offer all of the same products it had before.

So essentially, when this lawsuit was first filed, Stamps had been able to make money on both its revenue shares with resellers and the incentive payments under the PBIA for eight years, and then loss the less-lucrative PBIA but kept its revenue shares with the resellers, though it did expect those would decline somewhat.

The situation has actually just improved for Stamps since then.  Now that it is no longer exclusive with the USPS, it signed a collaboration agreement with United Parcel Service in October 2019, and as disclosed on Stamps' February 19, 2020, conference call, reflected on the Postal

Exhibit 18
127

10

Regulatory Commission website and in the 10-K excerpt that plaintiff submitted earlier this week, the USPS signed new long-term agreements with the resellers with whom Stamps still has revenue share agreements.

And then, while Stamps' stock price did fall into the 30s in May of 2019, it went up on the August 2019 disclosure to nearly $59, closed at $90 when United Parcel Service issued the press release about their partnership, got to $157 when it announced that the USPS had renewed the NSAs with the resellers in February 2020, closed at $203 after Stamps announced its first-quarter 2020 results on May 8. And as of this morning, when Stamps announced its second quarter 2020 results yesterday after the market closed, and these results showed its highest quarterly revenue ever, Stamps is trading right now at around $300 per share.

As I said, I think this case is relatively straightforward. At worst, Stamps made greater profits for eight years than it otherwise would have made, had it done what plaintiff claims it should have done; and then, after eight years -- and without violating any statute, regulation or contract -- lost the less-lucrative PBIA but kept the

CHANCERY COURT REPORTERS

Exhibit 18
128

11

more-lucrative reseller revenue shares, and it is growing again after one year that was just flat to down.

This Court has said time and time again that it's not its role to second-guess the decision of a reasonably informed board made in good faith, even if it was engaged in a risky strategy that turned out badly. Here, it is abundantly clear from the objective metrics that the board's ambitious strategy has benefited Stamps.

I also want to point out that there's something sort of very illogical in this theory that's presented in the complaint and opposition. The theory is that Stamps was abusing the reseller program. But the USPS still permits that abuse, and all that Stamps has lost is the PBIA, which plaintiff alleges was all that Stamps was permitted to use.

And I do understand how this case might seem complicated, because it involves a government agency, the USPS, that, for purposes of the issues in this case, is really just acting as a commercial participant in the wider package delivery ecosystem.

Also, an ecosystem that has developed

Exhibit 18
129

12

as a result of the incentive offered by the USPS to
better compete with UPS, FedEx, and Amazon, and
others, involved a number of companies that partner
and compete with each other at the same time, making
it potentially confusing to sort through the various
relationships.

I also don't think it helps that
you've got entities like Prescience Point, Capitol
Forum, and others, that took advantage of these
complexities and issued numerous reports -- nearly 50
just in 2016 and 2017 -- that thereby, you know,
further confused many, and it confused many such
that -- to the extent that the USPS actually felt the
need to tell the public that these reports were
inaccurate and misleading and indicated that it was
pleased with the reseller program.

And then what this lawsuit is, is
plaintiff has basically just copied these reports,
these short-seller reports, without attribution, and
then cherry-picked phrases from the Section 220
documents that fit into the narrative from those
reports.

But as I said, I do recognize that
this ecosystem has become or seemed somewhat

CHANCERY COURT REPORTERS

Exhibit 18
130

20

had used its relationships with resellers and reseller rates to retain the volume of 3 percent of its existing customers, which is approximately 19,000 customers at the time.

So that goes back to this exact point. If Stamps, or anybody, actually thought that it violated the NSAs with the reseller -- the reseller NSAs to offer reseller rates to existing customers, Stamps wouldn't have been openly making that acknowledgment on a conference call, you know, to the world.

So that idea that there is a bar in the NSA to making those rates available to existing customers is just not accurate.  It comes from short reports that had no -- basically, were just making this up.  And, you know, and then it has been sort of copied, without attribution, into the complaint.

THE COURT:  All right.  Now another question I have.  A point of confusion in my mind, in trying to figure out what's really going on in this case, has been the word "reseller," which gets thrown around a lot.

MR. ZELICHOV:  Yes.

THE COURT:  So as I understand it,

Exhibit 18
131

21

with Project Solar, Stamps acquired five or six, I don't know what it is, resellers.  Is that correct?

MR. ZELICHOV:  No.  That's not accurate, Your Honor.

THE COURT:  So that's what I need to know.  What did they acquire?  Multi-carrier solutions, I guess.

MR. ZELICHOV:  Yeah, Stamps acquired multi-carrier solutions that offered package services from entities other than the USPS.  Those multi-carrier solutions themselves also had contracts with the reseller in order to be able to offer the preferred reseller rates to their customers.

THE COURT:  There's one -- sorry.

MR. ZELICHOV:  Sorry.

THE COURT:  I am just trying to get the basics.  You've been living with this, so I'm like in kindergarten on this subject matter.  But a multi-carrier solution, I gather from what you're saying, is somebody, for example, they're not just wed to the Postal Service.  They can offer FedEx, they can offer UPS, just different solutions.  Is that what a multi-carrier solution is?

MR. ZELICHOV:  That is exactly it.  It

Exhibit 18
132

22

is not exclusive to the United States Postal Service or any other particular carrier.

THE COURT: All right. Before you go on, so when the word "reseller" is thrown around in this case, are we always talking about a third party, or are we ever talking about part of Stamps? A division, an affiliate, a subsidiary, anything of that nature?

MR. ZELICHOV: So 99 percent of the time we are referring solely to a third party. There is one exception, which is, in 2016, Stamps acquired a company called ShippingEasy, which is a multi-carrier solution, and rather than have contracts with third-party resellers, also had its own reseller contract. But the acquisitions of ShipStation, ShipWorks, and Endicia, which are the vast majority of the acquisitions, the resellers are solely third-party contracts, or third parties with respect to those entities.

THE COURT: All right. And you'll probably get to this, I guess when you get to your Slide 3, but the benefit of acquiring the multi carriers, I guess, was you could get a bigger cut of the spread with the resellers. Is that the net of it?

Exhibit 18
133

23

MR. ZELICHOV:  There are a few benefits.  That is one benefit of it.  The additional benefits are that Stamps was actually losing customers, as they were getting bigger, to these multi-carrier solutions.  And even not when they were necessarily getting bigger.  Because while Stamps could only offer the USPS rates, these multi-carriers were also offering other shippers.

So there was a benefit both from -- both from the variety and diversification, and then from the further access to the reseller contracts.

THE COURT:  Okay.  I interrupted you, so you can pick up where you were a moment ago.

MR. ZELICHOV:  Sure.  So I just want to move to Slide 2.

THE COURT:  All right.

MR. ZELICHOV:  This is a relatively straightforward slide because you just need to understand the USPS pricing structure a little bit. And so, you know, there are multiple ways that entities are paying for packaging, basically.  There's a retail price, which is if you go into a USPS store. There was commercial base pricing, which is basically available to any commercial business.  There's

Exhibit 18
134

27

was going to make money from them.

And then I've already covered what Stamps said in its July 2016 call about using the reseller rates for existing customers, but also on that call -- and that was about 19,000 customers.  It also disclosed on that call that it had about 10 percent of its customers on reseller rates, approximately 60,000 customers.  So as of that date, the USPS is going to know that not only -- you know, we're "double-dipping," in plaintiff's parlance, with respect to at least 60,000 customers.

If you look at paragraph 148 again. You've got another quote from Stamps acknowledging that we have revenue share agreements with the resellers.  And, you know, I guess sort of this is another aside, which is plaintiff says this entire strategy was cloaked in secrecy and that we had every intention of not disclosing everything.

Stamps disclosed every acquisition that it made -- press releases, earnings calls, 8-Ks. And I think for almost all of them, except maybe one that was a $20 million acquisition, the purchase agreements themselves are attached as exhibits to Stamps' SEC filings.  And then I guess, as I said

Exhibit 18
135

102

in a breach of the duty of loyalty.

Again, let's go back on the contracts. Nothing in the NSA barred the resellers from making their rates available to existing customers. We see that from paragraph 67 in the complaint and the admission by Stamps that we were doing just that in our conference call transcript.

The 2014 slides on which plaintiff seems to be basing the vast majority of its breach of fiduciary duty cases are an anachronism. The board did not implement those slides as they were written. It disclosed every acquisition of its -- of the multi-carrier solutions. It disclosed in its 10-Q in 2015 that we have a partnership with Express 1, one of the resellers, by which we are able to provide Express 1 shipping discounts to our lower-volume customers.

We disclosed in our 10-K that we earned compensation from our partners, which is further defined in the rest of that document to include the U.S. Postal resellers. The analyst calls all acknowledged that we had revenue shares with the resellers, in multiple places, with the analysts understanding this. This idea of deception and extortion is just a -- it is a -- we gained market

Exhibit 18
136

103

power and we used our market power and size to negotiate better deals.  There's absolutely nothing that is wrong with that.

Plaintiff wants to make a big deal about the slide talking about flipping the switch. Well, the Slide 3 that I provided the Court is exactly that flipping of the switch.  It is we were going to flip the switch such that customers that were printing PC postage through Endicia would switch to printing through Stamps, thereby allowing us to receive a greater portion of the revenue share.

Plaintiff has also spoken a lot about this 25 percent revenue from the resellers.  Look, we reported our service revenue in a single segment, in accordance with acceptable GAAP rules and approved by our independent auditors in each of our 10-Ks. There's nothing requiring us to disclose the exact amount of revenue that we received as a result of our reseller partnerships.

Yes, Mr. McBride answered a question specifically about intuiSHIP, because that is -- intuiSHIP was the entity with which -- at which he had been challenged, or the short-seller reports were claiming was an affiliate of Stamps and that we were

Exhibit 18
137

104

the same entity.  So he needed to explain that.

He didn't say, "And we don't receive revenue from any of the other resellers."  He just said, "I'm just answering intuiSHIP."  He didn't need to do anything more.

Let's go now to --

THE COURT:  Well, let me stop there, because what you're basically telling me, you're saying, obviously, your view of the earnings call is that that limited disclosure is not actionable.  Tell me a little bit more about that.  I don't have it right in front of me right now, but why is that so clear-cut?

MR. ZELICHOV:  Why it's so clear-cut is because the -- the context of this July 25, 2016, call was that a number of short reports had come out between Stamps' prior earnings call and this earnings call, during which Stamps had been in a quiet period and was not able to respond to them.

So on July 28, 2016, Mr. McBride lays out exactly -- he lays out these are the claims that the short sellers have made, and with respect to the reseller stuff, he mentioned that they're talk -- the thing that they have been focusing on is that Stamps

CHANCERY COURT REPORTERS

Exhibit 18
138

105

and intuiSHIP are so closely tied that they are perhaps even one company.

What does he -- what does Mr. McBride do?  He goes out -- he answers the question specifically with respect to intuiSHIP.  Keep in mind, on that same call, while he says intuiSHIP is less than 10 percent of its -- of Stamps' revenue, and he won't answer the overall question as to how much resellers are accounting for Stamps' revenue, he mentions that 60,000 customers of Stamps were on reseller rates.  So he's not not providing additional information about the resellers; he is just providing the information about the number of customers and, in specific, as to an amount of revenue from intuiSHIP.

Plaintiff keeps focusing on sort of this idea in those 2014 anachronistic slides that says, well, when intuiSHIP crosses 10 percent, we're going to need to disclose it.  That was -- you know, they didn't know what the accounting rules were at the time.  And it turns out the accounting rules did not require them to do that.

And I should also add, I guess, that regardless -- the analyst reports that are -- that come out at numerous times, they are all engaging in

Exhibit 18
139

106

estimates of the Stamps reseller revenue, and none of them are thinking, well, it must be less than 10 percent because Mr. McBride said intuiSHIP was below 10 percent.

They're all looking at things at much higher numbers, because they understood that Mr. McBride was answering a very specific question that had been raised in a very specific short report. And, you know, if the auditors had said we need to disclose the differences and this couldn't be a single segment, we would be -- that would have been disclosed. That is not what the auditors said or required.

Then we've got -- plaintiff brought out the 2017 stock sales and that they must have related to some negative information that was coming on. The information about MoveMethod was known -- it's in our -- in our October 2016 board presentation. Sales five to six months thereafter cannot be tied to that. The ShippingEasy slowdown, that occurred in the first quarter of 2016, and by early 2017 the channel had been resurrected. So information from a year prior was not going to be relevant.

There's no prohibition on reseller

Exhibit 18
140

119

put this together.  This is not an expedited case, so I'm not trying to break your back to put it together. If you can get this to me, say, within 30 days, I'm good with that.  This will help me actually sort through this in a more methodical way.  Candidly, I just couldn't do it from the briefs.

With that, thank you for the arguments.  You were both very well prepared, know your stuff really well.  I'm sorry you had to school me up on the nature of these relationships between the Postal Service and these different businesses, but it was fundamental and core to me having any ability to grasp what's really going on here.

Have a good day, and I appreciate the argument.

(Hearing concluded at 2:04 p.m.)

– – –

CHANCERY COURT REPORTERS

Exhibit 18
141

120

CERTIFICATE

I, JULIANNE LaBADIA, Official Court Reporter for the Court of Chancery of the State of Delaware, Registered Diplomate Reporter, Certified Realtime Reporter, and Delaware Notary Public, do hereby certify the foregoing pages numbered 3 through 119, contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing before the Chancellor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF, I have hereunto set my hand at Wilmington this 11th day of August, 2020.

/s/ Julianne LaBadia
_____
Julianne LaBadia
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
Delaware Notary Public

CHANCERY COURT REPORTERS

Exhibit 18
142