# EXHIBIT 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

PSI SYSTEMS, INC., D/B/A ENDICIA,          ) AU:14-CV-00750-LY
                                           )
    Plaintiff,                             )
                                           )
VS.                                        ) AUSTIN, TEXAS
                                           )
AUCTANE, L.L.C., D/B/A SHIPSTATION,        )
                                           )
    Defendant.                             ) SEPTEMBER 25, 2014

          ************************************************
                        TRANSCRIPT OF HEARING ON
                  MOTION FOR PRELIMINARY INJUNCTION
                   BEFORE THE HONORABLE LEE YEAKEL
          ************************************************

FOR THE PLAINTIFF:          JOSEPH J. KRASOVEC, III
                            ANDREW C. PORTER
                            SCHIFF HARDIN LLP
                            233 SOUTH WACKER DRIVE, SUITE 6600
                            CHICAGO, ILLINOIS 60606

                            ROY A. SPEZIA
                            RYAN BUECHE
                            GERMER BEAMAN & BROWN
                            301 CONGRESS AVENUE, SUITE 1700
                            AUSTIN, TEXAS 78701

FOR THE DEFENDANT:          M. CRAIG TYLER
                            ANNA G. PHILLIPS
                            GEOFFREY W. HEAVEN
                            JOSE A. VALERA
                            WILSON SONSINI GOODRICH & ROSATI, PC
                            900 SOUTH CAPITAL OF TEXAS HIGHWAY
                            LAS CIMAS IV, FIFTH FLOOR
                            AUSTIN, TEXAS 78746-5546

COURT REPORTER:             ARLINDA RODRIGUEZ, CSR
                            501 WEST 5TH STREET, SUITE 4152
                            AUSTIN, TEXAS 78701
                            (512) 391-8791

Proceedings recorded by computerized stenography, transcript produced by computer.

Exhibit 29
382

Case 2:19-cv-01828-MWF-SK Document 169-16 Filed 11/06/20 Page 3 of 9 Page
Case 1:14-cv-00730-LY Document 49 Filed 10/03/14 Page 2 of 209 ID
ID #:5264

2

**EXAMINATION INDEX**

RICK HERNANDEZ
     DIRECT BY MR. KRASOVEC                              12
     CROSS BY MR. TYLER                                  49
     REDIRECT BY MR. KRASOVEC                            77
     RECROSS BY MR. TYLER                                86

NATHAN JONES
     DIRECT BY MR. TYLER                                 88
     CROSS BY MR. KRASOVEC                              145
     REDIRECT BY MR. TYLER                              193
     RECROSS BY MR. KRASOVEC                            195
     FURTHER DIRECT BY MR. TYLER                        197


**EXHIBIT INDEX**

                                                    ADMITTED
Agreed Exhibits
 Plaintiff 1-40                                         5

 Defendant 1-21                                         5


                                                    OFFD/ADM
Defendant
 22                                                196   198


Note:  Plaintiff Exhibits 1, 11-19, and 23-24 withdrawn.

Exhibit 29
383

witness.

MR. TYLER: Thank you, Your Honor.

MR. KRASOVEC: Your Honor, I don't mean to step on Mr. Tyler. We also, as we indicated, we have witnesses, Mr. Colby Clark and Mr. Bowers. We have their deposition transcripts. Should we tender those to the Court now?

THE COURT: You can tender them whenever you want to before I close the evidence. I haven't closed it yet. Doesn't really matter when it comes in.

MR. KRASOVEC: I just wanted to make sure I wasn't missing something. Thank you.

MR. TYLER: Thank you, Your Honor. We would call Nathan Jones at this time.

(Witness sworn)

MR. TYLER: Your Honor, do you have a notebook for Mr. Jones?

THE COURT: I do.

MR. TYLER: Thank you. May I proceed?

THE COURT: You may.

**NATHAN JONES,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. TYLER:**

Q. Good afternoon, sir. Would you introduce yourself to the Court?

Exhibit 29
384

A.   My name is Nathan Jones.

Q.   And who do you work for, Mr. Jones?

A.   I work for Auctane, which is also known as ShipStation.

Q.   Do you live here in Austin?

A.   I do.

Q.   And what do you do for Auctane?

A.   I'm the CEO of Auctane.

Q.   And what do you do in that role?

A.   Primarily I manage the -- oversee operations of the business, both strategically and tactically, and all the functions of the business report up through me.

Q.   And you've talked about Auctane.  I may refer to Auctane as ShipStation during testimony.  Is that okay with you?

A.   That's fine.

Q.   And how many employees does ShipStation have?

A.   Approximately 45.

Q.   Most of them here in Austin?

A.   Most of them, yes.

Q.   Okay.  So this morning so far we have heard about a lot of different companies -- Stamps.com, Express 1, eBay, Bigcommerce, and of course the parties in the case.  Are you familiar with the ecosystem that ShipStation exists in?

A.   I am, yes.

Q.   And have you prepared a diagram to help explain some of this to the Court?

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Exhibit 29
385

THE WITNESS: Ebay was the very first one.

THE COURT: Ebay. Okay.

Q. (BY MR. TYLER) Did a reseller named Express 1 come into the picture at some time?

A. They did. They did.

Q. Can you tell us about that?

A. Sure. Next slide, please.

So I think we may have heard a little background before, but it's worth restating. We talked about first-class mail. First-class mail is -- is not competitive to the United States Post Office. They have a bit of a legislatively mandated monopoly on first-class mail. Once you get above first-class mail and start getting to Priority and Express, they actually have a competitive marketplace where they have to compete with UPS and they have to compete with DHL and FedEx and other carriers for that service.

So what they've done, the USPS, to extend their ability to connect and sell to more people and get more people to use their service, they've authorized what's called a reseller. And Express 1 is one of the early resellers for the United States Postal Service. And what that does, it allows them to make large volume commitments to the post office themselves and, in return, they receive large volume discounts. And then they have the rights to resell the labels they buy in volume. They may purchase those labels one at a time, but they

Exhibit 29
386

Case 2:10-cv-01828-MWF-SK Document 169-16 Filed 11/06/20 Page 7 of 9  Page
Case 1:14-cv-00750-LY Document 49-16 Filed 10/03/14 Page 96 of 203  Page
ID #:5268

HUGHES - DIRECT

96

make a volume commitment up front to the post office and, in exchange, they receive a discount. They're authorized to pass that discount -- some portion of that discount to the marketplace and to share some portion of that discount with us as well.

So we added Express 1 as a way for our customers to continue to buy USPS labels, but at a discount when they did it Priority and Express. And as part of that relationship that started in May of 2010, we also have a revenue share agreement where we receive some portion of the proceeds from that paid to us from Express 1.

Q. What do the green and the red arrows signify in the diagram?

A. The green and the red arrows -- so the green arrows signify relationships that we have -- that we've signed agreements for and that govern how we interact with those entities. So, you know, we have an agreement in 2009 with the United States Postal Service. We have one in 2009 -- October of 2009 for Stamps. We also have an agreement with Priority and Express -- excuse me -- with Express 1 in May of 2010.

A green just represents --

THE COURT: Slow down just a little bit.

A. Sorry. The green just represents agreements that we are directly a party to and that we have negotiated ourselves.

The red, on the other hand, represents agreements

Exhibit 29
387

Case 2:10-cv-01828-MWF-SK Document 169-16 Filed 11/06/20 Page 8 of 9   Page
Case 1:14-cv-00750-LY Document 49-1 Filed 10/03/14 Page 97 of 203
ID #:5269                 ROS - DIRECT                           97

that are not our agreements.  So Express 1 -- and this is where it's going to get a little bit technical, but I think it's probably -- you know, it's probably pretty easy to understand. Express 1 is allowed to resell labels, but they're not allowed to manufacture a label.

So Stamps in this diagram is allowed -- they're a PC postage provider, as we've heard.  They're allowed to manufacturer a label for the post office.  In fact, the post office pays them to do so.  Express 1, in order to receive a label to hand to someone, to be able to sell to someone, works through one of these other or PC postage providers, they manufacture the label on behalf of the post office, and then give it to Express 1, who then gives it, you know, through to us.

Q.   So the two red labels there, it's your understanding that when you began working with Express 1 --

A.   That's correct.

Q.   -- Express 1 had the option to have those labels manufactured by either Stamps or Endicia?

A.   That's correct.  Express 1 can manufacturer a label or can buy the labels through whoever they want to buy the labels through.

Q.   Based on their agreement with Endicia and Stamps?

A.   Correct.  Based on agreements they have.  We don't have any participation in those agreements.  They negotiate those

Exhibit 29
388

Q.   Right.  But there is something interesting about this case, and you understand this case to be focused on the transaction to the right through Express 1, right?

A.   Correct.

Q.   There's been testimony already -- and we'll hear from Mr. Hodges later -- about how exactly this happened.  But is it the case that ShipStation has something to do with which red arrow Express 1's customers go through?

A.   We do.  We -- we have the ability to specify -- I think we talked about APIs earlier.  At the risk of -- I don't want to waste the Court's time, but we might want to talk a little more about the APIs.

There are two connections.  You can look at the API as if it was a door on a house.  It's basically someone outside walks through a door to get inside.  We get to choose which door we walk in to Express 1.  There's a left door and right door.  It's like a metaphor for the API.  So when we go through the doors, it triggers Express 1 -- Express 1's system to use whichever agreement they have on the back end to supply the label.  So, in essence, it directs them to pick a supplier.

Q.   And that's based on your agreement with Express 1?

A.   That's based on our agreement with Express 1.  They give us the right to do that.

Exhibit 29
389