UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

MATT KARINSKI, et al.,               )
                                     )
            Plaintiffs,              )
                                     )
            vs.                      )
                                     )   2:19-CV-1828-MWF (SKx)
STAMPS.COM, INC., et al.,            )
                                     )
            Defendants.              )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Monday, November 2, 2020

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

APPEARANCES OF COUNSEL:

For the Plaintiffs:

        ROBBINS GELLER RUDMAN & DOWD LLP
        By:  Hillary Stakem, Attorney at Law
             Eric Niehaus, Attorney at Law
             Kevin Sciarani, Attorney at Law
             Steven Pepich, Attorney at Law
             Jason Forge, Attorney at Law
        655 West Broadway, Suite 1900
        San Diego, California 92101

For the Defendants:

        KATTEN MUCHIN ROSENMAN LLP
        By:  Richard Zelichov, Attorney at Law
             Christina Costley, Attorney at Law
        2029 Century Park East, Suite 2600
        Los Angeles, California 90067

        KATTEN MUCHIN ROSENMAN LLP
        By:  Jonathan Rotenberg, Attorney at Law
        575 Madison Avenue
        New York, New York, 10022

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

THE CLERK:  Calling item number 3, case number CV-19-1828-MWF, Matt Karinski et al. Vs. Stamps.com, Inc., et al.

Counsel, please state your appearance for the record, beginning with counsel for plaintiff.

MR. NIEHAUS: Good morning, Your Honor.  Eric Niehaus from Robbins Geller Rudman & Dowd on behalf of the plaintiff and class.

MR. FORGE: Good morning, Your Honor.  Jason Forge on behalf of the plaintiff.

MR. PEPICH: Good morning, Your Honor.  Steven Pepich, also on behalf of the lead plaintiff from Robbins Geller.

MS. STAKEM: Good morning, Your Honor.  Hillary Stakem from Robbins Geller, also on behalf of plaintiff.

MR. SCIARANI: Good morning, Your Honor.  Kevin Sciarani, also from Robbins Geller on behalf of the plaintiff.

THE CLERK:  Defendants, please.

MR. ZELICHOV: Richard Zelichov from Katten Muchin Rosenman on behalf of the defendant.

MS. COSTLEY: Good morning, Your Honor.  Christina Costley, also from Katten Muchin Rosenman on behalf of the defendant.

MR. ROTENBERG: Good morning, Your Honor.  Jonathan

Rotenberg, also from Katten Muchin Rosenman on behalf of defendant.

THE CLERK:  That's everyone, Your Honor.

THE COURT:  Thank you, Ms. Sanchez.

Counsel for defendants in particular, since the tentative is not part of the record, let me just say that it is to grant the motion and certify the class.

I respect the fact that you have focused your opposition on just essentially typicality and predominance instead of doing some scattershot thing and everything that is listed in Rule 23.  But at the same time, given the nature of this case and what usually happens in cases like this, as common sense or factual matter, combined with the presumption from basic as a legal matter, I think it is clear that, you know, you've got a lot of work to do in trying to keep a class from being certified.

So let me hear first from the defendants.

MR. ZELICHOV: Thank you, Your Honor.

And may it please the Court?  Plaintiff wants the Court to treat this area of the law --

THE COURT:  Excuse me, counsel.  If you could please remember, since we are doing this telephonically, to state your name before you begin to speak.

MR. ZELICHOV: I still haven't learned to do that after eight months.  This is Mr. Zelichov, Your Honor, and

the court reporter.

Plaintiff wants the Court to treat this area of the law as simple, where courts ordinarily grant class cert. But to do that, plaintiff has mischaracterized defendant's arguments to make this case seem routine. It is not. It is complicated. It has generated three Supreme Court opinions in three and a half years, and appellate courts around the country have issued conflicting decisions, while the Ninth Circuit has been silent.

There is also yet another petition for cert before the Supreme Court presently about whether price maintenance, the theory upon which plaintiff relies here, is viable. And also, the question is who bears the burden of proof on price impact in these cases?

This particular petition for cert is scheduled to be determined, based on our understanding of the calendar, on December 4th. And there are many issues raised by plaintiffs' motion in the various briefs and reports that have been filed. But I want to focus on two issues. One is going to be in some detail, and then one quite quickly.

The issue that I want to focus on in detail is that defendants have proved through direct evidence that the May and August 2017 alleged misstatement had no price impact.

And let's -- what the Supreme Court has said as to what price impact means. This is in *Halliburton* 1, the first

decision. "Price impact is whether the alleged misrepresentation affected the market price in the first place."

And I believe that the parties' differences here with respect to price impact primarily seem to be whether the stock drops at the end of the class period are sufficient to show price impact with respect to statements made nearly two years earlier.

In short -- and I'm going to provide more detail because I think this is the issue that I need to spend the most time on -- they are not.

First, Dr. Zurek and defendants have made an affirmative showing with direct evidence that there was no price impact from either the May 3rd, 2017 statements, or the August 1st and 2nd statements because the market price did not go up when it would have been expected to do so based on these reassuring statements.

He has also shown the price maintenance theory, even if it might apply in some cases, does not apply here because Stamps's positive statements should have caused an increase in the stock price in light of the additional negative information and increasing short interest that had impacted Stamps's stock price going into those statements.

And he has also established, along with by reference to the plaintiffs' report, that there was no confounding

negative information released on either of those days that would have counterbalanced the expected increase. So that is our first piece of direct evidence, and I will explain that in a little more detail shortly.

We've also put in a second piece of direct evidence. And we don't need to do this, because if you look -- apply either the Eighth Circuit's decision in Best Buy or the Northern District of California's decision in *Finisar*, what I just told you about direct evidence of no price impact at the front of the class period should be sufficient.

But with Dr. Zurek, he has further established by a preponderance of the evidence that there would also not have been any price impact had Stamps made an appropriately-framed alternative but/for disclosure at the same time as in the May and August 2017 statement.

He has shown that the disclosure in a but/for world, consistent with the undisputed evidence, could not have caused any stock price impact because such a disclosure that not everybody at the USPS was happy with Stamps in the reseller program and changes were being considered, would merely be a repetition of information that was already in the market.

This type of information has been publically disclosed starting no later than July of 2016. And I think this is further direct evidence that the May and August 2017

statements had no price impact.

You then get to what I think what plaintiff seems to be relying on, and what this Court seems to be relying on in its tentative, which is sort of the indirect or circumstantial evidence of price impact based on stock price drops at the end of the class period. But what Dr. Zurek has established is that what was disclosed at the end of the class period could not have been disclosed earlier, and that is -- even to the extent that that is considered indirect or circumstantial evidence of price impact at the front of the class period, it doesn't outweigh the direct evidence that we have proved by a preponderance of the evidence.

And I want to -- now I'm going to go into each of those three arguments in a little more detail. And there will be a little repetition, and I apologize for that.

But Dr. Zurek explained in his report that in an efficient market, defendant's May 3rd statement should have caused Stamps's stock price to increase. He describes evidence leading up to those statements which cast doubt on Stamps's relationship with the USPS and the USPS's approval of the reseller program.

In paragraph 37 of his report, he points out that there were rumors in the market in April 2017 that the USPS is going to make major changes to the reseller program, and that a letter was on its way to the three most important

reseller partners that would limit use of the reseller rates.

Also, and this is crucial, the market viewed this information as credible, as short interest, which is a measure of negative sentiment in the market and Stamps's stock price had increased significantly between Stamps's last positive statements about the USPS in February 2017, and these statements in May 2017, and then the short interest even continued going up thereafter.  You can see this in both Exhibit 5B in the Zurek report, and Exhibit 8B, and Dr. Nye's original report, where both of them show that the short interest went from 3.6 million shares at the end of February, 2017 to 4.3 million shares right before the May 3rd, 2017 statements, and then continued increasing to 5.6 million shares in the middle of May 2017.

That -- what Dr. Zurek has explained is that Stamps's positive and reassuring statements about the relationship and the lack of letter should have caused Stamps's stock price to increase, but it didn't.

And this is an area where Dr. Nye actually agrees with Dr. Zurek.  He says that Stamps's reassuring statements, the market should have given more weight to those statements and statements in the short reports.  This is in the Nye Reply at 28.  But the market didn't.  The market price continued to fall after May 3rd, 2017.

So what we've proved there, and this is direct

evidence of lack of price impact with respect to the May 3rd, 2017 statement that they had no positive price impact.

This is -- you know, this is where plaintiff says these positive statements on May 3rd would not be expected to cause a stock price to go up because Stamps is repeating similar information to what it had said before.  And so that these statements just maintained inflation that was already there.

But plaintiffs' argument ignores that new negative information in the market, and the increasing short interest leading up to those statements that shows that these are not statements that are just maintaining inflation, but that they actually should have caused the stock price to go up but did not.

We then move to the August 2nd, 2017 -- August 1st and 2nd, 2017 statements.  Dr. Zurek again explains that Stamps's statements about its relationship -- well, that the USPS statements about its relationship with the -- with Stamps, and with the resellers and the PC postage partners on August 1st, 2017 in an efficient market would be expected to have caused the stock price of Stamps to go up.  And once again, they didn't.

These statements by the USPS should have been reassuring to the market, should have caused Stamps's stock price to go up, but they didn't.  And plaintiffs can't argue

price maintenance with respect to those statements at all because the USPS had never spoken directly on these issues up until that point.

So you have a situation here where the USPS is making positive statements.  These should cause the stock price to go up, and that is what Dr. Zurek's ex ante hypothesis is.  But when he tests that ex ante hypothesis, it establishes, through his event study, that it didn't cause the stock price to go up.  And so these statements did not have a positive price impact.

And then here is an area where I guess this is a place where the plaintiffs' reply has completely mischaracterized the argument that we have made with respect to the information that was in the market beforehand.

The plaintiff has called that argument -- and this is sort of -- has called it a truth on the market argument.  But it is not a truth on the market argument.  This is Dr. Zurek providing even further direct evidence that the statements that Stamps made in May and August 2017 did not have price impact.  He says, "Even if you disagree with me that the market price should have gone up based on the Stamps and USPS's reassuring statement, and even if you believe that those statements somehow maintained artificial inflation in Stamps's stock price, he has shown based on undisputed evidence that Stamps could not have disclosed in May or

August of 2017 that the relationship between Stamps and the USPS had deteriorated to the point that it was inevitable that the USPS would terminate certain contracts with Stamps.

This is most clearly described in paragraphs 34 to 37 of his report, paragraphs 41 to 44, and then also in Appendix C.  What he has shown is that the undisputed evidence shows that Stamps and the USPS executed the very contract whose discontinuation was announced on February 21st, 2019, on June 14th, 2017, which is after the May 3rd, 2017 statements, and just before the August 1st and 2nd, 2017 statements.

So a but/for world that the USPS was going to inevitably terminate these contracts is just not credible given what the Court -- given that the USPS and Stamps signed a new contract thereafter.

And then he also explained that it is undisputed that both the chief marketing officer of the USPS, and the USPS spokesman in statements to the press made very positive statements about Stamps's relationship and the reseller program.

What did the chief marketing officer -- this is on August 1st, 2017 -- he says, "And we looked at resellers and things like PC postage providers like Stamps.com and Pitney and Endicia as excellent partners on bringing the best solutions to our customers."  He also said, "I think last

year we did about 7 billion in the channel, which is coming out of PC postage and resellers. So together those solutions have really crafted a nice segment solution for us for the small and medium-sized business."

And the USPS spokesperson speaking to the press says, "The USPS is pleased with the reseller program, and says that the coverage in the short reports is misleading."

So what I'm saying here, and this is -- you know, plaintiffs call this a truth in the market argument. It's not a truth in the market argument. It is an argument that in -- when you are -- under class cert, the Court has to look into the merits of the case when making a class certification determination.

And *Walmart vs. Dukes*, as this Court is well aware, makes that abundantly clear. And that defendants have established that whether we bear the burden of production or the burden of persuasion, that plaintiffs' allegations concerning what Stamps should have disclosed about its relationship are just completely meritless.

There is no circumstance where we could have disclosed -- it would have been entirely counterfactual, and we have met our burden of proof and our burden of production and persuasion -- to show that it would be entirely inappropriate or unreasonable or just false for Stamps to have said, along with the allegedly misstatements, the USPS

as a whole was not very happy with Stamps and was opposed to Stamps's actions, which would inevitably lead to termination of the Stamps/USPS partnership all together and changes to the reseller program to prevent Stamps's use of it.

And why do we know that that is -- based on the statements that the USPS made, and the fact that they signed a -- the very contract at issue here in that time period shows that that potential -- that particular but/for world that plaintiff is positing is just absolutely impossible.

And so what Dr. Zurek says is -- and plaintiffs call this a truth on the market argument, but it is not.  He is saying, "I will define -- plaintiffs' definition of the but/for world is unquestionably contrary to the undisputed evidence.  So I am going to define what an appropriate but/for world might be."  And that -- and he looks at what that but/for world might be, and says, you know what?  Even if plaintiff -- even if defendants had disclosed the additional information that would have been potentially reasonable under the circumstances in this particular situation, there would not have been any stock price movement because we know that those statements, the statements -- the statements that some at the USPS were not entirely happy with the reseller model or considering changes, that particular information was already in the market.

So for Stamps to repeat that along with their

statements about having a great relationship, that would not have had any price impact.

So he's now offered two pieces of evidence, direct pieces of evidence from the front end that there is no price impact.

So now we get to the last thing, which is, okay, courts have said, all right, you should also look at -- or some courts have said that you should also look at indirect evidence of price impact by looking at stock price drops at the end of the class period.

And I guess to make that clear, what *Allstate*, which is a Seventh Circuit case, which just came out earlier this year, they write directly -- let me find the exact quote, it says, "Stock price drops after alleged corrective disclosures are direct evidence as to loss causation, but only indirect evidence as to transaction causation."

And that is a sort of unique position to the Seventh Circuit in *Allstate*.  This Court, or the Ninth Circuit at least, has even since 1975 in Blackney vs. Barrett (ph) noted that a change in stock price after a corrected release is circumstantial evidence of inflation when purchased.

So the question we are left with, or the question that is there is, all right, we have these two sets -- pieces of evidence that are direct evidence of lack of price impact, and now let's look at this indirect evidence, and are we

really going to hold that this indirect evidence, the stock price dropped at the end of the class period, are going to outweigh the evidence that -- the direct evidence that we have shown?

And let me go through a few things here.  So first, I think as this Court has acknowledged, and I think plaintiff will say, is that the cases that plaintiff cites to say that the Court should look at stock drops at the end of the class period, had all previously concluded that plaintiff had alleged a price maintenance case.

And so this line of analysis only applies if you reject Dr. Zurek's first argument that the reassuring statement did not maintain a stock price, but actually should have caused the stock price to go up but did not.

Also, I know, you know, plaintiffs are now -- have brought up this price maintenance theory, and the Court has adopted it in its tentative.  But let's keep in mind, this price maintenance argument was raised by plaintiffs, frankly for the first time in its reply in support of its motion for class certification, as an effort around the direct evidence that we offered.

The Consolidated Complaint alleges in paragraph 121, and actually numerous other places, "Defendant's false and misleading statements artificially inflated Stamps's stock price."  Doesn't allege that these statements maintained

artificial inflation.

Similarly, if you look at plaintiffs' motion for class certification on pages 7 at line 22, 8 at line 1, 10 at line 15, again, "The Stamps's alleged misrepresentation caused the stock price to be artificially inflated."  Again, they are not saying that they maintained any previously-existing inflation.  This is a new argument that they are bringing up in reply, knowing that the direct evidence that we have established shows that there was no price impact.

I also -- I guess I talked about how the price impact at the end of the class period is only indirect evidence.  And then there is a -- but there is a further point there, which is in order for the price reaction at the end of the class period to be relevant at all to the question of whether alleged misstatements inflated the stock price at the time they were made, the information disclosed at the end of the class period needs to be something that the company could have disclosed at the time of the alleged misrepresentations.

And I went through this before, again when I talked about the alternative -- the parties' alternative views on the but/for world, but what we -- that evidence, both from the fact that the USPS and Stamps signed a brand new contract in June 2017, and that the USPS made these positive

statements about Stamps, very positive statements about Stamps on August 1, 2017, shows that we could not have disclosed on those particular dates the same information that plaintiff claims we could have.  So that the drops at the end of the class period are just either not relevant at all, and/or the indirect evidence of that price impact does not outweigh the direct evidence.

And again, here is something --

THE COURT:  Counsel, thank you.  Let me hear from the plaintiffs here.

You know, what I'm told is there is this incontrovertible direct evidence on the front end and then the very weak or misunderstood evidence -- indirect evidence on the back end.

So what are your responses to that?

MR. NIEHAUS: Thank you, Your Honor.  This is Eric Niehaus on behalf of the plaintiffs' class.

Everything that we've just heard presents issues, class-wide evidence, and will impact the class as a whole. It's a class-wide question.  And all of this evidence can be heard by the trier of fact at the appropriate time.

This idea that this is a complex or unsettled state of law is misleading.  There is -- defendants have raised the *Goldman Sachs* case in their briefing and seek to allude to it here in the argument.  That is a case that I have worked on

since 2010.

That case, after an extensive evidentiary hearing, class certification was granted by Judge Crotty, it was affirmed by the Second Circuit, and then again affirmed en banc. There is a cert pending, but that is no indication that the law will be changing anytime soon.

And to get to Your Honor's question about price impact, Your Honor, this reasoning or proposition advanced by defendants seems to emanate from the *Best Buy* decision in the Seventh Circuit, where in defendant's briefing they believe that they have essentially two bites at the apple or two shots to demonstrate a lack of price impact by either this front end concept, which has been sort of created by certain case law, or this back end price impact. That is not the law in this district -- in this Circuit Court. It's the law on this district.

The facts and circumstances in this case is that we have two drops where we have already presumed market efficiency. Both experts have conceded that both drops are statistically significant at a 95 percent competence level, and the inquiry after that, as far as a battle of the experts, should be reserved for the trier of fact.

Defendants want us to completely ignore that and look on the front end at the statements that are remaining in this case. And it's from defendant's own words, these

statements simply reassured that there was a strong relationship with USPS. It's nonsensical to assume that statements reassuring or omissions would create some statistically significant increase in the stock price.

And to the extent that there was any information in the market that undercut these statements, again as Your Honor pointed out in the tentative, that truth on the market inquiry is inappropriate at the class certification stage. And even if it were analyzed here by Your Honor, defendant's own affirmative statements denying that there was any problem with the relationship with the USPS would blunt any impact on the stock price.

And, you know, to address defendant's argument about the fact that we've waived any price maintenance theory in our briefing or Complaint, um, that is completely incorrect.

In cases that defendants have cited where the courts do look at front end price impact, plaintiffs explicitly note after false statements that there was an impact on the stock price, and they want the Court to look at that in determining the price impact of those false statements or misleading statements. Here, that is not the case.

Also in those cases the defendants have raised, *Finisar* and *Best Buy*, the reason why the front end price impact is the inquiry that is at issue in those cases is you don't have statistically significant drops or correct

disclosures on the back end, so the Court looks to the front end to determine if there is price impact on those statements.

It's -- for the Court to perform an analysis on the front end at this point, it's unnecessary.  Because as both experts concede, there are statistically significant drops on the back end, and the Court has already in its motion to dismiss opinion found that there is lost causation, and any attempts by defendant's expert to sever that causal link is also premature at class certification.

So the inquiry that defendants are inviting is entirely premature, Your Honor.  We agree with the reasoned opinion in your tentative, and we do believe that this is a straightforward question, and we're governed by solid Supreme Court precedent and framework that allows us to move forward in this case.

THE COURT:  All right.  Thank you.

Let me hear from the defense.

MR. ZELICHOV: Thank you, Your Honor.

Let me address just a few of the points that Mr. Niehaus made -- this is Mr. Zelichov again -- and then get back to the one other argument I wanted to make, which was ending the class period.

I think what plaintiff has said just sort of misstates the law.  The Supreme Court in *Halliburton* 1 and 2

both indicated that price impact is -- the issue on price impact is whether the alleged misrepresentation affected the market price in the first place. And the idea that we are going to disclaim or completely ignore direct evidence on that particular question and then solely look at what *Allstate* has defined as indirect evidence, what Blacky has defined as circumstantial evidence of price impact, or potential price impact at the end of the class period, in lieu of looking at price impact at the beginning -- at the front end is -- seems to be sort of ridiculous that you are going to put more weight on indirect evidence than you are going to be putting on direct evidence.

Indeed, one of the cases plaintiff itself cites from the Western District of Texas in *EZCORP* actually says -- in that particular case, the defendant came out and showed a lack of -- attempted to show a lack of price impact at the -- on the corrective disclosures. And the Court said, no, no, no, the proper inquiry is what is on the front end?

And there is an overall problem with the idea that you just are going to allow this back end or the stock price drop at the end of the class period to be given the most weight, because what you are essentially doing in that particular situation is you are making a presumption of reliance, which the fraud on the market provides presumption, but it's a rebuttable presumption. You are making that

presumption essentially irrebuttable.  Because plaintiffs are not bringing lawsuits where there isn't a stock price drop at the end of the class period.  That is, frankly, they see a stock price drop at the end of a class period, and then bring the lawsuit.

So if you are going to say that a stock price drop at the end of -- upon a corrective disclosure is the be all and end all, or is sufficient to outweigh direct evidence of what price impact really is, you have turned the *Halliburton* rebuttable presumption into an irrebuttable presumption, which is directly contrary to what the Supreme Court said in *Halliburton* 2.

And these are not -- plaintiff wants to say these are all questions for the trier of fact.  Well, no, *Walmart vs. Dukes*, even *Amgen*, which is a case in securities cases, has said there is an overlap on the merits.  And if the defendants have met their burden of production or persuasion, the Court should reach the merits at that point in time.  And our but/for world is exactly that.

And then with respect to this reassurance, reassurance sure may not -- in some abstract world, you could say, well, reassuring statements should not have a price impact because they are just reassuring.  But this isn't a hypothetical world.  These are reassuring statements by Stamps in light of increasing negative information being

released into the market, that the market viewed as credible because the short interest in Stamps's stock skyrocketed between from 3.5 million shares to over 5.6 million shares. Showing that these were not just statements that the market was thinking, "Oh, this is just more of the same, I'm not worried about it."  It was -- they had significant impact on the market.

And if the Court -- and if the market was going to then listen to Stamps and actually rely on those Stamps's statements, which is what this is all a -- this is all indirect evidence of reliance, the stock price should go up. That is what Dr. Zurek had as an ex ante hypothesis, and then he showed through direct evidence by looking at both his and Dr. Nye's event studies to show, no, the stock price didn't go up, it stayed flat.

And he further shows that there isn't confounding information that should have caused the stock price to stay flat.  Indeed, Dr. Nye acknowledges as much, where he says with respect to the May statement that everything that Stamps did that time was expected.

So I'm not surprised that there -- that the stock price basically stayed flat, went down a little bit.

THE COURT:  Counsel, I do have other cases.  Let me move on to your other point, the end of the class period.

MR. ZELICHOV: Sure.  I appreciate that.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

And here I'll do this much, much faster.  So plaintiff wants to claim that the February 21st, 2019 disclosure is not sufficient to end the class period.  But he -- plaintiff alleged in paragraph 63 of the current operative Complaint that on February 21st, 2019 Stamps revealed the true state of its relationship with the USPS when it announced the end of its USPS partnership.

Similar, the same plaintiff expressly adopted the Karinski Complaint, which has been superseded by the Consolidated Complaint, but this plaintiff adopted that when it sought to be lead plaintiff, and that Complaint not just -- not just says that the February 21st statements revealed the Stamps's partnership with the USPS is not strong because of manipulation of the USPS reseller program, but actually ended the class period there.

You know, this is where plaintiffs' really only response to that, at least as I could read it, is we only addressed the February 21st, 2019 disclosure as reflecting the discontinuation of the Commission agreement and not the Stamps's relationship with the USPS.  But that is inaccurate for the reasons I just explained.  They are ignoring the admissions that they make in their Consolidated Complaint, and in adopting the earlier Complaint.  They ignore paragraph 19 of Dr. Zurek's opposition.  And they ignore our opposition just on Dr. Zurek's report.  And they ignore lines 15 to 23

of page 19 of our opposition brief.

And I would ask the Court to read *MagnaChip* from the Northern District of California and *Medtronic* from the District of Minnesota on this particular issue.

And thank you very much, Your Honor.

THE COURT:  All right.  What is the plaintiffs' response to the argument based on the end of the class period?

MR. NIEHAUS: Your Honor, it's Eric Niehaus.

This is a rehashing of their argument on the motion for clarification.  They are taking an extremely narrow view of our case.

As Your Honor stated in its July 14th, 2020, order these misrepresentations and omissions that we state on this case are alleged to be misleading, because they could communicate that Stamps had a strong relationship with the USPS and/or tout that relationship in positive terms.

Defendants want to make this case about just the USPS Task Force report or just a contract that was renegotiated with the USPS.  This case has a much larger, overarching scheme that we have pled.

If the Court revisits the briefing on the motion for clarification, you will see a more expansive view of how we have argued that.  And I think the Court -- we obviously believe the Court has a well-reasoned order in that respect.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

And just really quickly, Your Honor, this idea that Dr. Zurek, defendant's expert, has proven the matter of law that if the information that we allege to be concealed was disclosed on the first day of the class period, that there would have been no stock drop at all, is completely ridiculous.

And I think that those type of assertions should be reserved for the trier of fact, and both experts can opine at the appropriate time on that.

THE COURT: All right. Thank you, counsel. I appreciate your briefs. I appreciate your arguments. The matter is taken under submission.

MR. ZELICHOV: May I make one further point? This is Mr. Zelichov.

THE COURT: Yes, Mr. Zelichov. I said no you may not.

Thank you, counsel. The matter is taken under submission.

\*\*\*\*\*     \*\*\*\*\*     \*\*\*\*\*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

----------------------------

Amy C. Diaz, RPR, CRR                    November 2, 2020

S/   Amy Diaz

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER