ROBBINS GELLER RUDMAN
  & DOWD LLP
STEVEN W. PEPICH (116086)
JASON A. FORGE (181542)
ERIC I. NIEHAUS (239023)
HILLARY B. STAKEM (286152)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
stevep@rgrdlaw.com
jforge@rgrdlaw.com
ericn@rgrdlaw.com
hstakem@rgrdlaw.com
ksciarani@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT KARINSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>     vs.<br><br>STAMPS.COM, INC., et al.,<br><br>                              Defendants. | Case No. 2:19-cv-01828-MWF-SK<br><br>CLASS ACTION<br><br>DECLARATION OF ERIC I. NIEHAUS IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR: (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT; (2) APPROVAL OF PLAN OF ALLOCATION; (3) AWARD OF ATTORNEYS' FEES AND EXPENSES; AND (4)  AWARD TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4)<br><br>DATE:     January 24, 2022<br>TIME:     10:00 a.m.<br>CTRM:    5A<br>JUDGE:  Hon. Michael W. Fitzgerald |

4880-5371-6740.v2

I, ERIC I. NIEHAUS, declare as follows:

1.    I am an attorney duly licensed to practice before all of the courts of the State of California, and I have been admitted before this Court.  I am a member of the firm Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), the Court-appointed Lead Counsel for Lead Plaintiff in this action.[1]  I was actively involved in the prosecution of this action (hereinafter, the "Litigation") and have personal knowledge of the matters set forth herein based upon my supervision of, and participation in, all material aspects of the Litigation.[2]

2.    I submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the Stipulation, which provides for a cash settlement of $100,000,000 on behalf of the Class (the "Settlement" or "Settlement Amount"); (b) the proposed Plan of Allocation; (c) Lead Counsel's request for an award of attorneys' fees and expenses; and (d) Lead Plaintiff's application for an award in connection with its prosecution of the Litigation on behalf of the Class.[3]

---

[1]    Lead Plaintiff and Class Representative in this action, Indiana Public Retirement System, is referred to herein as "Lead Plaintiff."

[2]    Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Stipulation of Settlement filed with the Court on August 16, 2021 (the "Stipulation").  ECF No. 196.

[3]    Pursuant to this Court's November 9, 2020 Order (ECF No. 172) granting Lead Plaintiff's motion for class certification and the Stipulation (¶1.6), the Class is defined as:

> [A]ll persons who purchased or otherwise acquired Stamps.com common stock between May 3, 2017, and May 8, 2019, inclusive, and were damaged thereby.  Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.  Also excluded from the Class are those Persons who exclude themselves by submitting a request for exclusion that is accepted by the Court.

- 1 -

4880-5371-6740.v2

## I. SUMMARY OF LITIGATION AND REASONS FOR SETTLEMENT

3. This securities class action was brought on behalf of all persons who purchased the common stock of Stamps.com Inc. ("Stamps" or the "Company") between May 3, 2017 and May 8, 2019, inclusive (the "Class Period"). The action was brought against Stamps, its Chief Executive Officer ("CEO"), Kenneth McBride, its President and former Chief Financial Officer ("CFO"), Kyle Huebner, and its CFO, Jeff Carberry (together, "Defendants"), on behalf of the Class for violations of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder, and against certain individual defendants for violations of §20(a) and §20A of the Exchange Act. Lead Plaintiff alleged that Defendants knowingly made materially false and misleading statements and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in contravention of the Exchange Act and Rule 10b-5.

4. This case was vigorously litigated from its commencement on February 28, 2019, until the proposed Settlement was reached on May 28, 2021, after Lead Plaintiff had conducted substantial fact discovery. At every stage of the Litigation, Defendants aggressively litigated the matter and asserted that they had comprehensive defenses.

5. The Settlement was not achieved until Lead Plaintiff had conducted extensive litigation, including, *inter alia*: (a) researching the factual and legal basis for Lead Plaintiff's claims to draft the Consolidated Class Action Complaint (the "Complaint") (ECF No. 71); (b) successfully opposing Defendants' Motion to Dismiss the Complaint; (c) successfully opposing Defendants' attempt to bifurcate class and merits discovery; (d) successfully preserving its claims by opposing Defendants' Motion to Clarify; (e) obtaining certification of this action as a class action; (f) opposing Defendants' Rule 23(f) petition to the Ninth Circuit Court of

- 2 -

4880-5371-6740.v2

Appeals; (g) conducting extensive fact discovery, including taking the depositions of two corporate designees and one expert; (h) obtaining two orders compelling discovery; (i) pursuing extensive non-party discovery from USPS and related industry non-parties; (j) responding to discovery propounded by Defendants; (k) defending Lead Plaintiff's deposition and the deposition of its class certification expert; (l) mediating with a nationally recognized mediator; and (m) assessing the risks of prevailing on its claims at trial and the Class' ability to collect on a final judgment, if obtained.

6.     The Settlement was the result of arm's-length negotiations facilitated with the assistance and oversight of the Honorable Daniel Weinstein (Ret.), a respected mediator with substantial experience in mediating class action cases involving alleged violations of the federal securities laws.  The parties attended two in-person mediation sessions held on December 1, 2020 and March 23, 2021.  In advance of the first mediation session, Lead Plaintiff and Defendants prepared comprehensive mediation briefs, supported by evidentiary materials, and vigorously advanced and defended their positions at the mediations.  At the mediations themselves, the parties further presented arguments on the merits of their positions. The parties did not reach a settlement during either mediation session, however, Judge Weinstein facilitated further negotiations between the parties leading up to the Settlement.  Ultimately, on May 28, 2021, the parties reached a resolution with the assistance of Judge Weinstein.

7.     The proposed Settlement is the result of hard-fought and contentious litigation pursued by zealous advocates on both sides, and takes into consideration the significant risks specific to the case.  It was negotiated by experienced counsel for Lead Plaintiff and Defendants with a solid understanding of both the strengths and weaknesses of their respective positions.

8.     Lead Counsel believes that this Settlement represents an exceptional result for the Class.  Based on its factual discovery, investigation, research, analysis,

- 3 -

4880-5371-6740.v2

motion practice and pre-trial preparation, Lead Counsel believes that the case has significant merit, but also recognizes there would be significant risks at trial, which had to be carefully evaluated in determining the course that was in the best interests of the Class (*i.e.*, whether to settle and on what terms, or to continue to litigate through a trial on the merits and the inevitable appeals process).  As set forth below, the specific circumstances involved here presented many risks and uncertainties if the case proceeded to trial.  And, if Lead Plaintiff were to win at trial, it would have to take into account in evaluating the proposed Settlement the risk of a potentially multi-year appeal process, during which time the Class would be denied any recovery.

9.     Lead Counsel's perseverance through the Litigation resulted in the discovery of substantial evidence in support of the alleged claims, including evidence that Lead Counsel believed would sustain a jury verdict that Defendants knowingly made false and misleading statements when they claimed that Stamps had a strong relationship with the United States Postal Service ("USPS") and that the USPS was "very happy" with Stamps' business practices.  At trial, Lead Plaintiff believes it could establish that Stamps had developed and implemented a business strategy to defraud the USPS by acquiring multicarrier shipping platforms (and their customer lists) to secretly migrate USPS business through the USPS reseller program to capture unearned spread between what the customer paid for postage and what the USPS took in as revenue.  Lead Counsel also believes it has obtained substantial evidence in discovery to establish that Defendants had anticipated the inevitable USPS backlash, which resulted in USPS terminating Stamps' exclusive commission deal and signaling that it was making changes to the reseller program to prevent further manipulation.  Lead Plaintiff further believes further analysis of the record will show that two corrective disclosures on February 21, 2019 and May 8, 2019 caused Stamps' stock price to plummet twice by 50% in successive fiscal quarters, causing over a billion dollars in damages to Class Members.

- 4 -

4880-5371-6740.v2

10.     Despite the strength of the evidence developed in discovery, there were substantial risks to Lead Plaintiff's ability to obtain, protect and recover on a favorable judgment at trial.  Defendants vigorously contested each of the foregoing allegations, and made clear their plan to marshal evidence at trial which they hoped would convince the jury that: (a) the alleged misstatements were not false or misleading; (b) any alleged misstatement was not material; (c) Defendants did not make the alleged misstatements with the requisite scienter; and (d) Lead Plaintiff cannot establish loss causation and damages.

11.     Liability was at issue because Defendants have asserted that USPS officials have made positive statements about Stamps and the reseller program, asserted a "truth-on-the market defense" that the market already knew the particulars of Stamps' use of the USPS reseller program, argued that Lead Plaintiff had misinterpreted key portions of the documents and the mechanics of Stamps' business model, and suggested that if the USPS was not happy with Stamps, it was not clearly communicated to Defendants.  While Lead Counsel believes it had substantial responses to each of these arguments, were the jury to credit any or all of them, the jury could reject some or all of Lead Plaintiff's claims.

12.     In addition, Lead Plaintiff would have to establish loss causation and damages as to two corrective disclosures, posing the risk that the jury could find Defendants liable but eliminate or substantially limit damages.  Moreover, the risk that Lead Plaintiff's expert testimony on the issues could be potentially excluded through *Daubert* motion practice by Defendants before trial could substantially hinder Lead Plaintiff's ability to prove loss causation and damages before the issues are presented to the jury.

13.     There was also significant risk of delay in providing Class Members with compensation for the harm caused by Defendants' Exchange Act violations.  Further litigation would require the expenditure of significantly more time, expense and risk, including, but not limited to, taking depositions, conducting expert

- 5 -

4880-5371-6740.v2

discovery, briefing summary judgment and motions *in limine*, negotiating pretrial issues and a joint pretrial order, trying the case and defeating Defendants' post-trial motions.

14.    There is also a substantial risk that Defendants would appeal any verdict achieved in Lead Plaintiff's favor.  The appeals process could then span years, during which time the Class would receive no recovery.  For example, one securities class action tried by Robbins Geller obtained a verdict in favor of the plaintiff class seven years after the case was filed, had judgment entered 11 years after the case was filed, and then had a major portion of the verdict reversed in 2015, 13 years after the case was filed.  A second trial of that case was set to occur in 2016, 14 years after the case was filed, when a settlement was finally reached.  Prevailing at trial does not equate to an immediate cash payment to the victimized class members.  Any appeal would also create the risk of reversal, in which case the Class would receive nothing after having prevailed at trial.

15.    Finally, although Lead Counsel believes that Defendants' appeal of the Court's class certification order ultimately would have been unsuccessful, the Ninth Circuit could reverse the Court's order and decertify the Class.  An adverse decision would eliminate the Class' ability to share in any recovery or result in additional delays upon further appeal or remand.

16.    All of these factors, together with the other factors discussed herein, were considered by Lead Plaintiff and Lead Counsel in concluding that the proposed $100,000,000 Settlement provided fair, reasonable and adequate consideration in light of the risks and uncertainties of trial.  In reaching the determination to settle, Lead Counsel weighed the documentary evidence and legal authority supporting Lead Plaintiff's allegations against Defendants' evidence and arguments which they legitimately believed undercut Lead Plaintiff's claims.  On balance, considering all the circumstances and risks both sides faced at summary judgment and at trial, in addition to Lead Plaintiff's ability to collect on a final judgment, Lead Plaintiff came

- 6 -

to the conclusion that the Settlement on the terms agreed upon provided fair, reasonable and adequate consideration for the claims alleged and was in the best interests of the Class.

17. The Settlement confers a substantial benefit on the Class and eliminates the significant risks of class certification appeals, summary judgment and *Daubert* challenges, as well as the risks inherent at trial, and in post-trial proceedings and appeals, the outcome of which was far from certain. It is respectfully submitted that the Settlement should be approved as fair, reasonable and adequate; that the Plan of Allocation should be approved; that Lead Counsel should be awarded attorneys' fees of 16.75% of the Settlement Amount and expenses of $526,792.79; and that Lead Plaintiff should be awarded $9,150 pursuant to 15 U.S.C. §78u-4(a)(4) in connection with its representation of the Class.

18. Lead Counsel has, as described below, vigorously prosecuted this action on a wholly contingent basis and advanced or incurred significant litigation expenses. Lead Counsel has not received any compensation for its substantial effort and has long borne the risk of an unfavorable result.

19. The fee application for 16.75% of the Settlement Amount is fair both to the Class and Lead Counsel, has been approved by Lead Plaintiff, and warrants this Court's approval. Indeed, this fee request is below the median fees awarded in cases settling between $100 million and $500 million. Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021) at 23. Under the particular facts of this case, this percentage is justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed. The Settlement here represents approximately 7.2% of estimated recoverable damages consistent with Lead Plaintiff's currently proposed Plan of Allocation and 13.3% as a percentage of damages if Defendants' argument for a reduced class period had been accepted. This is a very good result, especially when

- 7 -

4880-5371-6740.v2

compared to the median ratio of settlement to investor losses of 1.7% for securities class action settlements in 2020. *Id.* at 20, fig. 16.

20. Lead Counsel should also be awarded litigation expenses of $526,792.79, which were reasonably and necessarily incurred in prosecuting the Litigation. This amount includes the fees and expenses for: (a) investigators, consultants and experts whose services Lead Counsel required for the successful prosecution, analysis and resolution of this case; (b) stenographic and videographer services for depositions; (c) travel and lodging for Lead Counsel to attend Court hearings; (d) factual and legal research, as well as photocopying, imaging and printing thousands of pages of documents; (e) litigation database costs for serving, cataloging and facilitating the review and analysis of the electronic equivalent of more than 200,000 pages of documents; and (f) mediation fees.

21. As described in detail below, these expenses were reasonably and necessarily incurred to plead Lead Plaintiff's claims, certify the Class, conduct discovery, prepare this case for trial and obtain a settlement on the terms proposed.

## II.    PROCEDURAL HISTORY OF THE LITIGATION

22. This Litigation was highly contentious, involving significant disputes at all phases of the case. Defendants mounted vigorous challenges at the pleading and class certification stages, and the parties had numerous disputes over the scope and adequacy of discovery. As described below, extensive briefing was required to sustain and maintain the claims asserted throughout the Litigation.

23. Detailed communications were also exchanged with defense counsel regarding multiple disputes that arose during the pendency of this case. Extensive meet and confers, and ultimately motion practice, were required to compel Defendants to locate and produce documents responsive to Lead Plaintiff's discovery requests.

24. These efforts, described in more detail below, were needed to conduct discovery to prepare this case for trial, and to develop Lead Plaintiff's claims in the

4880-5371-6740.v2

manner that led Defendants to agree to the Settlement that is now before the Court for approval.

### A.    The Consolidated Complaint, Motion to Dismiss and Motion to Clarify

#### 1.    The Consolidated Amended Complaint

25.    On February 28, 2019, the initial putative class action complaint was filed.  Pursuant to the Private Securities Litigation Reform Act of 1995, on June 5, 2019, the Court appointed Lead Plaintiff as lead plaintiff and approved its selection of Lead Counsel, and shortly thereafter, directed the filing of a Consolidated Complaint.  ECF Nos. 62, 68.  Based on an extensive analysis of the Company's SEC filings, public statements, media, analyst reports and investigation by Lead Counsel, the Complaint, filed on August 5, 2019, alleged violations of §10(b) of the Exchange Act and SEC Rule 10b-5 by Stamps and the Individual Defendants,[4] violations of §20(a) of the Exchange Act by the Individual Defendants and violations §20A of the Exchange Act by McBride.  ECF No. 71.

26.    Specifically, Lead Plaintiff alleged that Stamps had engaged in unsustainable business practices which were designed to manipulate the USPS reseller program to cannibalize USPS revenue, and that Defendants made materially false and/or misleading statements: (a) that Stamps' relationship with the USPS was strong and mutually beneficial; (b) USPS was happy with Stamps and fully approved Stamps' use of the USPS reseller program; and (c) that Stamps' strong financial results were the result of its approved use of the USPS reseller program.

27.    Defendants moved to dismiss the Complaint on October 4, 2019.  ECF Nos. 79, 84.  Defendants filed a 40-page memorandum of point and authorities, along with a 399-page compendium of exhibits in support of their motion to dismiss, which argued that: (a) the market already knew ("truth-on-the-market") the alleged omissions concerning the particulars of Stamps' use of the USPS reseller program

---

[4]    The Individual Defendants are McBride, Huebner and Carberry.

- 9 -

to sell to small-volume and existing USPS customers, and that Stamps had revenue sharing agreements with affiliated resellers; (b) Stamps' statements regarding its relationship with USPS were not misleading because Lead Plaintiff failed to allege a breach of contract or any postal regulatory or statutory violations; (c) any allegations regarding a poor relationship with USPS merely amounted to a difference of opinion because certain USPS officials made positive statements about Stamps and the reseller program; (d) Stamps' financial statements were accurate and non-actionable; (e) in any event, Defendants' statements were forward-looking and thus protected by the Safe Harbor through Stamps' risk disclosures concerning its dependence on agreements (and renewal of those agreements) with the USPS and other business partners; (f) Lead Plaintiff failed to plead scienter because Defendants' stock sales were unremarkable and that holistically Lead Plaintiff's allegations did not give rise to a strong inference of scienter; (g) Lead Plaintiff did not adequately plead loss causation because the February 21, 2019 disclosure of the non-renewal of Stamps' incentive agreement did not reveal Defendants' alleged scheme and that the May 8, 2019 disclosure only referred to potential changes to agreements with non-party resellers; and (h) the §§20(a) and 20A claims should be dismissed for failing to allege a predicate cause of action. ECF No. 79.

28. Lead Plaintiff opposed Defendants' motion in a 40-page response. ECF No. 83. Lead Plaintiff argued in its opposition that the Complaint adequately alleged that Defendants concealed Stamps' manipulation and abuse of the USPS reseller program which strained its relationship with the USPS and that the Complaint pled facts overwhelmingly supporting a strong inference of scienter. The opposition also addressed loss causation and the §20A claim.

29. On January 17, 2020, after hearing oral argument, the Court granted in part and denied in part Defendants' motion to dismiss. ECF No. 89. Specifically, the Court upheld Lead Plaintiff's allegations that "Stamps had a strong partnership with USPS and that USPS fully approved Stamps' use of the reseller program." *Id.*

- 10 -

4880-5371-6740.v2

The Court granted Defendants' motion with respect to Defendants' positive statements about Stamps' financial results. *Id.*

30. Defendants filed their Answer on January 31, 2020. Defendants denied all of Lead Plaintiff's substantive allegations and asserted 35 separate affirmative defenses. ECF No. 94.

## B. Fact Discovery

31. During fact discovery, Lead Plaintiff reviewed and/or analyzed the electronic equivalent of more than 200,000 pages of documents from Defendants and non-parties, deposed two Rule 30(b)(6) witnesses and Defendants' class certification expert, and defended the deposition of Lead Plaintiff's Rule 30(b)(6) representative and Lead Plaintiff's expert in connection with class certification.

32. Months of negotiation and motion practice were necessary for Lead Plaintiff to obtain documents responsive to its discovery requests. Motion practice also included opposing Defendants' efforts to stay or limit merits discovery until Defendants could first oppose class certification. Once the relevant materials had been received, Lead Counsel undertook the substantial task of reviewing, organizing and analyzing the documents in anticipation of depositions, expert reports, summary judgment and trial. These trial preparation efforts were critical to Lead Plaintiff's ability to achieve a favorable settlement for the Class.

### 1. Protective Order for Confidential Documents and Testimony

33. The parties negotiated the terms of a proposed protective order to govern the confidential treatment of evidence produced in this case. The parties exchanged drafts of a proposed order and met and conferred to discuss the terms of the protective order. The parties also negotiated the extent to which, and the conditions under which, confidential information could be shown to deponents, non-parties and others not previously privy to such information. On March 23, 2020, the

- 11 -

4880-5371-6740.v2

Court approved the parties' Stipulated Protective Order for the Production and Exchange of Confidential Information. ECF No. 99.

**2.      Defendants' Request to Bifurcate Discovery, Motion to Clarify and Motion to Extend the Case Management Schedule**

34.      Defendants sought discovery relief by raising a dispute in the parties' Joint Rule 26(f) Discovery Plan. ECF No. 100. In the joint filing, Defendants argued that class and merits discovery should be bifurcated because they believed class certification was unlikely to be granted and, at a minimum, would result in the Class Period being truncated. Lead Plaintiff responded in a separate section and argued that bifurcation would merely add delay and needless expense to the Litigation and prejudice Lead Plaintiff. Defendants also submitted a request to provide supplemental briefing on the bifurcation issue. ECF No. 104. In conjunction with the Court's issuance of the pretrial schedule, on April 29, 2020, the Court granted Defendants' request for supplemental briefing, but denied their request to bifurcate discovery, stating that Defendants could seek relief from the Magistrate Judge as to a particular discovery request. ECF No. 107.

35.      On June 22, 2020, Defendants filed a Motion to Clarify the Court's Motion to Dismiss Order. ECF No. 111. In their 473-page Motion to Clarify, including exhibits, Defendants identified nine alleged false and misleading statements and argued that the Court should specifically dismiss six of them – including all statements made at or near the beginning of the Class Period. ECF No. 111. Lead Plaintiff responded that the statements were not dismissed under a fair reading of the Court's order and otherwise were upheld as an overarching scheme to defraud. ECF No. 116. Defendants filed a reply. ECF No. 137. After a telephonic hearing, the Court clarified that it intended to dismiss two of the nine statements at issue, but upheld the remaining misstatements, including those which occurred on the first day of the Class Period.

- 12 -

4880-5371-6740.v2

36. Also on June 22, 2020, Defendants filed a motion to extend the pre-trial schedule citing COVID-19 and additional issues with respect to class certification discovery and motion practice. ECF No. 113. Lead Plaintiff opposed this motion, arguing that it appeared to be a tactic to delay merits discovery while moving forward with class certification, contrary to the Court's pre-trial schedule denying bifurcation of merits and class discovery. ECF No. 117. The Court granted Defendants' motion, in part. ECF No. 142.

### 3. Initial Requests for Production of Documents

37. On February 27, 2020, Lead Plaintiff served its First Request for Production of Documents to Defendants containing 45 requests regarding all aspects of its claims. The requests sought documents and communications related to: (a) interactions with the USPS, the Postal Regulatory Commission and their employees and/or officers; (b) Stamps' relationships with independent postage resellers and other similar USPS shipping aggregators; (c) the USPS reseller program; (d) Negotiated Service Agreements and other agreements with USPS; (e) the status of Stamps' relationship with the USPS; (f) Stamps' acquisitions of multicarrier platforms; (g) Stamps' shifting of customers to or within the USPS reseller program; (h) Board of Directors meeting materials; (i) Stamps' SEC filings and other public statements; and (j) other matters pertinent to Lead Plaintiff's claims. Defendants submitted their responses on March 30, 2020, and objected on the grounds of relevance and over breadth claiming that the majority of the case had been dismissed and further asserting that such requests were premature and should be deferred until after the Court ruled on class certification.

38. On August 12, 2020, Lead Plaintiff served its Second Request for Production of Documents to Defendants. This set contained an additional six requests for documents, in part, concerning "Project Solar" which Lead Plaintiff believed documented the genesis of Stamps' scheme to manipulate the reseller program at issue in the Litigation. On September 10, 2020, Defendants objected to

- 13 -

these requests asserting that the requested materials were dated prior to the relevant time period for discovery or such time frame which may be proscribed upon a Court order limiting the Class Period.

39.    On February 23, 2021, Lead Plaintiff served its Third Request for Production of  Documents to Defendants.  This set contained an additional five requests for documents seeking data and reports to support Lead Plaintiff's claims and for materials supporting Defendants' responses to its written discovery.  The parties continued the deadline for Defendants' response so that they could explore reaching a settlement.

40.    Significant time was spent by Lead Counsel meeting and conferring and exchanging correspondence with defense counsel to resolve Defendants' objections to Lead Plaintiff's document requests.  Motion practice was ultimately required to resolve disputes between the parties over the scope of the production and the search for electronically stored information ("ESI"), necessitating significant time spent by Lead Counsel to brief and argue these issues, which significantly extended the length of fact discovery.

**4.    Negotiations Concerning the Production of Defendants' Electronically Stored Information ("ESI")**

41.    Multiple additional meet-and-confer discussions were necessary to address the identification and production of relevant ESI.  Virtually all of the relevant materials were maintained electronically, making these discussions particularly important to the prosecution of this case.  Lead Counsel, based on consultation with in-house ESI experts, engaged in extensive meet and confers with Defendants concerning: custodial and non-custodial sources of ESI; search terms and date ranges to be used in identifying relevant ESI; and ESI retention and deletion policies and practices.

42.    Lead Counsel initiated and participated in written and telephonic exchanges with Defendants' counsel regarding the use of de-duplication, file type

- 14 -

filtering, date filtering, review by thread-view and technology-assisted review as potential methods to efficiently search, review and produce the documents from agreed-upon custodians. In response to Defendants' concerns regarding the burden of review for privilege, Lead Counsel provided suggestions as to how to further reduce Defendants' burden, including the use of search terms.

43. The parties also negotiated a stipulation regarding the format of document production, so that documents would be produced electronically in a useable form with relevant metadata appended to the files. The parties exchanged drafts of a proposed order and met and conferred to discuss technical details of production. On April 24, 2020, the Court approved the parties' Stipulation Regarding the Format of Document Productions. ECF No. 102.

44. The parties worked to reach agreement on search terms, which required numerous meet-and-confer discussions and negotiations spanning a series of months and a second series of negotiations to attempt to reach a resolution on supplemental search terms and custodians. This process involved running and testing various alternatives to Lead Plaintiff's and Defendants' proposed searches. Lead Counsel utilized the services of in-house e-discovery experts and researched the capabilities of the vendor Defendants had proposed to manage the production of ESI. Although the parties were able to a reach general consensus on the search terms, the parties were unable to reach an agreement as to the appropriate number and identity of custodians.

45. Lead Counsel also deposed two Stamps' Rule 30(b)(6) designees to obtain information relevant to the discovery negotiations, including: Stamps' document retention policies, its preservation of documents, its organizational structure, relevant internal policies, and persons likely to possess information relevant to Lead Plaintiff's claims.

- 15 -

4880-5371-6740.v2

## 5.    Discovery Disputes

46.    Lead Counsel devoted substantial time to analyzing documents produced in discovery and available in the public record, preparing for meet-and-confer conferences with counsel for Defendants, conducting meet-and-confer conferences and preparing correspondence memorializing those conversations in order to narrow the scope of discovery disputes while still aggressively pursuing the discovery rights of the Class.

47.    The parties engaged in numerous meet and confers regarding Defendants' document discovery and production alone, as the parties disagreed on almost every aspect regarding the scope of Defendants' discovery and how the search for ESI should proceed.  Such disputes included: which party would provide initial search terms and custodians; which search terms and custodians should be used; the relevant time period for discovery; the relevance of the requested discovery; whether document productions from related litigation should be searched and produced; the extent to which analytics should be used and shared among the parties to determine the efficacy of proposed search terms and custodians in identifying relevant information; and whether follow-up discovery was appropriate. As a result, two motions to compel were filed to resolve these threshold discovery issues and at the time the Settlement was reached, the parties were continuing to negotiate issues Lead Plaintiff had raised after its initial review of documents.

### a.    Discovery Disputes with Defendants Regarding Scope of Production

48.    Counsel for all parties engaged in meet and confers to negotiate numerous issues concerning Defendants' anticipated production, which were memorialized in letters and e-mails documenting the parties' positions and outstanding issues.  Despite these efforts, the parties reached several impasses requiring Lead Plaintiff to seek Court intervention.  The issues in dispute included, among others, the relevance of the documents sought to Lead Plaintiff's surviving

- 16 -

4880-5371-6740.v2

allegations, Defendants' obligations to search for and locate relevant ESI, the relevant time period of the ESI search, the identity and number of custodians, and the burden of production.

**(1)   Dispute Regarding the Scope of Relevance, the Relevant Time Period and the Number of Document Custodians**

49.   On July 6, 2020, Lead Plaintiff filed a Joint Stipulation Regarding its Motion to Compel Discovery from Defendants and Defendants' response thereto, as required under the Local Rules of the Central District of California, requesting the Court to compel the production of documents. ECF No. 133. The discovery motion concerned three interrelated issues: (1) the relevance of discovery into Stamps' reseller business model; (2) the relevant time period for discovery; and (3) the number of custodians for ESI searches. Defendants opposed all these requests, arguing that the Court's dismissal of certain claims justified a narrower review protocol and the exclusion of specific time periods for discovery. The Court granted Lead Plaintiff's first two requests and declined to rule on the number of custodians without more information. *See* ECF No. 152.

**(2)   Dispute Regarding a Limited Expansion of the Relevant Discovery Time Period and Additional ESI Search Terms to Identify "Project Solar" Documents**

50.   On November 6, 2020, Lead Plaintiff filed a Joint Stipulation Regarding its Motion to Compel Documents Responsive to Request for Production No. 49 and Defendants' response thereto. ECF No. 170. The motion requested that the Court permit an expansion of the previously ordered relevant time period for discovery for certain categories of documents and compel Defendants to produce additional Board materials and documents returned by ESI search terms referencing "Project Solar." Lead Plaintiff believed these documents would be directly relevant to its claims. Defendants opposed and asserted that Lead Plaintiff's requests

- 17 -

contravened the Court's prior orders. On December 15, 2020, the Court granted Lead Plaintiff's motion in substantial part. ECF No. 183.

### 6. Review and Analysis of Documents Produced in Discovery

51. Defendants and non-parties produced the electronic equivalent of over 200,000 pages of documents in discovery. In addition to the larger issues related to where and how Defendants were searching for these documents, numerous smaller matters arose that required further attorney and support staff time related to the completeness of production, format of production, errors in the files of particular productions and improperly formatted files. All of these issues, and more, had to be addressed through the meet-and-confer process.

52. The size of the production in this case also required expending significant time and expense on document hosting, storage, review and analysis. Lead Counsel utilized industry-leading Relativity software, which permitted Lead Counsel to search, sort, categorize, tag, prioritize, highlight and annotate documents in support of its case. Attorneys and support staff used search terms, date filters, analytics and metadata fields in Relativity to compile, review and analyze sets of documents and locate the evidence needed to prepare the case for trial.

### 7. Requests for Admission

53. On May 26, 2020, Lead Plaintiff served 19 requests for admission on Defendants to narrow the scope of issues that would be disputed at class certification. Specifically, Lead Plaintiff requested that Defendants admit the information relevant for assessing the *Cammer* and *Krogman* factors used to assess whether Stamps common stock traded in an efficient market. Defendants responded, admitting in part, seven requests and asserting they were unable to admit or deny the remainder of the requests.

54. On February 23, 2021, Lead Plaintiff served 24 additional requests for admission on Defendants to narrow the scope of issues that would be disputed at

- 18 -

4880-5371-6740.v2

summary judgment and trial.  Defendants' response was pending at the time the parties reached a settlement.

### 8.   Interrogatories

55.   On February 23, 2021, Lead Plaintiff served 10 interrogatories on Defendants to request the identification of relevant documents and to garner evidence in support of its claims.  The topics of these interrogatories included the basis for Defendants' affirmative defenses and information relevant to determining the nature and extent of the Company's use of the USPS reseller program. Defendants' response was pending at the time the parties reached a settlement.

### 9.   Discovery Taken from Non-Parties

56.   Substantial efforts were undertaken by Lead Counsel to obtain relevant evidence from non-parties, including those described below.

#### a.   United States Postal Service

57.   On April 16, 2020, Lead Counsel served a subpoena on the USPS seeking, in part, documents concerning its interactions with and statements concerning Stamps, its agreements with Stamps and decisions related to the reseller program.  Lead Counsel engaged in a nearly year-long negotiation process, including regular correspondence and meet-and-confer calls to discuss the scope of the subpoena, the use of ESI search terms and custodians, the extent and application of the deliberative privilege, and to explore options to prioritize and expedite production of certain categories of documents given the limited resources of the USPS.  Ultimately, over 12,000 pages of documents were produced by the USPS.

#### b.   Postage Resellers

58.   Lead Counsel served subpoenas on six of Stamps' reseller and/or sales partners, including three USPS-approved postage resellers: Express1, Parcel Partners and Intuiship.  The subpoenas sought information concerning Stamps' use of the reseller program and the non-parties' agreements with Stamps.  Lead Counsel negotiated search terms and custodians with the non-parties resulting in the

- 19 -

production of over 55,000 pages of documents. With respect to the non-party Parcel Partners, the negotiations over burden were contentious as the parties disputed the accuracy of the document counts responsive to Lead Plaintiff's proposals and corresponding burdens. Resolution of the dispute required Lead Counsel to hire an ESI consulting expert to assist the non-party's information technology team implement the search protocols proposed by Lead Plaintiff to narrow the scope of production.

### 10. Freedom of Information Act ("FOIA") Request

59. Lead Counsel obtained approximately 2,000 pages of documents from the USPS by submitting a FOIA request. The USPS FOIA office initially resisted releasing certain materials, which required the exchange of further correspondence over the scope and specific subject matter of the request.

### 11. Depositions

60. Prior to the parties reaching a settlement, Lead Counsel took two depositions of Stamps under Fed. R. Civ. P. 30(b)(6), which also required serving detailed deposition topics on the Defendants, and meeting, conferring and exchanging correspondence to negotiate the scope of those depositions. Lead Counsel also took the deposition of Defendants' expert, Paul Zurek, Ph.D., who submitted a report in support of Defendants' opposition to Lead Plaintiff's Motion to Certify Class. A full listing of the depositions follows:

| Deponent | Position | Date | Location |
|---|---|---|---|
| Steve Rifai 30(b)(6) | Chief Sales Officer | September 17, 2020 | Remote |
| Philip Deul 30(b)(6) | Director of Corporate IT | September 23, 2020 | Remote |
| Paul Zurek | Defendants' Expert | October 5, 2020 | Remote |

- 20 -

4880-5371-6740.v2

### 12. Defendants' Discovery

#### a. Written Discovery Served on Lead Plaintiff

61. Over the course of the fact discovery period, Lead Plaintiff responded to multiple discovery requests from the Defendants, including 59 requests for production of documents, and at the time of the Settlement, had been preparing to respond to interrogatories and requests for admission.

62. On February 27, 2020, Defendants served their First Set of Requests for the Production of Documents to Lead Plaintiff. In 59 separate requests, not including subparts, Defendants sought documents and communications concerning the allegations in the Complaint, Lead Plaintiff's investments in Stamps and other securities, non-party witnesses, class certification, Lead Plaintiff's finances, communications with parties and non-parties, retainer agreements with Lead Counsel and numerous other categories of information. On March 30, 2020, Lead Plaintiff responded to each of Defendants' requests, objecting to the majority as overbroad, not relevant, not proportional and seeking attorney-client privileged information. After negotiating the scope of discovery with Defendants and reviewing the documents for privilege, Lead Plaintiff produced nearly 2,500 pages of documents to Defendants.

63. On February 23, 2021, Defendants served their First Set of Requests for Admission and Interrogatories on Lead Plaintiff. The four requests for admission and nine interrogatories sought primarily to identify evidence Lead Plaintiff intended to use to support its claims. Lead Plaintiff's response was pending at the time the parties reached a settlement.

#### b. Depositions Taken by Defendants

64. Lead Counsel defended Defendants' Rule 30(b)(6) deposition of Lead Plaintiff on July 30, 2020. The deposition notice contained 37 separate topics, not including subparts, which required meeting and conferring to object to and clarify the majority of the topics. Lead Counsel then met with Lead Plaintiff's

- 21 -

4880-5371-6740.v2

representative David W. Stelsel III multiple times to prepare for the deposition. Lead Counsel also defended the deposition of its expert, Zachary R. Nye, Ph.D. on August 14, 2020. Dr. Nye had provided a report at class certification supporting Lead Plaintiff's assertions that Stamps common stock traded on an efficient market and that §10(b) damages could be measured on a class-wide basis and in a manner consistent with Lead Plaintiff's theory of liability. Prior to his deposition, Lead Counsel met with Dr. Nye to prepare for his deposition.

### C.   Class Certification and Defendants' Petition to Appeal the Court's Class Certification Order

65.   Lead Plaintiff moved to certify the Class on June 29, 2020, arguing that it had met its burden to establish the prerequisites for certification under Fed. R. Civ. P. 23(a) and (b). ECF Nos. 119, 120. In support of the motion's assertions regarding market efficiency and a class-wide damages methodology, Lead Plaintiff submitted the expert report of Dr. Nye. ECF No. 122-2.

66.   Defendants opposed certification, asserting that Lead Plaintiff could not establish under Fed R. Civ. P 23(b)(3) that common questions of law or fact would predominate over individual issues. ECF No. 157. Specifically, Defendants argued that Lead Plaintiff's purchases of Stamps securities were atypical and that Lead Plaintiff could not establish preponderance because there was no positive "front-end" price impact connected to Defendants' alleged false statements to invoke the *Basic* presumption of reliance. Defendants also argued that the Court should shorten the alleged Class Period because there could be no price impact for the alleged corrective disclosures because they were unrelated to the alleged misrepresentations about its USPS relationship, the release of the USPS Task Force Report on December 4, 2018 fully corrected statements concerning the Task Force Report, and the announcement of the cancelation of Stamps' Package Business Incentive Agreement on February 21, 2019 fully corrected any alleged misstatement regarding the incentive agreement renegotiations.

- 22 -

4880-5371-6740.v2

67. Lead Plaintiff filed a reply in support of its class certification motion, rebutting Defendants' arguments. ECF No. 161.

68. The Court held a telephonic oral argument on November 2, 2020. On November 9, 2020, the Court granted Lead Plaintiff's motion in full and rejected Defendants' requests to adjust the Class Period. ECF No. 172.

69. Defendants submitted a petition for permission to file an appeal to the United States Court of Appeals for the Ninth Circuit pursuant to Fed. R. Civ. P. 23(f) on November 23, 2020. 9th Cir. No. 20-80160, ECF No. 1-1. On December 10, 2020, Lead Plaintiff opposed Defendants' petition, arguing the basis for Defendants' appeal, that the Court impermissibly rejected evidence of no "front-end" price impact, was not a novel or unsettled legal issue appropriate for an immediate appeal, nor did the Court err in concluding that Lead Plaintiff's "back-end" evidence for price impact was sufficient. 9th Cir. No. 20-80160, ECF No. 6. Defendants thereafter moved to file a reply in further support of their petition to appeal and attached their proposed reply. 9th Cir. No. 18-3036, ECF No. 8.

70. On March 10, 2021, the Ninth Circuit granted Defendants' petition. 9th Cir. No. 20-80160, ECF No. 10. Defendants' appeal was initially scheduled to be filed on June 18, 2021, but the Ninth Circuit administratively closed the appeal until December 6, 2021. 9th Cir. No. 21-55223, ECF No. 8.

**D.    Experts and Investigators Assisting in the Litigation**

71. Lead Counsel utilized the services of investigators and expert witnesses to assist Lead Plaintiff in the prosecution of the Litigation. Investigators interviewed witnesses, which assisted Lead Plaintiff in forming a basis for its allegations and developing proof in this case. Analyses by expert witnesses assisted Lead Counsel in refining Lead Plaintiff's class certification motion and assessing damages. The work performed by these experts and investigators provided valuable insight to Lead Counsel in preparing this case for trial and in evaluating prospects for settlement during the course of the Litigation.

- 23 -

4880-5371-6740.v2

### 1.     Zachary R. Nye, Ph.D.

72.     Zachary R. Nye, Ph.D. is a financial economist and vice president of Stanford Consulting Group, Inc., a financial economics consulting firm.  Dr. Nye has extensive experience in the financial industry, having academic research published in peer-reviewed conference proceedings, as well as authoring working papers with finance faculty at various universities.  He has conducted analyses and presented opinions related to markets, valuation and damages in over 20 cases in the last four years.

73.     Dr. Nye was retained by Lead Counsel to set forth a defensible damages methodology, assess the efficiency of the market for Stamps common stock, and estimate damages suffered by Lead Plaintiff and the Class as alleged in the Complaint.  Dr. Nye also prepared an expert report in support of Lead Plaintiff's motion for class certification.

74.     For his report, Dr. Nye analyzed a wide range of Company and market information, including Stamps' press releases, conference call transcripts, analyst reports, news articles, SEC filings, trading volume, the price of Stamps stock, and the overall market performance.  This information, and an event study constructed by Dr. Nye, formed the basis of his opinion that the market for Stamps common stock was efficient.  Indeed, Dr. Nye's event study empirically demonstrated that the Stamps' stock price reflected the information disclosed to the market, and promptly responded to the disclosure of new, material, and unexpected information.  As part of his report, Dr. Nye also explained that damages could be measured on a class-wide basis and in a manner consistent with Lead Plaintiff's theory of liability under §§10(b) and 20A of the Exchange Act.

### 2.     Investigators

75.     L.R. Hodges & Associates, Ltd. ("L.R. Hodges") was retained by Lead Counsel to assist in identifying and contacting potential (relevant) former employees of Stamps.  L.R. Hodges interviewed witnesses and prepared memoranda, which

- 24 -

4880-5371-6740.v2

assisted Lead Counsel in forming a basis for Lead Plaintiff's allegations and developing proof in this case.

## III.    THE STRENGTHS AND WEAKNESSES OF THE CASE

76.    Based on extensive document discovery, two fact depositions, and motion practice involving detailed analyses of the factual and legal issues underlying the Litigation, Lead Counsel had a thorough understanding of the issues and risks present in this case.  While Lead Counsel believes that substantial evidence existed to support a jury verdict in favor of the Class, it recognizes that there were considerable risks and uncertainties if the case had proceeded to trial.  Lead Counsel carefully considered these risks throughout the Litigation and in deciding to settle this matter.

77.    Although the Court granted class certification, the Ninth Circuit granted Defendants' permission to appeal the class certification order and, even if that appeal failed, the District Court's order was subject to revision at any time – presenting a continuous risk that this case, or particular claims, might not be maintained on a class-wide basis through trial.

78.    At the time the preliminary settlement agreement was reached, discovery was still underway, including follow-up discovery, fact depositions and expert discovery.  Accordingly, Lead Plaintiff's case was subject to the risk that fact depositions or expert reports could recast the documentary evidence to support Defendants' positions at motion for summary judgment and trial.  In addition, if the case proceeded to trial, there would likely be numerous motions filed by the parties that would determine the extent of the evidence that could be presented at trial and the issues upon which liability could be premised that would have to be resolved by the Court.  These would include disputes over the admissibility of expert testimony, specific trial exhibits, objections to deposition testimony and others.  This created additional uncertainty as to what evidence would ultimately be permitted to be shown to the jury and for what purposes.

- 25 -

4880-5371-6740.v2

79. Once at trial, Defendants could have offered potentially effective arguments of their own to defend against Lead Plaintiff's claims. Defendants challenged the factual and legal elements of Lead Plaintiff's claims and had articulated numerous defenses to Lead Plaintiff's allegations that the Court could have accepted at the summary judgment stage or the jury could have accepted at trial.

80. The principal basis on which Lead Plaintiff sought to establish Defendants' liability was establishing that Stamps' business practices were either knowingly harmful to Stamps' relationship with USPS and/or that USPS had actually voiced displeasure at Stamps for its business practices. Thus, at trial, Lead Plaintiff would have to prove that Defendants knew (or recklessly disregarded) that Stamps' business practices imperiled its relationship with USPS and/or that USPS had criticized Defendants for these practices. Proving these issues at a hotly disputed trial by a preponderance of the evidence would likely have been a difficult task, as demonstrated by Defendants' large submission of evidence in connection with their motions to dismiss and clarify suggesting that the USPS explicitly approved of certain of Stamps' practices.

81. Defendants have put forth various theories in support of their position that the alleged statements contained non-material omissions or misrepresentations and that Lead Plaintiff had no damages. From the outset, Lead Counsel and Lead Plaintiff appreciated the unique and significant risks inherent in this Litigation. For example, Defendants claimed that multiple USPS officials have spoken positively about Stamps and the reseller program, and thus even if Lead Plaintiff could show that some USPS officials were unhappy with Stamps' conduct, it would be a mere difference of opinion within the USPS. If Defendants were successful in demonstrating any of the above defenses, Lead Plaintiff would be unable to prove its case, and the Class would recover nothing.

- 26 -

82.    Further, in order to prove its case at trial, Lead Plaintiff expected to rely extensively on several expert witnesses for analysis of key issues.  Each expert's testimony would be critical to demonstrating the validity of Lead Plaintiff's claims to the jury, as well as loss causation and damages, and the conclusions of each expert would be hotly contested at trial.  Thus, Lead Plaintiff's case was particularly susceptible to a danger inherent in reliance on expert witness testimony, namely that the experts will be subject to a *Daubert* challenge.  If, for some reason, the Court determined that even one of Lead Plaintiff's experts should be excluded from testifying at trial, Lead Plaintiff's case would become much more difficult to prove.

83.    Even assuming none of Lead Plaintiff's experts were excluded, their testimony would concern complex issues concerning business, economics and damages.  Even with highly respected experts, there could be no guarantee that Lead Plaintiff would prevail, as Defendants would also likely retain experts to counter Lead Plaintiff's experts' theories.  The trial of this case may have hinged as much on the testimony of experts as on fact witnesses, which always presents a substantial risk of a party prevailing not because of the merits but because of a jury's assessment and impression of one party's expert or experts.

84.    Lead Plaintiff also faced risks with respect to causation and damages at trial.  As signaled at the motion to dismiss stage, Defendants have been prepared to argue to the jury that Lead Plaintiff could not prove damages because the failed renewal of Stamps' incentive agreement and potential changes to the reseller program were a result of shifting internal priorities at the USPS and thus could not have revealed that Stamps was misusing the USPS programs.  Defendants would have further argued that Lead Plaintiff's damages methodology is inherently unreliable because it fails to take into account other causes of Lead Plaintiff's claimed losses.  Defendants further would have argued that damages are zero or, at best, significantly less than Lead Plaintiff had estimated.  For example, Defendants have asserted that the alleged misstatements were fully corrected prior to the first

- 27 -

corrective disclosure, and thus preclude all damages, or at a minimum, were fully corrected by the February 21, 2019 disclosure, eliminating damages related to the May 8, 2019 corrective disclosure. While Lead Counsel believes it and its expert(s) would have overcome these arguments or defenses, there is certainly no assurance that the jury would agree with Lead Plaintiff's arguments.

85. Although Lead Counsel believes Lead Plaintiff has a strong case and would ultimately prevail on the merits at trial, it cannot be known how a jury would react to the various arguments and evidence presented by the parties.

86. Given the complex and multifaceted nature of the issues in the case, trial of this Litigation would be extremely complex and likely take weeks to complete. Then, it was also likely that Defendants would file post-trial motions and appeals to limit or overturn any verdict in Lead Plaintiff's favor. The post-trial motion and appeals process would likely span several years, during which time the Class would receive no payment. In addition, an appeal of any verdict would carry with it the risk of reversal, in which case the Class would receive no payment despite having prevailed on the claims at trial.

87. In summary, while Lead Counsel had developed strong documentary evidence which it expected to lead to favorable testimony and expert opinion, it faced both factual and legal challenges in presenting this matter to a jury and potentially on appeal. Based on all these factors, as well as the extensive experience of Lead Counsel in the litigation of securities class actions, Lead Counsel submits that the Settlement, which provides a very substantial recovery to Class Members, is far more beneficial than any of the realistic alternatives offered by continued litigation, and is, therefore, fair, reasonable and adequate.

88. Through very extensive negotiations, the parties compromised their differences and reached the agreement set forth in the Stipulation. In view of the $100,000,000 all-cash settlement that has been recovered for the Class, the sharply contested factual and legal issues (both as to liability and damages), and the

- 28 -

4880-5371-6740.v2

uncertainties and enormous costs and delays inherent in continuing the Litigation, Lead Counsel believes that the recovery amount provided by the Settlement constitutes an exceptional result and is in the best interests of Class Members.

## IV. NATURE AND ADEQUACY OF THE SETTLEMENT

89. The proposed Settlement was the result of arm's-length negotiation between zealous advocates on both sides, and could not have been reached without the substantial participation and assistance of a strong mediator with extensive experience in negotiating resolution of actions of this type. In the estimation of Lead Counsel, the compromise embodied in the Stipulation with Defendants represents a successful resolution of a complex and risky class action. We believe that our reputation as attorneys who will zealously prosecute a meritorious case through the trial and appellate levels, as well as our aggressive litigation of this case, put us in a strong position in settlement negotiations with Defendants.

90. Set forth below is a description of the discussions leading up to the Settlement, and a description of the significant terms of the Settlement.

### A. History of Settlement Negotiations

91. Settlement discussions occurred during the pendency of the Litigation, including at two formal mediation sessions with the Honorable Daniel Weinstein, retired, which occurred on December 1, 2020 and March 23, 2021. The parties also had numerous less-formal settlement communications, including communications between counsel (both in person and by phone and e-mail), as well as communications with and through the mediator. Robbins Geller has extensive experience in litigating and resolving complex cases in both federal and state courts. Members of Lead Plaintiff's trial team, including other Robbins Geller attorneys, and in-house and outside experts participated in or were consulted about settlement discussions, bringing substantial additional experience and insight to understanding the risks of litigation and the adequacy of Defendants' proposals to resolve the case.

- 29 -

4880-5371-6740.v2

The lead negotiators on the defense side had similar substantial experience in complex litigation, and included attorneys at Katten Muchin Rosenman LLP.

92. The parties remained far apart in their respective assessments of the strengths and weaknesses of the case during the initial mediation session, and no settlement was reached. Nevertheless, they agreed to further explore settlement at a second mediation session. Although the parties did not immediately settle, these mediations set the ground work for reaching an agreement. In particular, through the parties' settlement communications, as well as during the prosecution and defense of this case, each party obtained a solid understanding of their opponent's case, and as a result gained a better appreciation of the strengths and weaknesses of their own case.

93. Prior to the first mediation session with Judge Weinstein, the parties exchanged detailed mediation statements, accompanied by substantial evidentiary support, explaining their positions to the mediator. Then, at the mediations, both sides responded to the other sides' mediation statement and pointed questions posed by the mediator, which further detailed the strengths and weaknesses of their respective cases. During these negotiations, Lead Counsel zealously advanced Lead Plaintiff's position and was fully prepared to try this case to a jury rather than accept a settlement that was not in the best interests of the Class. Likewise, Defendants, through their counsel, zealously advanced their position and were fully prepared to continue to prepare for trial rather than accept a settlement that was not in their best interests.

94. The parties drafted, finalized and signed the formal settlement agreement detailing the terms of the proposed Settlement, which was submitted to the Court with the Motion for Preliminary Approval filed on August 16, 2021. ECF Nos. 193, 196.

4880-5371-6740.v2

95.    On October 14, 2021, the Court granted preliminary approval of the Settlement as well as the form and manner of notice of the Settlement to the Class. ECF No. 199.

**B.    The Settlement Is in the Best Interests of the Class and Warrants Approval**

96.    Lead Plaintiff believes it could have prevailed on the merits of the case. Defendants were just as adamant that the claims would fail.  There was a very real risk, as discussed in detail above, that the Class would not prevail at trial.  Had Lead Plaintiff's case successfully reached trial, the Class faced the risk that the Court would find Defendants' statements non-actionable or a jury would not be convinced that Defendants' statements were misleading, material or that they caused Lead Plaintiff's losses.  There was also the risk that the jury would reduce the damages awarded for the reasons described above.  Furthermore, even if Lead Plaintiff prevailed at trial, there was a significant risk that any recovery would be delayed by post-trial proceedings and appeals.

97.    Having considered the foregoing, and evaluating Defendants' likely defenses at trial, it is the informed judgment of Lead Counsel, based upon all the proceedings to date and its extensive experience in litigating shareholder class actions, that the proposed settlement of this matter before the Court upon a payment of $100,000,000 in exchange for a mutual release of all claims, and on the other terms set forth in the Stipulation, provides fair, reasonable and adequate consideration and is in the best interests of the Class.

**C.    The Plan of Allocation**

98.    The straightforward Plan of Allocation, set forth in the Notice, was developed in consultation with Lead Plaintiff's damages expert and is premised on the out-of-pocket measure of damages and is designed to measure the difference between what Class Members paid for Stamps common stock during the May 3, 2017 to May 8, 2019, inclusive, Class Period and what the price of Stamps stock

- 31 -

4880-5371-6740.v2

would have been had the misleading information about Stamps' business practices and its relationship with the USPS been disclosed.  The Plan of Allocation provides that a Class Member will be eligible to participate in the pro-rata distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her, or its transactions in Stamps common stock during the Class Period.

**D.**  **Lead Counsel's Application for Attorneys' Fees and Expenses Is Reasonable**

99.  The successful prosecution of this action required Lead Counsel and its paraprofessionals to perform more than 7,500 hours of work and incur $526,792.79 in expenses.  *See* Declaration of Eric I. Niehaus Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."), Exs. A-B, submitted herewith.  Based on the extensive efforts on behalf of the Class, as described above, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis, and has requested a fee in the amount of 16.75% of the Settlement Amount, plus interest.

**1.**  **The Requested Fee Is Reasonable**

100.  In light of the nature and extent of the Litigation, the diligent prosecution of the action, the complexity of the factual and legal issues presented, and the other factors described above and in the accompanying application for attorneys' fees and expenses, Lead Counsel believes that the requested fee of 16.75% of the Settlement Amount, plus interest, is fair and reasonable.

101.  A 16.75% fee award is on the low end of the range of percentages awarded by courts in this District and around the country, and is justified by Lead Counsel's efforts and the result achieved on behalf of the Class, the specific facts and circumstances in this case and the substantial risks that Lead Counsel faced in litigating the action.

- 32 -

## 2. The Requested Fee Is Supported by the Lead Plaintiff

102. Lead Plaintiff actively monitored the Litigation and consulted with counsel during the course of settlement negotiations. Lead Plaintiff spent considerable time and effort fulfilling its duties and responsibilities in this case, including answering discovery requests, reviewing documents, producing documents, sitting for deposition and consulting with counsel concerning the merits of this Litigation.

103. As reflected in the accompanying Declaration of Jeffrey M. Gill, on behalf of Lead Plaintiff Indiana Public Retirement System, Lead Plaintiff had approved the fee request before it was submitted to the Court, believes the requested fee is fair and reasonable in light of the result achieved, and supports the award of Lead Counsel's requested fee.

## 3. The Requested Fee Is Supported by the Effort Expended and Results Achieved

104. As set forth herein, the $100,000,000 cash Settlement was achieved as a result of extensive and creative prosecutorial and investigative efforts, contentious and complicated motions practice, hard-fought discovery, analysis of voluminous evidence and preparation for trial, as detailed herein.

105. As discussed in greater detail above, this case was fraught with significant risks concerning liability and damages. Lead Plaintiff's success was by no means assured. Defendants disputed whether the alleged misstatements were even actionable, disputed that the alleged misstatements were false and misleading, and attributed the harm to factors unrelated to the alleged misstatements. Were this Settlement not achieved, and even if Lead Plaintiff prevailed at trial, Lead Plaintiff potentially faced years of costly and risky appellate litigation, with ultimate success far from certain. It is also possible that a jury could have found no liability or no damages.

- 33 -

4880-5371-6740.v2

106.  As a result of this Settlement, thousands of Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.  These factors also support Lead Counsel's request for an award of attorneys' fees of 16.75% of the Settlement Amount, plus interest.

### 4.  The Risk of Contingent Class Action Litigation Supports the Requested Fee Award

107.  As set forth in the accompanying application for attorneys' fees and expenses, a determination of a fair fee should include consideration of the contingent nature of the fee, the financial burden carried by Lead Counsel, and the difficulties that were overcome in obtaining the Settlement.

108.  This action was prosecuted by Lead Counsel on a contingency fee basis. Lead Counsel committed over 7,500 hours of attorney and paraprofessional time and incurred $526,792.79 in expenses in the prosecution of the Litigation, as set forth in the accompanying Robbins Geller Declaration.  Lead Counsel fully assumed the risk of an unsuccessful result.  Lead Counsel has received no compensation for its services during the course of this Litigation and has incurred very significant expenses in litigating for the benefit of the Class.  Any fees or expenses awarded to Lead Counsel have always been at risk and are completely contingent on the result achieved.  Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

109.  Lead Counsel's efforts were performed on a wholly contingent basis, despite significant risk and in the face of determined opposition.  Under these circumstances, Lead Counsel is justly entitled to the award of a reasonable percentage fee based on the benefit conferred and the common fund obtained for the

- 34 -

4880-5371-6740.v2

Class.  A 16.75% fee, plus expenses, is fair and reasonable under the circumstances present here.

110.   There are numerous cases, including many handled by Robbins Geller, in which class counsel in contingency fee cases such as this, after expenditure of thousands of hours of time and incurring significant costs, have received no compensation whatsoever.  Class counsel who litigate cases in good faith and receive no fees whatsoever are often the most diligent members of the plaintiffs' bar.  The fact that Defendants and their counsel know that the leading members of the plaintiffs' bar are able to, and will, go to trial even in high-risk cases like this one gives rise to meaningful settlements in actions such as this.  The losses suffered by class counsel in other actions where insubstantial settlement offers were rejected, and where class counsel ultimately received little or no fee, should not be ignored.  Lead Counsel knows from personal experience that despite the most vigorous and competent of efforts, success in contingent litigation is never assured.

111.   Lawsuits such as this are expensive to litigate.  Those unfamiliar with the efforts required to litigate class actions often focus on the aggregate fees awarded at the end but ignore the fact that those fees fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal and state authorities, are used to fund the expenses of other contingent cases prosecuted by class counsel, and help pay the monthly salaries of the firms' attorneys and staff.

## V.   CONCLUSION

112.   For all of the foregoing reasons, Lead Counsel respectfully requests that the Court approve the Settlement and Plan of Allocation, award Lead Counsel 16.75% of the Settlement Amount and $526,792.79 in expenses, plus the interest earned on both amounts at the same rate and for the same period as that earned on

4880-5371-6740.v2

the Settlement Fund until paid, and approve the award of $9,150 to the Lead Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4).

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 20, 2021, at San Diego, California.

s/ ERIC I. NIEHAUS
ERIC I. NIEHAUS

- 36 -

4880-5371-6740.v2

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 20, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ ERIC I. NIEHAUS
ERIC I. NIEHAUS

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  ericn@rgrdlaw.com

-37-

# Mailing Information for a Case 2:19 cv 01828 MWF SK Matt Karinski v. Stamps.com, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christina Lucen Costley**
  christina.costley@katten.com,marsha.davis@katten.com,courtalertlax@katten.com

- **Jason A Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com,rswartz@scott-scott.com,edewan@scott-scott.com,dcolonna@scott-scott.com,tlaughlin@scott-scott.com,efile@scott-scott.com

- **Adam C McCall**
  amccall@zlk.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Eric Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.com,lobas@pomlaw.c

- **Steven W Pepich**
  stevep@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Jonathan A. Rotenberg**
  jonathan.rotenberg@katten.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kevin S Sciarani**
  ksciarani@rgrdlaw.com,KSciarani@ecf.courtdrive.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Hillary B. Stakem**
  hstakem@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Paul Satoshi Yong**
  paul.yong@katten.com,paula.phillips@katten.com,courtalertlax@katten.com

- **Richard H. Zelichov**
  richard.zelichov@katten.com,marsha.davis@katten.com,courtalertlax@katten.com,carrie.stickel@katten.com,jonathan.rotenberg@katten.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

-38-